IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| 600 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20580 | ) | |
|  | ) | |
| Petitioner, | ) | |
|  | ) | |
| v. | ) | Misc. No. |
|  | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC. , | ) | |
| 622 Broadway | ) | |
| New York, NY 10012 | ) | |
|  | ) | |
| Respondent. | ) | |

_____ )

**EMERGENCY PETITION OF THE
FEDERAL TRADE COMMISSION FOR AN ORDER ENFORCING A
SUBPOENA *DUCES TECUM* AND A CIVIL INVESTIGATIVE DEMAND
ISSUED IN A PRE-MERGER INVESTIGATION**

**PRELIMINARY STATEMENT**

The Federal Trade Commission ("Commission") petitions this Court, pursuant to

Sections 9, 16, and 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 49, 56,

57b-1, and 28 U.S.C. § 1367, for an order requiring respondent, Take-Two Interactive Software,

Inc. ("Take-Two"), to produce documents in accordance with a Commission administrative

Subpoena *duces tecum* and to respond to written interrogatories in accordance with a

Commission Civil Investigative Demand ("CID").  Both the Subpoena and the CID were issued

as part of a pre-merger investigation that seeks to determine whether the proposed acquisition of

Take-Two by Electronic Arts Inc. ("EA") (the "proposed transaction") would violate Section 7

of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45.

This petition is filed on an emergency basis because EA has announced it intends to

consummate the transaction on 45 days notice to the Commission.[1]  Since EA fully controls

when it will provide such notice, the Commission must be prepared to determine whether the

proposed transaction is anticompetitive and, if necessary, go into court to challenge it on a very

abbreviated schedule over which it has, at most, very limited control.  As a result, time of the

essence in the Court's resolution of this petition.  The Subpoena and CID, along with their May

9 return date, specifically were designed to require Take-Two to promptly produce documents to

Commission staff.  This would permit staff to analyze these documents, to use them to prepare

for investigational hearings of Take-Two officials, and to complete these investigational

hearings with sufficient time for the Commission to evaluate the competitive effects of the

proposed transaction and thus decide whether to challenge the transaction prior to it being

consummated within the abbreviated schedule that EA will set in motion.  Any delay in the

resolution of this petition force the Commission to make its pre-consummation assessment of the

proposed transaction based upon incomplete information.  Further, if the Commission were

forced by Take-Two's non-compliance to defer full evaluation of the proposed transaction until

after it is consummated, further harm may result because it usually is far more difficult for the

Commission to obtain effective relief after a merger has closed.

The Commission, therefore, requests that this Court expeditiously issue an Order to Show

Cause against Take-Two and schedule a hearing thereon as soon as practicable, and preferably

no later than fourteen (14) calendar days of the filing of this petition.[2]  Further, the Commission

---

[1]In fact, EA could close the transaction on as little as 10 days notice to the Commission.
16 C.F.R. § 803.10(b).

[2]Counsel for Take-Two, Stephen Axinn, is aware that the Commission is filing this
petition and, at Mr. Axinn's request, Commission staff is sending a courtesy copy of this petition
and all related papers to counsel via email.

requests that Take-Two's opposition to the petition (if any) be due within seven (7) calendar days of the date of entry of the Show Cause Order and the Commission's reply (if any), be due three (3) calendar days after the filing of Take-Two's opposition.  Should the Court issue an Order granting the petition, the Commission requests that Take-Two be ordered to produce to the Commission: (a) within three (3) calendar days of the date of entry of the Order, (i) the information responsive to the eight categories of prioritized information agreed to by Take-Two and the Commission on May 7, 2008, and (ii) narrative responses to the interrogatories contained in the Commission's CID; and (b) within seven (7) calendar days of the date of entry of the Order, the remainder of the documents responsive to the specifications contained in the Subpoena.

In support of this petition, the Commission alleges the following:

1.    The Commission is an administrative agency of the United States government, organized and existing pursuant to the FTC Act, 15 U.S.C. § 41 et seq.  The Commission is authorized and directed by Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), to prohibit unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce, and to enforce the federal antitrust laws, including § 7 of the Clayton Act, 15 U.S.C. § 18.  (Petition Exhibit ("Pet. Exh.") 1, ¶ 3).

3.    Take-Two is a video game software developer and manufacturer that maintains its principal place of business at 622 Broadway, New York, NY 10012.  Take-Two is engaged in, and its business affects, "commerce" as that term is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.  Through the sales of its video games, Take-Two engages in commerce throughout the country, including in this district.  (Pet. Exh.1, ¶ 4).

4.    On March 13, 2008, EA initiated a hostile cash tender offer to purchase the stock

3

of Take-Two.  This offer expires on June 16, 2008.  If the offer is accepted, Take-Two's

shareholders will receive approximately $2.1 billion in cash.  (Pet. Exh. 1, ¶ 5).  EA and Take-

Two publish video game titles within overlapping genres, including the sports genre.  In

particular, historically EA and Take-Two have sold competing titles for simulated sports games,

including basketball, football, hockey, and baseball.  (*Id*. at ¶ 6).

     5.     Sections 9, 20(e) and (h) of the FTC Act, 15 U.S.C. § 49 and 57b-1(e) and (h),

empowers the Commission to require by Subpoena the production of documentary and by CID -

to obtain responses to written interrogatories.  These provisions also authorize the Commission

to seek enforcement of this compulsory process in any United States District Court where the

person "resides, is found, or transacts business."  Along with Fed. R. Civ. P. 81(a)(5) and 28

U.S.C. § 1367, these provisions provide this Court with jurisdiction and venue over this

proceeding.

     6.     The Declaration of Reid Horwitz, which verifies the allegations of this petition, is

attached hereto as Pet. Exh. 1.  Additional exhibits attached to this Petition are:

| | |
|---|---|
| Pet. Exh. 2 | Subpoena *duces tecum* to Take-Two, April 21, 2008 (includes a copy of the Commission's April 17, 2008,  Resolution Directing Use of Compulsory Process in Nonpublic Investigation); |
| Pet. Exh. 3 | Civil Investigative Demand to Take-Two, April 21, 2008 (includes a copy of the Commission's April 17, 2008,  Resolution Directing Use of Compulsory Process in Nonpublic Investigation); |
| Pet. Exh. 4 | Slip opinion in *FTC v. Tarriff,* No. 1:08-Misc-217-RCL (D.D.C. Jun. 2, 2008); |
| Pet. Exh. 5 | May 8, 2008, letter to Stephen Axinn from Commission Staff; |
| Pet. Exh. 6 | May 15, 2008, letter to Stephen Axinn from Commission Staff; |
| Pet. Exh, 7 | June 4, 2008, letter to Stephen Axinn from Commission Staff. |

7.      On April 16, 2008, the Commission issued Requests for Additional Information about the proposed transaction to both Take-Two and EA pursuant the Hart Scott Rodino ("HSR") Act, 15 U.S.C. § 18(e)(1) ("HSR second requests").  (Pet. Exh. 1, ¶7).

8.      On April 17, 2008, the Commission passed a Resolution Directing Use of Compulsory Process in Nonpublic Investigation.  This resolution authorized the use of compulsory process to investigate whether the proposed transaction between EA and Take-Two is in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, or Section 7 of the Clayton Act, 15 U.S.C. § 18.  (resolution is the last page of both Pet. Exhs. 2 and 3).

9.      On April 21, 2008, the Commission issued its Subpoena and CID.  Both had a return date of May 9, 2008.  (Pet. Exh. 1, ¶7).  The Subpoena contains 29 document production specifications.  (Pet. Exh. 2).  The CID contains 27 interrogatories.  (Pet. Exh. 3).  Together, this compulsory process constitutes a substantial subset of the Commission's April 16, 2008, HSR second request to Take-Two.  (Pet. Exh. 1, ¶8).

10.      The Commission issued the Subpoena and CID in addition to the HSR second request because, for cash tender offers, the HSR creates an abbreviated schedule for cash tender offers.  15 U.S.C. §§ 18a(b)(1)(A) and (B); 16 C.F.R. § 803.10(b).  This schedule is triggered solely by certification by the prospective purchaser (here EA) that it has substantially complied with its HSR second request, *id*., and EA has announced it intends to consummate the transaction on 45 days after such certification.  *See* http://www.reuters.com/article/technologyNews/idUSN0435662420080604.  Since EA fully determines when it will provide such certification, the Commission must be prepared to determine whether the proposed transaction is anticompetitive and, if necessary, go into court to challenge it on a very abbreviated schedule over which it has, at most, very limited control.  The

5

Subpoena and CID, along with their May 9 return date, specifically were designed to require Take-Two to promptly produce documents to Commission staff. This would permit staff to analyze these documents, to use them to prepare for investigational hearings of Take-Two officials, and to complete these investigational hearings with sufficient time for the Commission to evaluate the competitive effects of the proposed transaction and thus decide whether to challenge the transaction prior to it being consummated within the abbreviated schedule that EA will set in motion. (Pet. Exh. 1, ¶¶9-11).

11.    As ¶ 10 demonstrates, time is of the essence for the resolution on this petition given the 45 day notice period that will be triggered solely by the action of EA and the substantial work that the Commission must complete prior to the expiration of this 45 day period. The Commission, therefore, requests that this petition be heard and resolved on an emergency basis.

12.    On April 25 and May 7, 2008, successive counsel for Take-Two entered into agreements with Commission staff that would have provided the agency with documents from a targeted group of employees potentially possessing key information to the Commission's investigation. This information likely would have contributed significantly to the Commission's market analysis which will control the outcome of this investigation. Moreover, either agreement would have helped to assure that the Commission promptly would receive these documents on an expedited basis. As indicated in ¶ 10, expedited production was (and remains) critical to the Commission. Further, if Take-Two's initial productions under either agreement had provided substantial information for the Commission to assess the proposed transaction, this could have served as a basis for narrowing what the Commission would consider to be a satisfactory response to the Subpoena and CID. Thus, by reneging on both of these agreements

Take-Two foreclosed itself from the possibility of significantly reducing its burden of coming into compliance with the Commission's compulsory process. (Pet. Exh. 1, ¶¶12-13 and 16-18). As part of the May 7 agreement, the Commission extended the May 9 return date for its compulsory process to May 16, 2008. (Pet. Exh.1, ¶17).

13      Within a short period of time after  entering into the April 25 and then the May 7 agreements, Take-Two's counsel informed the Commission that Take-Two was wholly reneging on the agreement. (Pet. Exh. 1, ¶¶15 and 19).

14.     On May 15, 2008, after Take-Two reneged on the May 7 agreement, counsel for Take-Two and Commission staff reached an interim agreement that solely served to delay the Commission from commencing an enforcement proceeding to compel compliance with the Subpoena and CID until at least May 22, 2008. In return for this forebearance by the Commission, Take-Two agreed to conduct promptly a very limited review of the files of three Take-Two officials. (Pet. Exh. 1, ¶21; Pet. Exh. 6). This interim agreement did *not*, however, extend the return date for the Subpoena and CID beyond May 16, 2008. (Pet. Exh. 1, ¶21).

15.     On June 2, 2008, counsel for Take-Two informed Commission staff that Take-Two would not voluntarily fully comply with the Subpoena or CID. At most, Take-Two represented that it would conduct a limited review of the files of three additional Take-Two officials and ambiguously promised that it would possibly consider searching unspecified files for unidentified individuals at an undetermined time. (Pet. Exh. 1, ¶¶ 29-30).

16.     In sum, while the May 16, 2008, return date for both the Subpoena and CID has run, as its own counsel admits, Take-Two is not in compliance with the Subpoena and CID and, absent an Order by this Court order, never will be.

17.     When a party has any legal or factual objections to compulsory process issued by

7

the Commission, a long standing Commission Rule requires that all such objections initially be raised with the Commission through a petition to limit or quash the process filed with the Commission's Secretary.  16 C.F.R. § 2.7(d).  Such a petition must be filed within the earlier of twenty days of service of process or the return date.  *Id.*  Take-Two has utterly failed to file such a petition, timely or otherwise.  (Pet. Exh. 1, ¶33).

18.    The Subpoena and CID issued to Take-Two are within the Commission's statutory authority, proper procedures were followed, and the information sought is reasonably related to the Commission's investigation of the proposed acquisition of Take-Two by EA. Take-Two is barred from asserting any objections before this Court that it otherwise may have been able to raise because it failed to raise them in the first instance with the Commission and, therefore, failed to exhaust its administrative remedies.  Further delays in the Commission's investigation caused by Take-Two's failure to comply are contrary to the public interest. Therefore, the Subpoena and CID should be enforced in full.

19.    No previous application for the relief sought herein has been made to this or any other court.

WHEREFORE, the Commission invokes the aid of this Court and prays:

a.    That this Court expeditiously enter an Order to Show Cause directing Take-Two to explain why it should not be required to comply with the Subpoena and CID, conduct a hearing on this petition within fourteen (14) days of the filing of the petition, and then make a prompt determination by this Court of Take-Two's obligation to comply with the Subpoena and CID;

b.    That following a determination that Take-Two must comply with the Subpoena and CID, that this Court enter an Order requiring that Take-Two produce to the

Commission:

     (1)    Within three (3) calendar days of the date of entry of the Order,

          (a) the information responsive to the eight categories of prioritized

          information agreed to by Take-Two and the Commission on May 7, 2008,

          as set forth in Pet. Exh. 5, and

          (b) narrative responses to the interrogatories contained in the

          Commission's CID; and

     (2)    Within seven (7) calendar days of the date of entry of the Order, the

remainder of the documents responsive to the specifications contained in the

Subpoena; and

   c.    That this Court provide such other relief as it deems just and proper.

                 Respectfully submitted,

                 WILLIAM BLUMENTHAL
                 General Counsel

                 JOHN F. DALY
                 Deputy General Counsel - Litigation

                 _____/S/_____
                 JOHN ANDREW SINGER
                 Attorneys for Petitioner
                 Federal Trade Commission
                 600 Pennsylvania Ave., N.W.
                 Washington, D.C. 20580
                 (202) 326-3234
                 Fax (202) 326-2477
                 Email: jsinger@ftc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August, 2008, I served a copy of the foregoing

Petition, Memorandum in support thereof, Declaration of Reid B. Horwitz, proposed Order to

Show Cause, and proposed Order to compel via Federal Express and email on the following:

> Stephen M. Axinn, Esq.
> Axinn, Veltrop & Harkrider
> 114 West 47th Street
> New York, NY 10036
> sma@avhlaw.com

_____/S/_____
JOHN ANDREW SINGER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Misc. No. |
| | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC. , | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## DECLARATION OF REID B. HORWITZ

Reid B. Horwitz states and declares as follows:

1.      I am an attorney employed in Washington, D.C., by the Mergers II Division in the Bureau of Competition of the Federal Trade Commission ("Commission"), and am authorized to execute this declaration.  I am the attorney leading the Commission's investigation concerning the proposed acquisition of Take-Two Interactive Software, Inc. ("Take-Two") by Electronic Arts Inc. ("EA") through a hostile cash tender offer (the "proposed transaction").

2.      I have reviewed all of the exhibits attached to the Petition of the Federal Trade Commission for an Order Enforcing a Subpoena *duces tecum* and a Civil Investigative Demand ("CID") and can verify that all of these exhibits are true and correct copies of documents contained in the Commission's files.

3.      The Commission is an administrative agency of the United States government, organized and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*.  The Commission is authorized and directed by Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, to determine if acquisitions such as the

proposed transaction may substantially lessen competition. The Commission must conclude its investigation within the statutory time allowed by Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Section 7A of the Clayton Act, 15 U.S.C. § 18a ("HSR Act"), in order to seek preliminary injunctive relief before the expiration of the premerger notice and waiting period under the HSR Act if the Commission has reason to believe such relief is warranted.

4.     It is my understanding that Take-Two is a video game software developer and manufacturer that maintains its principal place of business at 622 Broadway, New York, NY 10012. It is my further understanding that through the sales of its video games Take-Two engages in commerce throughout the country, including in the District of Columbia

5.     It is my understanding that EA initiated a hostile cash tender offer to purchase the stock of Take-Two on or about March 13, 2008. It is my further understanding that the deadline for this offer has been extended through June 16, 2008, and that if the offer is accepted, Take-Two's shareholders will receive approximately $2.1 billion in cash.

6.     EA and Take-Two publish video game titles within overlapping genres, including the sports genre. In particular, historically EA and Take-Two sell competing titles for simulated sports games, including basketball, football, hockey, and baseball.

7.     On April 16, 2008, the Commission issued requests for additional information ("HSR second requests") about the proposed transaction to both Take-Two and EA pursuant to the HSR Act. On April 21, the Commission issued a Subpoena and CID to Take-Two, setting a May 9, 2008, return date for both.

8.     The Subpoena and CID complement the Commission's HSR second request to Take-Two since this compulsory process requires the production of a substantial subset of

2

information and documents sought by the HSR second request.  Both the Subpoena and the CID were issued pursuant to a resolution passed by the Commission and were signed by a Commissioner.  The Subpoena and CID, including a copy of the authorizing resolution, are attached to the petition as Pet. Exh. 1 and 2.  After being issued, it is my understanding that both the Subpoena and CID were served by the Commission's Office of the Secretary.

9.     The Subpoena and CID, along with their May 9 return date, specifically were designed to require Take-Two to promptly produce documents to Commission staff.  This is critical because EA has announced that it intends to consummate the transaction 45 days after it certifies substantial compliance with its HSR obligations. *See* http://www.reuters.com/article/technologyNews/idUSN0435662420080604.  Since EA controls when it will provide such certification, the Commission must be prepared to determine whether the proposed transaction is anticompetitive and, if necessary, go into court to challenge it on a very abbreviated schedule over which it has, at most, very limited control.  Prior to the expiration of this 45 day period, therefore, Commission staff must receive Take-Two's documents, analyze them, use them to prepare for investigational hearings of Take-Two officials, and complete these investigational hearings with sufficient time for the Commission to evaluate the competitive effects of the proposed transaction.

10.     The purpose of any HSR second request investigation is two-fold: (1) to gather sufficient information for the Commission to use internally to determine whether it has reason to believe the transaction poses a competitive concern; and (2) to collect evidence sufficient to support a government enforcement action, if one should prove necessary, to enjoin the consummation of the merger pending the Commission's adjudication of the underlying merits of the transaction in an administrative trial.  The collection of such information and evidence

3

routinely involves reviewing documents and taking the testimony of corporate officials of the potentially merging parties, including those of the highest rank within the company, about the competitive dynamics of the market(s) potentially impacted by the transaction under review. The government ordinarily seeks injunctive relief before a federal court and presents its evidence prior to the expiration of the HSR Act premerger notice and waiting period due to the difficulty of obtaining meaningful relief after the consummation of the merger.

11.    As a result, time is of the essence in collecting the documents and information sought from Take-Two through the Subpoena and CID, and using such documents and information, as is routinely the case in HSR second request investigations, as the basis for conducting investigational hearings of knowledgeable corporate officials of Take-Two. This information – including testimony by the highest ranking officials within the prospective merger partners – about the competitive dynamics of the video game industry will be used by the Commission to discharge its statutory obligation to determine whether a proposed transaction is likely to substantially lessen competition and, accordingly, whether to challenge the proposed transaction.

The April 25 Agreement and Take-Two's Breach

12.    It was within this context that my agency colleagues and I held a series of discussions with Take-Two's counsel for the purpose of expediting the company's response to at least certain portions of the Subpoena. Those discussions began on April 22, 2008, when I spoke with Alicia Batts, a member of the Proskauer Rose LLP law firm, who then represented Take-Two. On April 23, Ms. Batts and I discussed Take-Two's request to relax the May 9, 2008, return date for the Subpoena and CID in return for Take-Two's agreement to provide responsive documents from the files of a limited number of Take-Two officials on an expedited rolling basis

4

that would constitute an initial submission.  In a follow-up conversation on April 24, I proposed specific officials whose files would be included in that initial submission.

13.     On April 25, Ms. Batts counter-proposed producing responsive documents from the files of a largely different group of Take-Two officials, whose files she represented would better assist the Commission in gaining an early insight into the competitive dynamics of competition within the video game industry.  Ms. Batts stated that the search of these files would begin within several days, and that the Commission could expect to begin receiving documents shortly thereafter.  The Commission accepted this counter-proposal, reserving the right to suggest the addition of a few individuals to the group of officials whose files would be produced in that initial submission.  Though not within the scope of the Subpoena or CID, I also understood that Take-Two was willing to produce these same corporate officials for early investigational hearings.

14.     During the week of April 28, 2008, it is my understanding that another Commission attorney, Eric Elmore, repeatedly attempted to speak to Ms. Batts to discuss remaining compliance issues, including a revised due date for full compliance.  It is my understanding that Ms. Batts declined these repeated offers to confer.  No documents were produced by Take-Two to the Commission during that week or the previous week other than a handful of documents relating to Take-Two's All Pro Football title that had been informally requested prior to April 16, and some organization charts.

15.     On May 5, 2008, I received a telephone call from Stephen Axinn of Axinn, Veltrop & Harkrider LLP, who informed me that his firm was now assisting Proskauer Rose in its representation of Take-Two before the Commission.  Mr. Axinn proposed meeting with counsel for the Commission on May 7 to discuss compliance with the Subpoena and CID.  On

May 7, 2008, several agency colleagues and I met with Mr. Axinn. At that meeting, Mr. Axinn

stated that Take-Two would not produce any additional documents pursuant to the agreement

entered into by Take-Two on April 25 through Ms. Batts.

<u>The May 7 Agreement and Take-Two's Breach</u>

16.    At our meeting on May 7, Mr. Axinn proposed that Commission staff could better

advance its investigation by adopting an approach that focused on specific categories of

documents or data rather than on systematic searches of the files of specific Take-Two corporate

officials. Mr. Axinn suggested that the Commission identify such categories of documents and

data and then Take-Two would quickly gather and produce these materials as its first phase

response to the Subpoena and CID. These documents, according to Mr. Axinn, would come

from the files of 15 custodians whose files Take-Two had already collected. Mr. Axinn

represented that, in the four days since he had been retained by Take-Two, he had hired a

substantial number (40) of contract attorneys to expedite document review. He further

represented that Take-Two was prepared to produce some of the responsive materials within a

few days and a significant portion of the balance of the first phase no later than May 16. He then

suggested that during or after completing its review of Take-Two's first phase responses,

Commission staff could identify additional documents or data that it wanted Take-Two to

produce as the next phase. Mr. Axinn envisioned this iterative process continuing until the

Commission staff had either completed or saw no reason to continue its investigation, or Take-

Two had substantially complied with the Subpoena and CID (and HSR second request). He also

indicated Take-Two's willingness to make key individuals available for investigational hearings.

17.    Commission staff accepted Mr. Axinn's proposal during the May 7 meeting and

then confirmed the agreement in a May 8, 2008, letter to Mr. Axinn from Mr. Elmore and a

Commission Bureau of Competition Assistant Director, Catharine Moscatelli (appended hereto as Pet. Exh. 5). The letter identifies the nine categories of documents and data that Take-Two and Commission staff agreed would make up the first phase. Wholly based upon this agreement, Commission staff agreed to extend Take-Two's compliance deadline for one week, from May 9 to May 16, 2008, for both the Subpoena and CID. Staff further indicated that it was prepared to extend Take-Two's return date further if the company demonstrated its good faith by starting production of the first phase of responsive materials during the week of May 5, and significantly expanding this production during the week of May 12. Commission staff received no immediate objections, corrections or comments concerning its May 8 confirmatory letter.

18.    Commission staff received only two very limited submissions following the May 7 agreement over the next two weeks. On May 9, we received a description of Take-Two's databases and copies of its licensing agreements with the various professional and college sports leagues and associations. On May 14, we received a half box (721 pages) of assorted documents. A number of these documents consisted of pdf versions of spreadsheets. None were produced in native format and, accordingly, there were instances where the documents were illegible either because columns were provided on successive pages without indications as to what was being cross-referenced or because the columns had not been widened sufficiently when their image was recorded so that "#####" rather than numbers were visible. By producing these documents in pdf format, Take-Two violated the express instructions of the CID and Subpoena that required that spreadsheets and powerpoints be produced in their native formats precisely to prevent this problem.

19.    Between May 9 and May 15, 2008, Mr. Axinn's law partner, Michael Keeley, made a series of telephone calls to other agency colleagues and me in which he informed us that

Take-Two would not not comply with the May 7 agreement.   He stated that because the proposed

transaction is a hostile cash tender offer, Take-Two had decided that it was unfair for the

Commission to burden it with the expense and effort that would be required to comply with the

Subpoena and CID (and by extension, the HSR second request).   During this time, Mr. Keeley

requested an indefinite extension on the May 16 return date for the Subpoena and CID.   This

request was not granted.

Take-Two's Third Proposal and Subsequent Retrenchment

20.     It is my understanding that in a May 9 telephone call with Mr. Elmore and Ms.

Victoria Lippincott, another Commission attorney working on this investigation, Mr. Keeley

stated that instead of searching the files of 15 employees for responsive documents, Take-Two

would search the files of only three employees for marketing and pricing documents relating to

basketball and hockey video games, but would include the files of the remaining 12 custodians in

its search for documents responsive to the other eight categories identified on May 7.

21.     On May 15, 2008, Mr. Axinn contacted me by telephone to state that Take-Two no

longer intended to carry through with its latest offer, and instead was going to further narrow the

scope of its search in the first phase to only three employees: David Ismailer, Sarah Anderson,

and Bob Blau.  He further stated that the search of their files would be limited to a subset of the

documents covered by the May 7 agreement.  For example, in the May 7 agreement Take-Two

agreed to conduct a search for marketing and competition documents relating to boxing and

tennis video game titles.  (Pet. Exh. 5, p. 2)   As of May 15, Take-Two stated it would not search

for such documents as part of its first phase of responses.  (Pet Exh. 6)  In a subsequent phone call

that day involving Bureau of Competition Deputy Assistant Director Morris Bloom, me and Mr.

Axinn, Mr. Axinn stated that he would try to complete the production of documents from the files

of Ismailer, Anderson and Blau quickly, but that he could not guarantee he could complete his

review by May 25. Mr. Bloom then informed Mr. Axinn that the Commission staff would not

extend the CID and Subpoena compliance deadline any further, but that the Agency would forego

filing a judicial enforcement action until at least May 22 for purposes of evaluating the

sufficiency of Take-Two's compliance. I sent Mr. Axinn a confirmation letter to this effect that

day, a copy of which is appended as Pet. Exh. 6.

22.     On May 22, 2008, Mr. Keeley represented by letter that Take-Two, through a

third-party litigation support company, had that day begun the electronic production of documents

from the files of Ismailer, Anderson and Blau.

The Commission's Second Phase Search Proposal and Take-Two's Response

23.     On May 27, 2008, to assess the status of Take-Two's compliance with the first

phase of its document submission and to ascertain its intentions with regard to additional phases,

several agency colleagues and I, including Deputy Assistant Director Bloom, spoke by telephone

with Mr. Keeley. Mr. Keeley represented that the production of documents from the files of

Ismailer, Anderson and Blau was not yet complete due to continuing privilege review. When

queried regarding the manner in which the search was being conducted, Mr. Keeley stated that his

firm was reviewing only electronic documents and that he did not intend to review any paper

documents located within the files of these employees. He also indicated that after Take-Two

completed the production of the files from these three employees, it had no present intent to

conduct further searches.

24.     The Commission staff indicated to Mr. Keeley that we expected Take-Two would

search the files of additional employees consistent with Take-Two's commitment to provide a

phased response to the Subpoena and CID. Mr. Keeley responded that he could not commit to

such an undertaking without first consulting his client. He stated that Take-Two was "very reluctant" to review files beyond those of Ismailer, Anderson and Blau because Take-Two considered compliance with the Commission's compulsory process in a hostile cash tender offer situation to be an "undue burden." Mr. Keeley also agreed to consult with his client about producing several Take-Two officials for investigational hearings by Commission staff, with the identification of the specific individuals to be deposed to be determined. We told him that we would contact him the following day to identify those employees whose files we proposed would constitute the next phase of Take-Two's search.

25.    On May 28, my agency colleagues and I again spoke with Mr. Keeley by telephone. He stated that he expected the search of the files of Ismailer, Anderson and Blau would be completed by June 2, although I understand that as of today the production of Ismailer's files is not yet complete. We informed Mr. Keeley that we had identified at least six additional employees whose files should be included in the second phase of Take-Two's response. We stated that these individuals appeared likely to have highly responsive documents by virtue of their titles and positions and we anticipated that they could provide highly useful information during investigational hearings. These employees are: Ben Feder, CEO; Christoph Hartmann, President of 2K Games; Greg Thomas, President, Visual Concepts (the wholly-owned studio that develops many of Take-Two's sports games); Gary Dale, Executive Vice President of Sales; and David Gershik, Vice President of Sales. We also asked for the files of Erik Whiteford, former Vice President of Marketing for 2K Sports. Although it is my understanding that he is no longer employed by Take-Two, we stated that we were under the impression that Take-Two still maintained and could review his files. The files of Feder, Hartmann, Dale, Gershik and Whiteford had been among those on the earliest lists of employees whose files either Ms. Batts

had proposed producing or that I, in April, had requested be included as part of the review process leading to a high priority document production by Take-Two.

26.    Because their names appeared frequently on documents already produced to the Commission, staff further requested that Take-Two provide the titles of three additional individuals: Jason Argent; Evan Drew Smith; and Christopher Snyder. We suggested that depending on what responsibilities they held, the Commission might want to add their files to the second phase search. We also requested that Take-Two expand its search to include documents referring to boxing and tennis video games. Finally, we asked Take-Two to designate the person or persons most familiar with Take-Two's pricing for its sports games, including promotional pricing, and, if this person (or these persons) were not among the search group identified by the Commission, that the documents of such person(s) also be produced in the next phase.

27.    Mr. Keeley indicated that he lacked the authority to make any commitments on behalf of Take-Two regarding the company's willingness to conduct a second phase search without first consulting his client. We reminded him that Take-Two was not in compliance with the Subpoena and CID, that our agreement to forego seeking judicial enforcement of the Commission's compulsory process had expired, and that because time remained of the essence, we needed a response to our proposed second phase of document production by noon on Friday, May 30, 2008, so that we could, if necessary, file this petition with sufficient time to obtain the information sought by Subpoena and CID.

28.    On May 29, at Mr. Keeley's request, the Commission staff agreed to extend Take-Two's deadline for responding to the Commission's May 28 proposal until June 2, because of the personal travel schedule of Mr. Axinn. Also on that day, Mr. Keeley left a voice mail message that, among other things, identified the titles of Argent, Smith and Snyder.

29.     On June 2, several agency colleagues and I conferred with Messrs. Axinn and Keeley by telephone. Mr. Axinn stated that Take-Two would not voluntarily fully comply with the Subpoena or CID.   Instead, Mr. Axinn indicated that, at most, Take-Two would agree to search the files of three additional current or former employees: Dale, Gershik and Whiteford. Any such reviews would be subject only to the limited scope of review set out on May 15, *see* Pet. Exh. 6, not the broader review to which Take-Two agreed on May 8, *see* Pet Exh. 5.

30.     Mr. Axinn stated that Take-Two would not review or produce documents from the files of any employees beyond Ismailer, Anderson, Blau, Dale, Gershik and Whiteford, although it is my understanding that in a subsequent phone call he had with Deputy Assistant Director Bloom he suggested that Take-Two might at some later point in time be willing to produce some set of files from some unspecified employee or group of employees.  He also stated in the June 2 call that Take-Two had already spent $1.2 million to review and produce documents from the files of Ismailer, Anderson and Blau, and would have to spend another $1 million to review and produce the files of Dale, Gershik and Whiteford.  According to Mr. Axinn, Take-Two believed that it was unreasonable to spend more than this to comply with the outstanding Subpoena and CID given that the proposed transaction was not a consensual transaction.  When asked why Take-Two would produce the files of those particular three custodians but not the files of the company's CEO, Ben Feder, the President of 2K Games, Christoph Hartmann, or the President of Visual Concepts, Greg Thomas, Mr. Axinn provided two explanations: (1) these individuals were "creative types" who would leave the company rather than agree to allow their files to be searched; and (2) he did not believe that the Commission should use its premerger investigation as "discovery to build a case."  However, if the Commission did not conduct discovery, as Mr. Axinn proposes here, the Commission jeopardizes its ability to support a petition for injunctive

relief, which must be filed before the expiration of the HSR notice and waiting period, should it ultimately conclude that such relief was necessary.

31.    Mr. Axinn also rejected the Commission's request that Take-Two search for and produce documents relating to boxing and tennis video games as part of its search.  Mr. Axinn indicated that the Commission need not investigate whether this transaction would reduce competition in this group of video games because he believed that these games did not constitute markets that implicated antitrust concerns.  To the contrary, since a determination by the Commission as to what markets may be affected by the proposed transaction goes to the core of the Commission's investigation, Mr. Axinn's personal belief simply is not dispositive. This only serves to underscore that, ultimately, some of the most potentially relevant and important evidence on this and other issues relating to the investigation likely will come from Take-Two's documents.

32.    On June 4, Commission staff emailed a letter to both Mr. Axinn and Mr. Keeley stating that negotiations with Take-Two had reached an impasse, and that the staff would seek immediate judicial enforcement of the Subpoena and CID barring a representation by Mr. Axinn before 9:00 am June 5, 2008, that Take-Two was willing to produce additional and comprehensive phased responses in a prompt and timely manner.  It is my understanding that Mr. Axinn responded that day by telephoning both the Director of the Bureau of Competition and the Commission's Principal Deputy General Counsel during the afternoon of June 4, requesting that they intercede before staff filed this petition.  It is my further understanding that both declined Mr. Axinn's request.  On June 5, Mr. Axinn responded to my letter with a letter that made no new proposals.

33.    To my knowledge Take-Two has not filed with the Commission's Secretary a

13

petition to limit or quash the Subpoena or CID consistent with the procedure established in 16

C.F.R. § 2.7(d).   Return receipts in the possession of the Commission indicate that, through its

counsel, Take-Two received service of the Subpoena and CID on April 22, 2008.


I certify that the above statements are true to the best of my knowledge, information and

belief subject to the penalties for unsworn statements set out in 28 U.S.C. § 1746.

DATE:


June 5, 2008

Washington, DC                        Reid B. Horwitz

14



# SUBPOENA DUCES TECUM

| 1. TO | 2. FROM |
|---|---|
| Take-Two Interactive Software, Inc.<br>c/o Alicia Batts, Esquire<br>Proskauer Rose LLP<br>1001 Pennsylvania Avenue, NW<br>Suite 400 South<br>Washington, DC 20004 | UNITED STATES OF AMERICA<br>FEDERAL TRADE COMMISSION |

This subpoena requires you to appear and testify at the request of the Federal Trade Commission at a hearing [or deposition] in the proceeding described in Item 6.

| 3. LOCATION OF HEARING | 4. YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| Federal Trade Commission<br>601 New Jersey Ave., Room 6128<br>Washington, DC 20001 | Reid B. Horwitz |
| | 5. DATE AND TIME OF HEARING OR DEPOSITION |
| | 9:00 a.m May 9, 2008 |

**6. SUBJECT OF INVESTIGATION**

Electronic Arts Inc.'s Proposed Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

**7. RECORDS YOU MUST BRING WITH YOU**

See attached "Specifications, Definitions and Instructions."

| 8. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 9. COMMISSION COUNSEL |
|---|---|
| Robert Tovsky, Custodian<br>Reid H. Horwitz, Deputy Custodian | Reid B. Horwitz (202) 326-2037<br>E. Eric Elmore (202) 326-3109 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 4/21/08 | |

## GENERAL INSTRUCTIONS

The delivery of this subpoena to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this subpoena be filed within 20 days after service or, if the return date is less than 20 days after service, prior to the return date. The original and ten copies of the petition must be filed with the Secretary of the Federal Trade Commission. Send one copy to the Commission Counsel named in Item 9.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this subpoena should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this subpoena and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

This subpoena does not require approval by OMB under the Paperwork Reduction Act of 1980.

FTC Form 68-B (rev. 9/92)

## RETURN OF SERVICE

*I hereby certify that a duplicate original of the within
subpoena was duly served:*    (check the method used)

○  *in person.*

○  *by registered mail.*

○  *by leaving copy at principal office or place of business, to wit:*

------------------------------------------------------

------------------------------------------------------

------------------------------------------------------

------------------------------------------------------

*on the person named herein on:*

----------------------------------------------------------------------
(Month, day, and year)

----------------------------------------------------------------------
(Name of person making service)

----------------------------------------------------------------------
(Official title)

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Unless modified by agreement with the staff of the Federal Trade Commission, each specification of this Subpoena *Duces Tecum* ("Subpoena") requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions, which appear after the following Specifications. If the company believes that the required search or any other part of the Subpoena can be narrowed in any way that is consistent with the Commission's need for documents, you are encouraged to discuss such questions and possible modifications with the Commission representative identified on the last page of this Subpoena. All modifications to this Subpoena must be agreed to in writing by such representative. You may find it useful to provide the response to Specification 1 of this Subpoena promptly and discuss limiting the required search with the Commission's representative before you begin your search.

## SPECIFICATIONS

1.    Submit one copy of each organization chart and personnel directory in effect since January 1, 2004, for the company as a whole and for each of the company's facilities or divisions involved in any activity relating to any relevant product in any relevant area.

2.    Submit all NPD (or equivalent) data that contains information on any relevant product in electronic format for each month and year since January 1, 1998.

3.    For each relevant product submit all documents relating to formulas, models and programs used to make determinations about each discount and allowance, including but not limited to, rebates, promotional allowances, merchandising discounts, and co-op advertising. Submit all documents relating to the methodology for determining each of these discounts and allowances, including the extent to which the existence of other titles in a given genre factor into such determinations.

4.    For each relevant product, provide the following:

(a) all documents relating to price sensitivity, price elasticity, price points, or product substitution, of any of the company's relevant products;

(b) all data compilations and underlying programs or models relating to price sensitivity, price elasticity, price points, wholesale pricing or production substitution, of any of the company's relevant products, developed by, used by, or obtained by the company or any agent of the company;

(c) all documents relating to the company's or any other person's prices, including but not limited to, price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, pricing analyses, market price indices or periodic market prices, and pricing decisions relating to any relevant product; and

(d) all documents relating to the company's compliance with the Robinson-Patman Act.

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

To the extent that any pricing analysis was performed using computerized data, submit the underlying data. Documents, programs, and information submitted, used, generated or obtained in electronic form should be produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

5.    For each of the company's 20 largest wholesale customers:

    (a) submit each contract or promotional agreement currently in place, or previously in effect for any period beginning January 1, 2006; and

    (b) provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement.

6.    For each of the company's 20 largest retail customers:

    (a) submit each contract or promotional agreement currently in place, or in effect for any period beginning January 1, 2006; and

    (b) provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement.

7.    Submit a copy of each relevant product and all packaging used for such product in the sports, shooter, strategy, racing and action genres.

8.    Submit each different advertisement or promotional material for each relevant product in the sports, shooter, strategy, racing and action genres in any medium, including but not limited to, newspapers, television, radio, telephone, direct mail, the Internet, or electronic mail.

9.    Submit a copy of all documents relating to marketing and advertising plans for each relevant product in the sports, shooter, strategy, racing and action genres that discuss or reference competition with, how to compete with, or how to market or advertise against other relevant products. Such documents include, but are not limited to, materials about advertising and marketing strategies, themes, or concepts, media recommendations and plans, marketing reports, business studies, and creative strategies that describe or discuss the planned or actual approaches for advertising, marketing, or promoting the product.

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

10.    Submit a copy of all consumer research concerning all relevant products, including but not limited to: all materials relating to consumer perceptions, preferences, and beliefs about such product(s); data and analyses relating to consumer demographics, target markets, customer type, purchasing patterns, or switching behavior, including but not limited to, switching from or to any relevant product; and consumer surveys, marketing surveys and reports.

11.    Submit all analyst reports that discuss any aspect of the video gaming industry, including but not limited to, any competitors within the industry or the acquisition of Take-Two by Electronic Arts.

12.    Submit all documents relating to the company's concerns, expressed or otherwise, over Electronic Arts' procurement of exclusive licensing agreements involving professional sports leagues and sports brands, including but not limited to, all correspondence and communications with the U.S. Department of Justice, Federal Trade Commission, or any other entity, and all documents and analyses relating to the effects such exclusive licensing agreements might have, or had, on the company's business or on competition within the video game software industry.

13.    Submit all documents relating to vendor participation with retailers on product placement in a store, through category management, category captaincy, vendor participation, or other similar activities. Provide all documents produced to retailers for whom the company acts as a category captain or any type of category supervisor, and all documents (whether internal or otherwise) that incorporate such activities.

14.    Provide all documents comparing the company's video game titles in sports, shooter, strategy, racing, and action genres with those of any of other person.

15.    Submit all documents relating to the company's or any other person's plans relating to any relevant product, including but not limited to: business plans; short term and long range strategies and objectives; investment banker and/or other consultant reports; title, genre, brand, or platform-specific plans; marketing plans; advertising plans and strategies, including all expenditures on advertising, selling aids and promotional materials; legislative affairs plans; purchasing plans; collaboration plans; budgets and financial projections; expansion or retrenchment plans; research and development efforts; and presentations to management committees, executive committees, and boards of directors. For regularly prepared budgets and financial projections, the company need only submit one copy of final year-end documents and cumulative year to date documents for the current year.

16.    Provide all of the following reports: financial statement, budget, profit and loss statement, customer or product line profitability report, and each other financial report regularly

3

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

prepared by or for the company on any periodic basis that relates to the production, manufacture and sale of any relevant product, or the manufacturing facility, sales office, distribution center, product line, or customer for any relevant product on both a quarterly basis and a yearly basis since January 1, 2003. If available, these reports should be provided in an electronic spreadsheet format acceptable to the Commission.

17.  Submit all documents relating to competition in the relevant product, including but not limited to, market studies, forecasts and surveys, and all other documents relating to: (a) the market share or competitive position of the company and any of its competitors; (b) the relative strength or weakness of companies selling or offering each relevant product; (c) supply and demand conditions; (d) allegations by any person that any company that sells or offers any relevant product is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints, threatened, pending or completed lawsuits, and federal and state investigations; (e) competition between any relevant product and any other product, such as music videos, movie videos, music or video downloads, or other entertainment products; (f) any actual or potential effect on the supply, demand, cost or price of any relevant product, as a result of competition from any other possible substitute product; (g) any actual or potential effect on supply or demand as a result of the wholesale or retail price or fee schedule of a relevant product; (h) attempts to win customers from other companies and losses of customers to other companies including, but not limited to, all sales personnel call reports; (i) product reviews; (j) the development, marketing, advertising, and value of each company brand, including brand equity studies; (k) competition to reduce the number of "glitches" in products; (l) NPD reports or studies; (m) differences in purchasing preferences and product demand between consumers inside and outside the United States; and (n) discussions in any forum including internet forums such as web logs ("blogs"), message boards, discussion boards, discussion groups or forums, bulletin boards, or any other type of internet communication.

18.  Submit all documents relating to any Intellectual Property ("IP") agreements relating to the relevant product, including but not limited to, the actual agreements, negotiations over such agreements, and how such agreements would or could impact competition.

19.  For any relevant product, submit all documents relating to economies of scale and economies of scope, including advantages of producing, selling, or distributing multiple relevant products.

20.  For each relevant product submit all documents relating to:

(a) requirements for entry into the development, production, sale, or distribution of the relevant product in each relevant area, including but not limited to, research and development, planning and design, production requirements, personnel, distribution sys-

4

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

tems, reputation, patents, licenses, sales and marketing activities, development of databases and customer support systems, development of an Internet site, and any necessary governmental and customer approvals, and the components of, and time necessary to meet, each such requirement;

(b) the total costs required for entry into the development, production, sale or distribution of the relevant product; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the development, production or sale of the product; the methods and amount of time necessary to recover such costs; and the total sunk costs entailed in satisfying the requirements for entry;

(c) possible new entrants into the development, production, sale or distribution of the relevant product in each relevant area; and an estimate of the time it would take each such potential entrant to (i) produce a commercially viable product and (ii) achieve competitively significant sales of that product (including a detailed description of the bases for each estimate);

(d) the minimum viable scale, the minimum and optimum research and development organization, sales volume, requirements for multi-center, or vertically integrated operations; or other factors required to attain any available cost savings or other efficiencies necessary to compete profitably in providing the relevant product;

(e) the extent to which a new entrant into the development, production, manufacture or sale of any relevant product would benefit from also being (or would suffer a disadvantage from not also being) a developer, producer or seller of any other relevant product or any product or service purchased, used or sold in conjunction with any relevant product; and

(f) any programs and/or models used to analyze the development potential of relevant products.

The company shall provide its response to this specification in terms of entry that would enable an entrant to develop, produce and sell products that compete directly (including, but not limited to, competition on performance and price) with each relevant product developed, produced, provided or sold by Take-Two. If the company contends that entry by entrants that do not compete directly may have competitive significance, then the company shall provide documents relating to each form of such entry.

21.    Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product submitted by the company or any other person to all trade associations, information services, and other organizations relating to the research, development,

5

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

production, license, or sale of any relevant product association, service, and organization or its agent. Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product received by the company or any other person from each such association, service, and organization or its agent.

22. For each business consultant, investment banker, and economic consultant (collectively "consultant") identified in response to Specification 1 of the CID issued to the company together with this Subpoena and that was engaged by the company with respect to the proposed acquisition of Take-Two by Electronic Arts, submit (a) all documents and data provided to and received from each such consultant; and (b) all reports and analyses generated by, and the underlying econometric programs, models and data used by, any such consultant to generate such reports and analyses. Documents, programs, and information submitted, used, generated or obtained in electronic form should be printed and produced in hard copy and produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

23. Submit all documents (except documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues) relating to the proposed acquisition by Electronic Arts of Take-Two.

24. Submit all documents relating to contemplated efficiencies in the production, distribution, or sale of the relevant product that will be achieved because of the acquisition.

25. Submit all documents relating to any plans of, interest in, or efforts undertaken by the company or any other person for any acquisition, divestiture, joint venture, alliance or merger of any kind involving the manufacture or sale of any interactive video games other than the acquisition of Take-Two by Electronic Arts.

26. Submit all documents relating to the company's plans or attempts to: reduce its costs; improve products or services; expand its sales or distribution efforts; introduce new products; improve its operating performance, financial condition, or competitive viability; or become more competitive in any other way, including, but not limited to, plans or attempts to close, consolidate or rationalize any facility, discontinue the research, development, manufacture or sale of any relevant product, research, develop, manufacture or sell any relevant product in conjunction with any other product or service.

27. Submit all documents previously submitted electronically to the Federal Trade Commission in conjunction with this investigation to the extent that previously submitted documents were not submitted in a machine-readable format as required in Instruction X.

6

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

28.   Submit documents sufficient to show the company's policies and procedures relating to the retention and destruction of documents.

29.   Submit a copy of all instructions prepared by the company relating to the steps taken to respond to this Subpoena, including instruction pertaining to document (written and electronic) and information preservation.

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this Subpoena, the following definitions and instructions apply:

A.   The term "the company" or "Take-Two" means Take-Two Interactive Software, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Take-Two and any other person.

B.   The term "Electronic Arts" means Electronic Arts, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

C.   The term "Subpoena *Duces Tecum*" or "Subpoena" means this Subpoena *Duces Tecum*.

D.   The term "Civil Investigative Demand" or "CID" means the Civil Investigative Demand issued by the Federal Trade Commission to the company together with this Subpoena *Duces Tecum*.

E.   The term "proposed acquisition" means the proposed acquisition of certain stock or assets of Take-Two as described in Item 3(a) of the company's Premerger Notification and Report Form.

F.   The term "documents" means all computer files and written, recorded, and graphic materials of every kind in the possession, custody or control of the company. The term "documents" includes, without limitation: electronic mail messages; electronic correspondence and drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody or control of the company.

7

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(1) Unless otherwise specified, the term "documents" excludes (a) bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature; (b) architectural plans and engineering blueprints; and (c) documents solely relating to tax, human resources, OSHA, or ERISA issues.

(2) The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. Thus, the company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off company premises. If the company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this instruction with the Commission representatives identified on the last page of this Subpoena. The Commission representative will consider modifying this instruction to:

(a) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the company;

(b) limit the portion of backup disks and tapes and archive disks and tapes that need to be searched and produced to certain key individuals, or certain time periods or certain specifications identified by Commission representatives; or

(c) include other proposals consistent with Commission policy and the facts of the case.

(3) If the company intends to utilize any De-duplication or Near-de-duplication software or services when copying or reviewing information that is stored in the company's computer systems or electronic storage media in response to this Subpoena, or if the company's computer systems contain or utilize such software, the company must contact Commission representatives to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this Subpoena.

G.     The term "advertisement" shall mean any written or verbal statement, illustration, or depiction, that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display,

8

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

film, slide, audio program transmitted over a telephone system, telemarketing script, onhold script, upsell script, training materials provided to telemarketing firms, program-length commercial ("infomercial"), the Internet, or any other medium. Promotional materials and items, and Web pages are included in the term "advertisement."

H.    The term "promotional material" shall mean any expenditure, written or verbal statement, illustration, or depiction, that is designed to create interest in the purchasing of goods, including but not limited to, press releases, video news releases, and other communications with any print, television, or radio media, or any website designer, developer, manager, or host, or any online service, coupons, and payments for shelf space or product placement in any media.

I.    A "copy" of an "advertisement" shall mean:

 (1)  In the case of print ads, including transit/outdoor, direct mail, and free standing inserts, the ad in the form made available for customers to read.

 (2)  In the case of radio ads, a compact disc (CD) recording and a written script.

 (3)  In the case of television ads and infomercials, a DVD, as well as a photoboard or a transcription of the advertisement.

 (4)  In the case of ads displayed or accessible as Web pages on the Internet or in a similar format on a commercial online service, a printout of all screens or pages displayed or accessible online; the date the information was initially placed online; all information necessary to view or access the information online (*i.e.* for Web pages, all electronic addresses, or URLs, at which the information is accessible, including any "mirrored" sites and *all documents showing metatags for the pages*). For similar advertising on commercial online services, provide the name of the commercial online services and the appropriate "Key" "Go" or "Jump" words; a transcript of any audio or video clips contained in the screens or pages, and identification of any audio, video, or other programs necessary to hear or view the clips; the name, mailing address, and telephone number of any entity with whom you arranged for placement of the information online (*i.e.* the owner of the Internet domain name(s) and, if different, the owner of the server(s) through which the Web page is made accessible on the Internet).

 (5) In the case of files archived or accessible online (*e.g.* at FTP sites, on bulletin boards, or as part of a Web page), the filename and file date of the file, along with the date it initially was posted online; a printout of the file, if feasible; all information necessary to locate, download, and view the file, including, where applicable, the name of the bulletin board and the category, topic, or file area where the file is located; and the identity of any software necessary to decompress the files. In the case of files archived on forums or bulletin boards found in commercial online services, provide the name of the online

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

service and the "Key" "Go" or "Jump" words to access the bulletin board; in the case of files archived or accessible on the Internet at FTP sites, at USENET sites, or on Web pages, all electronic addresses at which the file is available, including any "mirrored" sites; in the case of files archived on dial-in bulletin boards, provide the telephone number to access the bulletin board, and the name, business telephone number, and mailing address of the owner or operator of the bulletin board.

(6) In the case of messages posted on bulletin boards, a printout of the message posted, the date(s) it was posted, and information sufficient to locate and access the bulletin board areas where the information was posted.

(7) In the case of messages disseminated via e-mail, a printout of the e-mail message, the date(s) it was sent, and the electronic address from which the message was sent. In addition, if a LISTSERV or other mass mailing mechanism was utilized, provide the name of the LIST used to send the message, the e-mail address for subscribing to the LISTSERV or similar mechanism, and, if different, the e-mail address to which messages are submitted for mass mailing.

J.      The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

K.      The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

L.      The terms "and" and "or" have both conjunctive and disjunctive meanings.

M.      The term "plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

N.      The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company in the same manufactured form as purchased.

O.      The term "platform" as used herein includes, and information shall be provided separately for:

(1) consoles, and within consoles, information shall be provided separately for: PS2, PS3, XBOX, XBOX360, Wii, and all other types of consoles (specifying each such type);

(2) personal computers ("PC");

10

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(3) hand-held computers, and within hand-held computers, <u>information shall be provided separately for</u>: Playstation Portable ("PSP"), Nintendo Handheld ("NDS"), Gameboy Adventure ("GBA"), and all other types of hand held computers (specifying each such type);

(4) mobile devices and within mobile devices, <u>information shall be provided separately for</u>: cellular telephones, and all other types of mobile devices (specifying each such type); and

(5) digital content, and within digital content, <u>information shall be provided separately for</u>: game titles that are also sold as packaged goods which are downloaded, and games titles that are played online through hosted sites.

P.    The term "genre" as used herein includes, <u>and information shall be provided separately for</u>:

(1) action, and within action, <u>information shall be provided separately for</u>: each sub-genre (specifying each such sub-genre);

(2) sports, and within sports, <u>information shall be provided separately for</u> each type of sports game (e.g, football, basketball, baseball, hockey, soccer, tennis, golf, etc.), and within each type of sports game <u>information shall be provided separately for</u> simulation games and arcade-style games;

(3) shooter, and within shooter, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(4) role-playing game ("RPG"), and within RPG, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(5) racing, and within racing, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(6) strategy, and within strategy, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(7) family entertainment, and within family entertainment, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre); and

(8) and all other types of genres (specifying each such type).

Q.    The term "game rating" as used herein means, <u>and information shall be provided</u>

11

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

separately for: Early Childhood ("EC"), Everyone ("E"), Everyone 10+ ("E10+"), Teen ("T"), Mature ("M"), and Adult Only ("AO").

R.      The term "relevant product" as used herein means each individual video game title, which includes game titles scheduled to be released over the next two years, in active development now, and contemplated for development (in whole or in part) over the next two years. For each individual video game title, information shall be provided separately by platform.

S.      The term "relevant area" means, and information shall be provided separately for: (a) the United States; (b) worldwide; and (c) each area as to which the company collects and maintains information and data within the United States.

T.      The term "minimum viable scale" means the smallest amount of production at which average costs equal the price currently charged for the relevant product. It should be noted that minimum viable scale differs from the concept of minimum efficient scale, which is the smallest scale at which average costs are minimized.

U.      The term "sunk costs" means the acquisition costs of tangible and intangible assets necessary to manufacture and sell the relevant product that cannot be recovered through the redeployment of these assets for other uses.

V.      All references to year refer to calendar year. Unless otherwise specified, each of the specifications calls for documents for each of the years from January 1, 2004 to the present.

W.      This Subpoena shall be deemed continuing in nature so as to require production of all documents responsive to any specification included in this Subpoena produced or obtained by the company up to forty-five calendar days prior to the date of the company's full compliance with this Subpoena.

X.      The company shall discuss the form and method of production of responsive documents with the Commission representative identified on the last page of this Subpoena. The company shall be permitted to use any form and method of production of responsive documents that the Commission representative approves in writing. The Commission can support the following production forms and methods:

(1) In lieu of original paper documents, the company may submit either paper or electronic copies of original documents. If the documents are provided electronically as TIFF images, they should be accompanied by OCR;

(2) In lieu of original documents stored electronically, the company may submit documents in the following forms:

12

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(a) Electronically stored documents, except Microsoft Excel files and Access databases, may be produced as single-page TIFF images with a corresponding file containing the extracted text from the document, accompanied by a Opticon load file. Metadata and custodian information shall be provided in a delimited ASCII format. Microsoft Excel and Access files shall be provided natively.

(b) Electronically stored documents, excluding e-mail other than Microsoft Outlook, may be produced natively. Please discuss logistics of native production with the commission representative identified on the last page of this subpoena.

(3) Electronic productions may be submitted in the following methods:

(a) Responsive documents may be submitted through an online repository maintained by an independent vendor;

(b) Responsive documents may be submitted directly to the Commission on any combination of the listed media types; however, the Commission prefers IDE hard drives for productions over 10GB:

- CD-R CD-ROM formatted to ISO 9660 specifications;
- DVD-ROM for Windows-compatible personal computers;
- IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data;
- USB 2.0 Flash Drives;

(4) All electronic files submitted in response to this Subpoena will be scanned for viruses. Media containing infected files will be returned for replacement.

(5) Documents submitted in hard copy shall be submitted in sturdy cartons not larger than 1.5 cubic feet. Number each such box and mark each such box with corporate identification and the name(s) of the person(s) whose files are contained in the box.

Y.    All documents responsive to this Subpoena, regardless of format or form and regardless of whether submitted in paper or electronic form:

(1) shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged. For example:

(a) if in their original condition papers were stapled, clipped or otherwise fastened together or maintained in file folders, binders, covers or containers, they shall be produced in such form, and any documents that must be removed from

13

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

their original folders, binders, covers or containers in order to be produced shall be identified in a manner so as to clearly specify the folder, binder, cover or container from which such documents came; and

(b) if in their original condition electronic documents were maintained in folders or otherwise organized, they shall be produced in such form and information shall be produced so as to clearly specify the folder or organization format;

(2) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

(3) shall be produced in color where necessary to interpret the document;

(4) shall be marked on each page with corporate identification and consecutive document control numbers;

(5) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct and complete copies of the original documents;

(6) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that Commission representatives determine prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request.

Z.    If any documents created prior to the company's Hart-Scott-Rodino filing are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log (hereinafter "Complete Log") that includes each document's authors, addressees, date, a description of each document, and all recipients of the original and any copies. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed. For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all nonprivileged portions of any responsive document (including nonprivileged

14

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing the company that were not directly or indirectly furnished to the company or any third-party, such as internal law firm memoranda, may be omitted from the log.

In place of a Complete Log of all documents withheld from production based on a claim of privilege, the company may elect to submit a Partial Privilege Log ("Partial Log") for each person searched by the company whose documents are withheld based on such claim and a Complete Log for a subset of those persons, as specified below:

(1) The Partial Log will contain the following information: (a) the name of each person from whom responsive documents are withheld on the basis of a claim of privilege; and (b) the total number of documents that are withheld under a claim of privilege (stating the number of attachments separately) contained in each such person's files. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

(2) Within five (5) business days after receipt of the Partial Log, Commission staff may identify in writing five individuals or ten percent of the total number of persons searched, whichever is greater, for which the company will be required to produce a Complete Log in order to certify compliance with this Subpoena.

(3) For the company to exercise the option to produce a Partial Log, the company must provide a signed statement in which the company acknowledges and agrees that, in consideration for being permitted to submit a Partial Log:

(a) the Commission retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the Commission seeks relief through judicial or administrative proceedings;

(b) the company will produce a Complete Log of all documents withheld from production based on a claim of privilege no later than fifteen (15) calendar days after such a discovery request is served, which will occur promptly after the filing of the Commission's complaint; and

(c) the company waives all objections to such discovery, including the production of a Complete Log of all documents withheld from production based on a claim of privilege, except for any objections based strictly on privilege.

15

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(4) The company must retain all privileged documents that are responsive to this Subpoena until the expiration of the Hart-Scott-Rodino waiting period or the completion of any litigation challenging the acquisition of Take-Two by Electronic Arts.

(5) The Commission retains the right to require the company to produce a Complete Log for all persons searched in appropriate circumstances.

AA.    If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

BB.    If documents responsive to a particular specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy as disclosed in response to Specification 28 of this Subpoena, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the specification(s) to which they are responsive, and identify persons having knowledge of the content of such documents.

CC.    Unless specifically requested by a specification in this Subpoena, do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

For purposes of this Subpoena, Sensitive PII means an individual's Social Security Number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth, Social Security Number, driver's license number or other state identification number or a foreign country equivalent, passport number, financial account number, credit or debit card number. For purposes of this Subpoena, SHI includes medical records or other individually identifiable health information relating to the past, present, or future physical or mental condition of an individual, or the past, present, or future payment for the provision of health care to an individual.

DD.    In order for the company's response to this Subpoena to be complete, the attached certification form must be executed by the official supervising compliance with this Subpoena, notarized, and submitted along with the responsive materials.

16

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Any questions you have relating to the scope or meaning of anything in this Subpoena or suggestions for possible modifications thereto should be directed to Victoria Lippincott at 202-326-2983 or Ben Lorigo at 202-326-3717. The response to the Subpoena shall be addressed to the attention of Victoria Lippincott or Ben Lorigo and delivered between 8:30 a.m. and 5:00 p.m. on any business day to Federal Trade Commission. If you wish to submit your response by United States mail, please call one of the staff listed above for mailing instructions.

## CERTIFICATION

This response to the Subpoena *Duces Tecum*, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Federal Trade Commission.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Commission uses such copies in any court or administrative proceeding, the company will not object based on the Commission not offering the original document.

_____
(Signature)

_____
(Type or Print Name and Title)

Subscribed and sworn to before me at the City of _____,

State of _____, this _____ day of _____, 20_____.

_____
(Notary Public)

_____
(Date Commission Expires)

17

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:      William E. Kovacic, Chairman
                        Pamela Jones Harbour
                        Jon Leibowitz
                        J. Thomas Rosch

RESOLUTION DIRECTING USE OF
COMPULSORY PROCESS IN NON-PUBLIC INVESTIGATION

File No. 081-0138

Nature and Scope of Investigation:

To determine whether the proposed transaction between Electronic Arts Inc. and Take-Two Interactive Software, Inc. is in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; to determine whether the aforesaid proposed transaction, if consummated, would be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and to determine whether the requirements of Section 7A of the Clayton Act, 15 U.S.C. § 18a, have been or will be fulfilled with respect to said transaction.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

Authority to Conduct Investigation:

Sections 6, 9, 10 and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50 and 57b-1, as amended; Federal Trade Commission Procedures and Rules of Practice, 16 C.F.R. §§ 1.1, *et seq.*, and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Dated:  April 17, 2008



# CIVIL INVESTIGATIVE DEMAND
## Written Interrogatories and Report

| 1. TO | 2. FROM |
|---|---|
| Take-Two Interactive Software, Inc.<br>c/o Alicia Batts, Proskauer Rose LLP<br>1001 Pennsylvania Avenue, NW<br>Suite 400 South<br>Washington, DC 20004 | UNITED STATES OF AMERICA<br>FEDERAL TRADE COMMISSION |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. §57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

3. SUBJECT OF INVESTIGATION

Electronic Arts Inc.'s Proposed Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

You are required by this demand to answer the interrogatories on the attached schedule or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 6 on or before the date specified in Item 4.

| 4. DATE ANSWERS OR REPORT MUST BE SUBMITTED | 5. COMMISSION COUNSEL |
|---|---|
| 9:00 a.m. May 9, 2008 | Reid B. Horwitz<br>E. Eric Elmore |

| 6. RECORDS CUSTODIAN | 7. DEPUTY RECORDS CUSTODIAN |
|---|---|
| Robert Tovsky, Deputy Assistant Director | Reid B. Horwitz (202) 326-2037<br>E. Eric Elmore (202) 326-3109 |

| DATE ISSUED<br>4/21/08 | COMMISSIONER'S SIGNATURE |
|---|---|

## INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The answers or report in response to this demand must be submitted under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

## PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

## YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba. gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

FTC Form **142** (rev. 3/03)

# Form of Certificate of Compliance*

I/We do certify that all of the information required by the attached Civil Investigative Demand which is in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to a custodian named herein.

If an interrogatory or a portion of the request has not been fully answered or portion of the report has not been completed the objection to such interrogatory or uncompleted portion and the reasons for the objection have been stated.

Signature_____

Title_____

Sworn to before me this day

_____    _____

_____
            Notary Public

_____

*In the event that more than one person is responsible for answering the interrogatories or preparing the report, the certificate shall identify the interrogatories or portion of the report for which each certifying individual was responsible. In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Unless modified by agreement with the staff of the Federal Trade Commission, each specification of this Civil Investigative Demand ("CID") requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions, which appear after the following Specifications. If the company believes that the required search or any other part of the CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative identified on the last page of this CID. All modifications to this CID must be agreed to in writing by such representative.

## SPECIFICATIONS

1.   List all agents and representatives of the company, including but not limited to, all attorneys, consultants, investment bankers, product distributors, sales agents, marketing consultants, PR consultants, advertising agencies, and other persons retained by the company in any capacity relating to any relevant product in any relevant area (excluding those retained solely in connection with environmental, tax, human resources, pensions, benefits, ERISA, and OSHA issues), and their last known address and phone number.

2.   List each relevant product sold by the company since 2004, and for each relevant product:

(a) describe the product in detail, including its genre and game rating; and

(b) state the division, subsidiary, or affiliate of the company that produces or sells, or has produced or sold, the product;

(c) state whether the company produces or sells the product on behalf of another person, or whether another person produces or sells the product on behalf of the company, in either case identifying each such person.

3.   For each relevant product identified in Specification 2, and separately for each genre, state monthly and annually, for each year since January 1, 2004:

(a) the company's gross sales and net sales in each relevant area, stated separately in units and dollars;

(b) the company's production and shipment in each relevant area, stated separately in units and dollars;

(c) any deductions from the company's gross sales in each relevant area, identified separately by type of deduction, that the company uses to calculate net sales;

(d) the company's cost of goods sold stated separately in units and dollars for: total

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

production cost per unit, and by the following components: (1) materials; (2) licensing fees, and within licensing fees, state separately fees paid to (i) platform manufactures, and (ii) other providers of intellectual property (e.g., professional sports leagues, player, players associations, personalities); (3) packaging; (4) direct labor; (5) production overhead costs; and (6) any other costs (itemized by title) that are used to calculate cost of goods sold, or if the product sold is purchased or co-packed provide the purchase price;

(e) the company's production cost variances stated separately by type;

(f) gross margins and state the method of computation; and

(g) total payments by the company for distribution services, and the company's spending for advertising and other promotional efforts.

4.  For each relevant product identified in Specification 2, state monthly (if available, otherwise it may be provided quarterly) and annually, for each year since January 1, 2004:

(a) the company's distribution and freight-out costs, including without limitation, cost center expense summaries showing costs by type for each distribution center, expenses by type incurred for moving product from production facilities to distribution centers, retailers, or wholesalers, and expenses by type for third-party distribution and warehousing services;

(b) stated separately, the company's variable trade promotions by type, variable consumer promotions by type, fixed trade promotions by type, fixed consumer promotions by type, media advertising and expenditures by type, and any other promotional and marketing expenditures by type;

(c) the company's research and development costs;

(d) by type, assets directly dedicated to, and liabilities directly derived from, each relevant product, (or lowest product grouping available);

(e) any license and licensing fees associated with the relevant product;

(f) all advertising and marketing expenditures;

(g) all inventory costs; and

(h) the company's other costs, such as selling, general and administrative, and other overhead expenditures, by type.

2

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

5.    For each platform manufacturer, describe (a) the media (e.g. CD, DVD, proprietary
cartridge, etc.) on which the relevant products identified in Specification 2 are published;
(b) whether the company, the platform manufacturer, or a third party prints the relevant
product onto the media; and (c) the contract terms under which the media are printed (if
not by the company), including but not limited to (1) volume discounts, (2) refunds for
unsold media, and (3) lead time necessary to place orders or change order size.

6.    For each relevant product identified in Specification 2:

(a) identify and describe each discount and allowance, including but not limited to,
rebates, promotional allowances, merchandising discounts, and co-op advertising.
Describe the methodology for determining each of these discounts and allowances,
including the extent to which the existence of other titles in a given genre factor into such
determinations. Describe in detail all formulas, models and programs used to make such
determinations;

(b) state the credit terms extended by the company to retail and wholesale customers;

(c) state whether and under what circumstances the company pays refunds or extends
credit for returned goods or otherwise accepts returns and all terms for returns to retail
and wholesale customers;

(d) state the company's requirements, such as minimum order requirements and
creditworthiness, for direct purchasing by retail or wholesale customers; and

(e) describe in detail the process by which the company establishes and negotiates
discounts, rebates, other price concessions, or other terms such as free goods, incentives
or payments to retailers or the employees of retailers, slotting allowances, or other
compensation.

7.    For each relevant product, provide the following:

(a)  a detailed description of each category of documents and information (e.g., platform,
genre, number of competitors, release date, Metacritic rating, etc.) used to establish the
price and recommended resale price of such product, and how such information is used to
establish such prices;

(b) a detailed description of all price checking programs or efforts, including the names
of each employee or agent participating in such programs or efforts, their title or company
affiliation, the role that they play or played, and the last known address and phone number
of any former employees or agents involved in such programs or efforts.

3

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

8.    Identify the company's 20 largest wholesale customers, and for each such customer:

   (a)  state whether the company has a contract or other promotional agreement relating to the sales of relevant products, and;

   (b)  provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

9.    Identify the company's 20 largest retail customers, and for each such customer:

   (a)  state whether the company has a contract or other promotional agreement relating to the sales of relevant products; and

   (b)  provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

10.   State the full name and URL for each website operated by or on the company's behalf, and the purpose of each site, if it has or had content relating to any of the issues addressed by this CID or Second Request issued to the company on April 16, 2008.

11.   Identify all consultants identified in response to Specification 1 who advised or assisted the company in connection with the company's concerns, expressed or otherwise, over Electronic Art's procurement of exclusive licensing agreements involving professional sports leagues and sports brands, including but not limited to, all correspondence and communications with the U.S. Department of Justice, Federal Trade Commission, or any other entity. Describe all documents and analyses prepared in connection with such concerns to the extent they related to the effects such exclusive licensing agreements might have, or had, on the company's business or on competition within the video game software industry, and describe the role each consultant played, and provide each of their last known addresses and phone numbers. Identify all former employees who participated in any of the activities described above, and provide their last known addresses and phone numbers.

12.   List all retailers for whom the company acts as a category captain or any type of category supervisory position.

4

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

13. List all Metacritic ratings for each relevant product since 2000, and for each relevant product submit in Excel format, the title, publisher, developer, genre(s), players, ESRB rating, release date, release price, Metacritic rating, user rating, recommended resale price, the amount of any promotional pricing or type of promotional activity offered at the time of release, and date on which the company offered its first price discount, promotional pricing, or promotional activity after date of release.

14. State the top five video game titles (or less if five cannot be identified) that, to the company's knowledge, most constrain the price of each relevant product identified in the company's response to Specification 2 in the sports, strategy, shooter, racing and action genres, and for each such title, state the title's genre and publisher.

15. For each relevant product identified in response to Specification 2 in the sports, shooter, strategy, racing and action genres, state the top five video game titles (or less if five cannot be identified) that the company evaluated or is evaluating in deciding what product features to add.

16. Identify, provide the title and describe the contents of each financial statement, budget, profit and loss statement, customer or product line profitability report, and each other financial report regularly prepared by or for the company on any periodic basis that relates to the production, manufacture and sale of any relevant product, or the manufacturing facility, sales office, distribution center, product line, or customer for any relevant product, and for each such report, state how often each is prepared and the person responsible for its preparation and provide all such reports on both a quarterly basis and a yearly basis since January 1, 2003. If available, these reports should be provided in an electronic spreadsheet format acceptable to the Commission.

17. Provide the name of and link (if applicable) to each forum, including internet forums such as web logs ("blogs"), message boards, discussion boards, discussion groups or forums, bulletin boards, or any other type of internet communication, in which the company or any of its employees discussed or monitored discussions of competition relating to the relevant product. Identify all user ids, log-in names, and aliases used by the company or any of its employees in connection with such forums.

18. State the name, address, telephone number and contact name of each person that has entered, attempted to enter into, or exited from, the publishing of relevant product for each video game genre from January 1, 1998 to the present. For each such person, identify the title(s) it produces or sells, or produced or sold, the genre, and such title's release date for each platform. For each entrant, state whether the entrant also produces the title. If the publisher does not produce the title, state the producer of each title. For

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

each person that has exited due to an acquisition or merger, identify the acquiring person or the resulting merged person.

19.    For each relevant product, identify and describe any programs and/or models used to analyze the development potential of relevant products.

20.    Identify, and state whether the company is a member of, or subscribes to, all trade associations, information services, and other organizations relating to the research, development, production, license, or sale of any relevant product.

21.    For each electronic database maintained by the company that contains information relating to prices, sales, research and development, production, costs (including transportation costs), profits, margins, competitors, or customers for any relevant product, service, or input, provide a copy of the database, all software, user identifications, and passwords necessary to access the responsive data store, and all regularly prepared and ad hoc reports generated using information contained in the database ("reports"), and state the following information:

(a) the size and format of the database, including, but not limited to, the authoring application, operating system, and application version;

(b) a detailed description of the data contained in the database;

(c) the date range for which data has been input;

(d) a record layout and the title and description of each record or field contained in the database;

(e) an identification of databases, spreadsheets, or other electronic files that are linked to the database;

(f) the uses to which each of the reports was put; and

(e) for each such report, the name of the report, the distribution list for the report, the frequency with which the report is generated (e.g. daily, weekly, monthly, annually), and the person responsible for generating the report.

22.    Provide a detailed description of all statements or actions by any person (identifying the person by name, title, and business address) in support of, in opposition to, or otherwise expressing opinions about the proposed acquisition or its effects.

6

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

23.   Describe the company's plans or attempts to: reduce its costs; improve products or services; expand its sales or distribution efforts; introduce new products; improve its operating performance, financial condition, or competitive viability; or become more competitive in any other way, including but not limited to, plans or attempts to close, consolidate or rationalize any facility, discontinue the research, development, manufacture or sale of any relevant product, research, develop, manufacture or sell any relevant product in conjunction with any other product or service.

24.   Describe in detail the company's policies and procedures relating to the retention and destruction of documents.

25.   List: (a) each federal judicial district (e.g., District of Columbia, Southern District of New York) within the United States in which the company has an agent to receive service of process as well as each such agent's name, current business and home addresses, and telephone numbers; (b) each federal judicial district within the United States in which the company is incorporated or licensed to do business or currently is doing business; and (c) each federal judicial district within the United States in which the company has an office or a facility, and, for each such office or facility, list the address and the individual in charge (with his or her title).

26.   Identify the person(s) responsible for preparing the response to this CID, and describe in detail the steps taken by the company to respond to this CID, including instruction pertaining to document (written and electronic) and information preservation. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given. For each specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and corporate title or job description) whose files were searched by each person.

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this CID, the following definitions and instructions apply:

A.      The term "the company" or "Take-Two" means Take-Two Interactive Software, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Take-Two and any other person.

B.      The term "Electronic Arts" means Electronic Arts, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

C.      The term "Civil Investigative Demand" or "CID" means this Civil Investigative Demand.

D.      The term "Subpoena *Duces Tecum*" or "Subpoena" means the Subpoena *Duces Tecum* issued by the Federal Trade Commission to the company together with this Civil Investigative Demand.

E.      The term "proposed acquisition" means the proposed acquisition of certain stock or assets of Take-Two as described in Item 3(a) of the company's Premerger Notification and Report Form.

F.      The term "documents" means all computer files and written, recorded, and graphic materials of every kind in the possession, custody or control of the company.  The term "documents" includes, without limitation: electronic mail messages; electronic correspondence and drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody or control of the company.

(1)  Unless otherwise specified, the term "documents" excludes (a) bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature; (b) architectural plans and engineering blueprints; and (c) documents solely relating to tax, human resources, OSHA, or ERISA issues.

(2)  The term "computer files" includes information stored in, or accessible through,

8

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

computer or other information retrieval systems. Thus, the company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off company premises. If the company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this instruction with the Commission representatives identified on the last page of this CID. The Commission representative will consider modifying this instruction to:

> (a) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the company;

> (b) limit the portion of backup disks and tapes and archive disks and tapes that need to be searched and produced to certain key individuals, or certain time periods or certain specifications identified by Commission representatives; or

> (c) include other proposals consistent with Commission policy and the facts of the case.

(3) If the company intends to utilize any De-duplication or Near-de-duplication software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media in response to this CID, or if the company's computer systems contain or utilize such software, the company must contact Commission representatives to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this CID.

G.    The term "advertisement" shall mean any written or verbal statement, illustration, or depiction, that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, film, slide, audio program transmitted over a telephone system, telemarketing script, onhold script, upsell script, training materials provided to telemarketing firms, program-length commercial ("infomercial"), the Internet, or any other medium. Promotional materials and items, and Web pages are included in the term "advertisement."

9

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

H    The term "promotional material" shall mean any expenditure, written or verbal statement, illustration, or depiction, that is designed to create interest in the purchasing of goods, including but not limited to, press releases, video news releases, and other communications with any print, television, or radio media, or any website designer, developer, manager, or host, or any online service, coupons, and payments for shelf space or product placement in any media.

I.    A "copy" of an "advertisement" shall mean:

(1) In the case of print ads, including transit/outdoor, direct mail, and free standing inserts, the ad in the form made available for customers to read.

(2) In the case of radio ads, a compact disc (CD) recording and a written script.

(3) In the case of television ads and infomercials, a DVD, as well as a photoboard or a transcription of the advertisement.

(4) In the case of ads displayed or accessible as Web pages on the Internet or in a similar format on a commercial online service, a printout of all screens or pages displayed or accessible online; the date the information was initially placed online; all information necessary to view or access the information online (*i.e.* for Web pages, all electronic addresses, or URLs, at which the information is accessible, including any "mirrored" sites and *all documents showing metatags for the pages*). For similar advertising on commercial online services, provide the name of the commercial online services and the appropriate "Key" "Go" or "Jump" words; a transcript of any audio or video clips contained in the screens or pages, and identification of any audio, video, or other programs necessary to hear or view the clips; the name, mailing address, and telephone number of any entity with whom you arranged for placement of the information online (*i.e.* the owner of the Internet domain name(s) and, if different, the owner of the server(s) through which the Web page is made accessible on the Internet).

(5) In the case of files archived or accessible online (*e.g.* at FTP sites, on bulletin boards, or as part of a Web page), the filename and file date of the file, along with the date it initially was posted online; a printout of the file, if feasible; all information necessary to locate, download, and view the file, including, where applicable, the name of the bulletin board and the category, topic, or file area where the file is located; and the identity of any software necessary to decompress the files. In the case of files archived on forums or bulletin boards found in commercial online services, provide the name of the online service and the "Key" "Go" or "Jump" words to access the bulletin board; in the case of files archived or accessible on the Internet at FTP sites, at USENET sites, or on Web pages, all electronic addresses at which the file is available, including any "mirrored" sites; in the case of files archived on dial-in bulletin boards, provide the telephone

10

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

number to access the bulletin board, and the name, business telephone number, and mailing address of the owner or operator of the bulletin board.

(6) In the case of messages posted on bulletin boards, a printout of the message posted, the date(s) it was posted, and information sufficient to locate and access the bulletin board areas where the information was posted.

(7) In the case of messages disseminated via e-mail, a printout of the e-mail message, the date(s) it was sent, and the electronic address from which the message was sent. In addition, if a LISTSERV or other mass mailing mechanism was utilized, provide the name of the LIST used to send the message, the e-mail address for subscribing to the LISTSERV or similar mechanism, and, if different, the e-mail address to which messages are submitted for mass mailing.

J.    The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

K.    The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

L.    The terms "and" and "or" have both conjunctive and disjunctive meanings.

M.    The term "plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

N.    The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company in the same manufactured form as purchased.

O.    The term "platform" as used herein includes, and information shall be provided separately for:

(1) consoles, and within consoles, information shall be provided separately for: PS2, PS3, XBOX, XBOX360, Wii, and all other types of consoles (specifying each such type);

(2) personal computers ("PC");

(3) hand-held computers, and within hand-held computers, information shall be provided separately for: Playstation Portable ("PSP"), Nintendo Handheld ("NDS"), Gameboy Adventure ("GBA"), and all other types of hand held computers (specifying each such

11

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

type);

(4) mobile devices and within mobile devices, <u>information shall be provided separately for</u>: cellular telephones, and all other types of mobile devices (specifying each such type); and

(5) digital content, and within digital content, <u>information shall be provided separately for</u>: game titles that are also sold as packaged goods which are downloaded, and games titles that are played online through hosted sites.

P.    The term "genre" as used herein includes, <u>and information shall be provided separately for</u>:

(1) action, and within action, <u>information shall be provided separately for</u>: each sub-genre (specifying each such sub-genre);

(2) sports, and within sports, <u>information shall be provided separately for</u> each type of sports game (e.g, football, basketball, baseball, hockey, soccer, tennis, golf, etc.), and within each type of sports game <u>information shall be provided separately for</u> simulation games and arcade-style games;

(3) shooter, and within shooter, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(4) role-playing game ("RPG"), and within RPG, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(5) racing, and within racing, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(6) strategy, and within strategy, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(7) family entertainment, and within family entertainment, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre); and

(8) and all other types of genres (specifying each such type).

Q.    The term "game rating" as used herein means, <u>and information shall be provided separately for</u>: Early Childhood ("EC"), Everyone ("E"), Everyone 10+ ("E10+"), Teen ("T"), Mature ("M"), and Adult Only ("AO").

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

R.    The term "relevant product" as used herein means each individual video game title, which includes game titles scheduled to be released over the next two years, in active development now, and contemplated for development (in whole or in part) over the next two years.  For each individual video game title, <u>information shall be provided separately</u> by platform.

S.    The term "relevant area" means, <u>and information shall be provided separately for:</u> (a) the United States; (b) worldwide; and (c) each area as to which the company collects and maintains information and data within the United States.

T.    The term "minimum viable scale" means the smallest amount of production at which average costs equal the price currently charged for the relevant product.  It should be noted that minimum viable scale differs from the concept of minimum efficient scale, which is the smallest scale at which average costs are minimized.

U.    The term "sunk costs" means the acquisition costs of tangible and intangible assets necessary to manufacture and sell the relevant product that cannot be recovered through the redeployment of these assets for other uses.

V.    All references to year refer to calendar year.  Unless otherwise specified, each of the specifications calls for: (1) documents for each of the years from January 1, 2004 to the present; and (2) information for each of the years from January 1, 2004 to the present.  Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date.  If calendar year information is not available, supply the company's fiscal year data indicating the twelve month period covered, and provide the company's best estimate of calendar year data.

W.    This CID shall be deemed continuing in nature so as to require production of all documents <u>responsive to any specification included in this CID</u> produced or obtained by the company up to forty-five calendar days prior to the date of the company's full compliance with this CID.

X.    The company shall discuss the form and method of production of responsive documents with the Commission representative identified on the last page of this CID.  The company shall be permitted to use any form and method of production of responsive documents that the Commission representative approves in writing.  The Commission can support the following production forms and methods:

(1)  In lieu of original paper documents, the company may submit either paper or electronic copies of original documents. If the documents are provided electronically as TIFF images, they should be accompanied by OCR;

13

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(2) In lieu of original documents stored electronically, the company may submit documents in the following forms:

(a) Electronically stored documents, except Microsoft Excel files and Access databases, may be produced as single-page TIFF images with a corresponding file containing the extracted text from the document, accompanied by a Opticon load file. Metadata and custodian information shall be provided in a delimited ASCII format. Microsoft Excel and Access files shall be provided natively.

(b) Electronically stored documents, excluding e-mail other than Microsoft Outlook, may be produced natively. Please discuss logistics of native production with the commission representative identified on the last page of this CID.

(3) Electronic productions may be submitted in the following methods:

(a) Responsive documents may be submitted through an online repository maintained by an independent vendor;

(b) Responsive documents may be submitted directly to the Commission on any combination of the listed media types; however, the Commission prefers IDE hard drives for productions over 10GB:

- CD-R CD-ROM formatted to ISO 9660 specifications;
- DVD-ROM for Windows-compatible personal computers;
- IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data;
- USB 2.0 Flash Drives;

(4) All electronic files submitted in response to this CID will be scanned for viruses. Media containing infected files will be returned for replacement.

(5) Documents submitted in hard copy shall be submitted in sturdy cartons not larger than 1.5 cubic feet. Number each such box and mark each such box with corporate identification and the name(s) of the person(s) whose files are contained in the box.

Y.    All documents responsive to this CID, regardless of format or form and regardless of whether submitted in paper or electronic form:

(1) shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged. For example:

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

(a) if in their original condition papers were stapled, clipped or otherwise
fastened together or maintained in file folders, binders, covers or containers, they
shall be produced in such form, and any documents that must be removed from
their original folders, binders, covers or containers in order to be produced shall
be identified in a manner so as to clearly specify the folder, binder, cover or
container from which such documents came; and

(b) if in their original condition electronic documents were maintained in folders
or otherwise organized, they shall be produced in such form and information shall
be produced so as to clearly specify the folder or organization format;

(2) if written in a language other than English, shall be translated into English, with the
English translation attached to the foreign language document;

(3) shall be produced in color where necessary to interpret the document;

(4) shall be marked on each page with corporate identification and consecutive document
control numbers;

(5) shall be accompanied by an affidavit of an officer of the company stating that the
copies are true, correct and complete copies of the original documents;

(6) shall be accompanied by an index that identifies: (i) the name of each person from
whom responsive documents are submitted; and (ii) the corresponding consecutive
document control number(s) used to identify that person's documents, and if submitted in
paper form, the box number containing such documents. If the index exists as a computer
file(s), provide the index both as a printed hard copy and in machine-readable form
(provided that Commission representatives determine prior to submission that the
machine-readable form would be in a format that allows the agency to use the computer
files). The Commission representative will provide a sample index upon request.

Z.    If any documents created prior to the company's Hart-Scott-Rodino filing are withheld
from production based on a claim of privilege, provide a statement of the claim of privilege and
all facts relied upon in support thereof, in the form of a log (hereinafter "Complete Log") that
includes each document's authors, addressees, date, a description of each document, and all
recipients of the original and any copies. Attachments to a document should be identified as such
and entered separately on the log. For each author, addressee, and recipient, state the person's
full name, title, and employer or firm, and denote all attorneys with an asterisk. The description
of the subject matter shall describe the nature of each document in a manner that, though not
revealing information itself privileged, provides sufficiently detailed information to enable
Commission staff, the Commission, or a court to assess the applicability of the privilege claimed.

15

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing the company that were not directly or indirectly furnished to the company or any third-party, such as internal law firm memoranda, may be omitted from the log.

In place of a Complete Log of all documents withheld from production based on a claim of privilege, the company may elect to submit a Partial Privilege Log ("Partial Log") for each person searched by the company whose documents are withheld based on such claim and a Complete Log for a subset of those persons, as specified below:

(1) The Partial Log will contain the following information: (a) the name of each person from whom responsive documents are withheld on the basis of a claim of privilege; and (b) the total number of documents that are withheld under a claim of privilege (stating the number of attachments separately) contained in each such person's files. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

(2) Within five (5) business days after receipt of the Partial Log, Commission staff may identify in writing five individuals or ten percent of the total number of persons searched, whichever is greater, for which the company will be required to produce a Complete Log in order to certify compliance with this CID.

(3) For the company to exercise the option to produce a Partial Log, the company must provide a signed statement in which the company acknowledges and agrees that, in consideration for being permitted to submit a Partial Log:

(a) the Commission retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the Commission seeks relief through judicial or administrative proceedings;

(b) the company will produce a Complete Log of all documents withheld from production based on a claim of privilege no later than fifteen (15) calendar days after such a discovery request is served, which will occur promptly after the filing of the Commission's complaint; and

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(c) the company waives all objections to such discovery, including the production of a Complete Log of all documents withheld from production based on a claim of privilege, except for any objections based strictly on privilege.

(4) The company must retain all privileged documents that are responsive to this CID until the expiration of the Hart-Scott-Rodino waiting period or the completion of any litigation challenging the acquisition of Take-Two by Electronic Arts.

(5) The Commission retains the right to require the company to produce a Complete Log for all persons searched in appropriate circumstances.

AA.    If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

BB.    If documents responsive to a particular specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy as disclosed or described in response to Specification 24 of this CID, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the specification(s) to which they are responsive, and identify persons having knowledge of the content of such documents.

CC.    Unless specifically requested by a specification in this CID, do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

For purposes of this CID, Sensitive PII means an individual's Social Security Number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth, Social Security Number, driver's license number or other state identification number or a foreign country equivalent, passport number, financial account number, credit or debit card number. For purposes of this CID, SHI includes medical records or other individually identifiable health information relating to the past, present, or future physical or mental condition of an individual, or the past, present, or future payment for the provision of health care to an individual.

17

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

DD.     For the company's response to this CID to be complete, the attached certification form must be executed by the official supervising compliance with this CID, notarized, and submitted along with the responsive materials.


Any questions you have relating to the scope or meaning of anything in this CID or suggestions for possible modifications thereto should be directed to Victoria Lippincott at 202-326-2983 or Ben Lorigo at 202-326-3717. The response to the CID shall be addressed to the attention of Victoria Lippincott or Ben Lorigo, and delivered between 8:30 a.m. and 5:00 p.m. on any business day to Federal Trade Commission. If you wish to submit your response by United States mail, please call one of the staff above for mailing instructions.

18

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

## CERTIFICATION

The response to this Civil Investigative Demand, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Federal Trade Commission.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Commission uses such copies in any court or administrative proceeding, the company will not object based on the Commission not offering the original document.

_____
(Signature)


_____
(Type or Print Name and Title)


Subscribed and sworn to before me at the City of _____,

State of _____, this _____ day of _____, 20_____.


_____
(Notary Public)

_____
(Date Commission Expires)

19

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:        William E. Kovacic, Chairman
                      Pamela Jones Harbour
                      Jon Leibowitz
                      J. Thomas Rosch

RESOLUTION DIRECTING USE OF
COMPULSORY PROCESS IN NON-PUBLIC INVESTIGATION

File No. 081-0138

Nature and Scope of Investigation:

To determine whether the proposed transaction between Electronic Arts Inc. and Take-Two Interactive Software, Inc. is in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; to determine whether the aforesaid proposed transaction, if consummated, would be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and to determine whether the requirements of Section 7A of the Clayton Act, 15 U.S.C. § 18a, have been or will be fulfilled with respect to said transaction.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

Authority to Conduct Investigation:

Sections 6, 9, 10 and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50 and 57b-1, as amended; Federal Trade Commission Procedures and Rules of Practice, 16 C.F.R. §§ 1.1, *et seq.*, and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Dated:  April 17, 2008

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Misc. Action No. 08-217 (RCL)** |
| | ) | |
| **SCOTT TARRIFF,** *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## MEMORANDUM OPINION

Presently before the Court is the Federal Trade Commission's Petition for an Order

Enforcing Subpoenas *ad Testificandum*. Specifically, the Federal Trade Commission ("FTC" or

"Commission") petitions this Court for an Order requiring Mr. Scott Tarriff, the former Chief

Executive Officer of Par Pharmaceutical Companies, Inc. ("Par"), Mr. Edward Maloney, a senior

executive of Paddock Laboratories, Inc. ("Paddock"), and Mr. Paul Campanelli, President of

Par's Generic division (collectively "respondents") to comply with the subpoenas *ad*

*testificandum* issued by the FTC to each of these individuals. Upon consideration of the petition,

the opposition and reply thereto, arguments made during an oral hearing, the parties'

supplemental filings, the applicable law, and the record herein, the Court finds that the petition

should be GRANTED.

## I. BACKGROUND

This matter stems from an ongoing Commission law enforcement investigation. The

investigation seeks to determine whether agreements between Unimed Pharmaceuticals, Inc.,

Laboratories Besins Iscovesco, and Solvay Pharmaceuticals, Inc. (collectively, "Solvay") and Par
or Paddock, or any other agreement, unlawfully delayed entry of a lower-cost generic version of
the drug AndroGel in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. The Commission
staff issued subpoenas to the respondents requiring them to appear for investigational hearings.
Specifically, the subpoenas were issued to obtain the respondents' testimony relating to the
negotiation and terms of the settlement agreements.

On November 29, 2007, a subpoena *ad testificandum* for an investigational hearing was
issued for Mr. Campanelli. (Resp't Opp'n 10.) Subsequently, on January 16, 2008, subpoenas
*ad testificandum* for investigational hearings were issued for Messrs. Tarriff and Maloney. (*Id.*)
At this point, none of the subpoenas provided for recording the investigational hearings by means
other than by stenographic recording. (*Id.*)

On January 16, 2008, Mr. Campanelli appeared for his investigational hearing as
scheduled by his subpoena. The January 16 hearing was recorded only by stenographic means.
(*Id.*) After a full-day hearing, Mr. Campanelli agreed to the Commission staff's request to
continue the hearing a second day, March 5, 2008. (*Id.*) After a series of communications
between respondents' counsel and the Commission staff regarding the latter's intention to record
by sound-and-visual means the future investigational hearings of Messrs. Campanelli, Tarriff,
and Maloney, the Commission issued amended subpoenas to the respondents on February 13,
2008. (Resp't Opp'n 12.) The new subpoenas *ad testificandum* provided that the investigational
hearings would be recorded by sound-and-visual means in addition to stenographic means.
(Mem. Supp. Pet. 5.)

On February 20, 2008, Par and Paddock filed with the Secretary of the Commission a

2

Petition to Quash or Limit the Subpoenas. (*Id.*) The Petition to Quash sought to quash or limit the subpoenas to the extent they required videotaping of the investigational hearings.

On March 14, 2008, the Commission issued a letter opinion rejecting the Petition to Quash finding that the Commission's rules "do not explicitly forbid the use of videotaping." (Resp't Opp'n 14.) On March 21, 2008, Par and Paddock notified the Commission of their intention not to comply with the subpoenas, and that the individual respondents refused to appear for the videotaped investigational hearings. (*Id.* at 15.) The Commission brought this subpoena enforcement action on April 16, 2008, seeking an order requiring respondents to show cause why they should not fully comply with the subpoenas. This Court entered its Order to Show Cause on April 17, 2008. Respondents filed their Response to Order to Show Cause on May 7, 2008, which was followed by the Commission's reply brief on May 14, 2008. This Court held a show cause hearing on May 23, 2008, at which time both parties presented oral argument.

## II. DISCUSSION

The sole issue before the Court is whether the Commission has authority to videotape investigational hearings pursuant to Rule 2.8(b), 16 C.F.R. § 2.8(b). That section provides:

> Investigational hearings shall be conducted by any Commission member, examiner, attorney, investigator, or other person duly designated under the FTC Act, for the purpose of hearing the testimony of witnesses and receiving documents and other data relating to any subject under investigation. *Such hearings shall be stenographically reported* and a transcript thereof shall be made part of the record of the investigation.

16 C.F.R. § 2.8(b) (emphasis added). Respondents argue that the Commission's authority to record investigational hearings is limited to that provided in Rule 2.8(b)—that investigational hearings "shall be stenographically reported." Otherwise stated, respondents interpret the word

3

"shall" as used in Rule 2.8(b) as not only mandatory, but also limiting.  According to

respondents, the rule mandates stenographic reporting but precludes the use of any additional

means of recording, such as videotape.  The Commission contends that Rule 2.8(b)'s requirement

that investigational hearings be "stenographically recorded" and transcribed establishes a

minimum standard of recordation.  The Commission interprets the word "shall" as used in the

rule as a mandate for stenographic transcription rather than as a term of limitation.  That is, so

long as the Commission stenographically records its investigational hearings, Rule 2.8(b) places

no restriction on additional means of recordation.  This Court agrees.

Respondents have failed to convince this Court that the word "shall" expresses not only a

mandatory direction, but also a limiting principle.  This Court sees no basis to stretch the term

"shall" beyond its ordinary meaning and usage.  *See Williams v. Taylor*, 529 U.S. 420, 431

(2000) (words of a statute must be given their "ordinary, contemporary, common meaning").

Rather, "shall" most commonly means "must."  *See* BLACK'S LAW DICTIONARY 1407 (8th ed.

2004) (defining "shall" as "has a duty to; more broadly, is required to"); *see also* WEBSTER'S

NINTH NEW COLLEGIATE DICTIONARY 1081 (Merriam-Webster 1990) ("shall" is "used in laws,

regulations, or directives to express what is mandatory"); *accord* Merriam-Webster Online

Dictionary, http://www.merriam-webster.com/dictionary/shall (last visited May 30, 3008).  As

the Commission successfully argues, this definition is in accord with the normal usage of the

word "shall."[1]

Respondents primarily rely on *Beverly Health & Rehabilitation Services, Inc. v. NLRB*,

---

[1] The Commission provides the following illustrative example:  "A direction to a teenage
son that he 'shall' clean his room does not thereby forbid him from taking out the trash, walking
the dog, or going to school."  (Pet'r Reply 3.)

4

317 F.3d 316 (D.C. Cir. 2003) to support their argument that the plain meaning of the words in

Rule 2.8(b) requires the Commission to record investigational hearings only by stenographic

means. In *Beverly Health*, the D.C. Circuit addressed a statute's requirement for unions to notify

their employer institutions at least ten days before the union would begin to strike. The statute

further provided that "[t]he notice, once given, may be extended by the written agreement of both

parties." *Beverly Health*, 317 F.3d at 320. The National Labor Relations Board argued that the

statute permitted a union to unilaterally extend a strike deadline since the statute did not

expressly state that agreement of the parties is the *only* means to obtain an extension. The Court

rejected that argument finding that there was no ambiguity where Congress carved out a single

express exception for extending the strike deadline—when both parties consent in writing. *Id.* at

321. The rule in *Beverly Health* is not relevant in the instant matter for two reasons. First, the

focus in that case was whether Congress intended that the statute would permit a *substitute*

method of extending the strike deadline other than the single exception provided. To that

question, the court read the plain language of the statute to require mutual agreement as the only

means of obtaining an extension. In this matter, neither party disputes that the Commission is

required to record its investigational hearings by stenographic transcription. The Commission

does not, and could not lawfully attempt to *substitute* stenographic recording with videotaping.

Rather, it seeks to use videotape as an *additional* means of recording the hearings. Second, the

*Beverly Health* court had no occasion to interpret the meaning of the term "shall." If anything,

the reasoning in that case primarily relates to the meaning of the term "may" as it is used in the

statute: "[t]he notice, once given, *may* be extended by the written agreement of both parties."

Respondents also cite authority to support their contention that since the words in Rule

5

2.8(b) only specify stenographic recording, those words set both the "ceiling" and the "floor" of

the Commission's authority to record investigational hearings. (*See* Resp't Opp'n 19 (citing

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532–33 (2007) (holding

that a statute's use of "shall" rendered the criteria set forth in the statute mandatory and

exclusive)).) In *Defenders of Wildlife*, the Supreme Court held that where Congress provided

that the EPA "shall approve" a transfer application unless the state lacks authority to perform the

nine functions specified in the section, the EPA has no discretion to deny an application because

some other criteria is not met. In other words, once the state satisfies the nine conditions set

forth in the statute, the application must be granted. The statutory language at issue in *Defenders

of Wildlife* is altogether different from the language in Rule 2.8(b). In that case, the statute set

forth conditions precedent for EPA's nondiscretionary approval of a transfer application. Here,

the Commission established a minimum requirement for what it must do to record investigational

hearings, irrespective of any condition precedent. *Defenders of Wildlife* is therefore irrelevant to

the Court's interpretation of the instant provision.

Similarly, respondents rely upon the interpretive canon, *expressio unius est exclusio

alterius*, "expressing one item of [an] associated group or series excludes another left

unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (citation omitted).

Respondents cite this Court's decision in *District of Columbia Financial Responsibility and

Management Authority v. Concerned Senior Citizens of the Roosevelt Tenant Ass'n*, 129 F. Supp.

2d 13 (D.D.C. 2000) (Lamberth, J.), to support their arguments. In that case, Congress

established a list of laws of the District of Columbia that "shall apply" to the Control Board.

This Court relied upon the expression-exclusion rule and held that Congress's "affirmative

statement that certain laws 'shall apply' to the Control Board necessarily implies that laws not referenced shall *not* apply." 129 F. Supp. 2d at 16.  Respondents' reliance on the expression-exclusion rule in the instant matter, however is misguided.  As the Supreme Court explained, "[t]he canon [*expressio unius*] depends on identifying a series of two or more terms or things that should be understood to go hand in hand."  *Chevron*, 536 U.S. at 81; *see Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 370 (2d Cir. 2006) (recognizing that *expressio unius* "applies only when the statue identifies a series of two or more terms . . . [that] rais[e] the inference that a similar unlisted term was deliberately excluded").  As Rule 2.8(b) includes no such series of terms, this Court sees no basis to find, based on the construction of the rule, that additional means of recordation are excluded.

Moreover, respondents' interpretation of Rule 2.8(b), if adopted, would lead to absurd results.  The Commission argues, for example, that under the respondents' interpretation, Rule 2.8(b) could even prohibit both Commission staff and counsel for the witness from taking longhand notes during the course of investigational hearings, or from using laptop computers. Indeed, respondents do not argue that the language at the end of Rule 2.8(b) providing that "a transcript [of the hearing] shall be made part of the record" restricts the Commission from also providing a copy of the transcript to the witness or the witness's counsel.[2]

Finally, respondents, both in their opposition brief and at oral argument, urge this Court

---

[2] Nor could they.  Respondents complain in their opposition brief that "[t]o date, the Commission has not provided Mr. Campanelli with a transcript of the first day of his investigational hearing."  (Resp't Opp'n 10.)  Under respondents' own interpretation of the Rule, however, the word "shall" would limit the Commission's handling of transcripts to the precise action required by the rule—that the Commission merely make the transcript part of the record. Providing a copy of the hearing transcript to the witness is therefore forbidden under the logic of respondents' interpretation.

to compare the context and history of Rule 2.8(b) to that of Federal Rule of Civil Procedure 30, which has been amended over the years to expressly provide for recording testimony using means other than stenographic transcription. The respondents claim that the Commission's failure to amend the original language of Rule 2.8(b) to expressly provide for additional recording methods even after the Federal Rules were amended, is evidence that Rule 2.8(b) allows the Commission to record investigational hearings only by stenographic means. (*See* Resp't Opp'n 24–25.) Respondents' argument ignores, however, that the original language in Rule 2.8(b) and Federal Rule of Civil Procedure 30(c) is quite different on its face. The 1967 version of Rule 2.8(b) stated then (and states now) as follows: "Such hearings shall be stenographically reported and a transcript thereof shall be made part of the record of investigation." The 1967 version of Federal Rule of Civil Procedure 30(c) read: "The testimony shall be taken stenographically and transcribed unless the parties agree otherwise." The final clause of the federal civil rule—"unless the parties agree otherwise"—makes it clear that, absent mutual agreement, stenographic transcription is the only permissible means of recordation under the rule. Commission Rule 2.8(b) has never contained a clause similar to the "unless" clause of the 1967 version of the federal civil rule. Thus, the 1968 district court case interpreting Rule 30(c) to prohibit videotaping upon which respondents rely, is not instructive here. (*See* Resp't Opp'n 23 (citing *U.S. Steel Corp. v. United States*, 43 F.R.D. 447, 451 (S.D.N.Y. 1968)).[3]

_____

[3] For a critique and discussion of *U.S. Steel Corp.*, see 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2115 (2d ed. 2008) (explaining that "it is difficult to see the basis for the [*U.S. Steel Corp.*] decision, since as long as the examination was to be recorded stenographically in the usual manner as well as electronically the provisions of the rule were complied with").

## III. CONCLUSION

This Court finds that the language in Rule 2.8(b) does not preclude the Commission from using videotape as an additional means of recording testimony during investigational hearings. The rule mandates that the Commission must record the hearings stenographically and make the transcript part of the record. As long as the Commission satisfies that minimum requirement, there is nothing in Rule 2.8(b) that prohibits the Commission from using additional recording methods. Moreover, this Court recognizes the added value of demeanor evidence in accessing the credibility of witnesses. For all of the reasons stated above, the Commission's Petition for an Order Enforcing Subpoenas *ad Testificandum* shall be GRANTED.

A separate order shall issue this date.


Signed by Royce C. Lamberth, Chief Judge, on June 2, 2008.

.



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division

E. Eric Elmore
Attorney

Direct Dial (202) 326-3109
Facsimile (202) 326-2071

May 8, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

Re:    Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two
       Interactive Software, Inc. in connection with Electronics Arts Inc. Proposed
       Acquisition of Take-Two Interactive Software, Inc.
       File No. 081-0138

Dear Mr. Axinn:

Yesterday, in a meeting with staff that you requested on behalf of Take-Two Interactive
Software, Inc. ("Take-Two" or "the company"), we discussed your request to extend the
compliance deadline for both the Subpoena *Duces Tecum* and the Civil Investigative Demand
issued on April 21, 2008, to Take-Two. Because any modifications to the Subpoena *Duces
Tecum* and the Civil Investigative Demand must be memorialized in writing by the Federal
Trade Commission, this letter responds to that request. We agree to extend the deadline one
week from May 9, 2008 to May 16, 2008, for both the Subpoena *Duces Tecum* and the Civil
Investigative Demand.[1]

In addition, staff is prepared to extend Take-Two's compliance deadline further if the
company demonstrates its good faith by starting this week and significantly expanding next
week the production of documents and information that we discussed at yesterday's meeting.

Specifically, on behalf of Take-Two, you agreed to provide the following documents and
information, which fall into nine categories:

---

[1] Please take note that this extension relates to Take-Two's response to the Subpoena and
CID only. It does not modify the time period during which Take-Two may file a petition to
modify or set aside the Subpoena and CID, which, pursuant to 15 U.S.C. § 57b-1(f)(1), must be
filed within twenty days of service of the CID and/or Subpoena, or before the return date if it is
less than twenty days.

Stephen Axinn, Esq.                                                                          Page 2
May 8, 2008

1.  A full response to Specification 21 of the Civil Investigative Demand issued to Take-Two beginning with the immediate production of a description of the company's electronic databases that contain certain information detailed in the Specification, examples of all regularly prepared and ad hoc reports generated using information contained in the databases, and the answers to subparts (a) - (g);

2.  Documents that describe Take-Two's pricing strategy during the 2004 to 2005 time period when it introduced certain sports titles at a recommended price point of $19.99, an analysis of the effects of that strategy, and any decisions relating to whether the company would continue or alter that strategy;

3.  Marketing and competition documents, including past, present and future product development plans, consumer research documents, and documents describing Metacritic ratings for the company's basketball, boxing, football, hockey, and tennis titles;

4.  Retailer account files containing information on promotional activities, pricing plans and strategies, and actual price discounts granted for GameStop, Best Buy, and Circuit City;

5.  Documents that discuss sports titles in the current development pipeline;

6.  Consumer research studies for Take-Two's 2K Sports brand and any other company's sports brand;

7.  Copies of the company's sports league licenses;

8.  NPD studies prepared for Take-Two analyzing 2K Sports and any sports title; and

9.  All other business and strategic plans for the company's basketball, boxing, football, hockey, and tennis titles.

Stephen Axinn, Esq.                                                    Page 3
May 8, 2008

    We are prepared to work with you on the production of documents and information
responsive to the Subpoena *Duces Tecum* and Civil Investigative Demand consistent with our
need to conduct a thorough investigation of this matter.


                                              Sincerely,


                                              E. Eric Elmore
                                              Staff Attorney, Mergers II Division


                                              Catharine M. Moscatelli
                                              Assistant Director, Mergers II Division


cc: Michael L. Keeley, Esq.
    Alicia J. Batts, Esq.



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division

Reid B. Horwitz                                                                                    Direct Dial (202) 326-2037
Attorney                                                                                           Facsimile (202) 326-2071

May 15, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

    Re:    Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two Interactive
          Software, Inc. in connection with Electronics Arts Inc. Proposed Acquisition of Take-Two
          Interactive Software, Inc., File No. 081-0138

Dear Mr. Axinn:

      Pursuant to our phone call today, you proposed to narrow further the scope of the documents you previously agreed to provide to the following types of documents from the files of David Ismailer, COO and Senior VP Pub Ops; Sarah Anderson, SVP Marketing; and Bob Blau, SVP Sales:

1.    Marketing and competition documents, including past and present product development plans, consumer research documents, and documents describing Metacritic ratings for the company's basketball and hockey titles;

2.    Business and strategic plans for the company's basketball and hockey titles.

      Moreover, you stated after conferring with the General Counsel of Take-Two that neither the CEO nor anyone else within Take-Two has, as of today, had any discussions with EA regarding EA's latest cash tender offer.

      Although we have not extended the CID and Subpoena compliance deadline, we have agreed to forego filing a judicial enforcement action for the next seven days for purposes of evaluating the sufficiency of your compliance to date. We look forward to receiving documents and information pertaining to the above categories on a rolling basis over the next seven to ten days in a format consistent with instructions X of Y of the Subpoena *Duces Tecum* issued to Take-Two on April 21, 2008. If for any reason this letter does not accurately reflect our agreement and the representations that you made on behalf of Take-Two, please notify me immediately in writing.

                           Sincerely,

                           Reid B. Horwitz

cc: Michael L. Keeley, Esq.



UNITED STATES OF AMERICA

## FEDERAL TRADE COMMISSION

WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division
601 New Jersey Avenue, N.W.
Washington, D.C. 20580
~
Reid B. Horwitz
Attorney
~
Direct Dial
202.326.2037

June 4, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

Re:     Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two
        Interactive Software, Inc. in Connection with Electronic Arts Inc. Proposed
        Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

Dear Mr. Axinn:

As you know, your client, Take-Two Interactive, has been out of compliance with the above-referenced Subpoena and CID since May 16, 2008.  Moreover, as recently as June 2, you have represented that your client does not intend to ever come into compliance with the Subpoena and CID.  Commission staff repeatedly has attempted to work with Take-Two and its various counsel to attempt to reach a compromise concerning this process that would benefit Take-Two by narrowing the scope of the process and benefit the Commission by helping to assure the prompt submission of the most critical responsive information.  But, on both occasions where Commission staff and counsel for Take-Two reached such agreements, within one week counsel for Take-Two informed staff that Take-Two was reneging on the agreement.

Instead, after these false starts, Take-Two has reviewed the files of only three of its employees and these reviews were very limited in scope.  On June 2, you indicated that, at most, Take-Two would be willing to conduct a similarly limited review of the files of three additional current or former employees.  As has been repeatedly indicated to you, this attempt at unilateral line drawing by Take-Two regarding the scope of the Commission's investigation does not comprise satisfactory compliance with the Subpoena and CID.

As a result of the impasse created by Take-Two, the Commission sees little alternative to seeking judicial enforcement of its compulsory process.  After much consideration, we will file

Letter to Stephen Axinn                                                           Page 2
June 4, 2008

an action unless, by 9 a.m. tomorrow morning, Take-Two, in writing, agrees to the following terms:

- To search the files of the nine employees that we discussed on May 28 and again on June 2 (many of whom have files that we had requested as far back as April);[1]

- To search the files of each custodian for responsive documents consistent with the parameters that you agreed to on May 7;[2]

- To produce all such responsive, non-privileged documents by June 18, 2008;

- To produce all of the current employees whose files are reviewed for investigational hearings;[3] and

- To search the files and to produce all responsive, non-privileged documents for any additional current or former employees of Take-Two designated by the Commission, as you also agreed to do on May 7.

Unless we receive an affirmative response from you, we will presume that Take-Two rejects this final effort at compromise by the Commission and the Commission will seek immediate judicial relief.


                         Very truly yours,



                         Reid B. Horwitz



---

1 These custodians are:  Ben Feder, Christoph Hartmann, Greg Thomas, Gary Dale, David Gershik, Erik Whiteford, Jason Argent, Evan Drew Smith, and Christopher Snyder.
2 A copy of the May 8, 2008, letter memorializing the May 7 agreement  is attached for your convenience.
3 Our understanding is that all of the individuals whose files would be reviewed are currently employees of Take-Two other than Eric Whiteford.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

─────────────────────────────

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Misc. No. |
| | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC. , | ) | |
| | ) | |
| Respondent. | ) | |

─────────────────────────────

**MEMORANDUM IN SUPPORT OF EMERGENCY PETITION OF THE
FEDERAL TRADE COMMISSION FOR AN ORDER ENFORCING A
SUBPOENA *DUCES TECUM* AND A CIVIL INVESTIGATIVE DEMAND
ISSUED IN A PRE-MERGER INVESTIGATION**

WILLIAM BLUMENTHAL
General Counsel

JOHN F. DALY
Deputy General Counsel - Litigation

JOHN ANDREW SINGER
Attorneys for Petitioner
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
(202) 326-3234
Fax (202) 326-2477
Email: jsinger@ftc.gov

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      THE SCOPE OF ISSUES CONSIDERED IN PROCEEDINGS TO
        ENFORCE COMPULSORY PROCESS IS NARROW . . . . . . . . . . . . . . . . . . . 12

II.     THE CIVIL INVESTIGATIVE DEMAND SHOULD BE ENFORCED . . . . . . 13

        A.      The Civil Investigative Demand is Within the Authority of the
                Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      The Procedural Requirements were Followed . . . . . . . . . . . . . . . . . . . . 13

        C.      The CID and Subpoena Seek Information that is Reasonably
                Relevant to the Commission's Investigation . . . . . . . . . . . . . . . . . . . . . . 14

                1.      The May 7, 2008, Agreement between Take-Two and the
                        Commission Concerning Categories of Documents and
                        Information to be produced to the Commission  . . . . . . . . . . . . 14

                2.      The Documents and Information Specified in the CID and
                        Subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        a.      The CID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        b.      The Subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.      Take-Two is Barred from Objecting to this Court that the CID and
                Subpoena are Unduly Burdensome  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*United States v. Legal Services for New York City,*
    249 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Adams v. FTC,*
    296 F.2d 861 (8th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*CFTC v. McGraw-Hill Companies, Inc.,*
    390 F.Supp.2d 27 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*EEOC v. City of Milwaukee,*
    919 F. Supp. 1247 (E.D. Wis. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*EEOC v. Cuzzens of Georgia, Inc.,*
    608 F.2d 1062 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FEC v. Committee to Elect Lyndon LaRouche,*
    613 F.2d 849 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*FTC v. Browning,*
    435 F.2d 96 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*FTC v. Carter,*
    636 F.2d 781 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*FTC v. Green,*
    252 F. Supp. 153 (S.D.N.Y. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*FTC v. Invention Submission Corp.,*
    1991 WL 47104 (D.D.C. Feb. 14, 1991), *aff'd*, 965 F.2d 1086
    (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14, 21

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*FTC v. O'Connell,*
    828 F. Supp. 165 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

*FTC v. Standard Oil Co. of Ohio*,
    1979 WL 1663 (D.D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*FTC v. Stanley Kaplan Educ. Ltd.*,
    433 F. Supp. 989 (D. Mass. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*FTC v. Tarriff*,
    No. 1:08-Misc-217-RCL (D.D.C. Jun. 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. U.S. Borax and Chemical Corp.*,
    1978 WL 1316 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*FTC v. United States Pipe & Foundry Co.*,
    304 F. Supp. 1254 (D.D.C. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*General Finance Co. v. FTC*,
    700 F.2d 366 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*NLRB v. Baywatch Security & Investigations*,
    2005 WL 1155109 (S.D. Tex. Apr. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Sealed Case (Admin. Subpoena)*,
    42 F.3d 1412 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Aero Mayflower Transit Co.*,
    831 F.2d 1142 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Markwood*,
    48 F.3d 969 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL STATUTES**

Clayton Act

    Section 7, 15 U.S.C. § 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13

    Section 7A, 15 U.S.C. § 18a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

iii

Federal Trade Commission Act

Section 5, 15 U.S.C. § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Section 9, 15 U.S.C. § 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Section 16, 15 U.S.C. § 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Section 20, 15 U.S.C. § 57b-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Section 20(e), 15 U.S.C. § 57b-1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Section 20(h), 15 U.S.C. § 57b-1(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 18a(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 18a(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 18(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## RULES AND REGULATIONS

16 C.F.R. § 2.7(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 22

16 C.F.R. § 803.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

## PRELIMINARY STATEMENT

The Federal Trade Commission ("Commission") petitions this Court, pursuant to Sections 9, 16, and 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 49, 56, 57b-1, and 28 U.S.C. § 1367, for an order requiring respondent, Take-Two Interactive Software, Inc. ("Take-Two"), to produce documents in accordance with a Commission administrative Subpoena *duces tecum* and to respond to written interrogatories in accordance with a Commission Civil Investigative Demand ("CID").[1]  Both the Subpoena and the CID were issued April 21, 2008, as part of a pre-merger investigation that seeks to determine whether the proposed acquisition of Take-Two by Electronic Arts Inc. ("EA") would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45.  This investigation must be completed within the statutory time allowed by Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR"), Section 7A of the Clayton Act, 15 U.S.C. § 18a .

This petition is filed on an emergency basis because EA has announced it intends to consummate the transaction on 45 days notice to the Commission.[2]  Since EA fully controls when it will provide such notice, the Commission must be prepared to determine whether the proposed transaction is anticompetitive and, if necessary, go into court to challenge it on a very abbreviated schedule over which it has, at most, very limited control.  As a result, time of the

---

[1] Commission CIDs are a type of administrative subpoena.  *See*, *e.g.*, *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1087 (D.C. Cir. 1992);  *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995); *General Finance Co. v. FTC*, 700 F.2d 366, 367 (7th Cir. 1983).  In a pre-merger investigation, Section 9 of the FTC Act, 15 U.S.C. § 49, gives the Commission authority to issue subpoenas in order to obtain the production of documents.  When the Commission seeks responses to interrogatories, it invokes its authority to issue CIDs pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1.

[2] In fact, EA could close the transaction on as little as 10 days notice to the Commission. 16 C.F.R. § 803.10(b).

1

essence in the Court's resolution of this petition.  The Subpoena and CID, along with their May 9 return date, specifically were designed to require Take-Two to promptly produce documents to Commission staff.  This would permit staff to analyze these documents, to use them to prepare for investigational hearings of Take-Two officials, and to complete these investigational hearings with sufficient time for the Commission to evaluate the competitive effects of the proposed transaction and thus decide whether to challenge the transaction prior to it being consummated within the abbreviated schedule that EA will set in motion.  Any delay in the resolution of this petition force the Commission to make its pre-consummation assessment of the proposed transaction based upon incomplete information.  Further, if the Commission were forced by Take-Two's non-compliance to defer full evaluation of the proposed transaction until after it is consummated, further harm may result because it usually is far more difficult for the Commission to obtain effective relief after a merger has closed.

The Commission, therefore, requests that this Court expeditiously issue an Order to Show Cause against Take-Two and schedule a hearing thereon as soon as practicable and preferably no later than fourteen (14) calendar days of the filing of this Petition.[3]  Further, the Commission requests that Take-Two's opposition to the petition (if any) be due within seven (7) calendar days of the date of entry of the Show Cause Order and the Commission's reply (if any), be due three (3) calendar days after the filing of Take-Two's opposition.  Should the Court grant the petition, the Commission requests that Take-Two be ordered to produce to the Commission: (a) within three (3) calendar days of the date of entry of the Order, (i) the information responsive to

---

[3]Counsel for Take-Two, Stephen Axinn, is aware that the Commission is filing this petition and, at Mr. Axinn's request, Commission staff is sending him a courtesy copy of the petition and all related papers to counsel via email.

the eight categories of prioritized information agreed to by Take-Two and the Commission on

May 7, 2008, *see infra,* and (ii) narrative responses to the interrogatories contained in the

Commission's CID; and (b) within seven (7) calendar days, the remainder of the documents

responsive to the specifications contained in the Subpoena.

## JURISDICTION AND VENUE

The jurisdiction and venue of this Court to enter an order enforcing the Commission's

Subpoena are conferred by Section 9 of the FTC Act, 15 U.S.C. § 49, which authorizes the

Commission to invoke the aid of the United States District Courts in enforcing its subpoenas.

This provision also confers jurisdiction to order enforcement of such subpoenas on any District

Court where the Commission's inquiry is taking place.  The Subpoena requires that documents

concerning various aspects of Take-Two's business operations be produced at the Commission's

headquarters in Washington, DC as part of an investigation based here.  Accordingly, since this

is a judicial district within which the Commission's inquiry is being carried on, this Court has the

authority under Section 9 of the FTC Act to issue its process (*viz.*, a show cause order) to Take-

Two in this proceeding.  *E.g., FEC v. Committee to Elect Lyndon LaRouche*, 613 F.2d 849, 854-

58 (D.C. Cir. 1979);  *FTC v. Browning*, 435 F.2d 96, 100 (D.C. Cir. 1970); *FTC v. Tarriff,* No.

1:08-Misc-217-RCL slip. op. at 3 (D.D.C. Jun. 2, 2008) (attached as Pet. Exh. 4).

The jurisdiction and venue of this Court to enter an order to enforce the CID are

conferred by Sections 20(e) and (h) of the FTC Act, 15 U.S.C. § 57b-1(e) and (h), which

authorize the Commission to invoke the aid of the United States District Courts in enforcing

such CIDs and confers jurisdiction on any district court where the person subject to the CID

"resides, is found, or transacts business."  Take-Two, which sells its video games all over the

3

country, transacts business in this district.  (Pet. Exh. 1, ¶4).  Additionally, this Court has

supplemental jurisdiction to enforce the CID issued to Take-Two because the enforcement of the

CID is "so related" to the enforcement of the Subpoena that enforcement of the Subpoena and

CID "form part of the same case or controversy under Article III of the United States

Constitution."  28 U.S.C. § 1367(a).

## STATEMENT OF RELEVANT FACTS

On March 13, 2008, EA issued a hostile cash tender offer to purchase the stock of Take-

Two.  The offer is set to expire on June 16.  If Take-Two's shareholders accept the offer, they

will receive approximately $2.1 billion in cash.  (Pet. Exh. 1, ¶5).  EA and Take-Two publish

video game titles within overlapping genres, including the sports genre.  In particular,

historically EA and Take-Two have sold competing titles for simulated sports games, including

basketball, football, hockey, and baseball.  (Pet. Exh. 1, ¶6).

On April 16, 2008, the Commission issued Requests for Additional Information about the

proposed transaction to both Take-Two and EA pursuant the HSR Act, 15 U.S.C. § 18a(e)(1)

("HSR second requests").  (Pet. Exh.1, ¶7).  In most transactions, a HSR waiting period – after

which the parties are free to consummate a transaction – is triggered by the certification of both

parties that they have substantially complied with their HSR obligations, including any second

requests.  However, for cash tender offers, the HSR waiting period is triggered solely by

certification of substantial compliance by the prospective purchaser (here EA).  Thus, the

waiting period begins to run regardless of when (or if) Take-Two substantially complies with

any Commission requests for information.  15 U.S.C. §§ 18a(b)(1)(A) and (B); 16 C.F.R.

§ 803.10(b).  *Id*.  The purpose of this waiting period is to provide the Commission with an

opportunity, following certification of substantial compliance, to complete its investigation and

to determine whether to challenge the transaction.  EA has announced that it intends to consummate the transaction 45 days after it provides such certification to the Commission, http://www.reuters.com/article/technologyNews/idUSN0435662420080604.

To attempt to ensure that the Commission has an opportunity to review Take-Two's documents during the course of its investigation and before the expiration of the 45 day period whose start will be determined by EA, on April 21, 2008, the Commission issued a Subpoena and CID to Take-Two that sought a large subset of the materials requested in the HSR second request issued to Take-Two.  Both the Subpoena and CID had return dates of May 9, 2008.  (Pet. Exh. 1, ¶7; Pet. Exhs. 2 and 3).  The compulsory process and return date were designed to permit the Commission to have an opportunity to conduct a meaningful review of Take-Two's submissions and to provide sufficient time to conduct investigational hearings.  (Pet. Exh. 1, ¶7).  Return receipts in the possession of the Commission indicate that, through its counsel, Take-Two received service of the Subpoena and CID on April 22, 2008.

On April 23, 2008, Alicia Batts, an attorney with Proskauer Rose LLP and counsel for Take-Two, discussed compliance with the CID and Subpoena with Reid Horwitz, the lead Commission attorney on the investigation.  Ms. Batts proposed that the Commission extend the return date.  Mr. Horwitz expressed a willingness to relax the return date if Take-Two agreed to review and provide responsive documents from the files of a limited number of Take-Two officials on an expedited rolling basis that would begin substantially before May 9.  In a follow-up conversation on April 24, Mr. Horwitz proposed specific officials to be subject to such an agreement.  (Pet. Exh. 1, ¶12).

On April 25, Ms. Batts counter-proposed producing responsive documents from the files of a largely different group of Take-Two officials, which she represented would better meet the

5

Commission's needs.  Ms. Batts stated that the search of these files would begin within several days, and that the Commission could expect to begin to receive documents shortly thereafter. The Commission accepted this counter-proposal, reserving the right to suggest adding a few additional individuals to the group of officials whose files would be reviewed.  (Pet. Exh. 1, ¶13).[4]

During the week of April 28, 2008, another Commission attorney, Eric Elmore, repeatedly offered to speak to Ms. Batts to discuss remaining compliance issues, including a revised due date for full compliance.  Ms. Batts declined these offers.  No documents were produced to the Commission during that week other than a handful of documents relating to Take-Two's football title that had been informally requested prior to April 16.  (Pet. Exh. 1, ¶14).   On May 5, 2008, Mr. Horwitz received a telephone call from Stephen Axinn of Axinn, Veltrop & Harkrider LLP, who informed him that his firm was now assisting Proskauer Rose in its representation of Take-Two before the Commission.  Mr. Axinn proposed meeting with counsel for the Commission on May 7 to discuss compliance with the Subpoena and CID.   (Pet. Exh. 1, ¶15).

At the meeting, Mr. Axinn stated that Take-Two would not produce documents pursuant to the April 25 agreement entered into by Take-Two through Ms. Batts.  (Pet. Exh. 1, ¶15). Instead, Mr. Axinn proposed that Commission staff could better advance its investigation by adopting an approach focusing on the production of specific categories of documents on a phased basis, rather than focusing on particular Take-Two personnel.  Mr. Axinn represented

---

[4]Though not within the scope of Subpoena or CID, Mr. Horwitz also understood that Take-Two was willing to produce individuals for investigational hearings as is typically the case during HSR second request investigations, and would produce each witnesses's files to the Commission with sufficient time to review them prior to such hearings.

that, in the four days since he had been retained by Take-Two, he had hired 40 contract attorneys to expedite document review and would be prepared to produce some of the responsive materials within a few days and a significant portion of the balance of the first phase no later than May 16. He then suggested that, during or after completing its review of the documents produced in the first phase, Commission staff could identify additional documents  that it wanted Take-Two to produce as the next phase.  Mr. Axinn envisioned this iterative process continuing until the Commission staff had either completed or saw no reason to continue its investigation, or Take Two had substantially complied with the Subpoena and CID (and HSR second request).  He also indicated Take-Two's willingness to make key individuals available for investigational hearings. *Id*. at ¶16.

Commission staff accepted this May 7 proposal, as confirmed in a May 8, 2008, letter to Mr. Axinn.  (Pet. Exh. 1, ¶17; Pet. Exh. 5).  Commission staff identified nine categories of documents that would constitute the first phase and, based upon this agreement, Commission staff agreed to extend Take-Two's compliance deadline for one week, from May 9 to May 16, 2008, for both the Subpoena and CID.  (Pet. Exh. 1, ¶11; Pet. Exh. 5).  Staff further indicated that it was prepared to extend Take-Two's return date further if the company demonstrated its good faith by starting production of the first phase of responsive documents during the week of May 5, and significantly expanded this production during the week of May 12.  (Pet. Exh. 1, ¶17).

Commission staff received two very limited submissions following the May 7 agreement. On May 9, it received a description of Take-Two's databases and copies of its licensing agreements with the various professional and college sports leagues and associations.  On May 14, it received 721 pages of pricing analyses, marketing and business plans, and emails.  Many,

7

if not most, of these documents consisted of illegible spreadsheets.  (Pet. Exh. 1, ¶18).

On May 9, 2008, Mr. Axinn's law partner, Michael Keeley, informed Commission staff that Take-Two would not produce the documents covered by the May 7 agreement and had directed him to cease any further document review or production unless the Commission further circumscribed its document requests.  Take-Two had decided, because the proposed transaction is a hostile cash tender offer, that it did not want to be burdened with the expense or effort of compliance with the Subpoena and CID (or the HSR second request).  Presumably to avoid compliance disputes, Mr. Axinn requested an indefinite extension on the May 16 return date. (Pet. Exh. 1, ¶19-20).

While Take-Two negotiated and reneged on agreements with Commission staff, the deadline for Take-Two to seek administrative relief from the Commission by raising all legal and factual objections to the Subpoena and CID through a petition to quash or limit the Subpoena and CID passed. 16 C.F.R. § 2.7(d) (deadline for filing such a petition with the Commission's Secretary is the earlier of 20 days after receipt of process or the return date). Take-Two has not filed a such petition, timely or otherwise.  (Pet. Exh. 1, ¶33).

On May 15, 2008, Mr. Axinn and Commission staff reached an interim agreement under which the Commission agreed not to commence an enforcement proceeding for the Subpoena and CID until at least May 22, 2008.  (Pet. Exh. 6).[5]  In return for the Commission's forebearance, with what Mr. Axinn represented was express authorization of the Take-Two's general counsel, Take-Two agreed to review, as a first phase, the files of three of its officers,

---

[5]The Commission did not, however, extend the return date for the Subpoena and CID beyond May 16, 2008, and, therefore, Take-Two has been in default on this compulsory process since that date.  (Pet. Exh. 1, ¶21).

Chief Operating Officer and Senior Vice President, David Ismailer, Senior Vice President for Marketing, Sarah Anderson, and Senior Vice President for Sales, Bob Blau. Mr. Axinn represented that Take-Two believed these three individuals were the persons most likely to have information responsive to the Commission's compulsory process. For these three individuals Take-Two would search for a subset of the documents covered by the May 7 agreement: (1) marketing and competition documents, including past and present product development plans, consumer research documents, and documents describing Metacritic ratings for the company's basketball and hockey titles; and (2) business and strategic plans for the company's basketball and hockey titles. On a rolling basis beginning within one week, Take-Two agreed to produce all non-privileged responsive documents. (Pet. Exh. 1, ¶21).

On May 22, 3008, Take-Two began the electronic production of some of the documents within the scope of the May 15 interim agreement. (Pet. Exh. 1, ¶22).

On May 27, 2008, Commission staff spoke with Mr. Keeley, who reported that the document review for the three individuals covered within the May 15 interim agreement was not yet complete due to continuing privilege review. He also stated that his firm had not and did not intend to review any paper-format documents, only documents stored in electronic format. He also revealed that Take-Two had directed his firm to produce no additional documents absent any further agreement with Commission staff once the production pursuant to the May 15 interim agreement was completed. (Pet. Exh. 1, ¶23).

Commission staff indicated to Mr. Keeley that it expected Take-Two to search the files of additional employees consistent with Take-Two's May 7 commitment to provide a phased response to the Subpoena and CID. Mr. Keeley responded that he could not agree to such an undertaking without first consulting his client. He also agreed to consult with Take-Two about

9

producing several Take-Two officials for investigational hearings by Commission staff, with the

identification of the specific individuals to be deposed to be determined.  (Pet. Exh. 1, ¶24).

On May 28, Mr. Keeley and Commission staff again spoke.  Staff informed Mr. Keeley

that it wanted Take-Two to produce documents for between an additional six to nine current or

former officials of Take-Two.  (Pet. Exh. 1, ¶¶25-26).[6]  Staff also requested that Take-Two

expand its search to include documents relating to boxing and tennis.  (Pet. Exh. 1, ¶26).

Finally, staff indicated that it wanted Take-Two to designate the person or persons most familiar

with Take-Two's pricing, including promotional pricing, and, if this person (or these persons)

was (were) not among the persons already designated by the Commission, that the documents of

such person(s) also be produced.  *Id.*

Mr. Keeley again indicated that he lacked the authority to make any commitments on

behalf of Take-Two.  Commission staff reminded him that Take-Two was not in compliance

with the Subpoena and CID, that the agreement to forego seeking judicial enforcement of the

Commission's compulsory process had expired, and that because time remained of the essence,

staff needed a response to its proposed second phase of document production by noon on Friday,

May 30, 2008, so that, if necessary, the Commission could file this petition with sufficient time

to obtain the information sought by Subpoena and CID and have a meaningful opportunity to

---

[6]The six persons whose documents the Commission definitely wants to be produced are:
Gary Dale, Executive Vice President for Sales; Ben Feder, Chief Executive Officer; David
Gershik, Vice President of Sales; Chris Hartman, President of 2K Games; Greg Thomas,
President of Visual Concepts; and Eric Whiteford, former Vice President of Marketing.  (Pet.
Exh. 1, ¶25).  Because their names appeared frequently on documents already produced to the
Commission, staff requested that Take-Two inform them of the titles and place on the
organization chart for three individuals: Jason Argent; Even Drew Smith; and Christopher
Snyder.  The Commission reserved the right to demand the production of these individuals' files
based upon this additional information.  (*Id.* at ¶26).

assess and use it.  (Pet. Exh. 1, ¶27).

On May 29, at Mr. Keeley's request, Commission staff agreed to extend Take-Two's deadline for responding to the Commission's May 28 proposal until June 2, because of the personal travel schedule of Mr. Axinn.  Also on that day, Mr. Keeley left a voice mail message that identified the titles of Argent, Smith and Snyder.  (Pet. Exh. 1, ¶28).

In a June 2 telephone call, Mr. Axinn informed Commission staff that Take-Two would not voluntarily fully comply with the Subpoena or CID.  (Pet. Exh. 1, ¶).  Instead, at most  Take-Two would review the documents of three additional officials (Gary Dale, David Gershik and Eric Whiteford) and their documents would only be subject to the limited scope of review of the May 15 interim agreement, not the broader review of the May 7 agreement.  Mr. Axinn represented that the review and production of documents for the initial three employees cost $1.2 million and review and production for three more employees would cost an additional $1 million.  Mr. Axinn also contended that documents relating to boxing and tennis video games need be produced because, in Mr. Axinn's opinion, these two game genres did not have any antitrust implications.  Later in the day, in a conversation with Deputy Assistant Director Bloom, Mr Axinn ambiguously suggested that Take-Two might be willing to review unspecified files for unidentified employees.  (Pet. Exh. 1, ¶¶ 29-31).

On June 4, Commission staff emailed a letter to both Mr. Axinn and Mr. Keeley stating that negotiations with Take-Two had reached an impasse, and that the staff would seek immediate judicial enforcement of the Subpoena and CID barring a representation by Mr. Axinn before 9:00 AM June 5, 2008, that Take-Two was willing to produce additional and comprehensive phased responses in a prompt and timely manner.  (Pet. Exh. 7).  Mr. Axinn responded by telephoning both the Director of the Bureau of Competition and the Commission's

11

Principal Deputy General Counsel during the afternoon of June 4, requesting that they intercede before staff filed this petition.  Both declined Mr. Axinn's request. On June 5, Mr. Axinn sent a letter to Mr. Horwitz responding to Mr. Horwitz's June 4 letter.  Mr. Axinn's letter made no new proposals concerning document production or compliance but did reveal that Take-Two had not yet completed document production covered by the May 15 interim agreement.  (Pet. Exh. 1, ¶ 25 and 32).

## ARGUMENT

### I.    THE SCOPE OF ISSUES CONSIDERED IN PROCEEDINGS TO ENFORCE COMPULSORY PROCESS IS NARROW

Although "the court's function is 'neither minor nor ministerial,' the scope of issues which may be litigated in a [compulsory process] enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (*en banc*) (internal citation omitted).  Indeed, the "very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the *rapid* exercise of the power to investigate . . ."  *Id.*  (emphasis added).

The standard for judicial enforcement of administrative compulsory process is settled:

It is well established that a district court must enforce a federal agency's investigative subpoena if the information sought is "'reasonably relevant,'" *FTC v. Texaco Inc.*, 555 F.2d 862, 872, 873 n.23 (D.C. Cir.) (*en banc*) (*quoting United States v. Morton Salt*, 338 U.S. [at] 652 . . .) -- or, put differently, "'not plainly incompetent or irrelevant to any lawful purpose' of the agency," *Id.* at 872 (*quoting Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 . . . (1943))*; accord United States v. Aero Mayflower Transit Co.*, 831 F.2d 1142, 1145 (D.C. Cir. 1987) -- and not "unduly burdensome" to produce, *Texaco*, 555 F.2d at 881.  We have said that the agency's own appraisal of relevancy must be accepted so long as it is not "'obviously wrong.'" *FTC v. Carter*, 636 F.2d [at] 787-88 (*quoting Texaco*, 555 F.2d at 877 n.32).

*FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992). *Accord United States v. Legal Services for New York City*, 249 F.3d 1077, 1083 (D.C. Cir. 2001); *CFTC v. McGraw-Hill Companies, Inc.*, 390 F.Supp.2d 27, 35 (D.D.C. 2005). If an agency's administrative compulsory process meets this standard, this Court "must enforce it." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1415 (D.C. Cir. 1994).

II.    **THE CIVIL INVESTIGATIVE DEMAND SHOULD BE ENFORCED**

A.    **The Civil Investigative Demand is Within the Authority of the Commission**

The Commission's authority to issue its Subpoena and CID is clear. So, too, is the Commission's authority to investigate acts and practices that may violate § 5(a) of the FTC Act or Section 7 of the Clayton Act. *See Adams v. FTC*, 296 F.2d 861, 867-70 (8th Cir. 1961); *FTC v. United States Pipe & Foundry Co.*, 304 F. Supp. 1254, 1259 (D.D.C. 1969); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 584 (D.C. Cir. 2001) (Commission subpoenas to be enforced unless the Commission "patently" lacks authority over the subject of the investigation), *FTC v. Carter*, 636 F.2d 781, 787-88 (D.C. Cir. 1980); *FTC v. Green*, 252 F. Supp. 153, 155-56 (S.D.N.Y. 1966).

B.    **The Procedural Requirements were Followed**

The Subpoena and CID were issued pursuant to a valid Commission resolution authorizing the issuance of compulsory process for possible violations of the FTCA and Clayton Act arising from the possible acquisition of Take-Two by EA. (Pet. Exhs. 2 and 3). The Subpoena and CID were signed by a Commissioner, *id.*, and were served by the Commission's Secretary as provided by the Commission's Rules. (Pet. Exh. 1, ¶). The procedural requirements for the CID were, therefore, followed.

**C.    The CID and Subpoena Seek Information that is Reasonably Relevant to the Commission's Investigation**

Compulsory process issued by the Commission should be enforced so long as it is "reasonably relevant" – or put differently, "not plainly incompetent or irrelevant to any lawful purpose of the agency." *Invention Submission Corp.*, 965 F.2d at 1089. Here, this threshold is more than met. The Commission's Subpoena and CID are in furtherance of an investigation seeking to determine whether the proposed acquisition of Take-Two by EA could result in any violations of the FTC Act or the Clayton Act. The information sought by the Commission through the Subpoena and CID, which are substantially similar to standard HSR second requests, is reasonably relevant to this investigation because it is designed to produce information that will assist the Commission in ascertaining whether "the law is being violated in some way and . . . to determine whether or not to file a complaint." *Invention Submission Corp.*, 965 F.2d at 1090.

The Commission's Subpoena and CID are specifically focused on obtaining more knowledge about Take-Two, its operations, the markets in which operates, and the potential anticompetitive effects on these markets as a result of the proposed transaction. While Take-Two's board and management currently may oppose the proposed transaction, the ultimate decision makers are not them, but Take-Two's shareholders. Thus, even while this is characterized as a "hostile" tender offer, it remains indisputable that this is the Commission's only opportunity to obtain information reasonably relevant to its investigation and thereby fulfill its statutory duty to review the proposed transaction under the authority of the HSR Act and, if necessary, to seek to prevent it.

**1.    The May 7, 2008, Agreement between Take-Two and the Commission Concerning Categories of Documents and Information to be produced to the Commission**

14

The categories of documents and information that Take-Two agreed to produce through the agreement reached with Commission staff on May 7, 2008 (Pet. Exh. 4), are clearly relevant to the Commission's investigation on the potential effect of the proposed transaction on competition in sports games markets.[7]  The first category related to a discount pricing strategy conducted by Take-Two in 2004-05 for its sports games, including its games in direct competition with games sold by EA.  The effect of such price competition clearly is relevant to the investigation given that the proposed transaction would eliminate any future price competition in these areas between EA and Take-Two.  The second category covered Take-Two's marketing documents for its basketball, boxing, football, hockey, and tennis simulated sports games.  This information is relevant because it involves the types of games as to which Take-Two and EA have competed historically.

The third category involved information relating to Take-Two's relationship with three of its primary retail outlets.  This information is relevant since it would help to explain how Take-Two competes on the retail level.  The fourth category involves games under development by Take-Two, including updates of existing games.  This will help to reveal potential future competition between Take-Two and EA.  The fifth category covered information concerning marketing documents for Take-Two's "2K" series of sports games (baseball, basketball, football and hockey).  This information is relevant because, again, these are areas in which Take-Two and EA have historically competed.  The sixth category involved Take-Two's licensing agreements with major sports leagues.  This information is relevant because affiliation with these

---

[7]The May 7 agreement included nine categories of prioritized information.  One of these categories was responding to CID interrogatory 21.  This interrogatory is addressed in the discussion of the CID, *infra*.

15

leagues can enhance the marketing for a particular sports game, *e.g.*, National Hockey League for a hockey game.

The seventh category related to any studies prepared for Take-Two by NPD studies, an independent market research company that focuses on consumer trends, sales and other marketing information, involving Take-Two's 2K sports games and other sports games. These documents are relevant because they provide information on past, current and potential sports games markets. The eighth category concerned business and strategic plans for Take-Two's sports games. This information is relevant because it will help to explain Take-Two's view of sports games markets.

## 2. The Documents and Information Specified in the CID and Subpoena

### a. The CID

The CID consists of 26 interrogatories requiring narrative or other responses. Described summarily below, the interrogatories are set out in full in Pet. Exh. 3. Take-Two has not produced a single response to the CID even though, as indicated below, all of the interrogatories seek information reasonably relevant to the Commission's investigation of the potential transaction. Moreover, in the agreement with Commission reached on May 7, 2008, Take-Two specifically promised to respond to Interrogatory 21 no later than May 16, 2008. (Pet, Exh. 4).

Interrogatory 1 asks for the identification of persons with knowledge about Take-Two's products. Interrogatory 26 asks for the identification of all persons who prepared Take-Two's responses. Interrogatory 21 asks Take-Two to identify all electronic databases it maintains and what information is contained in each such database. These interrogatories are relevant because they provide the potential sources of information for the Commission's investigation.

Interrogatory 2 requests a listing of prices for Take-Two's products since 2004.

Interrogatories 3, 4 and 6 request various annual, quarterly and annual sales and financial information for Take-Two's products while Interrogatory 16 requests identification of the types of financial statements prepared by Take-Two since 2003. Interrogatory 5 requests information about the production and related contract terms and pricing for the media on which Take-Two's products are published. Interrogatory 7 requests various types of information about how Take-Two establishes recommended prices for its products and any price-checking programs it uses. These interrogatories are relevant to the Commission's investigation because they provide financial information about Take-Two.

Interrogatory 8 requests information concerning Take-Two's relationship with its largest 20 wholesalers while Interrogatories 9 and 12 request information concerning its relationship with retailers, especially its largest 20 retailers. Interrogatories 10 and 17 request information about any websites concerning Take-Two products maintained by Take-Two and any third parties. Interrogatory 11 asks for the identity of any consultants who worked with Take-Two regarding its concerns about EA's entering into licensing agreements with professional sports brands. These interrogatories are relevant to the Commission's investigation because they provide information about how Take-Two sells and markets its products.

Interrogatory 13 asks for Metacritic ratings for Take-Two's products. Interrogatory 14 requests the identification of the top five video games that restrain the prices on Take-Two's games while Interrogatory 15 asks for the identification of the top five competitors' video games that Take-Two has evaluated for its own product development. Interrogatory 19 requests how Take-Two evaluates the development potential for its products. Interrogatory 18 asks for the identification of all other video game producers since 1998. Interrogatory 20 requests the identification of all trade or other associations to which Take-Two belongs. Interrogatory 23

17

requests Take-Two to explain its future business plans.  These interrogatories are relevant to the Commission's investigation because they provide information about how Take-Two competes in the marketplace and helps to provide information about who Take-Two views as its competitors.

Interrogatory 22 requests an identification of all statements or actions by Take-Two or others concerning the proposed transaction.  This interrogatory is relevant because it will help the Commission determine how Take-Two and others perceive the proposed transaction.

Interrogatory 23 asks Take-Two to state its document retention and destruction program and to identify the jurisdictions where it does business and maintains resident agents.  This interrogatory is relevant because helps to determine what information may have been destroyed by Take-Two.

### b.    The Subpoena

The 29 Subpoena document production specifications are designed to permit the Commission to obtain documents that will permit it learn more about Take-Two, its sports and other games, and the markets on which the proposed transaction may have an impact on competition.  As a result, the documents sought by the Commission are "reasonably relevant" to the Commission's investigation of the transaction.  Described summarily below, the document production specifications are set forth in full in Pet. Exh. 2.

Specification 1 requests organization charts and personnel directories for Take-Two from January 1, 2004, through the present.  This specification permits the Commission to determine who may have information relevant to the investigation.

Specification 2 is covered by category 8 of the May 7 agreement.

Specification 3 requests documents relating to any discounts or allowances for Take-Two's video games, such as rebates and promotional allowances.  Specification 4 requests

18

documents relating to any data involving the substitutability or cross-elasticity of other video games for Take-Two's video games. Specifications 5 and 6, respectively, request documents relating to Take-Two's relationships with its twenty largest wholesalers and retailers, including all contractual and promotional agreements in place since January 1, 2006. Specification 13 requests all documents relating to vendor participation in product placement with retailers. These specifications are relevant to the Commission's investigation because they will provide information about how Take-Two sells and markets its products and how Take-Two defines its product market(s).

Specification 7 requests a copy of packaging for each of Take-Two's sports, shooter, strategy, racing and action games. Specifications 8, 9 and 10, respectively, request the production of all marketing and advertising materials, marketing and advertising plans, and consumer research materials concerning these types of games. Specification 14 requests the production of all documents comparing Take-Two's sports, shooter, strategy, racing and action games with those of any other entity. As with the specifications discussed in the preceding paragraph, these specifications are relevant to the Commission's investigation because they will provide information about how Take-Two sells and markets its products and how Take-Two defines its product market(s).

Specification 11 requests the production of any analyst reports concerning the video gaming industry, including Take-Two's competitors and the effect of the proposed transaction. Specification 12 is mostly covered by the Category 7 of the May 7 agreement but also requests the production of any documents analyzing the effect of licenses from professional sports leagues. These specifications are relevant to the Commission's investigation because they will provide information about how Take-Two markets its products and how Take-Two defines its

19

product market(s).

Specification 15 asks for the production of all planning documents relating to Take-Two's video games, such as business and strategic plans, investment banker or other consultant reports, and budgets and financial projections. Specification 16 requests the production of corporate financial statements. Specification 26 requests similar types of documents. These specifications are relevant to the Commission's investigation because they will provide financial information about Take-Two.

Specification 17 requests the production of all market studies, forecasts and surveys for its products. Specification 18 requests any intellectual property agreements relating to its interactive games. Specification 19 requests documents regarding economies of scale in the production of its products. Specification 20 requests documents concerning the cost of entry into the markets for its products. Specification 21 requests documents provided to or received from third parties concerning its products. These specifications are relevant to the Commission's investigation because they will provide information about how Take-Two sells and markets its products, its costs of production for its products, how Take-Two defines its product market(s), and how Take-Two views its competition.

Specifications 22 through 24 involve requests for documents concerning the proposed transaction. Number 22 asks for any documents from consultants concerning the transaction, 23 asks for all Take-Two documents relating to the transaction, and 24 asks for all documents relating to any efficiencies that may arise from the transaction. Specification 25 requests the production of documents relating to any possible transactions involving Take-Two with parties other than EA. These documents are relevant to the Commission's investigation because they will provide responsive information about how Take-Two views and is reacting to the proposed

20

transaction.

Finally, Specification 27 requests all documents previously produced to the Commission by Take-Two but not in machine readable form. Specifications 28 and 29 request the production of Take-Two's document retention and destruction policies and a copy of any internal documents prepared to by Take-Two concerning directions on the preparation of its response to the Commission's compulsory process.

### D. Take-Two is Barred from Objecting to this Court that the CID and Subpoena are Unduly Burdensome

The failure of Take-Two to seek any administrative relief from the Commission concerning the Subpoena and CID bars it from raising any factual or legal objections (relating to burden or otherwise) for the first time with this Court. Long standing Commission Rule 2.7(d)(1), 16 C.F.R. § 2.7(d), requires that all legal or factual objections to Commission compulsory process must be raised through a petition to quash or modify the Subpoena or CID. Such petitions must be filed with the Commission's Secretary "within twenty (20) days after service of the subpoena . . ., or, if the return date is less than twenty (20) days after service, prior to the return date." Here, Take-Two, which was served withe Subpoena and CID on April 22, 2008, has utterly failed to file a petition to quash or limit, timely or otherwise. (Pet. Exh 1, ¶33).

It is a well established principle of administrative law that a party that fails to exhaust its administrative remedies will not be permitted to raise objections for the first time in court. *E.g., EEOC v. Cuzzens of Georgia, Inc*., 608 F.2d 1062, 1063-64 (5th Cir. 1979); *NLRB v. Baywatch Security & Investigations*, 2005 WL 1155109, at *2 (S.D. Tex. Apr. 28, 2005); *EEOC v. City of Milwaukee*, 919 F. Supp. 1247, 1255 (E.D. Wis. 1996); *FTC v. O'Connell*, 828 F. Supp. 165, 168 (E.D.N.Y. 1993); *FTC v. Invention Submission Corp.*, 1991 WL 47104, at *2 n.12 (D.D.C.

Feb. 14, 1991), *aff'd*, 965 F.2d 1086, 1089 (D.C. Cir. 1992); *FTC v. Standard Oil Co. of Ohio*, 1979 WL 1663 at *2, n.4 (D.D.C. 1979); *FTC v. U.S. Borax and Chemical Corp*., 1978 WL 1316 (D.D.C. 1978); *FTC v. Stanley Kaplan Educ. Ltd.*, 433 F. Supp. 989, 992 (D. Mass. 1977). *Cf. FTC v. Tarriff,* No. 1:08-Misc-217-RCL slip. op. at 2-3 (D.D.C. Jun. 2, 2008) (in a Commission action to compel compliance with CID court considered objections in the first instance raised by a timely petition to quash filed with and then denied by the Commission).

The message of these cases is unambiguous: a recipient of administrative process that has any legal or factual objections to the process must in the first instance seek relief from the administrative agency that issued the process – the recipient cannot raise any objections for the first time in court, even if these objections are raised in the context an enforcement proceeding initiated by the administrative agency. This concept is critical since administrative process like the Commission's is not self-enforcing. If courts held otherwise and permitted objections to be raised for the first time in court, this would serve as an invitation for the recipients of administrative process to ignore administrative remedies such as those set out in 16 C.F.R. § 2.7(d) and sit on their rights unless and until the issuing agency seeks judicial enforcement of its process. This would result in a needless waste of judicial resources if courts were forced to consider such objections in the first instance. Not only would courts be forced to resolve objections that may have been resolvable at the administrative level, courts would also be forced to develop a record rather than to reach theirs decisions based upon a record developed before the administrative agency.

## CONCLUSION

For the reasons set out above, this Court promptly should issue an Order to Show Cause against Take-Two and then should grant the relief requested by the Commission in this Petition.

Respectfully submitted,

WILLIAM BLUMENTHAL
General Counsel

JOHN F. DALY
Deputy General Counsel - Litigation


_____/S/_____
JOHN ANDREW SINGER
Attorneys for Petitioner
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
(202) 326-3234
Fax (202) 326-2477
Email: jsinger@ftc.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| Petitioner, | ) | |
| v. | ) | Misc. No. |
| TAKE-TWO INTERACTIVE SOFTWARE, INC. , | ) | |
| Respondent. | ) | |

### (PROPOSED) ORDER TO SHOW CAUSE WHY RESPONDENT SHOULD NOT COMPLY WITH FEDERAL TRADE COMMISSION'S SUBPOENA *DUCES TECUM* AND CIVIL INVESTIGATIVE DEMAND

Pursuant to the authority conferred by Sections 9, 16, and 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 49, 56, 57b-1, and 28 U.S.C. § 1367, petitioner, the Federal Trade Commission, has invoked the aid of this Court, pursuant to Fed. R. Civ. P. 81(a)(5), for an order requiring the respondent, Take-Two Interactive Software, Inc. ("Take-Two"), to produce responses to written interrogatories and a sworn verification in compliance with both an administrative Subpoena *duces tecum* and Civil Investigative Demand ("CID") issued by the Commission on April 21, 2008, in aid of an investigation of the possible violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act ("FTCA"), 15 U.S.C. § 45(a), through the proposed acquisition of Take-Two by Entertainment Arts, Inc. ("EA").

The Court has considered the Commission's Petition for an Order enforcing its Subpoena and CID and the papers filed in support thereof and it appears to the Court that petitioner has shown good cause for the entry of this Order.

It is, therefore, ORDERED that Take-Two appear at ___:___ a.m./p.m. on the ____ day

of June, 2008, in Courtroom No. ___, United States Courthouse, Washington, DC, and show

cause, if any there be, why this Court should not grant said petition and enter an order directing

Take-Two to comply with the Commission's Subpoena and CID that were directed to Take-Two.

Unless the Court determines otherwise, notwithstanding the filing or pending of any procedural

or other motions, all issues raised by the petition and supporting papers, and any opposition to

the petition will be considered at the hearing on the petition, and the allegations of said petition

shall be deemed admitted unless controverted by a specific factual showing.

IT IS FURTHER ORDERED that, if Take-Two intends to file pleadings, affidavits,

exhibits, motions or other papers in opposition to said petition or to the entry of the Order

requested herein, such papers must be filed and delivered to the Commission's counsel by __

a.m./p.m. on June, __, 2008.  To the extent that Take-Two any opposition filed with this Court

by Take-Two asserts any factual or legal objections to the Subpoena or CID, Take-Two must

provide an explanation of why it failed to assert such objections in a timely filed petition to

quash or limit the Subpoena or CID as required by 16 C.F.R. § 2.7(d) and why any affidavits,

exhibits, motions or other papers submitted to this Court in objection to the Subpoena or CID

were not previously submitted to the Commission.  Any reply by the Commission shall be filed

with the Court and received by respondent by __a.m./p.m. on June, ___, 2008.  All papers filed

with the Court pursuant to this paragraph shall also be served on opposing counsel electronically

via email.

IT IS FURTHER ORDERED, pursuant to Fed. R. Civ. P. 81(a)(5), that this is a summary

proceeding and that no party shall be entitled to discovery without further order of the Court

upon a specific showing of need; and the dates for a hearing and the filing of papers established

by this Order shall not be altered without prior order of the Court upon good cause shown; and

IT IS FURTHER ORDERED, pursuant to Fed. R. Civ. P. 81(a)(5), that a certified copy of this Order and copies of said Petition and the Memorandum of Points and Authorities in support thereof and all other papers filed herein, shall be served forthwith upon Take-Two or its counsel by the Commission by personal service, by certified or registered mail return receipt requested, or by overnight express delivery service.


SO ORDERED:

_____
United States District Judge


Dated: June ___, 2008, Washington, DC

3

PRESENTED BY:

WILLIAM BLUMENTHAL
General Counsel

JOHN F. DALY
Deputy General Counsel - Litigation


_____
JOHN ANDREW SINGER
Attorneys for Petitioner
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580

(202) 326-3234
Fax (202) 326-2477
Email: jsinger@ftc.gov


(310) 824-4324
Fax: (310) 824-4380
Email: tsyta@ftc.gov

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

FEDERAL TRADE COMMISSION,                    )
                                             )
                    Petitioner,              )
                                             )
        v.                                   )        Misc. No.
                                             )
TAKE-TWO INTERACTIVE SOFTWARE, INC. ,        )
                                             )
                    Respondent.              )
_____      )

**(PROPOSED) ORDER ENFORCING SUBPOENA *DUCES TECUM***
**AND CIVIL INVESTIGATIVE DEMAND**
**ISSUED BY THE FEDERAL TRADE COMMISSION**

Petitioner, the Federal Trade Commission, has invoked the aid of this Court, pursuant to

Sections 9, 16, and 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 49, 56,

57b-1, and 28 U.S.C. § 1367, to require Respondent,  Take-Two Interactive Software, Inc.

("Take-Two"), to comply with the Commission's Administrative Subpoena and Civil

Investigative Demand ("CID"), both issued on April 21, 2008.  The Subpoena and CID were

issued by the Commission in aid of an investigation of the possible violations of  Section 7 of the

Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act ("FTCA"), 15 U.S.C. § 45(a),

through the proposed acquisition of Take-Two by Entertainment Arts, Inc. ("EA").   After con-

sidering the papers of record and the arguments of the parties, the Court has determined that the

inquiry is within the authority of the agency, that the information sought is reasonably relevant

to the inquiry, and that the inquiry is not unduly burdensome.  Because the Court is of the

opinion that the relief sought by the Commission should be granted, it is hereby ORDERED that

within three (3) days of its or its counsel receipt of this Order, or at such later date as may be

agreed upon by the parties, Take-Two:

    1.    Produce all documents in its custody, possession or control that are responsive to the following eight categories of prioritized information identified in the Commission staff's May 8, 2008, letter to Steven Axinn (Pet. Exh. 5):

        A.    Documents that describe Take-Two's pricing strategy during the 2004 to 2005 time period when it introduced certain sports titles at a recommended price point of $19.99, an analysis of the effects of that strategy, and any decisions relating to whether the company would continue or alter that strategy;

        B.    Marketing and competition documents, including past, present and future product development plans, consumer research documents, and documents describing Metacritic ratings for Take-Two's basketball, boxing, football, hockey, and tennis titles;

        C.    Retailer account files containing information on promotional activities, pricing plans and strategies, and actual price discounts granted by Take-Two's to GameStop, Best Buy, and Circuit City;

        D.    Documents that discuss sports titles in Take-Two's current development pipeline;

        E.    Consumer research studies for Take-Two's 2K Sports brand and any other company's sports brand;

        F.    Copies of Take-Two's sports league licenses;

        G.    NPD studies prepared for Take-Two analyzing 2K Sports and any sports title; and

        H.    All other business and strategic plans for Take-Two's basketball, boxing, football, hockey, and tennis titles; and

    2.    Narrative responses to the interrogatories contained in the Commission's CID.

    FURTHER ORDERED that within seven (7) days of its or its counsel receipt of this

Order, or at such later date as may be agreed upon by the parties, Take-Two produce all

documents in its custody, possession or control that are responsive to the specifications

contained in the Subpoena, to the extent that these documents have not been previously produced

to the Commission.

SO ORDERED:


_____

United States District Judge

Dated: June ____, 2008, Washington, DC