**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>600 Pennsylvania Ave, NW<br>Washington, DC 20580<br><br>Petitioner,<br>v.<br><br>TAKE-TWO INTERACTIVE SOFTWARE, INC.<br>622 Broadway<br>New York, NY 10012<br><br>Respondent. | )<br>)<br>)<br>) Case: 1:08-mc-00360 (HHK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**OPPOSITION TO THE FEDERAL TRADE COMMISSION'S**
**EMERGENCY PETITION FOR AN ORDER ENFORCING A SUBPOENA**
**DUCES TECUM AND A CIVIL  INVESTIGATIVE**
**DEMAND ISSUED IN A PRE MERGER INVESTIGATION**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATMENT ..................................................................... 1

BACKGROUND ......................................................................................... 4

ARGUMENT .............................................................................................. 9

I.    THE FTC IMPLICITLY CONCEDES THAT
      THE SUBPOENA AND CID ARE UNDULY BURDENSOME ...................... 9

      A.    Governmental Abuse of the Hart Scott Rodino Second
            Request Process .................................................................... 9

      B.    The Subpoena and CID At Issue Seek Legions Of
            Documents That Are Not Consistent with the FTC's
            Claim of Imminent Need ..................................................... 12

II.   TAKE-TWO'S UNDUE BURDEN ARGUMENT IS NOT
      WAIVED .......................................................................................... 15

      A.    Under the FTC's Own Rules, a Petition to Modify or
            Quash Was Inappropriate Before Exhausting Good-Faith
            Negotiations ....................................................................... 15

      B.    The FTC's Petition Seeks an
            Inequitable Order and Thus Should be Denied ................... 19

CONCLUSION ........................................................................................ 22

## TABLE OF AUTHORITIES

### Cases

Belle Fourche Pipeline Co. v. U.S.,
    554 F. Supp. 1350 (D. Wyo. 1983)............................................................. 14

Chapman v. Maren Elwood College,
    225 F.2d 230 (9th Cir. 1955)..................................................................... 19

Cossio v. Hawk,
    No. 97-445, 1998 U.S. Dist. LEXIS 2433 (D.D.C. Feb. 25, 1998)............................ 18

EEOC v. City of Milwaukee,
    919 F. Supp. 1247 (E.D. Wis. 1996)............................................................ 17

EEOC v. Cuzzens of Georgia, Inc.,
    608 F.2d 1062 (5th Cir. 1979)................................................................... 16

EEOC v. McCormick & Schmick's,
    No. 07-80065, 2007 U.S. Dist. LEXIS 38049 (N.D. Cal. May 15, 2007).................. 14

EEOC v. United Air Lines, Inc.,
    287 F.3d 643 (7th Cir. 2002)..................................................................... 13

Etelson v. Office of Personnel Mgmt.,
    684 F.2d 918 (D.C. Cir. 1982) ................................................................... 17

FTC v. Invention Submission Corp., No. 89-272, 1991 U.S. Dist. LEXIS
    5523 (D.D.C. Feb. 14, 1991)..................................................................... 17

FTC v. O'Connell,
    828 F. Supp. 165 (E.D.N.Y. 1993) .............................................................. 17

FTC v. Standard Oil Co. of Ohio,
    No. 79-0116, 1979 U.S. Dist. LEXIS 10730 (D.D.C. July 29, 1979) ....................... 17

FTC v. Stanley Kaplan Educ. Ltd.,
    433 F. Supp. 989 (D. Mass 1977)............................................................... 17

FTC v. Tarriff,
    No. 08-217, 2008 U.S. Dist. LEXIS 42739 (D.D.C. June 2, 2008) ......................... 17

FTC v. U.S. Borax and Chemical Corp.,
    No. 78-0009, 1978 U.S. Dist. LEXIS 19496 (D.D.C. Feb. 17, 1978)....................... 17

NLRB v. Baywatch Security & Investigations, No. 04-220, 2005 U.S.
    Dist. LEXIS 45955 (S.D. Tx. Apr. 28, 2005) ........................................ 17

SEC vs. Arthur Young & Co., 584 F.2d 1018 (D.C. Cir. 1978) .................................... 19

Sunshine Gas Co. v. U.S. Dep't of Energy,
    524 F. Supp. 834 (N.D. Tex. 1981) ................................................19, 20

## Statutes

15 U.S.C. 18a(e)(2) (2008). ....................................................................................... 9

15 U.S.C. 53(b) (2008) ............................................................................................... 2

## Other Authorities

122 Cong. Rec. H10, 293 (daily ed. Sept. 16, 1976)...................................... 10

Alec Chang, Federal Trade Commission, Merger Best Practices
    Workshop, June 5, 2002............................................................................. 10

Antitrust Division Department of Justice, Report to Congress Regarding
    Merger Review Procedures as Required by Section 630(c) of Public
    Law 106-553, June 19, 2001 ................................................................... 11

Bureau of Competition, Statement of the Federal Trade Commission's
    Bureau of Competition On Guidelines for Merger Investigations,
    December 2002................................................................................................. 3

Deborah Platt Majoras, Chairman, Federal Trade Commission, Reforms to
    the Merger Review Process (Feb. 16, 2006)....................................3, 11, 13

Ernest Gellhorn and William E. Kovacic, Analytical Approaches and
    Institutional Processes for Implementing Competition Policy Reforms
    by the Federal Trade Commission, December 12, 1995............................. 11

H.R. Rep. No. 94-1343 (1976)............................................................................ 15

R. Hewitt Pate, Antitrust Enforcement at the DOJ – Issues in Merger
    Investigations and Litigation, (Dec. 10, 2002)............................................ 10

Scott Sher and Daryl Teshima, e-Normous: The Increasing Burden
    Associated with Electronic Document Production in Second Request
    Investigations, The Antitrust Source, November 2005................................. 11

Stephen M. Axinn et al., Acquisitions Under the Hart-Scott-Rodino
    Antitrust Improvements Act (rev. ed., 17th release 2007).......................... 10

**<u>Regulations</u>**

16 C.F.R. 2.7(d)(1) (2008) ......................................................................... 15

16 C.F.R. 2.7(d)(2) (2008) ......................................................................... 15

**PRELIMINARY STATEMENT**

No one at Take-Two Interactive Software, Inc. ("Take-Two") is seeking to thwart the proper investigation by the Federal Trade Commission ("FTC") staff of Electronic Arts, Inc.'s ("EA") tender offer. On the contrary, from the outset, Take-Two has fully cooperated with these efforts, already having produced more than 479,000 pages of responsive documents through the date of this Opposition.[1] The issue before the Court is how the seemingly boundless desire of a government agency for information can be contained in order to save a company from the ruinous costs of compliance with a subpoena that requires it to search virtually every electronic and paper document in its possession, and to make available most of its senior executives for investigational hearings (pre-complaint depositions) in a situation where the company is not even a willing party to any transaction being investigated and where it is quite possible that no such transaction will ever occur.

The FTC's Emergency Petition For An Order Enforcing A Subpoena *Duces Tecum* And A Civil Investigative Demand Issued In A Pre-Merger Investigation (the "Petition") involves the FTC's investigation of a conditional unsolicited tender offer by EA to purchase the outstanding shares of Take-Two for $25.74 per share. Despite several extensions of the offer's deadline, approximately 8% of Take-Two's shareholders have offered to tender their shares.[2] Given that Take-Two's shares have recently been trading on NASDAQ for as much as $27.95 and the stock closed at $26.47 on June 13, it appears the company's shareholders do not believe that EA's offer will be consummated unless

---

[1] See Declaration of Michael L. Keeley ("Keeley Decl.") at ¶ 6.
[2] See id. at ¶ 4.

the price is substantially increased.[3]  Thus, unlike most acquisitions investigated by the FTC, there is serious doubt that this transaction will ever occur.

The Hart-Scott-Rodino Act, pursuant to which this investigation is being conducted, was designed to give the federal antitrust enforcers the time and tools to gather information sufficient to determine whether to challenge an acquisition under the antitrust laws.  It decidedly was not designed to serve as a substitute for the normal, judicially-controlled, pre-trial discovery with its attendant safeguards against abuse.  This is especially true in situations where the FTC is involved, since the federal court's role in an FTC enforcement action is limited to determining whether to issue a preliminary injunction.[4]  A trial on the merits of an acquisition occurs within the agency before an Administrative Law Judge.  The FTC's internal rules of practice provide ample opportunity for administrative pre-trial discovery if and when a complaint is filed.  And, of course, the Federal Rules provide the FTC, as a plaintiff in a preliminary injunction proceeding, with ample pre-hearing discovery as well, should it ultimately decide to contest such acquisition.[5]

In the early years of Hart-Scott-Rodino's application, governmental requests for additional information were typically confined to the essential information needed by agencies to determine whether to challenge mergers and acquisitions.  In recent years, however, the government's appetite for information has increased dramatically.  With the growth of electronic data files, and the drastic increase of e-mails that must be searched, the burden of compliance has shifted from a nuisance to a huge expense.  Although year after year, the Chair of the FTC, the Assistant Attorney General and their respective

---

[3] See id.
[4] 15 U.S.C. 53(b) (2008) (authorizing the Commission to seek preliminary and permanent injunctions).
[5] Take-Two is not taking any position at this time with respect to whether the acquisition raises a legitimate antitrust issue.

spokespeople assure the antitrust bar that they are working diligently to reduce the burden

caused by HSR Requests for Additional Information and ancillary CIDs and subpoenas,

unfortunately, year after year, the burden and cost of compliance continues to rise.  It is

now generally acknowledged that the cost and burden have become truly staggering.[6]

It is simply unfair to compel a company that is the unwilling target of a takeover

to be crippled with the burden and expense that the FTC is seeking to impose upon Take-

Two.  Nevertheless, Take-Two has gone to great lengths to accommodate the FTC's

legitimate interests.  It has offered to produce its key marketing and sales executives for

interviews and/or investigational hearings (*i.e.* depositions) and has already made

available to the FTC over 479,000 pages of its documents and full access to the

company's data warehouse for purposes of allowing the FTC access to economic

information concerning its operations, products, pricing, and other key data.  Moreover, it

has offered its continuing willingness to provide much of the material demanded by the

FTC.  For example, Take-Two has offered to make seven other executives' documents

available and to provide them as witnesses.  But there has to be a limit to the FTC's

demands.  In their most recent ultimatum, the FTC bluntly asserted that Take-Two must

"search the files and [] produce all responsive, non-privileged documents for any

---

[6] See, e.g., Deborah Platt Majoras, Chairman, Federal Trade Commission, Reforms to the Merger Review Process (Feb. 16, 2006) (available at: www.ftc.gov/os/2006/02/mergerreviewprocess.pdf) (the new guidelines and procedures applying to all transactions after February 17, 2006 were meant to "address the increased burden on parties and Staff," as well as "recognizing that second requests ordinarily cost millions of dollars and typically take six to nine months to complete"); Bureau of Competition, Statement of the Federal Trade Commission's Bureau of Competition On Guidelines for Merger Investigations. (December 2002) (available at: www.ftc.gov/os/2002/12/bcguidelines021211.html) (the policies stated therein seek "to reduce burdens on the parties that have received second requests").

additional current or former employee of Take-Two designated by the Commission . . . ."— a truly open-ended fishing license.[7]

Instead of using its statutory power as Congress intended–to determine whether there is a fair basis for litigating the competitive effects of an acquisition–the FTC is attempting, improperly, to prepare for trial of a case that will, in all likelihood, never be brought.

I.    Background

As of the date on which the FTC filed its Petition, Take-Two's attorneys had already spent in excess of 3,500 hours reviewing the company's files in search of documents responsive to the agency's demands.[8]   Take-Two, by then, had produced in excess of 13,000 documents—constituting more than 362,000 pages—not, as the FTC claims, a mere 721 pages.[9]   To produce these documents, its attorneys reviewed in excess of 120,000 documents constituting over 1,100,000 pages.[10]   Since then, more than 2,700 additional documents (comprising in excess of 117,000 pages) have been produced and the Company is continuing to review its files for responsive documents.[11]   This process has already cost Take-Two in excess of $2 million in legal bills and disbursements, not including the expenses of defending this proceeding, and is currently sustaining approximately an additional $50,000 in legal expenses per day just to produce responsive documents as production continues through this action.[12]   The FTC's outstanding

---

[7] (See Opposition Exhibit ("Opp. Ex.") 37 at 2.)  Take-Two disputes Mr. Horwitz's assertion in the June 4 letter that Take-Two agreed to any open-ended commitments regarding productions.  See Keeley Decl. at ¶¶ 23, 34.
[8] (See (Opp. Ex. 38) at 1.)
[9] Moreover, to the extent certain documents in Take-Two's initial production may have been difficult to read, such resulted from Take-Two's and its vendor's efforts to provide these documents to Staff in an extremely expedited manner.
[10] (See Opp. Ex. 38 at 1.)
[11] See Keeley Decl. at ¶¶ 6, 30.
[12] See id. at ¶ 6.

4

demands will multiply this expense several times over on a company that has sustained $323.3 million in net losses in the last two fiscal years.[13]

This steady stream of production, and absorption of cost, resulted from intense and productive good faith negotiations between Take-Two and the FTC, which commenced almost immediately after the issuance of its subpoena and civil investigative demand on April 21, 2008 (hereinafter collectively referred to as the "Second Request").[14, 15] On April 23 and 25, 2008, Take-Two provided the FTC with documents that were responsive to Request 1(a), Specification No. 8 and Specification No. 13 of the Second Request, supplementing documents that had already been voluntarily provided in response to the FTC's March 14 Letter requesting a voluntary production of preliminary information.[16] On April 23, Take-Two notified Staff that additional data collection would begin by Friday, April 25 if the parties could agree to a list of custodians by the following evening.[17]

On the following day, April 24, Staff requested a call to discuss which Take-Two custodians would likely have responsive documents.[18] After Take-Two's counsel quickly confirmed her availability, Staff then insisted that counsel first identify custodians to be searched in addition to those Staff had already designated, based upon the organizational charts Take-Two had provided.[19] On April 25, Take-Two's counsel complied with this request, proposing the names of additional individuals whose files could be searched.[20]

---

[13] Take-Two Interactive Software, Inc., 2007 Annual Report (Form 10-K) at 26 (December 20, 2007) ($323.3 million net income loss, FY06-FY07 combined).
[14] (See, e.g., Opposition Exhibits ("Opp. Exs.") 20, 22, 25-36, 39.)
[15] A detailed digest of each event in the negotiation process can be found in the Declaration of Michael L. Keeley, referenced herein.
[16] See Keeley Decl. at ¶¶ 9, 16; (Opp. Exs. 11, 13-16, 20, 22.)
[17] (See Opp. Ex. 21.)
[18] (See id.)
[19] (See id.)
[20] (See Opp. Ex. 23.)

Staff countered with two substitute custodians, requesting that the parties continue these negotiations on Monday, April 28.[21]  While retaining additional counsel during the week of April 28, Take-Two continued to make consistent progress preparing its files for review and production, incurring the burdensome costs that tasks such as data transfer, copying, and document collection entail.[22]

On May 7, 2008, at Take-Two's initiative, Take-Two's counsel met with FTC Staff to seek an acceptable solution that would enable Staff to receive the largest amount of priority documents in the shortest period of time, while reasonably containing the burden imposed on Take-Two.[23]  At that time, Staff stressed to Take-Two that it felt time was of the essence in obtaining its production and memorialized in a May 8, 2008 letter that Take-Two produce nine categories of documents relating to videogames in the so-called "sports genre."[24]  Both sides agreed that this agreement would not constitute a waiver of the FTC's right to seek other information called for by its Second Request or of Take-Two's right to object to further demands for production.[25]  Take-Two offered to produce the requested documents on a rolling basis while the FTC evaluated whether it was necessary to seek additional information.[26]  As Take-Two considered this rolling production an ordinary and customary process associated with ongoing good faith negotiations, it thus appeared that the parties would be able to resolve their differences without litigation.[27]  Therefore, Take-Two did not invoke the internal FTC process for moving to quash the subpoena or CID before the return date of the Second Request:  it

---

[21] (See id.)
[22] See Keeley Decl. at ¶¶ 19, 20.
[23] See id. at ¶ 21.
[24] See id.
[25] See id.
[26] See id. at ¶¶ 21-25.
[27] See id.

reasonably believed that a motion to quash would only prolong the process further and destroy the good-will that Take-Two believed existed between the parties.[28]

Soon after the May 7 meeting, Take-Two learned from its electronic production vendor that well over 2 million documents (comprising over 14 million pages) would have to be searched in order to provide documents responsive to the May 8 Letter.[29]  At that point, Take-Two explained to Staff that, unless the number of documents was greatly reduced, it would take several months and impose an unacceptable burden on the company to complete the production.[30]  Take-Two further suggested that if Staff was interested in obtaining a meaningful production of documents and information quickly, its request should be further focused upon the three main executives responsible for sales and marketing for the relevant products, and Staff agreed.[31]   Thus, the FTC's May 15, 2008 letter targeted its May 8, 2008 request for documents upon three key custodians: Robert Blau, Take-Two's Senior Vice President of Sales; Sarah Anderson, Senior Vice President of Marketing of 2K Games; and David Ismailer, Chief Operating Officer of 2K Games.[32]

By supplementing its legal team with large numbers of attorneys who worked through the long Memorial Day weekend, Take-Two began a rolling production of a vast amount of material on May 22 (5,834 documents and 117,106 pages), May 25 (4,811 documents and 170,407 pages), May 30 (625 documents and 51,712 pages), June 4 (1,719 documents and 22,448 pages), June 11 (1,397 documents and 25,416 pages), and June 12 (1,387 and 92,072 pages) as well as high level documents responsive to the

---

[28] See id. at ¶ 22.
[29] See id. at ¶ 27.
[30] See id.
[31] See id. at ¶ 28.
[32] (See Opp. Ex. 31.)

FTC's May 8 letter that could be secured using targeted searches (*i.e.* those which do not require searching through hundreds of thousands of documents).[33]  In addition, Take-Two on May 9 provided access to its "data warehouse" as requested by Staff only two days earlier to enable the FTC's economists to access data needed for their analysis.[34]

Throughout this arduous process, Staff was kept apprised of the progress of the review, and Take-Two further negotiated with Staff concerning the scope of the Second Request.[35]  Take-Two's expenses mounted daily, but counsel for Take-Two nevertheless offered on June 2 to produce additional files from Gary Dale, David Gershik, and Erik Whiteford, present and former executives with sales and marketing responsibilities, in addition to its previous offer to make David Ismailer, Sarah Anderson, and Robert Blau available for investigational hearings.[36]  Staff did not accept this proposal, instead demanding that an additional six custodians' files be produced on top of the three proposed by Take-Two.[37]

On the very day a round of documents was produced by Take-Two, Staff again demanded the production of files from six more custodians on top of the three proposed by Take-Two, as well as eleven investigational hearings of Take-Two employees.[38]  However, the FTC failed to inform Take-Two that EA had just agreed not to attempt to consummate its hostile offer for Take-Two's shares for at least 45 days after its substantial compliance with the FTC's Second Request.[39]  The following morning, Take-Two's counsel responded to Staff's letter, affirming that Take-Two remained willing to

---

[33] See Keeley Decl. at ¶¶ 29, 30.
[34] See id. at ¶¶ 7, 24.
[35] See Keeley Decl. at ¶¶ 23, 28-29, 33; (Opp. Exs. 34-36, 39.)
[36] See Keeley Decl. at ¶¶ 7, 33.
[37] See id. at ¶¶ 32, 34.
[38] See id. at ¶ 34; (Opp. Exs. 36-37.)
[39] See Keeley Decl. at ¶ 35.  While we have no way of knowing when EA will be in a position to "substantially comply," it is reasonable to assume that it is at least several weeks from the June 3 date of this agreement.

discuss the outstanding issues regarding the scope of the investigation in the hopes of reaching an amicable agreement without the need for costly litigation.[40]  Later that day, the FTC filed the present action.  Nonetheless, Take-Two has continued its rolling production to the FTC in good faith, consistent with the negotiations that had been ongoing for months prior to this action.[41]

## ARGUMENT

I.    **THE FTC IMPLICITLY CONCEDES THAT**
      **THE SUBPOENA AND CID ARE UNDULY BURDENSOME**

The FTC does not contest in its motion paper that the Subpoena and CID are unduly burdensome, but merely asserts that Take-Two is precluded from making that contention.  In its argument to this Court, as well as in its negotiations with Take-Two, the FTC simply refuses to appreciate the tremendous and unnecessary burden its demands impose upon Take-Two.

Governmental Abuse of the Hart Scott Rodino Second Request Process

The Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") established a process designed to provide the FTC and the Department of Justice's ("DoJ") Antitrust Division with the right to essential information and a set period of time to review the anti-competitive potential of acquisitions subject to the Act.  In the case of an all-cash tender offer such as EA's offer, the time period established by law is 15 days, plus in the event of the issuance of a Second Request, an additional 10 days following substantial compliance by the offeror.[42]  Because Take-Two's failure to comply with the Request for Additional Information would not toll the running of this second 10-day waiting period,

---

[40] See Keeley Decl. at ¶ 37; (Opp. Ex. 38 at 2-3.)
[41] See Keeley Decl. at ¶ 38; (Opp. Ex. 39.)
[42] 15 U.S.C. 18a(e)(2) (2008).

the FTC has followed the practice of issuing compulsory process to targets of all-cash tender offers in order to secure the information the agency requires to determine whether to challenge the acquisition.

Congress never intended the Second Request process to substitute for the normal process of litigation discovery. Rather, Congress enacted HSR to insure that the FTC need not have to decide whether to challenge a transaction without a sufficient factual basis.[43] Thus, even in the Congressional debates, sponsors of the legislation made clear that the scope of information to be gathered in a Second Request must be carefully limited and should not be burdensome.[44] Similarly, in contrast to Mr. Horwitz's assertion[45] that HSR acts as a pretrial discovery tool, the former Assistant Attorney General of the Antitrust Division of the DoJ has stated:

> [I]nvestigative discovery is different from trial discovery. In the investigative stage, the Division is trying to determine whether the transaction will result in a violation of the law that is subject to legal challenge. Some of this investigative discovery is relevant to the litigation that might ensue, but there are <u>many items of information that the Division must obtain through litigation discovery</u> that are not part of the investigative process.[46]

Unfortunately, abuses of this so-called "Second Request" process have become widespread, prompting criticism from the Bar and even senior government officials

---

[43] <u>See</u> Stephen M. Axinn et al., <u>Acquisitions Under the Hart-Scott-Rodino Antitrust Improvements Act</u>, at § 9.03(6) (rev. ed., 17th release 2007).

[44] <u>See</u> 122 Cong. Rec. H10, 293 (daily ed. Sept. 16, 1976) (Representative Rodino stating that "a government request for material of dubious or marginal relevance, or a request for data that [can] not be compiled or reduced to writing in a short period of time, might well be unreasonable"); <u>see also</u> Stephen M. Axinn et al., <u>Acquisitions Under the Hart-Scott-Rodino Antitrust Improvements Act</u>, at § 2.04(2) (rev. ed., 17th release 2007) (stating that "Senator Hart emphasized the government's responsibility to secure relevant information and not to issue unduly burdensome Section 7A(e) requests").

[45] <u>See</u> Declaration of Reid B. Horwitz, Esq., June 5, 2008 at ¶ 30.

[46] R. Hewitt Pate, Antitrust Enforcement at the DOJ – Issues in Merger Investigations and Litigation, (Dec. 10, 2002), available at: http://www.usdoj.gov/atr/public/speeches/200868.htm (emphasis added); <u>see also</u> Alec Chang, Federal Trade Commission, Merger Best Practices Workshop, June 5, 2002, available at: http://www.ftc.gov/bc/bestpractices/020605sfxscript.pdf (stating that the "HSR [Act] is a notice . . . but [does not act as] precomplaint discovery [or] precomplaint preparations.").

themselves.  For example, the most recent Federal Trade Commission Chairman Deborah

Majoras lamented in a 2006 address that "complying with a second request in a

significant transaction routinely costs millions of dollars and requires months to

respond," and more specifically that such investigations "often rang[e] from six to nine

months."[47]  Underscoring Former Chairman Majoras's comments, Scott Sher and Daryl

Teshima completed a study in 2005 finding that "the same number of attorneys required

to review documents from 14 employees in 2005 would have been used to review 135

employees' documents in 2001 [and] [t]hat alone has increased the cost of the Second

Request process tremendously."[48]  Indeed, current Federal Trade Commission Chair

William Kovacic has pointed to "suggest[ions by commentators] that federal antitrust

enforcement officials pay too little attention to the resources that firms consume in

responding to information demands [and that a] fruitful area for institutional reform is to

pursue new techniques for reducing information demands. . ."[49]

     These equitable considerations, which are so important where two companies

voluntarily agree to participate in a transaction, are even more crucial to consider where a

target of a hostile tender offer that may never be consummated has been unwillingly

dragged into the Second Request process.  It is under these latter circumstances that the

---

[47] See Deborah Platt Majoras, Chairman, Federal Trade Commission, Reforms to the Merger Review
Process (Feb. 16, 2006) (available at: www.ftc.gov/os/2006/02/mergerreviewprocess.pdf).
[48] Scott Sher and Daryl Teshima, e-Normous: The Increasing Burden Associated with Electronic Document
Production in Second Request Investigations, The Antitrust Source, November 2005.
[49] Ernest Gellhorn and William E. Kovacic, Analytical Approaches and Institutional Processes
for Implementing Competition Policy Reforms by the Federal Trade Commission, December 12, 1995,
available at http://www.ftc.gov/opp/global/gmu_1.shtm; see also Antitrust Division
Department of Justice, Report to Congress Regarding Merger Review Procedures
as Required by Section 630(c) of Public Law 106-553, June 19, 2001, available at:
http://0225.0145.01.040/atr/public/guidelines/8550.htm (stating that "Staff[] ha[s] been instructed to limit
the burden of second requests by omitting specifications from the Model Second Request in investigations
where they will not provide helpful information"); (Opp. Exs. 18, 19) (requesting that if Take-Two
"believes that the required search or any other part of [the Second Request] can be narrowed in any way
that is consistent with the Commission's need for documents, [Take-Two is] encouraged to discuss such
questions and possible modifications with the Commission. . .").

FTC served its Second Request upon Take-Two on April 21, and imposed an 18-day return date of May 9, 2008.[50]

> The Subpoena and CID At Issue Seek Legions Of Documents
> That Are Not Consistent with the FTC's Claim of Imminent Need

The Second Request served upon Take-Two is extraordinarily broad. It would require Take-Two's counsel to turn the company upside down, spending months and millions of dollars to search for and produce "all" non-privileged documents "relating to" or "concerning" a wide range of topics, some with only the slightest possible relevance to an investigation that is permitted by the HSR Act.[51] Some of these topics, among many others, covered by the Second Request include:

(1)    Take-Two's compliance with the Robinson-Patman Act;[52]

(2)    Take-Two's implementation of or their customers' compliance with contracts or promotional agreements regarding Take-Two's largest twenty wholesale and retail customers;[53]

(3)    Take-Two's marketing and advertising plans for every video game product;[54]

(4)    any consumer research;[55]

(5)    any analyst reports that discuss any aspect of the video gaming industry;[56]

(6)    any plans of the company or any other person;[57]

(7)    any intellectual property agreements for all video game products;[58]

(8)    and any comparison of the company's video game titles with those of any other person in the sports, shooter, strategy, racing, and action genres.[59]

---

[50] See Keeley Decl. at ¶ 10; (Opp. Ex. 18, 19.)
[51] See Keeley Decl. at ¶¶ 13, 36. The FTC acknowledges as such in the brief. See Petition at 14 (stating that the Second Request is "substantially similar to standard HSR second requests.")
[52] (Opp. Ex. 18 at ¶ 4(d).)
[53] (Id. at ¶¶ 5(b); 6(b).)
[54] (Id. at ¶ 9.)
[55] (Id. at ¶ 10.)
[56] (Id. at ¶ 11.)
[57] (Id. at ¶ 15.)
[58] (Id. at ¶ 18.)

Take-Two is further mandated to produce documents encompassed by the Second Request that are dated from January 1, 2004 to the present.[60] This time period is double the two-year period presumed by the FTC's own 2006 Revised Second Request Guidelines.[61]

The FTC's requests are far from "specifically focused" to quickly collect the documents that most directly bear upon the anticompetitive effects of a potential transaction with EA. Mr. Horwitz' Declaration candidly concedes that they are being used as pre-complaint discovery.[62] Compliance with these demands will require months of effort, many millions of dollars in legal fees and electronic processing and production charges, and thousands of hours of lawyers' time to conduct reviews to determine relevancy and protect the attorney-client privilege, all in pursuit of a transaction that may never occur.[63] As a matter of fundamental equity, the court should not allow the FTC to impose such weighty and unnecessary burdens on Take-Two.

Courts have routinely modified or quashed agency subpoenas where the production demand is overly burdensome and the information sought is only tangential to the purpose of the investigation. See, e.g., EEOC v. United Air Lines, Inc., 287 F.3d 643, 653-54 (7th Cir. 2002) (quashing EEOC subpoena where it was not limited by geography, type of employee, or the type of policy which was at issue). Further, courts often modify government subpoenas that would require a search of all of a company's files, to avoid an undue burden on its lawyers. See, e.g., EEOC v. McCormick &

---

[59] (Id. at ¶ 14); see also Keeley Decl. at ¶ 12.
[60] (See Opp. Ex. 18 at Instruction V.)
[61] See Deborah Platt Majoras, Chairman, Federal Trade Commission, Reforms to the Merger Review Process (Feb. 16, 2006) (available at: www.ftc.gov/os/2006/02/mergerreviewprocess.pdf).
[62] See Declaration of Reid B. Horwitz, Esq., June 5, 2008 at ¶ 30.
[63] See Keeley Decl. at ¶¶ 13, 36.

Schmick's, No. 07-80065, 2007 U.S. Dist. LEXIS 38049, at *19-21 (N.D. Cal. May 15, 2007) (modifying EEOC subpoena where compliance would have taken thousands of review hours).  In cases where the subpoenaed party has already produced a substantial number of documents, courts have required that the demanding party make a more targeted additional request should it be necessary.  See, e.g., Belle Fourche Pipeline Co. v. U.S., 554 F. Supp. 1350, 1362 (D. Wyo. 1983) (finding that the FERC's original request had been too broad, requiring it to examine the documents it already received and determine if further targeted requests were needed), rev'd on other grounds, 751 F.2d 332, 335 (10th Cir. 1984).

Here, as outlined above, Take-Two has already expended in excess of 6,000 hours of legal time to comply with the FTC's May 15 request, which the government acknowledges is only the tip of the iceberg of its current demands.[64]  Particularly in light of the unique circumstances of EA's tender offer, which is unlikely to be consummated any time soon, the FTC must be required to justify the specific burdens it seeks to place on Take-Two, rather than reciting the sweeping and conclusory boilerplate that all of its interrogatories and document demands are "reasonably related" to its investigation.

The FTC fails to engage in any meaningful analysis, in either its negotiations or motion papers, of its specific requests.  It refuses to acknowledge that compliance with all of its requests would require a comprehensive, company-wide review of Take-Two's data and documents, which encompass a huge universe of information due to a number of litigation holds the company has in place.[65]  This type of request is exactly the sort of unrestrained and unreasonable governmental action that Congressman Rodino, as well as

---

[64] See Keeley Decl. at ¶ 6; Petition at 9.
[65] See Keeley Decl. at ¶¶ 13, 27.

14

other sponsors of the bill, said that HSR should not be used for: "an unlimited,
exploratory investigation whose purposes and limits can be determined only as it
proceeds."[66]  Accordingly, the Second Request served upon Take-Two should be quashed
as unduly burdensome, and the Commission should be ordered to reduce its demands in
accordance with the policies and restrictions envisioned by Congress in the HSR Act.

## II.    TAKE-TWO'S UNDUE BURDEN ARGUMENT IS NOT WAIVED

### Under the FTC's Own Rules, a Petition to Modify or Quash
### Was Inappropriate Before Exhausting Good-Faith Negotiations

The FTC argues that pursuant to 16 C.F.R. 2.7(d)(1), Take-Two was required to
file a petition to quash or modify the Second Request within 20 days of its service, or
otherwise prior to the return date.[67]  However, 16 C.F.R. 2.7(d)(2) requires that "each
petition shall be accompanied by a signed statement representing that counsel for the
[party resisting production] has conferred with counsel for the Commission in an effort in
good faith to resolve by agreement the issues raised by the petition and has been unable
to reach such an agreement."  16 C.F.R. 2.7(d)(2) (2008).

The FTC fails to mention this provision because it knows that before May 8, the
date by which it now claims a limiting petition had to be filed, Take-Two had been
engaged in constant good faith negotiations with the Commission counsel, including its
Office of General Counsel, about meeting the FTC's demands, while concurrently
seeking to minimize the burden imposed on Take-Two by limiting the scope of the
Second Request.[68]   These negotiations rendered a potential petition inappropriate.[69]  In

---

[66] See H.R. Rep. No. 94-1343, at 10 (1976).
[67] See Petition at 21.
[68] See Keeley Decl. at ¶¶ 8, 14-17, 21-23.
[69] See id. at ¶ 22.

fact, the FTC's letter on May 8 asks that Take-Two "demonstrate[] its good faith by starting this week and significantly expanding next week the production of documents and information that we discussed at yesterday's meeting."[70]

Take-Two promptly demonstrated its good faith pursuant to this request by producing documents and information on May 9, May 13, May 19, May 20, as well as the subsequent large scale document productions on May 22, May 25, May 30, June 4, June 11, and June 12 (amounting to over 15,000 documents and 479,000 pages).[71]  Take-Two produced these documents, enduring substantial expense, on the premise that the FTC was also acting in good faith regarding the negotiation of subsequent demands.[72]

Throughout this period, documents that were identified as most pertinent to the FTC's investigation were being continually uploaded to an electronic viewer, at Take-Two's expense, to which the FTC had immediate and constant access.[73]  As long as it appeared that the FTC was negotiating in good faith, Take-Two determined not to poison the negotiation process by filing a petition to quash.[74]  Nor could Take-Two's counsel have signed a petition denying the progress of those negotiations.

The cases cited by Staff in support of its waiver argument are all distinguishable from the facts of this case, as none encompasses a situation where a governmental agency and subpoenaed party had been negotiating in good faith the scope of the agency's request, and the agency sought to enforce the entirety of the subpoena before the mandated negotiations had run their course.  See EEOC v. Cuzzens of Georgia, Inc., 608 F.2d 1062, 1063-64 (5th Cir. 1979) (no indication that the subpoenaed employer had

---

[70] (See Opp. Ex. 26 at 1.)
[71] See Keeley Decl. at ¶¶ 6, 24-25, 30.
[72] See id. at ¶¶ 21-25, 27-30.
[73] See id. at ¶ 30.
[74] See id. at ¶ 22.

16

engaged in good faith negotiations); <u>FTC v. Tarriff</u>, No. 08-217, 2008 U.S. Dist. LEXIS

42739, at *3-4 (D.D.C. June 2, 2008) (does not address the alleged exhaustion of

remedies); <u>NLRB v. Baywatch Sec. & Investigations</u>, No. 04-220, 2005 U.S. Dist.

LEXIS 45955, at *8 (S.D. Tx. Apr. 28, 2005) (subpoenaed party did not respond to the

NLRB's application for judicial enforcement for five months); <u>EEOC v. City of</u>

<u>Milwaukee</u>, 919 F.Supp. 1247, 1254 (E.D. Wis. 1996) (statute at issue authorizing

petition to modify or quash subpoena did not require exhaustion of negotiations); <u>FTC v.</u>

<u>O'Connell</u>, 828 F.Supp. 165, 167 (E.D.N.Y. 1993) (respondent did not engage in

negotiations regarding withheld documents that he knew were responsive to the CID at

issue); <u>FTC v. Invention Submission Corp.</u>, No. 89-272, 1991 U.S. Dist. LEXIS 5523, at

*1-4, 6 (D.D.C. Feb. 14, 1991) (no indication of good faith negotiations subsequent to

service of the subpoena); <u>FTC v. Standard Oil Co. of Ohio</u>, No. Misc. 79-0116, 1979

U.S. Dist. LEXIS 10730, at *1-2 (D.D.C. July 29, 1979) (same); <u>FTC v. U.S. Borax and</u>

<u>Chem. Corp.</u>, No. 78-0009, 1978 U.S. Dist. LEXIS 19496, at *1-2 (D.D.C. Feb. 17,

1978) (respondent to subpoena deleted portions of documents responsive to the request);

<u>FTC v. Stanley Kaplan Educ. Ltd.</u>, 433 F.Supp. 989, 992 (D. Mass 1977) (respondent

never disputed the scope of the subpoena).

      Further detracting from the weight of the FTC's argument is the fact that "it is

now beyond dispute that the exhaustion doctrine is to be applied flexibly, with an eye

toward its underlying purposes." <u>Etelson v. Office of Personnel Mgmt.</u>, 684 F.2d 918,

923 (D.C. Cir. 1982) (collecting cases).[75]  In the case "where the exhaustion of

administrative remedies is only required by [an] agency regulation, in determining

---

[75] In fact, "[t]he [exhaustion] doctrine is indeed so flexible that some assert it to be, at least in part, a matter
of judicial discretion." <u>Etelson</u>, 684 F.2d at 923 n. 7.

whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." Cossio v. Hawk, No. 97-445, 1998 U.S. Dist. LEXIS 2433, at *7 (D.D.C. Feb. 25, 1998).

In Etelson, the court found that because the appellant (1) had raised a form of the claim before the agency, (2) could not have raised the claim in its present form before the agency, and (3) had been aware of the agency's disinclination to respond favorably to the claim, appellant would not be ousted from court on exhaustion grounds. Etelson, 684 F.2d at 923. Similarly, Take-Two's attorneys have repeatedly worked with Staff to limit the onerous nature of the requests, and were prevented from filing a petition to modify or quash the subpoena because of ongoing good faith negotiations. See 16 C.F.R. 2.7(d)(2). Because Take-Two would have been denied a remedy on that basis, its petition to quash would have been futile. See Postal Careers Inst., Inc., No. 972-3282, 1998 F.T.C. LEXIS 190, at *4-5 (1998) (rejecting petition to quash a civil investigative demand, inter alia, due to the petitioner's failure to submit a Rule 2.7(d)(2) statement, as "[t]he conferral requirement is mandatory.").

Accordingly, if there is a party to this petition that has failed to fully utilize the administrative process before seeking equitable relief before the Court, it is the FTC. The Staff has failed to exhaust good faith negotiations regarding the scope of the subpoena before precipitously filing its Emergency Petition. The Second Request served by Staff anticipates such an ongoing and cooperative process, but it now seeks to use it as a weapon in negotiations with Take-Two, hoping to impose a burden that is clearly inappropriate and inequitable given the nature of this potential (but currently unlikely) transaction.

Moreover, the FTC rule at issue is necessarily consistent with public policy, as it is imperative that parties be able to negotiate in good faith without the fear that one party will later use the process as a weapon to assert that a meritorious judicial argument had been waived. Where negotiations are unfruitful, the burden is on the respondent to seek relief elsewhere, but where, as here, Take-Two and Staff had successfully established a mode of negotiation without having to expend judicial resources, Take-Two should not be penalized because the FTC decided to file this Petition amidst otherwise productive negotiations. Rather, Take-Two should now be entitled to the relief that the law and the equities demand.

### The FTC's Petition Seeks an <u>Inequitable Order and Thus Should be Denied</u>

It is a well-established principle that limits exist on agencies' subpoena power, and the duty to enforce those limits rests with the federal courts when their process has been invoked. <u>See</u> <u>SEC vs. Arthur Young & Co.</u>, 584 F.2d 1018, 1032-33 (D.C. Cir. 1978); <u>see also</u> <u>Sunshine Gas Co. v. U.S. Dep't of Energy</u>, 524 F. Supp. 834, 841 (N.D. Tex. 1981). Particularly, "[t]here is no rule requiring a court to act against conscience [-] the [] judicial enforcement of administrative subpoenas [] is equitable in character [and] [e]quitable considerations should prevail." <u>Sunshine Gas</u>, 524 F.Supp. at 841 (citing <u>Chapman v. Maren Elwood College</u>, 225 F.2d 230, 234 (9th Cir. 1955)). Here, the FTC seeks a wholly inequitable judgment requiring Take-Two to search the entirety of the Company's voluminous documents and records at enormous expense of time and money. At the same time, the FTC counter-intuitively claims that time is of the essence in identifying those documents most pertinent to its investigation of this transaction that may never occur. Yet despite its strict treatment of Take-Two, the FTC has negotiated a

19

limitation on EA's obligations under the Second Request and obtained a 45-day post-compliance waiting period with EA, a window 50% longer than it would have if this were a traditional acquisition rather than a cash tender offer, and more than four times as long as Congress deems necessary for a cash tender offer, as we have here.[76]

This Court has the discretion to review the FTC's demands, determine that they are not justified, and quash its subpoena. As the court in <u>Sunshine Gas</u> held under similar circumstances, "[i]t is not an element of the judicial process to allow or enforce fishing expeditions." <u>See id.</u> at 839. In applying principles of equity, the <u>Sunshine Gas</u> court held that it would "not allow the Department of Energy to bootstrap itself when justifying an investigation into every record and document [the respondent] possesse[d]." <u>See id.</u> at 841. That court found that such a broad investigation was not consistent with equity. Neither are the FTC's demands here. As noted above, Take-Two has already produced over 479,000 pages of over 15,000 responsive documents to date (including more than 2,700 documents comprising in excess of 117,000 pages since the filing of this Petition).[77] These are the documents identified by the FTC as among its highest priority requests. Staff now seeks to use these good faith productions as a bootstrap to demand a comprehensive review of all of Take-Two's documents and data which would take many months and millions of dollars to complete.[78] The production the FTC seeks is simply unjustified, unreasonable, and unfair. It is simply not consistent with equity to allow such a sweeping and unfocused demand, while the FTC simultaneously claims that time is of the essence in reviewing the most pertinent documents in its evaluation of an

---

[76] <u>See</u> 15 U.S.C. 18a(e)(2) (2008).
[77] <u>See</u> Keeley Decl. at ¶¶ 6, 30.
[78] <u>See</u> Keeley Decl. at ¶¶ 13, 36.

unconsummated, and hardly likely, transaction.  Its Petition should therefore be denied, and its Second Request quashed.

## CONCLUSION

It is respectfully submitted that this Court should deny the relief requested by the FTC's Petition and quash its subpoena and CID as unduly burdensome. It should further order both parties to negotiate an acceptable compromise that recognizes the FTC's legitimate need for information consistent with its responsibilities under Hart-Scott-Rodino and also Take-Two's legitimate concerns about burden, expense and disruption to its business. We further respectfully request that the Court retain jurisdiction to resolve any disputes that the parties are unable to resolve through good-faith negotiation.

Dated:  June 16, 2008

Respectfully submitted,

Stephen M. Axinn (D.C. Bar #478335)
114 West 47th Street
New York, New York 10036
(212) 728-2200

1330 Connecticut Ave. NW
Washington, D.C. 20036
(202) 9112-4700

*Attorneys for Respondent Take-Two Interactive Software, Inc.*

22

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| | ) |
| Petitioner, | ) Case:  1:08-mc-00360 (HHK) |
| | ) |
| v. | ) |
| | ) |
| TAKE-TWO INTERACTIVE SOFWARE, INC. | ) |
| | ) |
| | ) |
| Respondent. | ) |
| | ) |

## DECLARATION OF MICHAEL L. KEELEY

Michael L. Keeley hereby states and declares as follows:

1.      I am an attorney at law, licensed to practice before, and a member in good standing of, the Bar of the State of New York.  I am a member of the law firm Axinn, Veltrop & Harkrider LLP, attorneys for Take-Two Interactive Software, Inc. ("Take-Two") in the above-captioned action.  I submit this declaration in support of Take-Two's Opposition to the Federal Trade Commission's ("FTC") Emergency Petition For An Order Enforcing A Subpoena *Duces Tecum* And A Civil Investigative Demand Issued In A Pre-Merger Investigation dated June 5, 2008 ("Petition").

2.      In this declaration, I respond to some of the statements contained in the declaration of Reid B. Horwitz that was filed with the Petition.  Although many of the statements in his declaration are factually incorrect,  I only address those that are material to Take-Two's Opposition to the FTC's Petition.

3.      I have reviewed all the exhibits attached to Take-Two's Opposition to the FTC's Petition and verify that all of the exhibits are true and correct copies of documents in my files.

1

A schedule listing all the Opposition Exhibits ("Opp. Ex.") is attached to this declaration.

**Electronic Arts' Hostile Cash Tender Offer For Take-Two**

4.     On March 13, 2008, EA commenced an all-cash hostile tender offer to acquire all of Take-Two's outstanding shares of common stock at $26 per share.  (See Opp. Ex. 1; Opp. Ex. 2 at 1.)  Since March 13, EA has extended its tender offer three times (see Opp. Exs. 3, 5 and 7 (Item 11 in each filing); Opp. Exs. 4, 6 and 8) and has lowered the tender price to $25.74 per share.  (See Opp. Ex. 5 (Item 11); Opp. Ex. 6.)  EA's tender offer is currently set to expire today (see Opp. Ex. 7 (Item 11); Opp. Ex. 8) but it may be extended yet again.  As of May 16, 2008, approximately 6,210,261 shares of Take-Two were tendered to EA, which amounted to approximately  8% of Take-Two's shares.  (See Opp. Ex. 7 (Item 11); Opp. Ex. 8.)  Given that Take-Two's shares have recently been trading on NASDAQ for as much as $27.95 and closed at $26.47 on June 13,[1] it appears Take-Two's shareholders do not believe that EA's offer will be consummated unless its price is substantially increased.

5.     EA has publicly disclosed that on June 3, 2008 it "entered into an agreement with the FTC modifying the scope of [the] Second Request, pursuant to which, among other things, [EA] agreed that it would not consummate the acquisition of [Take-Two] until the earlier of (i) 45 days following substantial compliance with the Second Request or (ii) written notice from the FTC closing the investigation."  (Opp. Ex. 9 (Item 11).)  The FTC, according to EA, modified the Second Request to EA to limit the burden on EA of complying with the Second Request.  (Id.)  To my knowledge, EA has not yet substantially complied with the Second Request the FTC served on EA.

---

[1] See http://quotes.nasdaq.com/asp/summaryquote.asp?symbol=TTWO%60&selected=TTWO%60 (last visited on Jun. 16, 2008).

**Take-Two's Negotiations With And Productions To The FTC**

6.  Take-Two has been producing documents and data to the FTC in connection with EA's tender offer since March 19, 2008.  To date, Take-Two has produced in excess of 15,000 responsive documents representing more than 479,000 pages.  For its productions to the FTC, Take-Two has gathered and processed in excess of 300 gigabytes of data from its files and its attorneys have reviewed more than 217,000 documents, representing more than 1,750,000 pages.  Take-Two's attorneys have spent in excess of 6,000 hours reviewing these documents and Take-Two has incurred legal and electronic discovery bills in excess of $2 million in responding to the FTC's requests.  Take-Two continues to review and produce documents to this day, and with every additional day of review, Take-Two's legal bills increase by approximately $50,000.

7.  Take-Two has made three of its executives available for investigatory hearings, which have been scheduled to occur within the next nine days, and has offered several additional executives for such hearings.  Take-Two has also permitted informal voluntary interviews of these executives, and has already allowed its Chief Information Officer to be interviewed by the FTC's Staff (the "Staff") on June 11, 2008.  In addition, Take-Two has offered the Staff access to its databases.

8.  Take-Two's extensive document productions, proffers of its executives for informal interviews and investigatory hearings, and provision of access to its databases are the product of its continuous good faith dialogue and negotiations with the Staff since March 14, 2008.

Take-Two's Voluntary Productions Prior To The Subpoena And CID

9.      On March 14, 2008, Take-Two received a letter from the Staff seeking a voluntary production of ten different categories of information and documents in connection with EA's tender offer.  (See Opp. Ex. 10.)   Take-Two began producing the requested information and documents within three working days (see Opp. Ex. 11) and submitted additional voluntary productions on March 25, March 28, March 31 and April 8, 2008.  (See Opp. Exs. 13-16.)   In between these voluntary productions, on March 24, 2008, Take-Two submitted its premerger notification filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended in connection with EA's proposed tender offer.  (See Opp. Ex. 12.)

The Second Request, Subpoena and CID

10.      On April 16, 2008, Take-Two received a Request for Additional Information or Documentary Material ("Second Request") from the FTC in connection with EA's tender offer. (See Opp. Ex. 17.)  Shortly thereafter, on April 21, 2008, the FTC issued the Subpoena *Duces Tecum* ("Subpoena") and Civil Investigative Demand ("CID") at issue in this action.  (See Opp. Exs. 18-19.)  The Subpoena, which was 16 single-spaced pages long, and the CID, which was 18 single-spaced pages long, each called for the production of very broad categories of information and documents, all to be produced by May 9, 2008.  (See Opp. Ex. 18 (cover page); Opp. Ex. 19 (cover page).)

11.      In paragraph 8 of his declaration attached to the FTC's Petition, Mr. Horwitz suggests that the Subpoena and CID require production of a "substantial subset" of the information and documents sought by the Second Request.  That is true with regard to the CID.

But the document requests in the Subpoena are identical in all substantive respects to the document requests in the Second Request, and are not limited to a subset of the materials demanded by the Second Request.

12.    The Subpoena and CID request 29 categories of documents and responses to 26 interrogatories.  However, most of the interrogatories in the CID and many of the document requests in the Subpoena contain multiple subparts.  Accordingly, the Subpoena and CID impose in excess of 40 document requests and 90 interrogatories.  The Subpoena and CID seek production of documents and information dating back to at least January 1, 2004 (Instruction V) and, although the FTC's investigation has otherwise focused on Take-Two's sports games, the FTC's requests for information and documents are far broader that that: nearly every document request in the Subpoena and interrogatory in the CID covers <u>all</u> of Take-Two's hundreds of video game titles (Instruction R).  Moreover, Instructions O, P, Q, R and S of the CID require Take-Two to produce the information called for by the interrogatories separately for five different platforms (i.e. game consoles, personal computers, hand-held computers, mobile devices and digital content), eight different game genres, six different game ratings, and three different geographic dimensions (worldwide, United States, and areas within the United States).  Further contributing to their broad nature, most of the document requests ask for "all documents relating to" very broad topics, such as "the company's or any other person's plans relating to any relevant product" (Specification 15), "the company's or any other person's prices" (Specification 17), and "any Intellectual Property agreements relating to the relevant product" (Specification 18).  Definition F of the Subpoena explains that the term "documents" means "all computer files and written, recorded and graphic materials of every kind."

13.    Full compliance with the Subpoena and CID would require Take-Two's counsel to collect and search the files of dozens of Take-Two's executives and employees and to spend months reviewing their documents.  It would also require many of Take-Two's executives and employees to spend a significant portion of their time assisting in the compilation of the vast amounts of data called for by the interrogatories in the CID.  All of this would not only cause Take-Two to incur many millions of dollars in legal bills but would also be extremely disruptive to its business.

Take-Two's Responses To The Subpoena, Second Request and CID

14.    Shortly after the Subpoena and CID were issued, Take-Two's counsel and the Staff commenced a dialogue about how many individuals at Take-Two needed to have their files searched ("custodians").  (See Opp. Ex. 21.)  To that end, Take-Two provided organizational charts to the Staff as called for in Specification 1 of the Subpoena on April 23, 2008.  (See Opp. Ex. 20.)  On Friday April 25, 2008, Take-Two's counsel identified to the Staff several custodians that could potentially have relevant files.  (See Opp. Ex. 23.)

15.    In response, the Staff (Mr. Horwitz) suggested to prioritize certain custodians and productions so as to "help [the Staff] get up the learning curve as quickly as possible."  (Opp. Ex. 23.)  He explained that "[t]he goal here is to find a group knowledgeable enough to have such information, and small enough to search quickly and be available for investigational hearings."  (Id.)  At Mr. Horwitz's suggestion, Take-Two's counsel proposed a conference call with the Staff the following Monday to further discuss a custodian list.  (Id.)

16.    While the Staff and Take-Two's counsel continued negotiations about the relevant custodians and modification of the Subpoena and CID, Take-Two agreed to commence

expedited rolling productions of particular documents identified by the Staff.  On April 25, 2008, Take-Two provided the FTC with documents responsive to Specifications Nos. 8 and 13 of the Second Request, supplementing the productions that Take-Two had already submitted to the Staff in response to the March 14 letter.  (See Opp. Ex. 22.)

17.    Mr. Horwitz asserts in paragraph 14 of his declaration that Take-Two's counsel declined offers to confer with the Staff about compliance issues during the week of April 28. However, e-mail exchanges on Tuesday, April 29, and Wednesday, April 30, between the Staff attorney Eric Elmore and Take-Two counsel John Ingrassia show that there was an ongoing dialogue between the Staff and Take-Two's counsel during that week.  (See Opp. Ex. 24.)  Eric Elmore and John Ingrassia discussed a proposal by Take-Two's counsel to defer production of backup and archived tapes and disks.  (Id.)  Although no agreement was reached in that e-mail exchange, Mr. Elmore indicated that the Staff would "consider [the proposal by Take-Two's counsel regarding backup and archived tapes and disks] consistent with [the Staff's] need to get relevant documents and information in a timely manner."  (Id.)

18.    Mr. Horwitz states in paragraph 14 of his declaration that Take-Two did not produce any documents during the week of April 28 or the prior week except for a handful of documents relating to Take-Two's All-Pro Football game and some organization charts.  That statement ignores the fact that Take-Two had voluntarily produced numerous highly pertinent documents and information to the Staff since March 19, 2008.  (See Opp. Exs. 11, 13-16, 20 and 22.)  Moreover, it could not have been a surprise to the Staff that large-scale document productions had not yet occurred in the week of April 28 since the Staff and Take-Two's counsel were still discussing a custodian list.  As the Staff well knows, a large document production cannot happen overnight, especially given the stringent form specifications that the

7

FTC requires for productions.  Once documents are collected from the relevant custodians, it takes several days to upload the data into a document review database and several more days or even weeks to review a significant volume of documents for responsiveness and attorney-client privilege.  Some of the individuals at Take-Two had so many files that even a review of the files of that custodian would take days or weeks.  For instance, just the e-mail files of David Ismailer—whose documents the Staff insisted on receiving—amounted to more than 124,000 documents (representing in excess of 623,000 pages).  After the review is completed, an application service provider typically requires another two or more days to actually produce the documents.  And that assumes that all the production specifications have been ironed out between the Staff and the company, which had not occurred yet during the week of April 28, 2008.

19.    During the weeks of April 28 and May 2, 2008, as well as in the following weeks, Take-Two's counsel and IT department undertook extensive document collection from the files of the custodians that Take-Two's counsel had identified on April 25.

The Negotiation Of And Take-Two's Responses To The Staff's May 8 Letter

20.    My firm was retained by Take-Two to assist it in the FTC's investigation on May 2, 2008.  At our request, my partner Stephen Axinn and I met with the Staff at the FTC's offices on May 7.  That same day, Take-Two produced an additional subset of highly pertinent documents to the Staff, including documents responsive to Specification 12 of the Subpoena.  (See Opp. Ex. 25.)

21.    During the May 7 meeting, we discussed with the Staff how Take-Two could best enable the Staff to receive the largest amount of priority documents in the shortest period of

time, while reasonably containing the burden imposed on Take-Two. The Staff emphasized during the meeting that time was of the essence in obtaining Take-Two's production. Accordingly, we proposed, and the Staff agreed, that Take-Two would produce targeted categories of documents relating to videogames in the so-called "sports genre." Both sides agreed that this agreement would not constitute a waiver of the Staff's right to seek other information called for by its Subpoena and CID or of Take-Two's right to object to further demands for production. As part of the agreement, the Staff extended the deadline for the Subpoena and CID from May 9 to May 16, 2008. The Staff memorialized this in a May 8, 2008 letter to Mr. Axinn identifying nine different categories of information and documents. (See Opp. Ex. 26.) In that letter, the Staff also represented that it was prepared "to extend Take-Two's compliance deadline further if the company demonstrated its good faith by starting [that] week and significantly expanding [the] next week the production of documents and information" itemized in the letter. (Id. at 1.)

22.    In light of these good faith negotiations between the Staff and Take-Two, and due to Take-Two's desire to cooperate with the Staff, Take-Two did not file a petition to quash the Subpoena and CID. It believed that doing so would immediately sour the negotiations with the Staff.

23.    Mr. Horwitz makes a number of incorrect statements about the May 7 meeting in paragraphs 15 and 16 of his declaration. First, Mr. Axinn never stated during the May 7 meeting that Take-Two would not produce documents that Take-Two's counsel had promised on April 25, 2008. Mr. Axinn and I stated during the meeting that to produce documents from all the custodians identified by Take-Two's counsel on April 25 would be extremely time-consuming and expensive and that we were seeking a way to reduce the burden on Take-Two,

while also identifying a mechanism for successfully producing relevant documents to the Staff in a timely fashion.  Second, the assertion in paragraph 16 of Mr. Horwitz's declaration that Mr. Axinn had "suggested" during the meeting "that, during or after completing its review of the documents produced in the first phase, Commission staff could identify additional documents that it wanted Take-Two to produce as the next phase" is also incorrect.  Mr. Axinn and I never "envisioned" or committed to an "iterative process continuing until the Commission staff had either completed or saw no reason to continue its investigation" of the kind Mr. Horwitz describes in his declaration.  We made no open-ended commitments to provide unlimited productions.  Rather, we said that the Staff could come back to us to negotiate additional custodians and that we would be reasonable in considering their requests consistent with Take-Two's desire to cooperate but not endure an unreasonable burden.  The Staff agreed to this negotiation process.  Third, contrary to Mr. Horwitz's assertion in paragraph 16 of his declaration, because of the enormous cost that would have entailed, we never committed to produce documents from the files of all 15 custodians that were identified on April 25.

24.    Take-Two began producing the documents and information itemized in the May 8 letter on May 9, 2008.  Take-Two provided the detailed information about Take-Two's databases called for by Specification 21 of the CID, which completed Take-Two's response to Item 1 in the Staff's May 8 letter.  Take-Two additionally offered to make one of its representatives available to answer any questions the Staff had about the databases.  Despite its position that time was of the essence, the Staff did not make use of this opportunity until June 11 (six days after it filed the instant Petition).  Take-Two also produced copies of most of its license agreements with sports leagues to the Staff on May 9, for which Item 7 of the Staff's

May 8 letter called.  (<u>See</u> Opp. Ex. 28.)  Take-Two completed its response to Item 7 of the Staff's May 8 letter on May 19, after complying with provisions of certain of those licenses to provide notice before disclosing them to a third party.  (<u>See</u> Opp. Ex. 32.)

25.    On May 13, 2008, Take-Two produced a subset of highly relevant pricing, competition and marketing documents, and business and strategic plans, called for by Items 2, 3 and 9 of the Staff's May 8 letter.  (<u>See</u> Opp. Ex. 29.)  That same day, Take-Two also produced information and a document regarding Take-Two's product pipeline in response to Item 5 of the Staff's May 8 letter.  (<u>See</u> Opp. Ex. 30.)  Subsequently, on May 20 and 25, Take-Two produced, respectively, third party industry data called for by Item 8 of the Staff's May 8 letter (<u>see</u> Opp. Ex. 33) and account files for certain large retailers, called for by Item 4 of the letter.  (<u>See</u> Opp. Ex. 35.)

26.    In its Memorandum in support of the FTC's Petition (pages 7-8), the FTC claims that Take-Two's first May 13 production consisted largely of illegible spreadsheets.  This is incorrect and grossly misleading.  First, the production consisted of many documents other than spreadsheets.  Second, none of the spreadsheets in the production was illegible.  Contrary to the assertion in paragraph 18 of Mr. Horwitz's declaration, there was not a single spreadsheet page in the 721 page production that had insufficiently widened columns showing "####" instead of a number.  And, although the spreadsheets were broken up among multiple pages because they were produced in portable document format rather than native format, they were certainly not illegible.  The purpose of the May 13 production was to get a subset of highly relevant documents to the FTC ahead of the larger productions.  Such an expedited production was not possible in native format because that would have required processing by Take-Two's application service provider, which delays a production by several days.  Nonetheless, on May

25, Take-Two re-produced all the supposedly illegible spreadsheets included in the May 13 submission in native format.  (See Opp. Exs. 34-35.)

The Negotiations Of And Take-Two's Responses To The Staff's May 15 Letter

27.    After several days of document review following the May 8 letter, I observed that, despite the use of a large team of contract attorneys (at one point in excess of 40 contract attorneys), we were not making significant progress.  As a result of several "litigation holds" that are in place at Take-Two, the volume of documents of each custodian turned out to be overwhelming.  The files that had been collected by that time already amounted to more than two million documents, representing in excess of 14 million pages.  And, the collection of documents, preliminary to processing and reviewing, was not completed yet.  I understood at that time that unless the Staff significantly limited the scope of information it was requesting, Take-Two would be forced to spend weeks if not months of additional attorney time, and several more millions of dollars, to substantially comply with the Staff's requests.

28.    Accordingly, during a call with the Staff on May 15, Mr. Axinn and I proposed to the Staff that the scope of documents to be produced be limited to the two sports simulation games that the Staff indicated they were most interested in—i.e. basketball and hockey—and that review be limited to the documents of the three custodians that we believed to have most if not all of the documents that the Staff was looking for—i.e. David Ismailer, the Chief Operating Officer of 2K Games (a division of Take-Two), Sarah Anderson, the Senior Vice President of Marketing of 2K Games, and Robert Blau, the Senior Vice President of Sales of Take-Two.  The Staff agreed. That agreement was memorialized in a May 15 letter from the Staff to Mr. Axinn.  (See Opp. Ex. 31.)

29.     Mr. Horwitz asserts in paragraph 19 of his declaration that I informed the Staff in a series of phone calls between May 9 and May 15 that Take-Two would not comply with the Staff's May 8 letter.    Similarly, in its Petition, the FTC asserts that we reneged on our agreements with the Staff.    That is incorrect.    I never represented to the Staff that Take-Two would not produce the documents itemized in the Staff's May 8 letter.    Indeed, Take-Two produced several of the documents and information items called for in the Staff's May 8 letter on May 9, 13, 19, 20 and 25, 2008.    (See Opp. Exs. 27-30, 32-33, 35.)    Mr. Axinn and I merely sought to modify the document-intensive items in the May 8 letter (Items 2, 3 and 9), because it turned out that, without any further limitation, those items imposed extraordinary burden and cost on Take-Two and prevented any meaningful productions within the timeframe that the Staff needed.    Much like the modifications memorialized in the Staff's May 8 letter, the Staff's agreement to our May 15 modification proposal and the Staff's resulting May 15 letter were a product of continuing good faith negotiations between Take-Two and the Staff.

30.     As agreed, Take-Two's first production in response to the Staff's May 15 letter was made available to the Staff within a week, on May 22, 2008.    (See Opp. Ex. 34.)    That production was comprised of 5,834 documents representing 117,106 pages.    More productions followed throughout Memorial Day weekend, on May 25 (4,811 documents and 170,407 pages), and continued on May 30 (625 documents and 51,712 pages), June 4 (1,719 documents and 22,448 pages), June 11 (1,397 documents and 25,416 pages) and June 12, 2008 (1,387 documents and 92,079 pages).    (See Opp. Exs. 35-36, 39.)    From May 22 onward, all productions have been made available to the Staff on a database maintained by Take-Two's application service provider at Take-Two's expense.    (See Opp. Exs. 34-35, 36, 39.)    The Staff has been reviewing these documents.    Before the Staff filed its Petition, Take-Two produced a

total of 13,042 documents representing 362,292 pages.  For those productions, Take-Two's attorneys reviewed in excess of 120,000 documents representing more than 1,100,000 pages. Subsequent to the FTC's filing of its Petition, on June 11 and 12, Take-Two produced another 2,784 documents comprising 117,495 pages in response to the May 15 letter.  (See Opp. Ex. 39.)  Those were documents from David Ismailer that the reviewing attorneys hired by Take-Two initially identified as potentially privileged but that upon second-level review were determined not to be privileged.  Because David Ismailer acted as counsel for a division of Take-Two for several years, many of his documents contained potentially privileged material. That significantly slowed down the review of his documents.

31.    In paragraph 23 of his declaration, Mr. Horwitz asserts that during a May 27 call with the Staff, I stated that Take-Two did not intend to review any paper documents.  That is incorrect.  When asked whether our productions included paper documents, I stated that I was not sure and would have to verify.  I later found out that, at the time of that call, we had indeed already produced documents that originated in paper format.  I also stated, at various times, that physical paper files often are duplicative of electronically stored files and that, given the modern business world, they rarely contain substantively significant non-duplicative information.  I therefore suggested that it would make sense to prioritize the production of other types of files before these paper files.

The Staff's May 28 Request For Additional Custodians

32.    On May 28, 2008, the Staff requested files from six new custodians in addition to the files of David Ismailer, Sarah Anderson and Robert Blau which Take-Two had already committed to produce.

33.    In response, on June 2, 2008, Mr. Axinn and I offered to produce to the Staff the files from three of the six new custodians requested by the Staff: Gary Dale (Executive Vice President of Take-Two); David Gershik (Vice President of Sales of Take-Two); and Erik Whiteford (former Vice President of Marketing of 2K Sports).  In addition, we offered to make David Ismailer, Sarah Anderson, and Robert Blau available for investigational hearings.  Those hearings have been scheduled to occur in the next nine days.  We asked the Staff to omit from their search documents held by Ben Feder (Chief Executive Officer of Take-Two), Greg Thomas (President of Visual Concepts, one of Take-Two's studios) and Christoph Hartmann (President of 2K Games), because their documents were duplicative of the files of custodians already searched and because searching and producing their files would be disruptive to the performance of these individuals and unduly burdensome and costly for Take-Two.  We explained that, at that time, Take-Two had already expended approximately $1.2 million in legal fees responding to the Subpoena and CID (not including the data processing, hosting and production fees Take-Two had incurred, which amounted to more than $700,000).  We also indicated that David Ismailer, whose responsive files have been produced in full, and who will testify at an investigational hearing this week, would be fully knowledgeable to speak about the issues in which the Staff is interested.

34.    The Staff rejected our proposals.  In a June 4, 2008 letter, the Staff stated that Take-Two had been out of compliance with the Subpoena and CID since May 16 and threatened to file the Petition unless Take-Two agreed to: (a) produce by June 16 all files from nine new custodians (in addition to Anderson, Ismailer and Blau) responsive to the May 8 letter; (b) make all custodians available for investigational hearings (except for Erik Whiteford, who no longer works for Take-Two); and (c) to search and produce all responsive documents

for any additional custodians the FTC may designate in the future, without any numerical limitation. (See Opp. Ex. 37.) The Staff asserted in that letter that during the May 7 meeting, Mr. Axinn had agreed to search and produce responsive documents from any additional custodians the FTC would designate. (Id. at 2.) As I have explained in paragraph 23 of this declaration, Mr. Axinn and I never made any such open-ended commitments during the May 7 meeting.

35.    Notably, on June 4, 2008, Staff did not disclose to Take-Two that, the day before, EA had promised Staff not to attempt to consummate its hostile offer for Take-Two's shares for at least 45 days after its substantial compliance with the FTC's Second Request. (See Opp. Ex. 9.)

36.    To meet the demands in the Staff's June 4 letter, Take-Two would have to expend several more millions of dollars. The production of nine new custodians, alone, would likely require Take-Two's attorneys to review tens of thousands more documents, comprising hundreds of thousands if not millions of pages. And each custodian that the Staff would add would increase those numbers by thousands and hundreds of thousands, respectively. The eleven investigatory hearings that the Staff demanded would similarly impose tremendous cost and burden on Take-Two.

37.    Accordingly, in a June 5, 2008 letter, Mr. Axinn explained to the Staff that its demands imposed an unreasonable burden on Take-Two, especially given the hostile and uncertain nature of EA's highly conditional tender offer, but that Take-Two nevertheless remained willing to discuss ways of reaching an amicable agreement on modifications to the Subpoena. (See Opp. Ex. 38 at 2-3.)

16

38.    The FTC filed the Petition on June 5, 2008.  Despite the FTC's Petition, Take-Two has continued to produce documents to the Staff (see Opp. Ex. 39) and has agreed to specific dates for the investigatory hearings of Robert Blau (June 19), David Ismailer (June 20) and Sarah Anderson (June 25).

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on:   June 16, 2008
                    New York, New York

Michael L. Keeley

**F.T.C. v. Take-Two Interactive Software, Inc., No. 08-mc-00360 (HHK)**
**SCHEDULE OF**
**OPPOSITION EXHIBITS**
**Attached to Declaration of Michael L. Keeley**

| Exhibit | Description |
|---|---|
| 1) | Business Wire, EA Commences All Cash Tender Offer to Purchase Take-Two Interactive Software Shares for $26.00 Per Share (Mar. 13, 2008) |
| 2) | Electronic Arts, Inc., Tender Offer Statement (Form SC TO-T) (Mar. 13, 2008). |
| 3) | Electronic Arts, Inc., Tender Offer Statement (Form SC TO-T/A) (Mar. 28, 2008) |
| 4) | Business Wire, EA Amends Take-Two Tender Offer and Extends Expiration Date to April 18, 2008 (Mar. 28, 2008) |
| 5) | Business Wire, EA Extends Take-Two Tender Offer Expiration Date to May 16, 2008 (Apr. 17, 2008) |
| 6) | Electronic Arts, Inc., Tender Offer Statement (Form SC TO-T/A) (Apr. 18, 2008) |
| 7) | Electronic Arts, Inc., Tender Offer Statement (Form SC TO-T/A) (May 19, 2008) |
| 8) | Business Wire, EA Extends Expiration Date for Take-Two Offer to June 16, 2008 (May 19, 2008) |
| 9) | Electronic Arts, Inc. Tender Offer Statement (Form SC TO-T/A) (June 4, 2008) |
| 10) | Letter from Reid B. Horwitz, Esq. to Seth D. Krauss, Esq., dated Mar. 14, 2008 |
| 11) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Mar. 19, 2008 |
| 12) | Permerger Notification Filing under the HSR from John R. Ingrassia, Esq. to Department of Justice and Federal Trade Commission, dated Mar. 24, 2008 |
| 13) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Mar. 25, 2008 |
| 14) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Mar. 28, 2008 |
| 15) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Mar. 31, 2008 |
| 16) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Apr. 8, 2008 |
| 17) | Letter from William E. Kovacic to John R. Ingrassia, Esq. dated Apr. 16, 2008 |

**F.T.C. v. Take-Two Interactive Software, Inc., No. 08-mc-00360 (HHK)**
**SCHEDULE OF**
**OPPOSITION EXHIBITS**
**Attached to Declaration of Michael L. Keeley**

| Exhibit | Description |
|---|---|
| | |
| 18) | Subpoena *Duces Tecum* Issued to Take-Two Interactive Software, Inc., Apr. 21, 2008 |
| 19) | Civil Investigative Demand Written Interrogatories and Report to Take-Two Interactive Software, Inc., Apr. 21, 2008 |
| 20) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Apr. 23, 2008 |
| 21) | Chain of e-mails dated Apr. 23, 2008 through Apr. 24, 2008, among Alicia Batts, Esq. (Take-Two Counsel), Reid B. Horwitz, Esq. (FTC), Eric E. Elmore, Esq. (FTC), and Jacqueline Tapp, Esq. (FTC) |
| 22) | Letter from Alicia J. Batts, Esq. to Reid B. Horwitz, Esq., dated Apr. 25, 2008 |
| 23) | Chain of e-mails dated Apr. 25, 2008 through Apr. 28, 2008, among Alicia Batts, Esq. (Take-Two Counsel), Reid B. Horwitz, Esq. (FTC), Eric E. Elmore, Esq. (FTC), Jacqueline Tapp, Esq. (FTC), Jacqueline W. Perrell, Esq. (Take-Two Counsel), John Ingrassia, Esq. (Take-Two Counsel), and Linda Zabriski, Esq. (Take-Two Counsel) |
| 24) | Chain of e-mails dated Apr. 29 through Apr. 30, 2008 among John Ingrassia, Esq., Eric E. Elmore, Esq., and Alicia Batts, Esq. |
| 25) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 7, 2008 |
| 26) | Letter from Reid B. Horwitz, Esq. to Stephen M. Axinn, Esq., dated May 8, 2008 |
| 27) | [Intentionally Left Blank] |
| 28) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 9, 2008 |
| 29) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 13, 2008 |
| 30) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 13, 2008 |
| 31) | Letter from Reid B. Horwitz, Esq. to Stephen M. Axinn, Esq., dated May 15, 2008 |
| 32) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 19, 2008 |
| 33) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 20, 2008 |

**F.T.C. v. Take-Two Interactive Software, Inc., No. 08-mc-00360 (HHK)**
**SCHEDULE OF**
**OPPOSITION EXHIBITS**
**Attached to Declaration of Michael L. Keeley**

| Exhibit | Description |
|---------|-------------|
| | |
| 34) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 22, 2008 |
| 35) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated May 27, 2008 |
| 36) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated June 4, 2008 |
| 37) | Letter from Reid B. Horwitz, Esq. to Stephen M. Axinn, Esq., dated June 4, 2008 |
| 38) | Letter from Stephen M. Axinn, Esq. to Reid B. Horwitz, Esq., dated June 5, 2008 |
| 39) | Letter from Michael L. Keeley, Esq. to Reid B. Horwitz, Esq., dated June 16, 2008 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| | ) |
| Petitioner, | ) Case: 1:08-mc-00360 (HHK) |
| | ) |
| v. | ) |
| | ) |
| TAKE-TWO INTERACTIVE SOFWARE, INC. | ) |
| | ) |
| | ) |
| Respondent. | ) |
| | ) |

## DECLARATION OF STEPHEN M. AXINN

Stephen M. Axinn hereby states and declares as follows:

1.     I am an attorney at law, licensed to practice before this Court, and a member in good standing of this Court, the New York State Bar and the Bar of the District of Columbia (D.C. Bar # 478335).  I am a member of the law firm Axinn, Veltrop & Harkrider LLP, attorneys for Take-Two Interactive Software, Inc. ("Take-Two") in the above-captioned action.  I submit this declaration in support of Take-Two's Opposition to the Federal Trade Commission's ("FTC") Emergency Petition For An Order Enforcing A Subpoena *Duces Tecum* And A Civil Investigative Demand Issued In A Pre-Merger Investigation dated June 5, 2008 ("Petition").

2.     I have reviewed the Declaration of Michael L. Keeley in support of Take-Two's Opposition to the FTC's Petition and the exhibits referenced in his declaration, and hereby verify that, to the best of my knowledge, all the statements in Mr. Keeley's declaration are true and accurate, including specifically those statements referenced by Mr. Keeley as having been made by me.

I certify under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information and belief.

Executed on:   June 16, 2008
              New York, New York

Stephen M. Axinn  (D.C. Bar # 478335)

114 West 47th Street
New York, New York 10036
(212) 728-2200

1330 Connecticut Ave. NW
Washington, D.C. 20036
(202) 912-4700

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| | ) |
| Petitioner, | ) Case:  1:08-mc-00360 (HHK) |
| | ) |
| v. | ) |
| | ) |
| TAKE-TWO INTERACTIVE SOFWARE, INC. | ) |
| | ) |
| | ) |
| Respondent. | ) |
| | ) |

**(PROPOSED) ORDER DENYING
THE FEDERAL TRADE COMMISION'S PETITION
FOR AN ORDER ENFORCING THE SUBPOENA *DUCES TECUM*
AND CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO**

Petitioner, the Federal Trade Commission ("FTC"), has invoked the aid of this Court, pursuant to Sections 9, 16, and 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 49, 56, 57b-1, and 28 U.C.C. § 1367, to require Respondent, Take-Two Interactive Software, Inc. ("Take-Two"), to comply with the FTC's administrative Subpoena *Decus Tecum* ("Subpoena") and Civil Investigative Demand ("CID"), issued on April 21, 2008.  The FTC issued the Subpoena and CID in connection with its investigation pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), of the unsolicited cash tender offer by Electronic Arts, Inc., for all the outstanding common shares of Take-Two.

After considering the papers of record and the arguments of the parties, the Court has determined that the information sought by the Subpoena and CID is not reasonably relevant to the FTC's investigation and that the Subpoena and CID are unduly burdensome to Take-Two.

Accordingly, the FTC's Petition For An Order Enforcing A Subpoena *Duces Tecum* And A Civil Investigative Demand Issued In A Pre-Merger Investigation dated June 5, 2008, is hereby DENIED and Take-Two's motion to quash the Subpoena and CID as unduly burdensome is hereby GRANTED.

IT IS FURTHER ORDERED that the parties in good faith negotiate document requests and interrogatories that are reasonable in scope and enable the FTC to execute its statutory responsibilities without subjecting Take-Two to undue cost and burden.

The Court retains jurisdiction to resolve any disputes that the parties are unable to resolve through good-faith negotiation.

SO ORDERED:

Dated: June ___, 2008
       Washington, DC     _____

                         Henry H. Kennedy, United States District Judge

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 1

**EA Commences All Cash Tender Offer to Purchase Take-Two Interactive Software Shares for $26.00 Per Share**

### Price Offers 64% Premium Over Closing Price on Feb. 15

REDWOOD CITY, Calif., Mar 13, 2008 (BUSINESS WIRE) -- Electronic Arts Inc. ("EA") (NASDAQ:ERTS) today announced that a wholly owned subsidiary of EA commenced a tender offer for all of the currently outstanding shares of common stock of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ:TTWO) for $26.00 per share in cash.

The offer is valued at approximately $2 billion and represents a 64% premium over Take-Two's closing stock price on February 15, the last trading day before EA sent its revised proposal to Take-Two.

EA Chief Executive Officer John Riccitiello: "This is a great opportunity for Take-Two shareholders. We believe Take-Two investors will see our tender offer as the best way to maximize the value of their investment in Take-Two. This tender offer provides a clear process to complete the proposed transaction. For EA shareholders, the combination would add additional intellectual properties to our already strong portfolio and welcome Take-Two's talented creative teams to the great development organization we've built at EA."

The tender offer is scheduled to expire at 12:00 midnight, New York City time, on Friday, April 11, 2008, unless the tender offer is extended.

The tender offer is not conditioned upon financing. The tender offer is conditioned upon, among other things,

(1) EA being able to acquire a majority of the outstanding shares (fully-diluted) of Take-Two in the tender offer;

(2) the anti-takeover provisions of Section 203 of the Delaware General Corporation Law not being applied to the tender offer or any subsequent merger with EA;

(3) the expiration or termination of any applicable Hart- Scott-Rodino waiting period and;

(4) Take-Two entering into a merger agreement on terms satisfactory to EA in its reasonable judgment.

Morgan Stanley & Co. Incorporated is acting as the Dealer Manager for the tender offer and Georgeson Inc. is acting as Information Agent for the tender offer.

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The description of the tender offer contained in this press release is not intended to be a full or detailed description of the terms or conditions of the tender offer. Take-Two shareholders are urged to read the disclosure documents that will be filed later today with the Securities and Exchange Commission (the "SEC"), including the tender offer statement, regarding the tender offer because they contain important information. The disclosure documents (when they are available), and any other documents relating to the tender offer that are filed with the SEC, may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at http://investor.ea.com or the website maintained by the SEC at http://www.sec.gov.

This release does not constitute a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders. Neither EA nor its subsidiary making the tender offer is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting.

An Open Letter to the gaming community: http://www.eatake2.com.

For additional information, please contact:

Jeff Brown
VP Communications
Electronic Arts
650-628-7922

Tricia Gugler
Director of IR
Electronic Arts
650-628-7327

David Drake
Georgeson
212-440-9861

About Electronic Arts

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS BIG(TM) and POGO(TM). In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

Forward Looking Statements

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements. All information in this communication is as of March 13, 2008. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

SOURCE: Electronic Arts Inc.

Electronic Arts
Jeff Brown, 650-628-7922
VP Communications
Tricia Gugler, 650-628-7327
Director of IR
or
Georgeson
David Drake, 212-440-9861

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 2



# FORM SC TO-T

## TAKE TWO INTERACTIVE SOFTWARE INC - TTWO

**Filed: March 13, 2008 (period: )**

Tender offer schedule and amendment filed by a third party

# Table of Contents

SC TO-T - SCHEDULE TO

EX-99.(A)(1)(A) (OFFER TO PURCHASE DATED MARCH 13)

EX-99.(A)(1)(B) (LETTER OF TRANSMITTAL)

EX-99.(A)(1)(C) (NOTICE OF GUARANTEED DELIVERY)

EX-99.(A)(1)(D) (LETTER FROM PURCHASER TO BROKERS)

EX-99.(A)(1)(E) (LETTER TO CLIENTS FOR USE BY BROKERS)

EX-99.(A)(1)(F) (GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE W-9)

EX-99.(A)(1)(G) (SUMMARY ADVERTISEMENT AS PUBLISHED ON MARCH 13)

EX-99.(A)(5)(A) (PRESS RELEASE ISSUED BY ELECTRONIC ARTS INC.)

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Schedule TO

**TENDER OFFER STATEMENT UNDER SECTION 14(D)(1)**
**OR SECTION 13(E)(1) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Take-Two Interactive Software, Inc.**
*(Name of Subject Company—(Issuer))*

**EA08 Acquisition Corp.**
**Electronic Arts Inc.**
*(Name of Filing Persons—(Offeror))*

**Common Stock, Par Value $.01 Per Share**
*(Title of Class of Securities)*

**874054109**
*(CUSIP Number of Class of Securities)*

**Stephen G. Bené**
**Senior Vice President, General Counsel and Secretary**
**Electronic Arts Inc.**
**209 Redwood Shores Parkway**
**Redwood City, California 94065**
**Telephone: (650) 628-1500**

*(Name, address and telephone number of person authorized to*
*receive notices and communications on behalf of filing persons)*

*Copy to:*

**Richard Capelouto, Esq.**
**Simpson Thacher & Bartlett LLP**
**2550 Hanover Street**
**Palo Alto, California 94304**
**Telephone: (650) 251-5000**

**CALCULATION OF FILING FEE**

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $2,152,261,826 | $84,583.89 |

\*    Calculated solely for purposes of determining the filing fee. Calculated by multiplying $26.00, the per share tender offer price, by 82,779,301, which represents (i) 76,865,236 outstanding shares of common stock as of March 6, 2008 (according to the Subject Company's Quarterly Report on Form 10-Q for the quarter ended January 31, 2008), minus (ii) 10 shares of common stock beneficially owned by the filing persons as of the date hereof, and plus (iii) 5,914,075 shares of common stock subject to outstanding options as of October 31, 2007 (3,905,000 shares according to the Subject Company's Annual Report on Form 10-K for the period ended October 31, 2007 plus 2,009,075 shares subject to options granted by the Subject Company to ZelnickMedia Corporation).

\*\*    Calculated as 0.00393% of the transaction value. The amount of filing fee was calculated in accordance with Section 14(g)(3) of and Rule 0-11(d) under the Securities Exchange Act of 1934, as amended.

☐    Check box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

Amount Previously Paid:                          Filing Party:

Form or Registration No.:                         Date Filed:

☐    Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transactions to which the statement relates:

☒    third-party tender offer subject to Rule 14d-1.

☐    issuer tender offer subject to Rule 13e-4.

☐    going-private transaction subject to Rule 13e-3.

☐    amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer.    ☐

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

This Tender Offer Statement on Schedule TO ("*Schedule TO*") relates to the tender offer by EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Parent*"), to purchase all of the issued and outstanding shares of common stock, par value $.01 per share (the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), at a purchase price of $26.00 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), a copy of which is attached hereto as Exhibit (a)(1)(A), and in the related Letter of Transmittal (the "*Letter of Transmittal*"), a copy of which is attached hereto as Exhibit (a)(1)(B) (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*").

The information in the Offer to Purchase, including all schedules and annexes thereto, is hereby expressly incorporated herein by reference in response to all the items of this Schedule TO, and is supplemented by the information specifically provided therein.

Item 1.     *Summary Term Sheet.*

Regulation M-A Item 1001

The information set forth in the Offer to Purchase under the caption SUMMARY TERM SHEET is incorporated herein by reference.

Item 2.     *Subject Company Information.*

Regulation M-A Item 1002

(a) **Name and Address.** The name, address, and telephone number of the subject company's principal executive offices are as follows:

Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012
(646) 536-2842

(b) **Securities.** The class of securities to which this Schedule TO relates is the common stock, par value $.01 per share of Take-Two, of which 76,865,236 shares were issued and outstanding as of March 6, 2008 according to Take-Two's Quarterly Report on Form 10-Q for the quarter ended January 31, 2008. The information set forth on the cover page and in the INTRODUCTION of the Offer to Purchase is incorporated herein by reference.

(c) **Trading Market and Price.** The information set forth under the caption "The Offer—Section 6—Price Range of Shares" of the Offer to Purchase is incorporated herein by reference.

Item 3.     *Identity and Background of Filing Person.*

Regulation M-A Item 1003

(a)-(c) **Name and Address; Business and Background of Entities; and Business and Background of Natural Persons.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

SUMMARY TERM SHEET
The Offer—Section 9—Certain Information Concerning Purchaser and Parent
Schedule I attached thereto

Item 4.     *Terms of the Transaction.*

**Regulation M-A Item 1004**

(a) **Material Terms.** The information set forth in the Offer to Purchase is incorporated herein by reference.

Item 5.     *Past Contacts, Transactions, Negotiations and Agreements.*

**Regulation M-A Item 1005**

(a) **Transactions.** The information set forth in the Offer to Purchase under the following caption is incorporated herein by reference:

The Offer—Section 9—Certain Information Concerning Purchaser and Parent

(b) **Significant Corporate Events.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

SUMMARY TERM SHEET
INTRODUCTION
The Offer—Section 9—Certain Information Concerning Purchaser and Parent
The Offer—Section 11—Background of the Offer

Item 6.     *Purposes of the Transaction and Plans or Proposals.*

**Regulation M-A Item 1006**

(a) **Purposes.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

SUMMARY TERM SHEET
INTRODUCTION
The Offer—Section 7—Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations
The Offer—Section 11—Background of the Offer
The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights

(c)(1)-(7) **Plans.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

SUMMARY TERM SHEET
INTRODUCTION
The Offer—Section 7—Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations
The Offer—Section 11—Background of the Offer
The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights

Item 7.     *Source and Amount of Funds or Other Consideration.*

**Regulation M-A Item 1007**

(a)-(b) **Source of Funds; Conditions.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

SUMMARY TERM SHEET
The Offer—Section 10—Source and Amount of Funds
The Offer—Section 16—Fees and Expenses

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

**Item 8.**    *Interest in Securities of the Subject Company.*

**Regulation M-A Item 1008**

(a)-(b) **Securities Ownership; Securities Transactions.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

> INTRODUCTION
> The Offer—Section 9—Certain Information Concerning Purchaser and Parent

**Item 9.**    *Persons/Assets, Retained, Employed, Compensated or Used.*

**Regulation M-A Item 1009**

(a) **Solicitations or Recommendations.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

> SUMMARY TERM SHEET
> INTRODUCTION
> The Offer—Section 2—Acceptance for Payment and Payment
> The Offer—Section 3—Procedure for Tendering Shares
> The Offer—Section 11—Background of the Offer
> The Offer—Section 16—Fees and Expenses

**Item 10.**    *Financial Statements.*

**Regulation M-A Item 1010**

Not applicable. Because the form of payment consists solely of cash and is not conditioned upon any financing arrangements, the filing persons do not think Parent's financial condition is material to a stockholder's decision whether to tender in the Offer.

**Item 11.**    *Additional Information.*

**Regulation M-A Item 1011**

(a) **Agreements, Regulatory Requirements and Legal Proceedings.** The information set forth in the Offer to Purchase under the following captions is incorporated herein by reference:

> SUMMARY TERM SHEET
> The Offer—Section 7—Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the
> Exchange Act; Margin Regulations
> The Offer—Section 9—Certain Information Concerning Purchaser and Parent
> The Offer—Section 15—Certain Legal Matters; Regulatory Approvals

(b) **Other Material Information.** The information set forth in the Offer to Purchase and Letter of Transmittal is incorporated herein by reference.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Item 12.   *Exhibits.*

**Regulation M-A Item 1016**

| Exhibit No. | Description |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. |
| (a)(1)(B) | Letter of Transmittal. |
| (a)(1)(C) | Notice of Guaranteed Delivery. |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

## SIGNATURES

After due inquiry and to the best of their knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated March 13, 2008.

**ELECTRONIC ARTS INC.**

By:    /s/ Stephen G. Bené
_____
       Name:  Stephen G. Bené
       Title:   Senior Vice President, General Counsel, and Secretary

**EA08 ACQUISITION CORP.**

By:    /s/ Stephen G. Bené
_____
       Name:  Stephen G. Bené
       Title:   Vice President and Secretary

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. |
| (a)(1)(B) | Letter of Transmittal. |
| (a)(1)(C) | Notice of Guaranteed Delivery. |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

Exhibit (a)(1)(A)

*Offer to Purchase for Cash*
*All Outstanding Shares of Common Stock*
*of*
*Take-Two Interactive Software, Inc.*
*at*
*$26.00 Net Per Share*
*by*
*EA08 Acquisition Corp.*
*a wholly-owned subsidiary of*
*Electronic Arts Inc.*

*THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 12:00
MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11,
2008, UNLESS THE OFFER IS EXTENDED.*

*THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE HAVING BEEN VALIDLY TENDERED AND NOT WITHDRAWN BEFORE THE EXPIRATION OF THE OFFER AT LEAST THE NUMBER OF SHARES OF COMMON STOCK, PAR VALUE $.01 PER SHARE (THE "SHARES"), OF TAKE-TWO INTERACTIVE SOFTWARE, INC. ("TAKE-TWO" OR THE "COMPANY"), WHICH, TOGETHER WITH THE SHARES THEN OWNED BY ELECTRONIC ARTS INC. ("ELECTRONIC ARTS" OR "PARENT"), A DIRECT PARENT OF EA08 ACQUISITION CORP. ("PURCHASER"), AND ITS SUBSIDIARIES (INCLUDING PURCHASER), REPRESENTS AT LEAST A MAJORITY OF THE TOTAL NUMBER OF SHARES OUTSTANDING ON A FULLY-DILUTED BASIS, (II) PURCHASER BEING SATISFIED, IN ITS SOLE DISCRETION, THAT THE RESTRICTIONS ON BUSINESS COMBINATIONS WITH INTERESTED STOCKHOLDERS SET FORTH IN SECTION 203 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE ARE INAPPLICABLE TO THE OFFER AND THE PROPOSED MERGER, (III) TAKE-TWO HAVING ENTERED INTO A MERGER AGREEMENT WITH ELECTRONIC ARTS AND PURCHASER PROVIDING FOR THE CONSUMMATION OF THE OFFER AND A SECOND STEP MERGER AS CONTEMPLATED BY THIS OFFER TO PURCHASE ON TERMS SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER IN THEIR REASONABLE JUDGMENT, INCLUDING REPRESENTATIONS AND WARRANTIES THAT ARE REASONABLY SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER AND ARE NOT SUBJECT TO ANY EXCEPTIONS THAT REFLECT FACTS, CIRCUMSTANCES OR CONDITIONS THAT WOULD RESULT IN A FAILURE TO SATISFY ANY OTHER CONDITION TO THE OFFER AND (IV) ANY APPLICABLE WAITING PERIOD UNDER THE HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976, AS AMENDED, HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO SUBJECT TO CERTAIN OTHER CONDITIONS CONTAINED IN THIS OFFER TO PURCHASE. SEE "INTRODUCTION" AND "THE OFFER—SECTION 14—CONDITIONS OF THE OFFER", WHICH SET FORTH IN FULL THE CONDITIONS TO THE OFFER.*

*AS DISCLOSED IN TAKE-TWO'S PROXY STATEMENT FOR ITS ANNUAL MEETING OF STOCKHOLDERS TO BE HELD ON APRIL 10, 2008, THE COMPANY HAS SUBMITTED TO ITS STOCKHOLDERS A PROPOSAL TO AMEND THE COMPANY'S INCENTIVE STOCK PLAN TO INCREASE THE NUMBER OF SHARES RESERVED FOR ISSUANCE UNDER THAT PLAN BY 2,000,000 SHARES AND TO PERMIT THE ISSUANCE OF AWARDS UNDER SUCH PLAN TO CONSULTANTS, INCLUDING 1,500,000 SHARES OF RESTRICTED STOCK TO ZELNICKMEDIA CORPORATION. IN THE EVENT THAT THE STOCKHOLDERS OF THE COMPANY APPROVE THIS PROPOSAL, PURCHASER INTENDS TO AMEND THE OFFER TO REDUCE THE PURCHASE PRICE TO $25.74 NET PER SHARE. IF SUCH AN AMENDMENT IS MADE, PURCHASER WILL EXTEND THE OFFER TO THE EXTENT REQUIRED BY RULE 14E-1 UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.*

(Continued on next page)

*The Dealer Manager for the Offer is:*
# Morgan Stanley

*March 13, 2008*

ELECTRONIC ARTS AND PURCHASER INTEND TO CONTINUE TO SEEK TO NEGOTIATE THE ACQUISITION OF TAKE-TWO BY ELECTRONIC ARTS AND THE OFFER IS CONDITIONED ON ELECTRONIC ARTS AND PURCHASER ENTERING INTO A MERGER AGREEMENT WITH TAKE-TWO. SUBJECT TO APPLICABLE LAW, PURCHASER RESERVES THE RIGHT TO AMEND THE OFFER (INCLUDING AMENDING THE NUMBER OF SHARES TO BE PURCHASED AND THE OFFER PRICE), INCLUDING FOR PURPOSES OF NEGOTIATING OR ENTERING INTO A MERGER AGREEMENT WITH THE COMPANY. IF REQUESTED BY THE COMPANY, ANY SUCH MERGER AGREEMENT MAY CONTEMPLATE THE TERMINATION OF THE OFFER. IN THE EVENT THAT PARENT, PURCHASER AND THE COMPANY ENTER INTO A MERGER AGREEMENT THAT REQUIRES THAT THE OFFER BE TERMINATED, THE SHARES WOULD, UPON CONSUMMATION OF SUCH MERGER, BE CONVERTED INTO THE RIGHT TO RECEIVE THE CONSIDERATION PROVIDED FOR IN SUCH MERGER AGREEMENT.

THIS OFFER TO PURCHASE AND THE RELATED LETTER OF TRANSMITTAL CONTAIN IMPORTANT INFORMATION, AND YOU SHOULD CAREFULLY READ BOTH IN THEIR ENTIRETY BEFORE MAKING A DECISION WITH RESPECT TO THE OFFER.

## *IMPORTANT*

Any stockholder of the Company desiring to tender Shares in the Offer should either (i) complete and sign the Letter of Transmittal (or a facsimile thereof) in accordance with the instructions in the Letter of Transmittal, have such stockholder's signature thereon guaranteed if required by Instruction 1 to the Letter of Transmittal, and mail or deliver the Letter of Transmittal together with the certificate(s) representing tendered Shares and all other required documents to U.S. Bank National Association, the Depositary for the Offer, or tender such Shares pursuant to the procedure for book-entry transfer set forth in "The Offer – Section 3—Procedure for Tendering Shares" or (ii) give instruction to such stockholder's broker, dealer, commercial bank, trust company or other nominee to tender such stockholder's Shares for such stockholder. Stockholders whose Shares are registered in the name of a broker, dealer, commercial bank, trust company or other nominee must contact such person if they desire to tender their Shares.

Any stockholder who desires to tender Shares and whose certificates representing such Shares are not immediately available, or who cannot comply with the procedures for book-entry transfer on a timely basis, may tender such Shares pursuant to the guaranteed delivery procedure set forth in "The Offer – Section 3—Procedure for Tendering Shares".

Any questions and requests for assistance may be directed to the Information Agent or to the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Offer to Purchase. Additional copies of this Offer to Purchase, the Letter of Transmittal, the Notice of Guaranteed Delivery and other related materials may be obtained from the Information Agent. Stockholders may also contact their brokers, dealers, commercial banks, trust companies or other nominees for assistance concerning the Offer.

NEITHER THIS OFFER TO PURCHASE NOR THE OFFER CONSTITUTES A SOLICITATION OF PROXIES IN CONNECTION WITH ANY MATTER TO BE CONSIDERED AT TAKE-TWO'S 2008 ANNUAL MEETING OF STOCKHOLDERS SCHEDULED TO BE HELD ON APRIL 10, 2008. NEITHER ELECTRONIC ARTS NOR PURCHASER IS SOLICITING, OR INTENDS TO SOLICIT, PROXIES IN RESPECT OF ANY MATTER TO BE CONSIDERED AT TAKE-TWO'S 2008 ANNUAL MEETING. IN ADDITION, NEITHER THIS OFFER TO PURCHASE NOR THE OFFER CONSTITUTES A SOLICITATION OF CONSENTS FROM TAKE-TWO'S STOCKHOLDERS. ANY SOLICITATION WILL BE MADE ONLY PURSUANT TO SEPARATE PROXY OR CONSENT SOLICITATION MATERIALS COMPLYING WITH ALL APPLICABLE REQUIREMENTS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| SUMMARY TERM SHEET |  | 1 |
| INTRODUCTION |  | 7 |
| THE OFFER |  | 12 |
| 1. | Terms of the Offer | 12 |
| 2. | Acceptance for Payment and Payment | 14 |
| 3. | Procedure for Tendering Shares | 15 |
| 4. | Withdrawal Rights | 18 |
| 5. | Certain Tax Considerations | 19 |
| 6. | Price Range of Shares | 21 |
| 7. | Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations | 21 |
| 8. | Certain Information Concerning the Company | 23 |
| 9. | Certain Information Concerning Purchaser and Parent | 23 |

|  |  | Page |
|---|---|---|
| 10. | Source and Amount of Funds | 24 |
| 11. | Background of the Offer | 25 |
| 12. | Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights | 31 |
| 13. | Dividends and Distributions | 35 |
| 14. | Conditions of the Offer | 35 |
| 15. | Certain Legal Matters; Regulatory Approvals | 39 |
| 16. | Fees and Expenses | 42 |
| 17. | Miscellaneous | 42 |
| Schedule 1 | Directors and Executive Officers of Parent and the Purchaser | S-1 |

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

## SUMMARY TERM SHEET

EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., is offering to purchase all issued and outstanding shares of common stock, par value $.01 per share, of Take-Two Interactive Software, Inc., for $26.00 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Offer to Purchase and the related Letter of Transmittal. This summary term sheet highlights selected information from this Offer to Purchase, and may not contain all of the information that is important to you. To better understand our offer to you and for a complete description of the legal terms of the Offer, you should carefully read this Offer to Purchase and the accompanying Letter of Transmittal in their entirety. Questions or requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Offer to Purchase.

Unless the context requires otherwise, all references in this Summary Term Sheet and in this Offer to Purchase to "*Purchaser*," "*we*," "*us*," or "*our*" are to EA08 Acquisition Corp., all references to "*Parent*" or "*Electronic Arts*" are to Electronic Arts Inc. and all references to "*Take-Two*" or the "*Company*" are to Take-Two Interactive Software, Inc.

**Who is offering to buy my shares?**

- We are a Delaware corporation formed for the purpose of making this tender offer, and we have carried on no activities other than in connection with making the tender offer. We are a wholly-owned subsidiary of Electronic Arts, also a Delaware corporation.

- Electronic Arts is one of the world's leading interactive entertainment software companies. Electronic Arts develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet.

- See "The Offer—Section 9—Certain Information Concerning Purchaser and Parent" for more information about us and our affiliates.

**What securities are you offering to purchase?**

- We are offering to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, of Take-Two. We refer to one share of Take-Two common stock as a "*share*" or "*Share*". See "Introduction" and "The Offer—Section 1—Terms of the Offer".

**How much are you offering to pay for my shares and what is the form of payment?**

- We are offering to pay you $26.00 per share, net to you in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions contained in this Offer to Purchase and in the related Letter of Transmittal. See "Introduction", "The Offer—Section 1—Terms of the Offer" and "The Offer—Section 13—Dividends and Distributions".

- On February 15, 2008, Take-Two announced that it had amended the terms of its management agreement with ZelnickMedia Corporation, or "*ZelnickMedia*", pursuant to which ZelnickMedia has agreed to provide the services of Strauss Zelnick, Ben Feder and Karl Slatoff as the Executive Chairman, Chief Executive Officer and Executive Vice President, respectively, of the Company. Pursuant to the amendment to the management agreement, the Company, among other things, agreed to grant to ZelnickMedia Corporation 1,500,000 shares of restricted stock under the Company's Incentive Stock Plan, subject to the Company's stockholders approving at its 2008 annual meeting of

1

Table of Contents

stockholders, to be held on April 10, 2008, an amendment to the Company's Incentive Stock Plan providing for an increase in the number of shares of Take-Two common stock reserved for issuance under the Incentive Stock Plan by 2,000,000 shares and permitting the issuance of awards under that Plan to consultants (which would include ZelnickMedia). Take-Two's agreements with ZelnickMedia provide that if such shares of restricted stock are issued to ZelnickMedia, at least 780,000 of such shares would vest as a result of a purchase of Shares pursuant to the Offer. In the event that the amendment to the Incentive Stock Plan is approved by the Company's stockholders, we intend to amend this offer to reduce the purchase price to $25.74 per share, net to the seller in cash (subject to applicable withholding taxes), without interest (which reflects the reduction required if such shares are issued to keep the aggregate amount to be paid by Purchaser in the offer and the merger the same as would be paid if such shares were not issued, assuming the capitalization of Take-Two described in "Introduction" below). If such an amendment is made, we will extend the offer to the extent required by Rule 14e–1 under the Securities Exchange Act of 1934, as amended, or the "*Exchange Act*".

- If you are the record owner of your Shares and you tender your Shares to us in the offer, you will not have to pay any brokerage or similar fees. If you own your shares through a broker or other nominee, your broker or nominee may charge you a fee to tender your Shares on your behalf. You should consult your broker or nominee to determine whether any charges will apply. See "Introduction" and "The Offer—Section 1—Terms of the Offer".

**Why are you making the offer?**

- We are making the offer because we want to acquire control of, and ultimately the entire equity interest in, the Company. If the offer is consummated, Electronic Arts intends, as soon as practicable after consummation of the offer, to have us consummate a second-step merger with the Company pursuant to which each then outstanding share (other than shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their shares) would be converted into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the offer, without interest (and less any applicable withholding taxes). Upon consummation of this merger, the Company would be a wholly-owned subsidiary of Electronic Arts.

- See "Introduction", "The Offer—Section 11—Background of the Offer" and "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" for more information.

**Are you taking any position with respect to the matters to be considered at Take-Two's 2008 annual meeting of stockholders?**

- Take-Two has publicly announced that it is holding its 2008 annual meeting of stockholders on April 10, 2008, to consider certain matters, including, among other matters, the election of directors to Take-Two's Board of Directors and certain amendments to the Company's Incentive Stock Plan as described above. We are not taking any position with respect to any of the matters to be considered at the Take-Two annual meeting.

- **Neither this Offer to Purchase nor the offer constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting. In addition, neither this Offer to Purchase nor the offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.**

2

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

**Do you intend to undertake a consent solicitation to remove the directors of Take-Two?**

- To the extent we or Electronic Arts determines that a consent solicitation would be necessary or advisable in order to further our objective to acquire Take-Two, we and/or Electronic Arts intend to commence a solicitation of written consents from Take-Two stockholders in order to, among other things, remove each member of Take-Two's board of directors and replace such directors with nominees selected by us to serve as the directors of Take-Two. We would expect that any directors selected by us and/or Electronic Arts would, subject to their fiduciary duties, support our offer and the related merger and take certain actions to enable the offer and the related merger to proceed, including taking action to cause certain conditions of the offer to be satisfied (including negotiating and causing the Company to enter into a merger agreement, if the condition relating to Take-Two's entry into a merger agreement with us and Electronic Arts remains in place).

- Neither this Offer to Purchase nor the offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.

**If you do undertake a consent solicitation, will the granting of a consent be a condition to the tender of shares in the offer?**

- No. If we undertake a consent solicitation, the granting of a consent to us in connection with a consent solicitation by us would not be a condition to the tender of shares in the offer.

**What are the most significant conditions to the offer?**

- We are not obligated to purchase any shares unless, prior to the expiration of the offer:

  - there have been validly tendered and not withdrawn at least the number of shares, which, together with the shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of shares outstanding on a fully diluted basis;

  - we are satisfied, in our sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the offer and the proposed second-step merger or any other business combination involving Electronic Arts or any of its subsidiaries (including Purchaser) and Take-Two;

  - Take-Two has entered into a merger agreement with Purchaser and Electronic Arts providing for the consummation of the Offer and a second-step merger as contemplated by this Offer to Purchase on terms satisfactory to us in our reasonable judgment, including representations and warranties that are reasonably satisfactory to us; and

  - any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, has expired or been terminated;

- These and other conditions to our obligations to purchase shares tendered in the offer are described in greater detail in "Introduction" and "The Offer—Section 14—Conditions of the Offer". We can waive any and all of the conditions to the offer without the consent of Take-Two.

**Will you have the financial resources to pay for the shares?**

- Yes. Our offer is not subject to any financing condition. Electronic Arts will provide us with the funds necessary to purchase the shares in the offer and to pay related expenses. As of March 7, 2008, Parent

3

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

had cash and cash equivalents and short-term investments in the amount of approximately $2.3 billion. Although this amount exceeds the amount of financing required to purchase the Shares pursuant to the offer and the merger (and to pay related fees and expenses), the Board of Directors of Electronic Arts has also authorized Electronic Arts to obtain additional debt financing, a portion of which may be used to fund in part the offer and/or the merger. See "The Offer—Section 10—Source and Amount of Funds".

**How long do I have to decide whether to tender in the offer?**

- You have until the expiration of the offer to tender. The offer currently is scheduled to expire at 12:00 midnight, New York City time, on Friday, April 11, 2008.

- We may elect to provide a "subsequent offering period" for the offer. A subsequent offering period is an additional period of time beginning after we have purchased shares tendered during the offer, during which stockholders may tender, but not withdraw, their shares and receive the offer consideration. We do not currently intend to include a subsequent offering period, although we reserve the right to do so.

- See "The Offer—Section 1—Terms of the Offer".

**How will I be notified if the offer is extended?**

- If we decide to extend the offer, or if we decide to provide for a subsequent offering period, we will inform U.S. Bank National Association, the depositary for the offer, of that fact and will make a public announcement of the extension, no later than 9:00 a.m., New York City time, on the next business day after the date the offer was scheduled to expire. See "The Offer—Section 1—Terms of the Offer".

**How do I tender my shares?**

- To tender your shares in the offer, you must:

  - deliver the certificates representing your shares, together with a completed and signed Letter of Transmittal and any other required documents, to U.S. Bank National Association, the depositary for the offer, in accordance with the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" and in the Letter of Transmittal, not later than the time the offer expires;

  - tender your shares pursuant to the book-entry transfer procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares"; or

  - if your share certificates are not immediately available or if you cannot deliver your share certificates, and any other required documents, to the depositary prior to the expiration of the offer, or you cannot complete the procedure for delivery by book-entry transfer on a timely basis, you may still tender your shares if you comply with the guaranteed delivery procedures described in "The Offer—Section 3—Procedures for Tendering Shares".

**Can I withdraw my previously tendered shares?**

- You may withdraw previously tendered shares at any time prior to the expiration of the offer, and, if we have not by May 11, 2008, agreed to accept your shares for payment, you can withdraw them at any time after such time until we accept shares for payment. You may not, however, withdraw shares tendered during a subsequent offering period, if one is included, or after we accept your shares for payment. See "The Offer—Section 4—Withdrawal Rights".

- To withdraw previously tendered shares, you must deliver a written notice of withdrawal, or a facsimile of one, with the required information to U.S. Bank National Association, the depositary for the offer, while you have the right to withdraw the shares. See "The Offer—Section 4—Withdrawal Rights".

4

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

**What does the Board of Directors of Take-Two think of the offer?**

- Take-Two's Board of Directors rejected an earlier proposal by Electronic Arts to acquire all issued and outstanding shares of Take-Two for $26.00 per share in cash. Take-Two's Board of Directors has not approved this offer or otherwise commented on it as of the time this Offer to Purchase is being filed with the SEC. Within ten business days after the date of this Offer to Purchase, Take-Two is required by law to publish, send or give to you (and file with the SEC) a statement as to whether it recommends acceptance or rejection of the offer, that it has no opinion with respect to the offer or that it is unable to take a position with respect to the offer. See "Introduction".

**If I decide not to tender but the offer is successful, what will happen to my shares?**

- As indicated above, if the offer is successful, we and Electronic Arts intend, as soon as practicable following the consummation of the offer, to have us consummate a merger transaction with the Company pursuant to which each then outstanding share (other than shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their shares) would be converted into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the offer, without interest (and less any applicable withholding taxes). If the proposed second-step merger takes place, stockholders who do not tender in the offer (other than those described above) will receive the same amount of cash per share that they would have received had they tendered their shares in the offer. Therefore, if such merger takes place, the only differences between tendering and not tendering shares in the offer is that tendering stockholders will be paid earlier and stockholders who do not tender and who do not vote in favor of the merger may exercise appraisal rights as described below.

- The offer is conditioned on Take-Two entering into a merger agreement with Purchaser and Electronic Arts that provides for the contemplated second-step merger. However, Purchaser reserves the right to waive this merger agreement condition. If Purchaser waives the merger agreement condition and the offer is consummated but Electronic Arts determines not to consummate the merger, there may be so few remaining stockholders and publicly held shares that the shares will no longer be eligible to be traded on the Nasdaq Global Select Market or any other securities market, there may not be a public trading market for the shares, and Take-Two may cease making filings with the SEC or otherwise cease being required to comply with the SEC rules relating to publicly-held companies.

**Could the merger still be consummated if Purchaser waives the merger agreement condition and completes the offer?**

- Yes. While the offer is conditioned on the satisfaction of the merger agreement condition, if Purchaser waives the merger agreement condition and the offer is otherwise consummated, Electronic Arts currently intends, as soon as practicable after consummation of the offer, to cause Take-Two to consummate the merger.

**Are appraisal rights available in either the offer or the proposed merger?**

- Appraisal rights are not available in the offer. After the offer, if the proposed second-step merger takes place, appraisal rights will be available to holders of shares who do not vote in favor of the proposed merger and who properly seek appraisal rights for their shares in accordance with Section 262 of the General Corporation Law of the State of Delaware. The value you would receive if you perfect appraisal rights could be more or less than, or the same as, the price per share to be paid in the proposed merger. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

5

Table of Contents

**What is the market value of my shares as of a recent date?**

- On March 12, 2008, the last full trading day before the announcement of our intention to commence the offer, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $24.91 per share. On February 15, 2008, the last trading day before Electronic Arts sent its proposal to Take-Two to acquire the Company at $26.00 per share, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $15.83 per share. The offer price of $26.00 per share represents a premium of approximately 64% over Take-Two's closing stock price on February 15, 2008. Please obtain a recent quotation for your shares prior to deciding whether or not to tender. See "The Offer—Section 6—Price Range of Shares".

**What are the U.S. federal income tax consequences of participating in the offer?**

- In general, if you are a U.S. holder of shares of Take-Two common stock, the sale of shares pursuant to the offer will be a taxable transaction to you. For U.S. federal income tax purposes, your receipt of cash in exchange for your shares generally will cause you to recognize a gain or loss measured by the difference, if any, between the cash you receive in the offer and your adjusted tax basis in your shares. If you are a non-U.S. holder of Take-Two common stock, the sale of shares pursuant to the offer will generally not be a taxable transaction to you under U.S. federal income tax laws unless you have certain connections to the United States. You should consult your tax advisor about the tax consequences to you of participating in the offer in light of your particular circumstances. See "The Offer—Section 5—Certain Tax Considerations".

**Who can I talk to if I have questions about the offer?**

- You can call Georgeson Inc., the information agent for the offer, at (212) 440-9800 (for banks and brokers) or (800) 213-0473 (toll-free) or Morgan Stanley & Co. Incorporated, the dealer manager for the offer, at (877) 247-9865 (toll-free), with any questions you may have. See the back cover of this Offer to Purchase.

6

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents
To the Stockholders of Take-Two:

## INTRODUCTION

We, EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Parent*" or "*Electronic Arts*"), are offering to purchase all issued and outstanding shares (the "*Shares*") of common stock, par value $.01 per share (the "*Common Stock*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), for $26.00 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Offer to Purchase and the related Letter of Transmittal (which, together with any amendments or supplements hereto and thereto, collectively constitute the "*Offer*"). Electronic Arts is one of the world's leading interactive entertainment software companies.

Tendering stockholders who have Shares registered in their own names and tender directly to U.S. Bank National Association, the depositary for the Offer (the "*Depositary*"), will not have to pay brokerage fees or commissions with respect to the purchase of Shares by Purchaser pursuant to the Offer. If you own your Shares through a broker or other nominee, and your broker tenders your Shares on your behalf, your broker or nominee may charge a fee for doing so. You should consult your broker or nominee to determine whether any charges or commissions will apply. Any tendering stockholder or other payee that fails to complete and sign the Substitute Form W–9, which is included in the Letter of Transmittal, may be subject to backup withholding of U.S. federal income tax at a 28% rate on the gross proceeds payable to such stockholder or other payee pursuant to the Offer. See "The Offer—Section 5—Certain Tax Considerations". Purchaser will pay all charges and expenses of Morgan Stanley & Co. Incorporated ("*Morgan Stanley*"), the dealer manager for the Offer (the "*Dealer Manager*"), the Depositary and Georgeson Inc., the information agent for the Offer (the "*Information Agent*"), incurred in connection with the Offer. See "The Offer—Section 16—Fees and Expenses".

The Offer is conditioned upon:

(1)     there having been validly tendered and not withdrawn at least the number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis (taking into account, without limitation, all shares issuable upon the exercise of any options, warrants, convertible securities or rights or pursuant to other contractual obligations) on the date of the purchase of Shares pursuant to the Offer. We refer to this condition in this Offer to Purchase as the "*Minimum Condition*";

According to the Company's Quarterly Report on Form 10-Q for the quarter ended January 31, 2008 filed on March 11, 2008 with the SEC, as of March 6, 2008, there were outstanding 76,865,236 Shares (including shares of restricted stock). According to the Company's Annual Report on Form 10-K, filed on December 20, 2007 with the SEC (the "*Company 10-K*"), as of October 31, 2007, there were 3,905,000 Shares issuable upon or otherwise deliverable in connection with the exercise of outstanding options, which number would appear to exclude the 2,009,075 Shares issuable upon exercise of outstanding options granted to ZelnickMedia Corporation ("*ZelnickMedia*") pursuant to the Management Agreement referenced below. Parent currently beneficially owns nine Shares, which were acquired in open market transactions. Purchaser owns one Share.

Based on the foregoing and assuming that (i) no Shares have been issued (including pursuant to the exercise of any options, warrants, convertible securities or other rights or pursuant to other contractual obligations) or acquired by the Company after March 6, 2008 (other than as described in clause (iv) below), (ii) no options have been granted or have expired after October 31, 2007, (iii) Take-Two's stockholders do not approve the amendment to the Company's Stock Incentive Plan at Take-Two's 2008 annual meeting of stockholders and (iv) all 5,914,075 Shares subject to issuance pursuant to Company options (*i.e.*, the 3,905,000 Shares listed in the Company 10-K plus the 2,009,075 Shares

7

Table of Contents

underlying options issued to ZelnickMedia) are issued (and the corresponding options exercised), there would be 82,779,301 Shares outstanding immediately following consummation of the Offer, and, as a result, the Minimum Condition would be satisfied if 41,389,652 Shares were tendered and not withdrawn prior to the Expiration Date in addition to the ten Shares already owned by Electronic Arts and Purchaser.

(2) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware (the *"DGCL"*) are inapplicable to the Offer and the Merger (as defined below). We refer to this condition in this Offer to Purchase as the *"Section 203 Condition"*;

In general, Section 203 prevents an "interested stockholder" (generally, a stockholder owning 15% or more of a corporation's outstanding voting stock or an affiliate or associate thereof) from engaging in a "business combination" (defined to include a merger or consolidation and certain other transactions) with a Delaware corporation for a period of three years following the time on which such stockholder became an interested stockholder unless (i) prior to such time the corporation's board of directors approved either the business combination or the transaction which resulted in such stockholder becoming an interested stockholder, (ii) upon consummation of the transaction which resulted in such stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the corporation's voting stock outstanding at the time the transaction commenced (excluding shares owned by certain employee stock plans and persons who are directors and also officers of the corporation) or (iii) at or subsequent to such time the business combination is approved by the corporation's board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 $^2$/3% of the outstanding voting stock not owned by the interested stockholder. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

(3) Take-Two having entered into a merger agreement with us and Electronic Arts providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and us in our reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and us and are not subject to any exceptions which reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer described in "The Offer—Section 14—Conditions to the Offer". We refer to this condition in this Offer to Purchase as the *"Merger Agreement Condition"*; and

As described in further detail in "The Offer—Section 11—Background of the Offer", Electronic Arts has made a number of attempts to engage with the Board of Directors of the Company regarding a potential acquisition of the Company by Electronic Arts in a negotiated merger transaction. Take-Two's execution of a merger agreement in satisfaction of the Merger Agreement Condition will require Take-Two's Board of Directors to approve such merger agreement.

(4) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the *"HSR Act"*), having expired or having been terminated prior to the expiration of the Offer. We refer to this condition in this Offer to Purchase as the *"HSR Condition"*.

Consummation of the Offer is conditioned upon the expiration or termination of all waiting periods imposed by the HSR Act. Under the HSR Act, certain acquisition transactions, such as the Offer and the Merger, may not be consummated until certain information and documentary material have been furnished for review by the Antitrust Division of the Department of Justice and the Federal Trade Commission and certain waiting period requirements have been satisfied. See "The Offer—Section 15—Certain Legal Matters; Regulatory Approvals".

8

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents
In addition to the conditions described above, the Offer is also subject to certain other conditions described in "The Offer—Section 14—Conditions of the Offer".

On February 15, 2008, Take-Two announced that it had amended the terms of its management agreement with ZelnickMedia, pursuant to which ZelnickMedia has agreed to provide the services of Strauss Zelnick, Ben Feder and Karl Slatoff as the Executive Chairman, Chief Executive Officer and Executive Vice President, respectively, of the Company. Pursuant to the amendment to the management agreement, the Company, among other things, agreed to grant to ZelnickMedia 1,500,000 shares of restricted stock under the Company's Incentive Stock Plan, subject to the Company's stockholders approving at its 2008 annual meeting of stockholders, to be held on April 10, 2008, an amendment to the Company's Incentive Stock Plan providing for an increase in the number of shares of Take-Two common stock reserved for issuance under the Incentive Stock Plan by 2,000,000 shares and permitting the issuance of awards under that Plan to consultants (which would include ZelnickMedia) (such stockholder approval, the "*Incentive Stock Plan Amendment Approval*"). Take-Two's agreements with ZelnickMedia provide that if such shares of restricted stock are issued to ZelnickMedia, at least 780,000 of such shares would vest as a result of our purchase of Shares pursuant to the Offer. In the event that the Incentive Stock Plan Amendment Approval is received, we intend to amend the Offer to reduce the purchase price we are offering in the Offer to \$25.74 per share. This reduction to the per share offer price reflects, assuming a current Take-Two capitalization as described under clause (1) of the conditions above, the reallocation of the aggregate price payable by Purchaser in the Offer and the Merger (as defined below) that would need to be made assuming 780,000 shares of restricted stock of the Company that would be issued to ZelnickMedia pursuant to the aforementioned management agreement would vest and not be forfeited upon our purchase of Shares pursuant to the Offer (and that the aggregate amount to be paid by Purchaser in the Offer and the Merger is the same whether or not such shares are issued). If such an amendment is made, we will extend the Offer to the extent required by Rule 14e–1 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"). Neither this Offer to Purchase nor the Offer constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting. In addition, neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders.

The purpose of the Offer is to acquire control of, and ultimately the entire equity interest in, the Company. The Offer, as the first step in the acquisition of Take-Two, is intended to facilitate the acquisition of all issued and outstanding Shares. If the Offer is consummated, Electronic Arts and Purchaser intend, as soon as practicable after consummation of the Offer, to have Electronic Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronic Arts consummate a second-step merger or similar business combination with Take-Two (the "*Merger*"). At the effective time of the Merger, each then outstanding Share (other than Shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the Offer and who properly seek appraisal for their Shares in accordance with Section 262 of the DGCL) would be canceled and converted automatically into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the Offer, without interest (and less any applicable withholding taxes). Upon consummation of the Merger, the Company would be a wholly-owned subsidiary of Electronic Arts.

As of the date of this Offer to Purchase, Take-Two's Board of Directors has not approved the Offer. Within 10 business days after the date of this Offer to Purchase, the Company is required by law to publish, send or give to you (and file with the Securities and Exchange Commission, or the "*SEC*"), a statement as to whether it recommends acceptance or rejection of the Offer, that it has no opinion with respect to the Offer or that it is unable to take a position with respect to the Offer.

As described in further detail in "The Offer—Section 11—Background of the Offer", Electronic Arts has made a number of attempts to engage with the Board of Directors of the Company regarding a potential

9

Table of Contents

acquisition of the Company by Electronic Arts. Both in its discussions with Mr. Zelnick, and its formal proposal letters to Mr. Zelnick and the Take-Two Board of Directors, Electronic Arts has set forth its view as to the benefits of an acquisition of Take-Two by Electronic Arts to Take-Two stockholders, as well as its perceived benefits of such a transaction for Take-Two employees and customers. Electronic Arts stressed that it was prepared to move expeditiously to complete a transaction, and with minimal interference to the day to day operations of Take-Two. To date, Take-Two's Board of Directors has been unwilling to engage in substantive discussions with Electronic Arts regarding a possible acquisition of the Company.

**Parent is seeking, and intends to continue to seek, to negotiate the acquisition of the Company by Electronic Arts and the Offer is subject to the Merger Agreement Condition. Subject to applicable law, Purchaser reserves the right to amend the Offer (including amending the number of Shares to be purchased and the offer price), including for purposes of negotiating or entering into a merger agreement with the Company. Any such merger agreement may contemplate the termination or amendment of the Offer. In the event that the Offer is terminated and Parent, Purchaser and the Company enter into a merger agreement, the Shares would, upon consummation of such merger, be converted into the right to receive the consideration provided for in the merger agreement.**

Neither we nor Electronic Arts intends to nominate for election at the Company's 2008 annual meeting of stockholders any persons to serve as directors of the Company. Electronic Arts and we intend, however, if we and/or Electronic Arts deem it necessary or advisable in connection with our proposal to acquire the Company, in accordance with the Company's Restated Certificate of Incorporation, its bylaws and applicable rules and regulations of the Exchange Act, to commence a solicitation of written consents from Take-Two stockholders for the following purposes, among others that we and/or Electronic Arts may choose to include within any consent solicitation we and/or Electronic Arts may undertake: (1) to remove each member of Take-Two's board of directors, (2) to elect nominees selected by Electronic Arts, which we refer to as "*EA Nominees*", to serve as the directors of Take-Two and (3) to repeal each provision of the Take-Two bylaws and amendments thereto, if any, adopted after February 14, 2008, and before the effectiveness of the proposals made pursuant to such consent solicitation. **Neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.** If we and/or Electronic Arts do undertake the aforementioned consent solicitation, we and/or Electronic Arts will file solicitation materials with the SEC complying with the rules and requirements of the Exchange Act to solicit from Take-Two stockholders consents to undertake the aforementioned actions. Furthermore, if we and/or Electronic Arts undertake a consent solicitation, the granting of a consent will not be a condition to the tender of Shares in the Offer.

Electronic Arts and Purchaser expect that the EA Nominees, subject to fulfillment of the fiduciary duties that they would have as directors of the Company, would (i) consider the Offer and any other alternative proposal and (ii) consider taking action to remove certain obstacles to the stockholders of the Company determining whether to accept the Offer or otherwise consummate the Offer and the Merger, including taking action to (a) satisfy the Section 203 Condition and the Merger Agreement Condition (if then in place) and (b) seek or grant such other consents or approvals as may be desirable or necessary to expedite prompt consummation of the Offer and the Merger. Subject to their fiduciary duties, the EA Nominees, if a consent solicitation is undertaken and such nominees are elected, are expected to support the Offer and the Merger and take the actions described above.

**Neither this Offer to Purchase nor the Offer constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting. In addition, neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any**

10

Table of Contents

solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.

No appraisal rights are available in connection with the Offer; however, stockholders may have appraisal rights, if properly exercised under the DGCL, in connection with the Merger. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

This Offer to Purchase and the related Letter of Transmittal contain important information, and you should carefully read both in their entirety before you make a decision with respect to the Offer.

11

Table of Contents

THE OFFER

1. Terms of the Offer.

Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of such extension or amendment), Purchaser will accept for payment and pay for all Shares validly tendered (and not withdrawn in accordance with the procedures set forth in "The Offer—Section 4—Withdrawal Rights") on or prior to the Expiration Date. "*Expiration Date*" means 12:00 midnight, New York City time, on Friday, April 11, 2008, unless and until Purchaser, in its sole discretion, shall have extended the period during which the Offer is open, in which case Expiration Date shall mean the latest time and date at which the Offer, as so extended by Purchaser, shall expire.

The Offer is subject to the conditions set forth under "The Offer—Section 14—Conditions of the Offer", including the satisfaction of the Minimum Condition, the Section 203 Condition, the Merger Agreement Condition and the HSR Condition. If any such condition is not satisfied, Purchaser may:

(1)     extend the Offer and, subject to withdrawal rights as set forth in "The Offer—Section 4—Withdrawal Rights", retain all such Shares until the expiration of the Offer as so extended;

(2)     subject to complying with applicable rules and regulations of the SEC, waive any condition and, subject to any requirement to extend the period of time during which the Offer is open, purchase all Shares validly tendered prior to the Expiration Date and not withdrawn; or

(3)     terminate the Offer and not accept for payment or pay for any Shares and return all tendered Shares to tendering stockholders.

Purchaser expressly reserves the right (but will not be obligated), in its sole discretion, at any time and from time to time, to extend the period during which the Offer is open for any reason by giving oral or written notice of the extension to the Depositary and by making a public announcement of the extension. During any extension, all Shares previously tendered and not withdrawn will remain subject to the Offer and subject to the right of a tendering stockholder to withdraw Shares, as described in "The Offer—Section 4—Withdrawal Rights".

Subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act, Purchaser expressly reserves the right to:

(1)     terminate or amend the Offer if any of the conditions referred to in the Introduction has not been satisfied or upon the occurrence of any of the other events specified in "The Offer—Section 14—Conditions of the Offer" or amend the Offer if the Incentive Stock Plan Amendment Approval is received by the Company; or

(2)     waive any condition or otherwise amend the Offer in any respect, in each case, by giving oral or written notice of such termination, waiver or amendment to the Depositary and by making a public announcement thereof, as described below.

If Purchaser extends the Offer or if Purchaser is delayed in its acceptance for payment of or payment (whether before or after its acceptance for payment of Shares) for Shares, or it is unable to pay for Shares pursuant to the Offer for any reason, then, without prejudice to Purchaser's rights under the Offer, the Depositary may retain tendered Shares on behalf of the Purchaser, and such Shares may not be withdrawn except to the extent tendering stockholders are entitled to withdrawal rights as described in "The Offer—Section 4—Withdrawal Rights". However, Purchaser's ability to delay payment for Shares that the Purchaser has accepted for payment is limited by Rule 14e-1(c) under the Exchange Act, which requires that a bidder pay the consideration offered or return the securities deposited by or on behalf of stockholders promptly after the termination or withdrawal of the bidder's offer.

Any extension, delay, termination, waiver or amendment of the Offer will be followed as promptly as practicable by public announcement thereof, and such announcement in the case of an extension will be made no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration

12

Table of Contents
Date. Without limiting the manner in which the Purchaser may choose to make any public announcement, subject to applicable law (including Rules 14d–4(d), 14d–6(c) and 14e–1(d) under the Exchange Act, which require that material changes be promptly disseminated to holders of Shares in a manner reasonably designed to inform such holders of such change). Purchaser currently intends to make announcements regarding the Offer by issuing a press release.

If Purchaser makes a material change in the terms of the Offer, or if it waives a material condition to the Offer, Purchaser will extend the Offer and disseminate additional tender offer materials to the extent required by Rules 14d–4(d)(1), 14d–6(c) and 14e–1 under the Exchange Act. The minimum period during which an Offer must remain open following material changes in the terms of the Offer, other than a change in price or a change in the percentage of securities sought or a change in any dealer's soliciting fee, will depend upon the facts and circumstances, including the materiality of the changes. In contrast, a minimum 10–business day period from the date of such change is generally required to allow for adequate dissemination of new information to stockholders in connection with a change in price or, subject to certain limitations, a change in the percentage of securities sought or a change in any dealer's soliciting fee. For purposes of the Offer, a "*business day*" means any day other than a Saturday, Sunday or a federal holiday, and consists of the time period from 12:01 a.m. through 12:00 midnight, New York City time.

If Purchaser decides, in its sole discretion, to increase the consideration offered in the Offer to holders of Shares (or if Purchaser decreases the consideration offered in the Offer due to receipt by Take-Two of the Incentive Stock Plan Amendment Approval) and if, at the time that notice of the increase (or decrease) is first published, sent or given to holders of Shares, the Offer is scheduled to expire at any time earlier than the expiration of a period ending on the tenth business day from, and including, the date that such notice is first so published, sent or given, then the Offer will be extended until at least the expiration of ten business days from the date the notice of the increase (or decrease) is first published, sent or given to holders of Shares.

**If, on or before the Expiration Date, Purchaser increases the consideration being paid for Shares accepted for payment pursuant to the Offer, such increased consideration will be paid to all stockholders whose Shares are purchased in the Offer, whether or not such Shares were tendered before the announcement of the increase in consideration.**

Purchaser may, subject to certain conditions, elect to provide a subsequent offering period of between three business days and 20 business days in length after the expiration of the Offer on the Expiration Date and acceptance for payment of the Shares tendered in the Offer (a "*Subsequent Offering Period*"). A Subsequent Offering Period would be an additional period of time, after completion of the first purchase of Shares in the Offer, during which stockholders would be able to tender Shares not tendered in the Offer.

During a Subsequent Offering Period, tendering stockholders would not have withdrawal rights and Purchaser would promptly purchase and pay for any Shares tendered at the same price paid in the Offer. Purchaser may provide a Subsequent Offering Period so long as, among other things:

(1)    the initial 20–business day period of the Offer has expired;

(2)    Purchaser offers the same form and amount of consideration for Shares in the Subsequent Offering Period as in the initial Offer;

(3)    Purchaser immediately accepts and promptly pays for all Shares tendered during the Offer prior to its expiration;

(4)    Purchaser announces the results of the Offer, including the approximate number and percentage of Shares deposited in the Offer, no later than 9:00 a.m., New York City time, on the next business day after the Expiration Date and immediately begins the Subsequent Offering Period; and

(5)    Purchaser immediately accepts and promptly pays for Shares as they are tendered during the Subsequent Offering Period.

13

Table of Contents

Purchaser does not currently intend, but reserves the right in its sole discretion to include a Subsequent Offering Period in the Offer. If Purchaser elects to include a Subsequent Offering Period, it will notify stockholders of the Company consistent with the requirements of the SEC.

**In the event that Purchaser subsequently elects to include a Subsequent Offering Period, no withdrawal rights would apply to Shares tendered during such Subsequent Offering Period and no withdrawal rights would apply during such Subsequent Offering Period with respect to Shares tendered in the Offer and accepted for payment.**

A request is being made to Take-Two for use of the Company's stockholder lists and security position listings for the purpose of disseminating the Offer to stockholders. Upon compliance by the Company with this request and receipt of these lists or listings from the Company, this Offer to Purchase, the Letter of Transmittal and all other relevant materials will be mailed to record holders of Shares and will be furnished to brokers, dealers, banks, trust companies and similar persons whose names, or the names of whose nominees, appear on the Company's stockholders lists, or, if applicable, who are listed as participants in a clearing agency's security position listing for subsequent transmittal to beneficial owners of Shares by Purchaser. Alternatively, if the Company so elects, the materials will be mailed to stockholders by the Company. A request is also being made to Take-Two pursuant to Section 220 of the DGCL to inspect Take-Two's stock ledger, a list of Take-Two's stockholders and certain of Take-Two's other books and records.

## 2. Acceptance for Payment and Payment.

Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of the Offer as so extended or amended), Purchaser will accept for payment and pay for all Shares validly tendered and not withdrawn before the Expiration Date promptly after the Expiration Date. Subject to any applicable law, including the rules and regulations of the SEC, we reserve the right, in our sole discretion, to delay the acceptance for payment or payment for Shares if any of the conditions to the Offer specified in the Introduction or in "The Offer—Section 14—Conditions of the Offer" has not been satisfied or upon the occurrence of any of the events specified in "The Offer—Section 14—Conditions of the Offer". Any determination concerning the satisfaction of the terms and conditions of the Offer shall be within the sole discretion of Purchaser. See "The Offer—Section 14—Conditions of the Offer" for more information.

In all cases, payment for Shares accepted for payment pursuant to the Offer will be made only after timely receipt by the Depositary of:

(1)  the share certificates representing such Shares or timely confirmation (a "*Book–Entry Confirmation*") of the book–entry transfer of such Shares (if such procedure is available), into the Depositary's account at The Depository Trust Company (the "*Book–Entry Transfer Facility*"), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares";

(2)  the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message (as defined below) in connection with a book–entry transfer; and

(3)  any other documents required by the Letter of Transmittal.

The term "*Agent's Message*" in this Offer to Purchase means a message, transmitted by the Book–Entry Transfer Facility to, and received by, the Depositary and forming a part of a Book–Entry Confirmation, which states that the Book–Entry Transfer Facility has received an express acknowledgment from the participant in the Book–Entry Transfer Facility tendering the Shares which are the subject of such Book–Entry Confirmation, that such participant has received and agrees to be bound by the terms of the Letter of Transmittal and that Purchaser may enforce such agreement against such participant.

14

Table of Contents

For purposes of the Offer, Purchaser will be deemed to have accepted for payment, and thereby purchased, Shares validly tendered and not withdrawn as, if and when Purchaser gives oral or written notice to the Depositary of Purchaser's acceptance of such Shares for payment pursuant to the Offer. In all cases, upon the terms and subject to the conditions of the Offer, payment for Shares purchased pursuant to the Offer will be made by deposit of the purchase price therefor with the Depositary, which will act as agent for tendering stockholders for the purpose of receiving payment from Purchaser and transmitting payment to validly tendering stockholders. Upon the deposit of funds with the Depositary for the purpose of making payments to tendering stockholders, Purchaser's obligation to make such payment shall be satisfied and tendering stockholders must thereafter look solely to the Depositary for payment of amounts owed to them by reason of the acceptance for payment of Shares pursuant to the Offer. Under no circumstances will interest on the purchase price for Shares be paid by Purchaser regardless of any extension of the Offer or by reason of any delay in making such payment. Purchaser will pay any stock transfer taxes incident to the transfer to it of validly tendered Shares, except as otherwise provided in Instruction 6 of the Letter of Transmittal, as well as any charges and expenses of the Depositary and the Information Agent.

Purchaser reserves the right to transfer or assign to one or more of the Purchaser's affiliates, in whole or from time to time in part, the right to purchase all or any portion of the Shares tendered in the Offer, but any such transfer or assignment will not relieve Purchaser of its obligations under the Offer or prejudice the rights of tendering stockholders to receive payment for Shares validly tendered and accepted for payment pursuant to the Offer.

If any tendered Shares are not purchased under the Offer for any reason, or if share certificates are submitted representing more Shares than are tendered, certificates representing unpurchased or untendered Shares will be returned, without expense to the tendering stockholder (or, in the case of Shares delivered pursuant to the book–entry transfer procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares", such Shares will be credited to an account maintained within the Book–Entry Transfer Facility), as promptly as practicable following the expiration, termination or withdrawal of the Offer.

### 3. Procedure for Tendering Shares.

*Valid Tender of Shares.* Except as set forth below, for Shares to be validly tendered pursuant to the Offer, either

(1)    on or prior to the Expiration Date, (a) share certificates representing tendered Shares must be received by the Depositary at its address set forth on the back cover of this Offer to Purchase, or such Shares must be tendered pursuant to the book–entry transfer procedures set forth below and a Book–Entry Confirmation must be received by the Depositary, (b) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book–entry transfer of Shares, must be received by the Depositary at one of such addresses and (c) any other documents required by the Letter of Transmittal must be received by the Depositary at one of such addresses, or

(2)    the guaranteed delivery procedures set forth below must be followed.

The method of delivery of Shares, the Letter of Transmittal and all other required documents, including delivery through the Book-Entry Transfer Facility, is at the election and sole risk of the tendering stockholder, and the delivery will be deemed made only when actually received by the Depositary. If delivery is by mail, registered mail with return receipt requested, properly insured, is recommended. In all cases, sufficient time should be allowed to ensure timely delivery.

*Book–Entry Transfer.* The Depositary will make a request to establish accounts with respect to the Shares at the Book–Entry Transfer Facility for purposes of the Offer within two business days after the date of this Offer to Purchase. Any financial institution that is a participant with the Book–Entry Transfer Facility may make

15

Table of Contents
book–entry delivery of Shares by causing the Book–Entry Transfer Facility to transfer such Shares into the Depositary's account at the Book–Entry Transfer Facility in accordance with the Book–Entry Transfer Facility's procedures. Although delivery of Shares may be effected through book–entry transfer into the Depositary's account at the Book–Entry Transfer Facility, the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message, and any other required documents must, in any case, be transmitted to and received by the Depositary at its address set forth on the back cover of this Offer to Purchase on or prior to the Expiration Date or the expiration of the Subsequent Offering Period, if any, or the guaranteed delivery procedures set forth below must be complied with.

**Required documents must be transmitted to and received by the Depositary at its address set forth on the back cover page of this Offer to Purchase. Delivery of documents to the Book-Entry Transfer Facility in accordance with the Book-Entry Transfer Facility's procedures does not constitute delivery to the Depositary.**

*Signature Guarantees.* No signature guarantee is required on the Letter of Transmittal if:

(1)   the Letter of Transmittal is signed by the registered holder(s) (which term, for purposes of this Section, includes any participant in the Book–Entry Transfer Facility's system whose name appears on a security position listing as the owner of the Shares) of Shares tendered therewith and such registered holder has not completed either the box entitled "Special Delivery Instructions" or the box entitled "Special Payment Instructions" on the Letter of Transmittal, or

(2)   such Shares are tendered for the account of a financial institution (including most commercial banks, savings and loan associations and brokerage houses) that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program ("*Eligible Institutions*").

In all other cases, all signatures on Letters of Transmittal must be guaranteed by an Eligible Institution. See Instructions 1 and 2 to the Letter of Transmittal for more information. If the share certificates representing the Shares are registered in the name of a person other than the signer of the Letter of Transmittal, or if payment is to be made, or share certificates not tendered or not accepted for payment are to be returned, to a person other than the registered holder of the certificates surrendered, then the tendered share certificates representing the Shares must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered holders or owners appear on the certificates, with the signatures on the certificates or stock powers guaranteed as aforesaid. See Instructions 1, 2 and 5 to the Letter of Transmittal for more information.

If the share certificates representing the Shares are forwarded separately to the Depositary, such delivery must be accompanied by a Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees.

*Guaranteed Delivery.* If a stockholder desires to tender Shares under the Offer and such stockholder's share certificates are not immediately available or the procedures for book–entry transfer cannot be completed on a timely basis or time will not permit all required documents to reach the Depositary on or prior to the Expiration Date, such stockholder's tender may be effected if all the following conditions are met:

(1)   such tender is made by or through an Eligible Institution;

(2)   a properly completed and duly executed Notice of Guaranteed Delivery, substantially in the form provided by Purchaser, is received by the Depositary, as provided below, on or prior to the Expiration Date; and

(3)   within three Nasdaq Global Select Market trading days after the date of execution of such Notice of Guaranteed Delivery (a) share certificates representing tendered Shares are received by the Depositary

16

Table of Contents

at its address set forth on the back cover of this Offer to Purchase, or such Shares are tendered pursuant to the book–entry transfer procedures and a Book–Entry Confirmation is received by the Depositary, (b) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book–entry transfer of Shares, is received by the Depositary at such address and (c) any other documents required by the Letter of Transmittal are received by the Depositary at such address.

The Notice of Guaranteed Delivery may be delivered by hand to the Depositary, by facsimile transmission, or mailed to the Depositary and must include a guarantee by an Eligible Institution in the form set forth in such Notice of Guaranteed Delivery. The procedures for guaranteed delivery above may not be used during any Subsequent Offering Period.

Notwithstanding any other provision hereof, payment for Shares accepted for payment pursuant to the Offer will in all cases be made only after timely receipt by the Depositary of:

(1)  share certificates representing tendered Shares or a Book–Entry Confirmation with respect to all tendered Shares, and

(2)  a Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book–entry transfer of Shares and any other documents required by the Letter of Transmittal.

Accordingly, payment might not be made to all tendering stockholders at the same time, and will depend upon when share certificates representing, or Book–Entry Confirmations of, such Shares are received into the Depositary's account at the Book–Entry Transfer Facility.

*Backup Withholding.* Under the U.S. federal income tax laws, backup withholding will apply to any payments made pursuant to the Offer unless you provide the Depositary with your correct taxpayer identification number and certify that you are not subject to such backup withholding by completing the Substitute Form W-9 included in the Letter of Transmittal. If you are a non-resident alien or foreign entity not subject to backup withholding, you must give the Depositary a completed Form W-8BEN (or appropriate Form W-8) Certificate of Foreign Status before receipt of any payment.

*Determination of Validity.* All questions as to the form of documents and the validity, form, eligibility (including time of receipt) and acceptance for payment of any tender of Shares will be determined by Purchaser, in its sole discretion, which determination shall be final and binding on all parties. Purchaser reserves the absolute right to reject any and all tenders determined by it not to be in proper form or the acceptance for payment of which may, in the opinion of its counsel, be unlawful. Purchaser also reserves the absolute right to waive any condition of the Offer to the extent permitted by applicable law or any defect or irregularity in the tender of any Shares of any particular stockholder, whether or not similar defects or irregularities are waived in the case of other stockholders. Purchaser's interpretation of the terms and conditions of the Offer (including, without limitation, the Letter of Transmittal and the instructions thereto) will be final and binding. No tender of Shares will be deemed to have been validly made until all defects and irregularities have been cured or waived. None of Purchaser, Electronic Arts or any of their respective affiliates or assigns, the Dealer Manager, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such notification.

A tender of Shares pursuant to any of the procedures described above will constitute the tendering stockholder's acceptance of the terms and conditions of the Offer, as well as the tendering stockholder's representation and warranty to Purchaser that (i) such stockholder has the full power and authority to tender, sell, assign and transfer the tendered Shares (and any and all other Shares or other securities issued or issuable in respect of such Shares), and (ii) when the same are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title thereto, free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims.

17

Table of Contents

The acceptance for payment by Purchaser of Shares pursuant to any of the procedures described above will constitute a binding agreement between the tendering stockholder and Purchaser upon the terms and subject to the conditions of the Offer.

*Appointment of Proxy.* By executing a Letter of Transmittal as set forth above, a tendering stockholder irrevocably appoints designees of Purchaser as such stockholder's attorneys–in–fact and proxies, in the manner set forth in the Letter of Transmittal, each with full power of substitution and resubstitution, to the full extent of such stockholder's rights with respect to (a) the Shares tendered by such stockholder and accepted for payment by Purchaser and (b) any and all non–cash dividends, distributions, rights or other securities issued or issuable on or after the date of this Offer to Purchase in respect of such tendered and accepted Shares. All such proxies shall be considered coupled with an interest in the tendered Shares. This appointment will be effective if, when and only to the extent that the Purchaser accepts such Shares for payment pursuant to the Offer. Upon such acceptance for payment, all prior proxies given by such stockholder with respect to such Shares and other securities will, without further action, be revoked, and no subsequent proxies may be given nor any subsequent written consents executed (and, if given or executed, will not be deemed effective). The designees of Purchaser will, with respect to the Shares and other securities for which the appointment is effective, be empowered to exercise all voting and other rights of such stockholder as they, in their sole discretion, may deem proper at any annual, special, adjourned or postponed meeting of the Company's stockholders or with respect to any written consent of the Company's stockholders, and the Purchaser reserves the right to require that in order for Shares or other securities to be deemed validly tendered, immediately upon Purchaser's acceptance for payment of such Shares, Purchaser must be able to exercise full voting and other rights with respect to such Shares.

The foregoing proxies are effective only upon acceptance for payment of Shares pursuant to the Offer. Neither this Offer to Purchase nor the Offer constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting. In addition, neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.

### 4. Withdrawal Rights.

Except as otherwise provided in this Section 4, tenders of Shares under the Offer are irrevocable. Shares tendered under the Offer may be withdrawn at any time on or before the Expiration Date and, unless theretofore accepted for payment as provided herein, may also be withdrawn at any time after May 11, 2008 (or such later date as may apply if the Offer is extended). If Purchaser extends the Offer, is delayed in its acceptance for payment of Shares or is unable to purchase Shares validly tendered under the Offer for any reason, then, without prejudice to Purchaser's rights under the Offer, the Depositary may nevertheless, on behalf of Purchaser, retain tendered Shares, and such Shares may not be withdrawn except to the extent that tendering stockholders are entitled to withdrawal rights described in this Section 4. Any such delay will be accompanied by an extension of the Offer to the extent required by law.

For a withdrawal to be effective, a notice of withdrawal must be timely received by the Depositary at its address set forth on the back cover of this Offer to Purchase. Any such notice of withdrawal must specify the name of the person who tendered the Shares to be withdrawn, the number of Shares to be withdrawn and the name of the registered holder of the Shares to be withdrawn, if different from the name of the person who tendered the Shares. If share certificates evidencing Shares to be withdrawn have been delivered or otherwise identified to the Depositary, then, prior to the physical release of such certificates, the serial numbers shown on such certificates must be submitted to the Depositary and, unless such Shares have been tendered by an Eligible Institution, the signatures on the notice of withdrawal must be guaranteed by an Eligible Institution. If Shares have been delivered pursuant to the book–entry transfer procedures as set forth in "The Offer—

18

Table of Contents

Section 3—Procedures for Tendering Shares", any notice of withdrawal must also specify the name and number of the account at the Book–Entry Transfer Facility to be credited with the withdrawn Shares and otherwise comply with the Book–Entry Transfer Facility's procedures.

Withdrawals of Shares may not be rescinded. Any Shares properly withdrawn will be deemed not validly tendered for purposes of the Offer, but may be retendered at any subsequent time prior to the expiration of the Offer by following any of the procedures described in "The Offer—Section 3—Procedures for Tendering Shares".

All questions as to the form and validity (including time of receipt) of notices of withdrawal will be determined by Purchaser, in its sole discretion, whose determination will be binding on all parties. None of Purchaser or any of its affiliates or assigns, if any, the Dealer Manager, the Depositary, the Information Agent or any other person will be under any duty to give any notification of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give any such notification.

Purchaser does not currently intend to provide a Subsequent Offering Period following the Offer. In the event that Purchaser subsequently elects to provide a Subsequent Offering Period, no withdrawal rights will apply to Shares tendered during such Subsequent Offering Period or to Shares tendered in the Offer and accepted for payment.

5. Certain Tax Considerations.

The following is a general discussion of certain material U.S. federal income tax consequences of the Offer to holders of Common Stock. We base this summary on the provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), applicable current and proposed U.S. Treasury Regulations, judicial authority, and administrative rulings and practice, all of which are subject to change, possibly on a retroactive basis.

For purposes of this discussion, we use the term "*U.S. holder*" to mean:

(1)    a citizen or individual resident of the United States for U.S. federal income tax purposes;

(2)    a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state or the District of Columbia;

(3)    a trust if it (a) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person; or

(4)    an estate the income of which is subject to U.S. federal income tax regardless of its source.

A "*non-U.S. holder*" is a person (other than a partnership) that is not a U.S. holder.

This discussion assumes that a holder holds the Shares as a capital asset within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all aspects of U.S. federal income tax that may be relevant to a holder in light of its particular circumstances, or that may apply to a holder that is subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, dealers in securities or foreign currencies, traders in securities who elect the mark-to-market method of accounting for their securities, stockholders subject to the alternative minimum tax, U.S. holders that have a functional currency other than the U.S. dollar, tax-exempt organizations, financial institutions, mutual funds, partnerships or other pass through entities for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, certain expatriates, corporations that accumulate earnings to avoid U.S. federal income tax, stockholders who hold Shares as part of a hedge, straddle, constructive sale or conversion transaction, or stockholders who acquired their Shares through the exercise of employee stock options or other compensation arrangements). In addition, the discussion does not address any tax considerations under state, local or foreign laws or U.S. federal laws other than those pertaining to the U.S. federal income tax that may

19

Table of Contents

apply to holders. Holders are urged to consult their own tax advisors to determine the particular tax consequences, including the application and effect of any state, local or foreign income and other tax laws, of the receipt of cash in exchange for Shares pursuant to this Offer.

If a partnership holds Shares, the tax treatment of a partner will generally depend on the status of the partners and the activities of the partnership. If you are a partner of a partnership holding Company Common Stock, you should consult your tax advisors.

### U.S. Holders

The receipt of cash pursuant to this Offer by U.S. holders of Shares will be a taxable transaction for U.S. federal income tax purposes. In general, for U.S. federal income tax purposes, a U.S. holder of Shares will recognize gain or loss equal to the difference between (1) the amount of cash received in exchange for such Shares; and (2) the U.S. holder's adjusted tax basis in such Shares. If the holding period in Shares sold pursuant to this Offer is greater than one year as of the date of the sale, the gain or loss will be long-term capital gain or loss. The deductibility of a capital loss recognized on the exchange is subject to limitations under the Code. If a U.S. holder acquired different blocks of Common Stock at different times and different prices, such holder must determine its adjusted tax basis and holding period separately with respect to each block of Shares.

### Non-U.S. Holders

Any gain realized on the receipt of cash pursuant to this Offer by a non-U.S. holder generally will not be subject to U.S. federal income tax unless: (1) the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the non-U.S. holder); (2) the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or (3) the Company is or has been a "United States real property holding corporation" for U.S. federal income tax purposes and the non-U.S. holder owned more than 5% of the Common Stock at any time during the five years preceding the sale. An individual non-U.S. holder described in clause (1) above will be subject to tax on the net gain derived from the sale of Shares under regular graduated U.S. federal income tax rates. An individual non-U.S. holder described in clause (2) above will be subject to a flat 30% tax on the gain derived from the sale of Shares, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States. If a non-U.S. holder that is a foreign corporation falls under clause (1) above, it will be subject to tax on its net gain in the same manner as if it were a United States person as defined under the Code and, in addition, may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits or at such lower rate as may be specified by an applicable income tax treaty.

A holder whose Shares are purchased in the Offer may be subject to backup withholding unless certain information is provided to the Depositary or any exemption applies. See "Introduction" and "The Offer—Section 3—Procedures for Tendering Shares".

20

Table of Contents

6. **Price Range of Shares.**

The Shares are listed and principally traded on the Nasdaq Global Select Market under the symbol "TTWO". The following table sets forth for the periods indicated the last reported high and low sales prices per Share on the Nasdaq Global Select Market as reported in published financial sources:

|  | High | Low |
|---|---|---|
| **Year Ended October 31, 2006** | | |
| First Quarter | $19.80 | $13.64 |
| Second Quarter | 19.40 | 14.05 |
| Third Quarter | 17.36 | 9.06 |
| Fourth Quarter | 16.25 | 10.34 |
| **Year Ended October 31, 2007** | | |
| First Quarter | 20.57 | 13.96 |
| Second Quarter | 24.80 | 15.60 |
| Third Quarter | 21.70 | 17.45 |
| Fourth Quarter | 19.52 | 11.82 |
| **Year Ended October 31, 2008** | | |
| First Quarter | 19.45 | 13.53 |
| Second Quarter (through March 12, 2008) | 27.61 | 15.50 |

On March 12, 2008, the last full trading day before the announcement of our intention to commence the offer, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $24.91 per share. On February 15, 2008, the last trading day before Electronic Arts sent its proposal to Take-Two to acquire the Company at $26.00 per share, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $15.83 per share. The offer price of $26.00 per share represents a premium of approximately 64% over Take-Two's closing stock price on February 15, 2008. **Please obtain a recent quotation for your shares prior to deciding whether or not to tender.**

7. **Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations.**

*Possible Effects of the Offer on the Market for the Shares.* If the Offer is successful, we and Electronic Arts intend, as soon as practicable following the consummation of the Offer, to have Electronic Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronic Arts consummate a merger transaction or similar business combination with the Company pursuant to which each then outstanding share (other than shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their shares) would be converted into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the Offer, without interest (and less any applicable withholding taxes). If the proposed second-step merger takes place, stockholders who do not tender in the Offer (other than those described above) will be entitled to receive the same amount of cash per share that they would have received had they tendered their shares in the Offer. Therefore, if the Merger takes place, the only differences between tendering and not tendering shares in the Offer is that tendering stockholders will be paid earlier and stockholders who do not tender and who do not vote in favor of the Merger may exercise appraisal rights. However, if the Offer is consummated and the Merger does not take place, the number of stockholders and the number of Shares that might otherwise trade publicly may be so small that there may no longer be an active public trading market (or possibly any public trading market) for the Shares. Purchaser cannot predict whether the reduction in the number of Shares that might otherwise trade publicly would have an adverse or beneficial effect on the market price for, or marketability of, the Shares or whether such reduction would cause future market prices to be greater or less than the price paid in the Offer.

21

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

*Stock Exchange Listing.* Depending upon the number of Shares purchased pursuant to the Offer, the Shares may no longer meet the requirements for continued listing on the Nasdaq Global Select Market. According to the published guidelines of The NASDAQ Stock Market, LLC ("*NASDAQ*"), NASDAQ would consider disqualifying the Shares for listing on the Nasdaq Global Select Market (though not necessarily for listing on The NASDAQ Capital Market) if, among other possible grounds, the number of publicly held Shares falls below 750,000, the total number of beneficial holders of round lots of Shares falls below 400, the market value of publicly held Shares over a 30 consecutive business day period is less than $5 million, there are fewer than two active and registered market makers in the Shares over a 30 consecutive business day period, Take-Two has stockholders' equity of less than $10 million, or the bid price for the Shares over a 30 consecutive business day period is less than $1. Furthermore, NASDAQ would consider delisting the Shares from NASDAQ altogether if, among other possible grounds, (a) the number of publicly held Shares falls below 500,000, (b) the total number of beneficial holders of round lots of Shares falls below 300, (c) the market value of publicly held Shares over a 30 consecutive business day period is less than $1 million, (d) there are fewer than two active and registered market makers in the Shares over a 10 consecutive business day period, (e) the bid price for the Shares over a 30 consecutive business day period is less than $1, or (f) (i) Take-Two has stockholders' equity of less than $2.5 million, (ii) the market value of Take-Two's listed securities is less than $35 million over a 10 consecutive business day period, and (iii) Take-Two's net income from continuing operations is less than $500,000 for the most recently completed fiscal year and two of the last three most recently completed fiscal years. Shares held by officers or directors of Take-Two, or by any beneficial owner of more than 10 percent of the Shares, will not be considered as being publicly held for this purpose.

If, as a result of the purchase of Shares pursuant to the Offer or otherwise, the Shares cease to be listed on the Nasdaq Global Select Market or are delisted from NASDAQ altogether, the market for the Shares could be adversely affected. It is possible that the Shares would be traded on other securities exchanges (with trades published by such exchanges), the OTC Bulletin Board or in a local or regional over-the-counter market. The extent of the public market for the Shares would, however, depend upon the number of holders of Shares and the aggregate market value of the Shares remaining at such time, the interest in maintaining a market in the Shares on the part of securities firms, the possible termination of registration of the Shares under the Exchange Act, as described below, and other factors.

*Registration under the Exchange Act.* The Shares are currently registered under the Exchange Act. Such registration may be terminated upon application of the Company to the SEC if the Shares are neither listed on a national securities exchange nor held by 300 or more holders of record. Termination of the registration of the Shares under the Exchange Act would substantially reduce the information required to be furnished by the Company to holders of Shares and to the SEC and would make certain of the provisions of the Exchange Act, such as the short-swing profit recovery provisions of Section 16(b), the requirement to furnish a proxy statement pursuant to Section 14(a) in connection with a stockholders meeting and the related requirement to furnish an annual report to stockholders and the requirements of Rule 13e-3 under the Exchange Act with respect to "going private" transactions, no longer applicable to the Shares. Furthermore, the ability of "affiliates" of the Company and persons holding "restricted securities" of the Company to dispose of such securities pursuant to Rule 144 promulgated under the Securities Act of 1933, as amended, may be restricted. If registration of the Shares under the Exchange Act were terminated, the Shares would no longer be "margin securities" or eligible for listing on NASDAQ. Purchaser intends to seek to cause the Company to terminate registration of the Shares under the Exchange Act as soon after consummation of the Offer as the requirements for termination of registration of the Shares are met.

*Margin Regulations.* The Shares are currently "margin securities" under the regulations of the Board of Governors of the Federal Reserve System (the "*Federal Reserve Board*"), which has the effect, among other things, of allowing brokers to extend credit on the collateral of such Shares. Depending upon factors similar to those described above regarding listing and market quotations, following the Offer, the Shares may no longer constitute "margin securities" for the purposes of the Federal Reserve Board's margin regulations and, therefore, could no longer be used as collateral for loans made by brokers.

22

Table of Contents

8. Certain Information Concerning the Company.

The information concerning the Company contained in this Offer to Purchase has been taken from or based upon publicly available documents and records on file with the SEC and other public sources and is qualified in its entirety by reference thereto. None of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary has received any representations from the Company regarding any information contained in such documents or records or the completeness or accuracy of any such information, and none of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary generally has access to a means of obtaining independently verified information, or themselves verifying any such information, concerning the Company. None of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary can take responsibility for the accuracy or completeness of the information contained in such documents and records, or for any failure by the Company to disclose events which may have occurred or may affect the significance or accuracy of any such information but which are unknown to Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary, except to the extent required by law.

According to the Company 10-K, Take-Two was incorporated in the State of Delaware in 1993. The principal executive offices of the Company are located in New York, New York at 622 Broadway, New York, NY 10012 and its telephone number is (646) 536-2842. According to the Company 10-K, Take-Two is a global developer, marketer, distributor and publisher of interactive entertainment software games for the PC, PLAYSTATION® 3 and PlayStation® 2 computer entertainment systems, PSP® (PlayStation® Portable) system, Xbox 360® and Xbox® video game and entertainment systems from Microsoft, Wii™, Nintendo GameCube™, Nintendo DS™ and Game Boy® Advance. The Company publishes and develops products through its wholly-owned labels Rockstar Games, 2K Games, 2K Sports and 2K Play, and distributes software, hardware and accessories in North America through its Jack of All Games subsidiary.

*Additional Information.* The Company is subject to the informational requirements of the Exchange Act and in accordance therewith is required to file periodic reports, proxy statements and other information with the SEC relating to its business, financial condition and other matters. Such reports, proxy statements and other information may be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington D.C. 20549. Information regarding the public reference facilities may be obtained from the SEC by telephoning 1-800-SEC-0330. The Company's filings are also available to the public on the SEC's Internet site (http://www.sec.gov). Copies of such material also may be obtained by mail, upon payment of the SEC's prescribed fees, from the Public Reference Room of the SEC at 100 F Street, N.E., Washington, D.C. 20549.

9. Certain Information Concerning the Purchaser and Parent.

Purchaser is a newly-incorporated Delaware corporation organized in connection with the Offer and the Merger and has not carried on any activities other than in connection with the Offer and the proposed Merger. Purchaser was incorporated under the laws of Delaware on March 4, 2008. The principal offices of Purchaser are located at 209 Redwood Shores Parkway, Redwood City, CA 94065 and its telephone number is (650) 628-1500. Purchaser is a wholly-owned subsidiary of Electronic Arts.

Electronic Arts is one of the world's leading interactive entertainment software companies. Electronic Arts develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts was initially incorporated in California in 1982. In September 1991, Electronic Arts reincorporated under the laws of Delaware. Electronic Arts' principal executive offices are at 209 Redwood Shores Parkway, Redwood City, CA 94065 and its telephone number is (650) 628-1500.

The name, business address, present principal occupation or employment, five year employment history and citizenship of each director and executive officer of Parent and Purchaser are set forth on *Schedule I* hereto. None of Purchaser, Parent, or, to the best of their knowledge, any of the persons listed on *Schedule I* hereto has, during the past five years, (i) been convicted in a criminal proceeding (excluding traffic violations or similar

23

Table of Contents

misdemeanors) or (ii) been a party to any judicial or administrative proceeding (excluding matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, U.S. federal or state securities laws, or a finding of any violation of U.S. federal or state securities laws.

Parent currently beneficially owns nine Shares, and Purchaser currently owns one Share, which together represent a de minimus percentage of the issued and outstanding Shares as of the date of this Offer to Purchase. On January 25, 2008, Parent purchased ten Shares at a price per share of $15.76 through an ordinary brokerage transaction, and subsequently transferred one Share to Purchaser on March 11, 2008 for no consideration. Except for the foregoing and except as set forth elsewhere in this Offer to Purchase (including "The Offer—Section 11—Background of the Offer") or *Schedule I* to this Offer to Purchase: (i) none of Parent, Purchaser and, to Parent's and Purchaser's knowledge, the persons listed in *Schedule I* hereto or any associate or majority-owned subsidiary of Parent, Purchaser or of any of the persons so listed, beneficially owns or has a right to acquire any Shares or any other equity securities of the Company; (ii) none of Parent, the Purchaser and, to Parent's and Purchaser's knowledge, the persons or entities referred to in clause (i) above has effected any transaction in the Shares or any other equity securities of the Company during the past 60 days; (iii) none of Parent, Purchaser and, to Parent's and Purchaser's knowledge, the persons listed in *Schedule I* to this Offer to Purchase, has any contract, arrangement, understanding or relationship with any other person with respect to any securities of the Company (including, but not limited to, any contract, arrangement, understanding or relationship concerning the transfer or the voting of any such securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or the giving or withholding of proxies, consents or authorizations); (iv) during the two years before the date of this Offer to Purchase, there have been no transactions between Parent, Purchaser, their subsidiaries or, to Parent's and Purchaser's knowledge, any of the persons listed in *Schedule I* to this Offer to Purchase, on the one hand, and the Company or any of its executive officers, directors or affiliates, on the other hand, that would require reporting under SEC rules and regulations; and (v) during the two years before the date of this Offer to Purchase, there have been no contracts, negotiations or transactions between Parent, the Purchaser, their subsidiaries or, to Parent's and the Purchaser's knowledge, any of the persons listed in Schedule I to this Offer to Purchase, on the one hand, and the Company or any of its subsidiaries or affiliates, on the other hand, concerning a merger, consolidation or acquisition, a tender offer or other acquisition of securities, an election of directors or a sale or other transfer of a material amount of assets.

*Additional Information.* Parent is subject to the informational requirements of the Exchange Act and in accordance therewith files periodic reports, proxy statements and other information with the SEC relating to its business, financial condition and other matters. Such reports, proxy statements and other information are available for inspection and copying at the offices of the SEC in the same manner as set forth with respect to the Company in "The Offer—Section 8—Certain Information Concerning the Company". Information relating to Electronic Arts and its proposal to acquire Take-Two, including the Offer, can be found at http://www.eatake2.com.

**10. Source and Amount of Funds.**

Purchaser expects that approximately $2.1 billion would be required to purchase all Shares pursuant to the Offer and the Merger and to pay related fees and expenses. The Offer is not conditioned upon any financing arrangements. Electronic Arts will provide Purchaser with all of the funds necessary to purchase the Shares pursuant to the Offer and the Merger.

As of March 7, 2008, Parent had cash and cash equivalents and short-term investments in the amount of approximately $2.3 billion. Although this amount exceeds the amount of financing required to purchase the Shares pursuant to the Offer and the Merger (and to pay related fees and expenses), the Board of Directors of Electronic Arts has also authorized Electronic Arts to obtain additional debt financing, a portion of which may be used to fund in part the Offer and/or the Merger.

24

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

## 11. Background of the Offer.

Electronic Arts regularly considers a variety of strategic transactions to enhance its business, including through acquisitions of companies, businesses, intellectual properties and other assets. Following an inquiry initiated by Take-Two, on March 16, 2007, Electronic Arts and Take-Two entered into a nondisclosure agreement. After execution of the nondisclosure agreement, in March 2007, Electronic Arts conducted a due diligence review of Take-Two, including in-depth analyses of its operational, financial and legal condition. In addition, during that time, Take-Two and Electronic Arts engaged in negotiations concerning a potential acquisition of Take-Two by Electronic Arts. Prior to any agreement being reached regarding the terms of an acquisition, such negotiations were terminated by Electronic Arts on March 26, 2007, as a result of Electronic Arts having determined that such a transaction was not advisable at such time primarily due to Electronic Arts' desire to focus on other operating initiatives.

Following Strauss Zelnick's appointment as Chairman of Take-Two, John Riccitiello, the Chief Executive Officer of Electronic Arts, and Mr. Zelnick have periodically engaged in discussions regarding the interactive entertainment software business. In several conversations with Mr. Zelnick between April and November 2007, Mr. Riccitiello discussed Electronic Arts' potential interest in acquiring Take-Two. At a meeting on December 20, 2007, Mr. Riccitiello told Mr. Zelnick that Electronic Arts was interested in pursuing an acquisition of Take-Two in a transaction that would value Take-Two at a substantial premium to its then current market price. Mr. Riccitiello also stated that Electronic Arts was prepared to promptly commence due diligence and negotiations with Take-Two. In early January 2008, Mr. Zelnick responded to Mr. Riccietiello that Take-Two was not interested in engaging in negotiations at that time, and that he preferred that any discussions regarding a potential acquisition of Take-Two not occur until after April 2008.

On February 6, 2008, Mr. Riccitiello contacted Mr. Zelnick to inform him that the following letter would be delivered to Mr. Zelnick, which letter was delivered that morning.

*February 6, 2008*

*Mr. Strauss Zelnick*
*Chairman of the Board of Directors*
*Take-Two Interactive Software, Inc.*
*622 Broadway*
*New York, NY 10012*

*Dear Strauss:*

*Congratulations on your recent announcement about the release date for Grand Theft Auto IV. I am sure it must feel great to have this important title locked and ready.*

*Further to our recent discussions, this letter is to formally express Electronic Arts Inc's. ("EA") interest in acquiring Take-Two Interactive Software, Inc. ("Take-Two") and to propose a transaction in which EA would acquire all of the outstanding shares of Take-Two common stock for $25 per share payable in cash. We are confident we can consummate a transaction quickly, confidentially and on the terms proposed.*

*The proposed combination will create significant value for your stockholders. Our offer price provides a substantial premium of 58% over Take-Two's most recent closing price and a 51% premium over Take-Two's 30-day trailing average price. The cash purchase price provides certainty of value to Take-Two's stockholders in today's uncertain economic environment.*

*We believe that moving quickly to negotiate and conclude our proposed merger is in the best interest of Take-Two and EA. Waiting for a later date leaves open significant uncertainty regarding the timing, the probability and the value of a potential transaction and is not in the best interests of either company or Take-Two's stockholders.*

25

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

**Table of Contents**

*We also believe the proposed merger provides an attractive outcome for Take-Two's employees and business partners. We have a powerful product slate for 2008 and beyond with exciting releases planned for many of EA's well-established franchises as well as important new franchises we are launching such as SPORE, Dead Space, Dragon Age and Mirror's Edge. We feel that Take-Two's IP portfolio is well aligned against EA's product footprint and its studios fit well with our decentralized divisional model. Take-Two's creative teams are an essential part of the Take-Two business, and we believe EA would offer a stable and supportive environment for your studios to focus on developing great new games with the backing of a global games industry leader. We believe EA can and will represent the best home for these teams anywhere in the entertainment world.*

*We have completed a thorough review of Take-Two's public information and are prepared to move forward immediately to consummate a transaction with minimum disruption to Take-Two. We believe that with adequate access to the necessary information we can complete all required due diligence in approximately 2 weeks. We believe that our due diligence review would require limited access to a small number of senior executives of Take-Two and its legal, accounting and financial advisors. Importantly, no interaction with any of the studio leaders will be required until our other due diligence is completed and the material terms of a transaction are agreed to.*

*Considerable time and resources have been put forth in developing this offer, and our Board of Directors has approved its delivery to Take-Two. Our offer is not conditioned on any financing requirement. However, our offer is subject to the satisfactory completion of our due diligence review of Take-Two, the negotiation and execution of mutually acceptable definitive transaction agreements and the satisfaction of customary conditions to be set forth in such agreements.*

*We do not intend to make this letter public and our offer will automatically terminate and be withdrawn in its entirety if any portion of this letter, or the existence of discussions between EA and Take-Two relating to a possible business combination, are disclosed to any person other than the directors and officers of Take-Two and its legal and financial advisors.*

*We look forward to hearing back from you by the close of business on Friday, February 15, 2008, with a response to our proposal.*

*I am available to meet and discuss all aspects of this proposal with you and your Board. If you have any questions, please do not hesitate to contact me. I very much look forward to hearing from you and working with you and the Take-Two team to consummate a successful transaction.*

*Sincerely,*

*/s/ John Riccitiello*

*John Riccitiello*
*Chief Executive Officer*

*JSR/dul*

On February 11, 2008, Mr. Riccitiello called Mr. Zelnick and Mr. Zelnick indicated that Electronic Arts would receive a response to Electronic Arts' letter by February 15, 2008. On February 15, 2008, Mr. Zelnick sent a letter to Mr. Riccitiello, the full text of which is set forth below.

*February 15, 2008*

*Mr. John S. Riccitiello*
*Chief Executive Officer*
*Electronic Arts Inc.*
*209 Redwood Shores Parkway*
*Redwood City, CA 94065*

26

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

*Dear John:*

*Thank you for your letter of February 6, 2008.*

*The position of the Board of Directors (the "Board") of Take-Two Interactive Software, Inc. (the "Company") with respect to an acquisition of the Company by Electronic Arts Inc. ("EA") has not changed from that which you and I have previously discussed.*

*As part of the Board's stated objective of maximizing shareholder value, we have been and remain open to considering a business combination with interested parties at the right time and the right price. However, the Board has concluded that EA's proposal has not been delivered at a time nor does it contemplate a price which is consistent with this objective.*

*On a personal note, I want to thank you for the courtesy reflected in our prior discussions and also your letter. I look forward to getting to know you better in the future.*

*Sincerely,*

*/s/ Strauss Zelnick*

*Strauss Zelnick*
*Executive Chairman*

On February 19, 2008, Mr. Riccitiello contacted Mr. Zelnick to inform him that the following letter would be delivered, which letter was delivered that morning to Mr. Zelnick.

*February 19, 2008*

*Mr. Strauss Zelnick*
*Executive Chairman of the Board of Directors*
*Take-Two Interactive Software, Inc.*
*622 Broadway*
*New York, NY 10012*

*Dear Strauss:*

*Thank you for your letter of February 15, 2008. While I appreciate its courteous tone and value our ongoing dialogue, I am disappointed that you have rejected Electronic Arts Inc.'s ("EA's") $25 per share cash offer to acquire Take-Two Interactive Software, Inc. ("Take-Two") and declined to engage in the friendly negotiations we proposed. We continue to believe that an acquisition of Take-Two by EA is in the best interests of your shareholders, employees and other constituents, and we remain interested in acquiring Take-Two. So, to further demonstrate our seriousness and encourage you to move forward now, I am writing to increase EA's offer to acquire all of the outstanding shares of Take-Two to $26 per share in cash. This offer is subject to Take-Two agreeing by February 22, 2008 to commence negotiation of a definitive merger agreement and to permit EA to commence a limited due diligence review of Take-Two.*

*Our revised all-cash offer represents a 64% premium over Take-Two's most recent closing price and a 63% premium over Take-Two's 30-day trailing average price (based on prices as of market close on Friday, February 15th). We believe our offer represents a unique and compelling opportunity for Take-Two shareholders to maximize the value of their investment in the company, with materially lower risk than if Take-Two proceeds on a stand-alone basis.*

27

*We also believe that the transaction we are proposing represents a uniquely attractive opportunity for Take-Two's creative teams and key employees. EA is a diversified leader with well-established franchises and proven intellectual properties, global reach, and significant financial resources. I know we both agree that Take-Two's talented creative teams deserve a permanent home within a stable and growing publisher that provides these teams an environment to do what they do best – create great games. EA is organized in a four-label model that provides our creative teams the autonomy they need to fully realize their creative ambitions, while also providing a stable and supportive corporate and publishing infrastructure for the most creative and innovative games in the industry. In short, a combination with EA would provide Take-Two's studios and employees a combination of the right resources for investment and global reach, and the right environment to do their best work.*

*We believe that Take-Two's shareholders would not be well-served by any further delay in negotiating and completing the proposed merger. While the videogame industry remains an attractive, high-growth business, the challenges and risks in the business are escalating, and the need for scale is becoming more pronounced. Despite steps taken since March 2007, Take-Two remains dependent on a limited number of titles, and has limited capital resources. In addition, Take-Two faces ongoing financial, legal and operating issues and a very intense competitive environment. Given these factors, we believe it will be increasingly difficult for Take-Two to create sustainable shareholder value and that Take-Two remains exposed to considerable risk of value loss.*

*We also believe that any delay in this proposed transaction works against the interest of Take-Two's shareholders, because:*

- *There can be no certainty that in the future EA or any other buyer would pay the same high premium we are offering today. We place significant value on the ability to close the transaction relatively quickly so that EA's strong publishing and distribution network, including our global packaged goods, online and wireless publishing organizations, can positively impact the catalogue sales of GTA IV and also the launch and sale of titles released later this year. We want to work with you and your team to complete the transaction in time to begin realizing its significant marketplace benefits in advance of this year's holiday selling season.*

- *We believe Take-Two's current share price already reflects investor expectations for a strong release of GTA IV as well as the longer-term issues that Take-Two faces. Once GTA IV ships, Take-Two will again be dependent on less-popular titles and face increasing challenges to compete with larger and better-capitalized competitors.*

- *With GTA IV shipping on April 29, development on this important title must now be essentially complete. We believe now is the right time to complete a transaction with minimal disruption for Take-Two.*

*We also believe the transaction we are proposing will create value for EA's shareholders. In addition to the top-line benefits noted above, we can achieve bottom-line benefits by combining Take-Two's and EA's corporate and publishing infrastructures and by optimally supporting Take-Two's creative teams and intellectual properties in EA's decentralized label structure.*

*Considerable thought, time and resources have been put forth in developing this offer, and our Board of Directors unanimously supports it. Our offer is not conditioned on any financing requirement. It is subject to the satisfactory completion of a due diligence review of Take-Two, the negotiation and execution of mutually acceptable definitive transaction agreements, and the satisfaction of customary conditions to be set forth in such agreements. We are prepared to move forward immediately with formal due diligence and the negotiation and execution of a definitive merger agreement and believe that with adequate access to the necessary information and people, we can complete both in approximately two weeks. We believe that our due diligence review can be completed with minimal disruption, requiring only limited access to a small number of senior executives of Take-Two and its legal, accounting and financial advisors. We also have prepared a draft merger agreement that we can forward to you immediately.*

28

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

*Our strong preference is to conduct a private negotiation. If you are unwilling to proceed on that basis, however, we may pursue other means, including the public disclosure of this letter, to bring our offer and the compelling value it represents to the attention of Take-Two's shareholders.*

*I am available to meet and discuss any and all aspects of this proposal with you and your Board. Again, we believe this proposal represents a unique opportunity to maximize value for Take-Two's shareholders, and that the combined enterprise would be extraordinarily well positioned to build value for our respective customers, employees, developers and other business partners. We hope that you and your Board share our enthusiasm, and we look forward to hearing back from you by February 22.*

*Sincerely,*

*/s/ John Riccitiello*
_____

*John Riccitiello*
*Chief Executive Officer*

*JSR/dal*

On February 20, 2008, Mr. Riccitiello called Mr. Zelnick and Mr. Zelnick indicated that Electronic Arts would receive a response to its letter by February 22, 2008. On February 22, 2008, in response to the above letter, Mr. Zelnick sent the following letter to Mr. Riccitiello:

*February 22, 2008*

*Mr. John S. Riccitiello*
*Chief Executive Officer*
*Electronic Arts Inc.*
*209 Redwood Shores Parkway*
*Redwood City, CA 94065*

*Dear John:*

*Thank you for your letter of February 19, 2008. As you know, the Board of Directors (the "Board") of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company") carefully considered Electronic Arts Inc.'s ("EA's") previous offer of $25 per share and concluded that neither the timing of the proposed acquisition nor the price was consistent with the Board's objective of maximizing stockholder value. The Board's rationale for rejecting EA's prior offer is not altered by your decision to increase that offer by four percent.*

*I would like to reiterate, in the clearest possible terms, the Board's conviction that this is not the right time for Take-Two to enter into a negotiation to sell the Company. Our organization is keenly focused on the scheduled April 29th launch of Grand Theft Auto IV, and on maximizing the value of the game to the Company and, in turn, our stockholders. It is the Board's strongly held view that beginning strategic discussions now would distract our Company and thereby threaten the value of this key franchise.*

*While I understand that you may disagree with the Board's reluctance to commence discussions immediately, the Board and I want to assure you that our concerns about timing are genuine. Potential negative financial consequences to Take-Two are significant and we believe outweigh the benefits of commencing discussions at this time. As you know, there is no certainty that EA will actually close on the proposed transaction on mutually agreeable terms, especially since you have proposed a price that we would not accept and have qualified your offer by a diligence request. Moreover, as we have all seen time and again, the process surrounding acquiring a public company from start to finish is complex, uncertain, intrusive and distracting, and we believe it would be especially so to the creative artists at the core of our business and to all those who may be displaced by a transaction.*

29

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

*While the Board is convinced that discussions at this time would be imprudent, we also appreciate the potential benefit of a frank and private dialogue with EA. To that end, the Board would be willing to commit to entering into a good-faith discussion with EA on April 30, 2008 to determine if we can reach common ground on the proper value of the Company and therefore an appropriate, mutually beneficial transaction. This would, of course, be subject to both parties reaching a mutually acceptable confidentiality agreement on customary terms. We are prepared to begin negotiating this confidentiality agreement immediately.*

*In order to alleviate any concerns you may have about the proposed starting date for these discussions, I would be pleased to meet with you privately as soon as possible to talk on a general basis. In addition our Board would confirm, subject to its fiduciary duties, that from now until April 30, 2008 (the "Quiet Period"), the Company will not pursue negotiations with any other potential strategic partner for a business combination unless we have first contacted you. Further, if the Company receives any bona fide offer to acquire the Company during the Quiet Period that the Board decides to explore, the Company will immediately inform EA and we understand that EA may then act as it sees fit.*

*I would like to note that if EA chooses to announce publicly the Board's proposal or announce any offer by EA to acquire the Company during this Quiet Period or if the contents of this letter become publicly available in sum and substance, the Company will consider all of its alternatives, including discussions with other parties, and further we will reserve the right to refuse to provide EA access to information or diligence.*

*John, I believe I know you well enough to rely on your considering this proposal in the same good faith we have in making it. I look forward to your favorable response.*

*Sincerely,*

*/s/ Strauss Zelnick*
_____

*Strauss Zelnick*
*Executive Chairman*

Following receipt of Mr. Zelnick's letter of February 22, 2008, Mr. Riccitiello and Mr. Zelnick spoke by phone. On this call, Mr. Riccitiello explained that he felt it was in Take-Two's best interest to promptly engage in negotiations and conclude a sale of Take-Two to Electronic Arts, and that any delay could result in a reduction in the price Electronic Arts might be willing to pay for Take-Two. Mr. Zelnick responded that he felt that Electronic Arts' $26 per share offer price was too low and that Take-Two preferred to wait until after April to engage in negotiations. On February 24, 2008, Mr. Riccitiello contacted Mr. Zelnick to let him know that Electronic Arts had considered Mr. Zelnick's request that Electronic Arts delay negotiations until after April 2008 and that such delay was not acceptable to Electronic Arts. When Mr. Zelnick confirmed that Take-Two was not prepared to promptly engage in negotiations towards potentially entering into a definitive transaction, Mr. Riccitiello stated that given Take-Two's response, Electronic Arts would publicly announce its $26.00 per share proposal of February 19, 2008. At approximately 2:00 p.m., eastern time, on February, 24, 2008, Electronic Arts issued a press release indicating that it had made a proposal to acquire all of the outstanding Shares of Take-Two at a price of $26.00 per Share in cash. Included within the press release was a copy of the February 19, 2008 letter set forth above.

Later in the day on February 24, 2008, Take-Two issued a press release confirming that Take-Two's Board of Directors had rejected Electronic Arts' proposals regarding a potential sale at that time and setting forth the text of the four letters described above.

On March 13, 2008, Purchaser commenced the Offer.

30

Table of Contents
12. Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights.

*Purpose of the Offer; Plans for the Company.* The purpose of the Offer is to enable Electronic Arts and Purchaser to acquire control of, and ultimately the entire equity interest in, the Company. Purchaser currently intends, either as soon as practicable after consummation of the Offer, or, in the event that it undertakes a consent solicitation as described in "Introduction" above, upon the receipt of a sufficient number of stockholder consents, if earlier, to seek maximum representation on Take-Two's Board of Directors. Purchaser intends, in either instance, to seek to remove Take-Two's existing directors and to replace them with directors which Electronic Arts and Purchaser believe will consider, to the extent consistent with the Board's fiduciary duties, to take actions to satisfy the Section 203 Condition and to otherwise support the consummation of the Offer and the Merger. See "Introduction".

The Offer is conditioned on the satisfaction of the Merger Agreement Condition and, if the Offer is consummated, Parent intends, as soon as practicable after consummation of the Offer, to cause the Company to consummate the Merger. Pursuant to the Merger, each Share outstanding immediately prior to the effective time of the Merger (other than Shares held by Electronic Arts and Purchaser, Shares held in the treasury of the Company, Shares held by subsidiaries of the Company, if any, and Shares held by Take-Two stockholders who have not tendered Shares in the Offer and who properly seek appraisal for their Shares) would be converted into the right to receive cash in an amount equal to the highest price per Share paid by Purchaser pursuant to the Offer, without interest (and less applicable withholding taxes). Upon consummation of the Merger, Take-Two would be a wholly-owned subsidiary of Electronic Arts. Parent reserves the right to waive the Merger Agreement Condition and currently intends that if the Offer is consummated to consummate the Merger even if it were to waive the Merger Agreement Condition.

*Company Board and Stockholder Approval.* The timing and details of the consummation of the Offer and the Merger depend on a variety of factors and legal requirements, the number of Shares (if any) acquired by Purchaser pursuant to the Offer, and most importantly, actions of the Company's Board of Directors. In general (other than with respect to short-form mergers, described below), under the DGCL, the approval of both the stockholders and the board of directors of a corporation is required to effect a merger of that corporation with or into another corporation. Except in the case of a short-form merger, the Merger can only be effected with the approval of the Company's Board of Directors and the affirmative vote of the holders of at least a majority of the outstanding shares. If the Minimum Condition, the Section 203 Condition, the Merger Agreement Condition, the HSR Condition and the other conditions to the Offer discussed in "The Offer—Section 14—Conditions of the Offer" are satisfied, a merger agreement providing for the Merger will have been entered into and Purchaser will own Shares representing at least a majority of the outstanding Shares after consummation of the Offer, and will have the voting power necessary to assure approval of the Merger by the Company's stockholders.

Purchaser reserves the right to waive the Merger Agreement Condition, although there can be no assurance that it will do so, and Purchaser has not determined whether it would be willing to do so under any circumstances. If Purchaser waives such condition and purchases Shares pursuant to the Offer and if the Minimum Condition has been satisfied, then Purchaser will have the voting power necessary to act by written consent of the Company's stockholders to remove Take-Two's existing directors and replace them with directors that Electronic Arts and Purchaser believe would, subject to their fiduciary duties, support the Merger. Although Purchaser will seek to have the Company consummate the Merger as soon as practicable after consummation of the Offer, because the Merger must be approved by the Company's Board of Directors, the Merger could be delayed if the Company's Board of Directors refuses to negotiate and approve a merger agreement that satisfies the Merger Agreement Condition and the Merger Agreement Condition is waived by Purchaser.

Although Electronic Arts and Purchaser currently intend to propose the Merger on the terms described in this Offer to Purchase, if the Company's Board of Directors refuses to negotiate and approve a merger agreement that satisfies the Merger Agreement Condition and the Merger Agreement Condition is waived by Purchaser, it is

31

Table of Contents

possible that, as a result of substantial delays in Parent's and Purchaser's ability to effect such a transaction, actions the Company may take in response to the Offer, information Parent and Purchaser obtain hereafter, changes in general economic or market conditions or in the business of the Company or other currently unforeseen factors, such a transaction may not be so proposed, may be delayed or abandoned or may be proposed on different terms, and accordingly, under such circumstances, there can be no assurance that the Merger or another merger or business combination between Take-Two, Electronic Arts and Purchaser will occur (and if so, what the timing of such a transaction would be). Purchaser reserves the right not to propose a merger or other similar business combination with the Company or to propose such a transaction on terms other than those described in this Offer to Purchase.

*Short–Form Merger.* Under Section 253 of the DGCL, if a corporation owns at least 90% of the outstanding shares of each class of a subsidiary corporation, the corporation holding such stock may merge such subsidiary into itself or itself into such subsidiary, without any action or vote on the part of the board of directors or stockholders of such other corporation (a "*short–form merger*"). If Purchaser acquires, pursuant to the Offer or otherwise, at least 90% of the outstanding Shares (where the conditions in "The Offer—Section 14—Conditions of the Offer", including the Section 203 Condition and the HSR Condition, have been satisfied), Purchaser will be able to effect the Merger without a vote of the Company's stockholders. Undertaking a short-form merger generally will permit stockholders receiving consideration pursuant to the Merger to receive such consideration more promptly than in a merger in which a stockholder vote is required (assuming all other conditions have already been met).

*Statutory Requirements.* Under the DGCL and the Company's Restated Certificate of Incorporation, if the Section 203 Condition is satisfied, a merger of the Company would require the approval of the Company's Board of Directors and the holders of a majority of the outstanding Shares. Absent satisfaction of the Section 203 Condition, Section 203 could significantly delay our ability to acquire the entire equity interest in the Company. In general, Section 203 prevents an "interested stockholder" (generally, a stockholder owning 15% or more of a corporation's outstanding voting stock or an affiliate or associate thereof) from engaging in a "business combination" (defined to include a merger or consolidation and certain other transactions) with a Delaware corporation for a period of three years following the time on which such stockholder became an interested stockholder unless (i) prior to such time the corporation's board of directors approved either the business combination or the transaction which resulted in such stockholder becoming an interested stockholder, (ii) upon consummation of the transaction which resulted in such stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the corporation's voting stock outstanding at the time the transaction commenced (excluding shares owned by certain employee stock plans and persons who are directors and also officers of the corporation) or (iii) at or subsequent to such time the business combination is approved by the corporation's board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock not owned by the interested stockholder.

The provisions of Section 203 do not apply to a Delaware corporation if, among other things, (i) such corporation amends its certificate of incorporation or bylaws to elect not to be governed by Section 203 by (in addition to any other required vote) the affirmative vote of a majority of the shares entitled to vote; *provided* that such amendment would not be effective until 12 months after its adoption and would not apply to any business combination between such corporation and any person who became an interested stockholder on or prior to its adoption, (ii) such corporation does not have a class of voting stock that is listed on a national securities exchange or held of record by more than 2,000 stockholders, unless any of the foregoing results from action taken, directly or indirectly, by an interested stockholder or from a transaction in which a person becomes an interested stockholder, or (iii) the business combination is proposed by an interested stockholder prior to the consummation or abandonment of, and subsequent to the earlier of the public announcement or the notice required under Section 203 of, any one of certain proposed transactions which is with or by a person who was not an interested stockholder during the previous three years or who became an interested stockholder with the approval of the corporation's board of directors and is approved or not opposed by a majority of the board of

32

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents
directors then in office who were directors prior to any person becoming an interested stockholder during the previous three years or were recommended for election to succeed such directors by a majority of such directors.

The Offer is subject to satisfaction of the Section 203 Condition, which will be satisfied if, among other things, (i) prior to the acceptance for payment of Shares pursuant to the Offer, the Company Board approves the Offer and the Merger or (ii) there are validly tendered prior to the Expiration Date and not withdrawn a number of Shares which, together with the Shares then owned by us, would represent at least 85% of the Shares outstanding on the date hereof (excluding Shares owned by certain employee stock plans and persons who are directors and also officers of the Company).

Purchaser reserves the right to waive the Section 203 Condition, although there can be no assurance that it will do so, and Purchaser has not determined whether it would be willing to do so under any circumstances. If Purchaser waives such condition and purchases Shares pursuant to the Offer or otherwise and Section 203 is applicable, Purchaser may nevertheless seek to consummate a merger or other business combination with the Company. Purchaser believes it would be able to cause the consummation of such a merger or other business combination if Purchaser owns a majority of the outstanding Shares and (i) such merger or other business combination is approved by the Company's Board of Directors and authorized at an annual or special meeting of stockholders of the Company, and not by written consent, by the affirmative vote of at least 66 ⅔% of the outstanding Shares not owned by Parent and Purchaser or their affiliates and associates; or (ii) such merger or other business combination occurs after the expiration of three years following the time Purchaser became an interested stockholder.

On the other hand, if Purchaser waives the Section 203 Condition and purchases Shares pursuant to the Offer or otherwise and is prevented by Section 203 from consummating a merger or other business combination with the Company, Electronic Arts and Purchaser may (i) determine not to seek to consummate such a merger or other business combination, (ii) seek to acquire additional Shares in the open market, pursuant to privately negotiated transactions or otherwise, at prices that may be higher, lower or the same as the price paid in the Offer or (iii) seek to effect one or more alternative transactions with or by the Company. Purchaser has not determined whether it would take any of the actions described above under such circumstances.

A number of states have adopted laws and regulations that purport to apply to attempts to acquire corporations that are incorporated in such states, or whose business operations have substantial economic effects in such states, or which have substantial assets, security holders, employees, principal executive offices or principal places of business in such states. In *Edgar v. MITE Corp.*, the Supreme Court of the United States (the "*Supreme Court*") invalidated on constitutional grounds the Illinois Business Takeover statute, which, as a matter of state securities law, made certain corporate acquisitions more difficult. However, in 1987, in *CTS Corp. v. Dynamics Corp. of America*, the Supreme Court held that the State of Indiana may, as a matter of corporate law and, in particular, with respect to those aspects of corporate law concerning corporate governance, constitutionally disqualify a potential acquiror from voting on the affairs of a target corporation without the prior approval of the remaining stockholders. The state law before the Supreme Court was by its terms applicable only to corporations that had a substantial number of stockholders in the state and were incorporated there.

Purchaser does not believe that the anti-takeover laws and regulations of any state other than the State of Delaware will by their terms apply to the Offer. Purchaser reserves the right to challenge the applicability or validity of any state law purportedly applicable to the Offer and nothing in this Offer to Purchase or any action taken in connection with the Offer is intended as a waiver of such right. If it is asserted that any state anti-takeover statute is applicable to the Offer and an appropriate court does not determine that it is inapplicable or invalid as applied to the Offer, Purchaser might be required to file certain information with, or to receive approvals from, the relevant state authorities, and Purchaser might be unable to accept for payment or pay for Shares tendered pursuant to the Offer or may be delayed in consummating the Offer. In any such case, Purchaser may not be obligated to accept for payment, or pay for, any Shares tendered pursuant to the Offer.

33

Table of Contents

*Appraisal Rights.* You do not have appraisal rights as a result of the Offer. However, if a merger involving the Company is consummated, stockholders of the Company who have neither voted in favor of the merger nor consented thereto in writing, who timely submit a demand for appraisal in accordance with the requirements of Section 262 of the DGCL and who otherwise comply with the applicable statutory procedures under the DGCL will be entitled to receive a judicial determination of the fair value of their Shares (exclusive of any element of value arising from the accomplishment or expectation of such merger) and to receive payment of such fair value in cash, together with interest compounded quarterly and accruing at 5% over the Federal discount rate (unless a court determines otherwise) (all such Shares collectively, the "*Dissenting Shares*"). Any such judicial determination of the fair value of the Dissenting Shares could be based upon considerations other than or in addition to the price paid in the Offer and the market value of the Shares. Stockholders should recognize that the value so determined could be higher or lower than, or the same as, the price per Share paid pursuant to the Offer or the consideration paid in such a merger. Moreover, we may argue in an appraisal proceeding that, for purposes of such a proceeding, the fair value of the Dissenting Shares is less than the price paid in the Offer.

If any holder of Shares who demands appraisal under Section 262 of the DGCL fails to perfect, or effectively withdraws or loses his rights to appraisal as provided in the DGCL, the Shares of such stockholder will be converted into the right to receive the price per Share paid in the Offer.

Failure to follow the steps required by Section 262 of the DGCL for perfecting appraisal rights may result in the loss of such rights.

The foregoing discussion is not a complete statement of the DGCL or U.S. federal law and is qualified in its entirety by reference to the DGCL and applicable U.S. federal law.

*"Going–Private" Transactions.* Rule 13e–3 under the Exchange Act is applicable to certain "going–private" transactions and may, under certain circumstances, be applicable to the Merger. Purchaser does not believe that Rule 13e–3 will be applicable to the Merger unless the Merger is consummated more than one year after the termination of the Offer. However, in the event that Purchaser is deemed to have acquired control of the Company pursuant to the Offer and if the Merger is consummated more than one year after the completion of the Offer, or an alternative transaction is effected whereby stockholders of the Company receive consideration less than that paid pursuant to the Offer, in either case at a time when the Shares are still registered under the Exchange Act, Purchaser may be required to comply with Rule 13e–3 under the Exchange Act. If applicable, Rule 13e–3 would require, among other things, that certain financial information concerning the Company and certain information relating to the fairness of the Merger or alternative transaction and the consideration offered to minority stockholders in the Merger or alternative transaction be filed with the SEC and distributed to minority stockholders before the consummation of any such transaction. The purchase of a substantial number of Shares pursuant to the Offer may result in the Company's being able to terminate its Exchange Act registration. See "The Offer—Section 7—Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations" for more information. If such registration were terminated, Rule 13e–3 would be inapplicable to any future merger or alternative transaction.

*Other.* Purchaser reserves the right to purchase, following the consummation or termination of the Offer, additional Shares in the open market, in privately negotiated transactions, in another tender offer or exchange offer or otherwise. In addition, in the event that Purchaser waives the Merger Agreement Condition and decides not to pursue the Merger, Purchaser will evaluate its other alternatives. Such alternatives could include proposing a merger on terms other than those described above, purchasing additional Shares in the open market, in privately negotiated transactions, in another tender offer or exchange offer or otherwise, or taking no further action to acquire additional Shares. Any additional purchases of Shares could be at a price greater or less than the price to be paid for Shares in the Offer and could be for cash or other consideration. Alternatively, Purchaser or any of its affiliates may sell or otherwise dispose of any or all Shares acquired in the Offer or otherwise. Each such transaction may be effected on terms and at prices then determined by Purchaser or the applicable affiliate, which may vary from the terms and price in the Offer.

34

Table of Contents

*Future Plans for the Company in Addition to the Merger.* In connection with the Offer, Electronic Arts and Purchaser have reviewed, and will continue to review on the basis of publicly available information, various possible business strategies that they might consider if Purchaser acquires control of the Company. In addition, if and to the extent that Purchaser acquires control of the Company or otherwise obtains access to the books and records of the Company, Purchaser intends to conduct a detailed review of the Company and its assets, financial projections, corporate structure, dividend policy, capitalization, operations, properties, policies, management and personnel and consider and determine what, if any, changes would be desirable in light of the circumstances which then exist. Such strategies could include, among other things, changes in the Company's business, facility locations, assets, corporate structure, marketing strategies, capitalization, management or dividend policy.

Except as indicated in this Offer to Purchase, Purchaser does not have any current plans or proposals which relate to or would result in (i) any extraordinary transaction, such as a merger, reorganization or liquidation of the Company or any of its subsidiaries, (ii) any purchase, sale or transfer of a material amount of assets of the Company or any of its subsidiaries, (iii) any material change in the present dividend rate or policy, or indebtedness or capitalization of the Company, (iv) any change in the current board of directors or management of the Company, (v) any other material change in the Company's corporate structure or business, (vi) any class of equity security of the Company being delisted from a national stock exchange or ceasing to be authorized to be quoted in an automated quotation system operated by a national securities association or (vii) any class of equity securities of the Company becoming eligible for termination of registration under Section 12(g)(4) of the Exchange Act.

### 13. Dividends and Distributions.

If, on or after the date of this Offer to Purchase, the Company should (i) split, combine, reclassify or otherwise change the Shares or its capitalization, (ii) acquire or otherwise cause a reduction in the number of outstanding Shares, (iii) issue or sell any additional Shares (other than Shares issued pursuant to and in accordance with the terms in effect on the date of this Offer to Purchase of employee stock options outstanding as of such date), shares of any other class or series of capital stock, other voting securities or any securities convertible into, or options, rights, or warrants, conditional or otherwise, to acquire, any of the foregoing, or (iv) disclose that it has taken such action (which disclosure had not been previously made prior the date of this Offer to Purchase), then, without prejudice to our rights under "The Offer—Section 14—Conditions of the Offer", Purchaser may, in its sole discretion, make such adjustments in the purchase price and other terms of the Offer as it deems appropriate, including, without limitation the number or type of securities to be purchased.

If, on or after the date of this Offer to Purchase, the Company should declare or pay any dividend on the Shares or any distribution with respect to the Shares (including the issuance of additional Shares or other securities or rights to purchase of any securities) that is payable or distributable to stockholders of record on a date prior to the transfer to the name of the Purchaser or its nominee or transferee on the Company's stock transfer records of the Shares purchased pursuant to the Offer, then, without prejudice to Purchaser's rights under "The Offer—Section 14—Conditions of the Offer", (i) the purchase price per Share payable by Purchaser pursuant to the Offer will be reduced to the extent of any such cash dividend or distribution and (ii) the whole of any such non-cash dividend or distribution to be received by the tendering stockholders will (a) be received and held by the tendering stockholders for the account of Purchaser and will be required to be promptly remitted and transferred by each tendering stockholder to the Depositary for the account of Purchaser, accompanied by appropriate documentation of transfer or (b) at the direction of Purchaser, be exercised for the benefit of Purchaser, in which case the proceeds of such exercise will promptly be remitted to Purchaser. Pending such remittance and subject to applicable law, Purchaser will be entitled to all rights and privileges as owner of any such non-cash dividend or distribution, issuance or proceeds thereof and may withhold the entire purchase price or deduct from the purchase price the amount or value thereof, as determined by Purchaser in its sole discretion.

### 14. Conditions of the Offer.

Notwithstanding any other provision of the Offer, and in addition to (and not in limitation of) our rights to extend and amend the Offer at any time, in our sole discretion, we are not required to accept for payment or,

35

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act (relating to our obligation to pay for or return tendered shares promptly after termination or withdrawal of the Offer), pay for, and may delay the acceptance for payment of and accordingly the payment for, any Shares tendered pursuant to the Offer, and may terminate the Offer, if, in our sole judgment, before the Expiration Date, the Minimum Condition, the HSR Condition, the Merger Agreement Condition or the Section 203 Condition shall not have been satisfied, or if, at any time on or after the date of this Offer to Purchase, and before the time of payment for any such Shares (whether or not any Shares have theretofore been accepted for payment pursuant to the Offer), any of the following events shall occur or shall be determined by us to have occurred:

(1) there shall have been threatened, instituted or be pending any litigation, suit, claim, action, proceeding or investigation by any government, governmental authority or agency or any other person, domestic, foreign, or supranational, before any national, state, provincial, municipal or local government, governmental, regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal, or judicial or arbitral body (a "*Governmental Authority*"), (a) challenging or seeking to make illegal, delay or otherwise, directly or indirectly, to restrain or prohibit or make more costly the making of the Offer, the acceptance for payment of or payment for some or all of the Shares by us or any of our affiliates or the consummation by us or any of our subsidiaries or affiliates of the Merger or any other business combination involving the Company, (b) seeking to obtain damages in connection with the Offer or the Merger or any other business combination involving the Company, (c) seeking to restrain, prohibit or limit the ownership or operation by the Company, Parent or any of their subsidiaries or affiliates of all or any portion of our business or assets or that of the Company, Parent or any of their subsidiaries or affiliates or to compel the Company, Parent or any of their subsidiaries or affiliates to dispose of or hold separate all or any portion of the business or assets of the Company, Parent or any of their subsidiaries or affiliates, (d) seeking to impose or confirm limitations on the ability of Parent, Purchaser or any other affiliate of Parent effectively to exercise full rights of ownership of any Shares, including, without limitation, the right to vote any Shares acquired or owned by Parent, Purchaser or any of our subsidiaries or affiliates on all matters properly presented to the Company's stockholders, (e) seeking to require divestiture by Parent, Purchaser or any other affiliate of Parent as a result of the transactions contemplated by the Offer or the Merger or any other business combination involving the Company, (g) that otherwise, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or affiliates or the value of the Shares to us or any of our subsidiaries or affiliates or (h) in the reasonable judgment of Purchaser, materially adversely affecting the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the Company or any of its subsidiaries; or

(2) any clearances or approvals of any U.S. or non-U.S. Governmental Authority other than in connection with the HSR Condition shall not have been obtained, or any applicable waiting periods for such clearances or approvals shall not have expired;

(3) there shall have been any action taken or any statute, rule, regulation, legislation, interpretation, judgment, order, decree or injunction proposed, enacted, enforced, promulgated, amended, issued or deemed applicable to (i) Parent, the Company or any subsidiary or affiliate of Parent or the Company or (ii) the Offer or the Merger or any other business combination by Parent or any other affiliate of Parent with the Company, by any U.S. or non-U.S. legislative body or Governmental Authority with appropriate jurisdiction other than the routine application of the waiting period provisions of the HSR Act, or of any applicable foreign statutes or regulations that, in our judgment, might, directly or indirectly, result in any of the consequences referred to in clauses (a) through (h) of paragraph (1) above; or

(4) any event, circumstance, change or effect occurs or is threatened (or any development occurs or is threatened involving a prospective change) that, individually or in the aggregate with any other events, circumstances, changes or effects occurring after the date of this Offer to Purchase, in our reasonable judgment, is or may be materially adverse to the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the

36

Table of Contents

Company or any of its subsidiaries, or we become aware of any facts that, in our reasonable judgment, have or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or the value of the Shares to us or any of our affiliates; or

(5) there shall have occurred (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market, (b) any decline, measured from the date of this Offer to Purchase, in the Dow Jones Industrial Average, the Standard and Poor's Index of 500 Industrial Companies or the NASDAQ Composite Index by an amount in excess of 15%, measured from the close of business on the date of this Offer to Purchase, (c) any change in the general political, market, economic or financial conditions in the United States or abroad that, in our reasonable judgment, could have a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the Company or any of its subsidiaries or the trading in, or value of, the Shares, (d) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States, (e) any material adverse change (or development or threatened development involving a prospective material adverse change) in U.S. or any other currency exchange rates or a suspension of, or a limitation on, the markets therefor, (f) any material adverse change in the market price of the Shares or in the U.S. securities or financial markets, (g) the commencement of a war, armed hostilities or other international or national calamity directly or indirectly involving the United States or any attack on, outbreak or act of terrorism involving the United States, (h) any limitation (whether or not mandatory) by any government or Governmental Authority on, or any other event that, in our reasonable judgment, may adversely affect, the extension of credit by banks or other financial institutions or (i) in the case of any of the foregoing existing on the date of this Offer to Purchase, a material acceleration or worsening thereof; or

(6) (a) a tender or exchange offer for some or all of the Shares has been publicly proposed to be made or has been made by another person (including the Company or any of its subsidiaries or affiliates), or has been publicly disclosed, or we otherwise learn that any person or "group" (as defined in Section 13(d)(3) of the Exchange Act) has acquired or proposes to acquire beneficial ownership of more than 5% of any class or series of capital stock of the Company (including the Shares), through the acquisition of stock, the formation of a group or otherwise, or is granted any option, right or warrant, conditional or otherwise, to acquire beneficial ownership of more than 5% of any class or series of capital stock of the Company (including the Shares) other than acquisitions for bona fide arbitrage purposes only and except as disclosed in a Schedule 13D or 13G on file with the SEC on or prior to the date of this Offer to Purchase, (b) any such person or group which, on or prior to the date of this Offer to Purchase, had filed such a Schedule with the SEC has acquired or proposes to acquire beneficial ownership of additional shares of any class or series of capital stock of the Company, through the acquisition of stock, the formation of a group or otherwise, constituting 1% or more of any such class or series, or is granted any option, right or warrant, conditional or otherwise, to acquire beneficial ownership of additional shares of any class or series of capital stock of the Company constituting 1% or more of any such class or series, (c) any person or group has entered into a definitive agreement or an agreement in principle or made a proposal with respect to a tender or exchange offer or a merger, consolidation or other business combination with or involving the Company or any of its subsidiaries or (d) any person has filed a Notification and Report Form under the HSR Act or made a public announcement reflecting an intent to acquire the Company or any assets or securities of the Company or any of its subsidiaries; or

(7) the Company or any of its subsidiaries has (a) split, combined, reclassified or otherwise changed, or authorized or proposed the split, combination or other change of, the Shares or its capitalization, (b) acquired or otherwise caused a reduction in the number of, or authorized or proposed the acquisition or other reduction in the number of, outstanding Shares or other securities or equity interests, (c) issued or sold, or authorized or proposed the issuance, distribution or sale of, any additional Shares, shares of any other class or series of capital stock or other equity interests, other voting securities or any securities convertible into, or options, rights or warrants, conditional or otherwise, to acquire, any of the foregoing (other than the issuance of Shares pursuant to and in accordance with the terms in effect on the date of this Offer to

37

Purchase of employee stock options outstanding prior to such date and, if the stockholders of Take-Two approve the amendments to the Company's Incentive Stock Plan described in "Introduction" above, the issuance of up to (but not exceeding) 1,500,000 shares of restricted stock of the Company to ZelnickMedia pursuant to and on the terms disclosed in the Second Amendment to Management Agreement, dated February 14, 2008 (the "*Second Amendment*"), to the Management Agreement, dated March 30, 2007, by and between ZelnickMedia and Take-Two, as amended on July 26, 2007, filed as Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2008 (the "*Management Agreement*") provided that Take-Two has publicly announced the results of the stockholder vote related to such amendments), or any other securities or rights in respect of, in lieu of, or in substitution or exchange for any shares of its capital stock, (d) permitted the issuance or sale of any shares of any class of capital stock or other securities of any subsidiary of the Company; (e) declared, paid or proposed to declare or pay any dividend or other distribution on any shares of capital stock of the Company, (f) altered or proposed to alter any material term of any outstanding security, (g) issued or sold, or authorized or proposed the issuance or sale of, any debt securities or otherwise incurred or authorized or proposed the incurrence of any debt other than in the ordinary course of business consistent with past practice, or any debt containing, in the reasonable judgment of Purchaser, burdensome covenants or security provisions, (h) authorized, recommended, proposed, announced its intent to enter into or entered into an agreement with respect to or effected any merger, consolidation, liquidation, dissolution, business combination, acquisition of assets, disposition of assets or relinquishment of any material contract or other right of the Company or any of its subsidiaries or any comparable event not in the ordinary course of business consistent with past practice, (i) authorized, recommended, proposed, announced its intent to enter into or entered into any agreement or arrangement with any person or group that, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or affiliates or the value of the Shares to us or any of our subsidiaries or affiliates, (j) acquired or authorized, recommended or proposed to acquire, any business or assets material to the Company or any of its affiliates (except purchases of inventory in the ordinary course of business consistent with past practice), (k) adopted, established or entered into any new employment, change in control, severance compensation or similar agreement, arrangement or plan with or for one or more of its employees, consultants, directors or affiliates, or adopted, established or entered into or amended, or made grants or awards pursuant to, any agreements (including, without limitation, the Management Agreement), arrangements or plans so as to provide for increased benefits to, or otherwise taken any action (including, without limitation, by any resolution or other action of the Board of Directors of the Company or any of its subsidiaries or any committee thereof) to provide for acceleration of any awards under any agreements, arrangements or plans affecting, one or more employees, consultants, directors or affiliates, whether or not as a result of or in connection with the transactions contemplated by the Offer or the Merger or any other business combination with the Company, or we shall have become aware of any such action which has not been publicly disclosed prior to the date of this Offer to Purchase, (l) except as may be required by law, taken any action to adopt, establish, terminate or amend any employee benefit plan (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974) of the Company or any of its subsidiaries, or we shall have become aware of any such action which was not previously announced or (m) amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) or we become aware that the Company or any of its subsidiaries shall have amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) which has not been publicly disclosed prior to the date of this Offer to Purchase; or

(8) (a) pursuant to Section 8 of the Second Amendment, the compensation committee of the Board of Directors of the Company shall have failed to recommend to the independent members of the Board of Directors of the Company that no additional compensation be paid to ZelnickMedia, ZM Capital LLC and their affiliates in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" (as defined in the Management Agreement) or the independent members of the Board of Directors of the Company or the Board of Directors of the Company shall have failed to adopt a resolution providing that no such additional compensation shall be payable or (b) if the Company shall have

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

received the Incentive Stock Plan Amendment Approval, the compensation committee of the Board of Directors of the Company shall have failed to recommend to the independent members of the Board of Directors of the Company and the Board of Directors of the Company that no more than 780,000 of the shares of restricted stock of the Company issuable to ZelnickMedia pursuant to the Second Amendment shall vest in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" and that any shares of restricted stock not vesting in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" shall be forfeited without compensation, or the independent members of the Board of Directors of the Company or the Board of Directors of the Company shall have failed to adopt a resolution to the foregoing effects; or

(9) we become aware (a) that any material contractual right of the Company or any of its subsidiaries has been impaired or otherwise adversely affected or that any material amount of indebtedness of the Company or any of its subsidiaries has been accelerated or has otherwise become due or become subject to acceleration prior to its stated due date, in each case with or without notice or the lapse of time or both, as a result of or in connection with the Offer or the consummation by us or any of our subsidiaries or affiliates of the Merger or any other business combination involving the Company or (b) of any covenant, term or condition in any instrument, license, franchise or agreement of the Company or any of its subsidiaries that, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its affiliates or the value of the Shares to us or any of our affiliates (including, without limitation, any event of default that may ensue as a result of or in connection with the Offer, the acceptance for payment of or payment for some or all of the Shares by us or our consummation of the Merger or any other business combination involving the Company); or

(10) we or any of our affiliates enters into a definitive agreement or announces an agreement in principle with the Company providing for a merger or other similar business combination with the Company or any of its subsidiaries or the purchase of securities or assets of the Company or any of its subsidiaries pursuant to which it is agreed that the Offer will be terminated, or we and the Company reach any other agreement or understanding pursuant to which it is agreed that the Offer will be terminated; or

(11) the Company or any of its subsidiaries shall have (a) granted to any person proposing a merger or other business combination with or involving the Company or any of its subsidiaries or the purchase of securities or assets of the Company or any of its subsidiaries any type of option, warrant or right which, in our judgment, constitutes a "lock-up" device (including, without limitation, a right to acquire or receive any Shares or other securities, assets or business of the Company or any of its subsidiaries) or (b) paid or agreed to pay any cash or other consideration to any party in connection with or in any way related to any such business combination or purchase.

The foregoing conditions are for the sole benefit of Parent, Purchaser and their affiliates and may be asserted by us or Parent regardless of the circumstances giving rise to any such conditions or, other than the HSR Condition and the condition set forth in paragraph (2) above, may be waived by Parent or us in whole or in part at any time or from time to time before the Expiration Date in their sole discretion. The failure by Parent or us at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right. The waiver of any such right with respect to particular facts and circumstances shall not be deemed a waiver with respect to any other facts and circumstances. Each such right shall be deemed an ongoing right which may be asserted at any time or from time to time.

### 15. Certain Legal Matters; Regulatory Approvals.

*General.* Except as set forth in this Offer to Purchase, based on its review of publicly available filings by the Company with the SEC and other publicly available information regarding the Company, Purchaser is not aware of any governmental or regulatory licenses or permits that would be material to the business of the Company and its subsidiaries, taken as a whole, that might be adversely affected by Purchaser's acquisition of Shares (and the indirect acquisition of the stock of the Company's subsidiaries) as contemplated herein, or, except to the extent

39

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents
required by any foreign regulatory authorities, any filings, approvals or other actions by or with any domestic, foreign or supranational Governmental Authority that would be required prior to the acquisition of Shares (or the indirect acquisition of the stock of the Company's subsidiaries) by Purchaser pursuant to the Offer as contemplated herein.

Should any such approval or other action be required, there can be no assurance that any such additional approval or action, if needed, would be obtained without substantial conditions or that adverse consequences might not result to the Company's business, or that certain parts of the Company's, Parent's or Purchaser's business might not have to be disposed of or held separate or other substantial conditions complied with in order to obtain such approval or action or in the event that such approvals were not obtained or such actions were not taken, Purchaser's obligation to purchase and pay for Shares is subject to certain conditions which may be applicable under such circumstances. See "Introduction" and "The Offer—Section 14—Conditions of the Offer" for a description of the conditions to the Offer.

*State Takeover Statutes.* A number of states (including Delaware, where Take-Two is incorporated) have adopted laws which purport, to varying degrees, to apply to attempts to acquire corporations that are incorporated in, or which have substantial assets, stockholders, principal executive offices or principal places of business or whose business operations otherwise have substantial economic effects in, such states. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" for more information.

*Antitrust.* Under the HSR Act and the rules that have been promulgated thereunder by the Federal Trade Commission (the "*FTC*") and the Department of Justice ("*DOJ*"), certain acquisition transactions may not be consummated unless certain information has been furnished to the DOJ and the FTC and certain waiting period requirements have been satisfied. The purchase of Shares pursuant to the Offer is subject to such requirements.

Pursuant to the HSR requirements, we plan to file a Notification and Report Form with respect to the Offer with the DOJ and the FTC as promptly as possible after the date hereof and to provide written notice to the Company that we are doing so. As a result, the waiting period applicable to the purchase of Shares pursuant to the Offer will expire at 11:59 p.m., New York City time, 15 days following our HSR filing, unless such 15th day falls on a Saturday, Sunday or other legal public holiday, in which case the waiting period will expire at 11:59 p.m., New York City time, on the next regular business day. However, before this initial waiting period has expired, the DOJ or the FTC may extend the waiting period by requesting additional information and documentary material relevant to the Offer from Electronic Arts, as well as from the Company. If such a request is made to Electronic Arts, the waiting period will be extended until 11:59 p.m., New York City time, 10 days after Electronic Arts' (but not also the Company's) substantial compliance with such request. Thereafter, such waiting period can be extended only by court order or by Electronic Arts' voluntary agreement. As permitted under the HSR Act, Electronic Arts expects to request early termination of the initial waiting period applicable to the Offer. There can be no assurance, however, that the 15-day HSR Act waiting period will be terminated early.

Shares will not be accepted for payment or paid for pursuant to the Offer until the expiration or earlier termination of the applicable waiting period under the HSR Act. See "Introduction" and "The Offer—Section 14—Conditions of the Offer". Subject to certain circumstances described in "The Offer—Section 4—Withdrawal Rights", any extension of the waiting period will not give rise to any withdrawal rights not otherwise provided for by applicable law. If our acquisition of Shares is delayed pursuant to a formal request by the DOJ or the FTC for additional information and documentary material pursuant to the HSR Act, the Offer may, but need not, be extended.

The DOJ and the FTC frequently scrutinize the legality under the antitrust laws of transactions such as our acquisition of Shares pursuant to the Offer. At any time before or after the consummation of any such transactions, the DOJ or the FTC may take such action under the antitrust laws as it deems necessary or desirable to preserve competition, including seeking to enjoin the purchase of Shares pursuant to the Offer, or seeking

40

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

divestiture of the Shares so acquired or divestiture of certain of Electronic Arts' or the Company's assets. Private parties and individual states may also bring legal actions under the antitrust laws to enjoin consummation of the Offer. We do not believe that consummation of the Offer will result in a violation of any applicable antitrust laws. However, there can be no assurance that a governmental or private challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See "The Offer—Section 14—Conditions of the Offer" for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions.

In addition to our filing under the HSR Act with the DOJ and FTC, based on available public information Purchaser is also required to make a pre-merger filing with German competition authorities and, possibly, might be required to make additional merger filings in one or more other foreign jurisdictions. No assurance can be given that any requisite consents or approvals required from such foreign competition authorities will be received, or will be received prior to the Expiration Date. Shares will not be accepted for payment or paid for pursuant to the Offer until the receipt of such approvals or consents or the expiration or earlier termination of any applicable waiting period under foreign competition laws. See "The Offer—Section 14—Conditions of the Offer".

*Legal Proceedings.* On March 7, 2008, Patrick Solomon, an individual stockholder of Take-Two, filed a Class Action Complaint (the "*Complaint*") and motion for expedited proceedings in the Court of Chancery of the State of Delaware, New Castle County, against Take-Two and its directors, Strauss Zelnick, Michael Dornemann, Benjamin Feder, John F. Levy, Jon J. Moses, Robert A. Bowman, Michael James Sheresky and Grover C. Brown. The Complaint alleges that a February 14, 2008 amendment to Take-Two's bylaws, which amendment imposed an advance notice requirement for stockholder proposals concerning director nominations or other business to be heard at Take-Two's 2008 annual stockholder meeting (the "*Bylaw Amendment*"), was unreasonable, inequitable and not supported by any compelling business justification. The Complaint alleges that the Bylaw Amendment was enacted to deny stockholders an opportunity to nominate directors or propose other business to be heard at Take-Two's 2008 annual stockholder meeting. The Complaint further alleges that defendants breached their fiduciary duties to Take-Two stockholders by, among other things, (i) adopting the Bylaw Amendment, (ii) adopting the Second Amendment, which amendment provided additional compensation to ZelnickMedia, (iii) setting February 19, 2008 as the record date for stockholders eligible to vote at Take-Two's 2008 annual stockholder meeting, (iv) issuing a misleading February 28, 2008 proxy statement and (v) rejecting Electronic Arts' offers and failing to negotiate with Electronic Arts. The Complaint alleges that such alleged breaches of defendants' fiduciary duties were undertaken by defendants to, among other things, protect their incumbency, enrich ZelnickMedia at the expense of Take-Two stockholders and thwart Electronic Arts' offer. The Complaint seeks declaratory and injunctive relief, including, among other things, rescission of the Bylaw Amendment; an order enjoining defendants from (i) refusing to negotiate with Electronic Arts in connection with Electronic Arts' offer and (ii) impairing stockholders' ability to replace the incumbent Board; and an order requiring defendants to (i) set a new date for Take-Two's 2008 annual stockholder meeting, (ii) issue a new proxy statement containing complete and accurate disclosure and (iii) set a new record date for determining the stockholders eligible to vote at Take-Two's 2008 annual stockholder meeting. The Complaint additionally seeks on behalf of the proposed class damages of an unspecified amount. On March 10, 2008, plaintiff filed a motion for preliminary injunctive relief, enjoining defendants from (i) enforcing or applying the Bylaw Amendment and (ii) convening the Take-Two 2008 annual stockholder meeting until defendants issue amended disclosures and provide the stockholders a full and fair opportunity to nominate directors and submit proposals.

*Other.* Based upon our examination of publicly available information concerning the Company, it appears that the Company and its subsidiaries conduct business in a number of foreign countries. In connection with the acquisition of Shares pursuant to the Offer, the laws of certain of these foreign countries (including competition laws as discussed above) may require the filing of information with, or the obtaining of the approval of, Governmental Authorities therein. After commencement of the Offer, we will seek further information regarding the applicability of any such laws and currently intend to take such action as they may require, but no assurance can be given that such approvals will be obtained. If any action is taken before completion of the Offer by any

41

Table of Contents
such government or Governmental Authority, we may not be obligated to accept for payment or pay for any tendered Shares. See "The Offer—Section 14—Conditions of the Offer".

### 16. Fees and Expenses.

Morgan Stanley is acting as our financial advisor in connection with our proposal to acquire Take-Two and is acting as Dealer Manager in connection with the Offer. Morgan Stanley will receive customary fees in connection with these engagements. Electronic Arts and Purchaser have also agreed to reimburse Morgan Stanley for reasonable out-of-pocket expenses incurred in connection with the Offer and to indemnify Morgan Stanley against certain liabilities and expenses, including certain liabilities under the U.S. federal securities laws.

We have retained Georgeson Inc. to act as the Information Agent and U.S. Bank National Association to act as the Depositary in connection with the Offer. The Information Agent may contact holders of Shares by mail, telephone, telex, telegraph and personal interviews and may request brokers, dealers, banks, trust companies and other nominees to forward materials relating to the Offer to beneficial owners. The Depositary has not been retained to make solicitations or recommendations in its role as Depositary. The Information Agent and the Depositary each will receive reasonable and customary compensation for their respective services, will be reimbursed for certain reasonable out-of-pocket expenses and will be indemnified against certain liabilities and expenses in connection with their services, including certain liabilities under the U.S. federal securities laws.

Neither Electronic Arts nor Purchaser will pay any fees or commissions to any broker or dealer or any other person (other than the Dealer Manager, the Information Agent and the Depositary) for soliciting tenders of Shares pursuant to the Offer. Brokers, dealers, banks, trust companies and other nominees will, upon request, be reimbursed by Purchaser for reasonable and necessary costs and expenses incurred by them in forwarding materials to their customers.

### 17. Miscellaneous.

The Offer is being made solely by this Offer to Purchase and the related Letter of Transmittal and is being made to all holders of the Shares (excluding Shares beneficially owned by Electronic Arts and Purchaser). Purchaser is not aware of any jurisdiction where the making of the Offer is prohibited by any administrative or judicial action pursuant to any valid statute. If Purchaser becomes aware of any valid statute prohibiting the making of the Offer or the acceptance of the Shares pursuant thereto, Purchaser will make a good faith effort to comply with such statute. If, after such good faith effort Purchaser cannot comply with any such statute, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares in such jurisdiction. In those jurisdictions where the applicable laws require that the Offer be made by a licensed broker or dealer, the Offer shall be deemed to be made on behalf of Purchaser by the Dealer Manager or one or more registered brokers or dealers licensed under the laws of such jurisdiction.

**No person has been authorized to give any information or make any representation on behalf of Parent or Purchaser not contained in this Offer to Purchase or in the Letter of Transmittal, and if given or made, such information or representation must not be relied upon as having been authorized.**

Electronic Arts and Purchaser have filed with the SEC a Tender Offer Statement on Schedule TO, together with exhibits, pursuant to Rule 14d-3 under the Exchange Act, furnishing certain additional information with respect to the Offer. The Schedule TO and any amendments thereto, including exhibits, may be examined and copies may be obtained from the offices of the SEC in the manner described in "The Offer—Section 9—Certain Information Concerning Purchaser and Parent" of this Offer to Purchase.

42

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

### SOLICITATION OF PROXIES OR CONSENTS

Neither this Offer to Purchase nor the Offer constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting. In addition, neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.

EA08 ACQUISITION CORP.

March 13, 2008

43

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

## DIRECTORS AND EXECUTIVE OFFICERS OF PARENT AND PURCHASER
### DIRECTORS AND EXECUTIVE OFFICERS OF PARENT

The name, current principal occupation or employment and material occupations, positions, offices or employment for the past five years of each director and executive officer of Parent are set forth below. The business address of each director and officer is care of Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065. Unless otherwise indicated, each occupation set forth opposite an individual's name refers to employment with Parent. All directors and officers listed below are citizens of the United States, except for Gerhard Florin, who is a citizen of Germany, and Peter Moore, who is a citizen of the United Kingdom.

### Directors and Executive Officers of Parent

Leonard S. Coleman
*Director since 2001*

Mr. Coleman served as Senior Advisor to Major League Baseball from 1999 until 2005 and, from 2001 to 2002, was the Chairman of ARENACO, a subsidiary of Yankees/Nets. Mr. Coleman was President of The National League of Professional Baseball Clubs from 1994 to 1999, having previously served since 1992 as Executive Director, Market Development of Major League Baseball. Mr. Coleman serves on the Board of Directors of the following public companies: Avis Budget Group; Churchill Downs Inc.; H.J. Heinz Corporation; and Omnicom Group Inc.

Gary M. Kusin
*Director since 1995; Lead Director since 2006*

Mr. Kusin has been a Partner at TPG (formerly Texas Pacific Group) since June 2006. He served as the President and Chief Executive Officer of Fedex Kinko's Office and Print Services, an operating division of Fedex, Inc. from August 2001 until February 2006. Fedex Kinko's is a leading provider of document solutions and business services. From September 1998 to July 2001, he was the Chief Executive Officer of HQ Global Workplaces, Inc., a global leader in office outsourcing. Prior to September 1998, Mr. Kusin was co-founder and Chairman of Kusin Gurwitch Cosmetics, LLC and co-founder and President of Babbages, Inc.

Gregory B. Maffei
*Director since 2003*

Mr. Maffei has served as President and Chief Executive Officer of Liberty Media Corporation, which owns electronic retailing, media, communications and entertainment businesses and investments, since February 2006. He joined Liberty Media in November 2005 as CEO-Elect. From June 2005 until November 2005, Mr. Maffei served as President and Chief Financial Officer of Oracle Corporation. From 2000 until June 2005, Mr. Maffei served as Chief Executive Officer of 360networks Corporation, a broadband telecom service provider, and also became Chairman of the Board of 360networks in 2002. Previously, Mr. Maffei was with Microsoft Corporation from 1993 to 2000, in several positions, including Senior Vice President, Finance and Administration and Chief Financial Officer. Mr. Maffei also served as Chairman of Expedia, Inc. from 1999 to 2002. Mr. Maffei serves on the Board of Directors of Liberty Media and The DIRECTV Group, Inc.

Timothy Mott
*Director since 1990*

Mr. Mott has been Chairman of All Covered, a nationwide information technology outsourcing company focused on small and mid-size businesses, since June 2000 and has served as Chief Executive Officer since September 2006 (a position he had previously held from November 2001 to February 2004). At various times

S-1

**Table of Contents**

prior to 1999, Mr. Mott co-founded and was Chairman of Audible Inc., co-founded and was Chief Executive Officer and Chairman of Macromedia Inc., co-founded and was Senior Vice President of Parent, and was a member of the research staff at Xerox PARC.

Vivek Paul
*Director since 2005*

Mr. Paul has been a partner at TPG (formerly Texas Pacific Group) since October 2005. From July 1999 to September 2005, Mr. Paul served as Vice Chairman of the Board of Directors of Wipro, Ltd., a provider of integrated business, technology and process solutions, and Chief Executive Officer of Wipro Technologies, Wipro's global information technology, product engineering, and business process services segments. From January 1996 to July 1999, Mr. Paul was General Manager of Global CT Business at General Electric, Medical Systems Division. From March 1993 to December 1995, he served as President and Chief Executive Officer of Wipro GE Medical Systems Limited.

Lawrence F. Probst III
*Director since 1991; Chairman of the Board since 1994*

Mr. Probst has served as Chairman of the Board of Directors of Parent since July 1994 and, from May 1991 until April 2007, also served as Parent's Chief Executive Officer. Previously Mr. Probst served as President from 1991 until 1998 and Senior Vice President of EA Distribution from 1987 to 1991.

John S. Riccitiello
*Director and Chief Executive Officer*

Mr. Riccitiello has served as Chief Executive Officer and a director of Parent since April 2007. Prior to re-joining Parent, he was a co-founder and Managing Partner at Elevation Partners, a private equity fund. From October 1997 to April 2004, Mr. Riccitiello served as President and Chief Operating Officer of Parent. Prior to joining Parent, Mr. Riccitiello served as President and Chief Executive Officer of the worldwide bakery division at Sara Lee Corporation. Before joining Sara Lee, he served as President and Chief Executive Officer of Wilson Sporting Goods Co. and has also held executive management positions at Haagen-Dazs, PepsiCo, Inc. and The Clorox Company.

Richard A. Simonson
*Director since 2006*

Mr. Simonson has served as Executive Vice President and Chief Financial Officer of Nokia Corporation, a manufacturer of mobile devices and a leader in mobile network equipment, solutions and services, since 2004. From 2001 until 2003, Mr. Simonson served as Vice President & Head of Customer Finance of Nokia. In 2001, Mr. Simonson was Managing Director of the Telecom & Media Investment Banking Group of Barclays Capital. Prior to joining Barclays Capital, Mr. Simonson spent 16 years at Bank of America Securities where he held various positions, including Managing Director & Head of Global Project Finance, Global Corporate & Investment Bank, San Francisco and Chicago.

Linda J. Srere
*Director since 2001*

Ms. Srere is currently a marketing and advertising consultant. Previously, Ms. Srere was President of Young & Rubicam Advertising. Since 1994, Ms. Srere held many positions with Young & Rubicam Inc. ("Y&R"), including Vice Chairman and Chief Client Officer, Executive Vice President and Director of Business Development, Group Managing Director, and in 1997, was named Chief Executive Officer of Y&R's New York office, becoming the first female CEO in the company's 75-year history. Ms. Srere also serves on the Board of Directors of Universal Technical Institute, Inc., a technical education provider.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

Frank Gibeau

*President, EA Games Label*

Mr. Gibeau has served as President of the EA Games Label since June 2007. From September 2005 until June 2007, Mr. Gibeau served as Executive Vice President, General Manager, North America Publishing. Previously he was Senior Vice President of North American Marketing, a position he held from 2002 until September 2005. Mr. Gibeau has held various publishing positions since joining Parent in 1991.

Peter Moore

*President, EA Sports Label*

Mr. Moore has served as President, EA Sports Label since September 2007. From January 2003 until August 2007, Mr. Moore held several positions at Microsoft, where he initially served as head of Xbox marketing and was later named as Corporate Vice President, Interactive Entertainment Business, Entertainment and Devices Division, a position in which he led both the Xbox and Games for Windows businesses. Prior to joining Microsoft, Mr. Moore was president and Chief Operating Officer of SEGA of America, where he was responsible for overseeing SEGA's video game business in North America. Before joining SEGA, Mr. Moore was senior vice president of marketing at Reebok International Ltd.

Nancy Smith

*President, The Sims Label*

Ms. Smith was named President of The Sims Label in June 2007. Prior to that time, she had served as Executive Vice President, General Manager, The Sims Franchise from September 2005. From March 1998 until September 2005, she served as Executive Vice President and General Manager, North American Publishing. From October 1996 to March 1998, Ms. Smith served as Executive Vice President, North American Sales. She previously held the position of Senior Vice President of North American Sales and Distribution from July 1993 to October 1996 and as Vice President of Sales from 1988 to 1993. Ms. Smith has also served as Western Regional Sales Manager and National Sales Manager since she joined Parent in 1984.

Kathy Vrabeck

*President, EA Casual Entertainment*

Ms. Vrabeck has served as President, EA Casual Entertainment since May 2007. From August 1999 until April 2006, Ms. Vrabeck held various positions at Activision, Inc., an interactive entertainment company, including President of Activision Publishing, Executive Vice President, Global Publishing and Brand Management, and Executive Vice President, Global Brand Management. Following her departure from Activision, Ms. Vrabeck served as a consultant with various companies, including EA. Prior to joining Activision, Ms. Vrabeck was Senior Vice President/General Manager with ConAgra Foods, Inc., and also served in various marketing and sales roles for the Pillsbury Company and held positions at Quaker Oats Company and Eli Lilly & Company.

Gerhard Florin

*Executive Vice President, Publishing – Americas and Europe*

Dr. Florin has served as Executive Vice President, Publishing – Americas and Europe of Parent since August 2007. From June 2007 until August 2007, Dr. Florin served as Executive Vice President, Global Publishing. From September 2005 until June 2007, Dr. Florin served as Executive Vice President, International Publishing, and from April 2003 until September 2005, he served as Senior Vice President and Managing Director, European Publishing. From 2001 until September 2005, he served as Vice President, Managing Director for European countries. From the time he joined Parent in 1996 until 2001, Dr. Florin was the Managing Director for German speaking countries. Prior to joining Electronic Arts, Dr. Florin held various positions at BMG, the global music division of Bertelsmann AG, and worked as a consultant with McKinsey.

S-3

Table of Contents

Warren C. Jenson

*Executive Vice President, Chief Financial and Administrative Officer*

Mr. Jenson joined Parent in June 2002 as Executive Vice President, Chief Financial and Administrative Officer. Before joining Electronic Arts, he was the Senior Vice President and Chief Financial Officer for Amazon.com from 1999 to 2002. From 1998 to 1999, he was the Chief Financial Officer and Executive Vice President for Delta Air Lines. Prior to that, he worked in several positions as part of the General Electric Company. Most notably, he served as Chief Financial Officer and Senior Vice President for the National Broadcasting Company, a subsidiary of General Electric. Mr. Jenson also serves as an officer and director of Purchaser.

Joel Linzner

*Executive Vice President, Business and Legal Affairs*

Mr. Linzner has served as Executive Vice President, Business and Legal Affairs since March 2005. From April 2004 to March 2005, he served as Senior Vice President, Business and Legal Affairs. From October 2002 to April 2004, Mr. Linzner held the position of Senior Vice President of Worldwide Business Affairs and from July 1999 to October 2002, he held the position of Vice President of Worldwide Business Affairs. Prior to joining Electronic Arts in July 1999, Mr. Linzner served as outside litigation counsel to Parent and several other companies in the video game industry.

Gabrielle Toledano

*Executive Vice President, Human Resources*

Ms. Toledano has served as Executive Vice President, Human Resources since April 2007. From February 2006 to April 2007, Ms. Toledano held the position of Senior Vice President, Human Resources. Prior to joining Electronic Arts, Ms. Toledano worked at Siebel Systems, Inc. from July 2002 to February 2006 where she held a number of positions, including Senior Vice President of Human Resources. From September 2000 to June 2002, she served as Senior Director of Human Resources for Microsoft Corporation, and from September 1998 until September 2000, she served as Director of Human Resources and Recruiting for Microsoft.

Kenneth A. Barker

*Senior Vice President, Chief Accounting Officer*

Mr. Barker has served as Senior Vice President, Chief Accounting Officer since April 2006. From June 2003 to April 2006, Mr. Barker held the position of Vice President, Chief Accounting Officer. Prior to joining Electronic Arts, Mr. Barker was employed at Sun Microsystems, Inc., as Vice President and Corporate Controller from October 2002 to June 2003 and Assistant Corporate Controller from April 2000 to September 2002. Prior to that, he was an audit partner at Deloitte.

Stephen G. Bené

*Senior Vice President, General Counsel and Corporate Secretary*

Mr. Bené has served as Senior Vice President, General Counsel and Corporate Secretary since October 2004. From April 2004 to October 2004, Mr. Bené held the position of Vice President, Acting General Counsel and Corporate Secretary, and from June 2003 to April 2004, he held the position of Vice President and Associate General Counsel. Prior to June 2003, Mr. Bené had served as internal legal counsel since joining Parent in March 1995. Mr. Bené also serves as an officer and director of Purchaser.

S-4

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents

## DIRECTORS AND EXECUTIVE OFFICERS OF PURCHASER

The name, current principal occupation or employment and material occupations, positions, offices or employment for the past five years of each director and executive officer of Purchaser are set forth below. The business address of each director and officer is care of Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065. Unless otherwise indicated, each occupation set forth opposite an individual's name refers to employment with Parent. All directors and officers of Purchaser listed below are citizens of the United States.

### Directors and Executive Officers of Purchaser

Warren C. Jenson
*Director, President, Assistant Treasurer and Assistant Secretary*

Mr. Jenson is a director and the President, Assistant Treasurer and Assistant Secretary of Purchaser, having served in such capacities since Purchaser's formation in March 2008. Mr. Jenson also serves as Executive Vice President, Chief Financial and Administrative Officer of Parent, which he joined in June 2002. Before joining Electronic Arts, he was the Senior Vice President and Chief Financial Officer for Amazon.com from 1999 to 2002. From 1998 to 1999, he was the Chief Financial Officer and Executive Vice President for Delta Air Lines. Prior to that, he worked in several positions as part of the General Electric Company. Most notably, he served as Chief Financial Officer and Senior Vice President for the National Broadcasting Company, a subsidiary of General Electric.

Glen A. Kohl
*Director, Vice President and Treasurer*

Mr. Kohl is a director and Vice President and Treasurer of Purchaser, having served in such capacities since Purchaser's formation in March 2008. Mr. Kohl has served as Senior Vice President, Tax and Treasury of Parent since January 2004. Prior to joining Electronic Arts, from April 2001 until December 2003, Mr. Kohl was a partner at Cooley Godward LLP. Prior to that, Mr. Kohl held various senior positions at PeoplePC Inc., Ernst & Young LLP, Wilson Sonsini Goodrich & Rosati, where he was a partner and chair of its tax department, and the United States Treasury Department, where he served as deputy assistant secretary for tax policy and tax legislative counsel.

Stephen G. Bené
*Director, Vice President and Secretary*

Mr. Bené is a director and Vice President and Secretary of Purchaser, having served in such capacities since Purchaser's formation in March 2008. Mr. Bené has also served as Senior Vice President, General Counsel and Corporate Secretary of Electronic Arts since October 2004. From April 2004 to October 2004, Mr. Bené held the position of Vice President, Acting General Counsel and Corporate Secretary of Electronic Arts, and from June 2003 to April 2004, he held the position of Vice President and Associate General Counsel of Parent. Prior to June 2003, Mr. Bené had served as internal legal counsel of Electronic Arts since joining Parent in March 1995.

S-5

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Table of Contents
Facsimile copies of the Letter of Transmittal will be accepted. The Letter of Transmittal and certificates for Shares and any other required documents should be sent to the Depositary at the address set forth below:

*The Depositary for the Offer is:*

# U.S. Bank National Association

*By Registered or Certified Mail
or Overnight Courier to:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station - EP-MN-W52N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

If you have questions or need additional copies of this Offer to Purchase and the Letter of Transmittal, you can call the Information Agent or the Dealer Manager at their respective addresses and telephone numbers set forth below. You may also contact your broker, dealer, bank, trust company or other nominee for assistance concerning the Offer.

*The Information Agent for the Offer is:*

## Georgeson

Georgeson Inc.
199 Water Street, 26th Floor

New York, New York 10038
Banks and Brokers Call: (212) 440-9800
All Others Please Call Toll-Free: (800) 213-0473

*The Dealer Manager for the Offer is:*

## MORGAN STANLEY

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036
Call Toll Free: (877) 247-9865

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Exhibit (a)(1)(B)

# LETTER OF TRANSMITTAL

to

**Tender Shares of Common Stock**

of

## Take-Two Interactive Software, Inc.

**Pursuant to the Offer to Purchase**
**Dated March 13, 2008**

at

**$26.00 Net Per Share in Cash**

by

## EA08 Acquisition Corp.

a wholly-owned subsidiary of

## Electronic Arts Inc.

THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11, 2008, UNLESS THE OFFER IS EXTENDED.

*The Depositary For The Offer Is:*

### U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

DELIVERY OF THIS LETTER OF TRANSMITTAL TO AN ADDRESS, OR TRANSMISSION OF INSTRUCTIONS VIA FACSIMILE TO A NUMBER, OTHER THAN AS SET FORTH ABOVE, WILL NOT CONSTITUTE A VALID DELIVERY.

THE INSTRUCTIONS ACCOMPANYING THIS LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY BEFORE THIS LETTER OF TRANSMITTAL IS COMPLETED.

| DESCRIPTION OF SHARES TENDERED | | | |
|---|---|---|---|
| Name(s) and Address(es) of Registered Holder(s)<br>(Please fill in, if blank, exactly as Name(s)<br>appear(s) on Stock Certificate(s)) | Stock Certificate(s) Tendered<br>(Attach additional list if necessary) | | |
| | Stock<br>Certificate<br>Number(s)* | Total Number<br>of Shares<br>Evidenced by<br>Certificate(s)* | Number of<br>Shares<br>Tendered** |
| | | | |
| | Total Shares Tendered | | |

\* Need not be completed by Stockholders tendering Shares by book-entry transfer.

\*\* Unless otherwise indicated, it will be assumed that all Shares evidenced by any Stock Certificates delivered to the Depositary are being tendered hereby. See Instruction 4.

   THIS LETTER OF TRANSMITTAL IS TO BE COMPLETED BY STOCKHOLDERS OF TAKE-TWO EITHER (1) IF CERTIFICATES EVIDENCING SHARES (AS DEFINED BELOW) ARE TO BE FORWARDED HEREWITH OR (2) IF DELIVERY OF SHARES IS TO BE MADE BY BOOK-ENTRY TRANSFER TO AN ACCOUNT MAINTAINED BY THE DEPOSITARY AT THE BOOK-ENTRY TRANSFER FACILITY (AS DEFINED IN AND PURSUANT TO THE PROCEDURES SET FORTH IN "THE OFFER—SECTION 3—PROCEDURES FOR TENDERING SHARES" OF THE OFFER TO PURCHASE).

   DELIVERY OF DOCUMENTS TO THE BOOK-ENTRY TRANSFER FACILITY DOES NOT CONSTITUTE DELIVERY TO THE DEPOSITARY.

   IF ANY OF THE CERTIFICATES REPRESENTING SHARES THAT YOU OWN HAVE BEEN LOST OR DESTROYED, SEE INSTRUCTION 9.

Holders whose certificates evidencing Shares ("*Share Certificates*") are not immediately available or who cannot deliver their Share Certificates and all other documents required hereby to the Depositary prior to the Expiration Date (as defined in the "The Offer—Section 1—Terms of the Offer" of the Offer to Purchase) or who cannot complete the procedure for delivery by book-entry transfer on a timely basis and who wish to tender their Shares must do so pursuant to the guaranteed delivery procedure described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase. See Instruction 2.

☐   CHECK HERE IF SHARES ARE BEING DELIVERED BY BOOK-ENTRY TRANSFER MADE TO AN ACCOUNT MAINTAINED BY THE DEPOSITARY WITH THE BOOK-ENTRY TRANSFER FACILITY AND COMPLETE THE FOLLOWING (ONLY PARTICIPANTS IN THE BOOK-ENTRY TRANSFER FACILITY MAY DELIVER SHARES BY BOOK-ENTRY TRANSFER):

Name(s) of Tendering Institution: _____

Account Number: _____    Transaction Code Number: _____

☐   CHECK HERE IF SHARES ARE BEING TENDERED PURSUANT TO A NOTICE OF GUARANTEED DELIVERY PREVIOUSLY SENT TO THE DEPOSITARY AND COMPLETE THE FOLLOWING:

Name(s) of Registered Holder(s): _____

Window Ticket Number (if any): _____

Date of Execution of Notice of Guaranteed Delivery: _____

Name of Institution that Guaranteed Delivery: _____

If Delivered by Book-Entry Transfer, Check Box:   ☐

Name of Tendering Institution: _____

Account Number: _____

Transaction Code Number: _____

NOTE: SIGNATURES MUST BE PROVIDED AT THE END OF THIS LETTER OF TRANSMITTAL. PLEASE READ THE INSTRUCTIONS SET FORTH IN THIS LETTER OF TRANSMITTAL CAREFULLY.

Ladies and Gentlemen:

The undersigned hereby tenders to EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*" or "*Parent*"), the above-described shares of common stock, par value $.01 per share ("*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), for $26.00 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), receipt of which is hereby acknowledged, and in this Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements hereto or thereto, collectively constitute the "*Offer*"). The undersigned understands that Purchaser reserves the right to transfer or assign, in whole or from time to time in part, to one or more of its affiliates the right to purchase Shares tendered pursuant to the Offer, but any such transfer or assignment will not relieve Purchaser of its obligations under the Offer or prejudice your rights to receive payment for Shares validly tendered and accepted for payment. The undersigned understands that Purchaser intends to amend the Offer to reduce the offer price to $25.74 per share, net to the seller in cash (subject to applicable withholding taxes), without interest thereon, in the event that the stockholders of Take-Two approve, at Take-Two's 2008 annual meeting of stockholders to be held on April 10, 2008, amendments to Take-Two's Incentive Stock Plan to increase the number of shares reserved for issuance under the Plan and to permit the issuance of awards under such plan to consultants. This reduction to the per share offer price reflects, assuming a current Take-Two capitalization as described in "Introduction" to the Offer to Purchase, the reallocation of the aggregate price payable by Purchaser in the Offer and the Merger (as defined in the Offer to Purchase) that would need to be made assuming 780,000 shares of restricted stock of the Company that would be issued to ZelnickMedia Corporation pursuant to its management agreement with the Company would vest and not be forfeited upon our purchase of Shares pursuant to the Offer (and that the aggregate amount to be paid by Purchaser in the Offer and the Merger is the same whether or not such shares are issued).

Upon the terms and subject to the conditions of the Offer (and if the Offer is extended or amended, the terms of any such extension or amendment), and subject to, and effective upon, acceptance for payment of Shares tendered herewith, in accordance with the terms of the Offer, the undersigned hereby sells, assigns and transfers to, or upon the order of, Purchaser all right, title and interest in and to all Shares that are being tendered hereby and all dividends, distributions and transfers to, or upon the order of, Purchaser all right, title and interest in and to all Shares that are being tendered hereby and all dividends, distributions (including, without limitation, distributions of additional Shares or other securities) and rights declared, paid or distributed in respect of such Shares on or after the date of this Offer to Purchase (collectively, "*Distributions*") and irrevocably appoints the Depositary the true and lawful agent and attorney-in-fact of the undersigned with respect to such Shares and any and all Distributions, with full power of substitution and resubstitution (such power of attorney being deemed to be an irrevocable power coupled with an interest), to (i) deliver Share Certificates evidencing such Shares (and all Distributions), or transfer ownership of such Shares (and all Distributions) on the account books maintained by the Book-Entry Transfer Facility, together, in either case, with all accompanying evidences of transfer and authenticity, to or upon the order of the Purchaser, (ii) present such Shares (and all Distributions) for transfer on the books of the Company and (iii) receive all benefits and otherwise exercise all rights of beneficial ownership of such Shares (and all Distributions), all in accordance with the terms of the Offer.

By executing this Letter of Transmittal, the undersigned irrevocably appoints Warren C. Jenson, Glen A. Kohl and Stephen G. Bené, and each of them, as attorneys-in-fact and proxies of the undersigned, in the manner set forth in this Letter of Transmittal, each with full power of substitution and resubstitution, to the full extent of the undersigned's rights with respect to (a) the Shares tendered by the undersigned and accepted for payment by Purchaser and (b) any and all non-cash dividends, Distributions, rights or other securities issued or issuable on or after the date of the Offer to Purchase in respect of such tendered and accepted Shares. All such proxies shall be considered coupled with an interest in the tendered Shares. This appointment and proxies shall be effective if,

when and only to the extent that Purchaser accepts such Shares for payment pursuant to the Offer. The undersigned acknowledges and agrees that, upon such acceptance for payment, all prior proxies given by the undersigned with respect to his, her or its Shares and such other securities will, without further action, be revoked, and no subsequent proxies may be given nor any subsequent written consents executed (and, if given or executed, will not be deemed effective). Without limiting the foregoing, the proxy granted to the aforementioned designees of the Purchaser shall include the power to exercise all voting and other rights of the undersigned as such designees, in their sole discretion, may deem proper at any annual, special, adjourned or postponed meeting of the Company's stockholders (or in respect of any action by stockholder consent in lieu of a meeting of the Company's stockholders). The undersigned acknowledges that in order for Shares or other securities to be deemed validly tendered hereunder and otherwise pursuant to the Offer, immediately upon Purchaser's acceptance for payment of such Shares, Purchaser must be able to exercise full voting and other rights with respect to such Shares.

The undersigned hereby represents and warrants that the undersigned has full power and authority to tender, sell, assign and transfer Shares tendered hereby (and all Distributions), and that when such Shares are accepted for payment by Purchaser, Purchaser will acquire good, marketable and unencumbered title thereto (and to all Distributions), free and clear of all liens, restrictions, charges and encumbrances, and that none of such Shares or Distributions will be subject to any adverse claim. The undersigned, upon request, shall execute and deliver all additional documents deemed by the Depositary or Purchaser to be necessary or desirable to complete the sale, assignment and transfer of Shares tendered (and all Distributions assigned or transferred) hereby. In addition, the undersigned shall remit and transfer promptly to the Depositary for the account of Purchaser, all Distributions in respect of Shares tendered hereby, accompanied by appropriate documentation of transfer, and, pending such remittance and transfer or appropriate assurance thereof, Purchaser shall be entitled to all rights and privileges as owner of each such Distribution and may withhold the entire purchase price of Shares tendered hereby or deduct from such purchase price the amount or value of such Distribution, as determined by Purchaser in its sole discretion.

No authority herein conferred or agreed to be conferred shall be affected by, and all such authority shall survive, the death or incapacity of the undersigned, and any obligation of the undersigned hereunder shall be binding upon the heirs, personal representatives, successors and assigns of the undersigned. Except as stated in the Offer, this tender is irrevocable.

The undersigned understands that valid tenders of Shares pursuant to any one of the procedures described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase and in the Instructions hereto will constitute a binding agreement between the undersigned and Purchaser upon the terms and subject to the conditions of the Offer, including, without limitation, the undersigned's representation and warranty that the undersigned owns all Shares being tendered.

Unless otherwise indicated below in the box entitled "Special Payment Instructions", please issue the check for the purchase price and/or return all Share Certificates evidencing Shares not tendered or accepted for payment in the name(s) of the registered holder(s) appearing above under "Description of Shares Tendered". Similarly, unless otherwise indicated below in the box entitled "Special Delivery Instructions", please mail the check for the purchase price of all Shares purchased and return all Share Certificates evidencing Shares not tendered or not accepted for payment (and accompanying documents, as appropriate) to the address(es) of the registered holder(s) appearing above under "Description of Shares Tendered". In the event that the boxes below entitled "Special Payment Instructions" and "Special Delivery Instructions" are both completed, please issue the check for the purchase price of all Shares purchased and return all Share Certificates evidencing Shares not tendered or not accepted for payment in the name(s) of, and deliver such check and return such Share Certificates (and any accompanying documents, as appropriate) to, the person(s) so indicated and at the address so indicated. Unless otherwise indicated below in the box entitled "Special Payment Instructions", please credit any Shares tendered hereby and delivered by book-entry transfer that are not accepted for payment by crediting the account at the Book-Entry Transfer Facility designated above. The undersigned recognizes that Purchaser has no obligation, pursuant to the Special Payment Instructions, to transfer any Shares from the name of the registered holder(s) thereof if Purchaser does not accept for payment any Shares tendered hereby.

**SPECIAL PAYMENT INSTRUCTIONS**
**(SEE INSTRUCTIONS 1, 4, 5 AND 6)**

To be completed ONLY if the check for the purchase price of Shares purchased or Share Certificates evidencing Shares not tendered or not purchased are to be issued in the name of someone other than the undersigned.

Issue ☐ Check ☐ Share Certificate(s) to:

Name:

                                        **(Print)**

Address:

                                    **(Include Zip Code)**

                        **(Taxpayer Identification or Social Security Number)**
                        **(See Substitute Form W-9 Included Herein)**

☐  Credit Shares delivered by book-entry transfer and not purchased to the account set forth below:

DTC
Account
Number:

## SPECIAL DELIVERY INSTRUCTIONS
### (SEE INSTRUCTIONS 1, 4, 5 AND 6)

To be completed ONLY if the check for the purchase price of Shares purchased or Share Certificates evidencing Shares not tendered or not purchased are to be mailed to someone other than the undersigned, or to the undersigned at an address other than that shown under "Description of Shares Tendered" above.

Mail ☐ Check ☐ Share Certificate(s) to:

Name:

(Print)

Address:

(Include Zip Code)

(Taxpayer Identification or Social Security Number)
(See Substitute Form W-9 Included Herein)

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

**IMPORTANT**
**STOCKHOLDERS SIGN HERE**
(PLEASE COMPLETE SUBSTITUTE FORM W-9 INCLUDED HEREIN)

_____

Signature(s) of Holder(s)

Dated: _____

(Must be signed by registered holder(s) exactly as name(s) appear(s) on the Share Certificates or on a security position listing or by person(s) authorized to become registered holder(s) by certificates and documents transmitted herewith. If signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, please provide the following information and see Instruction 5.)

Name(s): _____

(Please Print)

Capacity (full title): _____

Address: _____ .

(Include Zip Code)

Daytime Area Code and Telephone Number: _____

Tax Identification or Social Security Number: _____

(SEE SUBSTITUTE FORM W-9 INCLUDED HEREIN)
**GUARANTEE OF SIGNATURE(S)**
(IF REQUIRED — SEE INSTRUCTIONS 1 AND 5)
**FOR USE BY FINANCIAL INSTITUTIONS ONLY.**
**FINANCIAL INSTITUTIONS: PLACE MEDALLION GUARANTEE IN SPACE BELOW**

Authorized Signature: _____

Name(s): _____

(Please Print)

Name of Firm: _____

Address: _____

(Include Zip Code)

Daytime Area Code and Telephone Number: _____

Dated: _____

INSTRUCTIONS
FORMING PART OF THE TERMS AND CONDITIONS OF THE OFFER

1.    **Guarantee of Signatures.**

Except as otherwise provided below, all signatures on this Letter of Transmittal must be guaranteed by a financial institution (including most commercial banks, savings and loan associations and brokerage houses) that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program (each an "*Eligible Institution*"). No signature guarantee is required on this Letter of Transmittal if (i) this Letter of Transmittal is signed by the registered holder(s) of the Shares (which term, for purposes of this document, includes any participant in the Book-Entry Transfer Facility's system whose name appears on a security position listing as the owner of the Shares) tendered herewith and such registered holder(s) have not completed the box entitled "Special Delivery Instructions" or the box entitled "Special Payment Instructions" on this Letter of Transmittal, or (ii) such Shares are tendered for the account of an Eligible Institution. See Instruction 5.

2.    **Delivery of Letter of Transmittal and Shares.**

This Letter of Transmittal is to be used if either Share Certificates are to be forwarded herewith or, unless an Agent's Message (as defined in the Offer to Purchase) is utilized, if deliveries are to be made by book-entry transfer pursuant to the procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase. Share Certificates for all physically tendered Shares, or a confirmation of a book-entry transfer into the Depositary's account at the Book-Entry Transfer Facility of all Shares delivered by book-entry transfer, as well as a properly completed and duly executed Letter of Transmittal (or a manually signed facsimile thereof) and any other documents required by this Letter of Transmittal, or an Agent's Message in the case of a book-entry transfer, must be received by the Depositary at its address set forth on the front page of this Letter of Transmittal prior to the Expiration Date (as defined in the Offer to Purchase) (or the expiration of a Subsequent Offering Period (as defined in the Offer to Purchase), if applicable). If Share Certificates are forwarded to the Depositary in multiple deliveries, a properly completed and duly executed Letter of Transmittal must accompany each such delivery. Stockholders whose Share Certificates are not immediately available, who cannot deliver their Share Certificates and all other required documents to the Depositary prior to the Expiration Date or who cannot complete the procedure for delivery by book-entry transfer on a timely basis, may tender their Shares pursuant to the guaranteed delivery procedure described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase. Pursuant to such procedure: (i) such tender must be made by or through an Eligible Institution; (ii) a properly completed and duly executed Notice of Guaranteed Delivery, substantially in the form provided by Purchaser, must be received by the Depositary prior to the Expiration Date; and (iii) Share Certificates representing all physically delivered Shares in proper form for transfer by delivery, or a confirmation of a book-entry transfer into the Depositary's account at the Book-Entry Transfer Facility of all Shares, in each case together with a properly completed and duly executed Letter of Transmittal (or a manually signed facsimile thereof), with any required signature guarantees (or in the case of a book-entry transfer, an Agent's Message (as defined in "The Offer—Section 2—Acceptance for Payment and Payment" of the Offer to Purchase)), and any other documents required by this Letter of Transmittal, must be received by the Depositary within three Nasdaq Global Select Market trading days of the date of execution of such Notice of Guaranteed Delivery, all as provided in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase.

THE METHOD OF DELIVERY OF SHARES, THE LETTER OF TRANSMITTAL AND ALL OTHER REQUIRED DOCUMENTS, INCLUDING DELIVERY THROUGH THE BOOK-ENTRY TRANSFER FACILITY, IS AT THE ELECTION AND SOLE RISK OF THE TENDERING STOCKHOLDER, AND THE DELIVERY WILL BE DEEMED MADE ONLY WHEN ACTUALLY RECEIVED BY THE DEPOSITARY. IF DELIVERY IS BY MAIL, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED, PROPERLY INSURED, IS RECOMMENDED. IN ALL CASES, SUFFICIENT TIME SHOULD BE ALLOWED TO ENSURE TIMELY DELIVERY.

No alternative, conditional or contingent tenders will be accepted, and no fractional Shares will be purchased. By execution of this Letter of Transmittal (or a manually signed facsimile hereof), the undersigned waives any right to receive any notice of the acceptance for payment of the Shares.

3.   **Inadequate Space.**

If the space provided under "Description of Shares Tendered" is inadequate, the Share Certificate numbers, the number of Shares evidenced by such Share Certificates and the number of Shares tendered should be listed on a separate signed schedule and attached hereto.

4.   **Partial Tenders (not applicable to stockholders who tender by book-entry transfer).**

If fewer than all the Shares represented by any Share Certificate delivered to the Depositary are to be tendered, fill in the number of Shares which are to be tendered in the box entitled "Number of Shares Tendered." In such case, a new certificate for the remainder of the Shares represented by the old certificate will be sent to the person(s) signing this Letter of Transmittal, unless otherwise provided in the box entitled "Special Delivery Instructions" in this Letter of Transmittal, as promptly as practicable following the expiration or termination of the Offer. All Shares represented by certificates delivered to the Depositary will be deemed to have been tendered unless otherwise indicated.

5.   **Signatures on Letter of Transmittal; Stock Powers and Endorsements.**

If this Letter of Transmittal is signed by the registered holder(s) of the Shares tendered hereby, the signature(s) must correspond with the name(s) as written on the face of the Share Certificates without alteration, enlargement or any change whatsoever.

If any of the Shares tendered hereby are held of record by two or more persons, all such persons must sign this Letter of Transmittal.

If any of the Shares tendered hereby are registered in names of different holders, it will be necessary to complete, sign and submit as many separate Letters of Transmittal as there are different registrations of Shares.

If this Letter of Transmittal is signed by the registered holder(s) of Shares tendered hereby, no endorsements of Share Certificates or separate stock powers are required unless payment of the purchase price is to be made to, or Shares not tendered or not purchased are to be returned or issued in the name of, any person other than the registered holder(s). If this Letter of Transmittal is signed by a person other than the registered holder(s) of the Share Certificate(s) evidencing Shares tendered hereby, the Share Certificate(s) tendered hereby must be endorsed or accompanied by appropriate stock powers, in either case, signed exactly as the name(s) of the registered holder(s) appear(s) on such Share Certificate(s). Signature(s) on such Share Certificates or stock powers must be guaranteed by an Eligible Institution.

If this Letter of Transmittal or any Share Certificate or stock power is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person should so indicate when signing, and proper evidence satisfactory to Purchaser of the authority of such person so to act must be submitted.

6.   **Stock Transfer Taxes.**

Purchaser will pay any stock transfer taxes with respect to the sale and transfer of any Shares to it or its order pursuant to the Offer. If, however, payment of the purchase price is to be made to, or Shares not tendered or not purchased are to be returned in the name of, any person other than the registered holder(s), or if a transfer tax is imposed for any reason other than the sale or transfer of Shares to Purchaser pursuant to the Offer, then the amount of any stock transfer taxes (whether imposed on the registered holder(s), such other person or otherwise) will be deducted from the purchase price unless satisfactory evidence of the payment of such taxes, or exemption therefrom, is submitted herewith.

Except as provided in this Instruction 6, it will not be necessary for transfer tax stamps to be affixed to the Share Certificates evidencing the Shares tendered hereby.

7.   **Special Payment and Delivery Instructions.**

If the check for the purchase price of any Shares purchased is to be issued to, or any Shares not tendered or not purchased are to be returned or issued in the name of, a person other than the person(s) signing this Letter of Transmittal or if the check or any Share Certificates for Shares not tendered or not purchased are to be mailed to someone other than the person(s) signing this Letter of Transmittal or to the person(s) signing this Letter of Transmittal at an address other than that shown above, the appropriate boxes on this Letter of Transmittal should be completed. Stockholders tendering Shares by book-entry transfer may request that Shares not purchased be credited to such account at the Book-Entry Transfer Facility as such stockholder may designate under "Special Payment Instructions." If no such instructions are given, any such Shares not purchased will be returned by crediting the account at the Book-Entry Transfer Facility designated above.

8.   **Substitute Form W-9.**

Under U.S. federal income tax laws, the Depositary will be required to withhold a portion of the amount of any payments made to certain stockholders pursuant to the Offer. In order to avoid such backup withholding, each tendering stockholder that is a "U.S. holder" (as defined in "The Offer—Section 5—Certain Tax Considerations" of the Offer to Purchase), and each other U.S. payee, must provide the Depositary with such holder's or payee's correct taxpayer identification number ("*TIN*") and certify that such holder or payee is not subject to such backup withholding by completing the attached Substitute Form W-9. Certain holders or payees (including, among others, corporations, non-resident foreign individuals and foreign entities) are not subject to these backup withholding and reporting requirements. For further information concerning backup withholding see "IMPORTANT TAX INFORMATION" below.

Failure to complete the Substitute Form W-9 will not, by itself, cause Shares to be deemed invalidly tendered, but may require the Depositary to withhold a portion of the amount of any payments made pursuant to the Offer. NOTE: FAILURE TO COMPLETE AND RETURN THE SUBSTITUTE FORM W-9 MAY RESULT IN BACKUP WITHHOLDING OF U.S. FEDERAL INCOME TAX AT A 28% RATE ON ANY PAYMENTS MADE TO YOU PURSUANT TO THE OFFER. PLEASE REVIEW THE "IMPORTANT TAX INFORMATION" SECTION BELOW AND THE ENCLOSED "GUIDELINES FOR CERTIFICATION OF TIN ON SUBSTITUTE FORM W-9" FOR ADDITIONAL DETAILS.

9.   **Mutilated, Lost, Stolen or Destroyed Certificates.**

If any Share Certificate(s) which represented Shares has been mutilated, lost, stolen, or destroyed, the stockholder should promptly notify Take-Two's transfer agent for the Shares. The holder will then be instructed as to the steps that must be taken in order to replace the Share Certificate. This Letter of Transmittal and related documents cannot be processed until the procedures for replacing lost or destroyed certificates have been followed.

10.   **Waiver of Conditions; Interpretation.**

Purchaser reserves the absolute right to waive any condition of the Offer to the extent permitted by applicable law or any defect or irregularity in the tender of any Shares of any particular stockholder, including without limitation the undersigned, whether or not similar defects or irregularities are waived in the case of other stockholders. Purchaser's interpretation of the terms and conditions of the Offer (including, without limitation, this Letter of Transmittal and these Instructions) will be final and binding.

11.  **Requests for Assistance or Additional Copies.**

Any questions and requests for assistance may be directed to the Information Agent or the Dealer Manager for the Offer at their respective addresses and telephone numbers set forth on the back cover of this Letter of Transmittal. Additional copies of the Offer to Purchase, this Letter of Transmittal, the Notice of Guaranteed Delivery and other related materials may be obtained from the Information Agent.

IMPORTANT: THIS LETTER OF TRANSMITTAL (OR MANUALLY SIGNED FACSIMILE HEREOF), PROPERLY COMPLETED AND DULY EXECUTED (TOGETHER WITH ANY REQUIRED SIGNATURE GUARANTEES (OR, IN THE CASE OF A BOOK-ENTRY TRANSFER, AN AGENT'S MESSAGE) AND SHARE CERTIFICATES OR CONFIRMATION OF BOOK-ENTRY TRANSFER AND ALL OTHER REQUIRED DOCUMENTS) OR A PROPERLY COMPLETED AND DULY EXECUTED NOTICE OF GUARANTEED DELIVERY MUST BE RECEIVED BY THE DEPOSITARY PRIOR TO THE EXPIRATION DATE (AS DEFINED IN THE OFFER TO PURCHASE).

IMPORTANT TAX INFORMATION

Under U.S. federal income tax law, a U.S. holder whose tendered Shares are accepted for payment is required by law to provide the Depositary (as payer) with such holder's correct TIN on Substitute Form W-9 below. If such holder is an individual, the TIN is such holder's social security number. If the Depositary is not provided with the correct TIN, the holder may be subject to penalties imposed by the Internal Revenue Service ("*IRS*") and payments that are made to such holder with respect to Shares purchased pursuant to the Offer may be subject to backup withholding.

Certain holders (including, among others, corporations, non-resident foreign individuals and foreign entities) are not subject to these backup withholding and reporting requirements. In order for a non-U.S. holder (as defined in "The Offer—Section 5—Certain Tax Considerations" of the Offer to Purchase) to qualify as an exempt recipient, such holder must submit the appropriate IRS Form W-8, signed under penalties of perjury, attesting to such person's foreign status. Each IRS Form W-8 is available on the IRS website (www.irs.gov) or can be obtained from the Depositary.

If backup withholding applies, the Depositary is required to withhold 28% of any payments made to the holder. Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained from the IRS provided that the required information is furnished to the IRS.

For further information concerning backup withholding and instructions for completing the Substitute Form W-9 (including how to obtain a TIN if you do not have one and how to complete the Substitute Form W-9 if Shares are held in more than one name), consult the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9."

**Purpose of Substitute Form W-9**

To prevent backup withholding on payments that are made to a U.S. holder with respect to Shares purchased pursuant to the Offer, the holder is required to notify the Depositary of such holder's correct TIN by completing the form below certifying (i) that the TIN provided on Substitute Form W-9 is correct (or that such holder is awaiting a TIN) and (ii) that such holder is not subject to backup withholding because (a) such holder has not been notified by the IRS that such holder is subject to backup withholding as a result of a failure to report all interest or dividends, (b) the IRS has notified such holder that such holder is no longer subject to backup withholding or (c) such holder is exempt from backup withholding.

**What Number to Give the Depositary**

U.S. holders are required to give the Depositary the social security number or employer identification number of the record holder of the Shares tendered hereby. If the Shares are in more than one name or are not in the name of the actual owner, consult the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9" for additional guidance on which number to report. If the tendering U.S. holder has not been issued a TIN and has applied for a number or intends to apply for a number in the near future, such holder should check the "Awaiting TIN" box in Part II, sign and date the Substitute Form W-9 and complete the Certificate of Awaiting Taxpayer Identification Number below. Notwithstanding that the "Awaiting TIN" box is checked in Part II and the Certificate of Awaiting Taxpayer Identification Number is completed, the Depositary will withhold 28% of all payments of the purchase price to such holder until a TIN is provided to the Depositary. Such amounts will be refunded to such surrendering holder if a TIN is provided to the Depositary within 60 days.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

| | PAYOR'S NAME: |
|---|---|
| **SUBSTITUTE**<br><br>Form **W-9**<br>Department of the Treasury,<br>Internal Revenue Service | Name: _____<br><br>Address: _____<br>(Number and Street)<br><br>(City) (State) (Zip Code) |

| **Request for Taxpayer Identification Number (TIN) and Certification** | Check appropriate box:<br>Individual/Sole Proprietor ☐<br>Partnership ☐ | Corporation ☐<br>Other (specify) ☐ | Exempt from<br>Backup Withholding ☐ |
|---|---|---|---|

| | Part I.—Please provide your taxpayer or identification number in the space at right. If awaiting TIN, *write ":Applied For."* | SSN: _____ or<br><br>EIN: _____ |
|---|---|---|

Part II.—Awaiting TIN  ☐
Part III.—Certification   Under penalties of perjury, I certify that:

(1)   The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me);

(2)   I am not subject to backup withholding either because (a) I am exempt from backup withholding, (b) I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

(3)   I am a United States person (including a United States resident alien).

Certification Instructions—You must cross out item (2) in Part III above if you have been notified by the IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received notification from the IRS that *you are no longer subject to backup withholding, do not cross out item (2).*

| Sign Here  ☐ | Signature: _____ | Date: _____ |
|---|---|---|

**NOTE: FAILURE TO COMPLETE AND RETURN THIS FORM MAY RESULT IN A $50 PENALTY IMPOSED BY THE INTERNAL REVENUE SERVICE AND BACKUP WITHHOLDING OF 28% OF ANY PAYMENTS MADE TO YOU PURSUANT TO THE OFFER. PLEASE REVIEW THE ENCLOSED GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9 FOR ADDITIONAL DETAILS.**

**NOTE: YOU MUST COMPLETE THE FOLLOWING CERTIFICATE IF YOU CHECKED THE BOX IN PART II OF THE SUBSTITUTE FORM W-9.**

## CERTIFICATION OF AWAITING TAXPAYER IDENTIFICATION NUMBER

I certify under penalties of perjury that a taxpayer identification number has not been issued to me, and either (1) I have mailed or delivered an application to receive a taxpayer identification number to the appropriate IRS Center or Social Security Administration office or (2) I intend to mail or deliver an application in the near future. I understand that if I do not provide a taxpayer identification number by the time of payment, 28% of all reportable payments made to me thereafter will be withheld until I provide a taxpayer identification number to the payer and that, if I do not provide my taxpayer identification number within sixty days, such retained amounts shall be remitted to the IRS as backup withholding.

| _____ | _____ |
|---|---|
| Signature | Date |

FACSIMILES OF THIS LETTER OF TRANSMITTAL, PROPERLY COMPLETED AND DULY SIGNED, WILL BE ACCEPTED. THIS LETTER OF TRANSMITTAL AND SHARE CERTIFICATES AND ANY OTHER REQUIRED DOCUMENTS SHOULD BE SENT OR DELIVERED BY EACH TAKE-TWO STOCKHOLDER OR SUCH STOCKHOLDER'S BROKER, DEALER, COMMERCIAL BANK, TRUST COMPANY OR OTHER NOMINEE TO THE DEPOSITARY AT ITS ADDRESS SET FORTH BELOW.

*The Depositary For The Offer Is:*

## U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

Any questions and requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephones number set forth below. Additional copies of the Offer to Purchase, the Letter of Transmittal and the Notice of Guaranteed Delivery may be obtained from the Information Agent at the address and telephone number set forth below. Holders of Shares may also contact their broker, dealer, commercial bank or trust company or other nominee for assistance concerning the Offer.

*The Information Agent for the Offer is:*

## Georgeson
Georgeson Inc.
199 Water Street, 26th Floor

New York, New York 10038

Banks and Brokers Call: (212) 440-9800
All Others Please Call Toll-Free: (800) 213-0473

*The Dealer Manager for the Offer is:*

## Morgan Stanley
Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Call Toll Free: (877) 247-9865

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Exhibit (a)(1)(C)

## NOTICE OF GUARANTEED DELIVERY

to

**Tender Shares of Common Stock**

of

**Take-Two Interactive Software, Inc.**

to

**EA08 Acquisition Corp.**
a wholly-owned subsidiary of

**Electronic Arts Inc.**

THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11, 2008, UNLESS THE OFFER IS EXTENDED.

(Not be used for Signature Guarantees)

This Notice of Guaranteed Delivery, or a form substantially equivalent to this form, must be used to accept the Offer (as defined below) (i) if certificates (the "*Share Certificates*") evidencing shares of common stock, par value $.01 per share (the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), are not immediately available, (ii) if Share Certificates and all other required documents cannot be delivered to U.S. Bank National Association, as Depositary (the "*Depositary*"), prior to the Expiration Date (as defined in "The Offer—Section 1—Terms of the Offer" of the Offer to Purchase (as defined below)) or (iii) if the procedure for book-entry transfer cannot be completed on a timely basis. This Notice of Guaranteed Delivery may be delivered by hand, facsimile transmission or mail to the Depositary. See "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase.

*The Depositary For The Offer Is:*

## U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

DELIVERY OF THIS NOTICE OF GUARANTEED DELIVERY TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF INSTRUCTIONS VIA FACSIMILE TRANSMISSION TO A NUMBER OTHER THAN AS LISTED ABOVE, DOES NOT CONSTITUTE A VALID DELIVERY TO THE DEPOSITARY.

THIS NOTICE OF GUARANTEED DELIVERY IS NOT TO BE USED TO GUARANTEE SIGNATURES. IF A SIGNATURE ON A LETTER OF TRANSMITTAL IS REQUIRED TO BE GUARANTEED BY AN "ELIGIBLE INSTITUTION" UNDER THE INSTRUCTIONS THERETO, SUCH SIGNATURE GUARANTEE MUST APPEAR IN THE APPLICABLE SPACE PROVIDED IN THE SIGNATURE BOX ON THE LETTER OF TRANSMITTAL.

THE GUARANTEE ON THE REVERSE SIDE MUST BE COMPLETED.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Ladies and Gentlemen:

The undersigned hereby tenders to EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*"), upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*"), receipt of which is hereby acknowledged, the number of Shares specified below pursuant to the guaranteed delivery procedure set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Offer to Purchase.

Name(s) of Record Holder(s): _____

(Please Print)

Address(es): _____

Area Code and Tel. No.: _____

Signature(s): _____

Number of Shares: _____

Certificate Nos. (if available): _____

Check this box if Shares will be tendered by book-entry transfer:  ☐

Depositary Trust Company
Account Number at Book-
Entry Transfer Facility: _____

Dated: _____, 2008

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

GUARANTEE
(NOT TO BE USED FOR SIGNATURE GUARANTEES)

The undersigned, a firm that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program or any other "eligible guarantor institution" (as such term is defined in Rule 17Ad-15 under the Securities Exchange Act of 1934, as amended), guarantees (a) that the above named person(s) "own(s)" the Shares tendered hereby within the meaning of Rule 14e-4 under the Securities Exchange Act of 1934, as amended, (b) that such tender of Shares complies with Rule 14e-4 and (c) delivery to the Depositary of the Shares tendered hereby, in proper form for transfer, or a Book-Entry Confirmation (as defined in the Offer to Purchase), together with a properly completed and duly executed Letter of Transmittal (or a manually signed facsimile thereof) with any required signature guarantees, or an Agent's Message (as defined in the Offer to Purchase) in the case of a book-entry delivery, and any other required documents, within three Nasdaq Global Select Market trading days after the date hereof.

The Eligible Institution that completes this form must communicate the guarantees to the Depositary and must deliver the Letter of Transmittal and Share Certificates to the Depositary within the time period shown herein. Failure to do so could result in a financial loss to such Eligible Institution.

Name of Firm: _____

Address: _____

                                                                                   Zip Code

Area Code and Tel. No.: _____

Authorized Signature: _____

Name: _____
                 Please Print

Title: _____

Dated: _____, 2008

**NOTE:** **DO NOT SEND SHARE CERTIFICATES WITH THIS NOTICE. SHARE CERTIFICATES SHOULD BE SENT WITH YOUR LETTER OF TRANSMITTAL.**

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Exhibit (a)(1)(D)

# OFFER TO PURCHASE FOR CASH

### All Outstanding Shares of Common Stock

of

## Take-Two Interactive Software, Inc.

at

### $26.00 Net Per Share in Cash

by

## EA08 Acquisition Corp.

a wholly-owned subsidiary of

## Electronic Arts Inc.

### THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11, 2008, UNLESS THE OFFER IS EXTENDED.

March 13, 2008

*To Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees:*

EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Electronic Arts*"), is offering to purchase all the issued and outstanding shares of common stock, par value $.01 per share (the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), at a price of $26.00 per share net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*") and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") enclosed herewith. Please furnish copies of the enclosed materials to those of your clients in whose accounts you hold Shares registered in your name or in the name of your nominee.

On February 15, 2008, Take-Two announced that it had amended the terms of its management agreement with ZelnickMedia Corporation ("*ZelnickMedia*"), pursuant to which ZelnickMedia has agreed to provide the services of Strauss Zelnick, Ben Feder and Karl Slatoff as the Executive Chairman, Chief Executive Officer and Executive Vice President, respectively, of Take-Two. Pursuant to the amendment to the management agreement, Take-Two, among other things, agreed to grant to ZelnickMedia Corporation 1,500,000 shares of restricted stock under the Company's Incentive Stock Plan, subject to Take-Two's stockholders approving at its 2008 annual meeting of stockholders, to be held on April 10, 2008, an amendment to Take-Two's Incentive Stock Plan providing for an increase in the number of shares of Take-Two common stock reserved for issuance under the Incentive Stock Plan by 2,000,000 shares and permitting the issuance of awards under that Plan to consultants (which would include ZelnickMedia). Take-Two's agreements with ZelnickMedia provide that if such shares of restricted stock are issued to ZelnickMedia, at least 780,000 of such shares would vest as a result of a purchase of Shares pursuant to the Offer. In the event that the amendment to the Incentive Stock Plan is approved by Take-Two's stockholders, we intend to amend the Offer to reduce the purchase price we are offering in the Offer to $25.74 per share, net to the seller in cash (subject to applicable withholding taxes), without interest (which reflects the reduction required if such shares are issued to keep the aggregate amount to be paid by Purchaser in the Offer and the Merger the same as would be paid if such shares were not issued, assuming the capitalization of Take-Two described in "Introduction" to the Offer to Purchase). If such an amendment is made, Purchaser will extend the Offer to the extent required by applicable law.

**The Offer is subject to certain conditions contained in the Offer to Purchase.**

For your information and for forwarding to your clients for whom you hold Shares registered in your name or in the name of your nominee, we are enclosing the following documents:

1. Offer to Purchase dated March 13, 2008;

2. Letter of Transmittal, including a Substitute Form W-9, for your use in accepting the Offer and tendering Shares on behalf of your clients and for the information of your clients;

3. Notice of Guaranteed Delivery, to be used to accept the Offer if the Shares and all other required documents are not immediately available or cannot be delivered to U.S. Bank National Association, the Depositary for the Offer, prior to the expiration of the Offer or if the procedure for book-entry transfer cannot be completed prior to the expiration of the Offer;

4. A form of letter which may be sent to your clients for whose accounts you hold Shares registered in your name or in the name of your nominee, with space provided for obtaining such clients' instructions with regard to the Offer;

5. Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9; and

6. Return envelope addressed to the Depositary.

**Your prompt action is requested. We urge you to contact your clients as promptly as possible. Please note that the Offer and withdrawal rights expire at 12:00 midnight, New York City time, on Friday, April 11, 2008, unless the Offer is extended.**

In all cases, payment for Shares accepted for payment pursuant to the Offer will be made only after timely receipt by the Depositary of (i) the share certificates representing such Shares or timely Book-Entry Confirmation (as defined in the Offer to Purchase) of the book-entry transfer of such Shares (if such procedure is available), into the Book-Entry Transfer Facility (as defined in the Offer to Purchase), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Offer to Purchase; (ii) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message (as defined in the Offer to Purchase); and (iii) any other documents required by the Letter of Transmittal.

If holders of Shares wish to tender, but it is impracticable for them to forward their certificates or other required documents prior to the expiration of the Offer, a tender may be effected by following the guaranteed delivery procedure described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase.

Purchaser will not pay any fees or commissions to any broker, dealer or other person (other than the Dealer Manager, the Depositary and the Information Agent as described in the Offer to Purchase) in connection with the solicitation of tenders of Shares pursuant to the Offer. Purchaser will, however, upon request, reimburse brokers, dealers, banks and trust companies for reasonable and necessary costs and expenses incurred by them in forwarding materials to their customers. Purchaser will pay any stock transfer taxes incident to the transfer to it of validly tendered Shares, except as otherwise provided in Instruction 6 of the Letter of Transmittal.

Any inquiries you may have with respect to the Offer should be addressed to, and additional copies of the enclosed materials may be obtained from, the Information Agent at the address and telephone number set forth on the back cover of the Offer to Purchase.

Very truly yours,

EA08 Acquisition Corp.

Nothing contained herein or in the enclosed documents shall constitute you or any other person as the agent of Purchaser, Electronic Arts, the Information Agent, the Depositary or any affiliate thereof, or authorize you or any other person to use any document or make any statement on behalf of any of them in connection with the Offer other than the documents enclosed herewith and the statements contained therein.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Exhibit (a)(1)(E)

# OFFER TO PURCHASE FOR CASH
### All Outstanding Shares of Common Stock
of
## Take-Two Interactive Software, Inc.
at
### $26.00 Net Per Share in Cash
by
## EA08 Acquisition Corp.
### a wholly-owned subsidiary of
## Electronic Arts Inc.

**THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11 2008, UNLESS THE OFFER IS EXTENDED.**

*To Our Clients:*

Enclosed for your consideration are an Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), and a related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") relating to the offer by EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*"), to purchase all the issued and outstanding shares of common stock, par value $.01 per share (the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), at a price of $26.00 per share net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer.

The purpose of the Offer and the associated second-step merger is for Electronic Arts, through Purchaser, to acquire control of, and ultimately the entire equity interest in, Take-Two. Purchaser has commenced the Offer as the first step in its plan to acquire all the outstanding Shares, pursuant to which, after completion of the Offer, if successful, Electronics Arts and Purchaser currently intend to have Electronics Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronics Arts consummate a second-step merger or similar business combination with Take-Two (the "*Merger*"). Pursuant to the Merger, Electronic Arts would acquire all of the Shares not purchased pursuant to the Offer (subject to limited exceptions as described in the Offer) at the highest price per share paid by Purchaser pursuant to the Offer (without interest and less applicable withholding taxes).

**We are (or our nominee is) the holder of record of Shares held for your account. A tender of such Shares can be made only by us as the holder of record and pursuant to your instructions. The Letter of Transmittal is furnished to you for your information only and cannot be used by you to tender Shares held by us for your account.**

We request instructions as to whether you wish us to tender any or all of the Shares held by us for your account, upon the terms and subject to the conditions set forth in the Offer.

Your attention is directed to the following:

1. The offer price is $26.00 per share, net to you in cash (subject to applicable withholding taxes), without interest.

2. Purchaser intends to amend the Offer to reduce the offer price to $25.74 per share, net to the seller in cash (subject to applicable withholding taxes), without interest (which reflects the reduction required if such shares are issued to keep the aggregate amount to be paid by Purchaser in the Offer and the Merger the same as would be paid if such shares were not issued, assuming the capitalization of Take-Two described in "Introduction" to the Offer to Purchase), in the event that the stockholders of Take-Two approve, at Take-Two's 2008 annual meeting of stockholders to be held on April 10, 2008, amendments to Take-Two's Incentive Stock Plan to increase the number of shares reserved for issuance under the Plan and to permit the issuance of awards under such plan to consultants. If such an amendment is made, Purchaser will extend the Offer to the extent required by applicable law.

3. The Offer is being made for all issued and outstanding Shares.

4. The Offer and withdrawal rights expire at 12:00 midnight, New York City time, on Friday, April 11, 2008, unless the Offer is extended.

5. The Offer is conditioned upon (i) there having been validly tendered and not withdrawn before the expiration of the Offer at least the number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis (taking into account, without limitation, all shares issuable upon the exercise of any options, warrants, convertible securities or rights or pursuant to other contractual obligations) on the date of the purchase of Shares pursuant to the Offer, (ii) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the Merger, (iii) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer and (iv) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or having been terminated prior to the expiration of the Offer. The Offer is also subject to certain other conditions set forth in the Offer to Purchase.

6. Tendering stockholders will not be obligated to pay brokerage fees or commissions or, subject to Instruction 6 of the Letter of Transmittal, stock transfer taxes on the transfer and sale of Shares pursuant to the Offer. However, federal income tax backup withholding at a rate of 28% may be required, unless an exemption is provided or unless the required taxpayer identification information is provided. See Instruction 8 of the Letter of Transmittal.

If you wish to have us tender any or all of your Shares, please so instruct us by completing, executing and returning to us the instruction form contained in this letter. An envelope to return your instructions to us is enclosed. If you authorize tender of your Shares, all such Shares will be tendered unless otherwise specified on the reverse side of this letter hereof. **Your instructions should be forwarded to us with sufficient time to permit us to submit a tender on your behalf prior to the expiration of the Offer.**

The Offer is being made solely by this Offer to Purchase and the related Letter of Transmittal and is being made to all holders of the Shares (excluding Shares beneficially owned by Electronic Arts and Purchaser). Purchaser is not aware of any jurisdiction where the making of the Offer is prohibited by any administrative or judicial action pursuant to any valid statute. If Purchaser becomes aware of any valid statute prohibiting the making of the Offer or the acceptance of the Shares pursuant thereto, Purchaser will make a good faith effort to comply with such statute. If, after such good faith effort Purchaser cannot comply with any such statute, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares in such jurisdiction. In those jurisdictions where the applicable laws require that the Offer be made by a licensed broker or dealer, the Offer shall be deemed to be made on behalf of Purchaser by the Dealer Manager or one or more registered brokers or dealers licensed under the laws of such jurisdiction.

Instructions with Respect to the Offer to Purchase for Cash
All Outstanding Shares of Common Stock
of
# TAKE-TWO INTERACTIVE SOFTWARE, INC.
at
### $26.00 NET PER SHARE
by
## EA08 ACQUISITION CORP.
a wholly-owned subsidiary of
## ELECTRONIC ARTS INC.

The undersigned acknowledge(s) receipt of your letter, the enclosed Offer to Purchase dated March 13, 2008, and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*"), in connection with the offer by EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., to purchase all the issued and outstanding shares of common stock, par value $.01 per share (the "*Shares*"), of Take-Two Interactive Software, Inc.

This will instruct you to tender the number of Shares indicated below (or, if no number is indicated below, all Shares) that are held for the account of the undersigned, upon the terms and subject to the conditions set forth in the Offer.

Number of Shares to be Tendered:

**SIGN BELOW:**

_____ Shares*

Certificate Nos. (if available): _____

Account Number: _____

Taxpayer Identification or Social Security Number(s):

_____

_____
Signature(s)

_____
Name(s)

_____
Address(es)

Dated _____, 2008

_____ (Zip Code)

_____
Area Code and Telephone Number(s)

* Unless otherwise indicated, it will be assumed that all Shares held for the undersigned's account are to be tendered.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

## GUIDELINES FOR CERTIFICATION OF TAXPAYER
## IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9

**Guidelines for Determining the Proper Identification Number to Give the Payer**—Social Security numbers have nine digits separated by two hyphens: *i.e.*, 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. Employer identification numbers have nine digits separated by only one hyphen: *i.e.*, 00-0000000. The table below will help determine the number to give the payer.

| For this type of account | Give the SOCIAL SECURITY number of: |
|---|---|
| 1. An individual's account | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gifts to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust account (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship account | The owner[3] |

| For this type of account | Give the SOCIAL SECURITY number of: |
|---|---|
| 6. A valid trust, estate, or pension trust | Legal entity (Do not furnish the identifying number of the personal representative or trustee unless the legal entity itself is not designated in the account title).[4] |
| 7. Corporate account | The corporation |
| 8. Association, club, religious, charitable, educational, or other tax-exempt organization account | The organization |
| 9. Partnership account | The partnership |
| 10. A broker or registered nominee | The broker or nominee |
| 11. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district or prison) that receives agricultural program payments | The public entity |

[1]   List first and circle the name of the person whose number you furnish.

[2]   Circle the minor's name and furnish the minor's social security number.

[3]   You must show your individual name, but you may also enter your business or "doing business as" name. You may use either your social security number or employer identification number (if you have one).

[4]   List first and circle the name of the legal trust, estate, or pension trust.

**Note:**   If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION
## NUMBER ON SUBSTITUTE FORM W-9
Page 2

**How to Obtain a TIN**
If you don't have a taxpayer identification number or you don't know your number, obtain
Form SS-5, Application for a Social Security Number Card, or Form SS-4, Application for
Employer Identification Number, at the local office of the Social Security Administration
or the Internal Revenue Service ("IRS") and apply for a number.

**Payees Exempt from Backup Withholding**
Payees exempt from backup withholding on all payments include the following:

- An organization exempt from tax under section 501(a), any IRA, or a custodial
  account under section 403(b)(7) if the account satisfies the requirements of
  Section 401(f)(2).

- The United States or any of its agencies or instrumentalities.

- A state, the District of Columbia, a possession of the United States, or any
  of their political subdivisions or instrumentalities.

- A foreign government or any of its political subdivisions, agencies, or
  instrumentalities.

- An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

- A corporation.

- A foreign central bank of issue.

- A dealer in securities or commodities required to register in the United States, the
  District of Columbia, or a possession of the United States.

- A futures commission merchant registered with the Commodity Futures Trading
  Commission.

- A real estate investment trust.

- An entity registered at all times during the tax year under the Investment Company Act
  of 1940.

- A common trust fund operated by a bank under section 584(a).

- A financial institution.

- A middleman known in the investment community as a nominee or custodian.

- A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends not generally subject to backup
withholding include the following:

- Payments to nonresident aliens subject to withholding under section 1441.

- Payments to partnerships not engaged in a trade or business in the United States and
  that have at least one nonresident alien partner.

- Payments of patronage dividends where the amount received is not paid in money.

- Payments made by certain foreign organizations.

Payments of interest not generally subject to backup withholding include the following:

- Payments of interest on obligations issued by individuals. Note: You may be subject to
  backup withholding if this interest is $600 or more and is paid in the course of the
  payer's trade of business and you have not provided your correct taxpayer
  identification number to the payer.

- Payments of tax-exempt interest (including exempt-interest dividends under section
  852).

- Payments described in section 6049(b)(5) to nonresident aliens.

- Payments on tax-free covenant bonds under section 1451.

- Payments made by certain foreign organizations.

Exempt payees described above should file Substitute Form W-9 to avoid possible
erroneous backup withholding. FURNISH YOUR TAXPAYER IDENTIFICATION
NUMBER, WRITE "EXEMPT" ON THE FACE OF THE FORM IN PART II, SIGN
AND DATE THE FORM, AND RETURN IT TO THE PAYER.

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

Certain payments, other than interest, dividends and patronage dividends that are not subject to information reporting are also not subject to backup withholding. For details, see the regulations under sections 6041, 6041A(a), 6045 and 6050A.

**Privacy Act Notice.**—Section 6109 requires most recipients of dividend, interest or other payments to give their correct taxpayer identification numbers to payers who must report the payments to the IRS. The IRS uses the numbers for identification purposes and to help verify the accuracy of tax returns. Payers must be given the numbers whether or not recipients are required to file tax returns. Payers must generally withhold 28% (or such other rate specified by the Internal Revenue Code) of taxable interest, dividend and certain other payments to a payee who does not furnish a taxpayer identification number to a payer. Certain penalties may also apply.

### Penalties

(1) **Penalty for Failure to Furnish Taxpayer Identification Number.**—If you fail to furnish your correct taxpayer identification number to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

(2) **Civil Penalty for False Information With Respect to Withholding.**—If you make a false statement with no reasonable basis which results in no imposition of backup withholding, you are subject to a penalty of $500.

(3) **Criminal Penalty for Falsifying Information.**—Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**FOR ADDITIONAL INFORMATION CONTACT YOUR TAX CONSULTANT OR THE INTERNAL REVENUE SERVICE.**

Exhibit (a)(1)(G)

This announcement is neither an offer to purchase nor a solicitation of an offer to sell Shares (as defined below). The Offer (as defined below) is made solely by the Offer to Purchase dated March 13, 2008 and the related Letter of Transmittal and any amendments or supplements thereto, and is being made to all holders of Shares. Purchaser (as defined below) is not aware of any jurisdiction where the making of the Offer is prohibited by any administrative or judicial action pursuant to any valid statute. If Purchaser becomes aware of any valid statute prohibiting the making of the Offer or the acceptance of the Shares pursuant thereto, Purchaser will make a good faith effort to comply with such statute. If, after such good faith effort Purchaser cannot comply with any such statute, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares in such jurisdiction. In those jurisdictions where the applicable laws require that the Offer be made by a licensed broker or dealer, the Offer shall be deemed to be made on behalf of Purchaser by Morgan Stanley & Co. Incorporated, the Dealer Manager, or one or more registered brokers or dealers licensed under the laws of such jurisdiction.

**NOTICE OF OFFER TO PURCHASE FOR CASH**
**All Outstanding Shares of Common Stock**
of
**Take-Two Interactive Software, Inc.**
at
**$26.00 Net Per Share**
by
**EA08 Acquisition Corp.**
**a wholly-owned subsidiary of**
**Electronic Arts Inc.**

EA08 Acquisition Corp. ("Purchaser"), a Delaware corporation and a wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("Electronic Arts"), is offering to purchase all issued and outstanding shares of common stock, par value $.01 per share (the "Shares"), of Take-Two Interactive Software, Inc., a Delaware corporation ("Take-Two"), for $26.00 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "Offer to Purchase") and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "Offer").

**THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, APRIL 11, 2008, UNLESS THE OFFER IS EXTENDED.**

The Offer is conditioned upon, among other things, (1) there having been validly tendered and not withdrawn before the expiration of the Offer at least that number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis, (2) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the Merger (as defined below), (3) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer (the "Merger Agreement Condition") and (4) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or been terminated. The Offer is also subject to certain other conditions contained in "The Offer—Section 14—Conditions of the Offer" of the Offer to Purchase.

As disclosed in Take-Two's proxy statement for its annual meeting of stockholders to be held on April 10, 2008, Take-Two has submitted to its stockholders a proposal to amend Take-Two's Incentive Stock Plan to increase the number of shares reserved for issuance under that plan by 2,000,000 shares and to permit the issuance of awards under such plan to consultants, including 1,500,000 shares of restricted stock to ZelnickMedia Corporation ("ZelnickMedia"). Take-Two's

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

agreements with ZelnickMedia provide that if such shares of restricted stock are issued to ZelnickMedia, at least 780,000 of such shares would vest as a result of Purchaser's purchase of Shares pursuant to the Offer. In the event that the stockholders of Take-Two approve this proposal, Purchaser intends to amend the Offer to reduce the offer price to $25.74 net per share. This reduction to the per share offer price reflects, assuming a current Take-Two capitalization as described in "Introduction" to the Offer to Purchase, the reallocation of the aggregate price payable by Purchaser in the Offer and the Merger that would need to be made assuming 780,000 shares of restricted stock of Take-Two that would be issued to ZelnickMedia pursuant to the aforementioned agreements would vest and not be forfeited upon Purchaser's purchase of Shares pursuant to the Offer (and that the aggregate amount to be paid by Purchaser in the Offer and the Merger is the same whether or not such shares are issued). If such an amendment is made, Purchaser will extend the Offer to the extent required by Rule 14e-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The purpose of the Offer is to acquire control of, and ultimately the entire equity interest in, Take-Two. The Offer, as the first step in the acquisition of Take-Two, is intended to facilitate the acquisition of all issued and outstanding Shares. If the Offer is consummated, Electronic Arts and Purchaser intend, as soon as practicable after consummation of the Offer, to have Electronic Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronic Arts consummate a second-step merger or similar business combination with Take-Two (the "Merger"). At the effective time of the Merger, each then outstanding Share (other than Shares held by Electronic Arts and Purchaser, shares held in the treasury of Take-Two, shares held by subsidiaries of Take-Two, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their Shares in accordance with Section 262 of the General Corporation Law of the State of Delaware) would be canceled and converted automatically into the right to receive an amount in cash per share equal to the highest price per share paid by Purchaser pursuant to the Offer, without interest (and less any applicable withholding taxes). Upon consummation of the Merger, Take-Two would be a wholly-owned subsidiary of Electronic Arts.

Electronic Arts is seeking, and intends to continue to seek, to negotiate the acquisition of Take-Two, and the Offer is subject to the Merger Agreement Condition. Subject to applicable law, Purchaser reserves the right to amend the Offer (including amending the number of Shares to be purchased and the offer price), including for purposes of negotiating or entering into a merger agreement with Take-Two. If requested by Take-Two, any such merger agreement may contemplate the termination of the Offer. In the event that Electronic Arts, Purchaser and Take-Two enter into a merger agreement that requires that the Offer be terminated, the Shares would, upon consummation of such merger, be converted into the right to receive the consideration provided for in such merger agreement.

For purposes of the Offer, Purchaser will be deemed to have accepted for payment, and thereby purchased, Shares validly tendered and not withdrawn as, if and when Purchaser gives oral or written notice to U.S. Bank National Association, the Depositary for the Offer, of Purchaser's acceptance of such Shares for payment pursuant to the Offer. In all cases, upon the terms and subject to the conditions of the Offer, payment for Shares purchased pursuant to the Offer will be made by deposit of the purchase price provided therefor with the Depositary, which will act as agent for tendering stockholders for the purpose of receiving payment from Purchaser and transmitting payment to validly tendering stockholders. In all cases, payment for Shares purchased pursuant to the Offer will be made only after timely receipt by the Depositary of (1) the share certificates representing such Shares or timely confirmation of the book-entry transfer of such Shares (if such procedure is available), into the Depositary's account at The Depository Trust Company (the "Book-Entry Transfer Facility"), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Offer to Purchase, (2) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message (as defined in "The Offer—Section 2—Acceptance for Payment and Payment" of the Offer to Purchase) in connection with a book-entry transfer, and (3) any other documents required by the Letter of Transmittal. Upon the deposit of funds with the Depositary for the purpose of making payments to tendering stockholders, Purchaser's obligation to make such payment shall be satisfied and tendering stockholders must thereafter look solely to the Depositary for payment of amounts owed to them by reason of the acceptance for payment of Shares pursuant to the Offer. Under no circumstances will interest on the purchase price for Shares be paid by the Purchaser regardless of any extension of the Offer or by reason of any delay in making such payment. Purchaser will pay any stock transfer taxes incident to the transfer to it of validly tendered Shares, except as otherwise provided in Instruction 6 of the Letter of Transmittal, as well as any charges and expenses of the Depositary and the Information Agent.

"Expiration Date" means 12:00 midnight, New York City time, on Friday, April 11, 2008, unless and until Purchaser, in its sole discretion, shall have extended the period during which the Offer is open, in which case Expiration Date shall mean the latest time and date at which the Offer, as so extended by Purchaser, shall expire. Subject to the applicable rules and regulations of the Securities and Exchange Commission, Purchaser expressly reserves the right (but will not be obligated), in

its sole discretion, at any time and from time to time, to extend the period during which the Offer is open for any reason by giving oral or written notice of the extension to the Depositary and by making a public announcement of the extension. Any such extension of the Offer will be followed as promptly as practicable by public announcement thereof no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date. Purchaser currently has no intention of making available a "subsequent offering period" (within the meaning of Rule 14d-11 under the Exchange Act), but has the right to do so under Rule 14d-11.

If Purchaser extends the Offer or if Purchaser is delayed in its acceptance for payment of or payment (whether before or after its acceptance for payment of Shares) for Shares, or it is unable to pay for Shares pursuant to the Offer for any reason, then, without prejudice to Purchaser's rights under the Offer, the Depositary may retain tendered Shares on behalf of the Purchaser, and such Shares may not be withdrawn except to the extent tendering stockholders are entitled to withdrawal rights as described in "The Offer—Section 4—Withdrawal Rights" of the Offer to Purchase.

If any tendered Shares are not purchased under the Offer for any reason, or if share certificates are submitted representing more Shares than are tendered, certificates representing unpurchased or untendered Shares will be returned, without expense to the tendering stockholder (or, in the case of Shares delivered pursuant to the book-entry transfer procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase, such Shares will be credited to an account maintained within the Book-Entry Transfer Facility), as promptly as practicable following the expiration, termination or withdrawal of the Offer.

Except as otherwise provided below, tenders of Shares under the Offer are irrevocable. Shares tendered under the Offer may be withdrawn at any time on or before the Expiration Date and, unless theretofore accepted for payment as provided herein, may also be withdrawn at any time after May 11, 2008 (or such later date as may apply if the Offer is extended).

For a withdrawal to be effective, a notice of withdrawal must be timely received by the Depositary at one of its addresses set forth on the back cover of the Offer to Purchase. Any such notice of withdrawal must specify the name of the person who tendered the Shares to be withdrawn, the number of Shares to be withdrawn and the name of the registered holder of the Shares to be withdrawn, if different from the name of the person who tendered the Shares. If share certificates evidencing Shares to be withdrawn have been delivered or otherwise identified to the Depositary, then, prior to the physical release of such certificates, the serial numbers shown on such certificates must be submitted to the Depositary and, unless such Shares have been tendered by an Eligible Institution (as defined in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase), the signatures on the notice of withdrawal must be guaranteed by an Eligible Institution. If Shares have been delivered pursuant to the book-entry transfer procedures as set forth in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase, any notice of withdrawal must also specify the name and number of the account at the Book-Entry Transfer Facility to be credited with the withdrawn Shares and otherwise comply with the Book-Entry Transfer Facility's procedures.

Withdrawals of Shares may not be rescinded. Any Shares properly withdrawn will be deemed not validly tendered for purposes of the Offer, but may be retendered at any subsequent time prior to the expiration of the Offer by following any of the procedures described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase. All questions as to the form and validity (including time of receipt) of notices of withdrawal will be determined by Purchaser, in its sole discretion, whose determination will be binding on all parties.

A request is being made to Take-Two for use of Take-Two's stockholder lists and security position listings for the purpose of disseminating the Offer to stockholders. Upon compliance by Take-Two with this request and receipt of these lists or listings from Take-Two, the Offer to Purchase, the Letter of Transmittal and all other relevant materials will be mailed to record holders of Shares and will be furnished to brokers, dealers, banks, trust companies and similar persons whose names, or the names of whose nominees, appear on Take-Two's stockholders lists, or, if applicable, who are listed as participants in a clearing agency's security position listing for subsequent transmittal to beneficial owners of Shares by Purchaser.

The receipt of cash in the Offer or the Merger will be a taxable transaction for U.S. federal income tax purposes, and may also be a taxable transaction under applicable state, local or foreign income or other tax laws. Stockholders should consult their own tax advisors about the particular effect the proposed transactions will have on their Shares.

The information required to be disclosed by Rule 14d-6(d)(1) of the Exchange Act is contained in the Offer to Purchase and is incorporated herein by reference.

**Neither this Notice, the Offer to Purchase nor the Offer referred to herein and therein constitutes a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders**

scheduled to be held on April 10, 2008. Neither Electronic Arts nor Purchaser is soliciting or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting.

The Offer to Purchase and the related Letter of Transmittal contain important information and both documents should be read in their entirety before any decision is made with respect to the Offer.

Questions and requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephone numbers set forth below. Requests for copies of the Offer to Purchase and the related Letter of Transmittal and other tender offer materials may be directed to the Information Agent and copies will be furnished promptly at Purchaser's expense.

*The Information Agent for the Offer is:*

**Georgeson**
199 Water Street, 26th Floor
New York, NY 10038
Banks and Brokerage Firms Please Call: (212) 440–9800
All Others Please Call Toll Free: (800) 213–0473

*The Dealer Manager for the Offer is:*

**Morgan Stanley**
1585 Broadway
New York, NY 10036
Call Toll Free: (877) 247-9865

March 13, 2008

Source: TAKE TWO INTERACTIVE, SC TO-T, March 13, 2008

## EA COMMENCES ALL CASH TENDER OFFER TO PURCHASE

## TAKE-TWO INTERACTIVE SOFTWARE SHARES FOR $26.00 PER SHARE

### Price Offers 64% Premium Over Closing Price on Feb. 15

REDWOOD CITY, Calif., March 13, 2008 – Electronic Arts Inc. ("EA") (NASDAQ: ERTS) today announced that a wholly owned subsidiary of EA commenced a tender offer for all of the currently outstanding shares of common stock of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ: TTWO) for $26.00 per share in cash.

The offer is valued at approximately $2 billion and represents a 64% premium over Take-Two's closing stock price on February 15, the last trading day before EA sent its revised proposal to Take-Two.

EA Chief Executive Officer John Riccitiello: "This is a great opportunity for Take-Two shareholders. We believe Take-Two investors will see our tender offer as the best way to maximize the value of their investment in Take-Two. This tender offer provides a clear process to complete the proposed transaction. For EA shareholders, the combination would add additional intellectual properties to our already strong portfolio and welcome Take-Two's talented creative teams to the great development organization we've built at EA."

The tender offer is scheduled to expire at 12:00 midnight, New York City time, on Friday, April 11, 2008, unless the tender offer is extended.

The tender offer is not conditioned upon financing. The tender offer is conditioned upon, among other things,

(1) EA being able to acquire a majority of the outstanding shares (fully-diluted) of Take-Two in the tender offer;

(2) the anti-takeover provisions of Section 203 of the Delaware General Corporation Law not being applied to the tender offer or any subsequent merger with EA;

(3) the expiration or termination of any applicable Hart-Scott-Rodino waiting period and;

(4) Take-Two entering into a merger agreement on terms satisfactory to EA in its reasonable judgment.

Morgan Stanley & Co. Incorporated is acting as the Dealer Manager for the tender offer and Georgeson Inc. is acting as Information Agent for the tender offer.

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The description of the tender offer contained in this press release is not intended to be a full or detailed description of the terms or conditions of the tender offer. Take-Two shareholders are urged to read the disclosure documents that will be filed later today with the Securities and Exchange Commission (the "SEC"), including the tender offer statement, regarding the tender offer because they contain

important information. The disclosure documents (when they are available), and any other documents relating to the tender offer that are filed with the SEC, may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at http://investor.ea.com or the website maintained by the SEC at http://www.sec.gov.

This release does not constitute a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders. Neither EA nor its subsidiary making the tender offer is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting.

An Open Letter to the gaming community: http://www.eatake2.com.

*For additional information, please contact:*

| Jeff Brown | Tricia Gugler | David Drake |
|---|---|---|
| VP Communications | Director of IR | Georgeson |
| Electronic Arts | Electronic Arts | 212-440-9861 |
| 650-628-7922 | 650-628-7327 | |

*About Electronic Arts*

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS BIG(TM) and POGO(TM). In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

*Forward Looking Statements*

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully

integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements. All information in this communication is as of March 13, 2008. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

Created by 10K Wizard    www.10KWizard.com

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 3



# FORM SC TO-T/A

## TAKE TWO INTERACTIVE SOFTWARE INC - TTWO

**Filed: March 28, 2008 (period: )**

Amendment to a previously filed SC TO-T

# Table of Contents

SC TO-T/A - AMENDMENT NO. 2 TO SCHEDULE TO

EX-99.(A)(5)(I) (PRESS RELEASE ISSUED BY ELECTRONIC ARTS INC.)

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Amendment No. 2
### to
## Schedule TO

### TENDER OFFER STATEMENT UNDER SECTION 14(D)(1)
### OR 13(E)(1) OF THE SECURITIES EXCHANGE ACT OF 1934

**Take-Two Interactive Software, Inc.**
*(Name of Subject Company—(Issuer))*

**EA08 Acquisition Corp.**
**Electronic Arts Inc.**
*(Names of Filing Persons—(Offeror))*

**Common Stock, Par Value $.01 Per Share**
*(Title of Class of Securities)*

**874054109**
*(CUSIP Number of Class of Securities)*

**Stephen G. Bené**
**Senior Vice President, General Counsel and Secretary**
**Electronic Arts Inc.**
**209 Redwood Shores Parkway**
**Redwood City, California 94065**
**Telephone: (650) 628-1500**

*(Name, address and telephone number of person authorized to*
*receive notices and communications on behalf of filing persons)*

*Copy to:*

**Richard Capelouto, Esq.**
**Simpson Thacher & Bartlett LLP**
**2550 Hanover Street**
**Palo Alto, California 94304**
**Telephone: (650) 251-5000**

### CALCULATION OF FILING FEE

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $2,152,261,826 | $84,583.89 |

\*    Calculated solely for purposes of determining the filing fee. Calculated by multiplying $26.00, the per share tender offer price, by 82,779,301, which represents (i) 76,865,236 outstanding shares of common stock as of March 6, 2008 (according to the Subject Company's Quarterly Report on Form 10-Q for the quarter ended January 31, 2008), minus (ii) 10 shares of common stock beneficially owned by the filing persons as of the date hereof, and plus (iii) 5,914,075 shares of common stock subject to outstanding options as of October 31, 2007 (3,905,000 shares according to the Subject Company's Annual Report on Form 10-K for the period ended October 31, 2007 plus 2,009,075 shares subject to options granted by the Subject Company to ZelnickMedia Corporation).

\*\*    Calculated as 0.00393% of the transaction value. The amount of filing fee was calculated in accordance with Section 14(g)(3) of and Rule 0-11(d) under the Securities Exchange Act of 1934, as amended.

☒    Check box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

Amount Previously Paid: $84,583.89                    Filing Parties: EA08 Acquisition Corp.
                                                  Electronic Arts Inc.

Form or Registration No.: SC TO                    Date Filed: March 13, 2008

☐    Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transactions to which the statement relates:

☒    third-party tender offer subject to Rule 14d-1.

☐    issuer tender offer subject to Rule 13e-4.

☐    going-private transaction subject to Rule 13e-3.

☐    amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer.  ☐

Source: TAKE TWO INTERACTIVE, SC TO-T/A, March 28, 2008

This Amendment No. 2 to Schedule TO amends and supplements the Tender Offer Statement on Schedule TO filed with the Securities and Exchange Commission on March 13, 2008, as amended (the "*Schedule TO*"), by Electronic Arts Inc. ("*Parent*") and EA08 Acquisition Corp., a wholly-owned subsidiary of Parent ("*Purchaser*"), relating to the offer by Purchaser to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc. ("*Take-Two*" or the "*Company*") at a purchase price of $26.00 net per Share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13 (the "*Offer to Purchase*") and in the related Letter of Transmittal, as each may be amended or supplemented from time to time.

Except as specifically set forth herein, this Amendment No. 2 does not modify any of the information previously reported on the Schedule TO. All capitalized terms used in this Amendment No. 2 and not otherwise defined have the respective meanings ascribed to them in the Offer to Purchase.

As permitted by General Instruction F to Schedule TO, the information set forth in the Schedule TO, as amended by this Amendment No. 2, including all appendices, schedules, exhibits and annexes hereto and thereto, is hereby expressly incorporated by reference herein in response to Items 1 through 12 of the Schedule TO. You should read this Amendment No. 2 to Schedule TO together with the Schedule TO.

**Items 1 through 9.**

THE OFFER TO PURCHASE ATTACHED AS EXHIBIT (A)(1)(A) TO THE SCHEDULE TO IS AMENDED AS FOLLOWS:

GENERAL AMENDMENTS

All references to Take-Two's "2008 annual meeting of stockholders to be held on April 10, 2008" and "2008 annual meeting of stockholders scheduled to be held on April 10, 2008" in the Offer to Purchase are amended to be references to Take-Two's "2008 annual meeting of stockholders scheduled to be held on April 17, 2008".

All references to "12:00 midnight, New York City time, on Friday, April 11, 2008" in the Offer to Purchase are amended to be references to "11:59 p.m., New York City time, on Friday, April 18, 2008".

COVER PAGE

The cover page of the Offer to Purchase is amended and restated as follows:

*Offer to Purchase for Cash*

*All Outstanding Shares of Common Stock*
*(Including the Associated Preferred Stock Purchase Rights)*
*of*

*Take-Two Interactive Software, Inc.*

*at*

*$26.00 Net Per Share*

*by*

*EA08 Acquisition Corp.*
*a wholly-owned subsidiary of*

*Electronic Arts Inc.*

*THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 11:59 P.M.,*
*NEW YORK CITY TIME, ON FRIDAY, APRIL 18, 2008,*
*UNLESS THE OFFER IS EXTENDED.*

*THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE HAVING BEEN VALIDLY TENDERED AND NOT WITHDRAWN BEFORE THE EXPIRATION OF THE OFFER AT LEAST THE*

Source: TAKE TWO INTERACTIVE, SC TO-T/A, March 28, 2008

*NUMBER OF SHARES OF COMMON STOCK, PAR VALUE $.01 PER SHARE, WITH THE ASSOCIATED PREFERRED STOCK PURCHASE RIGHTS (TOGETHER, THE "SHARES"), OF TAKE-TWO INTERACTIVE SOFTWARE, INC. ("TAKE-TWO" OR THE "COMPANY"), WHICH, TOGETHER WITH THE SHARES THEN OWNED BY ELECTRONIC ARTS INC. ("ELECTRONIC ARTS" OR "PARENT"), A DIRECT PARENT OF EA08 ACQUISITION CORP. ("PURCHASER"), AND ITS SUBSIDIARIES (INCLUDING PURCHASER), REPRESENTS AT LEAST A MAJORITY OF THE TOTAL NUMBER OF SHARES OUTSTANDING ON A FULLY-DILUTED BASIS, (II) PURCHASER BEING SATISFIED, IN ITS SOLE DISCRETION, THAT THE RESTRICTIONS ON BUSINESS COMBINATIONS WITH INTERESTED STOCKHOLDERS SET FORTH IN SECTION 203 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE ARE INAPPLICABLE TO THE OFFER AND THE PROPOSED MERGER, (III) TAKE-TWO'S BOARD OF DIRECTORS REDEEMING THE ASSOCIATED PREFERRED STOCK PURCHASE RIGHTS OR ELECTRONIC ARTS BEING SATISFIED, IN ITS SOLE DISCRETION, THAT SUCH RIGHTS HAVE BEEN INVALIDATED OR ARE OTHERWISE INAPPLICABLE TO THE OFFER AND THE PROPOSED MERGER, (IV) TAKE-TWO HAVING ENTERED INTO A MERGER AGREEMENT WITH ELECTRONIC ARTS AND PURCHASER PROVIDING FOR THE CONSUMMATION OF THE OFFER AND A SECOND STEP MERGER AS CONTEMPLATED BY THIS OFFER TO PURCHASE ON TERMS SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER IN THEIR REASONABLE JUDGMENT, INCLUDING REPRESENTATIONS AND WARRANTIES THAT ARE REASONABLY SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER AND ARE NOT SUBJECT TO ANY EXCEPTIONS THAT REFLECT FACTS, CIRCUMSTANCES OR CONDITIONS THAT WOULD RESULT IN A FAILURE TO SATISFY ANY OTHER CONDITION TO THE OFFER AND (V) ANY APPLICABLE WAITING PERIOD UNDER THE HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976, AS AMENDED, HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO SUBJECT TO CERTAIN OTHER CONDITIONS CONTAINED IN THIS OFFER TO PURCHASE. SEE "INTRODUCTION" AND "THE OFFER—SECTION 14—CONDITIONS OF THE OFFER", WHICH SET FORTH IN FULL THE CONDITIONS TO THE OFFER.*

*AS DISCLOSED IN TAKE-TWO'S PROXY STATEMENT FOR ITS ANNUAL MEETING OF STOCKHOLDERS TO BE HELD ON APRIL 17, 2008, THE COMPANY HAS SUBMITTED TO ITS STOCKHOLDERS A PROPOSAL TO AMEND THE COMPANY'S INCENTIVE STOCK PLAN TO INCREASE THE NUMBER OF SHARES RESERVED FOR ISSUANCE UNDER THAT PLAN BY 2,000,000 SHARES AND TO PERMIT THE ISSUANCE OF AWARDS UNDER SUCH PLAN TO CONSULTANTS, INCLUDING 1,500,000 SHARES OF RESTRICTED STOCK TO ZELNICKMEDIA CORPORATION. IN THE EVENT THAT THE STOCKHOLDERS OF THE COMPANY APPROVE THIS PROPOSAL, PURCHASER INTENDS TO AMEND THE OFFER TO REDUCE THE PURCHASE PRICE TO $25.74 NET PER SHARE. IF SUCH AN AMENDMENT IS MADE, PURCHASER WILL EXTEND THE OFFER TO THE EXTENT REQUIRED BY RULE 14E-1 UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.*

*ELECTRONIC ARTS AND PURCHASER INTEND TO CONTINUE TO SEEK TO NEGOTIATE THE ACQUISITION OF TAKE-TWO BY ELECTRONIC ARTS AND THE OFFER IS CONDITIONED ON ELECTRONIC ARTS AND PURCHASER ENTERING INTO A MERGER AGREEMENT WITH TAKE-TWO. SUBJECT TO APPLICABLE LAW, PURCHASER RESERVES THE RIGHT TO AMEND THE OFFER (INCLUDING AMENDING THE NUMBER OF SHARES TO BE PURCHASED AND THE OFFER PRICE), INCLUDING FOR PURPOSES OF NEGOTIATING OR ENTERING INTO A MERGER AGREEMENT WITH THE COMPANY. IF REQUESTED BY THE COMPANY, ANY SUCH MERGER AGREEMENT MAY CONTEMPLATE THE TERMINATION OF THE OFFER. IN THE EVENT THAT PARENT, PURCHASER AND THE COMPANY ENTER INTO A MERGER AGREEMENT THAT REQUIRES THAT THE OFFER BE TERMINATED, THE SHARES WOULD, UPON CONSUMMATION OF SUCH MERGER, BE CONVERTED INTO THE RIGHT TO RECEIVE THE CONSIDERATION PROVIDED FOR IN SUCH MERGER AGREEMENT.*

**THIS OFFER TO PURCHASE AND THE RELATED LETTER OF TRANSMITTAL CONTAIN IMPORTANT INFORMATION, AND YOU SHOULD CAREFULLY READ BOTH IN THEIR ENTIRETY BEFORE MAKING A DECISION WITH RESPECT TO THE OFFER.**

## IMPORTANT

*Any stockholder of the Company desiring to tender Shares in the Offer should either (i) complete and sign the Letter of Transmittal (or a facsimile thereof) in accordance with the instructions in the Letter of Transmittal, have such stockholder's signature thereon guaranteed if required by Instruction 1 to the Letter of Transmittal, and mail or deliver the Letter of Transmittal together with the certificate(s) representing tendered Shares and all other required documents to U.S. Bank National Association, the Depositary for the Offer, or tender such Shares pursuant to the procedure for book-entry transfer set forth in "The Offer—Section 3—Procedure for Tendering Shares" or (ii) give instructions to such stockholder's broker, dealer, commercial bank, trust company or other nominee to tender such stockholder's Shares for such stockholder. Stockholders whose Shares are registered in the name of a broker, dealer, commercial bank, trust company or other nominee must contact such person if they desire to tender their Shares. The associated preferred stock*

*purchase rights are currently evidenced by the certificates representing the Shares and, by tendering Shares, a stockholder will also tender the associated preferred stock purchase rights. If the Distribution Date (as defined in "The Offer—Section 8—Certain Information Concerning the Company") occurs, stockholders will be required to tender one associated preferred stock purchase right for each Share tendered in order to effect a valid tender of such Share.*

*Any stockholder who desires to tender Shares and whose certificates representing such Shares (including, if applicable, associated preferred stock purchase rights) are not immediately available, or who cannot comply with the procedures for book-entry transfer on a timely basis, may tender such Shares (including, if applicable, associated preferred stock purchase rights) pursuant to the guaranteed delivery procedure set forth in "The Offer—Section 3—Procedure for Tendering Shares".*

*Any questions and requests for assistance may be directed to the Information Agent or to the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Offer to Purchase. Additional copies of this Offer to Purchase, the Letter of Transmittal, the Notice of Guaranteed Delivery and other related materials may be obtained from the Information Agent. Stockholders may also contact their brokers, dealers, commercial banks, trust companies or other nominees for assistance concerning the Offer.*

*NEITHER THIS OFFER TO PURCHASE NOR THE OFFER CONSTITUTES A SOLICITATION OF PROXIES IN CONNECTION WITH ANY MATTER TO BE CONSIDERED AT TAKE-TWO'S 2008 ANNUAL MEETING OF STOCKHOLDERS SCHEDULED TO BE HELD ON APRIL 17, 2008. NEITHER ELECTRONIC ARTS NOR PURCHASER IS SOLICITING, OR INTENDS TO SOLICIT, PROXIES IN RESPECT OF ANY MATTER TO BE CONSIDERED AT TAKE-TWO'S 2008 ANNUAL MEETING. IN ADDITION, NEITHER THIS OFFER TO PURCHASE NOR THE OFFER CONSTITUTES A SOLICITATION OF CONSENTS FROM TAKE-TWO'S STOCKHOLDERS. ANY SOLICITATION WILL BE MADE ONLY PURSUANT TO SEPARATE PROXY OR CONSENT SOLICITATION MATERIALS COMPLYING WITH ALL APPLICABLE REQUIREMENTS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.*

*The Dealer Manager for the Offer is:*

# Morgan Stanley

*March 13, 2008*

Source: TAKE TWO INTERACTIVE, SC TO-T/A, March 28, 2008

SUMMARY TERM SHEET

The first paragraph of "**SUMMARY TERM SHEET**" is deleted in its entirety and replaced with the following paragraph:

"EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., is offering to purchase all issued and outstanding shares of common stock, par value $.01 per share, of Take-Two Interactive Software, Inc. (together with the associated preferred stock purchase rights), for $26.00 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Offer to Purchase and the related Letter of Transmittal. This summary term sheet highlights selected information from this Offer to Purchase, and may not contain all of the information that is important to you. **To better understand our offer to you and for a complete description of the legal terms of the Offer, you should carefully read this Offer to Purchase and the accompanying Letter of Transmittal in their entirety.** Questions or requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Offer to Purchase."

The answer to the question "**What securities are you offering to purchase?**" is deleted in its entirety and replaced with the following bullet point paragraph:

"• We are offering to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights, of Take-Two. We refer to one share of Take-Two common stock, together with the associated preferred stock purchase right, as a "*share*" or "*Share*". See "Introduction" and "The Offer—Section 1—Terms of the Offer"."

The answer to the question "**What are the most significant conditions to the offer?**" is amended to add the following bullet point paragraph after the third bullet point in such answer:

"• Take-Two's board of directors has redeemed the associated preferred stock purchase rights or Electronic Arts is satisfied, in its sole discretion, that such rights have been invalidated or are otherwise inapplicable to the offer and the proposed second-step merger or any other business combination involving Electronic Arts or any of its subsidiaries (including Purchaser) and Take-Two;"

INTRODUCTION

The first paragraph of "**INTRODUCTION**" is deleted in its entirety and replaced with the following paragraph:

"We, EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Parent*" or "*Electronic Arts*"), are offering to purchase all issued and outstanding shares of common stock, par value $.01 per share (the "*Common Stock*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), and the associated preferred stock purchase rights (the "*Rights*" and, together with the Common Stock, the "*Shares*") issued pursuant to the Stockholder Rights Agreement, dated as of March 24, 2008, between Take-Two and American Stock Transfer & Trust Company, as rights agent (the "*Rights Agreement*"), for $26.00 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Offer to Purchase and the related Letter of Transmittal (which, together with any amendments or supplements hereto and thereto, collectively constitute the "*Offer*"). Electronic Arts is one of the world's leading interactive entertainment software companies."

The third paragraph of "**INTRODUCTION**" is amended to add the following clause, and clauses (3) and (4) of such paragraph shall be renumbered as clauses (4) and (5), respectively:

"(3) Take-Two's board of directors having redeemed the Rights or Electronic Arts being satisfied, in its sole discretion, that the Rights have been invalidated or are otherwise inapplicable to the Offer and the Merger. We refer to this condition in this Offer to Purchase as the "*Rights Condition*";

As disclosed in the Company's Current Report on Form 8-K filed on March 26, 2008 with the SEC (the "*March 26 Form 8-K*"), on March 24, 2008, Take-Two's Board of Directors adopted and entered into the Rights Agreement and declared a distribution of one Right for each outstanding share of Common Stock to stockholders of record at the close of business on April 7, 2008, and for each share of Common Stock issued (including shares of Common Stock issued from the Company's treasury) by the Company thereafter and prior to the Distribution Date (as defined in "The Offer—Section 8—Certain Information Concerning the Company"). Each Right entitles the registered holder, subject to the terms of the Rights Agreement, to purchase from the Company one one-thousandth of a share of the Company's Series B Preferred Stock, par value $0.01 per share, at a price of $42.50 per Unit, subject to adjustment. The Company has publicly disclosed that its Board of Directors has committed to redeem the Rights 180 days after the date of adoption of the Rights Agreement. See "The Offer—Section 8—Certain Information Concerning the Company"."

The second sentence of the ninth paragraph of "**INTRODUCTION**" is amended by inserting the following parenthetical at the end of clause (3) set forth in such sentence: "(other than the amendments to the bylaws of the Company adopted by Take-Two's Board of Directors on March 24, 2008 as disclosed in Item 5.03 of the March 26 Form 8-K)".

The first sentence of the tenth paragraph of "**INTRODUCTION**" is amended by inserting after the phrase "the Section 203 Condition" the phrase ", the Rights Condition".

THE OFFER

### Section 1—Terms of the Offer

The first sentence of the second paragraph of "The Offer—Section 1—Terms of the Offer" is amended by inserting after the phrase "the 203 Condition," the phrase "the Rights Condition,".

"The Offer—Section 1—Terms of the Offer" is amended by inserting after the fifth paragraph thereof the following:

"As of the date of this Offer to Purchase, the Rights do not trade separately. Accordingly, by tendering Common Stock you are automatically tendering a similar number of Rights. If, however, the Rights detach and separate certificates evidencing the Rights are issued, tendering stockholders will be required to deliver Rights certificates with the Common Stock."

### Section 2—Acceptance for Payment and Payment

The second paragraph of "The Offer—Section 2—Acceptance for Payment and Payment" is amended by deleting clause (1) thereof in its entirety and replacing it with the following:

"(1)   the share certificates representing such Shares and, if the Distribution Date occurs, certificates representing the associated Rights, or timely confirmation (a "*Book-Entry Confirmation*") of the book-entry transfer of such Shares and, if the Distribution Date occurs, the Rights (if such procedure is available), into the Depositary's account at The Depository Trust Company (the "*Book-Entry Transfer Facility*"), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares";"

### Section 3—Procedure for Tendering Shares

The first paragraph of "The Offer—Section 3—Procedure for Tendering Shares" is amended by deleting clause (1) thereof in its entirety and replacing it with the following:

"(1)   on or prior to the Expiration Date, (a) share certificates representing tendered Shares (including, if the Distribution Date occurs, certificates for the Rights) must be received by the Depositary at its address

set forth on the back cover of this Offer to Purchase, or such Shares (including, if the Distribution Date occurs, the Rights) must be tendered pursuant to the book-entry transfer procedures set forth below and a Book-Entry Confirmation must be received by the Depositary, (b) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book-entry transfer of Shares (including, if the Distribution Date occurs, the Rights (if such procedure is available)) must be received by the Depositary at one of such addresses and (c) any other documents required by the Letter of Transmittal must be received by the Depositary at one of such addresses, or"

The sixth through eleventh paragraphs of "The Offer—Section 3—Procedure for Tendering Shares" are amended by inserting after each occurrence of the phrase "share certificates representing the Shares", "share certificates representing such Shares" or "share certificates representing tendered Shares" therein the parenthetical "(including, if the Distribution Date occurs, certificates for the Rights)".

### Section 4—Withdrawal Rights

The second sentence of the second paragraph of "The Offer—Section 4—Withdrawal Rights" is amended by inserting after the phrase "share certificates evidencing Shares" the phrase "(including, if the Distribution Date occurs, certificates for the Rights)".

### Section 8—Certain Information Concerning the Company

"The Offer—Section 8—Certain Information Concerning the Company" is amended by inserting after the second paragraph thereof and before the paragraph entitled "*Additional Information*" the following:

"*Preferred Stock Purchase Rights; Series B Preferred Stock.* The following description of the Rights and the Preferred Stock (as defined below) is based upon publicly available documents filed by Take-Two with the SEC. This description does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which is filed as Exhibit 4.1 to the Company's registration statement on Form 8-A filed with the SEC on March 26, 2008.

On March 24, 2008, the Company entered into the Rights Agreement with American Stock Transfer & Trust Company (the "*Rights Agent*"). In connection therewith, the Company's board of directors declared a distribution of one Right for each outstanding share of Common Stock to stockholders of record at the close of business on April 7, 2008 (the "*Rights Record Date*") and for each share of Common Stock issued (including shares of Common Stock issued from the Company's treasury) by the Company thereafter and prior to the Distribution Date. Each Right entitles the registered holder, subject to the terms of the Rights Agreement, to purchase from the Company one one-thousandth of a share of the Company's Series B Preferred Stock, par value $0.01 per share (the "*Preferred Stock*"), at a price of $42.50 per Unit, subject to adjustment (the "*Purchase Price*").

Initially, the Rights will attach to all certificates representing shares of Common Stock then outstanding, and no separate Rights Certificates will be distributed. The Rights will separate from the shares of Common Stock and the "*Distribution Date*" will occur upon the earlier of (i) ten business days following a public announcement that a person or group of affiliated or associated persons has become an Acquiring Person (as defined below), or (ii) either (x) with respect to any tender or exchange offer not pending on the date of the execution of the Rights Agreement, ten business days (or such later date as may be determined by the Company's Board of Directors prior to such time as any person becomes an Acquiring Person) following the commencement of a tender or exchange offer that would result in a person or group of affiliated and associated persons beneficially owning an aggregate of 20% or more of the total voting power represented by all the then outstanding shares of Common Stock and other voting securities of the Company (the "*Voting Securities*") or (y) with respect to any tender or exchange offer pending on the date of the Rights Agreement, simultaneously with the acceptance for payment of the shares tendered pursuant to such tender offer, if upon consummation thereof, such person would be the beneficial owner of shares of Voting Securities representing 20% or more of the total Voting Securities then outstanding. Until the Distribution Date, (i) the Rights will be evidenced by certificates for shares of Common Stock and will be transferred with and only with such share certificates, (ii) new share certificates for shares of

Common Stock issued after the Rights Record Date (including shares of Common Stock distributed from the Company's treasury) will contain a notation incorporating the Rights Agreement by reference, and (iii) the surrender for transfer of any certificates representing outstanding shares of Common Stock will also constitute the transfer of the Rights associated with the shares of Common Stock represented by such certificates.

An "*Acquiring Person*" is a person or group of affiliated or associated persons that has acquired, obtained the right to acquire, or otherwise obtained beneficial ownership of an aggregate of 20% or more of the total voting power represented by all the then outstanding shares of Voting Securities. The following, however, are not considered Acquiring Persons under the Rights Agreement: (1) the Company, its subsidiaries, any employee benefit plan of the Company or any of its subsidiaries, or any entity holding shares of Voting Securities pursuant to the terms of any such plan; (2) any person or group that becomes the beneficial owner of 20% or more of the total voting power represented by all the then outstanding Voting Securities solely as a result of the acquisition of Voting Securities by the Company, unless such person or group thereafter acquires beneficial ownership of additional Voting Securities; (3) subject to certain conditions set forth in the Rights Agreement, a person or group that otherwise would have become an Acquiring Person as a result of an inadvertent acquisition of 20% or more of the total voting power represented by all the then outstanding Voting Securities; and (4) subject to certain conditions set forth in a Rights Agreement, any person or group that would otherwise be deemed an Acquiring Person upon adoption of the Rights Agreement (a "*Grandfathered Stockholder*"). Except as provided in the Rights Agreement, a person or group that is a Grandfathered Stockholder will cease to be a Grandfathered Stockholder and will become an Acquiring Person if, after adoption of the Rights Agreement, such Grandfathered Stockholder acquires beneficial ownership of additional Voting Securities in excess of two percent of the number of shares of Common Stock outstanding as of March 24, 2008.

The Rights are not exercisable until the Distribution Date and will expire on the third anniversary of the Rights Agreement unless earlier redeemed or exchanged by the Company as described below.

As soon as practicable after the Distribution Date, Rights certificates will be mailed to holders of record of shares of Common Stock as of the close of business on the Distribution Date and, thereafter, the separate Rights certificates alone will represent the Rights.

If a person or group of affiliated or associated persons becomes an Acquiring Person, then each holder of a Right will thereafter have the right to receive, upon exercise, shares of Common Stock (or, in certain circumstances, shares of Preferred Stock, other securities, cash, property or a combination thereof) having a value equal to two times the exercise price of the Right. The exercise price is the Purchase Price multiplied by the number of one one-thousandths of a share of Preferred Stock issuable upon exercise of a Right prior to the events described in this paragraph.

Notwithstanding any of the foregoing, following the time any person or group becomes an Acquiring Person, all Rights that are, or under certain circumstances specified in the Rights Agreement were, beneficially owned by any Acquiring Person or its affiliates or associates will be null and void.

In the event that, at any time after a person or group becomes an Acquiring Person, (i) Take-Two is acquired in a merger or other business combination with another company and Take-Two is not the surviving corporation, (ii) another company consolidates or merges with Take-Two and all or part of the shares of Common Stock are converted or exchanged for other securities, cash, or property, or (iii) 50% or more of the consolidated assets or earning power of Take-Two and its subsidiaries is sold or transferred to another company, then each holder of a Right (except Rights that previously have been voided as described above) shall thereafter have the right to receive, upon exercise, common stock or other equity interest of the ultimate parent of such other company having a value equal to two times the exercise price of the Right.

The Purchase Price payable, and the number of shares of Preferred Stock (or other securities, as applicable) issuable, upon exercise of the Rights are subject to adjustment from time to time to prevent dilution (i) in the event of a stock dividend on, or a subdivision, combination or reclassification of, the Preferred Stock, (ii) if holders of the Preferred Stock are granted certain rights or warrants to subscribe for Preferred Stock or

Source: TAKE TWO INTERACTIVE, SC TO-T/A, March 28, 2008

convertible securities at less than the current market price of the Preferred Stock, or (iii) upon the distribution to the holders of the Preferred Stock of evidences of indebtedness, cash or assets (excluding regular quarterly cash dividends or dividends payable in the Preferred Stock) or of subscription rights or warrants (other than those referred to above).

With certain exceptions, no adjustment in the Purchase Price will be required until cumulative adjustments amount to at least one percent of the Purchase Price. The Company is not required to issue fractional Preferred Shares (other than fractional shares that are integral multiples of one one-thousandth of a share). In lieu thereof, an adjustment in cash may be made based on the market price of the Preferred Stock prior to the date of exercise.

At any time prior to such time as any person or group or affiliated or associated persons becomes an Acquiring Person, the Company's Board of Directors may redeem the Rights in whole, but not in part, at a price of $0.0001 per Right, rounded up to the nearest whole cent (subject to adjustment in certain events) (the "*Redemption Price*"). Immediately upon the action of the Company's Board of Directors ordering the redemption of the Rights, the Rights will terminate and the only right of the holders of such Rights will be to receive the Redemption Price for each Right held. The Company's Board of Directors has committed to redeem the Rights 180 days after the date of the adoption of the stockholders rights plan.

At any time after any person or group of affiliated or associated persons becomes an Acquiring Person and before any such Acquiring Person becomes the beneficial owner of 50% or more of the total voting power of the aggregate of all shares of Voting Securities then outstanding, the Take-Two Board of Directors, at its option, may exchange each Right (other than Rights that previously have become void as described above) in whole or in part, for Shares at an exchange ratio of one share of Common Stock (or under certain circumstances one Unit of Preferred Stock or equivalent preferred stock) per Right (subject to adjustment in certain events).

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company, including, without limitation, the right to vote or to receive dividends. While the distribution of the Rights will not be taxable to stockholders or to the Company, stockholders may, depending upon the circumstances, recognize taxable income in the event that the Rights become exercisable for Preferred Stock (or other consideration).

Any of the provisions of the Rights Agreement may be amended without the approval of the holders of Rights in order to cure any ambiguity, defect, or inconsistency or to make any other changes that the Take-Two Board of Directors may deem necessary or desirable. After any person or group of affiliated or associated persons becomes an Acquiring Person, the provisions of the Rights Agreement may not be amended in any manner that would adversely affect the interests of the holders of Rights (excluding the interests of any Acquiring Person).

The Preferred Stock that may be acquired upon exercise of the Rights will not be redeemable and will rank junior to any other shares of preferred stock that may be issued by the Company with respect to the payment of dividends and as to distribution of assets in liquidation.

Each share of Preferred Stock will have a minimum preferential quarterly dividend of the greater of $1.00 per share or 1,000 times the aggregate per share amount of any cash dividend declared on the shares of Common Stock since the immediately preceding quarterly dividend, subject to certain adjustments. In the event of liquidation, the holder of Preferred Stock will be entitled to receive a cash preferred liquidation payment per share equal to the greater of $1.00 (plus accrued and unpaid dividends thereon) or 1,000 times the amount paid in respect of a share of Common Stock, subject to certain adjustments.

Generally, each share of Preferred Stock will vote together with the shares of Common Stock and any other class or series of capital stock entitled to vote on such matter, and will be entitled to 1,000 votes per share, subject to certain adjustments. The holders of the Preferred Stock, voting as a separate class, shall be entitled to elect two directors if dividends on the Preferred Stock are in arrears in an amount equal to six quarterly dividends thereon.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, March 28, 2008

In the event of any merger, consolidation or other transaction in which shares of Common Stock are exchanged, each share of Preferred Stock will be entitled to receive 1,000 times the aggregate per share amount of stock, securities, cash or other property paid in respect of each share of Common Stock, subject to certain adjustments.

The rights of holders of the Preferred Stock to dividend, liquidation and voting rights are protected by customary anti-dilution provisions.

Because of the nature of the Preferred Stock's dividend, liquidation and voting rights, the economic value of one Unit of Preferred Stock is expected to approximate the economic value of one share of Common Stock.

The Offer is conditioned upon, among other things, the Rights Condition. See "The Offer—Section 14—Conditions of the Offer". Company stockholders will be required to tender one Right for each share of Common Stock tendered in order to effect a valid tender of Shares in accordance with the procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares". Unless the Distribution Date occurs, a tender of Common Stock will also constitute a tender of the Rights."

### *Section 12–Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights*

The last sentence of the first paragraph of "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" is amended by inserting after the phrase "the Section 203 Condition" the phrase "and the Rights Condition".

The fourth sentence of the third paragraph of "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" is amended by inserting after the phrase "the Section 203 Condition," the phrase "the Rights Condition,".

### *Section 14—Conditions of the Offer*

The first sentence of the first paragraph of "The Offer—Section 14—Conditions of the Offer" is amended by inserting after the phrase "the HSR Condition," the phrase "the Rights Condition,".

Clause (7) of "The Offer—Section 14—Conditions of the Offer" is deleted in its entirety and replaced with the following:

"(7) the Company or any of its subsidiaries has (a) split, combined, reclassified or otherwise changed, or authorized or proposed the split, combination or other change of, the Shares or its capitalization, (b) acquired or otherwise caused a reduction in the number of, or authorized or proposed the acquisition or other reduction in the number of, outstanding Shares or other securities or equity interests (other than a redemption of the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008), (c) issued or sold, or authorized or proposed the issuance, distribution or sale of, any additional Shares, shares of any other class or series of capital stock or other equity interests, other voting securities or any securities convertible into, or options, rights or warrants, conditional or otherwise, to acquire, any of the foregoing (other than (x) the issuance of Shares pursuant to and in accordance with the terms in effect on the date of this Offer to Purchase of employee stock options outstanding prior to such date, (y) a distribution of the certificates representing the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008 and (z) if the stockholders of Take-Two approve the amendments to the Company's Incentive Stock Plan described in "Introduction" above, the issuance of up to (but not exceeding) 1,500,000 shares of restricted stock of the Company to ZelnickMedia pursuant to and on the terms disclosed in the Second Amendment to Management Agreement, dated February 14, 2008 (the "*Second Amendment*"), to the Management Agreement, dated March 30, 2007, by and between ZelnickMedia and Take-Two, as amended on July 26, 2007, filed as Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2008 (the "*Management Agreement*") provided that

Take-Two has publicly announced the results of the stockholder vote related to such amendments), or any other securities or rights in respect of, in lieu of, or in substitution or exchange for any shares of its capital stock, (d) permitted the issuance or sale of any shares of any class of capital stock or other securities of any subsidiary of the Company, (e) declared, paid or proposed to declare or pay any dividend or other distribution on any shares of capital stock of the Company (other than a distribution of the certificates representing the Rights or a redemption of the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008), (f) altered or proposed to alter any material term of any outstanding security (other than to amend the Rights Agreement to make the Rights inapplicable to the Offer and the Merger), (g) issued or sold, or authorized or proposed the issuance or sale of, any debt securities or otherwise incurred or authorized or proposed the incurrence of any debt other than in the ordinary course of business consistent with past practice, or any debt containing, in the reasonable judgment of Purchaser, burdensome covenants or security provisions, (h) authorized, recommended, proposed, announced its intent to enter into or entered into an agreement with respect to or effected any merger, consolidation, liquidation, dissolution, business combination, acquisition of assets, disposition of assets or relinquishment of any material contract or other right of the Company or any of its subsidiaries or any comparable event not in the ordinary course of business consistent with past practice, (i) authorized, recommended, proposed, announced its intent to enter into or entered into any agreement or arrangement with any person or group that, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or affiliates or the value of the Shares to us or any of our subsidiaries or affiliates, (j) acquired or authorized, recommended or proposed to acquire, any business or assets material to the Company or any of its affiliates (except purchases of inventory in the ordinary course of business consistent with past practice), (k) adopted, established or entered into any new employment, change in control, severance compensation or similar agreement, arrangement or plan with or for one or more of its employees, consultants, directors or affiliates, or adopted, established or entered into or amended, or made grants or awards pursuant to, any agreements (including, without limitation, the Management Agreement), arrangements or plans (other than the amendments expressly disclosed in the March 26 Form 8-K to the employment agreements of each of Lainie Goldstein, Seth Krauss and Gary Dale, the Company's Chief Financial Officer, Executive Vice President and General Counsel and Executive Vice President, respectively) so as to provide for increased benefits to, or otherwise taken any action (including, without limitation, by any resolution or other action of the Board of Directors of the Company or any of its subsidiaries or any committee thereof) to provide for acceleration of any awards under any agreements, arrangements or plans affecting, one or more employees, consultants, directors or affiliates, whether or not as a result of or in connection with the transactions contemplated by the Offer or the Merger or any other business combination with the Company, or we shall have become aware of any such action which has not been publicly disclosed prior to the date of this Offer to Purchase, (l) except as may be required by law, taken any action to adopt, establish, terminate or amend any employee benefit plan (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974) of the Company or any of its subsidiaries, or we shall have become aware of any such action which was not previously announced or (m) amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) (other than the amendments to the Company's bylaws expressly disclosed in the March 26 Form 8-K) or we become aware that the Company or any of its subsidiaries shall have amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) which has not been publicly disclosed prior to the date of this Offer to Purchase; or"

THE FORM OF LETTER OF TRANSMITTAL ATTACHED AS EXHIBIT (A)(1)(B) TO THE SCHEDULE TO IS AMENDED AS FOLLOWS:

The cover page of the Letter of Transmittal is amended to include the phrase "(Including the Associated Preferred Stock Purchase Rights)" immediately following the phrase "Tender Shares of Common Stock" on the third line of the cover page.

All references to "12:00 midnight, New York City time, on Friday, April 11, 2008" in the Letter of Transmittal are amended to be references to "11:59 p.m., New York City time, on Friday, April 18, 2008".

The first paragraph at page 3 of the Letter of Transmittal is deleted in its entirety and placed with the following paragraph:

"Holders whose certificates evidencing Shares (including, if the Distribution Date (as defined in the Offer to Purchase) occurs, certificates for the associated preferred stock purchase rights) (any such certificates, "*Share Certificates*") are not immediately available or who cannot deliver their Share Certificates and all other documents required hereby to the Depositary prior to the Expiration Date (as defined in the "The Offer—Section 1—Terms of the Offer" of the Offer to Purchase) or who cannot complete the procedure for delivery by book-entry transfer on a timely basis and who wish to tender their Shares must do so pursuant to the guaranteed delivery procedure described in "The Offer—Section 3—Procedures for Tendering Shares" of the Offer to Purchase. See Instruction 2."

The first sentence of the letter to stockholders at page 3 of the Letter of Transmittal is deleted in its entirety and replaced with the following sentence:

"The undersigned hereby tenders to EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*" or "*Parent*"), the above-described shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), for $26.00 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), receipt of which is hereby acknowledged, and in this Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements hereto or thereto, collectively constitute the "*Offer*")."

The third sentence of the letter to stockholders at page 3 of the Letter of Transmittal is amended to replace the reference to "Take-Two's 2008 annual meeting of stockholders to be held on April 10, 2008" with "Take-Two's 2008 annual meeting of stockholders to be held on April 17, 2008".

THE FORM OF NOTICE OF GUARANTEED DELIVERY ATTACHED AS EXHIBIT (A)(1)(C) TO THE SCHEDULE TO IS AMENDED AS FOLLOWS:

The cover page of the Notice of Guaranteed Delivery is amended to include the phrase "(Including the Associated Preferred Stock Purchase Rights)" immediately following the phrase "Tender Shares of Common Stock" on the third line of the cover page and to replace clause (i) in the first paragraph thereof with the following: "(i) if certificates (the "*Share Certificates*") evidencing shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), are not immediately available,".

All references to "12:00 midnight, New York City time, on Friday, April 11, 2008" in the Notice of Guaranteed Delivery are amended to be references to "11:59 p.m., New York City time, on Friday, April 18, 2008".

THE FORM OF LETTER FROM PURCHASER TO BROKERS, DEALERS, COMMERCIAL BANKS, TRUST COMPANIES AND NOMINEES ATTACHED AS EXHIBIT (A)(1)(D) TO THE SCHEDULE TO IS AMENDED AS FOLLOWS:

The phrase "(Including the Associated Preferred Stock Purchase Rights)" shall be inserted immediately following the phrase "All Outstanding Shares of Common Stock" on the second line of the first page of the form of Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees.

All references to "12:00 midnight, New York City time, on Friday, April 11, 2008" in the form of Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees are amended to be references to "11:59 p.m., New York City time, on Friday, April 18, 2008".

The first paragraph on the first page of the form of Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees is deleted in its entirety and replaced with the following:

"EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Electronic Arts*"), is offering to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), at a price of $26.00 per Share net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*") and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") enclosed herewith. Please furnish copies of the enclosed materials to those of your clients in whose accounts you hold Shares registered in your name or in the name of your nominee."

The second paragraph on the first page of the form of Letter from Purchase to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees is amended to replace the reference to Take-Two's "2008 annual meeting of stockholders, to be held on April 10, 2008" with Take-Two's "2008 annual meeting of stockholders, to be held on April 17, 2008".

THE FORM OF LETTER TO CLIENTS FOR USE BY BROKERS, DEALERS, COMMERCIAL BANKS, TRUST COMPANIES AND NOMINEES ATTACHED AS EXHIBIT (A)(1)(E) TO THE SCHEDULE TO IS AMENDED AS FOLLOWS:

The phrase "(Including the Associated Preferred Stock Purchase Rights)" shall be inserted immediately following the phrase "All Outstanding Shares of Common Stock" on the second line of the first page of the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees.

All references to "12:00 midnight, New York City time, on Friday, April 11, 2008" in the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees are amended to be references to "11:59 p.m., New York City time, on Friday, April 18, 2008".

The first paragraph on the first page of the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees is deleted in its entirety and replaced with the following:

"Enclosed for your consideration are an Offer to Purchase dated March 13, 2008 (the "*Offer to Purchase*"), and a related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") relating to the offer by EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*"), to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (the "*Rights*") (the common stock, together with the Rights, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), at a price of $26.00 per Share net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer."

The fifth paragraph of the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees is deleted in its entirety and replaced with the following:

"Your attention is directed to the following:

1. The offer price is $26.00 per Share, net to you in cash (subject to applicable withholding taxes), without interest.

2. Purchaser intends to amend the Offer to reduce the offer price to $25.74 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest (which reflects the reduction required if such shares are issued to keep the aggregate amount to be paid by Purchaser in the Offer and the Merger the same as would be paid if such shares were not issued, assuming the capitalization of Take-Two described in "Introduction" to the Offer to Purchase), in the event that the stockholders of Take-Two approve, at Take-Two's 2008 annual meeting of stockholders to be held on April 17, 2008, amendments to Take-Two's Incentive Stock Plan to increase the number of shares reserved for issuance under the Plan and to permit the issuance of awards under such plan to consultants. If such an amendment is made, Purchaser will extend the Offer to the extent required by applicable law.

3. The Offer is being made for all issued and outstanding Shares.

4. The Offer and withdrawal rights expire at 11:59 p.m., New York City time, on Friday, April 18, 2008, unless the Offer is extended.

5. The Offer is conditioned upon (i) there having been validly tendered and not withdrawn before the expiration of the Offer at least the number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis (taking into account, without limitation, all shares issuable upon the exercise of any options, warrants, convertible securities or rights or pursuant to other contractual obligations) on the date of the purchase of Shares pursuant to the Offer, (ii) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the Merger, (iii) Take-Two's board of directors having redeemed the Rights or Electronic Arts being satisfied, in its sole discretion, that the Rights have been invalidated or are otherwise inapplicable to the Offer and the Merger, (iv) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer and (v) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or having been terminated prior to the expiration of the Offer. The Offer is also subject to certain other conditions set forth in the Offer to Purchase.

6. Tendering stockholders will not be obligated to pay brokerage fees or commissions or, subject to Instruction 6 of the Letter of Transmittal, stock transfer taxes on the transfer and sale of Shares pursuant to the Offer. However, federal income tax backup withholding at a rate of 28% may be required, unless an exemption is provided or unless the required taxpayer identification information is provided. See Instruction 8 of the Letter of Transmittal."

The phrase "(Including the Associated Preferred Stock Purchase Rights)" shall be inserted immediately following the phrase "All Outstanding Shares of Common Stock" on the second line of the Instructions Form included in the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees.

The first paragraph on the Instructions Form included in the form of Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees is deleted in its entirety and replaced with the following:

"The undersigned acknowledge(s) receipt of your letter, the enclosed Offer to Purchase dated March 13, 2008, and the related Letter of Transmittal (which, together with the Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*"), in connection with the offer by EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc."

### Item 11.    *Additional Information*

As reflected in the amendments to the Offer set forth in this Amendment No. 2, and as a result of the postponement of Take-Two's 2008 annual meeting of stockholders to April 17, 2008, on March 28, 2008, Purchaser extended the Expiration Date of the Offer until 11:59 p.m., New York City time, on Friday, April 18, 2008, unless further extended. As of 5:00 p.m., New York City time, on March 27, 2008, approximately 5,000 Shares had been tendered in and not withdrawn from the Offer.

The full text of the press release issued by Parent on March 28, 2008 announcing the amendment of its Offer, including the extension of the Offer, is filed as Exhibit (a)(5)(I) hereto and is incorporated by reference herein.

### Item 12.    *Exhibits.*

Item 12 of the Schedule TO is hereby amended and restated as follows:

| | |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |

| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
|---|---|
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

* Previously filed

## SIGNATURES

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: March 28, 2008.

**ELECTRONIC ARTS INC.**

By:    /s/ Stephen G. Bené
       _____
       Name:  Stephen G. Bené
       Title:   Senior Vice President, General Counsel, and Secretary

**EA08 ACQUISITION CORP.**

By:    /s/ Stephen G. Bené
       _____
       Name:  Stephen G. Bené
       Title:   Vice President and Secretary

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

* Previously filed

Exhibit (a)(5)(I)

**EA Amends Take-Two Tender Offer and**
**Extends Expiration Date to April 18, 2008**

REDWOOD CITY, Calif., March 28, 2008 -- Electronic Arts Inc. ("EA") (NASDAQ: ERTS) today announced that it is amending its tender offer for all of the currently outstanding shares of common stock of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ: TTWO). The amendments are in light of the actions publicly disclosed by Take-Two on March 26, 2008, including its adoption of a poison pill and change to the date of its 2008 annual meeting of stockholders to April 17.

The principal amendments to the offer include:

- EA has added a condition to its offer requiring either (1) that Take-Two's Board of Directors redeem the preferred stock purchase rights issued as a result of Take-Two's adoption on March 24, 2008 of the stockholder rights plan, or (2) that EA be satisfied that such rights have been invalidated or are otherwise inapplicable to its acquisition of Take-Two.

- EA has extended its tender offer for all of the common stock of Take-Two until 11:59 p.m., New York City time on Wednesday, April 18, 2008, unless further extended. The offer was previously set to expire at midnight, New York City time, on April 11, 2008.

"The actions of the Take-Two Board may increase the risk for their stockholders by delaying a potential transaction," said Owen Mahoney, Senior Vice President of Corporate Development at EA. "We continue to believe that our $26.00 per share offer price is full and fair, and that a transaction between Take-Two and EA is the most compelling combination financially, strategically and operationally for all parties."

EA commenced on March 13, 2008 its all-cash tender offer to purchase Take-Two shares for $26.00 per share, which represents a 64% premium over Take-Two's closing stock price on February 15, the last trading day before EA sent its revised proposal to Take-Two.

As of 5:00 p.m., New York City time, on Thursday, March 27, 2008, approximately 5,000 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

*Additional Information and Where to Find It*

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents, as they may be amended or supplemented from time to time, and any other documents relating to the tender offer that are filed with the SEC carefully and in their entirety because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

This release does not constitute a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders. Neither EA nor its subsidiary making the tender offer is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting.

*For additional information, please contact :*

| | | |
|---|---|---|
| Jeff Brown | Tricia Gugler | David Drake |
| VP Communications | Director of IR | Georgeson |
| Electronic Arts | Electronic Arts | 212-440-9861 |
| 650-628-7922 | 650-628-7327 | |

*About Electronic Arts*

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS™, EA™, EA SPORTS BIG™ and POGO™. In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

*Forward Looking Statements*

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

Created by 10K Wizard    www.10KWizard.com

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 4

EA Amends Take-Two Tender Offer and Extends Expiration Date to April 18, 2008

REDWOOD CITY, Calif.--(BUSINESS WIRE)--March 28, 2008--Electronic Arts Inc. ("EA") (NASDAQ:ERTS) today announced that it is amending its tender offer for all of the currently outstanding shares of common stock of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ:TTWO). The amendments are in light of the actions publicly disclosed by Take-Two on March 26, 2008, including its adoption of a poison pill and change to the date of its 2008 annual meeting of stockholders to April 17.

The principal amendments to the offer include:

-- EA has added a condition to its offer requiring either (1) that Take-Two's Board of Directors redeem the preferred stock purchase rights issued as a result of Take-Two's adoption on March 24, 2008 of the stockholder rights plan, or (2) that EA be satisfied that such rights have been invalidated or are otherwise inapplicable to its acquisition of Take-Two.

-- EA has extended its tender offer for all of the common stock of Take-Two until 11:59 p.m., New York City time on Wednesday, April 18, 2008, unless further extended. The offer was previously set to expire at midnight, New York City time, on April 11, 2008.

"The actions of the Take-Two Board may increase the risk for their stockholders by delaying a potential transaction," said Owen Mahoney, Senior Vice President of Corporate Development at EA. "We continue to believe that our $26.00 per share offer price is full and fair, and that a transaction between Take-Two and EA is the most compelling combination financially, strategically and operationally for all parties."

EA commenced on March 13, 2008 its all-cash tender offer to purchase Take-Two shares for $26.00 per share, which represents a 64% premium over Take-Two's closing stock price on February 15, the last trading day before EA sent its revised proposal to Take-Two.

As of 5:00 p.m., New York City time, on Thursday, March 27, 2008, approximately 5,000 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

Additional Information and Where to Find It

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents, as they may be amended or supplemented from time to time, and any other documents relating to the tender offer that are filed with the SEC carefully and in their entirety because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

This release does not constitute a solicitation of proxies in connection with any matter to be considered at Take-Two's 2008 annual meeting of stockholders. Neither EA nor its subsidiary

making the tender offer is soliciting, or intends to solicit, proxies in respect of any matter to be considered at Take-Two's 2008 annual meeting.

About Electronic Arts

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS BIG(TM) and POGO(TM). In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

Forward Looking Statements

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

CONTACT: Electronic Arts
Jeff Brown, 650-628-7922 (VP Communications)
Tricia Gugler, 650-628-7327 (Director of IR)
or
Georgeson
David Drake, 212-440-9861
SOURCE: Electronic Arts Inc.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 5



# FORM SC TO-T/A

## TAKE TWO INTERACTIVE SOFTWARE INC - TTWO

**Filed: April 18, 2008 (period: )**

Amendment to a previously filed SC TO-T

# Table of Contents

SC TO-T/A - AMENDMENT NO. 4 TO SCHEDULE TO

EX-99.(A)(1)(H) (AMENDED AND RESTATED OFFER TO PURCHASE DATED APRIL 18)

EX-99.(A)(1)(I) (AMENDED AND RESTATED LETTER OF TRANSMITTAL)

EX-99.(A)(1)(J) (AMENDED AND RESTATED NOTICE OF GUARANTEED DELIVERY)

EX-99.(A)(1)(K) (AMENDED AND RESTATED LETTER FROM PURCHASER TO BROKERS)
EX-99.(A)(1)(L) (AMENDED AND RESTATED LETTER TO CLIENTS)

EX-99.(A)(5)(K) (PRESS RELEASE ISSUED BY ELECTRONIC ARTS INC.)

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Amendment No. 4
to

## Schedule TO
### TENDER OFFER STATEMENT UNDER SECTION 14(D)(1)
### OR 13(E)(1) OF THE SECURITIES EXCHANGE ACT OF 1934

# Take-Two Interactive Software, Inc.
*(Name of Subject Company—(Issuer))*

# EA08 Acquisition Corp.
# Electronic Arts Inc.
*(Names of Filing Persons—(Offeror))*

**Common Stock, Par Value $.01 Per Share**
*(Title of Class of Securities)*

**874054109**
*(CUSIP Number of Class of Securities)*

Stephen G. Bené
Senior Vice President, General Counsel and Secretary
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, California 94065
Telephone: (650) 628-1500
*(Name, address and telephone number of person authorized to receive notices and communications on behalf of filing persons)*

*Copy to:*
Richard Capelouto, Esq.
Simpson Thacher & Bartlett LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000

### CALCULATION OF FILING FEE

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $2,152,261,826 | $84,583.89 |

\*    Calculated solely for purposes of determining the filing fee. Calculated by multiplying $25.74, the per share tender offer price, by 84,240,550, which represents (i) 76,826,485 outstanding shares of common stock as of March 21, 2008 (according to the Subject Company's Solicitation/Recommendation Statement on Schedule 14D-9 relating to the Offer), minus (ii) 10 shares of common stock beneficially owned by the filing persons as of the date hereof, plus (iii) 1,500,000 shares of restricted stock of the Subject Company issued to ZelnickMedia Corporation on February 14, 2008 pursuant to its management agreement with Subject Company and plus (iv) 5,914,075 shares of common stock subject to outstanding options as of October 31, 2007 (3,905,000 shares according to the Subject Company's Annual Report on Form 10—K for the period ended October 31, 2007 plus 2,009,075 shares subject to options granted by the Subject Company to ZelnickMedia Corporation).

\*\*    Calculated as 0.00393% of the transaction value. The amount of filing fee was calculated in accordance with Section 14(g)(3) of and Rule 0-11(d) under the Securities Exchange Act of 1934, as amended.

☒    Check box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| Amount Previously Paid: | $84,583.89 | Filing Parties: | EA08 Acquisition Corp. |
|---|---|---|---|
| | | | Electronic Arts Inc. |
| Form or Registration No.: | SC TO | Date Filed: | March 13, 2008 |

☐    Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.
Check the appropriate boxes below to designate any transactions to which the statement relates:

☒    third-party tender offer subject to Rule 14d-1.

☐    issuer tender offer subject to Rule 13e-4.

☐    going-private transaction subject to Rule 13e-3.

☐    amendment to Schedule 13D under Rule 13d-2.
Check the following box if the filing is a final amendment reporting the results of the tender offer.    ☐

This Amendment No. 4 to Schedule TO amends and supplements the Tender Offer Statement on Schedule TO filed with the Securities and Exchange Commission on March 13, 2008, as amended (the "*Schedule TO*"), by Electronic Arts Inc. ("*Parent*") and EA08 Acquisition Corp., a wholly-owned subsidiary of Parent ("*Purchaser*"), relating to the offer by Purchaser to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc. ("*Take-Two*" or the "*Company*") at a purchase price of $25.74 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*") and in the related Amended and Restated Letter of Transmittal, as each may be amended or supplemented from time to time.

Except as specifically set forth herein, this Amendment No. 4 does not modify any of the information previously reported on the Schedule TO. All capitalized terms used in this Amendment No. 4 and not otherwise defined have the respective meanings ascribed to them in the Amended and Restated Offer to Purchase.

As permitted by General Instruction F to the Schedule TO, the information set forth in the Schedule TO, as amended by this Amendment No. 4, including the Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal and all other appendices, schedules, exhibits and annexes hereto and thereto, is hereby expressly incorporated by reference herein in response to Items 1 through 12 of the Schedule TO. You should read this Amendment No. 4 to the Schedule TO together with the Schedule TO.

## Item 11.    Additional Information

On April 18, 2008, Parent and Purchaser announced that they had amended the Offer to adjust the price to be paid pursuant to the Offer to $25.74 per Share as a result of the approval by Take-Two's stockholders at the Take-Two 2008 annual meeting of stockholders of Take-Two's proposals to make certain amendments to Take-Two's Incentive Stock Plan.

In addition, as reflected in the Amended and Restated Offer to Purchase and Amended and Restated Letter of Transmittal filed with this Amendment No. 4, on April 18, 2008, Purchaser extended the Expiration Date of the Offer until 11:59 p.m., New York City time, on Friday, May 16, 2008, unless further extended. As of 5:00 p.m., New York City time, on April 17, 2008, approximately 6,432,787 Shares had been tendered and not withdrawn from the Offer.

The full text of the press release issued by Parent on April 18, 2008 announcing the amendment of its Offer and the extension of the Offer is filed as Exhibit (a)(5)(K) hereto and is incorporated by reference herein.

## Item 12.    Exhibits.

Item 12 of the Schedule TO is hereby amended and restated as follows:

(a)(1)(A)    Offer to Purchase dated March 13, 2008. *

(a)(1)(B)    Letter of Transmittal. *

(a)(1)(C)    Notice of Guaranteed Delivery. *

(a)(1)(D)    Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. *

(a)(1)(E)    Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. *

(a)(1)(F)    Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. *

(a)(1)(G)    Summary Advertisement as published on March 13, 2008. *

(a)(1)(H)    Amended and Restated Offer to Purchase dated April 18, 2008.

(a)(1)(I)    Amended and Restated Letter of Transmittal.

| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. |
|---|---|
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. * |
| (a)(5)(J) | Press Release issued by Electronic Arts Inc., dated April 17, 2008. * |
| (a)(5)(K) | Press Release issued by Electronic Arts Inc., dated April 18, 2008. |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

\*     Previously filed

## SIGNATURES

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: April 18, 2008.

**ELECTRONIC ARTS INC.**

By:                /s/   STEPHEN G. BENÉ
        _____
Name:               Stephen G. Bené
Title:    Senior Vice President, General Counsel, and Secretary


**EA08 ACQUISITION CORP.**

By:                /s/   STEPHEN G. BENÉ
        _____
Name:               Stephen G. Bené
Title:        Vice President and Secretary

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(1)(H) | Amended and Restated Offer to Purchase dated April 18, 2008. |
| (a)(1)(I) | Amended and Restated Letter of Transmittal. |
| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. |
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at www.eatake2.com (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at www.eatake2.com (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at www.eatake2.com (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. * |
| (a)(5)(J) | Press Release issued by Electronic Arts Inc., dated April 17, 2008. * |
| (a)(5)(K) | Press Release issued by Electronic Arts Inc., dated April 18, 2008. |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

\*    Previously filed

Exhibit (a)(1)(H)

*Amended and Restated*
*Offer to Purchase for Cash*
*All Outstanding Shares of Common Stock*
*(Including the Associated Preferred Stock Purchase Rights)*
*of*

*Take-Two Interactive Software, Inc.*

*at*

*$25.74 Net Per Share*
*by*

*EA08 Acquisition Corp.*
*a wholly-owned subsidiary of*

*Electronic Arts Inc.*

*THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 11:59 P.M.,*
*NEW YORK CITY TIME, ON FRIDAY, MAY 16, 2008,*
*UNLESS THE OFFER IS EXTENDED.*

*THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE HAVING BEEN VALIDLY TENDERED AND NOT WITHDRAWN BEFORE THE EXPIRATION OF THE OFFER AT LEAST THE NUMBER OF SHARES OF COMMON STOCK, PAR VALUE $.01 PER SHARE, WITH THE ASSOCIATED PREFERRED STOCK PURCHASE RIGHTS (TOGETHER, THE "SHARES"), OF TAKE-TWO INTERACTIVE SOFTWARE, INC. ("TAKE-TWO" OR THE "COMPANY"), WHICH, TOGETHER WITH THE SHARES THEN OWNED BY ELECTRONIC ARTS INC. ("ELECTRONIC ARTS" OR "PARENT"), A DIRECT PARENT OF EA08 ACQUISITION CORP. ("PURCHASER"), AND ITS SUBSIDIARIES (INCLUDING PURCHASER), REPRESENTS AT LEAST A MAJORITY OF THE TOTAL NUMBER OF SHARES OUTSTANDING ON A FULLY-DILUTED BASIS, (II) PURCHASER BEING SATISFIED, IN ITS SOLE DISCRETION, THAT THE RESTRICTIONS ON BUSINESS COMBINATIONS WITH INTERESTED STOCKHOLDERS SET FORTH IN SECTION 203 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE ARE INAPPLICABLE TO THE OFFER AND THE PROPOSED MERGER, (III) TAKE-TWO'S BOARD OF DIRECTORS REDEEMING THE ASSOCIATED PREFERRED STOCK PURCHASE RIGHTS OR ELECTRONIC ARTS BEING SATISFIED, IN ITS SOLE DISCRETION, THAT SUCH RIGHTS HAVE BEEN INVALIDATED OR ARE OTHERWISE INAPPLICABLE TO THE OFFER AND THE PROPOSED MERGER, (IV) TAKE-TWO HAVING ENTERED INTO A MERGER AGREEMENT WITH ELECTRONIC ARTS AND PURCHASER PROVIDING FOR THE CONSUMMATION OF THE OFFER AND A SECOND STEP MERGER AS CONTEMPLATED BY THIS OFFER TO PURCHASE ON TERMS SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER IN THEIR REASONABLE JUDGMENT, INCLUDING REPRESENTATIONS AND WARRANTIES THAT ARE REASONABLY SATISFACTORY TO ELECTRONIC ARTS AND PURCHASER AND ARE NOT SUBJECT TO ANY EXCEPTIONS THAT REFLECT FACTS, CIRCUMSTANCES OR CONDITIONS THAT WOULD RESULT IN A FAILURE TO SATISFY ANY OTHER CONDITION TO THE OFFER AND (V) ANY APPLICABLE WAITING PERIOD UNDER THE HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976, AS AMENDED, HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO SUBJECT TO CERTAIN OTHER CONDITIONS CONTAINED IN THIS OFFER TO PURCHASE. SEE "INTRODUCTION" AND "THE OFFER—SECTION 14—CONDITIONS OF THE OFFER", WHICH SET FORTH IN FULL THE CONDITIONS TO THE OFFER.*

*ELECTRONIC ARTS AND PURCHASER INTEND TO CONTINUE TO SEEK TO NEGOTIATE THE ACQUISITION OF TAKE-TWO BY ELECTRONIC ARTS AND THE OFFER IS CONDITIONED ON ELECTRONIC ARTS AND PURCHASER ENTERING INTO A MERGER AGREEMENT WITH TAKE-TWO. SUBJECT TO APPLICABLE LAW, PURCHASER RESERVES THE RIGHT TO AMEND THE OFFER (INCLUDING AMENDING THE NUMBER OF SHARES TO BE PURCHASED AND THE OFFER PRICE), INCLUDING FOR PURPOSES OF NEGOTIATING OR ENTERING INTO A MERGER AGREEMENT WITH THE COMPANY. IF REQUESTED BY THE COMPANY, ANY SUCH MERGER AGREEMENT MAY CONTEMPLATE THE TERMINATION OF THE OFFER. IN THE EVENT THAT PARENT, PURCHASER AND THE COMPANY ENTER INTO A MERGER AGREEMENT THAT REQUIRES THAT THE OFFER BE TERMINATED, THE SHARES WOULD, UPON CONSUMMATION OF SUCH MERGER, BE CONVERTED INTO THE RIGHT TO RECEIVE THE CONSIDERATION PROVIDED FOR IN SUCH MERGER AGREEMENT.*

Table of Contents

*THE DATE OF THE ORIGINAL OFFER TO PURCHASE IS MARCH 13, 2008. THE OFFER TO PURCHASE HAS BEEN AMENDED AND RESTATED AS OF APRIL 18, 2008.*

*THIS AMENDED AND RESTATED OFFER TO PURCHASE AND THE RELATED AMENDED AND RESTATED LETTER OF TRANSMITTAL CONTAIN IMPORTANT INFORMATION, AND YOU SHOULD CAREFULLY READ BOTH IN THEIR ENTIRETY BEFORE MAKING A DECISION WITH RESPECT TO THE OFFER.*

## *IMPORTANT*

*Any stockholder of the Company desiring to tender Shares in the Offer should either (i) complete and sign the Amended and Restated Letter of Transmittal (or a facsimile thereof) in accordance with the instructions in the Amended and Restated Letter of Transmittal, have such stockholder's signature thereon guaranteed if required by Instruction 1 to the Amended and Restated Letter of Transmittal, and mail or deliver the Amended and Restated Letter of Transmittal together with the certificate(s) representing tendered Shares and all other required documents to U.S. Bank National Association, the Depositary for the Offer, or tender such Shares pursuant to the procedure for book-entry transfer set forth in "The Offer—Section 3—Procedure for Tendering Shares" or (ii) give instructions to such stockholder's broker, dealer, commercial bank, trust company or other nominee to tender such stockholder's Shares for such stockholder. Stockholders whose Shares are registered in the name of a broker, dealer, commercial bank, trust company or other nominee must contact such person if they desire to tender their Shares. The associated preferred stock purchase rights are currently evidenced by the certificates representing the Shares and, by tendering Shares, a stockholder will also tender the associated preferred stock purchase rights. If the Distribution Date (as defined in "The Offer—Section 8—Certain Information Concerning the Company") occurs, stockholders will be required to tender one associated preferred stock purchase right for each Share tendered in order to effect a valid tender of such Share.*

*Any stockholder who desires to tender Shares and whose certificates representing such Shares (including, if applicable, associated preferred stock purchase rights) are not immediately available, or who cannot comply with the procedures for book-entry transfer on a timely basis, may tender such Shares (including, if applicable, associated preferred stock purchase rights) pursuant to the guaranteed delivery procedure set forth in "The Offer—Section 3—Procedure for Tendering Shares".*

*Any questions and requests for assistance may be directed to the Information Agent or to the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Amended and Restated Offer to Purchase. Additional copies of this Amended and Restated Offer to Purchase, the Amended and Restated Letter of Transmittal, the Amended and Restated Notice of Guaranteed Delivery and other related materials may be obtained from the Information Agent. Stockholders may also contact their brokers, dealers, commercial banks, trust companies or other nominees for assistance concerning the Offer.*

*NEITHER THIS AMENDED AND RESTATED OFFER TO PURCHASE NOR THE OFFER CONSTITUTES A SOLICITATION OF CONSENTS FROM TAKE-TWO'S STOCKHOLDERS. ANY SOLICITATION WILL BE MADE ONLY PURSUANT TO SEPARATE PROXY OR CONSENT SOLICITATION MATERIALS COMPLYING WITH ALL APPLICABLE REQUIREMENTS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.*

*The Dealer Manager for the Offer is:*

# Morgan Stanley

*April 18, 2008*

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| SUMMARY TERM SHEET |  | 1 |
| INTRODUCTION |  | 7 |
| THE OFFER |  | 12 |
| 1. | Terms of the Offer | 12 |
| 2. | Acceptance for Payment and Payment | 14 |
| 3. | Procedure for Tendering Shares | 15 |
| 4. | Withdrawal Rights | 18 |
| 5. | Certain Tax Considerations | 19 |
| 6. | Price Range of Shares | 21 |
| 7. | Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations | 21 |
| 8. | Certain Information Concerning the Company | 23 |
| 9. | Certain Information Concerning Purchaser and Parent | 26 |

|  |  | Page |
|---|---|---|
| 10. | Source and Amount of Funds | 27 |
| 11. | Background of the Offer | 28 |
| 12. | Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights | 35 |
| 13. | Dividends and Distributions | 39 |
| 14. | Conditions of the Offer | 40 |
| 15. | Certain Legal Matters; Regulatory Approvals | 44 |
| 16. | Fees and Expenses | 46 |
| 17. | Miscellaneous | 47 |
| Schedule I | Directors and Executive Officers of Parent and the Purchaser | S-1 |

Table of Contents

## SUMMARY TERM SHEET

EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., is offering to purchase all issued and outstanding shares of common stock, par value $.01 per share, of Take-Two Interactive Software, Inc. (together with the associated preferred stock purchase rights), for $25.74 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal. This summary term sheet highlights selected information from this Amended and Restated Offer to Purchase, and may not contain all of the information that is important to you. To better understand our offer to you and for a complete description of the legal terms of the Offer, you should carefully read this Amended and Restated Offer to Purchase and the accompanying Amended and Restated Letter of Transmittal in their entirety. Questions or requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephone numbers, in each case, as set forth on the back cover of this Amended and Restated Offer to Purchase.

Unless the context requires otherwise, all references in this Summary Term Sheet and in this Amended and Restated Offer to Purchase to "*Purchaser*," "*we*," "*us*," or "*our*" are to EA08 Acquisition Corp., all references to "*Parent*" or "*Electronic Arts*" are to Electronic Arts Inc. and all references to "*Take-Two*" or the "*Company*" are to Take-Two Interactive Software, Inc.

**Who is offering to buy my shares?**

- We are a Delaware corporation formed for the purpose of making this tender offer, and we have carried on no activities other than in connection with making the tender offer. We are a wholly-owned subsidiary of Electronic Arts, also a Delaware corporation.

- Electronic Arts is one of the world's leading interactive entertainment software companies. Electronic Arts develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet.

- See "The Offer—Section 9—Certain Information Concerning Purchaser and Parent" for more information about us and our affiliates.

**What securities are you offering to purchase?**

- We are offering to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights, of Take-Two. We refer to one share of Take-Two common stock, together with the associated preferred stock purchase right, as a "*share*" or "*Share*". See "Introduction" and "The Offer—Section 1—Terms of the Offer".

**How much are you offering to pay for my shares and what is the form of payment?**

- We are offering to pay you $25.74 per share, net to you in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions contained in this Amended and Restated Offer to Purchase. See "Introduction", "The Offer—Section 1—Terms of the Offer" and "The Offer—Section 13—Dividends and Distributions".

- If you are the record owner of your Shares and you tender your Shares to us in the offer, you will not have to pay any brokerage or similar fees. If you own your shares through a broker or other nominee, your broker or nominee may charge you a fee to tender your Shares on your behalf. You should consult your broker or nominee to determine whether any charges will apply. See "Introduction" and "The Offer—Section 1—Terms of the Offer".

1

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

**Why are the Offer to Purchase, the Letter of Transmittal, the Notice of Guaranteed Delivery and related materials being amended and restated?**

- At Take-Two's annual meeting of stockholders held on April 17, 2008, the Company's stockholders approved a proposal to amend the Company's Incentive Stock Plan to increase the number of shares reserved for issuance under that plan by 2,000,000 shares and to permit the issuance of awards under such plan to consultants. Under the terms of the amended management agreement between the Company and ZelnickMedia Corporation, or "*ZelnickMedia*", 1,500,000 of such newly-reserved shares under the Incentive Stock Plan will be issued to ZelnickMedia. At least 780,000 of such shares would vest as a result of a purchase of Shares pursuant to the Offer. Consistent with its previously-stated intention as set forth in the original Offer to Purchase, Letter of Transmittal and Notice of Guaranteed Delivery dated March 13, 2008, as a result of the approval of this proposal, Purchaser has amended and restated the Offer to Purchase, Letter of Transmittal and Notice of Guaranteed Delivery to adjust the purchase price to $25.74 net per share, without interest (and less applicable withholding taxes) and to reflect certain other developments to the offer previously reported in amendments to our tender offer statement on Schedule TO that have been filed with the SEC.

**Why are you making the offer?**

- We are making the offer because we want to acquire control of, and ultimately the entire equity interest in, the Company. If the offer is consummated, Electronic Arts intends, as soon as practicable after consummation of the offer, to have us consummate a second-step merger with the Company pursuant to which each then outstanding share (other than shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their shares) would be converted into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the offer, without interest (and less any applicable withholding taxes). Upon consummation of this merger, the Company would be a wholly-owned subsidiary of Electronic Arts.

- See "Introduction", "The Offer—Section 11—Background of the Offer" and "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" for more information.

**Do you intend to undertake a consent solicitation to remove the directors of Take-Two?**

- To the extent we or Electronic Arts determines that a consent solicitation would be necessary or advisable in order to further our objective to acquire Take-Two, we and/or Electronic Arts intend to commence a solicitation of written consents from Take-Two stockholders in order to, among other things, remove each member of Take-Two's board of directors and replace such directors with nominees selected by us to serve as the directors of Take-Two. We would expect that any directors selected by us and/or Electronic Arts would, subject to their fiduciary duties, support our offer and the related merger and take certain actions to enable the offer and the related merger to proceed, including taking action to cause certain conditions of the offer to be satisfied (including negotiating and causing the Company to enter into a merger agreement, if the condition relating to Take-Two's entry into a merger agreement with us and Electronic Arts remains in place).

- **Neither this Amended and Restated Offer to Purchase nor the offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Securities Exchange Act of 1934, as amended, or the "*Exchange Act*".**

2

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

**If you do undertake a consent solicitation, will the granting of a consent be a condition to the tender of shares in the offer?**

- No. If we undertake a consent solicitation, the granting of a consent to us in connection with a consent solicitation by us would not be a condition to the tender of shares in the offer.

**What are the most significant conditions to the offer?**

- We are not obligated to purchase any shares unless, prior to the expiration of the offer:

  - there have been validly tendered and not withdrawn at least the number of shares, which, together with the shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of shares outstanding on a fully diluted basis;

  - we are satisfied, in our sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the offer and the proposed second-step merger or any other business combination involving Electronic Arts or any of its subsidiaries (including Purchaser) and Take-Two;

  - Take-Two's board of directors has redeemed the associated preferred stock purchase rights or Electronic Arts is satisfied, in its sole discretion, that such rights have been invalidated or are otherwise inapplicable to the offer and the proposed second-step merger or any other business combination involving Electronic Arts or any of its subsidiaries (including Purchaser) and Take-Two;

  - Take-Two has entered into a merger agreement with Purchaser and Electronic Arts providing for the consummation of the offer and a second-step merger as contemplated by this Amended and Restated Offer to Purchase on terms satisfactory to us in our reasonable judgment, including representations and warranties that are reasonably satisfactory to us; and

  - any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, has expired or been terminated;

- These and other conditions to our obligations to purchase shares tendered in the offer are described in greater detail in "Introduction" and "The Offer—Section 14—Conditions of the Offer". We can waive any and all of the conditions to the offer without the consent of Take-Two.

**Will you have the financial resources to pay for the shares?**

- Yes. Our offer is not subject to any financing condition. Electronic Arts will provide us with the funds necessary to purchase the shares in the offer and to pay related expenses. As of March 31, 2008, Parent had cash and cash equivalents and short-term investments in the amount of approximately $2.3 billion. Although this amount exceeds the amount of financing required to purchase the Shares pursuant to the offer and the merger (and to pay related fees and expenses), the Board of Directors of Electronic Arts has also authorized Electronic Arts to obtain additional debt financing which may be used to fund in part the offer and/or the merger. See "The Offer—Section 10—Source and Amount of Funds".

**How long do I have to decide whether to tender in the offer?**

- You have until the expiration of the offer to tender. The offer currently is scheduled to expire at 11:59 p.m., New York City time, on Friday, May 16, 2008.

- We may elect to provide a "subsequent offering period" for the offer. A subsequent offering period is an additional period of time beginning after we have purchased shares tendered during the offer, during

3

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

which stockholders may tender, but not withdraw, their shares and receive the offer consideration. We do not currently intend to include a subsequent offering period, although we reserve the right to do so.

- See "The Offer—Section 1—Terms of the Offer".

**How will I be notified if the offer is extended?**

- If we decide to extend the offer, or if we decide to provide for a subsequent offering period, we will inform U.S. Bank National Association, the depositary for the offer, of that fact and will make a public announcement of the extension, no later than 9:00 a.m., New York City time, on the next business day after the date the offer was scheduled to expire. See "The Offer—Section 1—Terms of the Offer".

**How do I tender my shares?**

- To tender your shares in the offer, you must:

  - deliver the certificates representing your shares, together with a completed and signed Letter of Transmittal and any other required documents, to U.S. Bank National Association, the depositary for the offer, in accordance with the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" and in the Letter of Transmittal, not later than the time the offer expires;

  - tender your shares pursuant to the book-entry transfer procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares"; or

  - if your share certificates are not immediately available or if you cannot deliver your share certificates, and any other required documents, to the depositary prior to the expiration of the offer, or you cannot complete the procedure for delivery by book-entry transfer on a timely basis, you may still tender your shares if you comply with the guaranteed delivery procedures described in "The Offer—Section 3—Procedure for Tendering Shares".

**If I already tendered my shares in the original offer, do I have to do anything now?**

- No. Shares previously tendered pursuant to the original Offer to Purchase and Letter of Transmittal and not withdrawn constitute valid tenders for purposes of the offer as amended. Stockholders who have validly tendered and not withdrawn their shares are not required to take any further action with respect to such shares in order to receive the offer price if shares are accepted for payment and paid for by us pursuant to the offer, except as may be required by the guaranteed delivery procedure if such procedure was utilized. See "Introduction" and "The Offer—Section 3—Procedure for Tendering Shares".

**Can I withdraw my previously tendered shares?**

- You may withdraw previously tendered shares at any time prior to the expiration of the offer, and, following such expiration, you can withdraw them at any time until we accept such shares for payment. You may not, however, withdraw shares tendered during a subsequent offering period, if one is included, or after we accept your shares for payment. See "The Offer—Section 4—Withdrawal Rights".

- To withdraw previously tendered shares, you must deliver a written notice of withdrawal, or a facsimile of one, with the required information to U.S. Bank National Association, the depositary for the offer, while you have the right to withdraw the shares. See "The Offer—Section 4—Withdrawal Rights".

4

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

**What does the Board of Directors of Take-Two think of the offer?**

- Take-Two's Board of Directors rejected an earlier proposal by Electronic Arts to acquire all issued and outstanding shares of Take-Two for $26.00 per share in cash. On March 26, 2008, Take-Two issued a press release and filed a solicitation/recommendation statement with the Securities and Exchange Commission, or "*SEC*", on Schedule 14D-9, announcing that its Board of Directors had voted to recommend that Take-Two's stockholders reject the offer at the offer price of $26.00. As of the time of filing of this Amended and Restated Offer to Purchase with the SEC, Take-Two's Board of Directors has not publicly commented on our revised offer of $25.74 per share. See "The Offer—Section 1—Background of the Offer."

**If I decide not to tender but the offer is successful, what will happen to my shares?**

- As indicated above, if the offer is successful, we and Electronic Arts intend, as soon as practicable following the consummation of the offer, to have us consummate a merger transaction with the Company pursuant to which each then outstanding share (other than shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the offer and who properly seek appraisal for their shares) would be converted into the right to receive an amount in cash per share equal to the highest price per share paid by us pursuant to the offer, without interest (and less any applicable withholding taxes). If the proposed second-step merger takes place, stockholders who do not tender in the offer (other than those described above) will receive the same amount of cash per share that they would have received had they tendered their shares in the offer. Therefore, if such merger takes place, the only differences between tendering and not tendering shares in the offer is that tendering stockholders will be paid earlier and stockholders who do not tender and who do not vote in favor of the merger may exercise appraisal rights as described below.

- The offer is conditioned on Take-Two entering into a merger agreement with Purchaser and Electronic Arts that provides for the contemplated second-step merger. However, Purchaser reserves the right to waive this merger agreement condition. If Purchaser waives the merger agreement condition and the offer is consummated but Electronic Arts determines not to consummate the merger, there may be so few remaining stockholders and publicly held shares that the shares will no longer be eligible to be traded on the Nasdaq Global Select Market or any other securities market, there may not be a public trading market for the shares, and Take-Two may cease making filings with the SEC or otherwise cease being required to comply with the SEC rules relating to publicly-held companies.

**Could the merger still be consummated if Purchaser waives the merger agreement condition and completes the offer?**

- Yes. While the offer is conditioned on the satisfaction of the merger agreement condition, if Purchaser waives the merger agreement condition and the offer is otherwise consummated, Electronic Arts currently intends, as soon as practicable after consummation of the offer, to cause Take-Two to consummate the merger.

**Are appraisal rights available in either the offer or the proposed merger?**

- Appraisal rights are not available in the offer. After the offer, if the proposed second-step merger takes place, appraisal rights will be available to holders of shares who do not vote in favor of the proposed merger and who properly seek appraisal rights for their shares in accordance with Section 262 of the General Corporation Law of the State of Delaware. The value you would receive if you perfect appraisal rights could be more or less than, or the same as, the price per share to be paid in the proposed merger. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

5

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

**What is the market value of my shares as of a recent date?**

- On March 12, 2008, the last full trading day before the announcement of our intention to commence the offer, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $24.91 per share. On February 15, 2008, the last trading day before Electronic Arts sent its proposal to Take-Two to acquire the Company at $26.00 per share, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $15.83 per share. On April 17, 2008, the last trading day before the date of this Amended and Restated Offer to Purchase, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $25.85 per share. **Please obtain a recent quotation for your shares prior to deciding whether or not to tender.** See "The Offer—Section 6—Price Range of Shares".

**What are the U.S. federal income tax consequences of participating in the offer?**

- In general, if you are a U.S. holder of shares of Take-Two common stock, the sale of shares pursuant to the offer will be a taxable transaction to you. For U.S. federal income tax purposes, your receipt of cash in exchange for your shares generally will cause you to recognize a gain or loss measured by the difference, if any, between the cash you receive in the offer and your adjusted tax basis in your shares. If you are a non-U.S. holder of Take-Two common stock, the sale of shares pursuant to the offer will generally not be a taxable transaction to you under U.S. federal income tax laws unless you have certain connections to the United States. You should consult your tax advisor about the tax consequences to you of participating in the offer in light of your particular circumstances. See "The Offer—Section 5—Certain Tax Considerations".

**Who can I talk to if I have questions about the offer?**

- You can call Georgeson Inc., the information agent for the offer, at (212) 440-9800 (for banks and brokers) or (800) 213-0473 (toll-free) or Morgan Stanley & Co. Incorporated, the dealer manager for the offer, at (877) 247-9865 (toll-free), with any questions you may have. See the back cover of this Amended and Restated Offer to Purchase.

6

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents
To the Stockholders of Take-Two:

## INTRODUCTION

We, EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Parent*" or "*Electronic Arts*"), are offering to purchase all issued and outstanding shares of common stock, par value $.01 per share (the "*Common Stock*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), and the associated preferred stock purchase rights (the "*Rights*" and, together with the Common Stock, the "*Shares*") issued pursuant to the Stockholder Rights Agreement, dated as of March 24, 2008, between Take-Two and American Stock Transfer & Trust Company, as rights agent (the "*Rights Agreement*"), for $25.74 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in this Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal (which, together with any amendments or supplements hereto and thereto, collectively constitute the "*Offer*"). This Amended and Restated Offer to Purchase (this "*Offer to Purchase*") amends and restates the original Offer to Purchase, dated March 13, 2008 (the "*Original Offer to Purchase*"). The Offer was commenced on March 13, 2008. Electronic Arts is one of the world's leading interactive entertainment software companies.

Tendering stockholders who have Shares registered in their own names and tender directly to U.S. Bank National Association, the depositary for the Offer (the "*Depositary*"), will not have to pay brokerage fees or commissions with respect to the purchase of Shares by Purchaser pursuant to the Offer. If you own your Shares through a broker or other nominee, and your broker tenders your Shares on your behalf, your broker or nominee may charge a fee for doing so. You should consult your broker or nominee to determine whether any charges or commissions will apply. Any tendering stockholder or other payee that fails to complete and sign the Substitute Form W–9, which is included in the Amended and Restated Letter of Transmittal, may be subject to backup withholding of U.S. federal income tax at a 28% rate on the gross proceeds payable to such stockholder or other payee pursuant to the Offer. See "The Offer—Section 5—Certain Tax Considerations". Purchaser will pay all charges and expenses of Morgan Stanley & Co. Incorporated ("*Morgan Stanley*"), the dealer manager for the Offer (the "*Dealer Manager*"), the Depositary and Georgeson Inc., the information agent for the Offer (the "*Information Agent*"), incurred in connection with the Offer. See "The Offer—Section 16—Fees and Expenses".

**The Offer is conditioned upon:**

(1)   there having been validly tendered and not withdrawn at least the number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis (taking into account, without limitation, all shares issuable upon the exercise of any options, warrants, convertible securities or rights or pursuant to other contractual obligations) on the date of the purchase of Shares pursuant to the Offer. We refer to this condition in this Amended and Restated Offer to Purchase as the "*Minimum Condition*";

According to the Company's Solicitation/Recommendation Statement on Schedule 14D-9 relating to the Offer (the "*Take-Two Schedule 14D-9*") filed on March 26, 2008 with the Securities and Exchange Commission ("*SEC*"), as of March 21, 2008, there were outstanding 76,826,485 Shares. According to the Company's Annual Report on Form 10-K, filed on December 20, 2007 with the SEC (the "*Company 10-K*"), as of October 31, 2007, there were 3,905,000 Shares issuable upon or otherwise deliverable in connection with the exercise of outstanding options, which number would appear to exclude the 2,009,075 Shares issuable upon exercise of outstanding options granted to ZelnickMedia Corporation ("*ZelnickMedia*") pursuant to the Management Agreement referenced below. Parent currently beneficially owns nine Shares, which were acquired in open market transactions. Purchaser owns one Share.

Based on the foregoing and assuming that (i) no Shares have been issued (including pursuant to the exercise of any options, warrants, convertible securities or other rights or pursuant to other contractual

7

Table of Contents

obligations) or acquired by the Company after March 21, 2008 (other than as described in clauses (iii) and (iv) below), (ii) no options have been granted or have expired after October 31, 2007, (iii) the 1,500,000 shares of restricted stock of the Company have been issued to Zelnick Media pursuant to the Management Agreement and (iv) all 5,914,075 Shares subject to issuance pursuant to Company options (*i.e.*, the 3,905,000 Shares listed in the Company 10-K plus the 2,009,075 Shares underlying options issued to ZelnickMedia) are issued (and the corresponding options exercised), there would be 84,240,560 Shares outstanding immediately following consummation of the Offer, and, as a result, the Minimum Condition would be satisfied if 42,120,271 Shares were tendered and not withdrawn prior to the Expiration Date in addition to the ten Shares already owned by Electronic Arts and Purchaser.

(2)   **Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware (the "*DGCL*") are inapplicable to the Offer and the Merger (as defined below). We refer to this condition in this Amended and Restated Offer to Purchase as the "*Section 203 Condition*";**

In general, Section 203 prevents an "interested stockholder" (generally, a stockholder owning 15% or more of a corporation's outstanding voting stock or an affiliate or associate thereof) from engaging in a "business combination" (defined to include a merger or consolidation and certain other transactions) with a Delaware corporation for a period of three years following the time on which such stockholder became an interested stockholder unless (i) prior to such time the corporation's board of directors approved either the business combination or the transaction which resulted in such stockholder becoming an interested stockholder, (ii) upon consummation of the transaction which resulted in such stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the corporation's voting stock outstanding at the time the transaction commenced (excluding shares owned by certain employee stock plans and persons who are directors and also officers of the corporation) or (iii) at or subsequent to such time the business combination is approved by the corporation's board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 $2/3$% of the outstanding voting stock not owned by the interested stockholder. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

(3)   **Take-Two's Board of Directors having redeemed the Rights or Electronic Arts being satisfied, in its sole discretion, that the Rights have been invalidated or are otherwise inapplicable to the Offer and the Merger. We refer to this condition in this Amended and Restated Offer to Purchase as the "*Rights Condition*";**

As disclosed in the Company's Current Report on Form 8-K filed on March 26, 2008 with the SEC (the "*March 26 Form 8-K*"), on March 24, 2008, Take-Two's Board of Directors adopted and entered into the Rights Agreement and declared a distribution of one Right for each outstanding share of Common Stock to stockholders of record at the close of business on April 7, 2008, and for each share of Common Stock issued (including shares of Common Stock issued from the Company's treasury) by the Company thereafter and prior to the Distribution Date (as defined in "The Offer—Section 8—Certain Information Concerning the Company"). Each Right entitles the registered holder, subject to the terms of the Rights Agreement, to purchase from the Company one one-thousandth of a share of the Company's Series B Preferred Stock, par value $0.01 per share, at a price of $42.50 per Unit, subject to adjustment. The Company has publicly disclosed that its Board of Directors has committed to redeem the Rights 180 days after the date of adoption of the Rights Agreement. See "The Offer—Section 8—Certain Information Concerning the Company".

(4)   **Take-Two having entered into a merger agreement with us and Electronic Arts providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and us in our reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and us and are not subject to any exceptions that reflect facts, circumstances**

8

Table of Contents

or conditions that would result in a failure to satisfy any other condition to the Offer described in "The Offer—Section 14—Conditions to the Offer". We refer to this condition in this Amended and Restated Offer to Purchase as the "*Merger Agreement Condition*"; and

As described in further detail in "The Offer—Section 11—Background of the Offer", Electronic Arts has made a number of attempts to engage with the Board of Directors of the Company regarding a potential acquisition of the Company by Electronic Arts in a negotiated merger transaction. Take-Two's execution of a merger agreement in satisfaction of the Merger Agreement Condition will require Take-Two's Board of Directors to approve such merger agreement.

(5) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"), having expired or having been terminated prior to the expiration of the Offer. We refer to this condition in this Amended and Restated Offer to Purchase as the "*HSR Condition*".

Consummation of the Offer is conditioned upon the expiration or termination of all waiting periods imposed by the HSR Act. Under the HSR Act, certain acquisition transactions, such as the Offer and the Merger, may not be consummated until certain information and documentary material have been furnished for review by the Antitrust Division of the Department of Justice and the Federal Trade Commission (the "*FTC*") and certain waiting period requirements have been satisfied. On April 16, 2008, Electronic Arts received from the FTC a request for additional information under the HSR Act in connection with the purchase of Shares pursuant to the Offer and the Merger. As a result of the request for additional information, the waiting period under the HSR Act will be extended until 11:59 p.m., New York City time, ten days after Electronic Arts' substantial compliance with the request. See "The Offer—Section 15—Certain Legal Matters; Regulatory Approvals".

In addition to the conditions described above, the Offer is also subject to certain other conditions described in "The Offer—Section 14—Conditions to the Offer".

On February 15, 2008, Take-Two announced that it had amended the terms of its management agreement with ZelnickMedia, pursuant to which ZelnickMedia has agreed to provide the services of Strauss Zelnick, Ben Feder and Karl Slatoff as the Executive Chairman, Chief Executive Officer and Executive Vice President, respectively, of the Company. Pursuant to the amendment to the management agreement, the Company, among other things, agreed to grant to ZelnickMedia 1,500,000 shares of restricted stock under the Company's Incentive Stock Plan, subject to the Company's stockholders approving at its 2008 annual meeting of stockholders held on April 17, 2008, an amendment to the Company's Incentive Stock Plan providing for an increase in the number of shares of Take-Two common stock reserved for issuance under the Incentive Stock Plan by 2,000,000 shares and permitting the issuance of awards under that Plan to consultants (which would include ZelnickMedia) (such stockholder approval, the "*Incentive Stock Plan Amendment Approval*"). Take-Two's agreements with ZelnickMedia provide that if such shares of restricted stock are issued to ZelnickMedia, at least 780,000 of such shares would vest as a result of our purchase of Shares pursuant to the Offer. At the Company's 2008 annual meeting of stockholders held on April 17, 2008, the Company obtained the Incentive Stock Plan Amendment Approval. Accordingly, consistent with our previously stated intention as set forth in the Original Offer to Purchase, we have amended the Offer to adjust the purchase price we are offering in the Offer to $25.74 per Share. As stated in the Original Offer to Purchase, this adjustment to the per Share offer price reflects, assuming a current Take-Two capitalization as described under clause (1) of the conditions set forth in the Original Offer to Purchase, the reallocation of the aggregate price payable by Purchaser in the Offer and the Merger (as defined below) that needed to be made assuming 780,000 shares of restricted stock of the Company that are to be issued to ZelnickMedia pursuant to the aforementioned management agreement would vest and not be forfeited upon our purchase of Shares pursuant to the Offer (and that the aggregate amount to be paid by Purchaser in the Offer and the Merger is the same whether or not such shares are issued).

Although the Letter of Transmittal (the "*Original Letter of Transmittal*") previously circulated with the Original Offer to Purchase only refers to the Original Offer to Purchase, stockholders using such document to

9

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

tender their Shares will nevertheless be deemed to be tendering pursuant to the Offer as amended and will receive the adjusted offer price of $25.74 per Share if Shares are accepted for payment and paid for by Purchaser pursuant to the Offer. Unless otherwise indicated, as used herein the term "*Letter of Transmittal*" refers to either the Original Letter of Transmittal or the Amended and Restated Letter of Transmittal.

Stockholders tendering their Shares according to the guaranteed delivery procedures set forth under "The Offer—Section 3—Guaranteed Delivery" may do so using either the original Notice of Guaranteed Delivery circulated with the Original Offer to Purchase or the Amended and Restated Notice of Guaranteed Delivery. Unless otherwise indicated, as used herein, the term "Notice of Guaranteed Delivery" refers to either such document.

**Shares previously tendered pursuant to the Original Offer to Purchase and the Original Letter of Transmittal and not withdrawn constitute valid tenders for purposes of the Offer as amended. Stockholders who have validly tendered and not withdrawn their Shares are not required to take any further action with respect to such Shares in order to receive the offer price if Shares are accepted for payment and paid for by the Purchaser pursuant to the Offer, except as may be required by the guaranteed delivery procedure if such procedure was utilized. See "The Offer—Section 3—Procedure for Tendering Shares". If you have not already tendered your Shares, please disregard the materials previously delivered to you and use the materials accompanying this Amended and Restated Offer to Purchase.**

The purpose of the Offer is to acquire control of, and ultimately the entire equity interest in, the Company. The Offer, as the first step in the acquisition of Take-Two, is intended to facilitate the acquisition of all issued and outstanding Shares. If the Offer is consummated, Electronic Arts and Purchaser intend, as soon as practicable after consummation of the Offer, to have Electronic Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronic Arts consummate a second-step merger or similar business combination with Take-Two (the "*Merger*"). At the effective time of the Merger, each then outstanding Share (other than Shares held by Electronic Arts and us, shares held in the treasury of the Company, shares held by subsidiaries of the Company, if any, and shares held by Take-Two stockholders who have not tendered shares in the Offer and who properly seek appraisal for their Shares in accordance with Section 262 of the DGCL) would be canceled and converted automatically into the right to receive an amount in cash per Share equal to the highest price per share paid by us pursuant to the Offer, without interest (and less any applicable withholding taxes). Upon consummation of the Merger, the Company would be a wholly-owned subsidiary of Electronic Arts.

On March 26, 2008, Take-Two issued a press release and filed with the SEC the Take-Two Schedule 14D-9, announcing that its Board of Directors had voted to recommend that Take-Two's stockholders reject the Offer at the offer price of $26.00. As of the time of filing of this Amended and Restated Offer to Purchase with the SEC, Take-Two's Board of Directors has not publicly commented on our revised Offer of $25.74 per share.

As described in further detail in "The Offer—Section 11—Background of the Offer", Electronic Arts has made a number of attempts to engage with the Board of Directors of the Company regarding a potential acquisition of the Company by Electronic Arts. Both in its discussions with Mr. Zelnick, and its formal proposal letters to Mr. Zelnick and the Take-Two Board of Directors, Electronic Arts has set forth its view as to the benefits of an acquisition of Take-Two by Electronic Arts to Take-Two stockholders, as well as its perceived benefits of such a transaction for Take-Two employees and customers. Electronic Arts stressed that it was prepared to move expeditiously to complete a transaction, and with minimal interference to the day to day operations of Take-Two. To date, Take-Two's Board of Directors has been unwilling to engage in substantive discussions at this time with Electronic Arts regarding a possible acquisition of the Company. See "The Offer—Section 11—Background of the Offer."

**Parent is seeking, and intends to continue to seek, to negotiate the acquisition of the Company by Electronic Arts and the Offer is subject to the Merger Agreement Condition. Subject to applicable law,**

10

Table of Contents

Purchaser reserves the right to amend the Offer (including amending the number of Shares to be purchased and the offer price), including for purposes of negotiating or entering into a merger agreement with the Company. Any such merger agreement may contemplate the termination or amendment of the Offer. In the event that the Offer is terminated and Parent, Purchaser and the Company enter into a merger agreement, the Shares would, upon consummation of such merger, be converted into the right to receive the consideration provided for in the merger agreement.

Electronic Arts and we intend, if we and/or Electronic Arts deem it necessary or advisable in connection with our proposal to acquire the Company, in accordance with the Company's Restated Certificate of Incorporation, its bylaws and applicable rules and regulations of the Exchange Act, to commence a solicitation of written consents from Take-Two stockholders for the following purposes, among others that we and/or Electronic Arts may choose to include within any consent solicitation we and/or Electronic Arts may undertake: (1) to remove each member of Take-Two's board of directors, (2) to elect nominees selected by Electronic Arts, which we refer to as "*EA Nominees*", to serve as the directors of Take-Two and (3) to repeal each provision of the Take-Two bylaws and amendments thereto, if any, adopted after February 14, 2008, and before the effectiveness of the proposals made pursuant to such consent solicitation (other than the amendments to the bylaws of the Company adopted by Take-Two's Board of Directors on March 24, 2008 as disclosed in Item 5.03 of the March 26 Form 8-K). **Neither this Amended and Restated Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*").** If we and/or Electronic Arts do undertake the aforementioned consent solicitation, we and/or Electronic Arts will file solicitation materials with the SEC complying with the rules and requirements of the Exchange Act to solicit from Take-Two stockholders consents to undertake the aforementioned actions. Furthermore, if we and/or Electronic Arts undertake a consent solicitation, the granting of a consent will not be a condition to the tender of Shares in the Offer.

Electronic Arts and Purchaser expect that the EA Nominees, subject to fulfillment of the fiduciary duties that they would have as directors of the Company, would (i) consider the Offer and any other alternative proposal and (ii) consider taking action to remove certain obstacles to the stockholders of the Company determining whether to accept the Offer or otherwise consummate the Offer and the Merger, including taking action to (a) satisfy the Section 203 Condition, the Rights Condition and the Merger Agreement Condition (if then in place) and (b) seek or grant such other consents or approvals as may be desirable or necessary to expedite prompt consummation of the Offer and the Merger. Subject to their fiduciary duties, the EA Nominees, if a consent solicitation is undertaken and such nominees are elected, are expected to support the Offer and the Merger and take the actions described above.

**Neither this Amended and Restated Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.**

No appraisal rights are available in connection with the Offer; however, stockholders may have appraisal rights, if properly exercised under the DGCL, in connection with the Merger. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights".

**This Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal contain important information, and you should carefully read both in their entirety before you make a decision with respect to the Offer.**

11

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

## THE OFFER

**1. Terms of the Offer.**

Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of such extension or amendment), Purchaser will accept for payment and pay for all Shares validly tendered (and not withdrawn in accordance with the procedures set forth in "The Offer—Section 4—Withdrawal Rights") on or prior to the Expiration Date. "*Expiration Date*" means 11:59 p.m., New York City time, on Friday, May 16, 2008, unless and until Purchaser, in its sole discretion, shall have extended the period during which the Offer is open, in which case Expiration Date shall mean the latest time and date at which the Offer, as so extended by Purchaser, shall expire.

The Offer is subject to the conditions set forth under "The Offer—Section 14—Conditions of the Offer", including the satisfaction of the Minimum Condition, the Section 203 Condition, the Rights Condition, the Merger Agreement Condition and the HSR Condition. If any such condition is not satisfied, Purchaser may:

(1) extend the Offer and, subject to withdrawal rights as set forth in "The Offer—Section 4—Withdrawal Rights", retain all such Shares until the expiration of the Offer as so extended;

(2) subject to complying with applicable rules and regulations of the SEC, waive any condition and, subject to any requirement to extend the period of time during which the Offer is open, purchase all Shares validly tendered prior to the Expiration Date and not withdrawn; or

(3) terminate the Offer and not accept for payment or pay for any Shares and return all tendered Shares to tendering stockholders.

Purchaser expressly reserves the right (but will not be obligated), in its sole discretion, at any time and from time to time, to extend the period during which the Offer is open for any reason by giving oral or written notice of the extension to the Depositary and by making a public announcement of the extension. During any extension, all Shares previously tendered and not withdrawn will remain subject to the Offer and subject to the right of a tendering stockholder to withdraw Shares, as described in "The Offer—Section 4—Withdrawal Rights".

Subject to any applicable rules and regulations of the SEC, including Rule 14e–1(c) under the Exchange Act, Purchaser expressly reserves the right to:

(1) terminate or amend the Offer if any of the conditions referred to in the Introduction has not been satisfied or upon the occurrence of any of the other events specified in "The Offer—Section 14—Conditions of the Offer"; or

(2) waive any condition or otherwise amend the Offer in any respect, in each case, by giving oral or written notice of such termination, waiver or amendment to the Depositary and by making a public announcement thereof, as described below.

If Purchaser extends the Offer or if Purchaser is delayed in its acceptance for payment of or payment (whether before or after its acceptance for payment of Shares) for Shares, or it is unable to pay for Shares pursuant to the Offer for any reason, then, without prejudice to Purchaser's rights under the Offer, the Depositary may retain tendered Shares on behalf of the Purchaser, and such Shares may not be withdrawn except to the extent tendering stockholders are entitled to withdrawal rights as described in "The Offer—Section 4—Withdrawal Rights". However, Purchaser's ability to delay payment for Shares that the Purchaser has accepted for payment is limited by Rule 14e–1(c) under the Exchange Act, which requires that a bidder pay the consideration offered or return the securities deposited by or on behalf of stockholders promptly after the termination or withdrawal of the bidder's offer.

As of the date of this Amended and Restated Offer to Purchase, the Rights do not trade separately. Accordingly, by tendering Common Stock you are automatically tendering a similar number of Rights. If, however, the Rights detach and separate certificates evidencing the Rights are issued, tendering stockholders will be required to deliver Rights certificates with the Common Stock.

12

Table of Contents

Any extension, delay, termination, waiver or amendment of the Offer will be followed as promptly as practicable by public announcement thereof, and such announcement in the case of an extension will be made no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date. Without limiting the manner in which Purchaser may choose to make any public announcement, subject to applicable law (including Rules 14d–4(d), 14d–6(c) and 14e–1(d) under the Exchange Act, which require that material changes be promptly disseminated to holders of Shares in a manner reasonably designed to inform such holders of such change), Purchaser currently intends to make announcements regarding the Offer by issuing a press release.

If Purchaser makes a material change in the terms of the Offer, or if it waives a material condition to the Offer, Purchaser will extend the Offer and disseminate additional tender offer materials to the extent required by Rules 14d–4(d)(1), 14d–6(c) and 14e–1 under the Exchange Act. The minimum period during which an Offer must remain open following material changes in the terms of the Offer, other than a change in price or a change in the percentage of securities sought or a change in any dealer's soliciting fee, will depend upon the facts and circumstances, including the materiality of the changes. In contrast, a minimum 10–business day period from the date of such change is generally required to allow for adequate dissemination of new information to stockholders in connection with a change in price or, subject to certain limitations, a change in the percentage of securities sought or a change in any dealer's soliciting fee. For purposes of the Offer, a "*business day*" means any day other than a Saturday, Sunday or a federal holiday, and consists of the time period from 12:01 a.m. through 12:00 midnight, New York City time.

If Purchaser decides, in its sole discretion, to increase (or decrease) the consideration offered in the Offer to holders of Shares and if, at the time that notice of the increase (or decrease) is first published, sent or given to holders of Shares, the Offer is scheduled to expire at any time earlier than the expiration of a period ending on the tenth business day from, and including, the date that such notice is first so published, sent or given, then the Offer will be extended until at least the expiration of ten business days from the date the notice of the increase (or decrease) is first published, sent or given to holders of Shares.

**If, on or before the Expiration Date, Purchaser increases (or decreases) the consideration being paid for Shares accepted for payment pursuant to the Offer, such increased (or decreased) consideration will be paid to all stockholders whose Shares are purchased in the Offer, whether or not such Shares were tendered before the announcement of the increase (or decrease) in consideration.**

Purchaser may, subject to certain conditions, elect to provide a subsequent offering period of between three business days and 20 business days in length after the expiration of the Offer on the Expiration Date and acceptance for payment of the Shares tendered in the Offer (a "*Subsequent Offering Period*"). A Subsequent Offering Period would be an additional period of time, after completion of the first purchase of Shares in the Offer, during which stockholders would be able to tender Shares not tendered in the Offer.

During a Subsequent Offering Period, tendering stockholders would not have withdrawal rights and Purchaser would promptly purchase and pay for any Shares tendered at the same price paid in the Offer. Purchaser may provide a Subsequent Offering Period so long as, among other things:

(1) the initial 20–business day period of the Offer has expired;

(2) Purchaser offers the same form and amount of consideration for Shares in the Subsequent Offering Period as in the initial Offer;

(3) Purchaser immediately accepts and promptly pays for all Shares tendered during the Offer prior to its expiration;

(4) Purchaser announces the results of the Offer, including the approximate number and percentage of Shares deposited in the Offer, no later than 9:00 a.m., New York City time, on the next business day after the Expiration Date and immediately begins the Subsequent Offering Period; and

(5) Purchaser immediately accepts and promptly pays for Shares as they are tendered during the Subsequent Offering Period.

13

Table of Contents

Purchaser does not currently intend, but reserves the right in its sole discretion to include a Subsequent Offering Period in the Offer. If Purchaser elects to include a Subsequent Offering Period, it will notify stockholders of the Company consistent with the requirements of the SEC.

In the event that Purchaser subsequently elects to include a Subsequent Offering Period, no withdrawal rights would apply to Shares tendered during such Subsequent Offering Period and no withdrawal rights would apply during such Subsequent Offering Period with respect to Shares tendered in the Offer and accepted for payment.

Following the commencement of the Offer, the Company elected, in accordance with Rule 14d-5 under the Exchange Act, to provide holders of Shares with copies of the Original Offer to Purchase and the other tender offer materials. To the extent required by applicable law or otherwise deemed advisable by Purchaser and Parent, we (or the Company on our behalf) will send this Amended and Restated Offer to Purchase, the related Letter of Transmittal and other related documents to record holders of Shares and to brokers, dealers, banks, trust companies and other nominees who appear on the Company's stockholder list or, if applicable, who are listed as participants in a clearing agency's security position listing for subsequent transmittal to beneficial owners of Shares.

## 2. Acceptance for Payment and Payment.

Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of the Offer as so extended or amended), Purchaser will accept for payment and pay for all Shares validly tendered and not withdrawn before the Expiration Date promptly after the Expiration Date. Subject to any applicable law, including the rules and regulations of the SEC, we reserve the right, in our sole discretion, to delay the acceptance for payment or payment for Shares if any of the conditions to the Offer specified in the Introduction or in "The Offer—Section 14—Conditions of the Offer" has not been satisfied or upon the occurrence of any of the events specified in "The Offer—Section 14—Conditions of the Offer". Any determination concerning the satisfaction of the terms and conditions of the Offer shall be within the sole discretion of Purchaser. See "The Offer—Section 14—Conditions of the Offer" for more information.

In all cases, payment for Shares accepted for payment pursuant to the Offer will be made only after timely receipt by the Depositary of:

(1)   the share certificates representing such Shares and, if the Distribution Date occurs, certificates representing the associated Rights, or timely confirmation (a "*Book-Entry Confirmation*") of the book-entry transfer of such Shares and, if the Distribution Date occurs, the Rights (if such procedure is available), into the Depositary's account at The Depository Trust Company (the "*Book-Entry Transfer Facility*"), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares";

(2)   the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message (as defined below) in connection with a book-entry transfer; and

(3)   any other documents required by the Letter of Transmittal.

The term "*Agent's Message*" in this Amended and Restated Offer to Purchase means a message, transmitted by the Book-Entry Transfer Facility to, and received by, the Depositary and forming a part of a Book-Entry Confirmation, which states that the Book-Entry Transfer Facility has received an express acknowledgment from the participant in the Book-Entry Transfer Facility tendering the Shares which are the subject of such Book-Entry Confirmation, that such participant has received and agrees to be bound by the terms of the Letter of Transmittal and that Purchaser may enforce such agreement against such participant.

For purposes of the Offer, Purchaser will be deemed to have accepted for payment, and thereby purchased, Shares validly tendered and not withdrawn as, if and when Purchaser gives oral or written notice to the

14

Table of Contents

Depositary of Purchaser's acceptance of such Shares for payment pursuant to the Offer. In all cases, upon the terms and subject to the conditions of the Offer, payment for Shares purchased pursuant to the Offer will be made by deposit of the purchase price therefor with the Depositary, which will act as agent for tendering stockholders for the purpose of receiving payment from Purchaser and transmitting payment to validly tendering stockholders. Upon the deposit of funds with the Depositary for the purpose of making payments to tendering stockholders, Purchaser's obligation to make such payment shall be satisfied and tendering stockholders must thereafter look solely to the Depositary for payment of amounts owed to them by reason of the acceptance for payment of Shares pursuant to the Offer. **Under no circumstances will interest on the purchase price for Shares be paid by Purchaser regardless of any extension of the Offer or by reason of any delay in making such payment.** Purchaser will pay any stock transfer taxes incident to the transfer to it of validly tendered Shares, except as otherwise provided in Instruction 6 of the Letter of Transmittal, as well as any charges and expenses of the Depositary and the Information Agent.

Purchaser reserves the right to transfer or assign to one or more of the Purchaser's affiliates, in whole or from time to time in part, the right to purchase all or any portion of the Shares tendered in the Offer, but any such transfer or assignment will not relieve Purchaser of its obligations under the Offer or prejudice the rights of tendering stockholders to receive payment for Shares validly tendered and accepted for payment pursuant to the Offer.

If any tendered Shares are not purchased under the Offer for any reason, or if share certificates are submitted representing more Shares than are tendered, certificates representing unpurchased or untendered Shares will be returned, without expense to the tendering stockholder (or, in the case of Shares delivered pursuant to the book–entry transfer procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares", such Shares will be credited to an account maintained within the Book–Entry Transfer Facility), as promptly as practicable following the expiration, termination or withdrawal of the Offer.

**3. Procedure for Tendering Shares.**

*Valid Tender of Shares.* Except as set forth below, for Shares to be validly tendered pursuant to the Offer, either

(1)     on or prior to the Expiration Date, (a) share certificates representing tendered Shares (including, if the Distribution Date occurs, certificates for the Rights) must be received by the Depositary at its address set forth on the back cover of this Amended and Restated Offer to Purchase, or such Shares (including, if the Distribution Date occurs, the Rights) must be tendered pursuant to the book-entry transfer procedures set forth below and a Book-Entry Confirmation must be received by the Depositary, (b) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book-entry transfer of Shares (including, if the Distribution Date occurs, the Rights (if such procedure is available)) must be received by the Depositary at one of such addresses and (c) any other documents required by the Letter of Transmittal must be received by the Depositary at one of such addresses, or

(2)     the guaranteed delivery procedures set forth below must be followed.

**The method of delivery of Shares, the Letter of Transmittal and all other required documents, including delivery through the Book-Entry Transfer Facility, is at the election and sole risk of the tendering stockholder, and the delivery will be deemed made only when actually received by the Depositary. If delivery is by mail, registered mail with return receipt requested, properly insured, is recommended. In all cases, sufficient time should be allowed to ensure timely delivery.**

Although the Original Letter of Transmittal only refers to the Original Offer to Purchase, stockholders using such document to tender their Shares will nevertheless be deemed to be tendering pursuant to the Offer as amended and will receive the adjusted offer price of $25.74 per Share if Shares are accepted for payment and paid for by the Purchaser pursuant to the Offer.

15

Table of Contents

Stockholders tendering their Shares according to the guaranteed delivery procedures set forth under "The Offer—Section 3—Guaranteed Delivery" may do so using either the original Notice of Guaranteed Delivery circulated with the Original Offer to Purchase or the Amended and Restated Notice of Guaranteed Delivery circulated herewith.

Shares previously tendered pursuant to the Original Offer to Purchase and the Original Letter of Transmittal and not withdrawn constitute valid tenders for purposes of the Offer as amended. Stockholders who have validly tendered and not withdrawn their Shares are not required to take any further action with respect to such Shares in order to receive the offer price if Shares are accepted for payment and paid for by the Purchaser pursuant to the Offer, except as may be required by the guaranteed delivery procedure if such procedure was utilized. See "The Offer—Section 3—Procedure for Tendering Shares". If you have not already tendered your Shares, please disregard the materials previously delivered to you and use the materials accompanying this Amended and Restated Offer to Purchase.

*Book-Entry Transfer.* The Depositary has established accounts with respect to the Shares at the Book–Entry Transfer Facility for purposes of the Offer. Any financial institution that is a participant with the Book–Entry Transfer Facility may make book–entry delivery of Shares by causing the Book–Entry Transfer Facility to transfer such Shares into the Depositary's account at the Book–Entry Transfer Facility in accordance with the Book–Entry Transfer Facility's procedures. Although delivery of Shares may be effected through book–entry transfer into the Depositary's account at the Book–Entry Transfer Facility, the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, with any required signature guarantees, or an Agent's Message, and any other required documents must, in any case, be transmitted to and received by the Depositary at its address set forth on the back cover of this Amended and Restated Offer to Purchase on or prior to the Expiration Date or the expiration of the Subsequent Offering Period, if any, or the guaranteed delivery procedures set forth below must be complied with.

Required documents must be transmitted to and received by the Depositary at its address set forth on the back cover page of this Amended and Restated Offer to Purchase. Delivery of documents to the Book-Entry Transfer Facility in accordance with the Book-Entry Transfer Facility's procedures does not constitute delivery to the Depositary.

*Signature Guarantees.* No signature guarantee is required on the Letter of Transmittal if:

(1)     the Letter of Transmittal is signed by the registered holder(s) (which term, for purposes of this Section, includes any participant in the Book–Entry Transfer Facility's system whose name appears on a security position listing as the owner of the Shares) of Shares tendered therewith and such registered holder has not completed either the box entitled "Special Delivery Instructions" or the box entitled "Special Payment Instructions" on the Letter of Transmittal, or

(2)     such Shares are tendered for the account of a financial institution (including most commercial banks, savings and loan associations and brokerage houses) that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program ("*Eligible Institutions*").

In all other cases, all signatures on Letters of Transmittal must be guaranteed by an Eligible Institution. See Instructions 1 and 2 to the Letter of Transmittal for more information. If the share certificates representing the Shares (including, if the Distribution Date occurs, certificates for the Rights) are registered in the name of a person other than the signer of the Letter of Transmittal, or if payment is to be made, or share certificates not tendered or not accepted for payment are to be returned, to a person other than the registered holder of the certificates surrendered, then the tendered share certificates representing the Shares must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered holders or owners appear on the certificates, with the signatures on the certificates or stock powers guaranteed as aforesaid. See Instructions 1, 2 and 5 to the Letter of Transmittal for more information.

16

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

If the share certificates representing the Shares (including, if the Distribution Date occurs, certificates for the Rights) are forwarded separately to the Depositary, such delivery must be accompanied by a Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees.

*Guaranteed Delivery.* If a stockholder desires to tender Shares under the Offer and such stockholder's share certificates are not immediately available or the procedures for book–entry transfer cannot be completed on a timely basis or time will not permit all required documents to reach the Depositary on or prior to the Expiration Date, such stockholder's tender may be effected if all the following conditions are met:

    (1)    such tender is made by or through an Eligible Institution;

    (2)    a properly completed and duly executed Notice of Guaranteed Delivery, substantially in the form provided by Purchaser, is received by the Depositary, as provided below, on or prior to the Expiration Date; and

    (3)    within three Nasdaq Global Select Market trading days after the date of execution of such Notice of Guaranteed Delivery (a) share certificates representing tendered Shares (including, if the Distribution Date occurs, certificates for the Rights) are received by the Depositary at its address set forth on the back cover of this Amended and Restated Offer to Purchase, or such Shares are tendered pursuant to the book–entry transfer procedures and a Book–Entry Confirmation is received by the Depositary, (b) the Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book–entry transfer of Shares, is received by the Depositary at such address and (c) any other documents required by the Letter of Transmittal are received by the Depositary at such address.

The Notice of Guaranteed Delivery may be delivered by hand to the Depositary, by facsimile transmission, or mailed to the Depositary and must include a guarantee by an Eligible Institution in the form set forth in such Notice of Guaranteed Delivery. The procedures for guaranteed delivery above may not be used during any Subsequent Offering Period.

Notwithstanding any other provision hereof, payment for Shares accepted for payment pursuant to the Offer will in all cases be made only after timely receipt by the Depositary of:

    (1)    share certificates representing tendered Shares (including, if the Distribution Date occurs, certificates for the Rights) or a Book–Entry Confirmation with respect to all tendered Shares, and

    (2)    a Letter of Transmittal (or a facsimile thereof), properly completed and duly executed, together with any required signature guarantees, or an Agent's Message in connection with a book–entry transfer of Shares and any other documents required by the Letter of Transmittal.

Accordingly, payment might not be made to all tendering stockholders at the same time, and will depend upon when share certificates representing, or Book–Entry Confirmations of, such Shares (including, if the Distribution Date occurs, certificates for the Rights) are received into the Depositary's account at the Book–Entry Transfer Facility.

*Backup Withholding.* Under the U.S. federal income tax laws, backup withholding will apply to any payments made pursuant to the Offer unless you provide the Depositary with your correct taxpayer identification number and certify that you are not subject to such backup withholding by completing the Substitute Form W-9 included in the Letter of Transmittal. If you are a non-resident alien or foreign entity not subject to backup withholding, you must give the Depositary a completed Form W-8BEN (or appropriate Form W-8) Certificate of Foreign Status before receipt of any payment.

*Determination of Validity.* All questions as to the form of documents and the validity, form, eligibility (including time of receipt) and acceptance for payment of any tender of Shares will be determined by Purchaser,

17

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

in its sole discretion, which determination shall be final and binding on all parties. Purchaser reserves the absolute right to reject any and all tenders determined by it not to be in proper form or the acceptance for payment of which may, in the opinion of its counsel, be unlawful. Purchaser also reserves the absolute right to waive any condition of the Offer to the extent permitted by applicable law or any defect or irregularity in the tender of any Shares of any particular stockholder, whether or not similar defects or irregularities are waived in the case of other stockholders. Purchaser's interpretation of the terms and conditions of the Offer (including, without limitation, the Letter of Transmittal and the instructions thereto) will be final and binding. No tender of Shares will be deemed to have been validly made until all defects and irregularities have been cured or waived. None of Purchaser, Electronic Arts or any of their respective affiliates or assigns, the Dealer Manager, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such notification.

A tender of Shares pursuant to any of the procedures described above will constitute the tendering stockholder's acceptance of the terms and conditions of the Offer, as well as the tendering stockholder's representation and warranty to Purchaser that (i) such stockholder has the full power and authority to tender, sell, assign and transfer the tendered Shares (and any and all other Shares or other securities issued or issuable in respect of such Shares), and (ii) when the same are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title thereto, free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims.

The acceptance for payment by Purchaser of Shares pursuant to any of the procedures described above will constitute a binding agreement between the tendering stockholder and Purchaser upon the terms and subject to the conditions of the Offer.

*Appointment of Proxy.* By executing a Letter of Transmittal as set forth above, a tendering stockholder irrevocably appoints designees of Purchaser as such stockholder's attorneys–in–fact and proxies, in the manner set forth in the Letter of Transmittal, each with full power of substitution and resubstitution, to the full extent of such stockholder's rights with respect to (a) the Shares tendered by such stockholder and accepted for payment by Purchaser and (b) any and all non–cash dividends, distributions, rights or other securities issued or issuable on or after March 13, 2008 in respect of such tendered and accepted Shares. All such proxies shall be considered coupled with an interest in the tendered Shares. This appointment will be effective if, when and only to the extent that the Purchaser accepts such Shares for payment pursuant to the Offer. Upon such acceptance for payment, all prior proxies given by such stockholder with respect to such Shares and other securities will, without further action, be revoked, and no subsequent proxies may be given nor any subsequent written consents executed (and, if given or executed, will not be deemed effective). The designees of Purchaser will, with respect to the Shares and other securities for which the appointment is effective, be empowered to exercise all voting and other rights of such stockholder as they, in their sole discretion, may deem proper at any annual, special, adjourned or postponed meeting of the Company's stockholders or with respect to any written consent of the Company's stockholders, and the Purchaser reserves the right to require that in order for Shares or other securities to be deemed validly tendered, immediately upon Purchaser's acceptance for payment of such Shares, Purchaser must be able to exercise full voting and other rights with respect to such Shares.

**The foregoing proxies are effective only upon acceptance for payment of Shares pursuant to the Offer. Neither this Amended and Restated Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.**

**4. Withdrawal Rights.**

Except as otherwise provided in this Section 4, tenders of Shares under the Offer are irrevocable. Shares tendered under the Offer may be withdrawn at any time on or before the Expiration Date. Thereafter, such tenders may be withdrawn only if such Shares have not been accepted for payment as provided in this Amended and Restated Offer to Purchase. If Purchaser extends the Offer, is delayed in its acceptance for payment of Shares

18

Table of Contents

or is unable to purchase Shares validly tendered under the Offer for any reason, then, without prejudice to Purchaser's rights under the Offer, the Depositary may nevertheless, on behalf of Purchaser, retain tendered Shares, and such Shares may not be withdrawn except to the extent that tendering stockholders are entitled to withdrawal rights described in this Section 4. Any such delay will be accompanied by an extension of the Offer to the extent required by law.

For a withdrawal to be effective, a notice of withdrawal must be timely received by the Depositary at its address set forth on the back cover of this Amended and Restated Offer to Purchase. Any such notice of withdrawal must specify the name of the person who tendered the Shares to be withdrawn, the number of Shares to be withdrawn and the name of the registered holder of the Shares to be withdrawn, if different from the name of the person who tendered the Shares. If share certificates evidencing Shares (including, if the Distribution Date occurs, certificates for the Rights) to be withdrawn have been delivered or otherwise identified to the Depositary, then, prior to the physical release of such certificates, the serial numbers shown on such certificates must be submitted to the Depositary and, unless such Shares have been tendered by an Eligible Institution, the signatures on the notice of withdrawal must be guaranteed by an Eligible Institution. If Shares have been delivered pursuant to the book–entry transfer procedures as set forth in "The Offer— Section 3—Procedures for Tendering Shares", any notice of withdrawal must also specify the name and number of the account at the Book–Entry Transfer Facility to be credited with the withdrawn Shares and otherwise comply with the Book–Entry Transfer Facility's procedures.

Withdrawals of Shares may not be rescinded. Any Shares properly withdrawn will be deemed not validly tendered for purposes of the Offer, but may be retendered at any subsequent time prior to the expiration of the Offer by following any of the procedures described in "The Offer—Section 3—Procedure for Tendering Shares".

All questions as to the form and validity (including time of receipt) of notices of withdrawal will be determined by Purchaser, in its sole discretion, whose determination will be binding on all parties. None of Purchaser or any of its affiliates or assigns, if any, the Dealer Manager, the Depositary, the Information Agent or any other person will be under any duty to give any notification of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give any such notification.

Purchaser does not currently intend to provide a Subsequent Offering Period following the Offer. In the event that Purchaser subsequently elects to provide a Subsequent Offering Period, no withdrawal rights will apply to Shares tendered during such Subsequent Offering Period or to Shares tendered in the Offer and accepted for payment.

**5. Certain Tax Considerations.**

The following is a general discussion of certain material U.S. federal income tax consequences of the Offer to holders of Common Stock. We base this summary on the provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), applicable current and proposed U.S. Treasury Regulations, judicial authority, and administrative rulings and practice, all of which are subject to change, possibly on a retroactive basis.

For purposes of this discussion, we use the term "*U.S. holder*" to mean:

(1)  a citizen or individual resident of the United States for U.S. federal income tax purposes;

(2)  a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state or the District of Columbia;

(3)  a trust if it (a) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person; or

(4)  an estate the income of which is subject to U.S. federal income tax regardless of its source.

19

Table of Contents

A "*non-U.S. holder*" is a person (other than a partnership) that is not a U.S. holder.

This discussion assumes that a holder holds the Shares as a capital asset within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all aspects of U.S. federal income tax that may be relevant to a holder in light of its particular circumstances, or that may apply to a holder that is subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, dealers in securities or foreign currencies, traders in securities who elect the mark-to-market method of accounting for their securities, stockholders subject to the alternative minimum tax, U.S. holders that have a functional currency other than the U.S. dollar, tax-exempt organizations, financial institutions, mutual funds, partnerships or other pass through entities for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, certain expatriates, corporations that accumulate earnings to avoid U.S. federal income tax, stockholders who hold Shares as part of a hedge, straddle, constructive sale or conversion transaction, or stockholders who acquired their Shares through the exercise of employee stock options or other compensation arrangements). In addition, the discussion does not address any tax considerations under state, local or foreign laws or U.S. federal laws other than those pertaining to the U.S. federal income tax that may apply to holders. **Holders are urged to consult their own tax advisors to determine the particular tax consequences, including the application and effect of any state, local or foreign income and other tax laws, of the receipt of cash in exchange for Shares pursuant to this Offer.**

If a partnership holds Shares, the tax treatment of a partner will generally depend on the status of the partners and the activities of the partnership. If you are a partner of a partnership holding Common Stock, you should consult your tax advisors.

*U.S. Holders*

The receipt of cash pursuant to this Offer by U.S. holders of Shares will be a taxable transaction for U.S. federal income tax purposes. In general, for U.S. federal income tax purposes, a U.S. holder of Shares will recognize gain or loss equal to the difference between (1) the amount of cash received in exchange for such Shares; and (2) the U.S. holder's adjusted tax basis in such Shares. If the holding period in Shares sold pursuant to this Offer is greater than one year as of the date of the sale, the gain or loss will be long-term capital gain or loss. The deductibility of a capital loss recognized on the exchange is subject to limitations under the Code. If a U.S. holder acquired different blocks of Common Stock at different times and different prices, such holder must determine its adjusted tax basis and holding period separately with respect to each block of Shares.

*Non-U.S. Holders*

Any gain realized on the receipt of cash pursuant to this Offer by a non-U.S. holder generally will not be subject to U.S. federal income tax unless: (1) the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment of the non-U.S. holder); (2) the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or (3) the Company is or has been a "United States real property holding corporation" for U.S. federal income tax purposes and the non-U.S. holder owned more than 5% of the Common Stock at any time during the five years preceding the sale. An individual non-U.S. holder described in clause (1) above will be subject to tax on the net gain derived from the sale of Shares under regular graduated U.S. federal income tax rates. An individual non-U.S. holder described in clause (2) above will be subject to a flat 30% tax on the gain derived from the sale of Shares, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States. If a non-U.S. holder that is a foreign corporation falls under clause (1) above, it will be subject to tax on its net gain in the same manner as if it were a United States person as defined under the Code and, in addition, may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits or at such lower rate as may be specified by an applicable income tax treaty.

20

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

A holder whose Shares are purchased in the Offer may be subject to backup withholding unless certain information is provided to the Depositary or any exemption applies. See "Introduction" and "The Offer—Section 3—Procedure for Tendering Shares".

**6. Price Range of Shares.**

The Shares are listed and principally traded on the Nasdaq Global Select Market under the symbol "TTWO". The following table sets forth for the periods indicated the high and low sales prices per Share on the Nasdaq Global Select Market as reported in published financial sources:

|  | High | Low |
|---|---|---|
| Year Ended October 31, 2006 | | |
| First Quarter | $19.80 | $13.64 |
| Second Quarter | 19.40 | 14.05 |
| Third Quarter | 17.36 | 9.06 |
| Fourth Quarter | 16.25 | 10.34 |
| Year Ended October 31, 2007 | | |
| First Quarter | 20.57 | 13.96 |
| Second Quarter | 24.80 | 15.60 |
| Third Quarter | 21.70 | 17.45 |
| Fourth Quarter | 19.52 | 11.82 |
| Year Ended October 31, 2008 | | |
| First Quarter | 19.45 | 13.53 |
| Second Quarter (through April 17, 2008) | 27.61 | 15.50 |

On March 12, 2008, the last full trading day before the announcement of our intention to commence the offer, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $24.91 per share. On February 15, 2008, the last trading day before Electronic Arts sent its proposal to Take-Two to acquire the Company at $26.00 per share, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $15.83 per share. On April 17, 2008, the last trading day before the date of this Amended and Restated Offer to Purchase, the last reported sales price of Take-Two common stock reported on the Nasdaq Global Select Market was $25.85 per share. **Please obtain a recent quotation for your shares prior to deciding whether or not to tender.**

**7. Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations.**

*Possible Effects of the Offer on the Market for the Shares.* If the Offer is successful, we and Electronic Arts intend, as soon as practicable following the consummation of the Offer, to have Electronic Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronic Arts consummate a merger transaction or similar business combination with the Company pursuant to which each then outstanding Share (other than Shares held by Electronic Arts and us, Shares held in the treasury of the Company, Shares held by subsidiaries of the Company, if any, and Shares held by Take-Two stockholders who have not tendered Shares in the Offer and who properly seek appraisal for their Shares) would be converted into the right to receive an amount in cash per Share equal to the highest price per Share paid by us pursuant to the Offer, without interest (and less any applicable withholding taxes). If the proposed second-step merger takes place, stockholders who do not tender in the Offer (other than those described above) will be entitled to receive the same amount of cash per Share that they would have received had they tendered their Shares in the Offer. Therefore, if the Merger takes place, the only differences between tendering and not tendering Shares in the Offer is that tendering stockholders will be paid earlier and stockholders who do not tender and who do not vote in favor of the Merger may exercise appraisal rights. However, if the Offer is consummated and the Merger does not take place, the number of stockholders and the number of Shares that might otherwise trade publicly may be so small that there may no

21

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**Table of Contents**

longer be an active public trading market (or possibly any public trading market) for the Shares. Purchaser cannot predict whether the reduction in the number of Shares that might otherwise trade publicly would have an adverse or beneficial effect on the market price for, or marketability of, the Shares or whether such reduction would cause future market prices to be greater or less than the price paid in the Offer.

*Stock Exchange Listing.* Depending upon the number of Shares purchased pursuant to the Offer, the Shares may no longer meet the requirements for continued listing on the Nasdaq Global Select Market. According to the published guidelines of The NASDAQ Stock Market, LLC ("*NASDAQ*"), NASDAQ would consider disqualifying the Shares for listing on the Nasdaq Global Select Market (though not necessarily for listing on The NASDAQ Capital Market) if, among other possible grounds, the number of publicly held Shares falls below 750,000, the total number of beneficial holders of round lots of Shares falls below 400, the market value of publicly held Shares over a 30 consecutive business day period is less than $5 million, there are fewer than two active and registered market makers in the Shares over a 10 consecutive business day period, Take-Two has stockholders' equity of less than $10 million, or the bid price for the Shares over a 30 consecutive business day period is less than $1. Furthermore, NASDAQ would consider delisting the Shares from NASDAQ altogether if, among other possible grounds, (a) the number of publicly held Shares falls below 500,000, (b) the total number of beneficial holders of round lots of Shares falls below 300, (c) the market value of publicly held Shares over a 30 consecutive business day period is less than $1 million, (d) there are fewer than two active and registered market makers in the Shares over a 10 consecutive business day period, (e) the bid price for the Shares over a 30 consecutive business day period is less than $1, or (f) (i) Take-Two has stockholders' equity of less than $2.5 million, (ii) the market value of Take-Two's listed securities is less than $35 million over a 10 consecutive business day period, and (iii) Take-Two's net income from continuing operations is less than $500,000 for the most recently completed fiscal year and two of the last three most recently completed fiscal years. Shares held by officers or directors of Take-Two, or by any beneficial owner of more than 10 percent of the Shares, will not be considered as being publicly held for this purpose.

If, as a result of the purchase of Shares pursuant to the Offer or otherwise, the Shares cease to be listed on the Nasdaq Global Select Market or are delisted from NASDAQ altogether, the market for the Shares could be adversely affected. It is possible that the Shares would be traded on other securities exchanges (with trades published by such exchanges), the OTC Bulletin Board or in a local or regional over-the-counter market. The extent of the public market for the Shares would, however, depend upon the number of holders of Shares and the aggregate market value of the Shares remaining at such time, the interest in maintaining a market in the Shares on the part of securities firms, the possible termination of registration of the Shares under the Exchange Act, as described below, and other factors.

*Registration under the Exchange Act.* The Shares are currently registered under the Exchange Act. Such registration may be terminated upon application of the Company to the SEC if the Shares are neither listed on a national securities exchange nor held by 300 or more holders of record. Termination of the registration of the Shares under the Exchange Act would substantially reduce the information required to be furnished by the Company to holders of Shares and to the SEC and would make certain of the provisions of the Exchange Act, such as the short-swing profit recovery provisions of Section 16(b), the requirement to furnish a proxy statement pursuant to Section 14(a) in connection with a stockholders meeting and the related requirement to furnish an annual report to stockholders and the requirements of Rule 13e-3 under the Exchange Act with respect to "going private" transactions, no longer applicable to the Shares. Furthermore, the ability of "affiliates" of the Company and persons holding "restricted securities" of the Company to dispose of such securities pursuant to Rule 144 promulgated under the Securities Act of 1933, as amended, may be restricted. If registration of the Shares under the Exchange Act were terminated, the Shares would no longer be "margin securities" or eligible for listing on NASDAQ. Purchaser intends to seek to cause the Company to terminate registration of the Shares under the Exchange Act as soon after consummation of the Offer as the requirements for termination of registration of the Shares are met.

*Margin Regulations.* The Shares are currently "margin securities" under the regulations of the Board of Governors of the Federal Reserve System (the "*Federal Reserve Board*"), which has the effect, among other

22

Table of Contents

things, of allowing brokers to extend credit on the collateral of such Shares. Depending upon factors similar to those described above regarding listing and market quotations, following the Offer, the Shares may no longer constitute "margin securities" for the purposes of the Federal Reserve Board's margin regulations and, therefore, could no longer be used as collateral for loans made by brokers.

**8. Certain Information Concerning the Company.**

The information concerning the Company contained in this Amended and Restated Offer to Purchase has been taken from or based upon publicly available documents and records on file with the SEC and other public sources and is qualified in its entirety by reference thereto. None of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary has received any representations from the Company regarding any information contained in such documents or records or the completeness or accuracy of any such information, and none of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary generally has access to a means of obtaining independently verified information, or themselves verifying any such information, concerning the Company. None of Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary can take responsibility for the accuracy or completeness of the information contained in such documents and records, or for any failure by the Company to disclose events which may have occurred or may affect the significance or accuracy of any such information but which are unknown to Parent, Purchaser, their affiliates, the Dealer Manager, the Information Agent or the Depositary, except to the extent required by law.

According to the Company 10-K, Take-Two was incorporated in the State of Delaware in 1993. The principal executive offices of the Company are located in New York, New York at 622 Broadway, New York, NY 10012 and its telephone number is (646) 536-2842. According to the Company 10-K, Take-Two is a global developer, marketer, distributor and publisher of interactive entertainment software games for the PC, PLAYSTATION® 3 and PlayStation® 2 computer entertainment systems, PSP® (PlayStation® Portable) system, Xbox 360® and Xbox® video game and entertainment systems from Microsoft, Wii™, Nintendo GameCube™, Nintendo DS™ and Game Boy® Advance. The Company publishes and develops products through its wholly-owned labels Rockstar Games, 2K Games, 2K Sports and 2K Play, and distributes software, hardware and accessories in North America through its Jack of All Games subsidiary.

*Preferred Stock Purchase Rights; Series B Preferred Stock.* The following description of the Rights and the Preferred Stock (as defined below) is based upon publicly available documents filed by Take-Two with the SEC. This description does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which is filed as Exhibit 4.1 to the Company's registration statement on Form 8-A filed with the SEC on March 26, 2008.

On March 24, 2008, the Company entered into the Rights Agreement with American Stock Transfer & Trust Company (the "*Rights Agent*"). In connection therewith, the Company's board of directors declared a distribution of one Right for each outstanding share of Common Stock to stockholders of record at the close of business on April 7, 2008 (the "*Rights Record Date*") and for each share of Common Stock issued (including shares of Common Stock issued from the Company's treasury) by the Company thereafter and prior to the Distribution Date. Each Right entitles the registered holder, subject to the terms of the Rights Agreement, to purchase from the Company one one-thousandth of a share of the Company's Series B Preferred Stock, par value $0.01 per share (the "*Preferred Stock*"), at a price of $42.50 per Unit, subject to adjustment (the "*Purchase Price*").

Initially, the Rights will attach to all certificates representing shares of Common Stock then outstanding, and no separate Rights Certificates will be distributed. The Rights will separate from the shares of Common Stock and the "*Distribution Date*" will occur upon the earlier of (i) ten business days following a public announcement that a person or group of affiliated or associated persons has become an Acquiring Person (as defined below), or (ii) either (x) with respect to any tender or exchange offer not pending on the date of the execution of the Rights Agreement, ten business days (or such later date as may be determined by the Company's Board of Directors

23

Table of Contents

prior to such time as any person becomes an Acquiring Person) following the commencement of a tender or exchange offer that would result in a person or group of affiliated and associated persons beneficially owning an aggregate of 20% or more of the total voting power represented by all the then outstanding shares of Common Stock and other voting securities of the Company (the "*Voting Securities*") or (y) with respect to any tender or exchange offer pending on the date of the Rights Agreement, simultaneously with the acceptance for payment of the shares tendered pursuant to such tender offer, if upon consummation thereof, such person would be the beneficial owner of shares of Voting Securities representing 20% or more of the total Voting Securities then outstanding. Until the Distribution Date, (i) the Rights will be evidenced by certificates for shares of Common Stock and will be transferred with and only with such share certificates, (ii) new share certificates for shares of Common Stock issued after the Rights Record Date (including shares of Common Stock distributed from the Company's treasury) will contain a notation incorporating the Rights Agreement by reference, and (iii) the surrender for transfer of any certificates representing outstanding shares of Common Stock will also constitute the transfer of the Rights associated with the shares of Common Stock represented by such certificates.

An "*Acquiring Person*" is a person or group of affiliated or associated persons that has acquired, obtained the right to acquire, or otherwise obtained beneficial ownership of an aggregate of 20% or more of the total voting power represented by all the then outstanding shares of Voting Securities. The following, however, are not considered Acquiring Persons under the Rights Agreement: (1) the Company, its subsidiaries, any employee benefit plan of the Company or any of its subsidiaries, or any entity holding shares of Voting Securities pursuant to the terms of any such plan; (2) any person or group that becomes the beneficial owner of 20% or more of the total voting power represented by all the then outstanding Voting Securities solely as a result of the acquisition of Voting Securities by the Company, unless such person or group thereafter acquires beneficial ownership of additional Voting Securities; (3) subject to certain conditions set forth in the Rights Agreement, a person or group that otherwise would have become an Acquiring Person as a result of an inadvertent acquisition of 20% or more of the total voting power represented by all the then outstanding Voting Securities; and (4) subject to certain conditions set forth in the Rights Agreement, any person or group that would otherwise be deemed an Acquiring Person upon adoption of the Rights Agreement (a "*Grandfathered Stockholder*"). Except as provided in the Rights Agreement, a person or group that is a Grandfathered Stockholder will cease to be a Grandfathered Stockholder and will become an Acquiring Person if, after adoption of the Rights Agreement, such Grandfathered Stockholder acquires beneficial ownership of additional Voting Securities in excess of two percent of the number of shares of Common Stock outstanding as of March 24, 2008.

The Rights are not exercisable until the Distribution Date and will expire on the third anniversary of the Rights Agreement unless earlier redeemed or exchanged by the Company as described below.

As soon as practicable after the Distribution Date, Rights certificates will be mailed to holders of record of shares of Common Stock as of the close of business on the Distribution Date and, thereafter, the separate Rights certificates alone will represent the Rights.

If a person or group of affiliated or associated persons becomes an Acquiring Person, then each holder of a Right will thereafter have the right to receive, upon exercise, shares of Common Stock (or, in certain circumstances, shares of Preferred Stock, other securities, cash, property or a combination thereof) having a value equal to two times the exercise price of the Right. The exercise price is the Purchase Price multiplied by the number of one one-thousandths of a share of Preferred Stock issuable upon exercise of a Right prior to the events described in this paragraph.

Notwithstanding any of the foregoing, following the time any person or group becomes an Acquiring Person, all Rights that are, or under certain circumstances specified in the Rights Agreement were, beneficially owned by any Acquiring Person or its affiliates or associates will be null and void.

In the event that, at any time after a person or group becomes an Acquiring Person, (i) Take-Two is acquired in a merger or other business combination with another company and Take-Two is not the surviving corporation,

24

Table of Contents
(ii) another company consolidates or merges with Take-Two and all or part of the shares of Common Stock are converted or exchanged for other securities, cash, or property, or (iii) 50% or more of the consolidated assets or earning power of Take-Two and its subsidiaries is sold or transferred to another company, then each holder of a Right (except Rights that previously have been voided as described above) shall thereafter have the right to receive, upon exercise, common stock or other equity interest of the ultimate parent of such other company having a value equal to two times the exercise price of the Right.

The Purchase Price payable, and the number of shares of Preferred Stock (or other securities, as applicable) issuable, upon exercise of the Rights are subject to adjustment from time to time to prevent dilution (i) in the event of a stock dividend on, or a subdivision, combination or reclassification of, the Preferred Stock, (ii) if holders of the Preferred Stock are granted certain rights or warrants to subscribe for Preferred Stock or convertible securities at less than the current market price of the Preferred Stock, or (iii) upon the distribution to the holders of the Preferred Stock of evidences of indebtedness, cash or assets (excluding regular quarterly cash dividends or dividends payable in the Preferred Stock) or of subscription rights or warrants (other than those referred to above).

With certain exceptions, no adjustment in the Purchase Price will be required until cumulative adjustments amount to at least one percent of the Purchase Price. The Company is not required to issue fractional Preferred Shares (other than fractional shares that are integral multiples of one one-thousandth of a share). In lieu thereof, an adjustment in cash may be made based on the market price of the Preferred Stock prior to the date of exercise.

At any time prior to such time as any person or group or affiliated or associated persons becomes an Acquiring Person, the Company's Board of Directors may redeem the Rights in whole, but not in part, at a price of $0.0001 per Right, rounded up to the nearest whole cent (subject to adjustment in certain events) (the "*Redemption Price*"). Immediately upon the action of the Company's Board of Directors ordering the redemption of the Rights, the Rights will terminate and the only right of the holders of such Rights will be to receive the Redemption Price for each Right held. The Company's Board of Directors has committed to redeem the Rights 180 days after the date of the adoption of the stockholders rights plan.

At any time after any person or group or affiliated or associated persons becomes an Acquiring Person and before any such Acquiring Person becomes the beneficial owner of 50% or more of the total voting power of the aggregate of all shares of Voting Securities then outstanding, the Take-Two Board of Directors, at its option, may exchange each Right (other than Rights that previously have become void as described above) in whole or in part, for Shares at an exchange ratio of one share of Common Stock (or under certain circumstances one Unit of Preferred Stock or equivalent preferred stock) per Right (subject to adjustment in certain events).

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company, including, without limitation, the right to vote or to receive dividends. While the distribution of the Rights will not be taxable to stockholders or to the Company, stockholders may, depending upon the circumstances, recognize taxable income in the event that the Rights become exercisable for Preferred Stock (or other consideration).

Any of the provisions of the Rights Agreement may be amended without the approval of the holders of Rights in order to cure any ambiguity, defect, or inconsistency or to make any other changes that the Take-Two Board of Directors may deem necessary or desirable. After any person or group of affiliated or associated persons becomes an Acquiring Person, the provisions of the Rights Agreement may not be amended in any manner that would adversely affect the interests of the holders of Rights (excluding the interests of any Acquiring Person).

The Preferred Stock that may be acquired upon exercise of the Rights will not be redeemable and will rank junior to any other shares of preferred stock that may be issued by the Company with respect to the payment of dividends and as to distribution of assets in liquidation.

25

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

Each share of Preferred Stock will have a minimum preferential quarterly dividend of the greater of $1.00 per share or 1,000 times the aggregate per share amount of any cash dividend declared on the shares of Common Stock since the immediately preceding quarterly dividend, subject to certain adjustments. In the event of liquidation, the holder of Preferred Stock will be entitled to receive a cash preferred liquidation payment per share equal to the greater of $1.00 (plus accrued and unpaid dividends thereon) or 1,000 times the amount paid in respect of a share of Common Stock, subject to certain adjustments.

Generally, each share of Preferred Stock will vote together with the shares of Common Stock and any other class or series of capital stock entitled to vote on such matter, and will be entitled to 1,000 votes per share, subject to certain adjustments. The holders of the Preferred Stock, voting as a separate class, shall be entitled to elect two directors if dividends on the Preferred Stock are in arrears in an amount equal to six quarterly dividends thereon.

In the event of any merger, consolidation or other transaction in which shares of Common Stock are exchanged, each share of Preferred Stock will be entitled to receive 1,000 times the aggregate per share amount of stock, securities, cash or other property paid in respect of each share of Common Stock, subject to certain adjustments.

The rights of holders of the Preferred Stock to dividend, liquidation and voting rights are protected by customary anti-dilution provisions.

Because of the nature of the Preferred Stock's dividend, liquidation and voting rights, the economic value of one Unit of Preferred Stock is expected to approximate the economic value of one share of Common Stock.

The Offer is conditioned upon, among other things, the Rights Condition. See "The Offer—Section 14—Conditions of the Offer". Company stockholders will be required to tender one Right for each share of Common Stock tendered in order to effect a valid tender of Shares in accordance with the procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares". Unless the Distribution Date occurs, a tender of Common Stock will also constitute a tender of the Rights.

*Additional Information.* The Company is subject to the informational requirements of the Exchange Act and in accordance therewith is required to file periodic reports, proxy statements and other information with the SEC relating to its business, financial condition and other matters. Such reports, proxy statements and other information may be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington D.C. 20549. Information regarding the public reference facilities may be obtained from the SEC by telephoning 1-800-SEC-0330. The Company's filings are also available to the public on the SEC's Internet site (http://www.sec.gov). Copies of such material also may be obtained by mail, upon payment of the SEC's prescribed fees, from the Public Reference Room of the SEC at 100 F Street, N.E., Washington, D.C. 20549.

### 9. Certain Information Concerning the Purchaser and Parent.

Purchaser is a newly-incorporated Delaware corporation organized in connection with the Offer and the Merger and has not carried on any activities other than in connection with the Offer and the proposed Merger. Purchaser was incorporated under the laws of Delaware on March 4, 2008. The principal offices of Purchaser are located at 209 Redwood Shores Parkway, Redwood City, CA 94065 and its telephone number is (650) 628-1500. Purchaser is a wholly-owned subsidiary of Electronic Arts.

Electronic Arts is one of the world's leading interactive entertainment software companies. Electronic Arts develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts was initially incorporated in California in 1982. In September 1991, Electronic Arts reincorporated under the laws of Delaware. Electronic Arts' principal executive offices are at 209 Redwood Shores Parkway, Redwood City, CA 94065 and its telephone number is (650) 628-1500.

26

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008.

Table of Contents

The name, business address, present principal occupation or employment, five year employment history and citizenship of each director and executive officer of Parent and Purchaser are set forth on *Schedule I* hereto. None of Purchaser, Parent, or, to the best of their knowledge, any of the persons listed on *Schedule I* hereto has, during the past five years, (i) been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) been a party to any judicial or administrative proceeding (excluding matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, U.S. federal or state securities laws, or a finding of any violation of U.S. federal or state securities laws.

Parent currently beneficially owns nine Shares, and Purchaser currently owns one Share, which together represent a de minimus percentage of the issued and outstanding Shares as of the date of this Amended and Restated Offer to Purchase. On January 25, 2008, Parent purchased ten Shares at a price per share of $15.76 through an ordinary brokerage transaction, and subsequently transferred one Share to Purchaser on March 11, 2008 for no consideration. Except for the foregoing and except as set forth elsewhere in this Amended and Restated Offer to Purchase (including "The Offer—Section 11—Background of the Offer") or *Schedule I* to this Amended and Restated Offer to Purchase: (i) none of Parent, Purchaser and, to Parent's and Purchaser's knowledge, the persons listed in *Schedule I* hereto or any associate or majority-owned subsidiary of Parent, Purchaser or of any of the persons so listed, beneficially owns or has a right to acquire any Shares or any other equity securities of the Company; (ii) none of Parent, the Purchaser and, to Parent's and Purchaser's knowledge, the persons or entities referred to in clause (i) above has effected any transaction in the Shares or any other equity securities of the Company during the past 60 days; (iii) none of Parent, Purchaser and, to Parent's and Purchaser's knowledge, the persons listed in *Schedule I* to this Amended and Restated Offer to Purchase, has any contract, arrangement, understanding or relationship with any other person with respect to any securities of the Company (including, but not limited to, any contract, arrangement, understanding or relationship concerning the transfer or the voting of any such securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or the giving or withholding of proxies, consents or authorizations); (iv) during the two years before the date of this Amended and Restated Offer to Purchase, there have been no transactions between Parent, Purchaser, their subsidiaries or, to Parent's and Purchaser's knowledge, any of the persons listed in *Schedule I* to this Amended and Restated Offer to Purchase, on the one hand, and the Company or any of its executive officers, directors or affiliates, on the other hand, that would require reporting under SEC rules and regulations; and (v) during the two years before the date of this Amended and Restated Offer to Purchase, there have been no contracts, negotiations or transactions between Parent, the Purchaser, their subsidiaries or, to Parent's and the Purchaser's knowledge, any of the persons listed in *Schedule I* to this Amended and Restated Offer to Purchase, on the one hand, and the Company or any of its subsidiaries or affiliates, on the other hand, concerning a merger, consolidation or acquisition, a tender offer or other acquisition of securities, an election of directors or a sale or other transfer of a material amount of assets.

*Additional Information.* Parent is subject to the informational requirements of the Exchange Act and in accordance therewith files periodic reports, proxy statements and other information with the SEC relating to its business, financial condition and other matters. Such reports, proxy statements and other information are available for inspection and copying at the offices of the SEC in the same manner as set forth with respect to the Company in "The Offer—Section 8—Certain Information Concerning the Company". Information relating to Electronic Arts and its proposal to acquire Take-Two, including the Offer, can be found at http://www.eatake2.com.

**10. Source and Amount of Funds.**

Purchaser expects that approximately $2.1 billion would be required to purchase all Shares pursuant to the Offer and the Merger and to pay related fees and expenses. The Offer is not conditioned upon any financing arrangements. Electronic Arts will provide Purchaser with all of the funds necessary to purchase the Shares pursuant to the Offer and the Merger.

27

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**Table of Contents**

As of March 31, 2008, Parent had cash and cash equivalents and short-term investments in the amount of approximately $2.3 billion. Although this amount exceeds the amount of financing required to purchase the Shares pursuant to the Offer and the Merger (and to pay related fees and expenses), the Board of Directors of Electronic Arts has also authorized Electronic Arts to obtain additional debt financing which may be used to fund in part the Offer and/or the Merger.

**11. Background of the Offer.**

Electronic Arts regularly considers a variety of strategic transactions to enhance its business, including through acquisitions of companies, businesses, intellectual properties and other assets. Following an inquiry initiated by Take-Two, on March 16, 2007, Electronic Arts and Take-Two entered into a nondisclosure agreement. After execution of the nondisclosure agreement, in March 2007, Electronic Arts conducted a due diligence review of Take-Two, including in-depth analyses of its operational, financial and legal condition. In addition, during that time, Take-Two and Electronic Arts engaged in negotiations concerning a potential acquisition of Take-Two by Electronic Arts. Prior to any agreement being reached regarding the terms of an acquisition, such negotiations were terminated by Electronic Arts on March 26, 2007, as a result of Electronic Arts having determined that such a transaction was not advisable at such time primarily due to Electronic Arts' desire to focus on other operating initiatives.

Following Strauss Zelnick's appointment as Chairman of Take-Two, John Riccitiello, the Chief Executive Officer of Electronic Arts, and Mr. Zelnick have periodically engaged in discussions regarding the interactive entertainment software business. In several conversations with Mr. Zelnick between April and November 2007, Mr. Riccitiello discussed Electronic Arts' potential interest in acquiring Take-Two. At a meeting on December 20, 2007, Mr. Riccitiello told Mr. Zelnick that Electronic Arts was interested in pursuing an acquisition of Take-Two in a transaction that would value Take-Two at a substantial premium to its then current market price. Mr. Riccitiello also stated that Electronic Arts was prepared to promptly commence due diligence and negotiations with Take-Two. In early January 2008, Mr. Zelnick responded to Mr. Riccietiello that Take-Two was not interested in engaging in negotiations at that time, and that he preferred that any discussions regarding a potential acquisition of Take-Two not occur until after April 2008.

On February 6, 2008, Mr. Riccitiello contacted Mr. Zelnick to inform him that the following letter would be delivered to Mr. Zelnick, which letter was delivered that morning.

28

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

*February 6, 2008*

*Mr. Strauss Zelnick*
*Chairman of the Board of Directors*
*Take-Two Interactive Software, Inc.*
*622 Broadway*
*New York, NY 10012*

*Dear Strauss:*

*Congratulations on your recent announcement about the release date for Grand Theft Auto IV. I am sure it must feel great to have this important title locked and ready.*

*Further to our recent discussions, this letter is to formally express Electronic Arts Inc's. ("EA") interest in acquiring Take-Two Interactive Software, Inc. ("Take-Two") and to propose a transaction in which EA would acquire all of the outstanding shares of Take-Two common stock for $25 per share payable in cash. We are confident we can consummate a transaction quickly, confidentially and on the terms proposed.*

*The proposed combination will create significant value for your stockholders. Our offer price provides a substantial premium of 58% over Take-Two's most recent closing price and a 51% premium over Take-Two's 30-day trailing average price. The cash purchase price provides certainty of value to Take-Two's stockholders in today's uncertain economic environment.*

*We believe that moving quickly to negotiate and conclude our proposed merger is in the best interest of Take-Two and EA. Waiting for a later date leaves open significant uncertainty regarding the timing, the probability and the value of a potential transaction and is not in the best interests of either company or Take-Two's stockholders.*

*We also believe the proposed merger provides an attractive outcome for Take-Two's employees and business partners. We have a powerful product slate for 2008 and beyond with exciting releases planned for many of EA's well-established franchises as well as important new franchises we are launching such as SPORE, Dead Space, Dragon Age and Mirror's Edge. We feel that Take-Two's IP portfolio is well aligned against EA's product footprint and its studios fit well with our decentralized divisional model. Take-Two's creative teams are an essential part of the Take-Two business, and we believe EA would offer a stable and supportive environment for your studios to focus on developing great new games with the backing of a global games industry leader. We believe EA can and will represent the best home for these teams anywhere in the entertainment world.*

*We have completed a thorough review of Take-Two's public information and are prepared to move forward immediately to consummate a transaction with minimum disruption to Take-Two. We believe that with adequate access to the necessary information we can complete all required due diligence in approximately 2 weeks. We believe that our due diligence review would require limited access to a small number of senior executives of Take-Two and its legal, accounting and financial advisors. Importantly, no interaction with any of the studio leaders will be required until our other due diligence is completed and the material terms of a transaction are agreed to.*

*Considerable time and resources have been put forth in developing this offer, and our Board of Directors has approved its delivery to Take-Two. Our offer is not conditioned on any financing requirement. However, our offer is subject to the satisfactory completion of our due diligence review of Take-Two, the negotiation and execution of mutually acceptable definitive transaction agreements and the satisfaction of customary conditions to be set forth in such agreements.*

*We do not intend to make this letter public and our offer will automatically terminate and be withdrawn in its entirety if any portion of this letter, or the existence of discussions between EA and Take-Two relating to a possible business combination, are disclosed to any person other than the directors and officers of Take-Two and its legal and financial advisors.*

29

Table of Contents

*We look forward to hearing back from you by the close of business on Friday, February 15, 2008, with a response to our proposal.*

*I am available to meet and discuss all aspects of this proposal with you and your Board. If you have any questions, please do not hesitate to contact me. I very much look forward to hearing from you and working with you and the Take-Two team to consummate a successful transaction.*

*Sincerely,*

*/s/ John Riccitiello*

*John Riccitiello*
*Chief Executive Officer*

*JSR/dal*

On February 11, 2008, Mr. Riccitiello called Mr. Zelnick and Mr. Zelnick indicated that Electronic Arts would receive a response to Electronic Arts' letter by February 15, 2008. On February 15, 2008, Mr. Zelnick sent a letter to Mr. Riccitiello, the full text of which is set forth below.

*February 15, 2008*

*Mr. John S. Riccitiello*
*Chief Executive Officer*
*Electronic Arts Inc.*
*209 Redwood Shores Parkway*
*Redwood City, CA 94065*

*Dear John:*

*Thank you for your letter of February 6, 2008.*

*The position of the Board of Directors (the "Board") of Take-Two Interactive Software, Inc. (the "Company") with respect to an acquisition of the Company by Electronic Arts Inc. ("EA") has not changed from that which you and I have previously discussed.*

*As part of the Board's stated objective of maximizing shareholder value, we have been and remain open to considering a business combination with interested parties at the right time and the right price. However, the Board has concluded that EA's proposal has not been delivered at a time nor does it contemplate a price which is consistent with this objective.*

*On a personal note, I want to thank you for the courtesy reflected in our prior discussions and also your letter. I look forward to getting to know you better in the future.*

*Sincerely,*

*/s/ Strauss Zelnick*

*Strauss Zelnick*
*Executive Chairman*

30

Table of Contents
On February 19, 2008, Mr. Riccitiello contacted Mr. Zelnick to inform him that the following letter would be delivered, which letter was delivered that morning to Mr. Zelnick.

*February 19, 2008*

*Mr. Strauss Zelnick*
*Executive Chairman of the Board of Directors*
*Take-Two Interactive Software, Inc.*
*622 Broadway*
*New York, NY 10012*

*Dear Strauss:*

*Thank you for your letter of February 15, 2008. While I appreciate its courteous tone and value our ongoing dialogue, I am disappointed that you have rejected Electronic Arts Inc.'s ("EA's") $25 per share cash offer to acquire Take-Two Interactive Software, Inc. ("Take-Two") and declined to engage in the friendly negotiations we proposed. We continue to believe that an acquisition of Take-Two by EA is in the best interests of your shareholders, employees and other constituents, and we remain interested in acquiring Take-Two. So, to further demonstrate our seriousness and encourage you to move forward now, I am writing to increase EA's offer to acquire all of the outstanding shares of Take-Two to $26 per share in cash. This offer is subject to Take-Two agreeing by February 22, 2008 to commence negotiation of a definitive merger agreement and to permit EA to commence a limited due diligence review of Take-Two.*

*Our revised all-cash offer represents a 64% premium over Take-Two's most recent closing price and a 63% premium over Take-Two's 30-day trailing average price (based on prices as of market close on Friday, February 15th). We believe our offer represents a unique and compelling opportunity for Take-Two shareholders to maximize the value of their investment in the company, with materially lower risk than if Take-Two proceeds on a stand-alone basis.*

*We also believe that the transaction we are proposing represents a uniquely attractive opportunity for Take-Two's creative teams and key employees. EA is a diversified leader with well-established franchises and proven intellectual properties, global reach, and significant financial resources. I know we both agree that Take-Two's talented creative teams deserve a permanent home within a stable and growing publisher that provides these teams an environment to do what they do best – create great games. EA is organized in a four-label model that provides our creative teams the autonomy they need to fully realize their creative ambitions, while also providing a stable and supportive corporate and publishing infrastructure which allows them to best address the global marketplace. We have the resources to make the significant investments in technology and infrastructure needed for the most creative and innovative games in the industry. In short, a combination with EA would provide Take-Two's studios and employees a combination of the right resources for investment and global reach, and the right environment to do their best work.*

*We also believe that Take-Two's shareholders would not be well-served by any further delay in negotiating and completing the proposed merger. While the videogame industry remains an attractive, high-growth business, the challenges and risks in the business are escalating, and the need for scale is becoming more pronounced. Despite steps taken since March 2007, Take-Two remains dependent on a limited number of titles, and has limited capital resources. In addition, Take-Two faces ongoing financial, legal and operating issues and a very intense competitive environment. Given these factors, we believe it will be increasingly difficult for Take-Two to create sustainable shareholder value and that Take-Two remains exposed to considerable risk of value loss.*

31

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**Table of Contents**

*We also believe that any delay in this proposed transaction works against the interest of Take-Two's shareholders, because:*

- *There can be no certainty that in the future EA or any other buyer would pay the same high premium we are offering today. We place significant value on the ability to close the transaction relatively quickly so that EA's strong publishing and distribution network, including our global packaged goods, online and wireless publishing organizations, can positively impact the catalogue sales of GTA IV and also the launch and sale of titles released later this year. We want to work with you and your team to complete the transaction in time to begin realizing its significant marketplace benefits in advance of this year's holiday selling season.*

- *We believe Take-Two's current share price already reflects investor expectations for a strong release of GTA IV as well as the longer-term issues that Take-Two faces. Once GTA IV ships, Take-Two will again be dependent on less-popular titles and face increasing challenges to compete with larger and better-capitalized competitors.*

- *With GTA IV shipping on April 29, development on this important title must now be essentially complete. We believe now is the right time to complete a transaction with minimal disruption for Take-Two.*

*We also believe the transaction we are proposing will create value for EA's shareholders. In addition to the top-line benefits noted above, we can achieve bottom-line benefits by combining Take-Two's and EA's corporate and publishing infrastructures and by optimally supporting Take-Two's creative teams and intellectual properties in EA's decentralized label structure.*

*Considerable thought, time and resources have been put forth in developing this offer, and our Board of Directors unanimously supports it. Our offer is not conditioned on any financing requirement. It is subject to the satisfactory completion of a due diligence review of Take-Two, the negotiation and execution of mutually acceptable definitive transaction agreements, and the satisfaction of customary conditions to be set forth in such agreements. We are prepared to move forward immediately with formal due diligence and the negotiation and execution of a definitive merger agreement and believe that with adequate access to the necessary information and people, we can complete both in approximately two weeks. We believe that our due diligence review can be completed with minimal disruption, requiring only limited access to a small number of senior executives of Take-Two and its legal, accounting and financial advisors. We also have prepared a draft merger agreement that we can forward to you immediately.*

*Our strong preference is to conduct a private negotiation. If you are unwilling to proceed on that basis, however, we may pursue other means, including the public disclosure of this letter, to bring our offer and the compelling value it represents to the attention of Take-Two's shareholders.*

*I am available to meet and discuss any and all aspects of this proposal with you and your Board. Again, we believe this proposal represents a unique opportunity to maximize value for Take-Two's shareholders, and that the combined enterprise would be extraordinarily well positioned to build value for our respective customers, employees, developers and other business partners. We hope that you and your Board share our enthusiasm, and we look forward to hearing back from you by February 22.*

*Sincerely,*

*/s/ John Riccitiello*

*John Riccitiello*
*Chief Executive Officer*

*JSR/dal*

32

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**Table of Contents**

On February 20, 2008, Mr. Riccitiello called Mr. Zelnick and Mr. Zelnick indicated that Electronic Arts would receive a response to its letter by February 22, 2008. On February 22, 2008, in response to the above letter, Mr. Zelnick sent the following letter to Mr. Riccitiello:

*February 22, 2008*

*Mr. John S. Riccitiello*
*Chief Executive Officer*
*Electronic Arts Inc.*
*209 Redwood Shores Parkway*
*Redwood City, CA 94065*

*Dear John:*

*Thank you for your letter of February 19, 2008. As you know, the Board of Directors (the "Board") of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company") carefully considered Electronic Arts Inc.'s ("EA's") previous offer of $25 per share and concluded that neither the timing of the proposed acquisition nor the price was consistent with the Board's objective of maximizing stockholder value. The Board's rationale for rejecting EA's prior offer is not altered by your decision to increase that offer by four percent.*

*I would like to reiterate, in the clearest possible terms, the Board's conviction that this is not the right time for Take-Two to enter into a negotiation to sell the Company. Our organization is keenly focused on the scheduled April 29th launch of Grand Theft Auto IV, and on maximizing the value of the game to the Company and, in turn, our stockholders. It is the Board's strongly held view that beginning strategic discussions now would distract our Company and thereby threaten the value of this key franchise.*

*While I understand that you may disagree with the Board's reluctance to commence discussions immediately, the Board and I want to assure you that our concerns about timing are genuine. Potential negative financial consequences to Take-Two are significant and we believe outweigh the benefits of commencing discussions at this time. As you know, there is no certainty that EA will actually close on the proposed transaction on mutually agreeable terms, especially since you have proposed a price that we would not accept and have qualified your offer by a diligence request. Moreover, as we have all seen time and again, the process surrounding acquiring a public company from start to finish is complex, uncertain, intrusive and distracting, and we believe it would be especially so to the creative artists at the core of our business and to all those who may be displaced by a transaction.*

*While the Board is convinced that discussions at this time would be imprudent, we also appreciate the potential benefit of a frank and private dialogue with EA. To that end, the Board would be willing to commit to entering into a good-faith discussion with EA on April 30, 2008 to determine if we can reach common ground on the proper value of the Company and therefore an appropriate, mutually beneficial transaction. This would, of course, be subject to both parties reaching a mutually acceptable confidentiality agreement on customary terms. We are prepared to begin negotiating this confidentiality agreement immediately.*

*In order to alleviate any concerns you may have about the proposed starting date for these discussions, I would be pleased to meet with you privately as soon as possible to talk on a general basis. In addition our Board would confirm, subject to its fiduciary duties, that from now until April 30, 2008 (the "Quiet Period"), the Company will not pursue negotiations with any other potential strategic partner for a business combination unless we have first contacted you. Further, if the Company receives any bona fide offer to acquire the Company during the Quiet Period that the Board decides to explore, the Company will immediately inform EA and we understand that EA may then act as it sees fit.*

*I would like to note that if EA chooses to announce publicly the Board's proposal or announce any offer by EA to acquire the Company during this Quiet Period or if the contents of this letter become publicly available in sum and substance, the Company will consider all of its alternatives, including discussions with other parties, and further we will reserve the right to refuse to provide EA access to information or diligence.*

33

Table of Contents
   *John, I believe I know you well enough to rely on your considering this proposal in the same good faith we have in making it. I look forward to your favorable response.*

*Sincerely,*

*/s/ Strauss Zelnick*
—————————————————————

*Strauss Zelnick*
*Executive Chairman*

   Following receipt of Mr. Zelnick's letter of February 22, 2008, Mr. Riccitiello and Mr. Zelnick spoke by phone. On this call, Mr. Riccitiello explained that he felt it was in Take-Two's best interest to promptly engage in negotiations and conclude a sale of Take-Two to Electronic Arts, and that any delay could result in a reduction in the price Electronic Arts might be willing to pay for Take-Two. Mr. Zelnick responded that he felt that Electronic Arts' $26 per share offer price was too low and that Take-Two preferred to wait until after April to engage in negotiations. On February 24, 2008, Mr. Riccitiello contacted Mr. Zelnick to let him know that Electronic Arts had considered Mr. Zelnick's request that Electronic Arts delay negotiations until after April 2008 and that such delay was not acceptable to Electronic Arts. When Mr. Zelnick confirmed that Take-Two was not prepared to promptly engage in negotiations towards potentially entering into a definitive transaction, Mr. Riccitiello stated that given Take-Two's response, Electronic Arts would publicly announce its $26.00 per share proposal of February 19, 2008. At approximately 2:00 p.m., eastern time, on February, 24, 2008, Electronic Arts issued a press release indicating that it had made a proposal to acquire all of the outstanding Shares of Take-Two at a price of $26.00 per Share in cash. Included within the press release was a copy of the February 19, 2008 letter set forth above.

   Later in the day on February 24, 2008, Take-Two issued a press release confirming that Take-Two's Board of Directors had rejected Electronic Arts' proposals regarding a potential sale at that time and setting forth the text of the four letters described above.

   On March 13, 2008, Purchaser commenced the Offer.

   On March 26, 2008, Take-Two issued a press release and filed the Take-Two Schedule 14D-9, announcing that its Board of Directors had voted to recommend that Take-Two's stockholders reject the Offer at the offer price of $26.00. Take-Two also announced, among other things, that it had adopted the Rights Agreement, made certain amendments to its bylaws and changed the date of its 2008 annual meeting of stockholders to April 17, 2008.

   In the Take-Two Schedule 14D-9, Take-Two also stated that after the Company's release of *Grand Theft Auto IV*, scheduled for April 29, 2008, the Company's Board of Directors would be committed to exploring alternatives to maximize stockholder value, which may include a business combination of the Company with third parties or with Electronic Arts, and that to facilitate its efforts to explore alternatives to maximize stockholder value, the Company (1) had begun to assemble the materials necessary for interested parties to conduct due diligence and (2) was willing, prior to the release of *Grand Theft Auto IV*, to enter into confidentiality agreements on customary terms and to engage in preliminary conversations (not in the Company's view amounting to negotiations) with interested parties, including Electronic Arts.

   On March 28, 2009, Electronic Arts issued a press release announcing that it had amended the terms of the Offer by adding the Rights Condition and otherwise made certain amendments to address the adoption of the Rights Agreement by the Company. Electronic Arts also announced that it had extended the Expiration Date of the Offer to 11:59 p.m., New York City time on Friday, April 18, 2008.

   On April 17, 2008, Electronic Arts announced that it had received a request for additional information under the HSR Act in connection with the Offer.

34

Table of Contents

On April 17, 2008, Take-Two held its 2008 annual meeting of stockholders, at which time the Company received the Incentive Stock Plan Amendment Approval.

On April 18, 2008, Electronic Arts issued a press release announcing that as a result of the Company's receipt of the Incentive Stock Plan Amendment Approval, it was adjusting the price to be paid pursuant to the Offer to $25.74 per Share and that it had extended the Expiration Date of the Offer to 11:59 p.m., New York City time on Friday, May 16, 2008, unless further extended.

## 12. Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights.

*Purpose of the Offer; Plans for the Company.* The purpose of the Offer is to enable Electronic Arts and Purchaser to acquire control of, and ultimately the entire equity interest in, the Company. Purchaser currently intends, either as soon as practicable after consummation of the Offer, or, in the event that it undertakes a consent solicitation as described in "Introduction" above, upon the receipt of a sufficient number of stockholder consents, if earlier, to seek maximum representation on Take-Two's Board of Directors. Purchaser intends, in either instance, to seek to remove Take-Two's existing directors and to replace them with directors which Electronic Arts and Purchaser believe will consider, to the extent consistent with the Board's fiduciary duties, to take actions to satisfy the Section 203 Condition and the Rights Condition and to otherwise support the consummation of the Offer and the Merger. See "Introduction".

The Offer is conditioned on the satisfaction of the Merger Agreement Condition and, if the Offer is consummated, Parent intends, as soon as practicable after consummation of the Offer, to cause the Company to consummate the Merger. Pursuant to the Merger, each Share outstanding immediately prior to the effective time of the Merger (other than Shares held by Electronic Arts and Purchaser, Shares held in the treasury of the Company, Shares held by subsidiaries of the Company, if any, and Shares held by Take-Two stockholders who have not tendered Shares in the Offer and who properly seek appraisal for their Shares) would be converted into the right to receive cash in an amount equal to the highest price per Share paid by Purchaser pursuant to the Offer, without interest (and less applicable withholding taxes). Upon consummation of the Merger, Take-Two would be a wholly-owned subsidiary of Electronic Arts. Parent reserves the right to waive the Merger Agreement Condition and currently intends that if the Offer is consummated to consummate the Merger even if it were to waive the Merger Agreement Condition.

*Company Board and Stockholder Approval.* The timing and details of the consummation of the Offer and the Merger depend on a variety of factors and legal requirements, the number of Shares (if any) acquired by Purchaser pursuant to the Offer, and most importantly, actions of the Company's Board of Directors. In general (other than with respect to short-form mergers, described below), under the DGCL, the approval of both the stockholders and the board of directors of a corporation is required to effect a merger of that corporation with or into another corporation. Except in the case of a short-form merger, the Merger can only be effected with the approval of the Company's Board of Directors and the affirmative vote of the holders of at least a majority of the outstanding shares. If the Minimum Condition, the Section 203 Condition, the Rights Condition, the Merger Agreement Condition, the HSR Condition and the other conditions to the Offer discussed in "The Offer—Section 14—Conditions of the Offer" are satisfied, a merger agreement providing for the Merger will have been entered into and Purchaser will own Shares representing at least a majority of the outstanding Shares after consummation of the Offer, and will have the voting power necessary to assure approval of the Merger by the Company's stockholders.

Purchaser reserves the right to waive the Merger Agreement Condition, although there can be no assurance that it will do so, and Purchaser has not determined whether it would be willing to do so under any circumstances. If Purchaser waives such condition and purchases Shares pursuant to the Offer and if the Minimum Condition has been satisfied, then Purchaser will have the voting power necessary to act by written consent of the Company's stockholders to remove Take-Two's existing directors and replace them with directors

35

Table of Contents
that Electronic Arts and Purchaser believe would, subject to their fiduciary duties, support the Merger. Although Purchaser will seek to have the Company consummate the Merger as soon as practicable after consummation of the Offer, because the Merger must be approved by the Company's Board of Directors, the Merger could be delayed if the Company's Board of Directors refuses to negotiate and approve a merger agreement that satisfies the Merger Agreement Condition and the Merger Agreement Condition is waived by Purchaser.

Although Electronic Arts and Purchaser currently intend to propose the Merger on the terms described in this Offer to Purchase, if the Company's Board of Directors refuses to negotiate and approve a merger agreement that satisfies the Merger Agreement Condition and the Merger Agreement Condition is waived by Purchaser, it is possible that, as a result of substantial delays in Parent's and Purchaser's ability to effect such a transaction, actions the Company may take in response to the Offer, information Parent and Purchaser obtain hereafter, changes in general economic or market conditions or in the business of the Company or other currently unforeseen factors, such a transaction may not be as proposed, may be delayed or abandoned or may be proposed on different terms, and accordingly, under such circumstances, there can be no assurance that the Merger or another merger or business combination between Take-Two, Electronic Arts and Purchaser will occur (and if so, what the timing of such a transaction would be). Purchaser reserves the right not to propose a merger or other similar business combination with the Company or to propose such a transaction on terms other than those described in this Amended and Restated Offer to Purchase.

*Short–Form Merger.* Under Section 253 of the DGCL, if a corporation owns at least 90% of the outstanding shares of each class of a subsidiary corporation, the corporation holding such stock may merge such subsidiary into itself or itself into such subsidiary, without any action or vote on the part of the board of directors or stockholders of such other corporation (a "*short–form merger*"). If Purchaser acquires, pursuant to the Offer or otherwise, at least 90% of the outstanding Shares (where the conditions in "The Offer—Section 14—Conditions of the Offer", including the Section 203 Condition and the HSR Condition, have been satisfied), Purchaser will be able to effect the Merger without a vote of the Company's stockholders. Undertaking a short-form merger generally will permit stockholders receiving consideration pursuant to the Merger to receive such consideration more promptly than in a merger in which a stockholder vote is required (assuming all other conditions have already been met).

*Statutory Requirements.* Under the DGCL and the Company's Restated Certificate of Incorporation, if the Section 203 Condition is satisfied, a merger of the Company would require the approval of the Company's Board of Directors and the holders of a majority of the outstanding Shares. Absent satisfaction of the Section 203 Condition, Section 203 could significantly delay our ability to acquire the entire equity interest in the Company. In general, Section 203 prevents an "interested stockholder" (generally, a stockholder owning 15% or more of a corporation's outstanding voting stock or an affiliate or associate thereof) from engaging in a "business combination" (defined to include a merger or consolidation and certain other transactions) with a Delaware corporation for a period of three years following the time on which such stockholder became an interested stockholder unless (i) prior to such time the corporation's board of directors approved either the business combination or the transaction which resulted in such stockholder becoming an interested stockholder, (ii) upon consummation of the transaction which resulted in such stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the corporation's voting stock outstanding at the time the transaction commenced (excluding shares owned by certain employee stock plans and persons who are directors and also officers of the corporation) or (iii) at or subsequent to such time the business combination is approved by the corporation's board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 ²/3% of the outstanding voting stock not owned by the interested stockholder.

The provisions of Section 203 do not apply to a Delaware corporation if, among other things, (i) such corporation amends its certificate of incorporation or bylaws to elect not to be governed by Section 203 by (in addition to any other required vote) the affirmative vote of a majority of the shares entitled to vote; *provided* that such amendment would not be effective until 12 months after its adoption and would not apply to any business combination between such corporation and any person who became an interested stockholder on or prior to its

36

Table of Contents

adoption, (ii) such corporation does not have a class of voting stock that is listed on a national securities exchange or held of record by more than 2,000 stockholders, unless any of the foregoing results from action taken, directly or indirectly, by an interested stockholder or from a transaction in which a person becomes an interested stockholder, or (iii) the business combination is proposed by an interested stockholder prior to the consummation or abandonment of, and subsequent to the earlier of the public announcement or the notice required under Section 203 of, any one of certain proposed transactions which is with or by a person who was not an interested stockholder during the previous three years or who became an interested stockholder with the approval of the corporation's board of directors and is approved or not opposed by a majority of the board of directors then in office who were directors prior to any person becoming an interested stockholder during the previous three years or were recommended for election to succeed such directors by a majority of such directors.

The Offer is subject to satisfaction of the Section 203 Condition, which will be satisfied if, among other things, (i) prior to the acceptance for payment of Shares pursuant to the Offer, the Company Board approves the Offer and the Merger or (ii) there are validly tendered prior to the Expiration Date and not withdrawn a number of Shares which, together with the Shares then owned by us, would represent at least 85% of the Shares outstanding on the date hereof (excluding Shares owned by certain employee stock plans and persons who are directors and also officers of the Company).

Purchaser reserves the right to waive the Section 203 Condition, although there can be no assurance that it will do so, and Purchaser has not determined whether it would be willing to do so under any circumstances. If Purchaser waives such condition and purchases Shares pursuant to the Offer or otherwise and Section 203 is applicable, Purchaser may nevertheless seek to consummate a merger or other business combination with the Company. Purchaser believes it would be able to cause the consummation of such a merger or other business combination if Purchaser owns a majority of the outstanding Shares and (i) such merger or other business combination is approved by the Company's Board of Directors and authorized at an annual or special meeting of stockholders of the Company, and not by written consent, by the affirmative vote of at least 66 $^{2}$/3% of the outstanding Shares not owned by Parent and Purchaser or their affiliates and associates; or (ii) such merger or other business combination occurs after the expiration of three years following the time Purchaser became an interested stockholder.

On the other hand, if Purchaser waives the Section 203 Condition and purchases Shares pursuant to the Offer or otherwise and is prevented by Section 203 from consummating a merger or other business combination with the Company, Electronic Arts and Purchaser may (i) determine not to seek to consummate such a merger or other business combination, (ii) seek to acquire additional Shares in the open market, pursuant to privately negotiated transactions or otherwise, at prices that may be higher, lower or the same as the price paid in the Offer or (iii) seek to effect one or more alternative transactions with or by the Company. Purchaser has not determined whether it would take any of the actions described above under such circumstances.

A number of states have adopted laws and regulations that purport to apply to attempts to acquire corporations that are incorporated in such states, or whose business operations have substantial economic effects in such states, or which have substantial assets, security holders, employees, principal executive offices or principal places of business in such states. In *Edgar v. MITE Corp.*, the Supreme Court of the United States (the "*Supreme Court*") invalidated on constitutional grounds the Illinois Business Takeover statute, which, as a matter of state securities law, made certain corporate acquisitions more difficult. However, in 1987, in *CTS Corp. v. Dynamics Corp. of America*, the Supreme Court held that the State of Indiana may, as a matter of corporate law and, in particular, with respect to those aspects of corporate law concerning corporate governance, constitutionally disqualify a potential acquiror from voting on the affairs of a target corporation without the prior approval of the remaining stockholders. The state law before the Supreme Court was by its terms applicable only to corporations that had a substantial number of stockholders in the state and were incorporated there.

Purchaser does not believe that the anti-takeover laws and regulations of any state other than the State of Delaware will by their terms apply to the Offer. Purchaser reserves the right to challenge the applicability or validity of any state law purportedly applicable to the Offer and nothing in this Offer to Purchase or any action

37

Table of Contents
taken in connection with the Offer is intended as a waiver of such right. If it is asserted that any state anti–takeover statute is applicable to the Offer and an appropriate court does not determine that it is inapplicable or invalid as applied to the Offer, Purchaser might be required to file certain information with, or to receive approvals from, the relevant state authorities, and Purchaser might be unable to accept for payment or pay for Shares tendered pursuant to the Offer or may be delayed in consummating the Offer. In any such case, Purchaser may not be obligated to accept for payment, or pay for, any Shares tendered pursuant to the Offer.

*Appraisal Rights.* You do not have appraisal rights as a result of the Offer. However, if a merger involving the Company is consummated, stockholders of the Company who have neither voted in favor of the merger nor consented thereto in writing, who timely submit a demand for appraisal in accordance with the requirements of Section 262 of the DGCL and who otherwise comply with the applicable statutory procedures under the DGCL will be entitled to receive a judicial determination of the fair value of their Shares (exclusive of any element of value arising from the accomplishment or expectation of such merger) and to receive payment of such fair value in cash, together with interest compounded quarterly and accruing at 5% over the Federal discount rate (unless a court determines otherwise) (all such Shares collectively, the "*Dissenting Shares*"). Any such judicial determination of the fair value of the Dissenting Shares could be based upon considerations other than or in addition to the price paid in the Offer and the market value of the Shares. Stockholders should recognize that the value so determined could be higher or lower than, or the same as, the price per Share paid pursuant to the Offer or the consideration paid in such a merger. Moreover, we may argue in an appraisal proceeding that, for purposes of such a proceeding, the fair value of the Dissenting Shares is less than the price paid in the Offer.

If any holder of Shares who demands appraisal under Section 262 of the DGCL fails to perfect, or effectively withdraws or loses his rights to appraisal as provided in the DGCL, the Shares of such stockholder will be converted into the right to receive the price per Share paid in the Offer.

Failure to follow the steps required by Section 262 of the DGCL for perfecting appraisal rights may result in the loss of such rights.

The foregoing discussion is not a complete statement of the DGCL or U.S. federal law and is qualified in its entirety by reference to the DGCL and applicable U.S. federal law.

*"Going–Private" Transactions.* Rule 13e–3 under the Exchange Act is applicable to certain "going–private" transactions and may, under certain circumstances, be applicable to the Merger. Purchaser does not believe that Rule 13e–3 will be applicable to the Merger unless the Merger is consummated more than one year after the termination of the Offer. However, in the event that Purchaser is deemed to have acquired control of the Company pursuant to the Offer and if the Merger is consummated more than one year after the completion of the Offer, or an alternative transaction is effected whereby stockholders of the Company receive consideration less than that paid pursuant to the Offer, in either case at a time when the Shares are still registered under the Exchange Act, Purchaser may be required to comply with Rule 13e–3 under the Exchange Act. If applicable, Rule 13e–3 would require, among other things, that certain financial information concerning the Company and certain information relating to the fairness of the Merger or alternative transaction and the consideration offered to minority stockholders in the Merger or alternative transaction be filed with the SEC and distributed to minority stockholders before the consummation of any such transaction. The purchase of a substantial number of Shares pursuant to the Offer may result in the Company's being able to terminate its Exchange Act registration. See "The Offer—Section 7—Possible Effects of the Offer on the Market for the Shares; Stock Exchange Listing; Registration under the Exchange Act; Margin Regulations" for more information. If such registration were terminated, Rule 13e–3 would be inapplicable to any future merger or alternative transaction.

*Other.* Purchaser reserves the right to purchase, following the consummation or termination of the Offer, additional Shares in the open market, in privately negotiated transactions, in another tender offer or exchange offer or otherwise. In addition, in the event that Purchaser waives the Merger Agreement Condition and decides not to pursue the Merger, Purchaser will evaluate its other alternatives. Such alternatives could include proposing

38

Table of Contents

a merger on terms other than those described above, purchasing additional Shares in the open market, in privately negotiated transactions, in another tender offer or exchange offer or otherwise, or taking no further action to acquire additional Shares. Any additional purchases of Shares could be at a price greater or less than the price to be paid for Shares in the Offer and could be for cash or other consideration. Alternatively, Purchaser or any of its affiliates may sell or otherwise dispose of any or all Shares acquired in the Offer or otherwise. Each such transaction may be effected on terms and at prices then determined by Purchaser or the applicable affiliate, which may vary from the terms and price in the Offer.

*Future Plans for the Company in Addition to the Merger.* In connection with the Offer, Electronic Arts and Purchaser have reviewed, and will continue to review on the basis of publicly available information, various possible business strategies that they might consider if Purchaser acquires control of the Company. In addition, if and to the extent that Purchaser acquires control of the Company or otherwise obtains access to the books and records of the Company, Purchaser intends to conduct a detailed review of the Company and its assets, financial projections, corporate structure, dividend policy, capitalization, operations, properties, policies, management and personnel and consider and determine what, if any, changes would be desirable in light of the circumstances which then exist. Such strategies could include, among other things, changes in the Company's business, facility locations, assets, corporate structure, marketing strategies, capitalization, management or dividend policy.

Except as indicated in this Amended and Restated Offer to Purchase, Purchaser does not have any current plans or proposals which relate to or would result in (i) any extraordinary transaction, such as a merger, reorganization or liquidation of the Company or any of its subsidiaries, (ii) any purchase, sale or transfer of a material amount of assets of the Company or any of its subsidiaries, (iii) any material change in the present dividend rate or policy, or indebtedness or capitalization of the Company, (iv) any change in the current board of directors or management of the Company, (v) any other material change in the Company's corporate structure or business, (vi) any class of equity security of the Company being delisted from a national stock exchange or ceasing to be authorized to be quoted in an automated quotation system operated by a national securities association or (vii) any class of equity securities of the Company becoming eligible for termination of registration under Section 12(g)(4) of the Exchange Act.

### 13. Dividends and Distributions.

If, on or after March 13, 2008, the Company should (i) split, combine, reclassify or otherwise change the Shares or its capitalization, (ii) acquire or otherwise cause a reduction in the number of outstanding Shares, (iii) issue or sell any additional Shares (other than Shares issued pursuant to and in accordance with the terms in effect on March 13, 2008 of employee stock options outstanding as of such date), shares of any other class or series of capital stock, other voting securities or any securities convertible into, or options, rights, or warrants, conditional or otherwise, to acquire, any of the foregoing, or (iv) disclose that it has taken such action (which disclosure had not been previously made prior to March 13, 2008), then, without prejudice to our rights under "The Offer—Section 14—Conditions of the Offer", Purchaser may, in its sole discretion, make such adjustments in the purchase price and other terms of the Offer as it deems appropriate, including, without limitation the number or type of securities to be purchased.

If, on or after March 13, 2008, the Company should declare or pay any dividend on the Shares or any distribution with respect to the Shares (including the issuance of additional Shares or other securities or rights to purchase of any securities) that is payable or distributable to stockholders of record on a date prior to the transfer to the name of the Purchaser or its nominee or transferee on the Company's stock transfer records of the Shares purchased pursuant to the Offer, then, without prejudice to Purchaser's rights under "The Offer—Section 14—Conditions of the Offer", (i) the purchase price per Share payable by Purchaser pursuant to the Offer will be reduced to the extent of any such cash dividend or distribution and (ii) the whole of any such non-cash dividend or distribution to be received by the tendering stockholders will (a) be received and held by the tendering stockholders for the account of Purchaser and will be required to be promptly remitted and transferred by each tendering stockholder to the Depositary for the account of Purchaser, accompanied by appropriate documentation

39

of transfer or (b) at the direction of Purchaser, be exercised for the benefit of Purchaser, in which case the proceeds of such exercise will promptly be remitted to Purchaser. Pending such remittance and subject to applicable law, Purchaser will be entitled to all rights and privileges as owner of any such non-cash dividend or distribution, issuance or proceeds thereof and may withhold the entire purchase price or deduct from the purchase price the amount or value thereof, as determined by Purchaser in its sole discretion.

### 14. Conditions of the Offer.

Notwithstanding any other provision of the Offer, and in addition to (and not in limitation of) our rights to extend and amend the Offer at any time, in our sole discretion, we are not required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act (relating to our obligation to pay for or return tendered shares promptly after termination or withdrawal of the Offer), pay for, and may delay the acceptance for payment of and accordingly the payment for, any Shares tendered pursuant to the Offer, and may terminate the Offer, if, in our sole judgment, before the Expiration Date, the Minimum Condition, the HSR Condition, the Rights Condition, the Merger Agreement Condition or the Section 203 Condition shall not have been satisfied, or if, at any time on or after March 13, 2008, and before the time of payment for any such Shares (whether or not any Shares have theretofore been accepted for payment pursuant to the Offer), any of the following events shall occur or shall be determined by us to have occurred:

(1) there shall have been threatened, instituted or be pending any litigation, suit, claim, action, proceeding or investigation by any government, governmental authority or agency or any other person, domestic, foreign, or supranational, before any national, state, provincial, municipal or local government, governmental, regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal, or judicial or arbitral body (a "*Governmental Authority*"), (a) challenging or seeking to make illegal, delay or otherwise, directly or indirectly, to restrain or prohibit or make more costly the making of the Offer, the acceptance for payment of or payment for some or all of the Shares by us or any of our affiliates or the consummation by us or any of our subsidiaries or affiliates of the Merger or any other business combination involving the Company, (b) seeking to obtain damages in connection with the Offer or the Merger or any other business combination involving the Company, (c) seeking to restrain, prohibit or limit the ownership or operation by the Company, Parent or any of their subsidiaries or affiliates of all or any portion of our business or assets or that of the Company, Parent or any of their subsidiaries or affiliates or to compel the Company, Parent or any of their subsidiaries or affiliates to dispose of or hold separate all or any portion of the business or assets of the Company, Parent or any of their subsidiaries or affiliates, (d) seeking to impose or confirm limitations on the ability of Parent, Purchaser or any other affiliate of Parent effectively to exercise full rights of ownership of any Shares, including, without limitation, the right to vote any Shares acquired or owned by Purchaser or any of our subsidiaries or affiliates on all matters properly presented to the Company's stockholders, (e) seeking to require divestiture by Parent, Purchaser or any other affiliate of Parent of any Shares, (f) seeking any material diminution in the benefits expected to be derived by Parent, Purchaser or any other affiliate of Parent as a result of the transactions contemplated by the Offer or the Merger or any other business combination involving the Company, (g) that otherwise, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or affiliates or the value of the Shares to us or any of our subsidiaries or affiliates or (h) in the reasonable judgment of Purchaser, materially adversely affecting the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the Company or any of its subsidiaries; or

(2) any clearances or approvals of any U.S. or non-U.S. Governmental Authority other than in connection with the HSR Condition shall not have been obtained, or any applicable waiting periods for such clearances or approvals shall not have expired:

(3) there shall have been any action taken or any statute, rule, regulation, legislation, interpretation, judgment, order, decree or injunction proposed, enacted, enforced, promulgated, amended, issued or deemed applicable to (i) Parent, the Company or any subsidiary or affiliate of Parent or the Company or (ii) the Offer or the Merger or any other business combination by Parent or any other affiliate of Parent with the

40

Table of Contents

Company, by any U.S. or non-U.S. legislative body or Governmental Authority with appropriate jurisdiction other than the routine application of the waiting period provisions of the HSR Act, or of any applicable foreign statutes or regulations that, in our judgment, might, directly or indirectly, result in any of the consequences referred to in clauses (a) through (h) of paragraph (1) above; or

(4) any event, circumstance, change or effect occurs or is threatened (or any development occurs or is threatened involving a prospective change) that, individually or in the aggregate with any other events, circumstances, changes or effects occurring after March 13, 2008, in our reasonable judgment, is or may be materially adverse to the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the Company or any of its subsidiaries, or we become aware of any facts that, in our reasonable judgment, have or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or the value of the Shares to us or any of our affiliates; or

(5) there shall have occurred (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market, (b) any decline, measured from March 13, 2008, in the Dow Jones Industrial Average, the Standard and Poor's Index of 500 Industrial Companies or the NASDAQ Composite Index by an amount in excess of 15%, measured from the close of business on March 13, 2008, (c) any change in the general political, market, economic or financial conditions in the United States or abroad that, in our reasonable judgment, could have a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), capitalization, operations, licenses, franchises, revenues, results of operations or prospects of the Company or any of its subsidiaries or the trading in, or value of, the Shares, (d) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States, (e) any material adverse change (or development or threatened development involving a prospective material adverse change) in U.S. or any other currency exchange rates or a suspension of, or a limitation on, the markets therefor, (f) any material adverse change in the market price of the Shares or in the U.S. securities or financial markets, (g) the commencement of a war, armed hostilities or other international or national calamity directly or indirectly involving the United States or any attack on, outbreak or act of terrorism involving the United States, (h) any limitation (whether or not mandatory) by any government or Governmental Authority on, or any other event that, in our reasonable judgment, may adversely affect, the extension of credit by banks or other financial institutions or (i) in the case of any of the foregoing existing on March 13, 2008, a material acceleration or worsening thereof; or

(6) (a) a tender or exchange offer for some or all of the Shares has been publicly proposed to be made or has been made by another person (including the Company or any of its subsidiaries or affiliates), or has been publicly disclosed, or we otherwise learn that any person or "group" (as defined in Section 13(d)(3) of the Exchange Act) has acquired or proposes to acquire beneficial ownership of more than 5% of any class or series of capital stock of the Company (including the Shares), through the acquisition of stock, the formation of a group or otherwise, or is granted any option, right or warrant, conditional or otherwise, to acquire beneficial ownership of more than 5% of any class or series of capital stock of the Company (including the Shares) other than acquisitions for bona fide arbitrage purposes only and except as disclosed in a Schedule 13D or 13G on file with the SEC on or prior to March 13, 2008, (b) any such person or group which, on or prior to March 13, 2008, had filed such a Schedule with the SEC has acquired or proposes to acquire beneficial ownership of additional shares of any class or series of capital stock of the Company, through the acquisition of stock, the formation of a group or otherwise, constituting 1% or more of any such class or series, or is granted any option, right or warrant, conditional or otherwise, to acquire beneficial ownership of additional shares of any class or series of capital stock of the Company constituting 1% or more of any such class or series, (c) any person or group has entered into a definitive agreement or an agreement in principle or made a proposal with respect to a tender or exchange offer or a merger, consolidation or other business combination with or involving the Company or any of its subsidiaries or (d) any person has filed a Notification and Report Form under the HSR Act or made a public announcement reflecting an intent to acquire the Company or any assets or securities of the Company or any of its subsidiaries; or

41

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

(7) the Company or any of its subsidiaries has (a) split, combined, reclassified or otherwise changed, or authorized or proposed the split, combination or other change of, the Shares or its capitalization, (b) acquired or otherwise caused a reduction in the number of, or authorized or proposed the acquisition or other reduction in the number of, outstanding Shares or other securities or equity interests (other than a redemption of the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008), (c) issued or sold, or authorized or proposed the issuance, distribution or sale of, any additional Shares, shares of any other class or series of capital stock or other equity interests, other voting securities or any securities convertible into, or options, rights or warrants, conditional or otherwise, to acquire, any of the foregoing (other than (x) the issuance of Shares pursuant to and in accordance with the terms in effect on March 13, 2008 of employee stock options outstanding prior to such date, (y) the authorization of the Preferred Stock and the distribution of the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008 and (z) the issuance of up to (but not exceeding) 1,500,000 shares of restricted stock of the Company to ZelnickMedia pursuant to and on the terms disclosed in the Second Amendment to Management Agreement, dated February 14, 2008 (the "*Second Amendment*"), to the Management Agreement, dated March 30, 2007, by and between ZelnickMedia and Take-Two, as amended on July 26, 2007, filed as Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2008 (the "*Management Agreement*")), or any other securities or rights in respect of, in lieu of, or in substitution or exchange for any shares of its capital stock, (d) permitted the issuance or sale of any shares of any class of capital stock or other securities of any subsidiary of the Company, (e) declared, paid or proposed to declare or pay any dividend or other distribution on any shares of capital stock of the Company (other than the distribution of the Rights or a redemption of the Rights in accordance with the Rights Agreement as publicly disclosed to be in effect on March 26, 2008), (f) altered or proposed to alter any material term of any outstanding security (other than to amend the Rights Agreement to make the Rights inapplicable to the Offer and the Merger), (g) issued or sold, or authorized or proposed the issuance or sale of, any debt securities or otherwise incurred or authorized or proposed the incurrence of any debt other than in the ordinary course of business consistent with past practice, or any debt containing, in the reasonable judgment of Purchaser, burdensome covenants or security provisions, (h) authorized, recommended, proposed, announced its intent to enter into or entered into an agreement with respect to or effected any merger, consolidation, liquidation, dissolution, business combination, acquisition of assets, disposition of assets or relinquishment of any material contract or other right of the Company or any of its subsidiaries or any comparable event not in the ordinary course of business consistent with past practice, (i) authorized, recommended, proposed, announced its intent to enter into or entered into any agreement or arrangement with any person or group that, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its subsidiaries or affiliates or the value of the Shares to us or any of our subsidiaries or affiliates, (j) acquired or authorized, recommended or proposed to acquire, any business or assets material to the Company or any of its affiliates (except purchases of inventory in the ordinary course of business consistent with past practice), (k) adopted, established or entered into any new employment, change in control, severance compensation or similar agreement, arrangement or plan with or for one or more of its employees, consultants, directors or affiliates, or adopted, established or entered into or amended, or made grants or awards pursuant to, any agreements (including, without limitation, the Management Agreement), arrangements or plans (other than the amendments expressly disclosed in the March 26 Form 8-K to the employment agreements of each of Lainie Goldstein, Seth Krauss and Gary Dale, the Company's Chief Financial Officer, Executive Vice President and General Counsel and Executive Vice President, respectively) so as to provide for increased benefits to, or otherwise taken any action (including, without limitation, by any resolution or other action of the Board of Directors of the Company or any of its subsidiaries or any committee thereof) to provide for acceleration of any awards under any agreements, arrangements or plans affecting, one or more employees, consultants, directors or affiliates, whether or not as a result of or in connection with the transactions contemplated by the Offer or the Merger or any other business combination with the Company, or we shall have become aware of any such action which has not been publicly disclosed prior to March 13, 2008, (l) except as may be required by law, taken any action to adopt, establish, terminate or amend any employee benefit plan (as defined in Section 3(2) of the Employee

42

Table of Contents

Retirement Income Security Act of 1974) of the Company or any of its subsidiaries, or we shall have become aware of any such action which was not previously announced or (m) amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) (other than the amendments to the Company's bylaws expressly disclosed in the March 26 Form 8-K) or we become aware that the Company or any of its subsidiaries shall have amended, or authorized or proposed any amendment to, its certificate of incorporation or bylaws (or other similar constituent documents) which has not been publicly disclosed prior to March 13, 2008; or

(8) (a) pursuant to Section 8 of the Second Amendment, the compensation committee of the Board of Directors of the Company shall have failed to recommend to the independent members of the Board of Directors of the Company that no additional compensation be paid to ZelnickMedia, ZM Capital LLC and their affiliates in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" (as defined in the Management Agreement) or the independent members of the Board of Directors of the Company or the Board of Directors of the Company shall have failed to adopt a resolution providing that no such additional compensation shall be payable or (b) the compensation committee of the Board of Directors of the Company shall have failed to recommend to the independent members of the Board of Directors of the Company and the Board of Directors of the Company that no more than 780,000 of the shares of restricted stock of the Company issuable to ZelnickMedia pursuant to the Second Amendment shall vest in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" and that any shares of restricted stock not vesting in connection with the Offer, the Merger and any other business combination that constitutes a "Change in Control" shall be forfeited without compensation, or the independent members of the Board of Directors of the Company or the Board of Directors of the Company shall have failed to adopt a resolution to the foregoing effects; or

(9) we become aware (a) that any material contractual right of the Company or any of its subsidiaries has been impaired or otherwise adversely affected or that any material amount of indebtedness of the Company or any of its subsidiaries has been accelerated or has otherwise become due or become subject to acceleration prior to its stated due date, in each case with or without notice or the lapse of time or both, as a result of or in connection with the Offer or the consummation by us or any of our subsidiaries or affiliates of the Merger or any other business combination involving the Company or (b) of any covenant, term or condition in any instrument, license, franchise or agreement of the Company or any of its subsidiaries that, in our reasonable judgment, has or may have material adverse significance with respect to either the value of the Company or any of its affiliates or the value of the Shares to us or any of our affiliates (including, without limitation, any event of default that may ensue as a result of or in connection with the Offer, the acceptance for payment of or payment for some or all of the Shares by us or our consummation of the Merger or any other business combination involving the Company); or

(10) we or any of our affiliates enters into a definitive agreement or announces an agreement in principle with the Company providing for a merger or other similar business combination with the Company or any of its subsidiaries or the purchase of securities or assets of the Company or any of its subsidiaries pursuant to which it is agreed that the Offer will be terminated, or we and the Company reach any other agreement or understanding pursuant to which it is agreed that the Offer will be terminated; or

(11) the Company or any of its subsidiaries shall have (a) granted to any person proposing a merger or other business combination with or involving the Company or any of its subsidiaries or the purchase of securities or assets of the Company or any of its subsidiaries any type of option, warrant or right which, in our judgment, constitutes a "lock-up" device (including, without limitation, a right to acquire or receive any Shares or other securities, assets or business of the Company or any of its subsidiaries) or (b) paid or agreed to pay any cash or other consideration to any party in connection with or in any way related to any such business combination or purchase.

The foregoing conditions are for the sole benefit of Parent, Purchaser and their affiliates and may be asserted by us or Parent regardless of the circumstances giving rise to any such conditions or, other than the HSR Condition and the condition set forth in paragraph (2) above, may be waived by Parent or us in whole or in part at any time or from time to time before the Expiration Date in their sole discretion. The failure by Parent or us at

43

Table of Contents

any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right. The waiver of any such right with respect to particular facts and circumstances shall not be deemed a waiver with respect to any other facts and circumstances. Each such right shall be deemed an ongoing right which may be asserted at any time or from time to time.

## 15. Certain Legal Matters; Regulatory Approvals.

*General.* Except as set forth in this Amended and Restated Offer to Purchase, based on its review of publicly available filings by the Company with the SEC and other publicly available information regarding the Company, Purchaser is not aware of any governmental or regulatory licenses or permits that would be material to the business of the Company and its subsidiaries, taken as a whole, that might be adversely affected by Purchaser's acquisition of Shares (and the indirect acquisition of the stock of the Company's subsidiaries) as contemplated herein, or, except to the extent required by any foreign regulatory authorities, any filings, approvals or other actions by or with any domestic, foreign or supranational Governmental Authority that would be required prior to the acquisition of Shares (or the indirect acquisition of the stock of the Company's subsidiaries) by Purchaser pursuant to the Offer as contemplated herein.

Should any such approval or other action be required, there can be no assurance that any such additional approval or action, if needed, would be obtained without substantial conditions or that adverse consequences might not result to the Company's business, or that certain parts of the Company's, Parent's or Purchaser's business might not have to be disposed of or held separate or other substantial conditions complied with in order to obtain such approval or action or in the event that such approvals were not obtained or such actions were not taken. Purchaser's obligation to purchase and pay for Shares is subject to certain conditions which may be applicable under such circumstances. See "Introduction" and "The Offer—Section 14—Conditions of the Offer" for a description of the conditions to the Offer.

*State Takeover Statutes.* A number of states (including Delaware, where Take-Two is incorporated) have adopted laws which purport, to varying degrees, to apply to attempts to acquire corporations that are incorporated in, or which have substantial assets, stockholders, principal executive offices or principal places of business or whose business operations otherwise have substantial economic effects in, such states. See "The Offer—Section 12—Purpose of the Offer; Plans for the Company; Statutory Requirements; Approval of the Merger; Appraisal Rights" for more information.

*Antitrust.* Under the HSR Act and the rules that have been promulgated thereunder by the Federal Trade Commission (the "*FTC*") and the Department of Justice ("*DOJ*"), certain acquisition transactions may not be consummated unless certain information has been furnished to the DOJ and the FTC and certain waiting period requirements have been satisfied. The purchase of Shares pursuant to the Offer is subject to such requirements.

Pursuant to the HSR requirements, on March 13, 2008, Electronic Arts filed a Notification and Report Form with respect to the Offer with the DOJ and FTC and provided notice to the Company that it was doing so. In order to allow the FTC an additional period of time to review the proposed transaction, on March 28, 2008, Electronic Arts voluntarily withdrew, and re-filed with the DOJ and FTC on April 1, 2008, its Notification and Report Form. On April 16, 2008, Electronic Arts received from the FTC a request for additional information under the HSR Act in connection with the purchase of Shares pursuant to the Offer and the Merger. As a result of the request for additional information, the waiting period under the HSR Act will be extended until 11:59 P.M., New York City time, ten days after Electronic Arts' (but not also the Company's) substantial compliance with such request. Thereafter, such waiting period can be extended only by court order or by Electronic Arts' voluntary agreement. Parent intends to comply with the FTC's information requests as promptly as practicable.

Shares will not be accepted for payment or paid for pursuant to the Offer until the expiration or earlier termination of the applicable waiting period under the HSR Act. See "Introduction" and "The Offer—Section 14—Conditions of the Offer".

44

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

The DOJ and the FTC frequently scrutinize the legality under the antitrust laws of transactions such as our acquisition of Shares pursuant to the Offer. At any time before or after the consummation of any such transactions, the DOJ or the FTC may take such action under the antitrust laws as it deems necessary or desirable to preserve competition, including seeking to enjoin the purchase of Shares pursuant to the Offer, or seeking divestiture of the Shares so acquired or divestiture of certain of Electronic Arts' or the Company's assets. Private parties and individual states may also bring legal actions under the antitrust laws to enjoin consummation of the Offer. There can be no assurance that a governmental or private challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See "The Offer—Section 14—Conditions of the Offer" for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions.

In addition to our filing under the HSR Act with the DOJ and FTC, on March 25, 2008, Purchaser made a pre-merger filing with the German competition authorities, which, as of the date of this Amended and Restated Offer to Purchase, remains under review. Based on available public information, Purchaser might possibly be required to make additional merger filings in one or more other foreign jurisdictions. No assurance can be given that any requisite consents or approvals required from such foreign competition authorities will be received, or will be received prior to the Expiration Date. Shares will not be accepted for payment or paid for pursuant to the Offer until the receipt of such approvals or consents or the expiration or earlier termination of any applicable waiting period under foreign competition laws. See "The Offer—Section 14—Conditions of the Offer".

*Legal Proceedings.* On March 7, 2008, Patrick Solomon filed a Class Action Complaint and motion for expedited proceedings in the Court of Chancery of the State of Delaware, New Castle County, against Take-Two and its directors, Strauss Zelnick, Michael Dornemann, Benjamin Feder, John F. Levy, Jon J. Moses, Robert A. Bowman, Michael James Sheresky and Grover C. Brown. The Complaint alleges that a February 14, 2008 amendment to Take-Two's bylaws, which amendment imposed an advance notice requirement for stockholder proposals concerning director nominations or other business to be heard at Take-Two's 2008 annual stockholder meeting (the "*Bylaw Amendment*"), was unreasonable, inequitable and not supported by any compelling business justification. The Complaint alleges that the Bylaw Amendment was enacted to deny stockholders an opportunity to nominate directors or propose other business to be heard at Take-Two's 2008 annual stockholder meeting. The Complaint further alleges that defendants breached their fiduciary duties to Take-Two stockholders by, among other things, (i) adopting the Bylaw Amendment, (ii) adopting the Second Amendment, which amendment provided additional compensation to ZelnickMedia, (iii) setting February 19, 2008 as the record date for stockholders eligible to vote at Take-Two's 2008 annual stockholder meeting, (iv) issuing a misleading February 28, 2008 proxy statement and (v) rejecting Electronic Arts' offers and failing to negotiate with Electronic Arts. The Complaint alleges that such alleged breaches of defendants' fiduciary duties were undertaken by defendants to, among other things, protect their incumbency, enrich ZelnickMedia at the expense of Take-Two stockholders and thwart Electronic Arts' offer. The Complaint seeks declaratory and injunctive relief, including, among other things, rescission of the Bylaw Amendment; an order enjoining defendants from (i) refusing to negotiate with Electronic Arts in connection with Electronic Arts' offer and (ii) impairing stockholders' ability to replace the incumbent Board; and an order requiring defendants to (i) set a new date for Take-Two's 2008 annual stockholder meeting, (ii) issue a new proxy statement containing complete and accurate disclosure and (iii) set a new record date for determining the stockholders eligible to vote at Take-Two's 2008 annual stockholder meeting. The Complaint additionally seeks on behalf of the proposed class damages of an unspecified amount. On March 10, 2008, plaintiff filed a motion for preliminary injunctive relief, enjoining defendants from (i) enforcing or applying the Bylaw Amendment and (ii) convening the 2008 annual stockholder meeting until defendants issue amended disclosures and provide the stockholders a full and fair opportunity to nominate directors and submit proposals. On March 27, 2008 plaintiff withdrew his motion for a preliminary injunction based upon: (i) Take-Two's March 24, 2008 amendment to the Bylaw Amendment; (ii) Take-Two's March 26, 2008 supplemental disclosure; (iii) the rescheduling of Take-Two's 2008 annual stockholder meeting; and (iv) other developments and discussion and agreements among the parties. Plaintiff withdrew his preliminary injunction motion without prejudice to the claims alleged in the Complaint. On March 27, 2008 plaintiff entered into a stipulation with defendants providing that defendants shall answer, move or otherwise respond to the Complaint within ten (10) calendar days of request from plaintiff's counsel that defendants do so.

45

**Table of Contents**

On April 1, 2008, St. Clair Shores General Employees Retirement System filed a shareholder derivative suit and motion for expedited proceedings in the Court of Chancery of the State of Delaware, New Castle County, against Strauss Zelnick, Ben Feder, Jon J. Moses, Michael Dornemann, Michael Sheresky, Robert Bowman, John Levy, Grover Brown (the "*Take-Two directors*") and ZelnickMedia. The Complaint alleges, among other things, that the Take-Two directors breached their fiduciary duties, including the duty of loyalty, to Take-Two by, among other things, adopting the Second Amendment in order to defeat Electronic Arts' bid to acquire Take-Two. The Complaint further alleges that the Take-Two directors breached their fiduciary duties to Take-Two's shareholders by adopting the Bylaw Amendment in an effort to take away the shareholders' rights to be heard at the 2008 annual stockholder meeting. The Complaint further alleges that the Take-Two directors violated their fiduciary duties to shareholders by implementing certain defense measures, including a Shareholder Rights Plan adopted March 24, 2008, in an effort to thwart Electronic Arts' bid to acquire Take-Two. The Complaint alleges that ZelnickMedia aided and abetted the Take-Two directors in their alleged violation of their fiduciary duties. The Complaint states that plaintiff is excused from demanding that the Take-Two directors commence the action because such demand would be futile given that the Take-Two directors comprise a majority of Take-Two's board and participated in the alleged wrongful conduct. The Complaint seeks, among other things, declaratory and injunctive relief, including (i) an order enjoining the Take-Two directors from entering into any contractual agreements that inhibit the Take-Two directors' ability to maximize shareholder value; (ii) an order enjoining the Take-Two directors from initiating any defensive measures which may render the acquisition of the Company more burdensome or expensive for a potential acquirer; (iii) an order directing the Take-Two directors to rescind the Second Amendment; and (iv) an order directing the Take-Two directors to redeem the Shareholder Rights Plan adopted March 24, 2008. On April 4, 2008, plaintiff withdrew its motion for expedited proceedings and advised the Court of Chancery that it was coordinating with the defendants to arrange for a stay of its case in favor of the lawsuit commenced by Patrick Solomon on March 7, 2008.

According to the Company's Current Report on Form 8-K filed with the SEC on April 17, 2008, on April 11, 2008, Michael Maulano, an alleged stockholder of the Company, filed in the Supreme Court of the State of New York, County of New York, a purported class action complaint on behalf of himself and all others similarly situated, against the Company and the plaintiff contends that the members of the Company's Board of Directors breached their fiduciary duties by, among other things, allegedly refusing to explore offers by Electronic Arts to acquire all of the Company's shares, enacting certain bylaw amendments allegedly designed to entrench the current Board of Directors, approving the Second Amendment to the Management Agreement allegedly designed to entrench the Company's management, adopting the Rights Agreement allegedly to thwart Electronic Arts' tender offer, and issuing a proxy statement and response to Electronic Arts' offer that allegedly contained misleading and incomplete information. The plaintiff's complaint seeks declaratory relief, preliminary and permanent injunctive relief, damages, and reasonable attorneys' fees and litigation expenses.

*Other.* Based upon our examination of publicly available information concerning the Company, it appears that the Company and its subsidiaries conduct business in a number of foreign countries. In connection with the acquisition of Shares pursuant to the Offer, the laws of certain of these foreign countries (including competition laws as discussed above) may require the filing of information with, or the obtaining of the approval of, Governmental Authorities therein. After commencement of the Offer, we will seek further information regarding the applicability of any such laws and currently intend to take such action as they may require, but no assurance can be given that such approvals will be obtained. If any action is taken before completion of the Offer by any such government or Governmental Authority, we may not be obligated to accept for payment or pay for any tendered Shares. See "The Offer—Section 14—Conditions of the Offer".

46

Table of Contents

### 16. Fees and Expenses.

Morgan Stanley is acting as our financial advisor in connection with our proposal to acquire Take-Two and is acting as Dealer Manager in connection with the Offer. Morgan Stanley will receive customary fees in connection with these engagements. Electronic Arts and Purchaser have also agreed to reimburse Morgan Stanley for reasonable out-of-pocket expenses incurred in connection with the Offer and to indemnify Morgan Stanley against certain liabilities and expenses, including certain liabilities under the U.S. federal securities laws.

We have retained Georgeson Inc. to act as the Information Agent and U.S. Bank National Association to act as the Depositary in connection with the Offer. The Information Agent may contact holders of Shares by mail, telephone, telex, telegraph and personal interviews and may request brokers, dealers, banks, trust companies and other nominees to forward materials relating to the Offer to beneficial owners. The Depositary has not been retained to make solicitations or recommendations in its role as Depositary. The Information Agent and the Depositary each will receive reasonable and customary compensation for their respective services, will be reimbursed for certain reasonable out-of-pocket expenses and will be indemnified against certain liabilities and expenses in connection with their services, including certain liabilities under the U.S. federal securities laws.

Neither Electronic Arts nor Purchaser will pay any fees or commissions to any broker or dealer or any other person (other than the Dealer Manager, the Information Agent and the Depositary) for soliciting tenders of Shares pursuant to the Offer. Brokers, dealers, banks, trust companies and other nominees will, upon request, be reimbursed by Purchaser for reasonable and necessary costs and expenses incurred by them in forwarding materials to their customers.

### 17. Miscellaneous.

The Offer is being made solely by this Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal and is being made to all holders of the Shares (excluding Shares beneficially owned by Electronic Arts and Purchaser). Purchaser is not aware of any jurisdiction where the making of the Offer is prohibited by any administrative or judicial action pursuant to any valid statute. If Purchaser becomes aware of any valid statute prohibiting the making of the Offer or the acceptance of the Shares pursuant thereto, Purchaser will make a good faith effort to comply with such statute. If, after such good faith effort Purchaser cannot comply with any such statute, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares in such jurisdiction. In those jurisdictions where the applicable laws require that the Offer be made by a licensed broker or dealer, the Offer shall be deemed to be made on behalf of Purchaser by the Dealer Manager or one or more registered brokers or dealers licensed under the laws of such jurisdiction.

**No person has been authorized to give any information or make any representation on behalf of Parent or Purchaser not contained in this Amended and Restated Offer to Purchase or in the Amended and Restated Letter of Transmittal, and if given or made, such information or representation must not be relied upon as having been authorized.**

Electronic Arts and Purchaser have filed with the SEC a Tender Offer Statement on Schedule TO, together with exhibits, pursuant to Rule 14d-3 under the Exchange Act, furnishing certain additional information with respect to the Offer. The Schedule TO and any amendments thereto, including exhibits, may be examined and copies may be obtained from the offices of the SEC in the manner described in "The Offer—Section 9—Certain Information Concerning Purchaser and Parent" of this Amended and Restated Offer to Purchase.

47

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

## SOLICITATION OF CONSENTS

Neither this Offer to Purchase nor the Offer constitutes a solicitation of consents from Take-Two's stockholders. Any solicitation will be made only pursuant to separate proxy or consent solicitation materials complying with all applicable requirements of Section 14(a) of the Exchange Act.

**EA08 ACQUISITION CORP.**

April 18, 2008

48

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

### DIRECTORS AND EXECUTIVE OFFICERS OF PARENT AND PURCHASER
### DIRECTORS AND EXECUTIVE OFFICERS OF PARENT

The name, current principal occupation or employment and material occupations, positions, offices or employment for the past five years of each director and executive officer of Parent are set forth below. The business address of each director and officer is care of Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065. Unless otherwise indicated, each occupation set forth opposite an individual's name refers to employment with Parent. All directors and officers listed below are citizens of the United States, except for Gerhard Florin, who is a citizen of Germany, and Peter Moore, who is a citizen of the United Kingdom.

#### Directors and Executive Officers of Parent

**Leonard S. Coleman**
*Director since 2001*

Mr. Coleman served as Senior Advisor to Major League Baseball from 1999 until 2005 and, from 2001 to 2002, was the Chairman of ARENACO, a subsidiary of Yankees/Nets. Mr. Coleman was President of The National League of Professional Baseball Clubs from 1994 to 1999, having previously served since 1992 as Executive Director, Market Development of Major League Baseball. Mr. Coleman serves on the Board of Directors of the following public companies: Avis Budget Group; Churchill Downs Inc.; H.J. Heinz Corporation; and Omnicom Group Inc.

**Gary M. Kusin**
*Director since 1995; Lead Director since 2006*

Mr. Kusin has been a Partner at TPG (formerly Texas Pacific Group) since June 2006. He served as the President and Chief Executive Officer of Fedex Kinko's Office and Print Services, an operating division of Fedex, Inc. from August 2001 until February 2006. Fedex Kinko's is a leading provider of document solutions and business services. From September 1998 to July 2001, he was the Chief Executive Officer of HQ Global Workplaces, Inc., a global leader in office outsourcing. Prior to September 1998, Mr. Kusin was co-founder and Chairman of Kusin Gurwitch Cosmetics, LLC and co-founder and President of Babbages, Inc.

**Gregory B. Maffei**
*Director since 2003*

Mr. Maffei has served as President and Chief Executive Officer of Liberty Media Corporation, which owns electronic retailing, media, communications and entertainment businesses and investments, since February 2006. He joined Liberty Media in November 2005 as CEO-Elect. From June 2005 until November 2005, Mr. Maffei served as President and Chief Financial Officer of Oracle Corporation. From 2000 until June 2005, Mr. Maffei served as Chief Executive Officer of 360networks Corporation, a broadband telecom service provider, and also became Chairman of the Board of 360networks in 2002. Previously, Mr. Maffei was with Microsoft Corporation from 1993 to 2000, in several positions, including Senior Vice President, Finance and Administration and Chief Financial Officer. Mr. Maffei also served as Chairman of Expedia, Inc. from 1999 to 2002. Mr. Maffei serves on the Board of Directors of Liberty Media and The DIRECTV Group, Inc.

**Timothy Mott**
*Director since 1990*

Mr. Mott has been Chairman of All Covered, a nationwide information technology outsourcing company focused on small and mid-size businesses, since June 2000 and has served as Chief Executive Officer since September 2006 (a position he had previously held from November 2001 to February 2004). At various times prior to 1999, Mr. Mott co-founded and was Chairman of Audible Inc., co-founded and was Chief Executive Officer and Chairman of Macromedia Inc., co-founded and was Senior Vice President of Parent, and was a member of the research staff at Xerox PARC.

S-1

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**Table of Contents**

Vivek Paul
*Director since 2005*

Mr. Paul has been a partner at TPG (formerly Texas Pacific Group) since October 2005. From July 1999 to September 2005, Mr. Paul served as Vice Chairman of the Board of Directors of Wipro, Ltd., a provider of integrated business, technology and process solutions, and Chief Executive Officer of Wipro Technologies, Wipro's global information technology, product engineering, and business process services segments. From January 1996 to July 1999, Mr. Paul was General Manager of Global CT Business at General Electric, Medical Systems Division. From March 1993 to December 1995, he served as President and Chief Executive Officer of Wipro GE Medical Systems Limited.

Lawrence F. Probst III
*Director since 1991; Chairman of the Board since 1994*

Mr. Probst has served as Chairman of the Board of Directors of Parent since July 1994 and, from May 1991 until April 2007, also served as Parent's Chief Executive Officer. Previously Mr. Probst served as President from 1991 until 1998 and Senior Vice President of EA Distribution from 1987 to 1991.

John S. Riccitiello
*Director and Chief Executive Officer*

Mr. Riccitiello has served as Chief Executive Officer and a director of Parent since April 2007. Prior to re-joining Parent, he was a co-founder and Managing Partner at Elevation Partners, a private equity fund. From October 1997 to April 2004, Mr. Riccitiello served as President and Chief Operating Officer of Parent. Prior to joining Parent, Mr. Riccitiello served as President and Chief Executive Officer of the worldwide bakery division at Sara Lee Corporation. Before joining Sara Lee, he served as President and Chief Executive Officer of Wilson Sporting Goods Co. and has also held executive management positions at Haagen-Dazs, PepsiCo, Inc. and The Clorox Company.

Richard A. Simonson
*Director since 2006*

Mr. Simonson has served as Executive Vice President and Chief Financial Officer of Nokia Corporation, a manufacturer of mobile devices and a leader in mobile network equipment, solutions and services, since 2004. From 2001 until 2003, Mr. Simonson served as Vice President & Head of Customer Finance of Nokia. In 2001, Mr. Simonson was Managing Director of the Telecom & Media Investment Banking Group of Barclays Capital. Prior to joining Barclays Capital, Mr. Simonson spent 16 years at Bank of America Securities where he held various positions, including Managing Director & Head of Global Project Finance, Global Corporate & Investment Bank, San Francisco and Chicago.

Linda J. Srere
*Director since 2001*

Ms. Srere is currently a marketing and advertising consultant. Previously, Ms. Srere was President of Young & Rubicam Advertising. Since 1994, Ms. Srere held many positions with Young & Rubicam Inc. ("Y&R"), including Vice Chairman and Chief Client Officer, Executive Vice President and Director of Business Development, Group Managing Director, and in 1997, was named Chief Executive Officer of Y&R's New York office, becoming the first female CEO in the company's 75-year history. Ms. Srere also serves on the Board of Directors of Universal Technical Institute, Inc., a technical education provider.

John F. Pleasants
*President, Global Publishing and Chief Operating Officer*

Mr. Pleasants was named President, Global Publishing and Chief Operating Officer of Parent in March 2008. From June 2007 until March 2008, Mr. Pleasants was an investor in, and served as an advisor to, various privately-held companies. From September 2005 until June 2007, Mr. Pleasants served as President and Chief

S-2

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

Executive Officer of Revolution Health Group, a comprehensive consumer-directed healthcare company. From November 1996 until September 2005, Mr. Pleasants held various senior positions at IAC/InterActiveCorp, including, most recently, President and Chief Executive Officer of Ticketmaster (a division of IAC).

Frank Gibeau
*President, EA Games Label*

Mr. Gibeau has served as President of the EA Games Label since June 2007. From September 2005 until June 2007, Mr. Gibeau served as Executive Vice President, General Manager, North America Publishing. Previously he was Senior Vice President of North American Marketing, a position he held from 2002 until September 2005. Mr. Gibeau has held various publishing positions since joining Parent in 1991.

Peter Moore
*President, EA Sports Label*

Mr. Moore has served as President, EA Sports Label since September 2007. From January 2003 until August 2007, Mr. Moore held several positions at Microsoft, where he initially served as head of Xbox marketing and was later named as Corporate Vice President, Interactive Entertainment Business, Entertainment and Devices Division, a position in which he led both the Xbox and Games for Windows businesses. Prior to joining Microsoft, Mr. Moore was president and Chief Operating Officer of SEGA of America, where he was responsible for overseeing SEGA's video game business in North America. Before joining SEGA, Mr. Moore was senior vice president of marketing at Reebok International Ltd.

Nancy Smith
*President, The Sims Label*

Ms. Smith was named President of The Sims Label in June 2007. Prior to that time, she had served as Executive Vice President, General Manager, The Sims Franchise from September 2005. From March 1998 until September 2005, she served as Executive Vice President and General Manager, North American Publishing. From October 1996 to March 1998, Ms. Smith served as Executive Vice President, North American Sales. She previously held the position of Senior Vice President of North American Sales and Distribution from July 1993 to October 1996 and as Vice President of Sales from 1988 to 1993. Ms. Smith has also served as Western Regional Sales Manager and National Sales Manager since she joined Parent in 1984.

Kathy Vrabeck
*President, EA Casual Entertainment*

Ms. Vrabeck has served as President, EA Casual Entertainment since May 2007. From August 1999 until April 2006, Ms. Vrabeck held various positions at Activision, Inc., an interactive entertainment company, including President of Activision Publishing, Executive Vice President, Global Publishing and Brand Management, and Executive Vice President, Global Brand Management. Following her departure from Activision, Ms. Vrabeck served as a consultant with various companies, including EA. Prior to joining Activision, Ms. Vrabeck was Senior Vice President/General Manager with ConAgra Foods, Inc., and also served in various marketing and sales roles for the Pillsbury Company and held positions at Quaker Oats Company and Eli Lilly & Company.

Gerhard Florin
*Executive Vice President, Publishing – Americas and Europe*

Dr. Florin has served as Executive Vice President, Publishing – Americas and Europe of Parent since August 2007. From June 2007 until August 2007, Dr. Florin served as Executive Vice President, Global Publishing. From September 2005 until June 2007, Dr. Florin served as Executive Vice President, International Publishing, and from April 2003 until September 2005, he served as Senior Vice President and Managing Director, European Publishing. From 2001 until September 2005, he served as Vice President, Managing Director for European countries. From the time he joined Parent in 1996 until 2001, Dr. Florin was the Managing

S-3

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents
Director for German speaking countries. Prior to joining Electronic Arts, Dr. Florin held various positions at BMG, the global music division of Bertelsmann AG, and worked as a consultant with McKinsey.

Eric F. Brown
*Executive Vice President, Chief Financial and Administrative Officer*

Mr. Brown was named Executive Vice President and Chief Financial and Administrative Officer of Parent in April 2008. From March 2006 until March 2008, Mr. Brown served as Chief Operating Officer and Chief Financial Officer of McAfee, Inc., a security technology company. From January 2005 until March 2006, Mr. Brown was McAfee's Executive Vice President and Chief Financial Officer. Mr. Brown served as President and Chief Financial Officer of MicroStrategy Incorporated, a business intelligence software provider, from November 2000 until December 2004, and as its Chief Financial Officer from August 2000 until November 2000. Mr. Brown joined MicroStrategy as Chief Financial Officer of its Strategy.com subsidiary in February 2000. From October 1998 until February 2000, Mr. Brown served as Chief Financial Officer and then Chief Operating Officer of EA's studio organization in Redwood City, CA. Prior to that time, Mr. Brown was co-founder and Chief Financial Officer of DataSage, Inc., a vendor of e-business personalization software, from 1995 until October 1998. Mr. Brown also held several senior financial positions with Grand Metropolitan from 1990 until 1995. Mr. Brown also serves as an officer and director of Purchaser.

Joel Linzner
*Executive Vice President, Business and Legal Affairs*

Mr. Linzner has served as Executive Vice President, Business and Legal Affairs since March 2005. From April 2004 to March 2005, he served as Senior Vice President, Business and Legal Affairs. From October 2002 to April 2004, Mr. Linzner held the position of Senior Vice President of Worldwide Business Affairs and from July 1999 to October 2002, he held the position of Vice President of Worldwide Business Affairs. Prior to joining Electronic Arts in July 1999, Mr. Linzner served as outside litigation counsel to Parent and several other companies in the video game industry.

Gabrielle Toledano
*Executive Vice President, Human Resources*

Ms. Toledano has served as Executive Vice President, Human Resources since April 2007. From February 2006 to April 2007, Ms. Toledano held the position of Senior Vice President, Human Resources. Prior to joining Electronic Arts, Ms. Toledano worked at Siebel Systems, Inc. from July 2002 to February 2006 where she held a number of positions, including Senior Vice President of Human Resources. From September 2000 to June 2002, she served as Senior Director of Human Resources for Microsoft Corporation, and from September 1998 until September 2000, she served as Director of Human Resources and Recruiting for Microsoft.

Kenneth A. Barker
*Senior Vice President, Chief Accounting Officer*

Mr. Barker has served as Senior Vice President, Chief Accounting Officer since April 2006. From June 2003 to April 2006, Mr. Barker held the position of Vice President, Chief Accounting Officer. Prior to joining Electronic Arts, Mr. Barker was employed at Sun Microsystems, Inc., as Vice President and Corporate Controller from October 2002 to June 2003 and Assistant Corporate Controller from April 2000 to September 2002. Prior to that, he was an audit partner at Deloitte.

Stephen G. Bené
*Senior Vice President, General Counsel and Corporate Secretary*

Mr. Bené has served as Senior Vice President, General Counsel and Corporate Secretary since October 2004. From April 2004 to October 2004, Mr. Bené held the position of Vice President, Acting General Counsel and Corporate Secretary, and from June 2003 to April 2004, he held the position of Vice President and Associate General Counsel. Prior to June 2003, Mr. Bené had served as internal legal counsel since joining Parent in March 1995. Mr. Bené also serves as an officer and director of Purchaser.

S-4

Table of Contents

## DIRECTORS AND EXECUTIVE OFFICERS OF PURCHASER

The name, current principal occupation or employment and material occupations, positions, offices or employment for the past five years of each director and executive officer of Purchaser are set forth below. The business address of each director and officer is care of Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065. Unless otherwise indicated, each occupation set forth opposite an individual's name refers to employment with Parent. All directors and officers of Purchaser listed below are citizens of the United States.

### Directors and Executive Officers of Purchaser

#### Eric F. Brown
*Director, President, Assistant Treasurer and Assistant Secretary*

Mr. Brown was named director and the President, Assistant Treasurer and Assistant Secretary of Purchaser in April 2008. Mr Brown has served as Executive Vice President and Chief Financial and Administrative Officer of Parent since April 2008. From March 2006 until March 2008, Mr. Brown served as Chief Operating Officer and Chief Financial Officer of McAfee, Inc., a security technology company. From January 2005 until March 2006, Mr. Brown was McAfee's Executive Vice President and Chief Financial Officer. Mr. Brown served as President and Chief Financial Officer of MicroStrategy Incorporated, a business intelligence software provider, from November 2000 until December 2004, and as its Chief Financial Officer from August 2000 until November 2000. Mr. Brown joined MicroStrategy as Chief Financial Officer of its Strategy.com subsidiary in February 2000. From October 1998 until February 2000, Mr. Brown served as Chief Financial Officer and then Chief Operating Officer of EA's studio organization in Redwood City, CA. Prior to that time, Mr. Brown was co-founder and Chief Financial Officer of DataSage, Inc., a vendor of e-business personalization software, from 1995 until October 1998. Mr. Brown also held several senior financial positions with Grand Metropolitan from 1990 until 1995.

#### Glen A. Kohl
*Director, Vice President and Treasurer*

Mr. Kohl is a director and Vice President and Treasurer of Purchaser, having served in such capacities since Purchaser's formation in March 2008. Mr. Kohl has served as Senior Vice President, Tax and Treasury of Parent since January 2004. Prior to joining Electronic Arts, from April 2001 until December 2003, Mr. Kohl was a partner at Cooley Godward LLP. Prior to that, Mr. Kohl held various senior positions at PeoplePC Inc., Ernst & Young LLP, Wilson Sonsini Goodrich & Rosati, where he was a partner and chair of its tax department, and the United States Treasury Department, where he served as deputy assistant secretary for tax policy and tax legislative counsel.

#### Stephen G. Bené
*Director, Vice President and Secretary*

Mr. Bené is a director and Vice President and Secretary of Purchaser, having served in such capacities since Purchaser's formation in March 2008. Mr. Bené has also served as Senior Vice President, General Counsel and Corporate Secretary of Electronic Arts since October 2004. From April 2004 to October 2004, Mr. Bené held the position of Vice President, Acting General Counsel and Corporate Secretary of Electronic Arts, and from June 2003 to April 2004, he held the position of Vice President and Associate General Counsel of Parent. Prior to June 2003, Mr. Bené had served as internal legal counsel of Electronic Arts since joining Parent in March 1995.

S-5

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Table of Contents

Facsimile copies of the Amended and Restated Letter of Transmittal will be accepted. The Amended and Restated Letter of Transmittal and certificates for Shares and any other required documents should be sent to the Depositary at the address set forth below:

*The Depositary for the Offer is:*

# U.S. Bank National Association

*By Registered or Certified Mail*
*or Overnight Courier to:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station - EP-MN-W52N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

If you have questions or need additional copies of this Amended and Restated Offer to Purchase and the Amended and Restated Letter of Transmittal, you can call the Information Agent or the Dealer Manager at their respective addresses and telephone numbers set forth below. You may also contact your broker, dealer, bank, trust company or other nominee for assistance concerning the Offer.

*The Information Agent for the Offer is:*



Georgeson Inc.
199 Water Street, 26th Floor

New York, New York 10038

Banks and Brokers Call: (212) 440-9800
All Others Please Call Toll-Free: (800) 213-0473

*The Dealer Manager for the Offer is:*

## MORGAN STANLEY

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Call Toll Free: (877) 247-9865

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Exhibit (a)(1)(I)

# AMENDED AND RESTATED
# LETTER OF TRANSMITTAL

to

**Tender Shares of Common Stock**
**(Including the Associated Preferred Stock Purchase Rights)**

of

## Take-Two Interactive Software, Inc.
Pursuant to the Amended and Restated Offer to Purchase
Dated April 18, 2008

at

#### $25.74 Net Per Share in Cash

by

## EA08 Acquisition Corp.
a wholly-owned subsidiary of

## Electronic Arts Inc.

THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON FRIDAY, MAY 16, 2008, UNLESS THE OFFER IS EXTENDED.

*The Depositary For The Offer Is:*

### U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

DELIVERY OF THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL TO AN ADDRESS, OR TRANSMISSION OF INSTRUCTIONS VIA FACSIMILE TO A NUMBER, OTHER THAN AS SET FORTH ABOVE, WILL NOT CONSTITUTE A VALID DELIVERY.

THE INSTRUCTIONS ACCOMPANYING THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY BEFORE THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL IS COMPLETED.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

| DESCRIPTION OF SHARES TENDERED | | | |
|---|---|---|---|
| Name(s) and Address(es) of Registered Holder(s)<br>(Please fill in, if blank, exactly as Name(s)<br>appear(s) on Stock Certificate(s)) | Stock Certificate(s) Tendered<br>(Attach additional list if necessary) | | |
| | Stock<br>Certificate<br>Number(s)* | Total Number<br>of Shares<br>Evidenced by<br>Certificate(s)* | Number of<br>Shares<br>Tendered** |
| | | | |
| | Total Shares Tendered | | |

  * Need not be completed by Stockholders tendering Shares by book-entry transfer.

 ** Unless otherwise indicated, it will be assumed that all Shares evidenced by any Stock Certificates delivered to the Depositary are being tendered hereby. See Instruction 4.

THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL IS TO BE COMPLETED BY STOCKHOLDERS OF TAKE-TWO EITHER (1) IF CERTIFICATES EVIDENCING SHARES (AS DEFINED BELOW) ARE TO BE FORWARDED HEREWITH OR (2) IF DELIVERY OF SHARES IS TO BE MADE BY BOOK-ENTRY TRANSFER TO AN ACCOUNT MAINTAINED BY THE DEPOSITARY AT THE BOOK-ENTRY TRANSFER FACILITY (AS DEFINED IN AND PURSUANT TO THE PROCEDURES SET FORTH IN "THE OFFER—SECTION 3—PROCEDURES FOR TENDERING SHARES" OF THE AMENDED AND RESTATED OFFER TO PURCHASE).

DELIVERY OF DOCUMENTS TO THE BOOK-ENTRY TRANSFER FACILITY DOES NOT CONSTITUTE DELIVERY TO THE DEPOSITARY.

IF ANY OF THE CERTIFICATES REPRESENTING SHARES THAT YOU OWN HAVE BEEN LOST OR DESTROYED, SEE INSTRUCTION 9.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Holders whose certificates evidencing Shares (including, if the Distribution Date (as defined in the Amended and Restated Offer to Purchase) occurs, certificates for the associated preferred stock purchase rights) (any such certificates, "*Share Certificates*") are not immediately available or who cannot deliver their Share Certificates and all other documents required hereby to the Depositary prior to the Expiration Date (as defined in the "The Offer—Section 1—Terms of the Offer" of the Amended and Restated Offer to Purchase) or who cannot complete the procedure for delivery by book-entry transfer on a timely basis and who wish to tender their Shares must do so pursuant to the guaranteed delivery procedure described in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase. See Instruction 2.

This Amended and Restated Letter of Transmittal supersedes and replaces, in its entirety, the Letter of Transmittal sent to stockholders on or about March 13, 2008 (the "*Original Letter of Transmittal*"). Tendering stockholders may continue to use the Original Letter of Transmittal previously circulated with the Offer to Purchase dated March 13, 2008 (the "*Original Offer to Purchase*") or they may use this Amended and Restated Letter of Transmittal. Although the Original Letter of Transmittal refers only to the Original Offer to Purchase, stockholders using such document to tender their Shares will nevertheless be deemed to be tendering pursuant to the Offer (as defined below) as amended and will receive the adjusted offer price of $25.74 per Share described in the Amended and Restated Offer to Purchase if Shares are accepted for payment and paid for by Purchaser (as defined below) pursuant to the Offer. Stockholders tendering their Shares according to the guaranteed delivery procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase may do so using either the original Notice of Guaranteed Delivery circulated with the Original Offer to Purchase or the Amended and Restated Notice of Guaranteed Delivery circulated herewith. Unless otherwise indicated, as used herein, the term "*Notice of Guaranteed Delivery*" refers to either such document.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Shares previously tendered pursuant to the Original Offer to Purchase and the Original Letter of Transmittal and not withdrawn constitute valid tenders for purposes of the Offer as amended. Stockholders who have validly tendered and not withdrawn their Shares are not required to take any further action with respect to such Shares in order to receive the offer price if Shares are accepted for payment and paid for by Purchaser pursuant to the Offer, except as may be required by the guaranteed delivery procedure if such procedure was utilized. See "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase. If you have not already tendered your Shares, please disregard the materials previously delivered to you and use the materials accompanying the Amended and Restated Offer to Purchase.

☐   CHECK HERE IF SHARES ARE BEING DELIVERED BY BOOK-ENTRY TRANSFER MADE TO AN ACCOUNT MAINTAINED BY THE DEPOSITARY WITH THE BOOK-ENTRY TRANSFER FACILITY AND COMPLETE THE FOLLOWING (ONLY PARTICIPANTS IN THE BOOK-ENTRY TRANSFER FACILITY MAY DELIVER SHARES BY BOOK-ENTRY TRANSFER):

Name(s) of Tendering Institution: _____

Account Number: _____   Transaction Code Number: _____

☐   CHECK HERE IF SHARES ARE BEING TENDERED PURSUANT TO A NOTICE OF GUARANTEED DELIVERY PREVIOUSLY SENT TO THE DEPOSITARY AND COMPLETE THE FOLLOWING:

Name(s) of Registered Holder(s): _____

Window Ticket Number (if any): _____

Date of Execution of Notice of Guaranteed Delivery: _____

Name of Institution that Guaranteed Delivery: _____

If Delivered by Book-Entry Transfer, Check Box:   ☐

Name of Tendering Institution: _____

Account Number: _____

Transaction Code Number: _____

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

NOTE: SIGNATURES MUST BE PROVIDED AT THE END OF
THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL.
PLEASE READ THE INSTRUCTIONS SET FORTH IN
THIS AMENDED AND RESTATED LETTER OF
TRANSMITTAL CAREFULLY.

Ladies and Gentlemen:

The undersigned hereby tenders to EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*" or "*Parent*"), the above-described shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), for $25.74 per Share, net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*"), receipt of which is hereby acknowledged, and in this Amended and Restated Letter of Transmittal (which, together with the Amended and Restated Offer to Purchase and any amendments or supplements hereto or thereto, collectively constitute the "*Offer*"). The undersigned understands that Purchaser reserves the right to transfer or assign, in whole or from time to time in part, to one or more of its affiliates the right to purchase Shares tendered pursuant to the Offer, but any such transfer or assignment will not relieve Purchaser of its obligations under the Offer or prejudice your rights to receive payment for Shares validly tendered and accepted for payment.

Upon the terms and subject to the conditions of the Offer (and if the Offer is extended or amended, the terms of any such extension or amendment), and subject to, and effective upon, acceptance for payment of Shares tendered herewith, in accordance with the terms of the Offer, the undersigned hereby sells, assigns and transfers to, or upon the order of, Purchaser all right, title and interest in and to all Shares that are being tendered hereby and all dividends, distributions (including, without limitation, distributions of additional Shares or other securities) and rights declared, paid or distributed in respect of such Shares on or after March 13, 2008 (collectively, "*Distributions*") and irrevocably appoints the Depository the true and lawful agent and attorney-in-fact of the undersigned with respect to such Shares and any and all Distributions, with full power of substitution and resubstitution (such power of attorney being deemed to be an irrevocable power coupled with an interest), to (i) deliver Share Certificates evidencing such Shares (and all Distributions), or transfer ownership of such Shares (and all Distributions) on the account books maintained by the Book-Entry Transfer Facility, together, in either case, with all accompanying evidences of transfer and authenticity, to or upon the order of the Purchaser, (ii) present such Shares (and all Distributions) for transfer on the books of the Company and (iii) receive all benefits and otherwise exercise all rights of beneficial ownership of such Shares (and all Distributions), all in accordance with the terms of the Offer.

By executing this Amended and Restated Letter of Transmittal, the undersigned irrevocably appoints Glen A. Kohl and Stephen G. Bené, and each of them, as attorneys-in-fact and proxies of the undersigned, in the manner set forth in this Amended and Restated Letter of Transmittal, each with full power of substitution and resubstitution, to the full extent of the undersigned's rights with respect to (a) the Shares tendered by the undersigned and accepted for payment by Purchaser and (b) any and all non-cash dividends, Distributions, rights or other securities issued or issuable on or after March 13, 2008 in respect of such tendered and accepted Shares. All such proxies shall be considered coupled with an interest in the tendered Shares. This appointment and proxies shall be effective if, when and only to the extent that Purchaser accepts such Shares for payment pursuant to the Offer. The undersigned acknowledges and agrees that, upon such acceptance for payment, all prior proxies given by the undersigned with respect to his, her or its Shares and such other securities will, without further action, be revoked, and no subsequent proxies may be given nor any subsequent written consents executed (and, if given or executed, will not be deemed effective). Without limiting the foregoing, the proxy granted to the aforementioned designees of the Purchaser shall include the power to exercise all voting and other rights of the undersigned as such designees, in their sole discretion, may deem proper at any annual, special, adjourned or postponed meeting of the Company's stockholders (or in respect of any action by stockholder consent in lieu of a meeting of the Company's stockholders). The undersigned acknowledges that in order for Shares or other

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

securities to be deemed validly tendered hereunder and otherwise pursuant to the Offer, immediately upon Purchaser's acceptance for payment of such Shares, Purchaser must be able to exercise full voting and other rights with respect to such Shares.

The undersigned hereby represents and warrants that the undersigned has full power and authority to tender, sell, assign and transfer Shares tendered hereby (and all Distributions), and that when such Shares are accepted for payment by Purchaser, Purchaser will acquire good, marketable and unencumbered title thereto (and to all Distributions), free and clear of all liens, restrictions, charges and encumbrances, and that none of such Shares or Distributions will be subject to any adverse claim. The undersigned, upon request, shall execute and deliver all additional documents deemed by the Depositary or Purchaser to be necessary or desirable to complete the sale, assignment and transfer of Shares tendered (and all Distributions assigned or transferred) hereby. In addition, the undersigned shall remit and transfer promptly to the Depositary for the account of Purchaser, all Distributions in respect of Shares tendered hereby, accompanied by appropriate documentation of transfer, and, pending such remittance and transfer or appropriate assurance thereof, Purchaser shall be entitled to all rights and privileges as owner of each such Distribution and may withhold the entire purchase price of Shares tendered hereby or deduct from such purchase price the amount or value of such Distribution, as determined by Purchaser in its sole discretion.

No authority herein conferred or agreed to be conferred shall be affected by, and all such authority shall survive, the death or incapacity of the undersigned, and any obligation of the undersigned hereunder shall be binding upon the heirs, personal representatives, successors and assigns of the undersigned. Except as stated in the Offer, this tender is irrevocable.

The undersigned understands that valid tenders of Shares pursuant to any one of the procedures described in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase and in the Instructions hereto will constitute a binding agreement between the undersigned and Purchaser upon the terms and subject to the conditions of the Offer, including, without limitation, the undersigned's representation and warranty that the undersigned owns all Shares being tendered.

Unless otherwise indicated below in the box entitled "Special Payment Instructions", please issue the check for the purchase price and/or return all Share Certificates evidencing Shares not tendered or accepted for payment in the name(s) of the registered holder(s) appearing above under "Description of Shares Tendered". Similarly, unless otherwise indicated below in the box entitled "Special Delivery Instructions", please mail the check for the purchase price of all Shares purchased and return all Share Certificates evidencing Shares not tendered or not accepted for payment (and accompanying documents, as appropriate) to the address(es) of the registered holder(s) appearing above under "Description of Shares Tendered". In the event that the boxes below entitled "Special Payment Instructions" and "Special Delivery Instructions" are both completed, please issue the check for the purchase price of all Shares purchased and return all Share Certificates evidencing Shares not tendered or not accepted for payment in the name(s) of, and deliver such check and return such Share Certificates (and any accompanying documents, as appropriate) to, the person(s) so indicated and at the address so indicated. Unless otherwise indicated below in the box entitled "Special Payment Instructions", please credit any Shares tendered hereby and delivered by book-entry transfer that are not accepted for payment by crediting the account at the Book-Entry Transfer Facility designated above. The undersigned recognizes that Purchaser has no obligation, pursuant to the Special Payment Instructions, to transfer any Shares from the name of the registered holder(s) thereof if Purchaser does not accept for payment any Shares tendered hereby.

**SPECIAL PAYMENT INSTRUCTIONS**
**(SEE INSTRUCTIONS 1, 4, 5 AND 6)**

To be completed ONLY if the check for the purchase price of Shares purchased or Share Certificates evidencing Shares not tendered or not purchased are to be issued in the name of someone other than the undersigned.

Issue  ☐  Check  ☐  Share Certificate(s) to:                                       .

Name:
                                                            (Print)
Address:

                                                            (Include Zip Code)


                                          (Taxpayer Identification or Social Security Number)
                                          (See Substitute Form W-9 Included Herein)

☐  Credit Shares delivered by book-entry transfer and not purchased to the account set forth below:

DTC
Account
Number:

## SPECIAL DELIVERY INSTRUCTIONS
### (SEE INSTRUCTIONS 1, 4, 5 AND 6)

To be completed ONLY if the check for the purchase price of Shares purchased or Share Certificates evidencing Shares not tendered or not purchased are to be mailed to someone other than the undersigned, or to the undersigned at an address other than that shown under "Description of Shares Tendered" above.

Mail ☐ Check ☐ Share Certificate(s) to:

Name:

(Print)

Address:

(Include Zip Code)

(Taxpayer Identification or Social Security Number)
(See Substitute Form W-9 Included Herein)

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**IMPORTANT**
**STOCKHOLDERS SIGN HERE**
(PLEASE COMPLETE SUBSTITUTE FORM W-9 INCLUDED HEREIN)

**Signature(s) of Holder(s)**

Dated: _____

(Must be signed by registered holder(s) exactly as name(s) appear(s) on the Share Certificates or on a security position listing or by person(s) authorized to become registered holder(s) by certificates and documents transmitted herewith. If signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, please provide the following information and see Instruction 5.)

Name(s): _____

(Please Print)

Capacity (full title): _____

Address: _____

(Include Zip Code)

Daytime Area Code and Telephone Number: _____

Tax Identification or Social Security Number: _____

(SEE SUBSTITUTE FORM W-9 INCLUDED HEREIN)
**GUARANTEE OF SIGNATURE(S)**
**(IF REQUIRED — SEE INSTRUCTIONS 1 AND 5)**
**FOR USE BY FINANCIAL INSTITUTIONS ONLY.**
**FINANCIAL INSTITUTIONS: PLACE MEDALLION GUARANTEE IN SPACE BELOW**

Authorized Signature: _____

Name(s): _____

(Please Print)

Name of Firm: _____

Address: _____

(Include Zip Code)

Daytime Area Code and Telephone Number: _____

Dated: _____

INSTRUCTIONS
FORMING PART OF THE TERMS AND CONDITIONS OF THE OFFER

1. **Guarantee of Signatures.**

Except as otherwise provided below, all signatures on this Amended and Restated Letter of Transmittal must be guaranteed by a financial institution (including most commercial banks, savings and loan associations and brokerage houses) that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program (each an "*Eligible Institution*"). No signature guarantee is required on this Amended and Restated Letter of Transmittal if (i) this Amended and Restated Letter of Transmittal is signed by the registered holder(s) of the Shares (which term, for purposes of this document, includes any participant in the Book-Entry Transfer Facility's system whose name appears on a security position listing as the owner of the Shares) tendered herewith and such registered holder(s) have not completed the box entitled "Special Delivery Instructions" or the box entitled "Special Payment Instructions" on this Amended and Restated Letter of Transmittal, or (ii) such Shares are tendered for the account of an Eligible Institution. See Instruction 5.

2. **Delivery of Amended and Restated Letter of Transmittal and Shares.**

This Amended and Restated Letter of Transmittal is to be used if either Share Certificates are to be forwarded herewith or, unless an Agent's Message (as defined in the Amended and Restated Offer to Purchase) is utilized, if deliveries are to be made by book-entry transfer pursuant to the procedures set forth in "The Offer—Section 3—Procedures for Tendering Shares" of the Amended and Restated Offer to Purchase. Share Certificates for all physically tendered Shares, or a confirmation of a book-entry transfer into the Depositary's account at the Book-Entry Transfer Facility of all Shares delivered by book-entry transfer, as well as a properly completed and duly executed Amended and Restated Letter of Transmittal (or a manually signed facsimile thereof) and any other documents required by this Amended and Restated Letter of Transmittal, or an Agent's Message in the case of a book-entry transfer, must be received by the Depositary at its address set forth on the front page of this Amended and Restated Letter of Transmittal prior to the Expiration Date (as defined in the Amended and Restated Offer to Purchase) (or the expiration of a Subsequent Offering Period (as defined in the Amended and Restated Offer to Purchase), if applicable). If Share Certificates are forwarded to the Depositary in multiple deliveries, a properly completed and duly executed Amended and Restated Letter of Transmittal must accompany each such delivery. Stockholders whose Share Certificates are not immediately available, who cannot deliver their Share Certificates and all other required documents to the Depositary prior to the Expiration Date or who cannot complete the procedure for delivery by book-entry transfer on a timely basis, may tender their Shares pursuant to the guaranteed delivery procedure described in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase. Pursuant to such procedure: (i) such tender must be made by or through an Eligible Institution; (ii) a properly completed and duly executed Notice of Guaranteed Delivery, substantially in the form provided by Purchaser, must be received by the Depositary prior to the Expiration Date; and (iii) Share Certificates representing all physically delivered Shares in proper form for transfer by delivery, or a confirmation of a book-entry transfer into the Depositary's account at the Book-Entry Transfer Facility of all Shares, in each case together with a properly completed and duly executed Amended and Restated Letter of Transmittal (or a manually signed facsimile thereof), with any required signature guarantees (or in the case of a book-entry transfer, an Agent's Message (as defined in "The Offer—Section 2—Acceptance for Payment and Payment" of the Amended and Restated Offer to Purchase)), and any other documents required by this Amended and Restated Letter of Transmittal, must be received by the Depositary within three Nasdaq Global Select Market trading days of the date of execution of such Notice of Guaranteed Delivery, all as provided in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase.

THE METHOD OF DELIVERY OF SHARES, THE AMENDED AND RESTATED LETTER OF TRANSMITTAL AND ALL OTHER REQUIRED DOCUMENTS, INCLUDING DELIVERY THROUGH THE BOOK-ENTRY TRANSFER FACILITY, IS AT THE ELECTION AND SOLE RISK OF THE TENDERING STOCKHOLDER, AND THE DELIVERY WILL BE DEEMED MADE ONLY

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

WHEN ACTUALLY RECEIVED BY THE DEPOSITARY. IF DELIVERY IS BY MAIL, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED, PROPERLY INSURED, IS RECOMMENDED. IN ALL CASES, SUFFICIENT TIME SHOULD BE ALLOWED TO ENSURE TIMELY DELIVERY.

No alternative, conditional or contingent tenders will be accepted, and no fractional Shares will be purchased. By execution of this Amended and Restated Letter of Transmittal (or a manually signed facsimile hereof), the undersigned waives any right to receive any notice of the acceptance for payment of the Shares.

3.   Inadequate Space.

If the space provided under "Description of Shares Tendered" is inadequate, the Share Certificate numbers, the number of Shares evidenced by such Share Certificates and the number of Shares tendered should be listed on a separate signed schedule and attached hereto.

4.   Partial Tenders (not applicable to stockholders who tender by book-entry transfer).

If fewer than all the Shares represented by any Share Certificate delivered to the Depositary are to be tendered, fill in the number of Shares which are to be tendered in the box entitled "Number of Shares Tendered." In such case, a new certificate for the remainder of the Shares represented by the old certificate will be sent to the person(s) signing this Amended and Restated Letter of Transmittal, unless otherwise provided in the box entitled "Special Delivery Instructions" in this Amended and Restated Letter of Transmittal, as promptly as practicable following the expiration or termination of the Offer. All Shares represented by certificates delivered to the Depositary will be deemed to have been tendered unless otherwise indicated.

5.   Signatures on Amended and Restated Letter of Transmittal; Stock Powers and Endorsements.

If this Amended and Restated Letter of Transmittal is signed by the registered holder(s) of the Shares tendered hereby, the signature(s) must correspond with the name(s) as written on the face of the Share Certificates without alteration, enlargement or any change whatsoever.

If any of the Shares tendered hereby are held of record by two or more persons, all such persons must sign this Amended and Restated Letter of Transmittal.

If any of the Shares tendered hereby are registered in names of different holders, it will be necessary to complete, sign and submit as many separate Amended and Restated Letters of Transmittal as there are different registrations of Shares.

If this Amended and Restated Letter of Transmittal is signed by the registered holder(s) of Shares tendered hereby, no endorsements of Share Certificates or separate stock powers are required unless payment of the purchase price is to be made to, or Shares not tendered or not purchased are to be returned or issued in the name of, any person other than the registered holder(s). If this Amended and Restated Letter of Transmittal is signed by a person other than the registered holder(s) of the Share Certificate(s) evidencing Shares tendered hereby, the Share Certificate(s) tendered hereby must be endorsed or accompanied by appropriate stock powers, in either case, signed exactly as the name(s) of the registered holder(s) appear(s) on such Share Certificate(s). Signature(s) on such Share Certificates or stock powers must be guaranteed by an Eligible Institution.

If this Amended and Restated Letter of Transmittal or any Share Certificate or stock power is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person should so indicate when signing, and proper evidence satisfactory to Purchaser of the authority of such person so to act must be submitted.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

6.    **Stock Transfer Taxes.**

Purchaser will pay any stock transfer taxes with respect to the sale and transfer of any Shares to it or its order pursuant to the Offer. If, however, payment of the purchase price is to be made to, or Shares not tendered or not purchased are to be returned in the name of, any person other than the registered holder(s), or if a transfer tax is imposed for any reason other than the sale or transfer of Shares to Purchaser pursuant to the Offer, then the amount of any stock transfer taxes (whether imposed on the registered holder(s), such other person or otherwise) will be deducted from the purchase price unless satisfactory evidence of the payment of such taxes, or exemption therefrom, is submitted herewith.

Except as provided in this Instruction 6, it will not be necessary for transfer tax stamps to be affixed to the Share Certificates evidencing the Shares tendered hereby.

7.    **Special Payment and Delivery Instructions.**

If the check for the purchase price of any Shares purchased is to be issued to, or any Shares not tendered or not purchased are to be returned or issued in the name of, a person other than the person(s) signing this Amended and Restated Letter of Transmittal or if the check or any Share Certificates for Shares not tendered or not purchased are to be mailed to someone other than the person(s) signing this Amended and Restated Letter of Transmittal or to the person(s) signing this Amended and Restated Letter of Transmittal at an address other than that shown above, the appropriate boxes on this Amended and Restated Letter of Transmittal should be completed. Stockholders tendering Shares by book-entry transfer may request that Shares not purchased be credited to such account at the Book-Entry Transfer Facility as such stockholder may designate under "Special Payment Instructions." If no such instructions are given, any such Shares not purchased will be returned by crediting the account at the Book-Entry Transfer Facility designated above.

8.    **Substitute Form W-9.**

Under U.S. federal income tax laws, the Depositary will be required to withhold a portion of the amount of any payments made to certain stockholders pursuant to the Offer. In order to avoid such backup withholding, each tendering stockholder that is a "U.S. holder" (as defined in "The Offer—Section 5—Certain Tax Considerations" of the Amended and Restated Offer to Purchase), and each other U.S. payee, must provide the Depositary with such holder's or payee's correct taxpayer identification number ("*TIN*") and certify that such holder or payee is not subject to such backup withholding by completing the attached Substitute Form W-9. Certain holders or payees (including, among others, corporations, non-resident foreign individuals and foreign entities) are not subject to these backup withholding and reporting requirements. For further information concerning backup withholding see "IMPORTANT TAX INFORMATION" below.

Failure to complete the Substitute Form W-9 will not, by itself, cause Shares to be deemed invalidly tendered, but may require the Depositary to withhold a portion of the amount of any payments made pursuant to the Offer. NOTE: FAILURE TO COMPLETE AND RETURN THE SUBSTITUTE FORM W-9 MAY RESULT IN BACKUP WITHHOLDING OF U.S. FEDERAL INCOME TAX AT A 28% RATE ON ANY PAYMENTS MADE TO YOU PURSUANT TO THE OFFER. PLEASE REVIEW THE "IMPORTANT TAX INFORMATION" SECTION BELOW AND THE ENCLOSED "GUIDELINES FOR CERTIFICATION OF TIN ON SUBSTITUTE FORM W-9" FOR ADDITIONAL DETAILS.

9.    **Mutilated, Lost, Stolen or Destroyed Certificates.**

If any Share Certificate(s) which represented Shares has been mutilated, lost, stolen, or destroyed, the stockholder should promptly notify Take-Two's transfer agent for the Shares. The holder will then be instructed as to the steps that must be taken in order to replace the Share Certificate. This Amended and Restated Letter of Transmittal and related documents cannot be processed until the procedures for replacing lost or destroyed certificates have been followed.

**10.    Waiver of Conditions; Interpretation.**

Purchaser reserves the absolute right to waive any condition of the Offer to the extent permitted by applicable law or any defect or irregularity in the tender of any Shares of any particular stockholder, including without limitation the undersigned, whether or not similar defects or irregularities are waived in the case of other stockholders. Purchaser's interpretation of the terms and conditions of the Offer (including, without limitation, this Amended and Restated Letter of Transmittal and these Instructions) will be final and binding.

**11.    Requests for Assistance or Additional Copies.**

Any questions and requests for assistance may be directed to the Information Agent or the Dealer Manager for the Offer at their respective addresses and telephone numbers set forth on the back cover of this Amended and Restated Letter of Transmittal. Additional copies of the Amended and Restated Offer to Purchase, this Amended and Restated Letter of Transmittal, the Amended and Restated Notice of Guaranteed Delivery and other related materials may be obtained from the Information Agent.

IMPORTANT: THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL (OR MANUALLY SIGNED FACSIMILE HEREOF), PROPERLY COMPLETED AND DULY EXECUTED (TOGETHER WITH ANY REQUIRED SIGNATURE GUARANTEES (OR, IN THE CASE OF A BOOK-ENTRY TRANSFER, AN AGENT'S MESSAGE) AND SHARE CERTIFICATES OR CONFIRMATION OF BOOK-ENTRY TRANSFER AND ALL OTHER REQUIRED DOCUMENTS) OR A PROPERLY COMPLETED AND DULY EXECUTED NOTICE OF GUARANTEED DELIVERY MUST BE RECEIVED BY THE DEPOSITARY PRIOR TO THE EXPIRATION DATE (AS DEFINED IN THE AMENDED AND RESTATED OFFER TO PURCHASE).

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

## IMPORTANT TAX INFORMATION

Under U.S. federal income tax law, a U.S. holder whose tendered Shares are accepted for payment is required by law to provide the Depositary (as payer) with such holder's correct TIN on Substitute Form W-9 below. If such holder is an individual, the TIN is such holder's social security number. If the Depositary is not provided with the correct TIN, the holder may be subject to penalties imposed by the Internal Revenue Service ("*IRS*") and payments that are made to such holder with respect to Shares purchased pursuant to the Offer may be subject to backup withholding.

Certain holders (including, among others, corporations, non-resident foreign individuals and foreign entities) are not subject to these backup withholding and reporting requirements. In order for a non-U.S. holder (as defined in "The Offer—Section 5—Certain Tax Considerations" of the Amended and Restated Offer to Purchase) to qualify as an exempt recipient, such holder must submit the appropriate IRS Form W-8, signed under penalties of perjury, attesting to such person's foreign status. Each IRS Form W-8 is available on the IRS website (www.irs.gov) or can be obtained from the Depositary.

If backup withholding applies, the Depositary is required to withhold 28% of any payments made to the holder. Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained from the IRS provided that the required information is furnished to the IRS.

For further information concerning backup withholding and instructions for completing the Substitute Form W-9 (including how to obtain a TIN if you do not have one and how to complete the Substitute Form W-9 if Shares are held in more than one name), consult the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9."

### Purpose of Substitute Form W-9

To prevent backup withholding on payments that are made to a U.S. holder with respect to Shares purchased pursuant to the Offer, the holder is required to notify the Depositary of such holder's correct TIN by completing the form below certifying (i) that the TIN provided on Substitute Form W-9 is correct (or that such holder is awaiting a TIN) and (ii) that such holder is not subject to backup withholding because (a) such holder has not been notified by the IRS that such holder is subject to backup withholding as a result of a failure to report all interest or dividends, (b) the IRS has notified such holder that such holder is no longer subject to backup withholding or (c) such holder is exempt from backup withholding.

### What Number to Give the Depositary

U.S. holders are required to give the Depositary the social security number or employer identification number of the record holder of the Shares tendered hereby. If the Shares are in more than one name or are not in the name of the actual owner, consult the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9" for additional guidance on which number to report. If the tendering U.S. holder has not been issued a TIN and has applied for a number or intends to apply for a number in the near future, such holder should check the "Awaiting TIN" box in Part II, sign and date the Substitute Form W-9 and complete the Certificate of Awaiting Taxpayer Identification Number below. Notwithstanding that the "Awaiting TIN" box is checked in Part II and the Certificate of Awaiting Taxpayer Identification Number is completed, the Depositary will withhold 28% of all payments of the purchase price to such holder until a TIN is provided to the Depositary. Such amounts will be refunded to such surrendering holder if a TIN is provided to the Depositary within 60 days.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

| **SUBSTITUTE** | PAYEE'S NAME: |
|---|---|

**Form W-9**

Department of the Treasury,
Internal Revenue Service

**Request for Taxpayer Identification Number (TIN) and Certification**

Name: _____

Address: _____
                         **(Number and Street)**

_____
**(City) (State) (Zip Code)**

| Check appropriate box:<br>Individual/Sole Proprietor ☐<br>Partnership ☐ | Corporation ☐<br>Other (specify) ☐ | Exempt from<br>Backup Withholding ☐ |
|---|---|---|

| Part I.—Please provide your taxpayer or identification number in the space at right. If awaiting TIN, *write "Applied For."* | SSN: _____ or<br>EIN: _____ |
|---|---|

**Part II.—Awaiting TIN** ☐

**Part III.—Certification**    Under penalties of perjury, I certify that:

(1)  The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me);

(2)  I am not subject to backup withholding either because (a) I am exempt from backup withholding, (b) I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

(3)  I am a United States person (including a United States resident alien).

**Certification Instructions—**You must cross out item (2) in Part III above if you have been notified by the IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received notification from the IRS that *you are no longer subject to backup withholding, do not cross out item (2).*

**Sign Here** ☐    Signature: _____    Date: _____

NOTE: FAILURE TO COMPLETE AND RETURN THIS FORM MAY RESULT IN A $50 PENALTY IMPOSED BY THE INTERNAL REVENUE SERVICE AND BACKUP WITHHOLDING OF 28% OF ANY PAYMENTS MADE TO YOU PURSUANT TO THE OFFER. PLEASE REVIEW THE ENCLOSED GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9 FOR ADDITIONAL DETAILS.

NOTE: YOU MUST COMPLETE THE FOLLOWING CERTIFICATE IF YOU CHECKED THE BOX IN PART II OF THE SUBSTITUTE FORM W-9.

**CERTIFICATION OF AWAITING TAXPAYER IDENTIFICATION NUMBER**

I certify under penalties of perjury that a taxpayer identification number has not been issued to me, and either (1) I have mailed or delivered an application to receive a taxpayer identification number to the appropriate IRS Center or Social Security Administration office or (2) I intend to mail or deliver an application in the near future. I understand that if I do not provide a taxpayer identification number by the time of payment, 28% of all reportable payments made to me thereafter will be withheld until I provide a taxpayer identification number to the payer and that, if I do not provide my taxpayer identification number within sixty days, such retained amounts shall be remitted to the IRS as backup withholding.

_____          _____
Signature                                              Date

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

FACSIMILES OF THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL, PROPERLY COMPLETED AND DULY SIGNED, WILL BE ACCEPTED. THIS AMENDED AND RESTATED LETTER OF TRANSMITTAL AND SHARE CERTIFICATES AND ANY OTHER REQUIRED DOCUMENTS SHOULD BE SENT OR DELIVERED BY EACH TAKE-TWO STOCKHOLDER OR SUCH STOCKHOLDER'S BROKER, DEALER, COMMERCIAL BANK, TRUST COMPANY OR OTHER NOMINEE TO THE DEPOSITARY AT ITS ADDRESS SET FORTH BELOW.

*The Depositary For The Offer Is:*

## U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

Any questions and requests for assistance may be directed to the Information Agent or the Dealer Manager at their respective addresses and telephones number set forth below. Additional copies of the Amended and Restated Offer to Purchase, the Amended and Restated Letter of Transmittal and the Amended and Restated Notice of Guaranteed Delivery may be obtained from the Information Agent at the address and telephone number set forth below. Holders of Shares may also contact their broker, dealer, commercial bank or trust company or other nominee for assistance concerning the Offer.

*The Information Agent for the Offer is:*



Georgeson Inc.
199 Water Street, 26th Floor

New York, New York 10038

Banks and Brokers Call: (212) 440-9800
All Others Please Call Toll-Free: (800) 213-0473

*The Dealer Manager for the Offer is:*

### MORGAN STANLEY

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Call Toll Free: (877) 247-9865

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

# AMENDED AND RESTATED
# NOTICE OF GUARANTEED DELIVERY

to

**Tender Shares of Common Stock
(Including the Associated Preferred Stock Purchase Rights)**

of

## Take-Two Interactive Software, Inc.

to

### EA08 Acquisition Corp.
a wholly-owned subsidiary of

### Electronic Arts Inc.

**THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON FRIDAY, MAY 16, 2008, UNLESS THE OFFER IS EXTENDED.**

*(Not be used for Signature Guarantees)*

This Amended and Restated Notice of Guaranteed Delivery, or a form substantially equivalent to this form, must be used to accept the Offer (as defined below) (i) if certificates (the "*Share Certificates*") evidencing shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), are not immediately available, (ii) if Share Certificates and all other required documents cannot be delivered to U.S. Bank National Association, as Depositary (the "*Depositary*"), prior to the Expiration Date (as defined in "The Offer—Section 1—Terms of the Offer" of the Amended and Restated Offer to Purchase (as defined below)) or (iii) if the procedure for book-entry transfer cannot be completed on a timely basis. This Amended and Restated Notice of Guaranteed Delivery may be delivered by hand, facsimile transmission or mail to the Depositary. See "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase.

*The Depositary For The Offer Is:*

## U.S. Bank National Association

*By Registered or Certified Mail or Overnight Courier:*

U.S. Bank National Association
West Side Flats Operations Center
Attn: Specialized Finance, Joyce Terry
Corporate Trust Services
60 Livingston Ave.
Mail Station—EP-MN-WS2N
St. Paul, MN 55107-2292

For Information: (651) 495-3512
By Facsimile: (651) 495-8158

**DELIVERY OF THIS AMENDED AND RESTATED NOTICE OF GUARANTEED DELIVERY TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF INSTRUCTIONS VIA FACSIMILE TRANSMISSION TO A NUMBER OTHER THAN AS LISTED ABOVE, DOES NOT CONSTITUTE A VALID DELIVERY TO THE DEPOSITARY.**

**THIS AMENDED AND RESTATED NOTICE OF GUARANTEED DELIVERY IS NOT TO BE USED TO GUARANTEE SIGNATURES. IF A SIGNATURE ON THE AMENDED AND RESTATED LETTER OF TRANSMITTAL IS REQUIRED TO BE GUARANTEED BY AN "ELIGIBLE INSTITUTION" UNDER THE INSTRUCTIONS THERETO, SUCH SIGNATURE GUARANTEE MUST APPEAR IN THE APPLICABLE SPACE PROVIDED IN THE SIGNATURE BOX ON THE AMENDED AND RESTATED LETTER OF TRANSMITTAL.**

**THE GUARANTEE ON THE REVERSE SIDE MUST BE COMPLETED.**

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Ladies and Gentlemen:

    The undersigned hereby tenders to EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*"), upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Offer to Purchase*"), and the related Amended and Restated Letter of Transmittal (which, together with the Amended and Restated Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*"), receipt of which is hereby acknowledged, the number of Shares specified below pursuant to the guaranteed delivery procedure set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase.

Name(s) of Record Holder(s): _____

                                                **(Please Print)**

Address(es): _____

Area Code and Tel. No.: _____

Signature(s): _____

Number of Shares: _____

Certificate Nos. (if available): _____

Check this box if Shares will be tendered by book-entry transfer:　☐

Depositary Trust Company
Account Number at Book-
Entry Transfer Facility:　_____

Dated: _____, 2008

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

**GUARANTEE**
**(NOT TO BE USED FOR SIGNATURE GUARANTEES)**

    The undersigned, a firm that is a participant in the Security Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Guarantee Program or the Stock Exchange Medallion Program or any other "eligible guarantor institution" (as such term is defined in Rule 17Ad-15 under the Securities Exchange Act of 1934, as amended), guarantees (a) that the above named person(s) "own(s)" the Shares tendered hereby within the meaning of Rule 14e-4 under the Securities Exchange Act of 1934, as amended, (b) that such tender of Shares complies with Rule 14e-4 and (c) delivery to the Depositary of the Shares tendered hereby, in proper form for transfer, or a Book-Entry Confirmation (as defined in the Amended and Restated Offer to Purchase), together with a properly completed and duly executed Amended and Restated Letter of Transmittal (or a manually signed facsimile thereof) with any required signature guarantees, or an Agent's Message (as defined in the Amended and Restated Offer to Purchase) in the case of a book-entry delivery, and any other required documents, within three Nasdaq Global Select Market trading days after the date hereof.

    The Eligible Institution that completes this form must communicate the guarantees to the Depositary and must deliver the Amended and Restated Letter of Transmittal and Share Certificates to the Depositary within the time period shown herein. Failure to do so could result in a financial loss to such Eligible Institution.

Name of Firm: _____

Address: _____

                                                                                                                       Zip Code

Area Code and Tel. No.: _____

Authorized Signature: _____

Name: _____
                 Please Print

Title: _____

Dated: _____, 2008

NOTE:    DO NOT SEND SHARE CERTIFICATES WITH THIS NOTICE. SHARE CERTIFICATES SHOULD BE SENT WITH YOUR AMENDED AND RESTATED LETTER OF TRANSMITTAL.

# AMENDED AND RESTATED
# OFFER TO PURCHASE FOR CASH
### All Outstanding Shares of Common Stock
### (Including the Associated Preferred Stock Purchase Rights)
of

## Take-Two Interactive Software, Inc.
at
### $25.74 Net Per Share in Cash
by
# EA08 Acquisition Corp.
#### a wholly-owned subsidiary of
## Electronic Arts Inc.

**THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON FRIDAY, MAY 16, 2008, UNLESS THE OFFER IS EXTENDED.**

April 18, 2008

*To Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees:*

EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc., a Delaware corporation ("*Electronic Arts*"), is offering to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*"), at a price of $25.74 per Share net to the seller in cash (subject to applicable withholding taxes), without interest thereon, upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*") and the related Amended and Restated Letter of Transmittal (which, together with the Amended and Restated Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") enclosed herewith. Please furnish copies of the enclosed materials to those of your clients in whose accounts you hold Shares registered in your name or in the name of your nominee.

**The Offer is subject to certain conditions contained in the Amended and Restated Offer to Purchase.**

For your information and for forwarding to your clients for whom you hold Shares registered in your name or in the name of your nominee, we are enclosing the following documents:

1. Amended and Restated Offer to Purchase dated April 18, 2008;

2. Amended and Restated Letter of Transmittal, including a Substitute Form W-9, for your use in accepting the Offer and tendering Shares on behalf of your clients and for the information of your clients;

3. Amended and Restated Notice of Guaranteed Delivery, to be used to accept the Offer if the Shares and all other required documents are not immediately available or cannot be delivered to U.S. Bank National Association, the Depositary for the Offer, prior to the expiration of the Offer or if the procedure for book-entry transfer cannot be completed prior to the expiration of the Offer;

4. A form of letter which may be sent to your clients for whose accounts you hold Shares registered in your name or in the name of your nominee, with space provided for obtaining such clients' instructions with regard to the Offer;

5. Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9; and

6. Return envelope addressed to the Depositary.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Your prompt action is requested. We urge you to contact your clients as promptly as possible. Please note that the Offer and withdrawal rights expire at 11:59 p.m., New York City time, on Friday, May 16, 2008, unless the Offer is extended.

In all cases, payment for Shares accepted for payment pursuant to the Offer will be made only after timely receipt by the Depositary of (i) the share certificates representing such Shares or timely Book-Entry Confirmation (as defined in the Amended and Restated Offer to Purchase) of the book-entry transfer of such Shares (if such procedure is available), into the Book-Entry Transfer Facility (as defined in the Amended and Restated Offer to Purchase), pursuant to the procedures set forth in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase; (ii) the Letter of Transmittal (or a facsimile thereof) (whether the original Letter of Transmittal or the Amended and Restated Letter of Transmittal, as described in further detail in, and permitted by, the Amended and Restated Offer to Purchase), properly completed and duly executed, with any required signature guarantees, or an Agent's Message (as defined in the Amended and Restated Offer to Purchase); and (iii) any other documents required by the Amended and Restated Letter of Transmittal.

If holders of Shares wish to tender, but it is impracticable for them to forward their certificates or other required documents prior to the expiration of the Offer, a tender may be effected by following the guaranteed delivery procedure described in "The Offer—Section 3—Procedure for Tendering Shares" of the Amended and Restated Offer to Purchase.

Purchaser will not pay any fees or commissions to any broker, dealer or other person (other than the Dealer Manager, the Depositary and the Information Agent as described in the Amended and Restated Offer to Purchase) in connection with the solicitation of tenders of Shares pursuant to the Offer. Purchaser will, however, upon request, reimburse brokers, dealers, banks and trust companies for reasonable and necessary costs and expenses incurred by them in forwarding materials to their customers. Purchaser will pay any stock transfer taxes incident to the transfer to it of validly tendered Shares, except as otherwise provided in Instruction 6 of the Amended and Restated Letter of Transmittal.

Any inquiries you may have with respect to the Offer should be addressed to, and additional copies of the enclosed materials may be obtained from, the Information Agent at the address and telephone number set forth on the back cover of the Amended and Restated Offer to Purchase.

Very truly yours,

EA08 Acquisition Corp.

Nothing contained herein or in the enclosed documents shall constitute you or any other person as the agent of Purchaser, Electronic Arts, the Information Agent, the Depositary or any affiliate thereof, or authorize you or any other person to use any document or make any statement on behalf of any of them in connection with the Offer other than the documents enclosed herewith and the statements contained therein.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

# AMENDED AND RESTATED
# OFFER TO PURCHASE FOR CASH
### All Outstanding Shares of Common Stock
### (Including the Associated Preferred Stock Purchase Rights)
of

## Take-Two Interactive Software, Inc.

at

### $25.74 Net Per Share in Cash

by

## EA08 Acquisition Corp.
### a wholly-owned subsidiary of

## Electronic Arts Inc.

**THE OFFER AND WITHDRAWAL RIGHTS EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON FRIDAY, MAY 16, 2008, UNLESS THE OFFER IS EXTENDED.**

*To Our Clients:*

Enclosed for your consideration are an Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*"), and a related Amended and Restated Letter of Transmittal (which, together with the Amended and Restated Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*") relating to the offer by EA08 Acquisition Corp. ("*Purchaser*"), a Delaware corporation and wholly-owned subsidiary of Electronic Arts Inc. ("*Electronic Arts*"), to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (the "*Rights*") (the common stock, together with the Rights, the "*Shares*"), of Take-Two Interactive Software, Inc., a Delaware corporation ("*Take-Two*" or the "*Company*"), at a price of $25.74 per Share net to the seller in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Offer.

The purpose of the Offer and the associated second-step merger is for Electronic Arts, through Purchaser, to acquire control of, and ultimately the entire equity interest in, Take-Two. Purchaser has commenced the Offer as the first step in its plan to acquire all the outstanding Shares, pursuant to which, after completion of the Offer, if successful, Electronics Arts and Purchaser currently intend to have Electronics Arts, Purchaser or another direct or indirect wholly-owned subsidiary of Electronics Arts consummate a second-step merger or similar business combination with Take-Two (the "*Merger*"). Pursuant to the Merger, Electronic Arts would acquire all of the Shares not purchased pursuant to the Offer (subject to limited exceptions as described in the Offer) at the highest price per share paid by Purchaser pursuant to the Offer (without interest and less applicable withholding taxes).

We are (or our nominee is) the holder of record of Shares held for your account. A tender of such Shares can be made only by us as the holder of record and pursuant to your instructions. The Amended and Restated Letter of Transmittal is furnished to you for your information only and cannot be used by you to tender Shares held by us for your account.

We request instructions as to whether you wish us to tender any or all of the Shares held by us for your account, upon the terms and subject to the conditions set forth in the Offer.

Your attention is directed to the following:

1. The offer price is $25.74 per Share, net to you in cash (subject to applicable withholding taxes), without interest. At Take-Two's 2008 annual meeting of stockholders held on April 17, 2008, the Company's stockholders approved a proposal to amend the Company's Incentive Stock Plan to increase the number of shares reserved for issuance under that plan by 2,000,000 shares and to permit the issuance of awards under such plan to consultants. 1,500,000 of such newly-reserved shares of restricted stock will be issued to ZelnickMedia Corporation pursuant to its management agreement with Take-Two. Consistent with our previously-stated intention as set forth in the original Offer to Purchased dated March 13, 2008, as a result of the approval of this proposal, Purchaser has adjusted the purchase price in the Offer from $26.00 to $25.74 net per share.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

2. The Offer is being made for all issued and outstanding Shares.

3. The Offer and withdrawal rights expire at 11:59 p.m., New York City time, on Friday, May 16, 2008, unless the Offer is extended.

4. The Offer is conditioned upon (i) there having been validly tendered and not withdrawn before the expiration of the Offer at least the number of Shares, which, together with the Shares then owned by Electronic Arts and its subsidiaries (including Purchaser), represents at least a majority of the total number of Shares outstanding on a fully-diluted basis (taking into account, without limitation, all shares issuable upon the exercise of any options, warrants, convertible securities or rights or pursuant to other contractual obligations) on the date of the purchase of Shares pursuant to the Offer, (ii) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the Merger, (iii) Take-Two's board of directors having redeemed the Rights or Electronic Arts being satisfied, in its sole discretion, that the Rights have been invalidated or are otherwise inapplicable to the Offer and the Merger, (iv) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the Offer and the Merger on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer and (v) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or having been terminated prior to the expiration of the Offer. The Offer is also subject to certain other conditions set forth in the Amended and Restated Offer to Purchase.

5. Tendering stockholders will not be obligated to pay brokerage fees or commissions or, subject to Instruction 6 of the Amended and Restated Letter of Transmittal, stock transfer taxes on the transfer and sale of Shares pursuant to the Offer. However, federal income tax backup withholding at a rate of 28% may be required, unless an exemption is provided or unless the required taxpayer identification information is provided. See Instruction 8 of the Amended and Restated Letter of Transmittal.

6. If you have previously provided us with instructions to tender any or all of the Shares held by us for your account upon the terms and subject to the conditions set forth in the Offer and wish to continue to tender such Shares and have not provided us with instructions to withdraw such Shares, you do not need to provide us with new instructions or take any further action with respect to such Shares to be tendered in order to receive the adjusted offer price of $25.74 per Share described in the Amended and Restated Offer to Purchase with respect to such tendered Shares if Shares are accepted for payment and paid for by Purchaser pursuant to the Offer.

If you wish to have us tender any or all of your Shares (and have not already done so), please so instruct us by completing, executing and returning to us the instruction form contained in this letter. An envelope to return your instructions to us is enclosed. If you authorize the tender of your Shares, all such Shares will be tendered unless otherwise specified on the reverse side of this letter. **Your instructions should be forwarded to us with sufficient time to permit us to submit a tender on your behalf prior to the expiration of the Offer.**

The Offer is being made solely by this Amended and Restated Offer to Purchase and, subject to the exception above relating to use of the original Letter of Transmittal, the related Amended and Restated Letter of Transmittal and is being made to all holders of the Shares (excluding Shares beneficially owned by Electronic Arts and Purchaser). Purchaser is not aware of any jurisdiction where the making of the Offer is prohibited by any administrative or judicial action pursuant to any valid statute. If Purchaser becomes aware of any valid statute prohibiting the making of the Offer or the acceptance of the Shares pursuant thereto, Purchaser will make a good faith effort to comply with such statute. If, after such good faith effort Purchaser cannot comply with any such statute, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares in such jurisdiction. In those jurisdictions where the applicable laws require that the Offer be made by a licensed broker or dealer, the Offer shall be deemed to be made on behalf of Purchaser by the Dealer Manager or one or more registered brokers or dealers licensed under the laws of such jurisdiction.

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

Instructions with Respect to the Amended and Restated Offer to Purchase for Cash
All Outstanding Shares of Common Stock (Including the Associated Preferred Stock Purchase Rights)
of

# TAKE-TWO INTERACTIVE SOFTWARE, INC.

at

## $25.74 NET PER SHARE

by

# EA08 ACQUISITION CORP.

a wholly-owned subsidiary of

# ELECTRONIC ARTS INC.

The undersigned acknowledge(s) receipt of your letter, the enclosed Amended and Restated Offer to Purchase dated April 18, 2008, and the related Amended and Restated Letter of Transmittal (which, together with the Amended and Restated Offer to Purchase and any amendments or supplements thereto, collectively constitute the "*Offer*"), in connection with the offer by EA08 Acquisition Corp., a wholly-owned subsidiary of Electronic Arts Inc., to purchase all the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc.

This will instruct you to tender the number of Shares indicated below (or, if no number is indicated below, all Shares) that are held for the account of the undersigned, upon the terms and subject to the conditions set forth in the Offer.

Number of Shares to be Tendered:

**SIGN BELOW:**

_____ Shares*

_____
Signature(s)

Certificate Nos. (if available): _____

Account Number: _____

_____
Name(s)

Taxpayer Identification or Social Security Number(s):

_____

_____
Address(es)

Dated _____, 2008

_____
(Zip Code)

_____
Area Code and Telephone Number(s)

\* Unless otherwise indicated, it will be assumed that all Shares held for the undersigned's account are to be tendered.

EA Extends Take-Two Tender Offer Expiration Date to May 16, 2008
Offer Price is $25.74 per Share,
Reflecting Additional Shares to be Issued by Take-Two

REDWOOD CITY, Calif., April 18, 2008 – Electronic Arts Inc. ("EA") (NASDAQ: ERTS) today announced that it has extended its tender offer for all of the currently outstanding shares of common stock (including the associated preferred stock purchase rights) of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ: TTWO) to 11:59 p.m., EDT on May 16, 2008. The tender offer was previously set to expire at 11:59 p.m., EDT, on April 18, 2008. EA also amended its offer to reflect a price of $25.74 per share. The price takes into consideration additional shares to be issued to Zelnick Media following stockholder approval of the amendment to Take-Two's incentive stock plan at its 2008 annual stockholders meeting on April 17.

Valued at approximately $2 billion in cash, EA's aggregate consideration for Take-Two shares remains unchanged.

EA continues to believe that the offer price is full and fair, and that a transaction between Take-Two and EA is the most compelling combination financially, strategically and operationally for all parties.

As of 5:00 p.m., EDT, on April 17, 2008, 6,432,787 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

*Additional Information and Where to Find It*

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents carefully and in their entirely because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

*For additional information, please contact:*

Jeff Brown
VP Communications
Electronic Arts
650-628-7922

Tricia Gugler
Director of Investor Relations
Electronic Arts
650-628-7327

David Drake
President.
Georgeson Inc.
212-440-9861

Source: TAKE TWO INTERACTIVE, SC TO-T/A, April 18, 2008

*About Electronic Arts*

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS BIG(TM) and POGO(TM). In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

*Forward Looking Statements*

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

---

Created by 10KWizard    www.10KWizard.com

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 6

EA Extends Take-Two Tender Offer Expiration Date to May 16, 2008

**Offer Price is $25.74 per Share, Reflecting Additional Shares to be Issued by Take-Two**

REDWOOD CITY, Calif.--(BUSINESS WIRE)--April 18, 2008--Electronic Arts Inc. ("EA") (NASDAQ:ERTS) today announced that it has extended its tender offer for all of the currently outstanding shares of common stock (including the associated preferred stock purchase rights) of Take-Two Interactive Software, Inc. ("Take-Two") (NASDAQ:TTWO) to 11:59 p.m., EDT on May 16, 2008. The tender offer was previously set to expire at 11:59 p.m., EDT, on April 18, 2008. EA also amended its offer to reflect a price of $25.74 per share. The price takes into consideration additional shares to be issued to Zelnick Media following stockholder approval of the amendment to Take-Two's incentive stock plan at its 2008 annual stockholders meeting on April 17.

Valued at approximately $2 billion in cash, EA's aggregate consideration for Take-Two shares remains unchanged.

EA continues to believe that the offer price is full and fair, and that a transaction between Take-Two and EA is the most compelling combination financially, strategically and operationally for all parties.

As of 5:00 p.m., EDT, on April 17, 2008, 6,432,787 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

Additional Information and Where to Find It

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents, as they may be amended or supplemented from time to time, and any other documents relating to the tender offer that are filed with the SEC carefully and in their entirety because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

For additional information, please contact:

Jeff Brown
VP Communications
Electronic Arts
650-628-7922

Tricia Gugler
Director of Investor Relations
Electronic Arts
650-628-7327

David Drake
President
Georgeson, Inc.
212-440-9861

About Electronic Arts

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the

Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS BIG(TM) and POGO(TM). In fiscal 2007, EA posted revenue of $3.09 billion and had 24 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

EA, EA SPORTS, EA SPORTS BIG and POGO are trademarks or registered trademarks of Electronic Arts Inc. in the U.S. and/or other countries.

Forward Looking Statements

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

CONTACT:
Electronic Arts
Jeff Brown, VP Communications, 650-628-7922
Tricia Gugler, 650-628-7327
Director of Investor Relations
or
Georgeson Inc.
David Drake, President, 212-440-9861

SOURCE: Electronic Arts Inc.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 7



# FORM SC TO-T/A

## TAKE TWO INTERACTIVE SOFTWARE INC - TTWO

**Filed: May 19, 2008 (period: )**

Amendment to a previously filed SC TO-T

# Table of Contents

SC TO-T/A - AMENDMENT NO. 8 TO SCHEDULE TO

EX-99.(A)(5)(M) (PRESS RELEASE)

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## Amendment No. 8
#### to
## Schedule TO
### TENDER OFFER STATEMENT UNDER SECTION 14(D)(1)
### OR 13(E)(1) OF THE SECURITIES EXCHANGE ACT OF 1934

# Take-Two Interactive Software, Inc.
*(Name of Subject Company—(Issuer))*

# EA08 Acquisition Corp.
# Electronic Arts Inc.
*(Names of Filing Persons—(Offeror))*

**Common Stock, Par Value $.01 Per Share**
*(Title of Class of Securities)*

**874054109**
*(CUSIP Number of Class of Securities)*

**Stephen G. Bené**
**Senior Vice President, General Counsel and Secretary**
**Electronic Arts Inc.**
**209 Redwood Shores Parkway**
**Redwood City, California 94065**
**Telephone: (650) 628-1500**
*(Name, address and telephone number of person authorized to receive notices and communications on behalf of filing persons)*
*Copy to:*
**Richard Capelouto, Esq.**
**Simpson Thacher & Bartlett LLP**
**2550 Hanover Street**
**Palo Alto, California 94304**
**Telephone: (650) 251-5000**

### CALCULATION OF FILING FEE

| Transaction Valuation* | Amount of Filing Fee** |
| --- | --- |
| $2,152,261,826 | $84,583.89 |

\*  Calculated solely for purposes of determining the filing fee. Calculated by multiplying $25.74, the per share tender offer price, by 84,240,550, which represents (i) 76,826,485 outstanding shares of common stock as of March 21, 2008 (according to the Subject Company's Solicitation/Recommendation Statement on Schedule 14D-9 relating to the Offer), minus (ii) 10 shares of common stock beneficially owned by the filing persons as of the date hereof, plus (iii) 1,500,000 shares of restricted stock of the Subject Company issued to ZelnickMedia Corporation on February 14, 2008 pursuant to its management agreement with Subject Company and plus (iv) 5,914,075 shares of common stock subject to outstanding options as of October 31, 2007 (3,905,000 shares according to the Subject Company's Annual Report on Form 10—K for the period ended October 31, 2007 plus 2,009,075 shares subject to options granted by the Subject Company to ZelnickMedia Corporation).

\*\*  Calculated as 0.00393% of the transaction value. The amount of filing fee was calculated in accordance with Section 14(g)(3) of and Rule 0-11(d) under the Securities Exchange Act of 1934, as amended.

☒  Check box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| | | | |
| --- | --- | --- | --- |
| Amount Previously Paid: | $84,583.89 | Filing Parties: | EA08 Acquisition Corp. |
| | | | Electronic Arts Inc. |
| Form or Registration No.: | SC TO | Date Filed: | March 13, 2008 |

☐  Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.
Check the appropriate boxes below to designate any transactions to which the statement relates:

☒  third-party tender offer subject to Rule 14d-1.

☐  issuer tender offer subject to Rule 13e-4.

☐  going-private transaction subject to Rule 13e-3.

☐  amendment to Schedule 13D under Rule 13d-2.
Check the following box if the filing is a final amendment reporting the results of the tender offer.  ☐

Source: TAKE TWO INTERACTIVE, SC TO-T/A, May 19, 2008

This Amendment No. 8 to Schedule TO amends and supplements the Tender Offer Statement on Schedule TO filed with the Securities and Exchange Commission on March 13, 2008, as amended (the "*Schedule TO*"), by Electronic Arts Inc. ("*Parent*") and EA08 Acquisition Corp., a wholly-owned subsidiary of Parent ("*Purchaser*"), relating to the offer by Purchaser to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc. ("*Take-Two*" or the "*Company*") at a purchase price of $25.74 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*") and in the related Amended and Restated Letter of Transmittal, as each may be amended or supplemented from time to time.

Except as specifically set forth herein, this Amendment No. 8 does not modify any of the information previously reported on the Schedule TO. All capitalized terms used in this Amendment No. 8 and not otherwise defined have the respective meanings ascribed to them in the Amended and Restated Offer to Purchase.

As permitted by General Instruction F to the Schedule TO, the information set forth in the Schedule TO, as amended by this Amendment No. 8, including the Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal and all other appendices, schedules, exhibits and annexes hereto and thereto, is hereby expressly incorporated by reference herein in response to Items 1 through 12 of the Schedule TO. You should read this Amendment No. 8 to the Schedule TO together with the Schedule TO.

**Item 11.       Additional Information**

On May 19, 2008, Purchaser extended the Expiration Date of the Offer until 11:59 p.m., New York City time, on Monday, June 16, 2008, unless further extended. As of 5:00 p.m., New York City time, on May 16, 2008, approximately 6,210,261 Shares had been tendered and not withdrawn from the Offer.

**Item 12.       Exhibits.**

Item 12 of the Schedule TO is hereby amended and restated as follows:

| | |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(1)(H) | Amended and Restated Offer to Purchase dated April 18, 2008. * |
| (a)(1)(I) | Amended and Restated Letter of Transmittal. * |
| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. * |
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |

(a)(5)(C)    Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(D)    Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(E)    Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(F)    February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(G)    Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008).

(a)(5)(H)    Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. *

(a)(5)(I)    Press Release issued by Electronic Arts Inc., dated March 28, 2008. *

(a)(5)(J)    Press Release issued by Electronic Arts Inc., dated April 17, 2008. *

(a)(5)(K)    Press Release issued by Electronic Arts Inc., dated April 18, 2008. *

(a)(5)(L)    Transcript of question and response related to the Offer addressed during Electronic Arts' fourth quarter fiscal year 2008 earnings conference call held on May 13, 2008. *

(a)(5)(M)    Press Release issued by Electronic Arts Inc., dated May 19, 2008.

(b)(1)    Commitment Letter for up to $1 billion loan facility, dated May 9, 2008, between Electronic Arts, Morgan Stanley Senior Funding, Inc., Morgan Stanley Bank and the other lenders named therein. *

(c)    Not applicable.

(d)    Not applicable.

(g)    Not applicable.

(h)    Not applicable.


  \*    Previously filed

## SIGNATURES

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: May 19, 2008.

**ELECTRONIC ARTS INC.**

By: _____ /s/ STEPHEN G. BENÉ _____

Name:           Stephen G. Bené
Title:      Senior Vice President, General Counsel, and Secretary

**EA08 ACQUISITION CORP.**

By: _____ /s/ STEPHEN G. BENÉ _____

Name:           Stephen G. Bené
Title:      Vice President and Secretary

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(1)(H) | Amended and Restated Offer to Purchase dated April 18, 2008. * |
| (a)(1)(I) | Amended and Restated Letter of Transmittal. * |
| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. * |
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. * |
| (a)(5)(J) | Press Release issued by Electronic Arts Inc., dated April 17, 2008. * |
| (a)(5)(K) | Press Release issued by Electronic Arts Inc., dated April 18, 2008. * |
| (a)(5)(L) | Transcript of question and response related to the Offer addressed during Electronic Arts' fourth quarter fiscal year 2008 earnings conference call held on May 13, 2008. * |
| (a)(5)(M) | Press Release issued by Electronic Arts Inc., dated May 19, 2008. |
| (b)(1) | Commitment Letter for up to $1 billion loan facility, dated May 9, 2008, between Electronic Arts, Morgan Stanley Senior Funding, Inc., Morgan Stanley Bank and the other lenders named therein. * |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

\* Previously filed

### EA Extends Expiration Date for Take-Two Offer to June 16, 2008

REDWOOD CITY, Calif., May 19, 2008 – Electronic Arts Inc. ("EA") (NASDAQ: ERTS) announced today that it has extended its tender offer for all of the currently outstanding shares of common stock (including the associated preferred stock purchase rights) of Take-Two Interactive Software Inc. ("Take-Two") (NASDAQ: TTWO) to 11:59 p.m., New York City time, on Monday, June 16, 2008, unless further extended. The tender offer was previously set to expire at 11:59 p.m., New York City time, on May 16, 2008.

"Extending our offer will allow the FTC review process to continue," said Owen Mahoney, Senior Vice President of EA Corporate Development. "EA's offer price remains unchanged at $25.74 per share and our offer is still subject to conditions that include regulatory approval. As stated earlier, we retain the right to terminate the offer if the conditions are not satisfied."

As of 5:00 p.m., New York City time, on Friday, May 16, 2008, approximately 6,210,261 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

#### Additional Information and Where to Find It

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents, as they may be amended or supplemented from time to time, and any other documents relating to the tender offer that are filed with the SEC carefully and in their entirety because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

#### For additional information, please contact :

| | | | |
|---|---|---|---|
| Jeff Brown | Tricia Gugler | Tiffany Steckler | David Drake |
| VP Communications | Director of IR | Corporate Communications | President |
| Electronic Arts | Electronic Arts | Electronic Arts | Georgeson Inc. |
| 650-628-7922 | 650-628-7327 | +41 22 316 1322 | 212-440-9861 |

#### About Electronic Arts

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the Company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS, EA, EA SPORTS Freestyle and POGO. In fiscal 2008, EA posted GAAP net revenue of $3.67 billion and had 27 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

*Forward Looking Statements*

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form 10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

Created by 10K Wizard    www.10KWizard.com

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 8

EA Extends Expiration Date for Take-Two Offer to June 16, 2008

REDWOOD CITY, Calif.--(BUSINESS WIRE)--May 19, 2008--Electronic Arts Inc. ("EA") (NASDAQ:ERTS) announced today that it has extended its tender offer for all of the currently outstanding shares of common stock (including the associated preferred stock purchase rights) of Take-Two Interactive Software Inc. ("Take-Two") (NASDAQ:TTWO) to 11:59 p.m., New York City time, on Monday, June 16, 2008, unless further extended. The tender offer was previously set to expire at 11:59 p.m., New York City time, on May 16, 2008.

"Extending our offer will allow the FTC review process to continue," said Owen Mahoney, Senior Vice President of EA Corporate Development. "EA's offer price remains unchanged at $25.74 per share and our offer is still subject to conditions that include regulatory approval. As stated earlier, we retain the right to terminate the offer if the conditions are not satisfied."

As of 5:00 p.m., New York City time, on Friday, May 16, 2008, approximately 6,210,261 shares of Take-Two had been tendered in and not withdrawn from the tender offer.

Additional Information and Where to Find It

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities of Take-Two. The offer to purchase or solicitation of offers to sell is being made pursuant to a Tender Offer Statement on Schedule TO (including the Offer to Purchase, Letter of Transmittal and other related offer documents) filed by EA and EA08 Acquisition Corp. with the Securities and Exchange Commission, or SEC, on March 13, 2008. Before making any decision with respect to the offer, Take-Two stockholders are advised to read these documents, as they may be amended or supplemented from time to time, and any other documents relating to the tender offer that are filed with the SEC carefully and in their entirety because they contain important information, including the terms and conditions of the offer. These documents may be obtained at no charge by directing a request by mail to Georgeson, Inc., 199 Water Street, 26th Floor, New York, NY 10038, or by calling toll-free at (800) 213-0473, and may also be obtained at no charge at the website maintained by the SEC at http://www.sec.gov.

About Electronic Arts

Electronic Arts Inc. (EA), headquartered in Redwood City, California, is the world's leading interactive entertainment software company. Founded in 1982, the Company develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet. Electronic Arts markets its products under four brand names: EA SPORTS(TM), EA(TM), EA SPORTS Freestyle(TM) and POGO(TM). In fiscal 2008, EA posted GAAP net revenue of $3.67 billion and had 27 titles that sold more than one million copies. EA's homepage and online game site is www.ea.com. More information about EA's products and full text of press releases can be found on the Internet at http://info.ea.com.

Forward Looking Statements

Some statements set forth in this communication, including those regarding EA's offer to acquire Take-Two and the expected impact of the acquisition on EA's strategic and operational plans and financial results, contain forward-looking statements that are subject to change. Statements including words such as "anticipate", "believe", "estimate" or "expect" and statements in the future tense are forward-looking statements. These forward-looking statements are subject to risks and uncertainties that could cause actual events or actual future results to differ materially from the expectations set forth in the forward-looking statements. Some of the factors which could cause results to differ materially from the expectations expressed in these forward-looking statements include the following: the possibility that EA's offer to acquire Take-Two will not be consummated; the possibility that, even if EA's offer is consummated, the transaction will not close or that the closing may be delayed; the effect of the announcement of the offer on EA's and Take-Two's strategic relationships, operating results and business generally, including the ability to retain key employees; EA's ability to successfully integrate Take-Two's operations and employees; general economic conditions; and other factors described in EA's SEC filings (including EA's Annual Report on Form

10-K for the year ended March 31, 2007 and Quarterly Report on Form 10-Q for the quarter ended December 31, 2007). If any of these risks or uncertainties materializes, the offer may not be consummated, the acquisition may not be consummated, the potential benefits of the acquisition may not be realized, EA's and/or Take-Two's operating results and financial performance could suffer, and actual results could differ materially from the expectations described in these forward-looking statements.

All information in this communication is as of the initial date on which this communication was released. EA undertakes no duty to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

CONTACT: Electronic Arts
Jeff Brown, 650-628-7922
VP Communications
Tricia Gugler, 650-628-7327
Director of IR
Tiffany Steckler, +41 22 316 1322
Corporate Communications
or
Georgeson Inc.
David Drake, 212-440-9861
President

SOURCE: Electronic Arts Inc.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 9


10k **WIZARD**
SEC POWER SEARCH

# FORM SC TO-T/A

## TAKE TWO INTERACTIVE SOFTWARE INC - TTWO

**Filed: June 04, 2008 (period: )**

Amendment to a previously filed SC TO-T

# Table of Contents

SC TO-T/A - AMENDMENT NO. 9 TO SCHEDULE TO

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Amendment No. 9
to

## Schedule TO
TENDER OFFER STATEMENT UNDER SECTION 14(D)(1)
OR 13(E)(1) OF THE SECURITIES EXCHANGE ACT OF 1934

# Take-Two Interactive Software, Inc.
*(Name of Subject Company—(Issuer))*

# EA08 Acquisition Corp.
# Electronic Arts Inc.
*(Names of Filing Persons—(Offeror))*

Common Stock, Par Value $.01 Per Share
*(Title of Class of Securities)*

874054109
*(CUSIP Number of Class of Securities)*

Stephen G. Bené
Senior Vice President, General Counsel and Secretary
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, California 94065
Telephone: (650) 628-1500
*(Name, address and telephone number of person authorized to receive notices and communications on behalf of filing persons)*
*Copy to:*
Richard Capelouto, Esq.
Simpson Thacher & Bartlett LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000

### CALCULATION OF FILING FEE

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $2,152,261,826 | $84,583.89 |

\*   Calculated solely for purposes of determining the filing fee. Calculated by multiplying $25.74, the per share tender offer price, by 84,240,550, which represents (i) 76,826,485 outstanding shares of common stock as of March 21, 2008 (according to the Subject Company's Solicitation/Recommendation Statement on Schedule 14D-9 relating to the Offer), minus (ii) 10 shares of common stock beneficially owned by the filing persons as of the date hereof, plus (iii) 1,500,000 shares of restricted stock of the Subject Company issued to ZelnickMedia Corporation on February 14, 2008 pursuant to its management agreement with Subject Company and plus (iv) 5,914,075 shares of common stock subject to outstanding options as of October 31, 2007 (3,905,000 shares according to the Subject Company's Annual Report on Form 10—K for the period ended October 31, 2007 plus 2,009,075 shares subject to options granted by the Subject Company to ZelnickMedia Corporation).

\*\*  Calculated as 0.00393% of the transaction value. The amount of filing fee was calculated in accordance with Section 14(g)(3) of and Rule 0-11(d) under the Securities Exchange Act of 1934, as amended.

☒   Check box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| | | | |
|---|---|---|---|
| Amount Previously Paid: | $84,583.89 | Filing Parties: | EA08 Acquisition Corp. |
| | | | Electronic Arts Inc. |
| Form or Registration No.: | SC TO | Date Filed: | March 13, 2008 |

☐   Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.
Check the appropriate boxes below to designate any transactions to which the statement relates:

☒   third-party tender offer subject to Rule 14d-1.

☐   issuer tender offer subject to Rule 13e-4.

☐   going-private transaction subject to Rule 13e-3.

☐   amendment to Schedule 13D under Rule 13d-2.
Check the following box if the filing is a final amendment reporting the results of the tender offer.   ☐

Source: TAKE TWO INTERACTIVE, SC TO-T/A, June 04, 2008

This Amendment No. 9 to Schedule TO amends and supplements the Tender Offer Statement on Schedule TO filed with the Securities and Exchange Commission on March 13, 2008, as amended (the "*Schedule TO*"), by Electronic Arts Inc. ("*Parent*") and EA08 Acquisition Corp., a wholly-owned subsidiary of Parent ("*Purchaser*"), relating to the offer by Purchaser to purchase all of the issued and outstanding shares of common stock, par value $.01 per share, and the associated preferred stock purchase rights (together, the "*Shares*"), of Take-Two Interactive Software, Inc. ("*Take-Two*" or the "*Company*") at a purchase price of $25.74 net per share in cash (subject to applicable withholding taxes), without interest, upon the terms and subject to the conditions set forth in the Amended and Restated Offer to Purchase dated April 18, 2008 (the "*Amended and Restated Offer to Purchase*") and in the related Amended and Restated Letter of Transmittal, as each may be amended or supplemented from time to time.

Except as specifically set forth herein, this Amendment No. 9 does not modify any of the information previously reported on the Schedule TO. All capitalized terms used in this Amendment No. 9 and not otherwise defined have the respective meanings ascribed to them in the Amended and Restated Offer to Purchase.

As permitted by General Instruction F to the Schedule TO, the information set forth in the Schedule TO, as amended by this Amendment No. 9, including the Amended and Restated Offer to Purchase and the related Amended and Restated Letter of Transmittal and all other appendices, schedules, exhibits and annexes hereto and thereto, is hereby expressly incorporated by reference herein in response to Items 1 through 12 of the Schedule TO. You should read this Amendment No. 9 to the Schedule TO together with the Schedule TO.

#### Item 11.    Additional Information.

The Amended and Restated Offer to Purchase attached as Exhibit (a)(1)(H) to the Schedule TO is amended as follows:

The third, fourth and fifth sentences of the fifth paragraph of "The Offer—Section 15—Certain Legal Matters; Regulatory Approvals" are deleted in their entirety and replaced with the following:

"On April 16, 2008, Electronic Arts received from the FTC a request for additional information (the "*Second Request*") under the HSR Act in connection with the purchase of Shares pursuant to the Offer and the Merger. On June 3, 2008, Parent entered into an agreement with the FTC modifying the scope of Second Request, pursuant to which, among other things, Parent agreed that it would not consummate the acquisition of the Company until the earlier of (i) 45 days following substantial compliance with the Second Request or (ii) written notice from the FTC closing the investigation."

#### Item 12.    Exhibits.

Item 12 of the Schedule TO is hereby amended and restated as follows:

| | |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(1)(H) | Amended and Restated Offer to Purchase dated April 18, 2008. * |
| (a)(1)(I) | Amended and Restated Letter of Transmittal. * |
| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. * |
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |

(a)(5)(C)    Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(D)    Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(E)    Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(F)    February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008).

(a)(5)(G)    Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008).

(a)(5)(H)    Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. *

(a)(5)(I)    Press Release issued by Electronic Arts Inc., dated March 28, 2008. *

(a)(5)(J)    Press Release issued by Electronic Arts Inc., dated April 17, 2008. *

(a)(5)(K)    Press Release issued by Electronic Arts Inc., dated April 18, 2008. *

(a)(5)(L)    Transcript of question and response related to the Offer addressed during Electronic Arts' fourth quarter fiscal year 2008 earnings conference call held on May 13, 2008. *

(a)(5)(M)    Press Release issued by Electronic Arts Inc., dated May 19, 2008. *

(b)(1)    Commitment Letter for up to $1 billion loan facility, dated May 9, 2008, between Electronic Arts, Morgan Stanley Senior Funding, Inc., Morgan Stanley Bank and the other lenders named therein. *

(c)    Not applicable.

(d)    Not applicable.

(g)    Not applicable.

(h)    Not applicable.

\*    Previously filed

Source: TAKE TWO INTERACTIVE, SC TO-T/A, June 04, 2008

## SIGNATURES

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: June 4, 2008.

**ELECTRONIC ARTS INC.**

By: _____ /s/   STEPHEN G. BENÉ _____

Name:                    **Stephen G. Bené**
Title:        **Senior Vice President, General Counsel, and Secretary**

**EA08 ACQUISITION CORP.**

By: _____ /s/   STEPHEN G. BENÉ _____

Name:                    **Stephen G. Bené**
Title:        **Vice President and Secretary**

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| (a)(1)(A) | Offer to Purchase dated March 13, 2008. * |
| (a)(1)(B) | Letter of Transmittal. * |
| (a)(1)(C) | Notice of Guaranteed Delivery. * |
| (a)(1)(D) | Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(E) | Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(F) | Guidelines for Certification of Taxpayer Identification Number on Substitute W-9. * |
| (a)(1)(G) | Summary Advertisement as published on March 13, 2008. * |
| (a)(1)(H) | Amended and Restated Offer to Purchase dated April 18, 2008. * |
| (a)(1)(I) | Amended and Restated Letter of Transmittal. * |
| (a)(1)(J) | Amended and Restated Notice of Guaranteed Delivery. * |
| (a)(1)(K) | Amended and Restated Letter from Purchaser to Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(1)(L) | Amended and Restated Letter to Clients for Use by Brokers, Dealers, Commercial Banks, Trust Companies and Nominees. * |
| (a)(5)(A) | Press Release issued by Electronic Arts Inc., dated March 13, 2008. * |
| (a)(5)(B) | Electronic Arts Press Release, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(C) | Open Letter to the Public, dated February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(D) | Electronic Arts Frequently Asked Questions, dated as of February 24, 2008 posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.3 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(E) | Transcript of February 25, 2008 Electronic Arts Conference Call posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(F) | February 25, 2008 Conference Call Prepared Remarks posted at *www.eatake2.com* (incorporated by reference to Exhibit 99.2 of Electronic Arts Inc.'s current report on Form 8-K filed on February 25, 2008). |
| (a)(5)(G) | Transcript of Warren C. Jenson remarks at the March 3, 2008 Morgan Stanley Technology Conference (incorporated by reference to Exhibit 99.1 of Electronic Arts Inc.'s current report on Form 8-K filed on March 4, 2008). |
| (a)(5)(H) | Electronic Arts Inc. e-mail response to inquiries from the press regarding the response of Take-Two Interactive Software, Inc. to the tender offer set forth in Take-Two's Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on March 26, 2008. * |
| (a)(5)(I) | Press Release issued by Electronic Arts Inc., dated March 28, 2008. * |
| (a)(5)(J) | Press Release issued by Electronic Arts Inc., dated April 17, 2008. * |
| (a)(5)(K) | Press Release issued by Electronic Arts Inc., dated April 18, 2008. * |
| (a)(5)(L) | Transcript of question and response related to the Offer addressed during Electronic Arts' fourth quarter fiscal year 2008 earnings conference call held on May 13, 2008. * |
| (a)(5)(M) | Press Release issued by Electronic Arts Inc., dated May 19, 2008. * |
| (b)(1) | Commitment Letter for up to $1 billion loan facility, dated May 9, 2008, between Electronic Arts, Morgan Stanley Senior Funding, Inc., Morgan Stanley Bank and the other lenders named therein. * |
| (c) | Not applicable. |
| (d) | Not applicable. |
| (g) | Not applicable. |
| (h) | Not applicable. |

\*     Previously filed

Created by 10K Wizard    www.10KWizard.com

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 10



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division

Reid B. Horwitz
202-326-2037

March 14, 2008

By email: seth.krauss@take2games.com

Seth D. Krauss
General Counsel
Take-Two Interactive Software, Inc.
622 Broadway, 6th Floor
New York, NY 10012

Re:  Acquisition of 100% of the voting securities of Take-Two Interactive, Inc. ("Tale-Two") by
     Electronic Arts, Inc. ("EA")

Dear Seth:

This letter follows up our telephone discussion earlier today informing you that the Commission has
opened a preliminary investigation of the above-referenced transaction, and requests certain documents
and information to assist it in that investigation.  This request is not to be construed as a "request for
additional information or documentary material" under the Hart-Scott-Rodino Antitrust Improvements
Act, and compliance with this request is entirely voluntary.

Please provide:

1.  The title of each video game title currently published by EA and Take-Two, and indicate under
    which of the following genres it belongs: Action, Sports, Shooter, Role-Playing, Racing, Fighting,
    Family Entertainment, Children's Entertainment, Strategy, Adventure, Other, Flight, or Arcade,
    and indicate for each such title whether it is produced for consoles and/or PCs.

2.  A list of each of the EA and Take-Two titles identified in response to Item 1 that Take-Two
    believes competes with each other.

3.  Take-Two's total 2007 sales for each of the video games identified in response to Item 1.

4.  For each genre identified in Item 1, the name of each additional video game publisher and title(s)
    currently published by such publisher in each such genre, indicating for each such title whether it
    is produced for consoles and/or PCs, and indicating for each genre actual or estimated market
    share for each publisher including EA and Take-Two.

5.  A list of Take-Two's top 10 customers (based on dollar purchases) for each genre, by each
    distribution channel, with contact information and dollar value of each such customer's purchases
    during the last year.

Letter to Seth D. Krauss, Esq.                                                    Page 2 of 2

6.  Copies of the most recent advertising or marketing documents that discuss video game console products published by EA and others which compete with Take-Two's 2K Sports brand video game console products, and what kind of advertising and marketing strategies Take-Two pursues or should pursue to better compete.

7.  A list of all resources (whether available online or in hard copy) that Take-Two uses to obtain information about competition in the marketplace for those video games listed in response to Item 1.

8.  Copies of any market studies and analyses discussing any of the titles and genres listed in response to Item 1, and video publishers listed in response to Item 4, whether prepared by or for, or obtained by, Take-Two.

9.  Copies of internal business or strategic plans developed during the past two years discussing Take-Two's businesses relating to the titles and genres listed in response to Item 1, including assessments of its competitors in such segment(s), market shares, and strategic direction(s).

10. All planning and due diligence materials prepared by or for Take-Two and its agents and advisors evaluating the acquisition since it was first contemplated with respect to market shares, competition, competitors, markets, and potential for sales growth or expansion into product or geographic markets.

Because time is of the essence in this matter, we would welcome piecemeal submission of the requested information as soon as it is available, and request that you forward all such information by email, fax, overnight or hand-delivery.  As always, we encourage you to submit any additional information or documents that you consider pertinent to this investigation, but would appreciate your focusing on the requested information first.

Please contact either myself at the number above, Victoria Lippincott at 202-326-2983, or Ben Lorigo at 202-326-3717 if you have any questions.

Thank you for your cooperation.

Sincerely,



Reid B. Horwitz

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 12

# PROSKAUER ROSE LLP

1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

**John R. Ingrassia**
Attorney at Law

Direct Dial 202.416.6869
jingrassia@proskauer.com

March 24, 2008

**<u>BY HAND</u>**

Premerger Notification Office
Bureau of Competition
Room 303
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

Director of Operations
Antitrust Division
Department of Justice
950 Pennsylvania Avenue, N.W.
Room #3335
Washington, D.C. 20530

Re:     Premerger Notification Under the Hart-Scott-Rodino Antitrust
        <u>Improvements Act of 1976, as amended (the "Act")</u>

Sir or Madam:

On behalf of Take-Two Interactive Software, Inc., we hereby submit the appropriate number of copies of a Notification and Report Form for Certain Mergers and Acquisitions, and one set of documentary attachments, with respect to the Tender Offer by Electronic Arts, Inc. for all of the issued and outstanding voting securities of Take-Two Interactive Software, Inc.

This filing is being submitted with a copy of the original signature page and declaration. The originals will be submitted to the Premerger Notification Office as soon as possible.

If there are any questions regarding this filing, please contact the undersigned at 202.416.6869. Please acknowledge receipt of this filing by stamping the enclosed copy of this letter and returning it to our messenger.

PROSKAUER ROSE LLP

March 24, 2008
Page 2

Sincerely,

John R. Ingrassia

Enclosure

TRANSACTION NUMBER ASSIGNED ☐☐☐☐☐☐☐☐

## 16 C.F.R. Part 803 - Appendix
## NOTIFICATION AND REPORT FORM FOR CERTAIN MERGERS AND ACQUISITIONS

Approved by OMB
3084-0005
Expires 05/31/2010

THE INFORMATION REQUIRED TO BE SUPPLIED ON THESE ANSWER SHEETS IS SPECIFIED IN THE INSTRUCTIONS
➤ Attach the Affidavit required by § 803.5 to this page.

| FEE INFORMATION | TAXPAYER IDENTIFICATION NUMBER or SOCIAL SECURITY NUMBER of payer |
|---|---|

AMOUNT PAID Not applicable
In cases where your filing fee would be higher if based on acquisition price or where the acquisition price is undetermined to the extent that it may straddle a filing fee threshold, attach an explanation of how you determined the appropriate fee *(acquiring persons only)*.
Attachment Number _____

*(acquiring person (and payer if different from acquiring person))*
CHECK ATTACHED ☐       MONEY ORDER ATTACHED ☐
WIRE TRANSFER ☐        CONFIRMATION NO.
FROM: NAME OF INSTITUTION
NAME OF PAYER (if different from PERSON FILING)

IS THIS A CORRECTIVE FILING?       ☐ YES   ☒ NO

IS THIS ACQUISITION SUBJECT TO FOREIGN FILING REQUIREMENTS?       ☒ YES   ☐ NO
If YES, list jurisdictions: *(voluntary)* Germany

IS THIS ACQUISITION A CASH TENDER OFFER?   ☒ YES   ☐ NO   |   BANKRUPTCY?   ☐ YES   ☒ NO

DO YOU REQUEST EARLY TERMINATION OF THE WAITING PERIOD? *(Grants of early termination are published in the Federal Register AND*
☐ YES   ☒ NO                                                     *on the FTC web site www.ftc.gov)*

ITEM 1 – PERSON FILING
1(a) NAME and
HEADQUARTERS ADDRESS
of PERSON FILING

Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012

1(b) PERSON FILING NOTIFICATION IS
☐ an acquiring person      ☒ an acquired person      ☐ both

1(c) PUT AN "X" IN THE APPROPRIATE BOX TO DESCRIBE PERSON FILING NOTIFICATION
☒ Corporation   ☐ Unincorporated Entity   ☐ Other *(Specify):*

1(d) DATA FURNISHED BY
☐ calendar year   ☒ fiscal year *(specify period )* 11/2006   (month/year) to  10/2007   (month/year)

THIS FORM IS REQUIRED BY LAW and must be filed separately by each person which, by reason of a merger, consolidation or acquisition, is subject to §7A of the Clayton Act, 15 U.S.C. §18a, as added by Section 201 of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1390, and rules promulgated thereunder (hereinafter referred to as "the rules" or by section number). The statute and rules are set forth in the *Federal Register* at 43 FR 33450; the rules may also be found at 16 CFR Parts 801-03. Failure to file the Notification and Report Form, and to observe the required waiting period before consummating the acquisition in accordance with the applicable provisions of 15 U.S.C. §18a and the rules, subjects any "person," as defined in the rules, or any individuals responsible for noncompliance, to liability for a penalty of not more than $11,000 for each day during which such person is in violation of 15 U.S.C. §18a.

Pursuant to the Hart-Scott-Rodino Act, information and documentary material filed in or with this Form is confidential. It is exempt from disclosure under the Freedom of Information Act, and may be made public only in an administrative or judicial proceeding, or disclosed to Congress or to a duly authorized committee or subcommittee of Congress.
Filing - Complete and return two copies (with one original affidavit and certification and one set of documentary attachments) of this Notification and Report Form to: Premerger Notification Office, Bureau of Competition, Room 303, Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. Three copies (with one set of documentary attachments) should be sent to: Director of Operations and Merger Enforcement, Antitrust Division, Department of Justice, 950 Pennsylvania Avenue N.W., Room #3335, Washington, D.C. 20530. (For FEDEX airbills to the Department of Justice do not use the 20530 zip code; use zip code 20004.)

DISCLOSURE NOTICE - Public reporting burden for this report is estimated to vary from 8 to 160 hours per response, with an average of 39 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to: Premerger Notification Office, H-303, Federal Trade Commission, Washington, DC 20503 and
Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20580
Under the Paperwork Reduction Act, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. That number is 3084-0005, which also appears in the upper right-hand corner of the first page of this form.

Privacy Act Statement--Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. Our authority to collect Social Security numbers is 31 U.S.C. 7701. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to $11,000 per day. We also may be unable to process the Form unless you provide all of the requested information.

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

**1(e) PUT AN X IN THE APPROPRIATE BOX AND GIVE THE NAME AND ADDRESS OF ENTITY FILING NOTIFICATION** (if other than ultimate parent entity)

| ☒ NA | ☐ This report is being filed on behalf of a foreign person pursuant to § 803.4. | ☐ This report is being filed on behalf of the ultimate parent entity by another entity within the same person authorized by it to file pursuant to § 803.2(a). |
|---|---|---|

| NAME OF ENTITY FILING NOTIFICATION | ADDRESS |
|---|---|
| | |

**1(f) NAME AND ADDRESS OF ENTITY MAKING ACQUISITION OR WHOSE ASSETS, VOTING SECURITIES OR NON-CORPORATE INTERESTS ARE BEING ACQUIRED IF DIFFERENT FROM THE ULTIMATE PARENT ENTITY IDENTIFIED IN ITEM 1(a)**

Not applicable

**PERCENT OF VOTING SECURITIES OR NON-CORPORATE INTERESTS HELD BY EACH ENTITY IDENTIFIED IN ITEM 1(a)**

**1(g) IDENTIFICATION OF PERSON TO CONTACT REGARDING THIS REPORT**

| NAME OF CONTACT PERSON | John R. Ingrassia |
|---|---|
| TITLE | Associate |
| FIRM NAME | Proskauer Rose LLP |
| BUSINESS ADDRESS | 1001 Pennsylvania Avenue, NW, Suite 400 South, Washington DC 20004 |
| TELEPHONE NUMBER | 202.416.6869 |
| FAX NUMBER | 202.416.6899 |
| E-MAIL ADDRESS | jingrassia@proskauer.com |

**(h) IDENTIFICATION OF AN INDIVIDUAL LOCATED IN THE UNITED STATES DESIGNATED FOR THE LIMITED PURPOSE OF RECEIVING NOTICE OF ISSUANCE OF A REQUEST FOR ADDITIONAL INFORMATION OR DOCUMENTS. (See § 803.20(b)(2)(iii))**

| NAME OF CONTACT PERSON | |
|---|---|
| TITLE | |
| FIRM NAME | Not applicable |
| BUSINESS ADDRESS | |
| | |
| TELEPHONE NUMBER | |
| FAX NUMBER | |
| E-MAIL ADDRESS | |

**ITEM 2**

| 2(a) LIST NAMES OF ULTIMATE PARENT ENTITIES OF ALL ACQUIRING PERSONS | LIST NAMES OF ULTIMATE PARENT ENTITIES OF ALL ACQUIRED PERSONS |
|---|---|
| Electronic Arts Inc. | Take-Two Interactive Software, Inc. |

**2(b) THIS ACQUISITION IS** (put an X in all the boxes that apply)

| ☐ an acquisition of assets | ☐ a consolidation (see § 801.2) |
|---|---|
| ☐ a merger (see § 801.2) | ☒ an acquisition of voting securities |
| ☐ an acquisition subject to § 801.2(e) | ☐ a secondary acquisition |
| ☐ a formation of a joint venture or other corporation or unincorporated entity (see § 801.40 or § 801.50) | ☐ an acquisition subject to § 801.31 |
| | ☐ acquisition of non-corporate interests |
| ☒ an acquisition subject to § 801.30 (specify type) <u>Cash Tender Offer</u> | |
| ☐ other (specify) _____ | |

**2(c) INDICATE THE HIGHEST NOTIFICATION THRESHOLD IN § 801.1(h) FOR WHICH THIS FORM IS BEING FILED** (acquiring person only in an acquisition of <u>voting securities</u>)

| ☐ $50 million (as adjusted) | ☐ $100 million (as adjusted) | ☐ $500 million (as adjusted) | ☐ 25% (see instructions) (as adjusted) | ☐ 50% |
|---|---|---|---|---|
| **2(d)(i) VALUE OF VOTING SECURITIES TO BE HELD AS A RESULT OF THE ACQUISITION** | **(ii) PERCENTAGE OF VOTING SECURITIES** | **(iii) VALUE OF ASSETS TO BE HELD AS A RESULT OF THE ACQUISITION** | **(iv) VALUE OF NONCORPORATE INTERESTS TO BE HELD AS A RESULT OF THE ACQUISITION** | **(v) AGGREGATE TOTAL VALUE** |
| Approximately $2.152 billion | 100% | Not applicable | Not applicable | Approximately $2.152 billion |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

2(e) If aggregate total value in 2(d)(v) is based in whole or in part on a fair market valuation pursuant to § 801.10(c)(3), identify the person or persons responsible for making the valuation *(acquiring persons only)*.

Not applicable

## ITEM 3
### 3(a) DESCRIPTION OF ACQUISITION

Acquiring Person
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, California 94065

Acquired Person
Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012

Take-Two Interactive Software, Inc. has been notified that Electronic Arts Inc. launched a Tender Offer for all of the issued and outstanding voting securities of Take-Two Interactive Software, Inc. at a price of $26.00 per share. The Tender Offer was launched on March 13, 2008, and Take-Two Interactive Software, Inc. was notified the same day that Electronic Arts Inc. had filed notification under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

As described in the Offer to Purchase dated March 13, 2008, the Offer is conditioned upon, among other things, (i) there having been validly tendered and not withdrawn before the expiration of the offer at least the number of shares of common stock, par value $.01 per share (the "Shares"), of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"), which, together with the shares then owned by Electronic Arts Inc. ("Electronic Arts" or "Parent"), a direct parent of EA08 Acquisition Corp. ("Purchaser"), and its subsidiaries (including Purchaser), represents at least a majority of the total number of shares outstanding on a fully-diluted basis, (ii) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the proposed merger, (iii) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the offer and a second step merger as contemplated by this Offer to Purchase on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer and (iv) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or been terminated. The Offer is also subject to certain other conditions set forth at Section 14 of the Offer.

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

---

**3(b)(i) ASSETS TO BE ACQUIRED (to be completed only for asset acquisitions)**

Not applicable

---

**3(b)(ii) ASSETS HELD BY ACQUIRING PERSON**

Not applicable

---

**3(b)(iii) ASSETS HELD BY UNINCORPORATED ENTITIES**

Not applicable

---

**3(c) VOTING SECURITIES TO BE ACQUIRED**
   **3(c)(i) LIST AND DESCRIPTION OF VOTING SECURITIES AND LIST OF NON-VOTING SECURITIES:**

The Acquiring Person has indicated its intent to acquire 100% of the outstanding voting securities of the Acquired Person as a result of the Cash Tender Offer for a total transaction value of approximately $2.152 billion.

**3(c)(ii) TOTAL NUMBER OF SHARES OF EACH CLASS OF SECURITY:**

See response to Item 3(c)(i).

**3(c)(iii) TOTAL NUMBER OF SHARES OF EACH CLASS OF SECURITY BEING ACQUIRED:**

See response to Item 3(c)(i).

---

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

3(c)(iv) IDENTITY OF PERSONS ACQUIRING SECURITIES:

See response to Item 3(c)(i).

3(c)(v) DOLLAR VALUE OF SECURITIES IN EACH CLASS BEING ACQUIRED:

See response to Item 3(c)(i).

3(c)(vi) TOTAL NUMBER OF EACH CLASS OF SECURITIES TO BE HELD AS A RESULT OF THE ACQUISITION:

See response to Item 3(c)(i).

3(d) SUBMIT A COPY OF THE MOST RECENT VERSION OF CONTRACT OR AGREEMENT (or letter of Intent to merge or acquire)

DO NOT ATTACH THIS DOCUMENT TO THIS PAGE          ATTACHMENT OR REFERENCE NUMBER OF CONTRACT OR AGREEMENT Not applicable

| NAME OF PERSON FILING NOTIFICATION<br>Take-Two Interactive Software, Inc. | DATE<br>March 24, 2008 |
| --- | --- |

**ITEM 4** PERSONS FILING NOTIFICATION MAY PROVIDE BELOW AN OPTIONAL INDEX OF DOCUMENTS REQUIRED TO BE SUBMITTED BY ITEM 4
(See Item by Item instructions). THESE DOCUMENTS SHOULD NOT BE ATTACHED TO THIS PAGE.

| 4(a) DOCUMENTS FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| Take-Two Interactive Software, Inc. Form 10-K for the fiscal year ended October 31, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00010<br>4746907010213/a2181758z10-k.htm |
| Take-Two Interactive Software, Inc. Form 10-Q for the period ended January 31, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010<br>4746908002514/a2183552z10-q.htm |
| Take-Two Interactive Software, Inc. Proxy Statement Additional Materials dated March 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408015121/v106962_defa14a.htm |
| Take-Two Interactive Software, Inc. Proxy Statement Additional Materials dated March 7, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408014093/v106256_defa14a.htm |
| Take-Two Interactive Software, Inc. Proxy Statement dated February 28, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010<br>4746908001935/a2183114zdef14a.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408015114/v106924_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 11, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>0465908016764/0001104659-08-016764-index.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 7, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408014086/v105825_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 25, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408011454/0001144204-08-011454-index.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 15, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408009931/v103944_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408008490/v103333_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed January 4, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420408000717/v098903_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed December 18, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420407068113/v097599_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed November 20, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00011<br>4420407063550/v095104_8k.htm |

| 4(b) ANNUAL REPORTS, ANNUAL AUDIT REPORTS, AND REGULARLY PREPARED BALANCE SHEETS | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| Take-Two Interactive Software, Inc. Form 10-K for the fiscal year ended October 31, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00010<br>4746907010213/a2181758z10-k.htm |
| Take-Two Interactive Software, Inc. Form 10-Q for the period ended January 31, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010<br>4746908002514/a2183552z10-q.htm |

| 4(c) STUDIES, SURVEYS, ANALYSES, AND REPORTS | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| February 6, 2008 letter from John Riccitiello, CEO Electronic Arts, to Strauss Zelnick, Chairman, Take-Two Interactive Software, Inc. | 4(c)-1 |
| February 19, 2008 letter from John Riccitiello, CEO Electronic Arts, to Strauss Zelnick, Chairman, Take-Two Interactive Software, Inc. | 4(c)-2 |
| Project Texas Preliminary Discussion Materials, prepared February 21, 2008 by Lehman Brothers | 4(c)-3 |
| Presentation to Texas Regarding Project Tournament, prepared March 20, 2008 by Bear Sterns | 4(c)-4 |
| Project Tournament Preliminary Discussion Materials, prepared March 20, 2008 by Lehman Brothers | 4(c)-5 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

## Statement of reasons for noncompliance under 16 CFR § 803.3

Take-Two Interactive Software, Inc. is unable to provide a complete response to Item 4(c) of this Notification and Report Form because certain responsive materials in its possession or control are privileged attorney/client communications. The following is an index of all such materials and includes each of the elements required under 16 CFR § 803.3(d):

### Document P1

(a) **Privilege Claim:**          Attorney/client communication

(b) **Identity of Document:**    Forwarded email communication

(c) **Author:**                        Alicia Batts, Proskauer Rose LLP

(d) **Addressee:**                  Arnold Jacobs, Ori Solomon, Stephanie Kraus, Proskauer Rose LLP

(e) **Document Date:**           March 6, 2008, forwarded March 7, 2008

(f) **Subject:**                       The document includes discussions of legal issues relevant to Electronic Arts Inc.'s proposed tender offer for Take-Two Interactive Software, Inc.

(g) **Additional Recipients:**   Seth Krauss, General Counsel, Take-Two Interactive Software, Inc.

(h) **Location/Control:**          The document is located at Take-Two Interactive Software, Inc. headquarters under the control of Seth Krauss, General Counsel Take-Two Interactive Software, Inc.

**ITEM 5** (See "References" listed in the General Instructions to the Form. Refer to the *North American Industry Classification System-United States, 2002 (2002 NAICS Manual)* for the 6-digit (NAICS) industry codes. Refer to the *2002 Numerical List of Manufactured and Mineral Products* (EC02M31R-NL) for the 7-digit product class codes and the 10-digit product codes. Report revenues for the 7-digit product class codes and 10-digit product codes using the codes in the columns labeled "Product code." For further information on NAICS-based codes visit the www.census.gov web site.)

5(a) DOLLAR REVENUES BY INDUSTRY

| 6-DIGIT INDUSTRY CODE | DESCRIPTION | 2002 TOTAL DOLLAR REVENUES ($000's) |
|---|---|---|
| 511210 | Software Publishers | 474 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | 199 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(i) DOLLAR REVENUES BY MANUFACTURED PRODUCTS

| 10-DIGIT PRODUCT CODE | DESCRIPTION | 2002 TOTAL DOLLAR REVENUES |
|---|---|---|
| | Not applicable | |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(ii) PRODUCTS ADDED OR DELETED

| DESCRIPTION (10-DIGIT PRODUCT CODE) | ADD | DELETE | YEAR OF CHANGE | TOTAL DOLLAR REVENUES |
|---|---|---|---|---|
| Not applicable | | | | |

ITEM 5(b)(iii) DOLLAR REVENUES BY MANUFACTURED PRODUCT CLASS

| 7-DIGIT PRODUCT CLASS | DESCRIPTION | YEAR I_2007_I TOTAL DOLLAR REVENUES |
|---|---|---|
| | Not applicable | |

(Item 5(b)(iii) continued on page 10)

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(iii) DOLLAR REVENUES BY MANUFACTURED PRODUCT CLASS – CONTINUED

| 7-DIGIT PRODUCT CLASS | DESCRIPTION | YEAR I2007I TOTAL DOLLAR REVENUES |
|---|---|---|
| | | |

ITEM 5(c) DOLLAR REVENUES BY NON-MANUFACTURING INDUSTRY

| 6-DIGIT INDUSTRY CODE | DESCRIPTION | YEAR I2007I TOTAL DOLLAR REVENUES ($000's) |
|---|---|---|
| 511210 | Software Publishers | 438 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | 236 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

5(d) COMPLETE ONLY IF ACQUISITION IS IN THE FORMATION OF A JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY.

5(d)(i) NAME AND ADDRESS OF THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY

Not applicable

5(d)(ii)
(A) CONTRIBUTIONS THAT EACH PERSON FORMING THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY HAS AGREED TO MAKE

Not applicable

(B) DESCRIPTION OF ANY CONTRACTS OR AGREEMENTS

Not applicable

(C) DESCRIPTION OF ANY CREDIT GUARANTEES OR OBLIGATIONS

Not applicable

(D) DESCRIPTION OF CONSIDERATION WHICH EACH PERSON FORMING THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY WILL RECEIVE

Not applicable

5(d)(iii) DESCRIPTION OF THE BUSINESS IN WHICH THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY WILL ENGAGE

Not applicable

5(d)(iv) SOURCE OF DOLLAR REVENUES BY 6-DIGIT INDUSTRY CODE (non-manufacturing) AND BY 7-DIGIT PRODUCT CLASS (manufacturing)

Not applicable

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 12

## PROSKAUER ROSE LLP

1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

**John R. Ingrassia**
Attorney at Law

Direct Dial 202.416.6869
jingrassia@proskauer.com

March 24, 2008

**BY HAND**

Premerger Notification Office
Bureau of Competition
Room 303
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

Director of Operations
Antitrust Division
Department of Justice
950 Pennsylvania Avenue, N.W.
Room #3335
Washington, D.C. 20530

Re:   Premerger Notification Under the Hart-Scott-Rodino Antitrust
      Improvements Act of 1976, as amended (the "Act")

Sir or Madam:

On behalf of Take-Two Interactive Software, Inc., we hereby submit the appropriate number of copies of a Notification and Report Form for Certain Mergers and Acquisitions, and one set of documentary attachments, with respect to the Tender Offer by Electronic Arts, Inc. for all of the issued and outstanding voting securities of Take-Two Interactive Software, Inc.

This filing is being submitted with a copy of the original signature page and declaration. The originals will be submitted to the Premerger Notification Office as soon as possible.

If there are any questions regarding this filing, please contact the undersigned at 202.416.6869. Please acknowledge receipt of this filing by stamping the enclosed copy of this letter and returning it to our messenger.

PROSKAUER ROSE LLP

March 24, 2008
Page 2

Sincerely,

John R. Ingrassia

Enclosure

TRANSACTION NUMBER ASSIGNED   ☐☐☐☐☐☐☐☐

**16 C.F.R. Part 803 - Appendix**
**NOTIFICATION AND REPORT FORM FOR CERTAIN MERGERS AND ACQUISITIONS**

Approved by OMB
3084-0005
Expires 05/31/2010

THE INFORMATION REQUIRED TO BE SUPPLIED ON THESE ANSWER SHEETS IS SPECIFIED IN THE INSTRUCTIONS
➤ Attach the Affidavit required by § 803.5 to this page.

| FEE INFORMATION | TAXPAYER IDENTIFICATION NUMBER or SOCIAL SECURITY NUMBER of payer |
|---|---|

AMOUNT PAID Not applicable
In cases where your filing fee would be higher if based on acquisition price or where the acquisition price is undetermined to the extent that it may straddle a filing fee threshold, attach an explanation of how you determined the appropriate fee *(acquiring persons only).*
Attachment Number _____

*(acquiring person (and payer if different from acquiring person))*
CHECK ATTACHED ☐   MONEY ORDER ATTACHED ☐
WIRE TRANSFER ☐   CONFIRMATION NO.
FROM: NAME OF INSTITUTION
NAME OF PAYER (if different from PERSON FILING)

IS THIS A CORRECTIVE FILING? ☐ YES ☒ NO

IS THIS ACQUISITION SUBJECT TO FOREIGN FILING REQUIREMENTS? ☒ YES ☐ NO
   If YES, list jurisdictions: *(voluntary)* Germany

IS THIS ACQUISITION A CASH TENDER OFFER? ☒ YES ☐ NO | BANKRUPTCY? ☐ YES ☒ NO

DO YOU REQUEST EARLY TERMINATION OF THE WAITING PERIOD? *(Grants of early termination are published in the Federal Register AND*
   ☐ YES ☒ NO                                                    *on the FTC web site www.ftc.gov)*

**ITEM 1 – PERSON FILING**
1(a) NAME and
      HEADQUARTERS ADDRESS
      of PERSON FILING

Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012

1(b) PERSON FILING NOTIFICATION IS
   ☐ an acquiring person   ☒ an acquired person   ☐ both

1(c) PUT AN "X" IN THE APPROPRIATE BOX TO DESCRIBE PERSON FILING NOTIFICATION
   ☒ Corporation   ☐ Unincorporated Entity   ☐ Other *(Specify):*

1(d) DATA FURNISHED BY
   ☐ calendar year   ☒ fiscal year *(specify period )* 11/2006   (month/year) to   10/2007   (month/year)

THIS FORM IS REQUIRED BY LAW and must be filed separately by each person which, by reason of a merger, consolidation or acquisition, is subject to §7A of the Clayton Act, 15 U.S.C. §18a, as added by Section 201 of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1390, and rules promulgated thereunder (hereinafter referred to as "the rules" or by section number). The statute and rules are set forth in the *Federal Register* at 43 FR 33450; the rules may also be found at 16 CFR Parts 801-03. Failure to file the Notification and Report Form, and to observe the required waiting period before consummating the acquisition in accordance with the applicable provisions of 15 U.S.C. §18a and the rules, subjects any "person," as defined in the rules, or any individuals responsible for noncompliance, to liability for a penalty of not more than $11,000 for each day during which such person is in violation of 15 U.S.C. §18a.

Pursuant to the Hart-Scott-Rodino Act, information and documentary material filed in or with this Form is confidential. It is exempt from disclosure under the Freedom of Information Act, and may be made public only in an administrative or judicial proceeding, or disclosed to Congress or to a duly authorized committee or subcommittee of Congress.
Filing - Complete and return two copies (with one original affidavit and certification and one set of documentary attachments) of this Notification and Report Form to: Premerger Notification Office, Bureau of Competition, Room 303, Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. Three copies (with one set of documentary attachments) should be sent to: Director of Operations and Merger Enforcement, Antitrust Division, Department of Justice, 950 Pennsylvania Avenue N.W., Room #3335, Washington, D.C. 20530. (For FEDEX airbills to the Department of Justice do not use the 20530 zip code; use zip code 20004.)

DISCLOSURE NOTICE - Public reporting burden for this report is estimated to vary from 8 to 160 hours per response, with an average of 39 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to: Premerger Notification Office, H-303, Federal Trade Commission, Washington, DC 20503 and Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20580
Under the Paperwork Reduction Act, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. That number is 3084-0005, which also appears in the upper right-hand corner of the first page of this form.

Privacy Act Statement--Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. Our authority to collect Social Security numbers is 31 U.S.C. 7701. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to $11,000 per day. We also may be unable to process the Form unless you provide all of the requested information.

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

1(e) PUT AN X IN THE APPROPRIATE BOX AND GIVE THE NAME AND ADDRESS OF ENTITY FILING NOTIFICATION (if other than ultimate parent entity)

☒ NA      ☐ This report is being filed on behalf of a foreign person pursuant to § 803.4.      ☐ This report is being filed on behalf of the ultimate parent entity by another entity within the same person authorized by it to file pursuant to § 803.2(a).

| NAME OF ENTITY FILING NOTIFICATION | ADDRESS |
|---|---|
| | |

1(f) NAME AND ADDRESS OF ENTITY MAKING ACQUISITION OR WHOSE ASSETS, VOTING SECURITIES OR NON-CORPORATE INTERESTS ARE BEING ACQUIRED IF DIFFERENT FROM THE ULTIMATE PARENT ENTITY IDENTIFIED IN ITEM 1(a)

Not applicable

PERCENT OF VOTING SECURITIES OR NON-CORPORATE INTERESTS HELD BY EACH ENTITY IDENTIFIED IN ITEM 1(a)

1(g) IDENTIFICATION OF PERSON TO CONTACT REGARDING THIS REPORT

| NAME OF CONTACT PERSON | John R. Ingrassia |
|---|---|
| TITLE | Associate |
| FIRM NAME | Proskauer Rose LLP |
| BUSINESS ADDRESS | 1001 Pennsylvania Avenue, NW, Suite 400 South, Washington DC 20004 |
| TELEPHONE NUMBER | 202.416.6869 |
| FAX NUMBER | 202.416.6899 |
| E-MAIL ADDRESS | jingrassia@proskauer.com |

(h) IDENTIFICATION OF AN INDIVIDUAL LOCATED IN THE UNITED STATES DESIGNATED FOR THE LIMITED PURPOSE OF RECEIVING NOTICE OF ISSUANCE OF A REQUEST FOR ADDITIONAL INFORMATION OR DOCUMENTS. (See § 803.20(b)(2)(iii))

| NAME OF CONTACT PERSON | |
|---|---|
| TITLE | |
| FIRM NAME | Not applicable |
| BUSINESS ADDRESS | |
| | |
| TELEPHONE NUMBER | |
| FAX NUMBER | |
| E-MAIL ADDRESS | |

**ITEM 2**

| 2(a) LIST NAMES OF ULTIMATE PARENT ENTITIES OF ALL ACQUIRING PERSONS | LIST NAMES OF ULTIMATE PARENT ENTITIES OF ALL ACQUIRED PERSONS |
|---|---|
| Electronic Arts Inc. | Take-Two Interactive Software, Inc. |

2(b) THIS ACQUISITION IS (put an X in all the boxes that apply)

☐ an acquisition of assets
☐ a merger (see § 801.2)
☐ an acquisition subject to § 801.2(e)
☐ a formation of a joint venture or other corporation or unincorporated entity (see § 801.40 or § 801.50)
☒ an acquisition subject to § 801.30 (specify type) Cash Tender Offer
☐ other (specify) _____

☐ a consolidation (see § 801.2)
☒ an acquisition of voting securities
☐ a secondary acquisition
☐ an acquisition subject to § 801.31
☐ acquisition of non-corporate interests

2(c) INDICATE THE HIGHEST NOTIFICATION THRESHOLD IN § 801.1(h) FOR WHICH THIS FORM IS BEING FILED (acquiring person only in an acquisition of voting securities)

| ☐ $50 million (as adjusted) | ☐ $100 million (as adjusted) | ☐ $500 million (as adjusted) | ☐ 25% (see instructions) (as adjusted) | ☐ 50% |
|---|---|---|---|---|
| **2(d)(i) VALUE OF VOTING SECURITIES TO BE HELD AS A RESULT OF THE ACQUISITION** | **(ii) PERCENTAGE OF VOTING SECURITIES** | **(iii) VALUE OF ASSETS TO BE HELD AS A RESULT OF THE ACQUISITION** | **(iv) VALUE OF NONCORPORATE INTERESTS TO BE HELD AS A RESULT OF THE ACQUISITION** | **(v) AGGREGATE TOTAL VALUE** |
| Approximately $2.152 billion | 100% | Not applicable | Not applicable | Approximately $2.152 billion |

| NAME OF PERSON FILING NOTIFICATION | DATE |
| --- | --- |
| Take-Two Interactive Software, Inc. | March 24, 2008 |

2(e) If aggregate total value in 2(d)(v) is based in whole or in part on a fair market valuation pursuant to § 801.10(c)(3), identify the person or persons responsible for making the valuation *(acquiring persons only).*

Not applicable

## ITEM 3
### 3(a) DESCRIPTION OF ACQUISITION

Acquiring Person
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, California 94065

Acquired Person
Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012

Take-Two Interactive Software, Inc. has been notified that Electronic Arts Inc. launched a Tender Offer for all of the issued and outstanding voting securities of Take-Two Interactive Software, Inc. at a price of $26.00 per share. The Tender Offer was launched on March 13, 2008, and Take-Two Interactive Software, Inc. was notified the same day that Electronic Arts Inc. had filed notification under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

As described in the Offer to Purchase dated March 13, 2008, the Offer is conditioned upon, among other things, (i) there having been validly tendered and not withdrawn before the expiration of the offer at least the number of shares of common stock, par value $.01 per share (the "Shares"), of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"), which, together with the shares then owned by Electronic Arts Inc. ("Electronic Arts" or "Parent"), a direct parent of EA08 Acquisition Corp. ("Purchaser"), and its subsidiaries (including Purchaser), represents at least a majority of the total number of shares outstanding on a fully-diluted basis, (ii) Purchaser being satisfied, in its sole discretion, that the restrictions on business combinations with interested stockholders set forth in Section 203 of the General Corporation Law of the State of Delaware are inapplicable to the Offer and the proposed merger, (iii) Take-Two having entered into a merger agreement with Electronic Arts and Purchaser providing for the consummation of the offer and a second step merger as contemplated by this Offer to Purchase on terms satisfactory to Electronic Arts and Purchaser in their reasonable judgment, including representations and warranties that are reasonably satisfactory to Electronic Arts and Purchaser and are not subject to any exceptions that reflect facts, circumstances or conditions that would result in a failure to satisfy any other condition to the Offer and (iv) any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, having expired or been terminated. The Offer is also subject to certain other conditions set forth at Section 14 of the Offer.

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

---

**3(b)(i) ASSETS TO BE ACQUIRED (to be completed only for asset acquisitions)**

Not applicable

---

**3(b)(ii) ASSETS HELD BY ACQUIRING PERSON**

Not applicable

---

**3(b)(iii) ASSETS HELD BY UNINCORPORATED ENTITIES**

Not applicable

---

**3(c) VOTING SECURITIES TO BE ACQUIRED**
   **3(c)(i) LIST AND DESCRIPTION OF VOTING SECURITIES AND LIST OF NON-VOTING SECURITIES:**

The Acquiring Person has indicated its intent to acquire 100% of the outstanding voting securities of the Acquired Person as a result of the Cash Tender Offer for a total transaction value of approximately $2.152 billion.

**3(c)(ii) TOTAL NUMBER OF SHARES OF EACH CLASS OF SECURITY:**

See response to Item 3(c)(i).

**3(c)(iii) TOTAL NUMBER OF SHARES OF EACH CLASS OF SECURITY BEING ACQUIRED:**

See response to Item 3(c)(i).

---

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

3(c)(iv) IDENTITY OF PERSONS ACQUIRING SECURITIES:

See response to Item 3(c)(i).

3(c)(v) DOLLAR VALUE OF SECURITIES IN EACH CLASS BEING ACQUIRED:

See response to Item 3(c)(i).

3(c)(vi) TOTAL NUMBER OF EACH CLASS OF SECURITIES TO BE HELD AS A RESULT OF THE ACQUISITION:

See response to Item 3(c)(i).

3(d) SUBMIT A COPY OF THE MOST RECENT VERSION OF CONTRACT OR AGREEMENT (or letter of intent to merge or acquire)

DO NOT ATTACH THIS DOCUMENT TO THIS PAGE          ATTACHMENT OR REFERENCE NUMBER OF CONTRACT OR AGREEMENT Not applicable

| NAME OF PERSON FILING NOTIFICATION<br>Take-Two Interactive Software, Inc. | DATE<br>March 24, 2008 |
| --- | --- |

**ITEM 4** PERSONS FILING NOTIFICATION MAY PROVIDE BELOW AN OPTIONAL INDEX OF DOCUMENTS REQUIRED TO BE SUBMITTED BY ITEM 4
(See Item by Item instructions). THESE DOCUMENTS SHOULD NOT BE ATTACHED TO THIS PAGE.

| 4(a) DOCUMENTS FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| Take-Two Interactive Software, Inc. Form 10-K for the fiscal year ended October 31, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00010 4746907010213/a2181758z10-k.htm |
| Take-Two Interactive Software, Inc. Form 10-Q for the period ended January 31, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010 4746908002514/a2183552z10-q.htm |
| Take-Two Interactive Software, Inc. Proxy Statement Additional Materials dated March 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408015121/v106962_defa14a.htm |
| Take-Two Interactive Software, Inc. Proxy Statement Additional Materials dated March 7, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408014093/v106256_defa14a.htm |
| Take-Two Interactive Software, Inc. Proxy Statement dated February 28, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010 4746908001935/a2183114zdef14a.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408015114/v106924_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 11, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 0465908016764/0001104659-08-016764-index.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed March 7, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408014086/v105825_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 25, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408011454/0001144204-08-011454-index.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 15, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408009931/v103944_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed February 13, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408008490/v103333_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed January 4, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420408000717/v098903_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed December 18, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420407068113/v097599_8k.htm |
| Take-Two Interactive Software, Inc. Form 8-K filed November 20, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00011 4420407063550/v095104_8k.htm |

| 4(b) ANNUAL REPORTS, ANNUAL AUDIT REPORTS, AND REGULARLY PREPARED BALANCE SHEETS | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| Take-Two Interactive Software, Inc. Form 10-K for the fiscal year ended October 31, 2007 | http://www.sec.gov/Archives/edgar/data/946581/00010 4746907010213/a2181758z10-k.htm |
| Take-Two Interactive Software, Inc. Form 10-Q for the period ended January 31, 2008 | http://www.sec.gov/Archives/edgar/data/946581/00010 4746908002514/a2183552z10-q.htm |

| 4(c) STUDIES, SURVEYS, ANALYSES, AND REPORTS | ATTACHMENT OR REFERENCE NUMBER |
| --- | --- |
| February 6, 2008 letter from John Riccitiello, CEO Electronic Arts, to Strauss Zelnick, Chairman, Take-Two Interactive Software, Inc. | 4(c)-1 |
| February 19, 2008 letter from John Riccitiello, CEO Electronic Arts, to Strauss Zelnick, Chairman, Take-Two Interactive Software, Inc. | 4(c)-2 |
| Project Texas Preliminary Discussion Materials, prepared February 21, 2008 by Lehman Brothers | 4(c)-3 |
| Presentation to Texas Regarding Project Tournament, prepared March 20, 2008 by Bear Sterns | 4(c)-4 |
| Project Tournament Preliminary Discussion Materials, prepared March 20, 2008 by Lehman Brothers | 4(c)-5 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

## Statement of reasons for noncompliance under 16 CFR § 803.3

Take-Two Interactive Software, Inc. is unable to provide a complete response to Item 4(c) of this Notification and Report Form because certain responsive materials in its possession or control are privileged attorney/client communications. The following is an index of all such materials and includes each of the elements required under 16 CFR § 803.3(d):

### Document P1

**(a) Privilege Claim:**  Attorney/client communication

**(b) Identity of Document:**  Forwarded email communication

**(c) Author:**  Alicia Batts, Proskauer Rose LLP

**(d) Addressee:**  Arnold Jacobs, Ori Solomon, Stephanie Kraus, Proskauer Rose LLP

**(e) Document Date:**  March 6, 2008, forwarded March 7, 2008

**(f) Subject:**  The document includes discussions of legal issues relevant to Electronic Arts Inc.'s proposed tender offer for Take-Two Interactive Software, Inc.

**(g) Additional Recipients:**  Seth Krauss, General Counsel, Take-Two Interactive Software, Inc.

**(h) Location/Control:**  The document is located at Take-Two Interactive Software, Inc. headquarters under the control of Seth Krauss, General Counsel Take-Two Interactive Software, Inc.

**ITEM 5** (See "References" listed in the General Instructions to the Form. Refer to the *North American Industry Classification System-United States, 2002 (2002 NAICS Manual)* for the 6-digit (NAICS) industry codes. Refer to the *2002 Numerical List of Manufactured and Mineral Products* (EC02M31R-NL) for the 7-digit product class codes and the 10-digit product codes. Report revenues for the 7-digit product class codes and 10-digit product codes using the codes in the columns labeled "Product code." For further information on NAICS-based codes visit the www.census.gov web site.)

5(a) DOLLAR REVENUES BY INDUSTRY

| 6-DIGIT INDUSTRY CODE | DESCRIPTION | 2002 TOTAL DOLLAR REVENUES ($000's) |
|---|---|---|
| 511210 | Software Publishers | 474 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | 199 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(i) DOLLAR REVENUES BY MANUFACTURED PRODUCTS

| 10-DIGIT PRODUCT CODE | DESCRIPTION | 2002 TOTAL DOLLAR REVENUES |
|---|---|---|
| | Not applicable | |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(ii) PRODUCTS ADDED OR DELETED

| DESCRIPTION (10-DIGIT PRODUCT CODE) | ADD | DELETE | YEAR OF CHANGE | TOTAL DOLLAR REVENUES |
|---|---|---|---|---|
| Not applicable | | | | |

ITEM 5(b)(iii) DOLLAR REVENUES BY MANUFACTURED PRODUCT CLASS

| 7-DIGIT PRODUCT CLASS | DESCRIPTION | YEAR I_2007_I TOTAL DOLLAR REVENUES |
|---|---|---|
| | Not applicable | |

(Item 5(b)(iii) continued on page 10)

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

ITEM 5(b)(iii) DOLLAR REVENUES BY MANUFACTURED PRODUCT CLASS – CONTINUED

| 7-DIGIT PRODUCT CLASS | DESCRIPTION | YEAR I2007I TOTAL DOLLAR REVENUES |
|---|---|---|
| | | |

ITEM 5(c) DOLLAR REVENUES BY NON-MANUFACTURING INDUSTRY

| 6-DIGIT INDUSTRY CODE | DESCRIPTION | YEAR I2007I TOTAL DOLLAR REVENUES ($000's) |
|---|---|---|
| 511210 | Software Publishers | 438 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | 236 |

| NAME OF PERSON FILING NOTIFICATION | DATE |
|---|---|
| Take-Two Interactive Software, Inc. | March 24, 2008 |

5(d) COMPLETE ONLY IF ACQUISITION IS IN THE FORMATION OF A JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY.

5(d)(i) NAME AND ADDRESS OF THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY

Not applicable

5(d)(ii)
(A) CONTRIBUTIONS THAT EACH PERSON FORMING THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY HAS AGREED TO MAKE

Not applicable

(B) DESCRIPTION OF ANY CONTRACTS OR AGREEMENTS

Not applicable

(C) DESCRIPTION OF ANY CREDIT GUARANTEES OR OBLIGATIONS

Not applicable

(D) DESCRIPTION OF CONSIDERATION WHICH EACH PERSON FORMING THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY WILL RECEIVE

Not applicable

5(d)(iii) DESCRIPTION OF THE BUSINESS IN WHICH THE JOINT VENTURE CORPORATION OR UNINCORPORATED ENTITY WILL ENGAGE

Not applicable

5(d)(iv) SOURCE OF DOLLAR REVENUES BY 6-DIGIT INDUSTRY CODE (non-manufacturing) AND BY 7-DIGIT PRODUCT CLASS (manufacturing)

Not applicable

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 13

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

## PROSKAUER ROSE LLP

Alicia J. Batts
Member of the Firm

Direct Dial 202.416.6812
abatts@proskauer.com

March 25, 2008

Federal Trade Commission
Bureau of Competition
Mergers II Division
600 Pennsylvania Avenue, N.W.
Room NJ 6105
Mail Drop 6128
Washington, D.C. 20580



Attn.: Eric Elmore

Re: Acquisition of 100% of the voting securities of Take-Two Interactive, Inc. ("Take-Two") by
Electronic Arts, Inc. ("EA")

Dear Eric:

In follow up to our letter dated March 19, 2008, this letter further responds to your letter
to Seth D. Krauss, General Counsel of Take-Two Interactive Software, Inc. dated March 14, 2008
relating to the Commission's preliminary investigation of the above-referenced transaction (the
"Access Letter").

RESPONSE TO REQUEST NUMBER 8

*Please see Annex TT-AI-01-08.30*

REQUEST NUMBER 10:

All planning and due diligence materials prepared by or for Take-Two and its agents and
advisors evaluating the acquisition since it was first contemplated with respect to market shares,
competition, competitors, markets, and potential for sales growth or expansion into product or
geographic markets.

RESPONSE TO REQUEST NUMBER 10

*Please see Annex TT-AL-01-10.05*

Federal Trade Commission
Attn: Reid B. Horwitz
March 25, 2008

Page 2

      Please note that these materials are confidential and provided pursuant to the confidentiality rules of the Federal Trade Commission. Please feel free to contact me at 202.416.6812, or John Ingrassia at 202.416.6869 if you have any questions or follow-up requests.

Sincerely,

Alicia J. Batts

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 14

1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

# PROSKAUER ROSE LLP

Alicia J. Batts
Member of the Firm

Direct Dial 202.416.6812
abatts@proskauer.com

March 28, 2008

Federal Trade Commission
Bureau of Competition
Mergers II Division
600 Pennsylvania Avenue, N.W.
Room NJ 6105
Mail Drop 6128
Washington, D.C. 20580

Attn.: Eric Elmore

Re: Acquisition of 100% of the voting securities of Take-Two Interactive, Inc. ("Take-Two") by Electronic Arts, Inc. ("EA")

Dear Eric:

In follow up to our letters dated March 19, 2008 and March 25, 2008, this letter further responds to your letter to Seth D. Krauss, General Counsel of Take-Two Interactive Software, Inc. dated March 14, 2008 relating to the Commission's preliminary investigation of the above-referenced transaction (the "Access Letter").

RESPONSE TO REQUEST NUMBER 6

*Please see Annex TT-AL-01-06.01 through Annex TT-AL-01-06.11*

Please note that these materials are confidential and provided pursuant to the confidentiality rules of the Federal Trade Commission. Please feel free to contact me at 202.416.6812, or John Ingrassia at 202.416.6869 if you have any questions or follow-up requests.

Sincerely,

*Alicia J Batts*

Alicia J. Batts

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 15

1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

# PROSKAUER ROSE LLP

Alicia J. Batts
Member of the Firm

Direct Dial 202.416.6812
abatts@proskauer.com

March 31, 2008

Mr. E. Eric Elmore
Federal Trade Commission
Bureau of Competition
Mergers II Division
601 New Jersey Avenue, N.W.
Room NJ 6120
Washington, D.C. 20580

*Received by*
*Front Desk Clare*
*4:40p.m.    03/31/08*

Re: Acquisition of 100% of the voting securities of Take-Two Interactive, Inc. ("Take-Two") by Electronic Arts, Inc. ("EA")

Dear Eric:

In follow up to our letters dated March 19, 2008, March 25, 2008 and March 28, 2008, this letter further responds to your letter to Seth D. Krauss, General Counsel of Take-Two Interactive Software, Inc. dated March 14, 2008 relating to the Commission's preliminary investigation of the above-referenced transaction (the "Access Letter").

RESPONSE TO REQUEST NUMBER 4

*Please see Annex TT-AL-01-04, except note that Take-Two is not prepared to evaluate the market shares for each publisher at this time.*

Please note that these materials are confidential and provided pursuant to the confidentiality rules of the Federal Trade Commission. Please feel free to contact me at 202.416.6812, or John Ingrassia at 202.416.6869 if you have any questions or follow-up requests.

Sincerely,

*Alicia J. Batts*

Alicia J. Batts

Enclosures

7450/73539-023 Current/10937977v1

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 16



1001 Pennsylvania Avenue, NW
Suite 400 South
Washington DC 20004-2533
Telephone 202.416.6800
Fax 202.416.6899

BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO

# PROSKAUER ROSE LLP

Alicia J. Batts
Member of the Firm

Direct Dial 202.416.6812
abatts@proskauer.com

April 8, 2008

Mr. Reid B. Horwitz
Federal Trade Commission
Bureau of Competition
Mergers II Division
601 New Jersey Avenue, N.W.
Room NJ 6128
Washington, D.C. 20580

Re:  Acquisition of 100% of the voting securities of Take-Two Interactive, Inc. ("Take-Two") by
     Electronic Arts, Inc. ("EA")

Dear Reid:

In follow up to our letters dated March 19, 2008, March 25, 2008, March 28, 2008 and March 31, 2008, this letter further responds to your letter to Seth D. Krauss, General Counsel of Take-Two Interactive Software, Inc. dated March 14, 2008 relating to the Commission's preliminary investigation of the above-referenced transaction (the "Access Letter").

RESPONSE TO REQUEST NUMBER 9

*Please see Annex TT-AL-01-09.01 through Annex TT-AL-01-09.21*

Please note that these materials are confidential and provided pursuant to the confidentiality rules of the Federal Trade Commission. Please feel free to contact me at 202.416.6812, or John Ingrassia at 202.416.6869 if you have any questions or follow-up requests.

Sincerely,

Alicia J. Batts

Enclosures

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 17

# PREMERGER NOTIFICATION OFFICE

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: John R. Ingrassia, Esquire | FROM: Renee Hallman, Contact Representative |
| COMPANY: Proskauer Rose LLP | DATE: 4/16/2008 |
| 202-416-6899 | TOTAL NO. OF PAGES INCLUDING COVER: 2*q* |
| PHONE NUMBER: 202-416-6869 | SENDER'S REFERENCE NUMBER: 2008-0905 |
| RE: Second Request for Take-Two Interactive Software, Inc. | YOUR REFERENCE NUMBER: 2008-0905 |

☐ URGENT    X FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    X PLEASE RECYCLE

NOTES/COMMENTS:

See attached Second Request for Take-Two Interactive Software, Inc.
Thank-You



OFFICE OF
THE CHAIRMAN

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

April 16, 2008

John R. Ingrassia, Esquire
Proskauer Rose LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004

> Re:    Premerger Notification Requirements Under the Hart-Scott-Rodino Antitrust
> Improvements Act of 1976;
> Transaction Identification Number: 2008-0905
> Take-Two Interactive Software, Inc.

Dear Mr. Ingrassia:

This is a request for additional information or documentary material relevant to the proposed cash tender offer by Electronic Arts Inc. of certain voting securities of Take-Two Interactive Software, Inc. This request is made pursuant to Section 7A(e) of the Clayton Act, 15 U.S.C. § 18a(e), and § 803.20 of the premerger notification rules, 16 C.F.R. § 803.20, and in accordance with Section 20(i) of the Federal Trade Commission Act, 15 U.S.C. § 57b-1(i). The purpose of this request is to investigate a possible violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

Under Section 7A(e)(2) of the Clayton Act, this request extends the waiting period until 10 days following the date of our receipt of the requested information or documentary materials. You are required to submit your response within a reasonable period of time in accordance with § 803.21 of the premerger notification rules, 16 C.F.R. § 803.21. We will notify you of our receipt of the requested information or documentary materials and will inform you of the expiration of the extended waiting period.

A certification attesting to the completeness of your response in accordance with § 803.6 of the Rules must be submitted with the response.

If you have any questions concerning this matter, please call or write Reid Horwitz, Esquire, (202) 326-2037 , Federal Trade Commission, 601 New Jersey Avenue, N.W., Suite 6128, Washington, D.C. 20580.

Sincerely,

*William E. Kovacic*

William E. Kovacic
Chairman

Attachment

## REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIAL ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE, INC.

Unless modified by agreement with the staff of the Federal Trade Commission, each specification of this Request requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions, which appear after the following Specifications. If the company believes that the required search or any other part of the Request can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss such questions and possible modifications with the Commission representatives identified on the last page of this Request. All modifications to this Request must be agreed to in writing by those representatives. You may find it useful to provide the response to Specification 1 of this Request promptly and discuss limiting the required search with the Commission's representatives before you begin your search.

### SPECIFICATIONS

1.    Submit:

(a) one copy of each organization chart and personnel directory in effect since January 1, 2004, for the Company as a whole and for each of the Company's facilities or divisions involved in any activity relating to any relevant product in any relevant area; and

(b) a list of all agents and representatives of the Company, including, but not limited to, all attorneys, consultants, investment bankers, product distributors, sales agents, marketing consultants, PR consultants, advertising agencies, and other persons retained by the Company in any capacity relating to any relevant product in any relevant area (excluding those retained solely in connection with environmental, tax, human resources, pensions, benefits, ERISA, and OSHA issues), and their last known address and phone number.

2.    List each relevant product sold by the company since 2004, and for each relevant product:

(a) describe the product in detail, including its genre and game rating; and

(b) state the division, subsidiary, or affiliate of the company that produces or sells, or has produced or sold, the product;

(c) state whether the company produces or sells the product on behalf of another person, or whether another person produces or sells the product on behalf of the company, in either case identifying each such person.

3.      For each relevant product identified in Specification 2, and separately for each genre, state monthly and annually, for each year since January 1, 2004:

(a)  the company's gross sales and net sales in each relevant area, stated separately in units and dollars;

(b)  the company's production and shipment in each relevant area, stated separately in units and dollars;

(c)  any deductions from the company's gross sales in each relevant area, identified separately by type of deduction, that the company uses to calculate net sales;

(d)  the company's cost of goods sold stated separately in units and dollars for: total production cost per unit, and by the following components: (1) materials; (2) licensing fees, and within licensing fees, state separately fees paid to (i) platform manufactures, and (ii) other providers of intellectual property (e.g., professional sports leagues, player, players associations, personalities); (3) packaging; (4) direct labor; (5) production overhead costs; and (6) any other costs (itemized by title) that are used to calculate cost of goods sold, or if the product sold is purchased or co-packed provide the purchase price;

(e)  the company's production cost variances stated separately by type;

(f)  gross margins and state the method of computation; and

(g)  total payments by the company for distribution services, and the company's spending for advertising and other promotional efforts.

4.      For each relevant product identified in Specification 2, state monthly (if available, otherwise it may be provided quarterly) and annually, for each year since January 1, 2004:

(a) the company's distribution and freight-out costs, including without limitation, cost center expense summaries showing costs by type for each distribution center, expenses by type incurred for moving product from production facilities to distribution centers, retailers, or wholesalers, and expenses by type for third-party distribution and warehousing services;

(b) stated separately, the company's variable trade promotions by type, variable consumer promotions by type, fixed trade promotions by type, fixed consumer promotions by type, media advertising and expenditures by type, and any other promotional and marketing expenditures by type;

(c) the company's research and development costs;

2

(d) by type, assets directly dedicated to, and liabilities directly derived from, each relevant product, (or lowest product grouping available);

(e) any license and licensing fees associated with the relevant product;

(f) all advertising and marketing expenditures;

(g) all inventory costs; and

(h) the company's other costs, such as selling, general and administrative, and other overhead expenditures, by type.

5.     For each platform manufacturer, describe (a) the media (e.g. CD, DVD, proprietary cartridge, etc.) on which the relevant products identified in Specification 2 are published; (b) whether the company, the platform manufacturer, or a third party prints the relevant product onto the media; and (c) the contract terms under which the media are printed (if not by the company), including but not limited to (1) volume discounts, (2) refunds for unsold media, and (3) lead time necessary to place orders or change order size.

6.     Submit all NPD (or equivalent) data that contains information on any relevant product in electronic format for each month and year since January 1, 1998.

7.     For each relevant product identified in Specification 2:

(a) identify and describe each discount and allowance, including but not limited, to rebates, promotional allowances, merchandising discounts, and co-op advertising. Describe the methodology for determining each of these discounts and allowances, including the extent to which the existence of other titles in a given genre factor into such determinations. Submit all documents relating to formulas, models and programs used to make such determinations;

(b) state the credit terms extended by the company to retail and wholesale customers;

(c) state whether and under what circumstances the company pays refunds or extends credit for returned goods or otherwise accepts returns and all terms for returns to retail and wholesale customers;

(d) state the company's requirements, such as minimum order requirements and creditworthiness, for direct purchasing by retail or wholesale customers; and

(e) describe in detail the process by which the company establishes and negotiates discounts, rebates, other price concessions, or other terms such as free goods, incentives or

payments to retailers or the employees of retailers, slotting allowances, or other compensation.

8.     For each relevant product, provide the following:

(a)  a detailed description of each category of documents and information (e.g., platform, genre, number of competitors, release date, Metacritic rating, etc.) used to establish the price and recommended resale price of such product, and how such information is used to establish such prices;

(b)  all documents relating to price sensitivity, price elasticity, price points, or product substitution, of any of the company's relevant products;

(c)  all data compilations and underlying programs or models relating to price sensitivity, price elasticity, price points, wholesale pricing or production substitution, of any of the company's relevant products, developed by, used by, or obtained by the company or any agent of the company;

(d)  all documents relating to the company's or any other person's prices, including, but not limited to, price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, pricing analyses, market price indices or periodic market prices, and pricing decisions relating to any relevant product;

(e)  a detailed description of all price checking programs or efforts, including the names of each employee or agent participating in such programs or efforts, their title or company affiliation, the role that they play or played, and the last known address and phone number of any former employees or agents involved in such programs or efforts; and

(f)  all documents relating to the company's compliance with the Robinson-Patman Act.

To the extent that any pricing analysis was performed using computerized data, submit the underlying data. Documents, programs, and information submitted, used, generated or obtained in electronic form should be produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

9.     Identify the company's 20 largest wholesale customers, and for each such customer:

(a)  state whether the company has a contract or other promotional agreement relating to the sales of relevant products, and submit each contract or promotional agreement currently in place, or previously in effect for any period beginning January 1, 2006;

4

(b) provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement; and

(c) provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

10.    Identify the company's 20 largest retail customers, and for each such customer:

(a) state whether the company has a contract or other promotional agreement relating to the sales of relevant products, submit each contract or promotional agreement currently in place, or in effect for any period beginning January 1, 2006;

(b) provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement; and

(c) provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

11.    Submit a copy of each relevant product and all packaging used for such product in the sports, shooter, strategy, racing and action genres.

12.    Submit each different advertisement or promotional material for each relevant product in the sports, shooter, strategy, racing and action genres in any medium, including but not limited to, newspapers, television, radio, telephone, direct mail, the Internet, or electronic mail.

13.    Submit a copy of all documents relating to marketing and advertising plans for each relevant product in the sports, shooter, strategy, racing and action genres that discuss or reference competition with, how to compete with, or how to market or advertise against other relevant products. Such documents include, but are not limited to, materials about advertising and marketing strategies, themes, or concepts, media recommendations and plans, marketing reports, business studies, and creative strategies that describe or discuss the planned or actual approaches for advertising, marketing, or promoting the product.

14.     Submit a copy of all consumer research concerning all relevant products, including, but not limited to: all materials relating to consumer perceptions, preferences, and beliefs about such product(s); data and analyses relating to consumer demographics, target markets, customer type, purchasing patterns, or switching behavior, including but not limited to, switching from or to any relevant product; and consumer surveys, marketing surveys and reports.

15.     State the full name and URL for each website operated by or on the company's behalf, and the purpose of each site, if it has or had content relating to any of the issues addressed by this Second Request.

16.     Submit all analyst reports that discuss any aspect of the video gaming industry, including, but not limited to, any competitors within the industry or the acquisition of Take-Two by Electronic Arts.

16A.    Submit all documents relating to the company's concerns, expressed or otherwise, over Electronic Art's procurement of exclusive licensing agreements involving professional sports leagues and sports brands, including, but not limited to, all correspondence and communications with the U.S. Department of Justice, Federal Trade Commission, or any other entity, and all documents and analyses relating to the effects such exclusive licensing agreements might have, or had, on the company's business or on competition within the video game software industry. Identify all consultants identified in response to Specification 1 who advised or assisted the company in connection with the above, describe their role, and provide their last known address and phone number. Identify all former employees who participated in any of the activities described above, and provide their last known address and phone number.

17.     Submit all documents relating to vendor participation with retailers on product placement in a store, through category management, category captaincy, vendor participation, or other similar activities. List all retailers for whom the company acts as a category captain or any type of category supervisory position and provide all documents produced to retailers in connection with such activities, and all documents (whether internal or otherwise) that incorporate such activities.

18.     Submit all Metacritic ratings for any relevant product since 2000, and for each relevant product submit in Excel format, the title, publisher, developer, genre(s), players, ESRB rating, release date, release price, Metacritic rating, user rating, recommended resale price, the amount of any promotional pricing or type of promotional activity offered at the time of release, and date on which the company offered its first price discount, promotional pricing, or promotional activity after date of release.

19.     State the top five video game titles (or less if five cannot be identified) that, to the company's knowledge, most constrain the price of each relevant product identified in the

6

company's response to Specification 2 in the sports, strategy, shooter, racing and action genres, and for each such title, state the title's genre and publisher.

20.    For each relevant product identified in response to Specification 2 in the sports, shooter, strategy, racing and action genres, state the top five video game titles (or less if five cannot be identified) that the company evaluated or is evaluating in deciding what product features to add, and provide all documents comparing the company's video game titles in such genres with those of any of other person.

21.    Submit all documents relating to the company's or any other person's plans relating to any relevant product, including, but not limited to: business plans; short term and long range strategies and objectives; investment banker and/or other consultant reports; title, genre, brand, or platform-specific plans; marketing plans; advertising plans and strategies, including all expenditures on advertising, selling aids and promotional materials; legislative affairs plans; purchasing plans; collaboration plans; budgets and financial projections; expansion or retrenchment plans; research and development efforts; and presentations to management committees, executive committees, and boards of directors. For regularly prepared budgets and financial projections, the company need only submit one copy of final year-end documents and cumulative year to date documents for the current year.

22.    Identify, provide the title and describe the contents of each financial statement, budget, profit and loss statement, customer or product line profitability report, and each other financial report regularly prepared by or for the company on any periodic basis that relates to the production, manufacture and sale of any relevant product, or the manufacturing facility, sales office, distribution center, product line, or customer for any relevant product, and for each such report, state how often each is prepared and the person responsible for its preparation and provide all such reports on both a quarterly basis and a yearly basis since January 1, 2003. If available, these reports should be provided in an electronic spreadsheet format acceptable to the Commission.

23.    Submit all documents relating to competition in the relevant product, including, but not limited to, market studies, forecasts and surveys, and all other documents relating to: (a) the market share or competitive position of the company and any of its competitors; (b) the relative strength or weakness of companies selling or offering each relevant product; (c) supply and demand conditions; (d) allegations by any person that any company that sells or offers any relevant product is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints, threatened, pending or completed lawsuits, and federal and state investigations; (e) competition between any relevant product and any other product, such as music videos, movie videos, music or video downloads, or other entertainment products; (f) any actual or potential effect on the supply, demand, cost or price of any relevant product, as a result of competition from any other possible substitute product; (g) any actual or potential effect on supply or demand as a result of the wholesale or retail price or fee schedule of a relevant product; (h) attempts to win customers from other companies and losses of customers to other

7

companies including, but not limited to, all sales personnel call reports: (i) product reviews; (j) the development, marketing, advertising, and value of each company brand, including brand equity studies; (k) competition to reduce the number of "glitches" in products; (l) NPD reports or studies; (m) differences in purchasing preferences and product demand between consumers inside and outside the United States; and (n) discussions in any forum including internet forums such as web logs ("blogs"), message boards, discussion boards, discussion groups or forums, bulletin boards, or any other type of internet communication. For all discussions identified in subpart (n) above, provide the name of and link (if applicable) to the forum and identify all user ids, log-in names, and aliases used by the company or any of its employees.

24. Submit all documents relating to any Intellectual Property ("IP") agreements relating to the relevant product, including, but not limited to, the actual agreements, negotiations over such agreements, and how such agreements would or could impact competition.

25. State the name, address, telephone number and contact name of each person that has entered, attempted to enter into, or exited from, the publishing of relevant product for each video game genre from January 1, 1998 to the present. For each such person, identify the title(s) it produces or sells, or produced or sold, the genre, and such title's release date for each platform. For each entrant, state whether the entrant also produces the title. If the publisher does not produce the title, state the producer of each title. For each person that has exited due to an acquisition or merger, identify the acquiring person or the resulting merged person.

26. For any relevant product, submit all documents relating to economies of scale and economies of scope, including advantages of producing, selling, or distributing multiple relevant products.

27. For each relevant product, identify or describe (including the bases for your response) and submit all documents relating to:

(a) requirements for entry into the development, production, sale, or distribution of the relevant product in each relevant area including, but not limited to, research and development, planning and design, production requirements, personnel, distribution systems, reputation, patents, licenses, sales and marketing activities, development of databases and customer support systems, development of an Internet site, and any necessary governmental and customer approvals, and the components of, and time necessary to meet, each such requirement;

(b) the total costs required for entry into the development, production, sale or distribution of the relevant product; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the development, production or sale of the product; the methods and amount of time necessary to recover such costs; and the total sunk costs entailed in satisfying the requirements for entry;

8

(c) possible new entrants into the development, production, sale or distribution of the relevant product in each relevant area; and an estimate of the time it would take each such potential entrant to (i) produce a commercially viable product and (ii) achieve competitively significant sales of that product (including a detailed description of the bases for each estimate);

(d) the minimum viable scale, the minimum and optimum research and development organization, sales volume, requirements for multi-center, or vertically integrated operations; or other factors required to attain any available cost savings or other efficiencies necessary to compete profitably in providing the relevant product;

(e) the extent to which a new entrant into the development, production, manufacture or sale of any relevant product would benefit from also being (or would suffer a disadvantage from not also being) a developer, producer or seller of any other relevant product or any product or service purchased, used or sold in conjunction with any relevant product; and

(f) any programs and/or models used to analyze the development potential of relevant products.

The company shall provide its response to this specification in terms of entry that would enable an entrant to develop, produce and sell products that compete directly (including, but not limited to, competition on performance and price) with each relevant product developed, produced, provided or sold by Take-Two. If the company contends that entry by entrants that do not compete directly may have competitive significance, then the company shall provide a separate response for each form of such entry (including, but not limited to, an explanation of the manner in which each form of such entry would have competitive significance, as well as how each form of such entry differs from entry that would enable an entrant to compete directly).

    28.     Identify, and state whether the company is a member of, or subscribes to, all trade associations, information services, and other organizations relating to the research, development, production, license, or sale of any relevant product. Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product submitted by the company or any other person to each such association, service, and organization or its agent. Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product received by the company or any other person from each such association, service, and organization or its agent.

    29.     For each business consultant, investment banker, and economic consultant (collectively "consultant") identified in response to Specification 1(b) and that was engaged by the company with respect to the proposed acquisition of Take-Two by Electronic Arts, submit (a) all documents and data provided to and received from each such consultant; and (b) all

reports and analyses generated by, and the underlying econometric programs, models and data used by, any such consultant to generate such reports and analyses. Documents, programs, and information submitted, used, generated or obtained in electronic form should be printed and produced in hard copy and produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

30. For each electronic database maintained by the company that contains information relating to prices, sales, research and development, production, costs (including transportation costs), profits, margins, competitors, or customers for any relevant product, service, or input, provide a copy of the database, all software, user identifications, and passwords necessary to access the responsive data store, and all regularly prepared and ad hoc reports generated using information contained in the database ("reports"), and state the following information:

(a) the size and format of the database, including, but not limited to, the authoring application, operating system, and application version;

(b) a detailed description of the data contained in the database;

(c) the date range for which data has been input;

(d) a record layout and the title and description of each record or field contained in the database;

(e) an identification of databases, spreadsheets, or other electronic files that are linked to the database;

(f) the uses to which each of the reports was put; and

(e) for each such report, the name of the report, the distribution list for the report, the frequency with which the report is generated (e.g. daily, weekly, monthly, annually), and the person responsible for generating the report.

31. Submit all documents (except documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues) relating to the proposed acquisition by Electronic Arts of Take-Two and provide:

(a) a timetable for the proposed acquisition, a description of all actions that must be taken prior to consummation of the proposed acquisition, and any harm that will result if the acquisition is not consummated;

(b) a detailed description of (including the rationale for, and identification of all documents directly or indirectly used to prepare the company's response to this sub-part)

10

all plans for changes in Electronic Art's and Take-Two's operations, structure, policies, strategies, corporate goals, financing, business, officers, employees or any other area of corporate activity as a result of the proposed acquisition;

(c) a detailed description of (including the identification of all documents directly or indirectly used to prepare the company's response to this sub-part and quantification, if possible, of all cost savings, economies or other efficiencies) the reasons for the proposed acquisition and the benefits, costs, and risks anticipated as a result of the proposed acquisition, including, but not limited to, all cost savings, economies, or other efficiencies of whatever kind; and

(d) a detailed description of all statements or actions by any person (identifying the person by name, title, and business address) in support of, in opposition to, or otherwise expressing opinions about the proposed acquisition or its effects.

32.    Submit:

(a) an enumeration and detailed description of all efficiencies that the company claims will or may arise from the proposed acquisition by Electronic Arts of Take-Two, and for each efficiency claimed:

> (i) provide a complete description of the means by which the efficiency is to be accomplished, including a complete description of the steps to be taken, the investments to be made, and the timetable for achieving the efficiency;

> (ii) state the method(s) by which the company proposes the efficiency should be measured (e.g., cost savings, increase in output, increase in competition);

> (iii) identify and state the amount of all cost savings the company claims are attributable to the efficiency, stating separately and describing each one-time fixed cost saving, recurring cost saving, and variable cost saving, all in dollars per unit, and providing a detailed explanation of the company's bases for such claims;

> (iv) state all reasons why the company claims that the efficiency (a) is likely to be accomplished with the acquisition, and (b) is unlikely to be accomplished without the acquisition;

> (v) identify all alternatives to the acquisition considered by the company as a means to achieve the claimed efficiency, state the costs of achieving the efficiency through the alternative means identified, and state any reasons why the efficiency could not be achieved by alternative means;

(vi) identify all costs of achieving the efficiency, stating separately and describing each one-time fixed cost, recurring fixed cost, and variable cost, all in dollars per unit;

(vii) state whether the company claims that achieving the efficiency will increase competition for the relevant product in any relevant area and, if the company so claims, explain in detail the basis of the claim, identifying with particularity each area in which the company claims competition will increase;

(viii) if the company claims that the efficiency will increase competition for products or services other than the relevant product, or for the relevant product in areas other than the relevant areas, so state, identifying the other products, services, or areas in which the company claims competition will be enhanced and explaining in detail the basis of the claim; and

(ix) identify all persons: (a) knowledgeable about the statements made in subparts (i) - (viii), or (b) employed or retained by the company and having any responsibility for achieving, analyzing, quantifying, or implementing the claimed efficiency; and

(b) all documents relating to contemplated efficiencies in the production, distribution, or sale of the relevant product that will be achieved because of the acquisition.

33.     List each of the company's prior acquisitions and describe each efficiency (including cost savings, new product or service introductions, and product or service improvements) that was derived from each such acquisition, including in the description:

(a) the steps that the company took to achieve the efficiency and the time and costs required to achieve it;

(b) the dollar value of the efficiency and a detailed explanation of how that was calculated;

(c) an explanation of how each prior acquisition helped the company achieve the efficiency;

(d) the reason(s) the company could not have achieved the efficiency without the prior acquisition;

(e) the proportion of the dollar value of the efficiency that the company passed on to consumers and the manner and form (e.g., lower prices, better service) in which the company passed on the efficiency;

(f) the identity of each person (including the person's title and business address) employed or retained by the company (including the company's counsel) with any responsibility for achieving, analyzing or quantifying any efficiency described; and

(g) for each efficiency that involved cost savings, state separately (i) the one time fixed cost savings and (ii) the variable cost savings (in dollars per unit and dollars per year).

34. Submit all documents relating to any plans of, interest in, or efforts undertaken by the company or any other person for any acquisition, divestiture, joint venture, alliance or merger of any kind involving the manufacture or sale of any interactive video games other than the acquisition of Take-Two by Electronic Arts.

35. Describe and submit all documents relating to the company's plans or attempts to: reduce its costs; improve products or services; expand its sales or distribution efforts; introduce new products; improve its operating performance, financial condition, or competitive viability; or become more competitive in any other way, including, but not limited to, plans or attempts to close, consolidate or rationalize any facility, discontinue the research, development, manufacture or sale of any relevant product, research, develop, manufacture or sell any relevant product in conjunction with any other product or service.

36. Submit all documents previously submitted electronically to the Federal Trade Commission in conjunction with this investigation to the extent that previously submitted documents were not submitted in a machine-readable format as required in Instruction U.

37. Submit documents sufficient to show and, to the extent not reflected in such documents, describe in detail the company's policies and procedures relating to the retention and destruction of documents.

38. List: (a) each federal judicial district (e.g., District of Columbia, Southern District of New York) within the United States in which the company has an agent to receive service of process as well as each such agent's name, current business and home addresses, and telephone numbers; (b) each federal judicial district within the United States in which the company is incorporated or licensed to do business or currently is doing business; and (c) each federal judicial district within the United States in which the company has an office or a facility, and, for each such office or facility, list the address and the individual in charge (with his or her title).

39. Identify the person(s) responsible for preparing the response to this Request, describe in detail the steps taken by the company to respond to this Request, and submit a copy of all instructions prepared by the company relating to the steps taken to respond to this Request, including instruction pertaining to document (written and electronic) and information preservation. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were

given. For each specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and corporate title or job description) whose files were searched by each person.

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this Request, the following definitions and instructions apply:

A.    The term "the company" or "Take-Two" means Take-Two Interactive Software, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Take-Two and any other person.

B.    The term "Electronic Arts" means Electronic Arts, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

C.    The term "documents" means all computer files and written, recorded, and graphic materials of every kind in the possession, custody or control of the company. The term "documents" includes, without limitation: electronic mail messages; electronic correspondence and drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody or control of the company.

(1) Unless otherwise specified, the term "documents" excludes (a) bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature; (b) architectural plans and engineering blueprints; and (c) documents solely relating to tax, human resources, OSHA, or ERISA issues.

(2) The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. Thus, the company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off company premises. If the company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this instruction with the Commission representatives identified on the last page of this Request. The Commission representative will consider modifying this instruction to:

15

(a) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the company;

(b) limit the portion of backup disks and tapes and archive disks and tapes that need to be searched and produced to certain key individuals, or certain time periods or certain specifications identified by Commission representatives; or

(c) include other proposals consistent with Commission policy and the facts of the case.

(3) If the company intends to utilize any De-duplication or Near-de-duplication software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media in response to this Request, or if the company's computer systems contain or utilize such software, the company must contact Commission representatives to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this Request.

D.     The term "advertisement" shall mean any written or verbal statement, illustration, or depiction, that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, film, slide, audio program transmitted over a telephone system, telemarketing script, onhold script, upsell script, training materials provided to telemarketing firms, program-length commercial ("infomercial"), the Internet, or any other medium. Promotional materials and items, and Web pages are included in the term "advertisement."

E     The term "promotional material" shall mean any expenditure, written or verbal statement, illustration, or depiction, that is designed to create interest in the purchasing of goods, including but not limited to, press releases, video news releases, and other communications with any print, television, or radio media, or any website designer, developer, manager, or host, or any online service, coupons, and payments for shelf space or product placement in any media.

F.     A "copy" of an "advertisement" shall mean:

(1) In the case of print ads, including transit/outdoor, direct mail, and free standing inserts, the ad in the form made available for customers to read.

(2) In the case of radio ads, a compact disc (CD) recording and a written script.

(3) In the case of television ads and infomercials, a DVD, as well as a photoboard or a transcription of the advertisement.

(4) In the case of ads displayed or accessible as Web pages on the Internet or in a similar format on a commercial online service, a printout of all screens or pages displayed or accessible online; the date the information was initially placed online; all information necessary to view or access the information online (*i.e.* for Web pages, all electronic addresses, or URLs, at which the information is accessible, including any "mirrored" sites and *all documents showing metatags for the pages*). For similar advertising on commercial online services, provide the name of the commercial online services and the appropriate "Key" "Go" or "Jump" words; a transcript of any audio or video clips contained in the screens or pages, and identification of any audio, video, or other programs necessary to hear or view the clips; the name, mailing address, and telephone number of any entity with whom you arranged for placement of the information online (*i.e.* the owner of the Internet domain name(s) and, if different, the owner of the server(s) through which the Web page is made accessible on the Internet).

(5) In the case of files archived or accessible online (*e.g.* at FTP sites, on bulletin boards, or as part of a Web page), the filename and file date of the file, along with the date it initially was posted online; a printout of the file, if feasible; all information necessary to locate, download, and view the file, including, where applicable, the name of the bulletin board and the category, topic, or file area where the file is located; and the identity of any software necessary to decompress the files. In the case of files archived on forums or bulletin boards found in commercial online services, provide the name of the online service and the "Key" "Go" or "Jump" words to access the bulletin board; in the case of files archived or accessible on the Internet at FTP sites, at USENET sites, or on Web pages, all electronic addresses at which the file is available, including any "mirrored" sites; in the case of files archived on dial-in bulletin boards, provide the telephone number to access the bulletin board, and the name, business telephone number, and mailing address of the owner or operator of the bulletin board.

(6) In the case of messages posted on bulletin boards, a printout of the message posted, the date(s) it was posted, and information sufficient to locate and access the bulletin board areas where the information was posted.

(7) In the case of messages disseminated via e-mail, a printout of the e-mail message, the date(s) it was sent, and the electronic address from which the message was sent. In addition, if a LISTSERV or other mass mailing mechanism was utilized, provide the name of the LIST used to send the message, the e-mail address for subscribing to the LISTSERV or similar mechanism, and, if different, the e-mail address to which messages are submitted for mass mailing.

G. The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

H. The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

I. The terms "and" and "or" have both conjunctive and disjunctive meanings.

J. The term "plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

K. The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company in the same manufactured form as purchased.

L. The term "platform" as used herein includes, and information shall be provided separately for:

(1) consoles, and within consoles, information shall be provided separately for: PS2, PS3, XBOX, XBOX360, Wii, and all other types of consoles (specifying each such type);

(2) personal computers ("PC");

(3) hand-held computers, and within hand-held computers, information shall be provided separately for: Playstation Portable ("PSP"), Nintendo Handheld ("NDS"), Gameboy Adventure ("GBA"), and all other types of hand held computers (specifying each such type);

(4) mobile devices and within mobile devices, information shall be provided separately for: cellular telephones, and all other types of mobile devices (specifying each such type); and

(5) digital content, and within digital content, information shall be provided separately for: game titles that are also sold as packaged goods which are downloaded, and games titles that are played online through hosted sites.

M. The term "genre" as used herein includes, and information shall be provided separately for:

(1) action, and within action, information shall be provided separately for: each sub-genre (specifying each such sub-genre);

(2) sports, and within sports, <u>information shall be provided separately for</u> each type of sports game (e.g, football, basketball, baseball, hockey, soccer, tennis, golf, etc.), and within each type of sports game <u>information shall be provided separately for</u> simulation games and arcade-style games;

(3) shooter, and within shooter, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(4) role-playing game ("RPG"), and within RPG, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(5) racing, and within racing, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(6) strategy, and within strategy, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(7) family entertainment, and within family entertainment, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre); and

(8) and all other types of genres (specifying each such type).

N.     The term "game rating" as used herein means, <u>and information shall be provided separately for</u>; Early Childhood ("EC"), Everyone ("E"), Everyone 10+ ("E10+"), Teen ("T"), Mature ("M"), and Adult Only ("AO").

O.     The term "relevant product" as used herein means each individual video game title, which includes game titles scheduled to be released over the next two years, in active development now, and contemplated for development (in whole or in part) over the next two years. For each individual video game title, <u>information shall be provided separately</u> by platform.

P.     The term "relevant area" means, <u>and information shall be provided separately for</u>: (a) the United States; (b) worldwide; and (c) each area as to which the company collects and maintains information and data within the United States.

Q.     The term "minimum viable scale" means the smallest amount of production at which average costs equal the price currently charged for the relevant product. It should be noted that minimum viable scale differs from the concept of minimum efficient scale, which is the smallest scale at which average costs are minimized.

R.      The term "sunk costs" means the acquisition costs of tangible and intangible assets necessary to manufacture and sell the relevant product that cannot be recovered through the redeployment of these assets for other uses.

S.      All references to year refer to calendar year. Unless otherwise specified, each of the specifications calls for: (1) documents for each of the years from January 1, 2004 to the present; and (2) information for each of the years from January 1, 2004 to the present.  Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date.  If calendar year information is not available, supply the company's fiscal year data indicating the twelve month period covered, and provide the company's best estimate of calendar year data.

T.      This Request shall be deemed continuing in nature so as to require production of all documents responsive to any specification included in this Request produced or obtained by the company up to forty-five calendar days prior to the date of the company's full compliance with this Request.

U.      The company shall discuss the form and method of production of responsive documents with the Commission representative identified on the last page of this request.  The company shall be permitted to use any form and method of production of responsive documents that the Commission representative approves in writing.  The Commission can support the following production forms and methods:

    (1) In lieu of original paper documents, the company may submit either paper or electronic copies of original documents. If the documents are provided electronically as TIFF images, they should be accompanied by OCR;

    (2) In lieu of original documents stored electronically, the company may submit documents in the following forms:

        (a) Electronically stored documents, except Microsoft Excel files and Access databases, may be produced as single-page TIFF images with a corresponding file containing the extracted text from the document, accompanied by a Opticon load file. Metadata and custodian information shall be provided in a delimited ASCII format. Microsoft Excel and Access files shall be provided natively.

        (b) Electronically stored documents, excluding e-mail other than Microsoft Outlook, may be produced natively.  Please discuss logistics of native production with the commission representative identified on the last page of this request.

    (3) Electronic productions may be submitted in the following methods:

20

(a) Responsive documents may be submitted through an online repository maintained by an independent vendor;

(b) Responsive documents may be submitted directly to the Commission on any combination of the listed media types; however, the Commission prefers IDE hard drives for productions over 10GB:

- CD-R CD-ROM formatted to ISO 9660 specifications;
- DVD-ROM for Windows-compatible personal computers;
- IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data;
- USB 2.0 Flash Drives;

(4) All electronic files submitted in response to this request will be scanned for viruses. Media containing infected files will be returned for replacement.

(5) Documents submitted in hard copy shall be submitted in sturdy cartons not larger than 1.5 cubic feet. Number each such box and mark each such box with corporate identification and the name(s) of the person(s) whose files are contained in the box.

V.    All documents responsive to this request, regardless of format or form and regardless of whether submitted in paper or electronic form:

(1) shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged. For example:

(a) if in their original condition papers were stapled, clipped or otherwise fastened together or maintained in file folders, binders, covers or containers, they shall be produced in such form, and any documents that must be removed from their original folders, binders, covers or containers in order to be produced shall be identified in a manner so as to clearly specify the folder, binder, cover or container from which such documents came; and

(b) if in their original condition electronic documents were maintained in folders or otherwise organized, they shall be produced in such form and information shall be produced so as to clearly specify the folder or organization format;

(2) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

(3) shall be produced in color where necessary to interpret the document;

21

(4) shall be marked on each page with corporate identification and consecutive document control numbers;

(5) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct and complete copies of the original documents;

(6) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that Commission representatives determine prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request.

W.      If any documents created prior to the company's Hart-Scott-Rodino filing are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log (hereinafter "Complete Log") that includes each document's authors, addressees, date, a description of each document, and all recipients of the original and any copies. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed. For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing the company that were not directly or indirectly furnished to the company or any third-party, such as internal law firm memoranda, may be omitted from the log.

In place of a Complete Log of all documents withheld from production based on a claim of privilege, the company may elect to submit a Partial Privilege Log ("Partial Log") for each person searched by the company whose documents are withheld based on such claim and a Complete Log for a subset of those persons, as specified below:

(1) The Partial Log will contain the following information: (a) the name of each person from whom responsive documents are withheld on the basis of a claim of privilege; and (b) the total number of documents that are withheld under a claim of privilege (stating the

22

number of attachments separately) contained in each such person's files. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

(2) Within five (5) business days after receipt of the Partial Log, Commission staff may identify in writing five individuals or ten percent of the total number of persons searched, whichever is greater, for which the company will be required to produce a Complete Log in order to certify compliance with this Request.

(3) For the company to exercise the option to produce a Partial Log, the company must provide a signed statement in which the company acknowledges and agrees that, in consideration for being permitted to submit a Partial Log:

(a) the Commission retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the Commission seeks relief through judicial or administrative proceedings;

(b) the company will produce a Complete Log of all documents withheld from production based on a claim of privilege no later than fifteen (15) calendar days after such a discovery request is served, which will occur promptly after the filing of the Commission's complaint; and

(c) the company waives all objections to such discovery, including the production of a Complete Log of all documents withheld from production based on a claim of privilege, except for any objections based strictly on privilege.

(4) The company must retain all privileged documents that are responsive to this Request until the expiration of the Hart-Scott-Rodino waiting period or the completion of any litigation challenging the acquisition of Take-Two by Electronic Arts.

(5) The Commission retains the right to require the company to produce a Complete Log for all persons searched in appropriate circumstances.

X.    If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

23

Y.        If documents responsive to a particular specification no longer exist for reasons other
than the ordinary course of business or the implementation of the company's document retention
policy as disclosed or described in response to Specification 37 of this Request, but the company
has reason to believe have been in existence, state the circumstances under which they were lost
or destroyed, describe the documents to the fullest extent possible, state the specification(s) to
which they are responsive, and identify persons having knowledge of the content of such
documents.

Z.        Unless specifically requested by a specification in this Second Request, do not produce
any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health
Information ("SHI") prior to discussing the information with a Commission representative. If
any document responsive to a particular specification contains unresponsive Sensitive PII or
SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

        For purposes of this Second Request, Sensitive PII means an individual's Social Security
Number alone; or an individual's name or address or phone number in combination with one or
more of the following: date of birth, Social Security Number, driver's license number or other
state identification number or a foreign country equivalent, passport number, financial account
number, credit or debit card number. For purposes of this Second Request, SHI includes medical
records or other individually identifiable health information relating to the past, present, or
future physical or mental condition of an individual, or the past, present, or future payment for
the provision of health care to an individual.

AA.       In order for the company's response to this Request to be complete, the attached
certification form must be executed by the official supervising compliance with this Request,
notarized, and submitted along with the responsive materials.

        Any questions you have relating to the scope or meaning of anything in this Request or
suggestions for possible modifications thereto should be directed to Victoria Lippincott at 202-
326-2983 or Ben Lorigo at 202-326-3717. The response to the Request shall be addressed to the
attention of Victoria Lippincott or Ben Lorigo and delivered between 8:30 a.m. and 5:00 p.m. on
any business day to Federal Trade Commission. If you wish to submit your response by United
States mail, please call one of the staff listed above for mailing instructions.

## CERTIFICATION

As required by § 803.6 of the implementing rules for the Hart-Scott-Rodino Antitrust Improvements Act of 1976, this response to the Request for Additional Information and Documentary Material, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Federal Trade Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required information, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Commission uses such copies in any court or administrative proceeding, the company will not object based on the Commission not offering the original document.

_____
(Signature)

_____
(Type or Print Name and Title)

Subscribed and sworn to before me at the City of _____,

State of _____, this _____day of _____, 19_____.

_____
(Notary Public)

_____
(Date Commission Expires)

25

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 18



# SUBPOENA DUCES TECUM

| 1. TO | 2. FROM |
|---|---|
| Take-Two Interactive Software, Inc.<br>c/o Alicia Batts, Esquire<br>Proskauer Rose LLP<br>1001 Pennsylvania Avenue, NW<br>Suite 400 South<br>Washington, DC 20004 | UNITED STATES OF AMERICA<br>FEDERAL TRADE COMMISSION |

This subpoena requires you to appear and testify at the request of the Federal Trade Commission at a hearing [or deposition] in the proceeding described in Item 6.

| 3. LOCATION OF HEARING | 4. YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| Federal Trade Commission<br>601 New Jersey Ave., Room 6128<br>Washington, DC 20001 | Reid B. Horwitz |
| | 5. DATE AND TIME OF HEARING OR DEPOSITION |
| | 9:00 a.m May 9, 2008 |

**6. SUBJECT OF INVESTIGATION**

Electronic Arts Inc.'s Proposed Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

**7. RECORDS YOU MUST BRING WITH YOU**

See attached "Specifications, Definitions and Instructions."

| 8. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 9. COMMISSION COUNSEL |
|---|---|
| Robert Tovsky, Custodian<br>Reid H. Horwitz, Deputy Custodian | Reid B. Horwitz (202) 326-2037<br>E. Eric Elmore (202) 326-3109 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 4/21/08 | *Pamela J. ...* |

## GENERAL INSTRUCTIONS

The delivery of this subpoena to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this subpoena be filed within 20 days after service or, if the return date is less than 20 days after service, prior to the return date. The original and ten copies of the petition must be filed with the Secretary of the Federal Trade Commission. Send one copy to the Commission Counsel named in Item 9.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this subpoena should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this subpoena and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

This subpoena does not require approval by OMB under the Paperwork Reduction Act of 1980.

FTC Form 68-B (rev. 9/92)

## RETURN OF SERVICE

*I hereby certify that a duplicate original of the within
subpoena was duly served:*   (check the method used)

○  *in person.*

○  *by registered mail.*

○  *by leaving copy at principal office or place of business, to wit:*

-------------------------------------------------------

-------------------------------------------------------

-------------------------------------------------------

-------------------------------------------------------

*on the person named herein on:*

-------------------------------------------------------------------------------
(Month, day, and year)

-------------------------------------------------------------------------------
(Name of person making service)

-------------------------------------------------------------------------------
(Official title)

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Unless modified by agreement with the staff of the Federal Trade Commission, each specification of this Subpoena *Duces Tecum* ("Subpoena") requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions, which appear after the following Specifications. If the company believes that the required search or any other part of the Subpoena can be narrowed in any way that is consistent with the Commission's need for documents, you are encouraged to discuss such questions and possible modifications with the Commission representative identified on the last page of this Subpoena. All modifications to this Subpoena must be agreed to in writing by such representative. You may find it useful to provide the response to Specification 1 of this Subpoena promptly and discuss limiting the required search with the Commission's representative before you begin your search.

## SPECIFICATIONS

1.  Submit one copy of each organization chart and personnel directory in effect since January 1, 2004, for the company as a whole and for each of the company's facilities or divisions involved in any activity relating to any relevant product in any relevant area.

2.  Submit all NPD (or equivalent) data that contains information on any relevant product in electronic format for each month and year since January 1, 1998.

3.  For each relevant product submit all documents relating to formulas, models and programs used to make determinations about each discount and allowance, including but not limited to, rebates, promotional allowances, merchandising discounts, and co-op advertising. Submit all documents relating to the methodology for determining each of these discounts and allowances, including the extent to which the existence of other titles in a given genre factor into such determinations.

4.  For each relevant product, provide the following:

    (a) all documents relating to price sensitivity, price elasticity, price points, or product substitution, of any of the company's relevant products;

    (b) all data compilations and underlying programs or models relating to price sensitivity, price elasticity, price points, wholesale pricing or production substitution, of any of the company's relevant products, developed by, used by, or obtained by the company or any agent of the company;

    (c) all documents relating to the company's or any other person's prices, including but not limited to, price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, pricing analyses, market price indices or periodic market prices, and pricing decisions relating to any relevant product; and

    (d) all documents relating to the company's compliance with the Robinson-Patman Act.

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

To the extent that any pricing analysis was performed using computerized data, submit the underlying data. Documents, programs, and information submitted, used, generated or obtained in electronic form should be produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

5.    For each of the company's 20 largest wholesale customers:

    (a)  submit each contract or promotional agreement currently in place, or previously in effect for any period beginning January 1, 2006; and

    (b)  provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement.

6.    For each of the company's 20 largest retail customers:

    (a) submit each contract or promotional agreement currently in place, or in effect for any period beginning January 1, 2006; and

    (b) provide all documents relating to negotiation of the contract or promotional agreement, the implementation of the contract or promotional agreement, and the customer's compliance (or non-compliance) with the terms of the contract or promotional agreement.

7.    Submit a copy of each relevant product and all packaging used for such product in the sports, shooter, strategy, racing and action genres.

8.    Submit each different advertisement or promotional material for each relevant product in the sports, shooter, strategy, racing and action genres in any medium, including but not limited to, newspapers, television, radio, telephone, direct mail, the Internet, or electronic mail.

9.    Submit a copy of all documents relating to marketing and advertising plans for each relevant product in the sports, shooter, strategy, racing and action genres that discuss or reference competition with, how to compete with, or how to market or advertise against other relevant products. Such documents include, but are not limited to, materials about advertising and marketing strategies, themes, or concepts, media recommendations and plans, marketing reports, business studies, and creative strategies that describe or discuss the planned or actual approaches for advertising, marketing, or promoting the product.

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

10.    Submit a copy of all consumer research concerning all relevant products, including but not limited to: all materials relating to consumer perceptions, preferences, and beliefs about such product(s); data and analyses relating to consumer demographics, target markets, customer type, purchasing patterns, or switching behavior, including but not limited to, switching from or to any relevant product; and consumer surveys, marketing surveys and reports.

11.    Submit all analyst reports that discuss any aspect of the video gaming industry, including but not limited to, any competitors within the industry or the acquisition of Take-Two by Electronic Arts.

12.    Submit all documents relating to the company's concerns, expressed or otherwise, over Electronic Arts' procurement of exclusive licensing agreements involving professional sports leagues and sports brands, including but not limited to, all correspondence and communications with the U.S. Department of Justice, Federal Trade Commission, or any other entity, and all documents and analyses relating to the effects such exclusive licensing agreements might have, or had, on the company's business or on competition within the video game software industry.

13.    Submit all documents relating to vendor participation with retailers on product placement in a store, through category management, category captaincy, vendor participation, or other similar activities. Provide all documents produced to retailers for whom the company acts as a category captain or any type of category supervisor, and all documents (whether internal or otherwise) that incorporate such activities.

14.    Provide all documents comparing the company's video game titles in sports, shooter, strategy, racing, and action genres with those of any of other person.

15.    Submit all documents relating to the company's or any other person's plans relating to any relevant product, including but not limited to: business plans; short term and long range strategies and objectives; investment banker and/or other consultant reports; title, genre, brand, or platform-specific plans; marketing plans; advertising plans and strategies, including all expenditures on advertising, selling aids and promotional materials; legislative affairs plans; purchasing plans; collaboration plans; budgets and financial projections; expansion or retrenchment plans; research and development efforts; and presentations to management committees, executive committees, and boards of directors. For regularly prepared budgets and financial projections, the company need only submit one copy of final year-end documents and cumulative year to date documents for the current year.

16.    Provide all of the following reports: financial statement, budget, profit and loss statement, customer or product line profitability report, and each other financial report regularly

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

prepared by or for the company on any periodic basis that relates to the production, manufacture and sale of any relevant product, or the manufacturing facility, sales office, distribution center, product line, or customer for any relevant product on both a quarterly basis and a yearly basis since January 1, 2003. If available, these reports should be provided in an electronic spreadsheet format acceptable to the Commission.

17. Submit all documents relating to competition in the relevant product, including but not limited to, market studies, forecasts and surveys, and all other documents relating to: (a) the market share or competitive position of the company and any of its competitors; (b) the relative strength or weakness of companies selling or offering each relevant product; (c) supply and demand conditions; (d) allegations by any person that any company that sells or offers any relevant product is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints, threatened, pending or completed lawsuits, and federal and state investigations; (e) competition between any relevant product and any other product, such as music videos, movie videos, music or video downloads, or other entertainment products; (f) any actual or potential effect on the supply, demand, cost or price of any relevant product, as a result of competition from any other possible substitute product; (g) any actual or potential effect on supply or demand as a result of the wholesale or retail price or fee schedule of a relevant product; (h) attempts to win customers from other companies and losses of customers to other companies including, but not limited to, all sales personnel call reports; (i) product reviews; (j) the development, marketing, advertising, and value of each company brand, including brand equity studies; (k) competition to reduce the number of "glitches" in products; (l) NPD reports or studies; (m) differences in purchasing preferences and product demand between consumers inside and outside the United States; and (n) discussions in any forum including internet forums such as web logs ("blogs"), message boards, discussion boards, discussion groups or forums, bulletin boards, or any other type of internet communication.

18. Submit all documents relating to any Intellectual Property ("IP") agreements relating to the relevant product, including but not limited to, the actual agreements, negotiations over such agreements, and how such agreements would or could impact competition.

19. For any relevant product, submit all documents relating to economies of scale and economies of scope, including advantages of producing, selling, or distributing multiple relevant products.

20. For each relevant product submit all documents relating to:

(a) requirements for entry into the development, production, sale, or distribution of the relevant product in each relevant area, including but not limited to, research and development, planning and design, production requirements, personnel, distribution sys-

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

tems, reputation, patents, licenses, sales and marketing activities, development of databases and customer support systems, development of an Internet site, and any necessary governmental and customer approvals, and the components of, and time necessary to meet, each such requirement;

(b) the total costs required for entry into the development, production, sale or distribution of the relevant product; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the development, production or sale of the product; the methods and amount of time necessary to recover such costs; and the total sunk costs entailed in satisfying the requirements for entry;

(c) possible new entrants into the development, production, sale or distribution of the relevant product in each relevant area; and an estimate of the time it would take each such potential entrant to (i) produce a commercially viable product and (ii) achieve competitively significant sales of that product (including a detailed description of the bases for each estimate);

(d) the minimum viable scale, the minimum and optimum research and development organization, sales volume, requirements for multi-center, or vertically integrated operations; or other factors required to attain any available cost savings or other efficiencies necessary to compete profitably in providing the relevant product;

(e) the extent to which a new entrant into the development, production, manufacture or sale of any relevant product would benefit from also being (or would suffer a disadvantage from not also being) a developer, producer or seller of any other relevant product or any product or service purchased, used or sold in conjunction with any relevant product; and

(f) any programs and/or models used to analyze the development potential of relevant products.

The company shall provide its response to this specification in terms of entry that would enable an entrant to develop, produce and sell products that compete directly (including, but not limited to, competition on performance and price) with each relevant product developed, produced, provided or sold by Take-Two. If the company contends that entry by entrants that do not compete directly may have competitive significance, then the company shall provide documents relating to each form of such entry.

21.   Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product submitted by the company or any other person to all trade associations, information services, and other organizations relating to the research, development,

5

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

production, license, or sale of any relevant product association, service, and organization or its agent. Submit one copy of all documents that discuss or describe research, development, production, licensing, sale, prices, competition, or entry conditions relating to any relevant product received by the company or any other person from each such association, service, and organization or its agent.

22. For each business consultant, investment banker, and economic consultant (collectively "consultant") identified in response to Specification 1 of the CID issued to the company together with this Subpoena and that was engaged by the company with respect to the proposed acquisition of Take-Two by Electronic Arts, submit (a) all documents and data provided to and received from each such consultant; and (b) all reports and analyses generated by, and the underlying econometric programs, models and data used by, any such consultant to generate such reports and analyses. Documents, programs, and information submitted, used, generated or obtained in electronic form should be printed and produced in hard copy and produced in electronic form together with instructions, programs, and all other materials necessary to use or interpret the data or analyses provided in electronic form.

23. Submit all documents (except documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues) relating to the proposed acquisition by Electronic Arts of Take-Two.

24. Submit all documents relating to contemplated efficiencies in the production, distribution, or sale of the relevant product that will be achieved because of the acquisition.

25. Submit all documents relating to any plans of, interest in, or efforts undertaken by the company or any other person for any acquisition, divestiture, joint venture, alliance or merger of any kind involving the manufacture or sale of any interactive video games other than the acquisition of Take-Two by Electronic Arts.

26. Submit all documents relating to the company's plans or attempts to: reduce its costs; improve products or services; expand its sales or distribution efforts; introduce new products; improve its operating performance, financial condition, or competitive viability; or become more competitive in any other way, including, but not limited to, plans or attempts to close, consolidate or rationalize any facility, discontinue the research, development, manufacture or sale of any relevant product, research, develop, manufacture or sell any relevant product in conjunction with any other product or service.

27. Submit all documents previously submitted electronically to the Federal Trade Commission in conjunction with this investigation to the extent that previously submitted documents were not submitted in a machine-readable format as required in Instruction X.

6

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

28.     Submit documents sufficient to show the company's policies and procedures relating to the retention and destruction of documents.

29.     Submit a copy of all instructions prepared by the company relating to the steps taken to respond to this Subpoena, including instruction pertaining to document (written and electronic) and information preservation.

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this Subpoena, the following definitions and instructions apply:

A.     The term "the company" or "Take-Two" means Take-Two Interactive Software, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Take-Two and any other person.

B.     The term "Electronic Arts" means Electronic Arts, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

C.     The term "Subpoena *Duces Tecum*" or "Subpoena" means this Subpoena *Duces Tecum*.

D.     The term "Civil Investigative Demand" or "CID" means the Civil Investigative Demand issued by the Federal Trade Commission to the company together with this Subpoena *Duces Tecum*.

E.     The term "proposed acquisition" means the proposed acquisition of certain stock or assets of Take-Two as described in Item 3(a) of the company's Premerger Notification and Report Form.

F.     The term "documents" means all computer files and written, recorded, and graphic materials of every kind in the possession, custody or control of the company. The term "documents" includes, without limitation: electronic mail messages; electronic correspondence and drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody or control of the company.

7

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(1) Unless otherwise specified, the term "documents" excludes (a) bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature; (b) architectural plans and engineering blueprints; and (c) documents solely relating to tax, human resources, OSHA, or ERISA issues.

(2) The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. Thus, the company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off company premises. If the company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this instruction with the Commission representatives identified on the last page of this Subpoena. The Commission representative will consider modifying this instruction to:

> (a) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the company;

> (b) limit the portion of backup disks and tapes and archive disks and tapes that need to be searched and produced to certain key individuals, or certain time periods or certain specifications identified by Commission representatives; or

> (c) include other proposals consistent with Commission policy and the facts of the case.

(3) If the company intends to utilize any De-duplication or Near-de-duplication software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media in response to this Subpoena, or if the company's computer systems contain or utilize such software, the company must contact Commission representatives to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this Subpoena.

G.     The term "advertisement" shall mean any written or verbal statement, illustration, or depiction, that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display,

8

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

film, slide, audio program transmitted over a telephone system, telemarketing script, onhold script, upsell script, training materials provided to telemarketing firms, program-length commercial ("infomercial"), the Internet, or any other medium. Promotional materials and items, and Web pages are included in the term "advertisement."

H.     The term "promotional material" shall mean any expenditure, written or verbal statement, illustration, or depiction, that is designed to create interest in the purchasing of goods, including but not limited to, press releases, video news releases, and other communications with any print, television, or radio media, or any website designer, developer, manager, or host, or any online service, coupons, and payments for shelf space or product placement in any media.

I.     A "copy" of an "advertisement" shall mean:

 ·(1)  In the case of print ads, including transit/outdoor, direct mail, and free standing inserts, the ad in the form made available for customers to read.

 (2)  In the case of radio ads, a compact disc (CD) recording and a written script.

 (3)  In the case of television ads and infomercials, a DVD, as well as a photoboard or a transcription of the advertisement.

 (4)  In the case of ads displayed or accessible as Web pages on the Internet or in a similar format on a commercial online service, a printout of all screens or pages displayed or accessible online; the date the information was initially placed online; all information necessary to view or access the information online (*i.e.* for Web pages, all electronic addresses, or URLs, at which the information is accessible, including any "mirrored" sites and *all documents showing metatags for the pages*). For similar advertising on commercial online services, provide the name of the commercial online services and the appropriate "Key" "Go" or "Jump" words; a transcript of any audio or video clips contained in the screens or pages, and identification of any audio, video, or other programs necessary to hear or view the clips; the name, mailing address, and telephone number of any entity with whom you arranged for placement of the information online (*i.e.* the owner of the Internet domain name(s) and, if different, the owner of the server(s) through which the Web page is made accessible on the Internet).

 (5) In the case of files archived or accessible online (*e.g.* at FTP sites, on bulletin boards, or as part of a Web page), the filename and file date of the file, along with the date it initially was posted online; a printout of the file, if feasible; all information necessary to locate, download, and view the file, including, where applicable, the name of the bulletin board and the category, topic, or file area where the file is located; and the identity of any software necessary to decompress the files. In the case of files archived on forums or bulletin boards found in commercial online services, provide the name of the online

9

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

service and the "Key" "Go" or "Jump" words to access the bulletin board; in the case of files archived or accessible on the Internet at FTP sites, at USENET sites, or on Web pages, all electronic addresses at which the file is available, including any "mirrored" sites; in the case of files archived on dial-in bulletin boards, provide the telephone number to access the bulletin board, and the name, business telephone number, and mailing address of the owner or operator of the bulletin board.

(6) In the case of messages posted on bulletin boards, a printout of the message posted, the date(s) it was posted, and information sufficient to locate and access the bulletin board areas where the information was posted.

(7) In the case of messages disseminated via e-mail, a printout of the e-mail message, the date(s) it was sent, and the electronic address from which the message was sent. In addition, if a LISTSERV or other mass mailing mechanism was utilized, provide the name of the LIST used to send the message, the e-mail address for subscribing to the LISTSERV or similar mechanism, and, if different, the e-mail address to which messages are submitted for mass mailing.

J.       The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

K.       The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

L.       The terms "and" and "or" have both conjunctive and disjunctive meanings.

M.       The term "plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

N.       The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company in the same manufactured form as purchased.

O.       The term "platform" as used herein includes, and information shall be provided separately for:

(1) consoles, and within consoles, information shall be provided separately for: PS2, PS3, XBOX, XBOX360, Wii, and all other types of consoles (specifying each such type);

(2) personal computers ("PC");

10

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(3) hand-held computers, and within hand-held computers, information shall be provided separately for: Playstation Portable ("PSP"), Nintendo Handheld ("NDS"), Gameboy Adventure ("GBA"), and all other types of hand held computers (specifying each such type);

(4) mobile devices and within mobile devices, information shall be provided separately for: cellular telephones, and all other types of mobile devices (specifying each such type); and

(5) digital content, and within digital content, information shall be provided separately for: game titles that are also sold as packaged goods which are downloaded, and games titles that are played online through hosted sites.

P.    The term "genre" as used herein includes, and information shall be provided separately for:

(1) action, and within action, information shall be provided separately for: each sub-genre (specifying each such sub-genre);

(2) sports, and within sports, information shall be provided separately for each type of sports game (e.g, football, basketball, baseball, hockey, soccer, tennis, golf, etc.), and within each type of sports game information shall be provided separately for simulation games and arcade-style games;

(3) shooter, and within shooter, information shall be provided separately for each sub-genre (specifying each such sub-genre);

(4) role-playing game ("RPG"), and within RPG, information shall be provided separately for each sub-genre (specifying each such sub-genre);

(5) racing, and within racing, information shall be provided separately for each sub-genre (specifying each such sub-genre);

(6) strategy, and within strategy, information shall be provided separately for each sub-genre (specifying each such sub-genre);

(7) family entertainment, and within family entertainment, information shall be provided separately for each sub-genre (specifying each such sub-genre); and

(8) and all other types of genres (specifying each such type).

Q.    The term "game rating" as used herein means, and information shall be provided

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

separately for: Early Childhood ("EC"), Everyone ("E"), Everyone 10+ ("E10+"), Teen ("T"), Mature ("M"), and Adult Only ("AO").

R.    The term "relevant product" as used herein means each individual video game title, which includes game titles scheduled to be released over the next two years, in active development now, and contemplated for development (in whole or in part) over the next two years. For each individual video game title, information shall be provided separately by platform.

S.    The term "relevant area" means, and information shall be provided separately for: (a) the United States; (b) worldwide; and (c) each area as to which the company collects and maintains information and data within the United States.

T.    The term "minimum viable scale" means the smallest amount of production at which average costs equal the price currently charged for the relevant product. It should be noted that minimum viable scale differs from the concept of minimum efficient scale, which is the smallest scale at which average costs are minimized.

U.    The term "sunk costs" means the acquisition costs of tangible and intangible assets necessary to manufacture and sell the relevant product that cannot be recovered through the redeployment of these assets for other uses.

V.    All references to year refer to calendar year. Unless otherwise specified, each of the specifications calls for documents for each of the years from January 1, 2004 to the present.

W.    This Subpoena shall be deemed continuing in nature so as to require production of all documents responsive to any specification included in this Subpoena produced or obtained by the company up to forty-five calendar days prior to the date of the company's full compliance with this Subpoena.

X.    The company shall discuss the form and method of production of responsive documents with the Commission representative identified on the last page of this Subpoena. The company shall be permitted to use any form and method of production of responsive documents that the Commission representative approves in writing. The Commission can support the following production forms and methods:

    (1) In lieu of original paper documents, the company may submit either paper or electronic copies of original documents. If the documents are provided electronically as TIFF images, they should be accompanied by OCR;

    (2) In lieu of original documents stored electronically, the company may submit documents in the following forms:

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(a) Electronically stored documents, except Microsoft Excel files and Access databases, may be produced as single-page TIFF images with a corresponding file containing the extracted text from the document, accompanied by a Opticon load file. Metadata and custodian information shall be provided in a delimited ASCII format. Microsoft Excel and Access files shall be provided natively.

(b) Electronically stored documents, excluding e-mail other than Microsoft Outlook, may be produced natively. Please discuss logistics of native production with the commission representative identified on the last page of this subpoena.

(3) Electronic productions may be submitted in the following methods:

(a) Responsive documents may be submitted through an online repository maintained by an independent vendor;

(b) Responsive documents may be submitted directly to the Commission on any combination of the listed media types; however, the Commission prefers IDE hard drives for productions over 10GB:

- CD-R CD-ROM formatted to ISO 9660 specifications;
- DVD-ROM for Windows-compatible personal computers;
- IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data;
- USB 2.0 Flash Drives;

(4) All electronic files submitted in response to this Subpoena will be scanned for viruses. Media containing infected files will be returned for replacement.

(5) Documents submitted in hard copy shall be submitted in sturdy cartons not larger than 1.5 cubic feet. Number each such box and mark each such box with corporate identification and the name(s) of the person(s) whose files are contained in the box.

Y.     All documents responsive to this Subpoena, regardless of format or form and regardless of whether submitted in paper or electronic form:

(1) shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged. For example:

(a) if in their original condition papers were stapled, clipped or otherwise fastened together or maintained in file folders, binders, covers or containers, they shall be produced in such form, and any documents that must be removed from

13

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

their original folders, binders, covers or containers in order to be produced shall be identified in a manner so as to clearly specify the folder, binder, cover or container from which such documents came; and

(b) if in their original condition electronic documents were maintained in folders or otherwise organized, they shall be produced in such form and information shall be produced so as to clearly specify the folder or organization format;

(2) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

(3) shall be produced in color where necessary to interpret the document;

(4) shall be marked on each page with corporate identification and consecutive document control numbers;

(5) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct and complete copies of the original documents;

(6) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that Commission representatives determine prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request.

Z.    If any documents created prior to the company's Hart-Scott-Rodino filing are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log (hereinafter "Complete Log") that includes each document's authors, addressees, date, a description of each document, and all recipients of the original and any copies. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed. For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all nonprivileged portions of any responsive document (including nonprivileged

14

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing the company that were not directly or indirectly furnished to the company or any third-party, such as internal law firm memoranda, may be omitted from the log.

In place of a Complete Log of all documents withheld from production based on a claim of privilege, the company may elect to submit a Partial Privilege Log ("Partial Log") for each person searched by the company whose documents are withheld based on such claim and a Complete Log for a subset of those persons, as specified below:

(1) The Partial Log will contain the following information: (a) the name of each person from whom responsive documents are withheld on the basis of a claim of privilege; and (b) the total number of documents that are withheld under a claim of privilege (stating the number of attachments separately) contained in each such person's files. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

(2) Within five (5) business days after receipt of the Partial Log, Commission staff may identify in writing five individuals or ten percent of the total number of persons searched, whichever is greater, for which the company will be required to produce a Complete Log in order to certify compliance with this Subpoena.

(3) For the company to exercise the option to produce a Partial Log, the company must provide a signed statement in which the company acknowledges and agrees that, in consideration for being permitted to submit a Partial Log:

(a) the Commission retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the Commission seeks relief through judicial or administrative proceedings;

(b) the company will produce a Complete Log of all documents withheld from production based on a claim of privilege no later than fifteen (15) calendar days after such a discovery request is served, which will occur promptly after the filing of the Commission's complaint; and

(c) the company waives all objections to such discovery, including the production of a Complete Log of all documents withheld from production based on a claim of privilege, except for any objections based strictly on privilege.

15

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(4) The company must retain all privileged documents that are responsive to this Subpoena until the expiration of the Hart-Scott-Rodino waiting period or the completion of any litigation challenging the acquisition of Take-Two by Electronic Arts.

(5) The Commission retains the right to require the company to produce a Complete Log for all persons searched in appropriate circumstances.

AA.    If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

BB.    If documents responsive to a particular specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy as disclosed in response to Specification 28 of this Subpoena, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the specification(s) to which they are responsive, and identify persons having knowledge of the content of such documents.

CC.    Unless specifically requested by a specification in this Subpoena, do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

For purposes of this Subpoena, Sensitive PII means an individual's Social Security Number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth, Social Security Number, driver's license number or other state identification number or a foreign country equivalent, passport number, financial account number, credit or debit card number. For purposes of this Subpoena, SHI includes medical records or other individually identifiable health information relating to the past, present, or future physical or mental condition of an individual, or the past, present, or future payment for the provision of health care to an individual.

DD.    In order for the company's response to this Subpoena to be complete, the attached certification form must be executed by the official supervising compliance with this Subpoena, notarized, and submitted along with the responsive materials.

16

SUBPOENA *DUCES TECUM* ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Any questions you have relating to the scope or meaning of anything in this Subpoena or suggestions for possible modifications thereto should be directed to Victoria Lippincott at 202-326-2983 or Ben Lorigo at 202-326-3717. The response to the Subpoena shall be addressed to the attention of Victoria Lippincott or Ben Lorigo and delivered between 8:30 a.m. and 5:00 p.m. on any business day to Federal Trade Commission. If you wish to submit your response by United States mail, please call one of the staff listed above for mailing instructions.

## CERTIFICATION

This response to the Subpoena *Duces Tecum*, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Federal Trade Commission.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Commission uses such copies in any court or administrative proceeding, the company will not object based on the Commission not offering the original document.

_____
(Signature)

_____
(Type or Print Name and Title)

Subscribed and sworn to before me at the City of _____,

State of _____, this _____ day of _____, 20_____.

_____
(Notary Public)

_____
(Date Commission Expires)

17

**UNITED STATES OF AMERICA**
**BEFORE FEDERAL TRADE COMMISSION**

COMMISSIONERS:  William E. Kovacic, Chairman
        Pamela Jones Harbour
        Jon Leibowitz
        J. Thomas Rosch

RESOLUTION DIRECTING USE OF
COMPULSORY PROCESS IN NON-PUBLIC INVESTIGATION

File No. 081-0138

Nature and Scope of Investigation:

To determine whether the proposed transaction between Electronic Arts Inc. and Take-Two Interactive Software, Inc. is in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; to determine whether the aforesaid proposed transaction, if consummated, would be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and to determine whether the requirements of Section 7A of the Clayton Act, 15 U.S.C. § 18a, have been or will be fulfilled with respect to said transaction.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

Authority to Conduct Investigation:

Sections 6, 9, 10 and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50 and 57b-1, as amended; Federal Trade Commission Procedures and Rules of Practice, 16 C.F.R. §§ 1.1, *et seq.*, and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Dated: April 17, 2008

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 19



# CIVIL INVESTIGATIVE DEMAND
## Written Interrogatories and Report

| 1. TO | 2. FROM |
|---|---|
| Take-Two Interactive Software, Inc.<br>c/o Alicia Batts, Proskauer Rose LLP<br>1001 Pennsylvania Avenue, NW<br>Suite 400 South<br>Washington, DC 20004 | UNITED STATES OF AMERICA<br>FEDERAL TRADE COMMISSION |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. §57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

**3. SUBJECT OF INVESTIGATION**

Electronic Arts Inc.'s Proposed Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

You are required by this demand to answer the interrogatories on the attached schedule or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 6 on or before the date specified in Item 4.

| 4. DATE ANSWERS OR REPORT MUST BE SUBMITTED | 5. COMMISSION COUNSEL |
|---|---|
| 9:00 a.m. May 9, 2008 | Reid B. Horwitz<br>E. Eric Elmore |
| **6. RECORDS CUSTODIAN**<br><br>Robert Tovsky, Deputy Assistant Director | **7. DEPUTY RECORDS CUSTODIAN**<br><br>Reid B. Horwitz (202) 326-2037<br>E. Eric Elmore (202) 326-3109 |

| DATE ISSUED<br><br>4/21/08 | COMMISSIONER'S SIGNATURE |
|---|---|

## INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The answers or report in response to this demand must be submitted under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

## PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

## YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

FTC Form **142** (rev. 3/03)

# Form of Certificate of Compliance*

I/We do certify that all of the information required by the attached Civil Investigative Demand which is in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to a custodian named herein.

If an interrogatory or a portion of the request has not been fully answered or portion of the report has not been completed the objection to such interrogatory or uncompleted portion and the reasons for the objection have been stated.

Signature_____

Title_____

Sworn to before me this day

_____      _____

_____
       Notary Public

_____

*In the event that more than one person is responsible for answering the interrogatories or preparing the report, the certificate shall identify the interrogatories or portion of the report for which each certifying individual was responsible. In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

Unless modified by agreement with the staff of the Federal Trade Commission, each specification of this Civil Investigative Demand ("CID") requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions, which appear after the following Specifications. If the company believes that the required search or any other part of the CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative identified on the last page of this CID. All modifications to this CID must be agreed to in writing by such representative.

## SPECIFICATIONS

1. List all agents and representatives of the company, including but not limited to, all attorneys, consultants, investment bankers, product distributors, sales agents, marketing consultants, PR consultants, advertising agencies, and other persons retained by the company in any capacity relating to any relevant product in any relevant area (excluding those retained solely in connection with environmental, tax, human resources, pensions, benefits, ERISA, and OSHA issues), and their last known address and phone number.

2. List each relevant product sold by the company since 2004, and for each relevant product:

   (a) describe the product in detail, including its genre and game rating; and

   (b) state the division, subsidiary, or affiliate of the company that produces or sells, or has produced or sold, the product;

   (c) state whether the company produces or sells the product on behalf of another person, or whether another person produces or sells the product on behalf of the company, in either case identifying each such person.

3. For each relevant product identified in Specification 2, and separately for each genre, state monthly and annually, for each year since January 1, 2004:

   (a) the company's gross sales and net sales in each relevant area, stated separately in units and dollars;

   (b) the company's production and shipment in each relevant area, stated separately in units and dollars;

   (c) any deductions from the company's gross sales in each relevant area, identified separately by type of deduction, that the company uses to calculate net sales;

   (d) the company's cost of goods sold stated separately in units and dollars for: total

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

production cost per unit, and by the following components: (1) materials; (2) licensing fees, and within licensing fees, state separately fees paid to (i) platform manufactures, and (ii) other providers of intellectual property (e.g., professional sports leagues, player, players associations, personalities); (3) packaging; (4) direct labor; (5) production overhead costs; and (6) any other costs (itemized by title) that are used to calculate cost of goods sold, or if the product sold is purchased or co-packed provide the purchase price;

(e) the company's production cost variances stated separately by type;

(f) gross margins and state the method of computation; and

(g) total payments by the company for distribution services, and the company's spending for advertising and other promotional efforts.

4.  For each relevant product identified in Specification 2, state monthly (if available, otherwise it may be provided quarterly) and annually, for each year since January 1, 2004:

(a) the company's distribution and freight-out costs, including without limitation, cost center expense summaries showing costs by type for each distribution center, expenses by type incurred for moving product from production facilities to distribution centers, retailers, or wholesalers, and expenses by type for third-party distribution and warehousing services;

(b) stated separately, the company's variable trade promotions by type, variable consumer promotions by type, fixed trade promotions by type, fixed consumer promotions by type, media advertising and expenditures by type, and any other promotional and marketing expenditures by type;

(c) the company's research and development costs;

(d) by type, assets directly dedicated to, and liabilities directly derived from, each relevant product, (or lowest product grouping available);

(e) any license and licensing fees associated with the relevant product;

(f) all advertising and marketing expenditures;

(g) all inventory costs; and

(h) the company's other costs, such as selling, general and administrative, and other overhead expenditures, by type.

2

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

5.  For each platform manufacturer, describe (a) the media (e.g. CD, DVD, proprietary cartridge, etc.) on which the relevant products identified in Specification 2 are published; (b) whether the company, the platform manufacturer, or a third party prints the relevant product onto the media; and (c) the contract terms under which the media are printed (if not by the company), including but not limited to (1) volume discounts, (2) refunds for unsold media, and (3) lead time necessary to place orders or change order size.

6.  For each relevant product identified in Specification 2:

    (a) identify and describe each discount and allowance, including but not limited to, rebates, promotional allowances, merchandising discounts, and co-op advertising. Describe the methodology for determining each of these discounts and allowances, including the extent to which the existence of other titles in a given genre factor into such determinations. Describe in detail all formulas, models and programs used to make such determinations;

    (b) state the credit terms extended by the company to retail and wholesale customers;

    (c) state whether and under what circumstances the company pays refunds or extends credit for returned goods or otherwise accepts returns and all terms for returns to retail and wholesale customers;

    (d) state the company's requirements, such as minimum order requirements and creditworthiness, for direct purchasing by retail or wholesale customers; and

    (e) describe in detail the process by which the company establishes and negotiates discounts, rebates, other price concessions, or other terms such as free goods, incentives or payments to retailers or the employees of retailers, slotting allowances, or other compensation.

7.  For each relevant product, provide the following:

    (a) a detailed description of each category of documents and information (e.g., platform, genre, number of competitors, release date, Metacritic rating, etc.) used to establish the price and recommended resale price of such product, and how such information is used to establish such prices;

    (b) a detailed description of all price checking programs or efforts, including the names of each employee or agent participating in such programs or efforts, their title or company affiliation, the role that they play or played, and the last known address and phone number of any former employees or agents involved in such programs or efforts.

3

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

8. Identify the company's 20 largest wholesale customers, and for each such customer:

   (a) state whether the company has a contract or other promotional agreement relating to the sales of relevant products, and;

   (b) provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

9. Identify the company's 20 largest retail customers, and for each such customer:

   (a) state whether the company has a contract or other promotional agreement relating to the sales of relevant products; and

   (b) provide by month, by relevant product listed in response to Specification 2, in units and dollars: (i) gross sales; (ii) allowances; (iii) discounts; (iv) returns; (v) promotional payments; (vi) excise taxes; (vii) any other dollar amount deducted to reach the net sales; and (viii) net sales, where net sales is gross sales minus the deductions specified in subparts (ii)-(vii).

10. State the full name and URL for each website operated by or on the company's behalf, and the purpose of each site, if it has or had content relating to any of the issues addressed by this CID or Second Request issued to the company on April 16, 2008.

11. Identify all consultants identified in response to Specification 1 who advised or assisted the company in connection with the company's concerns, expressed or otherwise, over Electronic Art's procurement of exclusive licensing agreements involving professional sports leagues and sports brands, including but not limited to, all correspondence and communications with the U.S. Department of Justice, Federal Trade Commission, or any other entity. Describe all documents and analyses prepared in connection with such concerns to the extent they related to the effects such exclusive licensing agreements might have, or had, on the company's business or on competition within the video game software industry, and describe the role each consultant played, and provide each of their last known addresses and phone numbers. Identify all former employees who participated in any of the activities described above, and provide their last known addresses and phone numbers.

12. List all retailers for whom the company acts as a category captain or any type of category supervisory position.

4

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

13.  List all Metacritic ratings for each relevant product since 2000, and for each relevant
     product submit in Excel format, the title, publisher, developer, genre(s), players, ESRB
     rating, release date, release price, Metacritic rating, user rating, recommended resale
     price, the amount of any promotional pricing or type of promotional activity offered at the
     time of release, and date on which the company offered its first price discount,
     promotional pricing, or promotional activity after date of release.

14.  State the top five video game titles (or less if five cannot be identified) that, to the
     company's knowledge, most constrain the price of each relevant product identified in the
     company's response to Specification 2 in the sports, strategy, shooter, racing and action
     genres, and for each such title, state the title's genre and publisher.

15.  For each relevant product identified in response to Specification 2 in the sports, shooter,
     strategy, racing and action genres, state the top five video game titles (or less if five
     cannot be identified) that the company evaluated or is evaluating in deciding what
     product features to add.

16.  Identify, provide the title and describe the contents of each financial statement, budget,
     profit and loss statement, customer or product line profitability report, and each other
     financial report regularly prepared by or for the company on any periodic basis that relates
     to the production, manufacture and sale of any relevant product, or the manufacturing
     facility, sales office, distribution center, product line, or customer for any relevant
     product, and for each such report, state how often each is prepared and the person
     responsible for its preparation and provide all such reports on both a quarterly basis and a
     yearly basis since January 1, 2003. If available, these reports should be provided in an
     electronic spreadsheet format acceptable to the Commission.

17.  Provide the name of and link (if applicable) to each forum, including internet forums such
     as web logs ("blogs"), message boards, discussion boards, discussion groups or forums,
     bulletin boards, or any other type of internet communication, in which the company or
     any of its employees discussed or monitored discussions of competition relating to the
     relevant product. Identify all user ids, log-in names, and aliases used by the company or
     any of its employees in connection with such forums.

18.  State the name, address, telephone number and contact name of each person that has
     entered, attempted to enter into, or exited from, the publishing of relevant product for
     each video game genre from January 1, 1998 to the present. For each such person,
     identify the title(s) it produces or sells, or produced or sold, the genre, and such title's
     release date for each platform. For each entrant, state whether the entrant also produces
     the title. If the publisher does not produce the title, state the producer of each title. For

5

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

each person that has exited due to an acquisition or merger, identify the acquiring person or the resulting merged person.

19. For each relevant product, identify and describe any programs and/or models used to analyze the development potential of relevant products.

20. Identify, and state whether the company is a member of, or subscribes to, all trade associations, information services, and other organizations relating to the research, development, production, license, or sale of any relevant product.

21. For each electronic database maintained by the company that contains information relating to prices, sales, research and development, production, costs (including transportation costs), profits, margins, competitors, or customers for any relevant product, service, or input, provide a copy of the database, all software, user identifications, and passwords necessary to access the responsive data store, and all regularly prepared and ad hoc reports generated using information contained in the database ("reports"), and state the following information:

    (a) the size and format of the database, including, but not limited to, the authoring application, operating system, and application version;

    (b) a detailed description of the data contained in the database;

    (c) the date range for which data has been input;

    (d) a record layout and the title and description of each record or field contained in the database;

    (e) an identification of databases, spreadsheets, or other electronic files that are linked to the database;

    (f) the uses to which each of the reports was put; and

    (e) for each such report, the name of the report, the distribution list for the report, the frequency with which the report is generated (e.g. daily, weekly, monthly, annually), and the person responsible for generating the report.

22. Provide a detailed description of all statements or actions by any person (identifying the person by name, title, and business address) in support of, in opposition to, or otherwise expressing opinions about the proposed acquisition or its effects.

6

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

23.   Describe the company's plans or attempts to: reduce its costs; improve products or services; expand its sales or distribution efforts; introduce new products; improve its operating performance, financial condition, or competitive viability; or become more competitive in any other way, including but not limited to, plans or attempts to close, consolidate or rationalize any facility, discontinue the research, development, manufacture or sale of any relevant product, research, develop, manufacture or sell any relevant product in conjunction with any other product or service.

24.   Describe in detail the company's policies and procedures relating to the retention and destruction of documents.

25.   List:  (a) each federal judicial district (e.g., District of Columbia, Southern District of New York) within the United States in which the company has an agent to receive service of process as well as each such agent's name, current business and home addresses, and telephone numbers; (b) each federal judicial district within the United States in which the company is incorporated or licensed to do business or currently is doing business; and (c) each federal judicial district within the United States in which the company has an office or a facility, and, for each such office or facility, list the address and the individual in charge (with his or her title).

26.   Identify the person(s) responsible for preparing the response to this CID, and describe in detail the steps taken by the company to respond to this CID, including instruction pertaining to document (written and electronic) and information preservation.  Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given.  For each specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and corporate title or job description) whose files were searched by each person.

7

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this CID, the following definitions and instructions apply:

A.     The term "the company" or "Take-Two" means Take-Two Interactive Software, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Take-Two and any other person.

B.     The term "Electronic Arts" means Electronic Arts, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents and representatives of the foregoing. The terms "subsidiary," "affiliate" and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

C.     The term "Civil Investigative Demand" or "CID" means this Civil Investigative Demand.

D.     The term "Subpoena *Duces Tecum*" or "Subpoena" means the Subpoena *Duces Tecum* issued by the Federal Trade Commission to the company together with this Civil Investigative Demand.

E.     The term "proposed acquisition" means the proposed acquisition of certain stock or assets of Take-Two as described in Item 3(a) of the company's Premerger Notification and Report Form.

F.     The term "documents" means all computer files and written, recorded, and graphic materials of every kind in the possession, custody or control of the company. The term "documents" includes, without limitation: electronic mail messages; electronic correspondence and drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody or control of the company.

(1) Unless otherwise specified, the term "documents" excludes (a) bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature; (b) architectural plans and engineering blueprints; and (c) documents solely relating to tax, human resources, OSHA, or ERISA issues.

(2) The term "computer files" includes information stored in, or accessible through,

8

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

computer or other information retrieval systems. Thus, the company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off company premises. If the company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this instruction with the Commission representatives identified on the last page of this CID. The Commission representative will consider modifying this instruction to:

> (a) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the company;

> (b) limit the portion of backup disks and tapes and archive disks and tapes that need to be searched and produced to certain key individuals, or certain time periods or certain specifications identified by Commission representatives; or

> (c) include other proposals consistent with Commission policy and the facts of the case.

(3) If the company intends to utilize any De-duplication or Near-de-duplication software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media in response to this CID, or if the company's computer systems contain or utilize such software, the company must contact Commission representatives to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this CID.

G.     The term "advertisement" shall mean any written or verbal statement, illustration, or depiction, that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears on or in a label, package, package insert, radio, television, cable television, brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, film, slide, audio program transmitted over a telephone system, telemarketing script, onhold script, upsell script, training materials provided to telemarketing firms, program-length commercial ("infomercial"), the Internet, or any other medium. Promotional materials and items, and Web pages are included in the term "advertisement."

9

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

H    The term "promotional material" shall mean any expenditure, written or verbal statement, illustration, or depiction, that is designed to create interest in the purchasing of goods, including but not limited to, press releases, video news releases, and other communications with any print, television, or radio media, or any website designer, developer, manager, or host, or any online service, coupons, and payments for shelf space or product placement in any media.

I.    A "copy" of an "advertisement" shall mean:

(1) In the case of print ads, including transit/outdoor, direct mail, and free standing inserts, the ad in the form made available for customers to read.

(2) In the case of radio ads, a compact disc (CD) recording and a written script.

(3) In the case of television ads and infomercials, a DVD, as well as a photoboard or a transcription of the advertisement.

(4) In the case of ads displayed or accessible as Web pages on the Internet or in a similar format on a commercial online service, a printout of all screens or pages displayed or accessible online; the date the information was initially placed online; all information necessary to view or access the information online (*i.e.* for Web pages, all electronic addresses, or URLs, at which the information is accessible, including any "mirrored" sites and *all documents showing metatags for the pages*). For similar advertising on commercial online services, provide the name of the commercial online services and the appropriate "Key" "Go" or "Jump" words; a transcript of any audio or video clips contained in the screens or pages, and identification of any audio, video, or other programs necessary to hear or view the clips; the name, mailing address, and telephone number of any entity with whom you arranged for placement of the information online (*i.e.* the owner of the Internet domain name(s) and, if different, the owner of the server(s) through which the Web page is made accessible on the Internet).

(5) In the case of files archived or accessible online (*e.g.* at FTP sites, on bulletin boards, or as part of a Web page), the filename and file date of the file, along with the date it initially was posted online; a printout of the file, if feasible; all information necessary to locate, download, and view the file, including, where applicable, the name of the bulletin board and the category, topic, or file area where the file is located; and the identity of any software necessary to decompress the files. In the case of files archived on forums or bulletin boards found in commercial online services, provide the name of the online service and the "Key" "Go" or "Jump" words to access the bulletin board; in the case of files archived or accessible on the Internet at FTP sites, at USENET sites, or on Web pages, all electronic addresses at which the file is available, including any "mirrored" sites; in the case of files archived on dial-in bulletin boards, provide the telephone

10

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

number to access the bulletin board, and the name, business telephone number, and mailing address of the owner or operator of the bulletin board.

(6) In the case of messages posted on bulletin boards, a printout of the message posted, the date(s) it was posted, and information sufficient to locate and access the bulletin board areas where the information was posted.

(7) In the case of messages disseminated via e-mail, a printout of the e-mail message, the date(s) it was sent, and the electronic address from which the message was sent. In addition, if a LISTSERV or other mass mailing mechanism was utilized, provide the name of the LIST used to send the message, the e-mail address for subscribing to the LISTSERV or similar mechanism, and, if different, the e-mail address to which messages are submitted for mass mailing.

J.    The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

K.    The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

L.    The terms "and" and "or" have both conjunctive and disjunctive meanings.

M.    The term "plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

N.    The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company in the same manufactured form as purchased.

O.    The term "platform" as used herein includes, and information shall be provided separately for:

(1) consoles, and within consoles, information shall be provided separately for: PS2, PS3, XBOX, XBOX360, Wii, and all other types of consoles (specifying each such type);

(2) personal computers ("PC");

(3) hand-held computers, and within hand-held computers, information shall be provided separately for: Playstation Portable ("PSP"), Nintendo Handheld ("NDS"), Gameboy Adventure ("GBA"), and all other types of hand held computers (specifying each such

type);

(4) mobile devices and within mobile devices, <u>information shall be provided separately for</u>: cellular telephones, and all other types of mobile devices (specifying each such type); and

(5) digital content, and within digital content, <u>information shall be provided separately for</u>: game titles that are also sold as packaged goods which are downloaded, and games titles that are played online through hosted sites.

P.    The term "genre" as used herein includes, <u>and information shall be provided separately for</u>:

(1) action, and within action, <u>information shall be provided separately for</u>: each sub-genre (specifying each such sub-genre);

(2) sports, and within sports, <u>information shall be provided separately for</u> each type of sports game (e.g, football, basketball, baseball, hockey, soccer, tennis, golf, etc.), and within each type of sports game <u>information shall be provided separately for</u> simulation games and arcade-style games;

(3) shooter, and within shooter, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(4) role-playing game ("RPG"), and within RPG, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(5) racing, and within racing, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(6) strategy, and within strategy, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre);

(7) family entertainment, and within family entertainment, <u>information shall be provided separately for</u> each sub-genre (specifying each such sub-genre); and

(8) and all other types of genres (specifying each such type).

Q.    The term "game rating" as used herein means, <u>and information shall be provided separately for</u>: Early Childhood ("EC"), Everyone ("E"), Everyone 10+ ("E10+"), Teen ("T"), Mature ("M"), and Adult Only ("AO").

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

R.     The term "relevant product" as used herein means each individual video game title, which includes game titles scheduled to be released over the next two years, in active development now, and contemplated for development (in whole or in part) over the next two years.  For each individual video game title, <u>information shall be provided separately</u> by platform.

S.     The term "relevant area" means, <u>and information shall be provided separately for:</u> (a) the United States; (b) worldwide; and (c) each area as to which the company collects and maintains information and data within the United States.

T.     The term "minimum viable scale" means the smallest amount of production at which average costs equal the price currently charged for the relevant product.  It should be noted that minimum viable scale differs from the concept of minimum efficient scale, which is the smallest scale at which average costs are minimized.

U.     The term "sunk costs" means the acquisition costs of tangible and intangible assets necessary to manufacture and sell the relevant product that cannot be recovered through the redeployment of these assets for other uses.

V.     All references to year refer to calendar year.  Unless otherwise specified, each of the specifications calls for: (1) documents for each of the years from January 1, 2004 to the present; and (2) information for each of the years from January 1, 2004 to the present.  Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date.  If calendar year information is not available, supply the company's fiscal year data indicating the twelve month period covered, and provide the company's best estimate of calendar year data.

W.     This CID shall be deemed continuing in nature so as to require production of all documents <u>responsive to any specification included in this CID</u> produced or obtained by the company up to forty-five calendar days prior to the date of the company's full compliance with this CID.

X.     The company shall discuss the form and method of production of responsive documents with the Commission representative identified on the last page of this CID.  The company shall be permitted to use any form and method of production of responsive documents that the Commission representative approves in writing.  The Commission can support the following production forms and methods:

(1)  In lieu of original paper documents, the company may submit either paper or electronic copies of original documents. If the documents are provided electronically as TIFF images, they should be accompanied by OCR;

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(2) In lieu of original documents stored electronically, the company may submit documents in the following forms:

(a) Electronically stored documents, except Microsoft Excel files and Access databases, may be produced as single-page TIFF images with a corresponding file containing the extracted text from the document, accompanied by a Opticon load file. Metadata and custodian information shall be provided in a delimited ASCII format. Microsoft Excel and Access files shall be provided natively.

(b) Electronically stored documents, excluding e-mail other than Microsoft Outlook, may be produced natively. Please discuss logistics of native production with the commission representative identified on the last page of this CID.

(3) Electronic productions may be submitted in the following methods:

(a) Responsive documents may be submitted through an online repository maintained by an independent vendor;

(b) Responsive documents may be submitted directly to the Commission on any combination of the listed media types; however, the Commission prefers IDE hard drives for productions over 10GB:

- CD-R CD-ROM formatted to ISO 9660 specifications;
- DVD-ROM for Windows-compatible personal computers;
- IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data;
- USB 2.0 Flash Drives;

(4) All electronic files submitted in response to this CID will be scanned for viruses. Media containing infected files will be returned for replacement.

(5) Documents submitted in hard copy shall be submitted in sturdy cartons not larger than 1.5 cubic feet. Number each such box and mark each such box with corporate identification and the name(s) of the person(s) whose files are contained in the box.

Y.    All documents responsive to this CID, regardless of format or form and regardless of whether submitted in paper or electronic form:

(1) shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged. For example:

14

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(a) if in their original condition papers were stapled, clipped or otherwise fastened together or maintained in file folders, binders, covers or containers, they shall be produced in such form, and any documents that must be removed from their original folders, binders, covers or containers in order to be produced shall be identified in a manner so as to clearly specify the folder, binder, cover or container from which such documents came; and

(b) if in their original condition electronic documents were maintained in folders or otherwise organized, they shall be produced in such form and information shall be produced so as to clearly specify the folder or organization format;

(2) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

(3) shall be produced in color where necessary to interpret the document;

(4) shall be marked on each page with corporate identification and consecutive document control numbers;

(5) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct and complete copies of the original documents;

(6) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that Commission representatives determine prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request.

Z.  If any documents created prior to the company's Hart-Scott-Rodino filing are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log (hereinafter "Complete Log") that includes each document's authors, addressees, date, a description of each document, and all recipients of the original and any copies. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed.

15

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing the company that were not directly or indirectly furnished to the company or any third-party, such as internal law firm memoranda, may be omitted from the log.

In place of a Complete Log of all documents withheld from production based on a claim of privilege, the company may elect to submit a Partial Privilege Log ("Partial Log") for each person searched by the company whose documents are withheld based on such claim and a Complete Log for a subset of those persons, as specified below:

(1) The Partial Log will contain the following information: (a) the name of each person from whom responsive documents are withheld on the basis of a claim of privilege; and (b) the total number of documents that are withheld under a claim of privilege (stating the number of attachments separately) contained in each such person's files. Submit all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted (except where the only nonprivileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

(2) Within five (5) business days after receipt of the Partial Log, Commission staff may identify in writing five individuals or ten percent of the total number of persons searched, whichever is greater, for which the company will be required to produce a Complete Log in order to certify compliance with this CID.

(3) For the company to exercise the option to produce a Partial Log, the company must provide a signed statement in which the company acknowledges and agrees that, in consideration for being permitted to submit a Partial Log:

(a) the Commission retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the Commission seeks relief through judicial or administrative proceedings;

(b) the company will produce a Complete Log of all documents withheld from production based on a claim of privilege no later than fifteen (15) calendar days after such a discovery request is served, which will occur promptly after the filing of the Commission's complaint; and

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

(c) the company waives all objections to such discovery, including the production of a Complete Log of all documents withheld from production based on a claim of privilege, except for any objections based strictly on privilege.

(4) The company must retain all privileged documents that are responsive to this CID until the expiration of the Hart-Scott-Rodino waiting period or the completion of any litigation challenging the acquisition of Take-Two by Electronic Arts.

(5) The Commission retains the right to require the company to produce a Complete Log for all persons searched in appropriate circumstances.

AA. If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

BB. If documents responsive to a particular specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy as disclosed or described in response to Specification 24 of this CID, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the specification(s) to which they are responsive, and identify persons having knowledge of the content of such documents.

CC. Unless specifically requested by a specification in this CID, do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

For purposes of this CID, Sensitive PII means an individual's Social Security Number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth, Social Security Number, driver's license number or other state identification number or a foreign country equivalent, passport number, financial account number, credit or debit card number. For purposes of this CID, SHI includes medical records or other individually identifiable health information relating to the past, present, or future physical or mental condition of an individual, or the past, present, or future payment for the provision of health care to an individual.

17

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE
INC.

DD.    For the company's response to this CID to be complete, the attached certification
form must be executed by the official supervising compliance with this CID, notarized, and
submitted along with the responsive materials.


Any questions you have relating to the scope or meaning of anything in this CID or
suggestions for possible modifications thereto should be directed to Victoria Lippincott at 202-
326-2983 or Ben Lorigo at 202-326-3717.  The response to the CID shall be addressed to the
attention of Victoria Lippincott or Ben Lorigo, and delivered between 8:30 a.m. and 5:00 p.m. on
any business day to Federal Trade Commission.  If you wish to submit your response by United
States mail, please call one of the staff above for mailing instructions.

CIVIL INVESTIGATIVE DEMAND ISSUED TO TAKE-TWO INTERACTIVE SOFTWARE INC.

## CERTIFICATION

The response to this Civil Investigative Demand, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Federal Trade Commission.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Commission uses such copies in any court or administrative proceeding, the company will not object based on the Commission not offering the original document.

_____
(Signature)

_____
(Type or Print Name and Title)

Subscribed and sworn to before me at the City of _____,

State of _____, this _____ day of _____, 20 _____.

_____
(Notary Public)

_____
(Date Commission Expires)

19

# UNITED STATES OF AMERICA
## BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:      William E. Kovacic, Chairman
                          Pamela Jones Harbour
                          Jon Leibowitz
                          J. Thomas Rosch

## RESOLUTION DIRECTING USE OF
## COMPULSORY PROCESS IN NON-PUBLIC INVESTIGATION

File No. 081-0138

### Nature and Scope of Investigation:

To determine whether the proposed transaction between Electronic Arts Inc. and Take-Two Interactive Software, Inc. is in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; to determine whether the aforesaid proposed transaction, if consummated, would be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and to determine whether the requirements of Section 7A of the Clayton Act, 15 U.S.C. § 18a, have been or will be fulfilled with respect to said transaction.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

### Authority to Conduct Investigation:

Sections 6, 9, 10 and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50 and 57b-1, as amended; Federal Trade Commission Procedures and Rules of Practice, 16 C.F.R. §§ 1.1, *et seq.*, and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Dated:  April 17, 2008

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 21

**From:**  Horwitz, Reid [rhorwitz@ftc.gov]
**Sent:**  Thursday, April 24, 2008 12:11 PM
**To:**  Batts, Alicia
**Cc:**  Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

OK, we will call you at your office number.

The org charts are obviously an important first step to identify the custodians to be searched. There are clearly certain individuals whose names appear on these charts who have files that we would like to include on the search list.  These include:

Strauss Zelnick, Chairman
Ben Feder, CEO
Lainie Goldstein, Chief Financial Officer
Gary Dale, Executive Vice President of Sales
Cindi Buckwalter, Executive Vice President of Investor Relations
Christopher Hartmann, President, 2K Games
Eric Whiteford, VP Marketing, 2K Sports

However, we are hoping that today, as is customary in a second request investigation, you can walk us through the various org charts that you provided yesterday so that we can develop an understanding of how Take Two is organized, and hear from you where else you believe responsive documents are kept and whose files in addition to the individuals above you propose to search to obtain those documents.  We will then react to your proposal as quickly as possible, keeping in mind that time is of the essence.

We look forward to speaking with you later today.

--Reid

-----Original Message-----
**From:** Batts, Alicia [mailto:abatts@proskauer.com]
**Sent:** Thursday, April 24, 2008 12:02 PM
**To:** Horwitz, Reid
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

That works fine.  Alicia

**From:** Horwitz, Reid [mailto:rhorwitz@ftc.gov]
**Sent:** Thursday, April 24, 2008 11:56 AM
**To:** Batts, Alicia
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

Alicia, are you available today at 3PM?

-----Original Message-----
**From:** Batts, Alicia [mailto:abatts@proskauer.com]

**Sent:** Wednesday, April 23, 2008 6:08 PM
**To:** Horwitz, Reid
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** FTC Custodians

Reid,

We are moving along with our process.  I trust you received the detailed organization charts this afternoon. I have spent much of today finalizing our vendor selection. We should be able to begin data collection late Friday if not Monday morning if I give my vendor a list of custodians by close of business tomorrow.  Please let me know what times you are able to discuss your desired custodians tomorrow and if you are not available tomorrow when you will be to resolve this issue so that we can move forward.

Best,

Alicia

Alicia J. Batts | **PROSKAUER ROSE LLP**
Member of the Firm
1001 Pennsylvania Avenue, NW | Suite 400 South | Washington, DC 20004-2533
v: 202.416.6812 | F: 202.416.6899
abatts@proskauer.com | www.proskauer.com

```
**********************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

**********************************************************
This message and its attachments are sent from a law firm
and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.

    ====================================================================
**********************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.
```

```
*********************************************************
This message and its attachments are sent from a law firm
and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.

===========================================================================
```

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 21

**From:**    Horwitz, Reid [rhorwitz@ftc.gov]
**Sent:**    Thursday, April 24, 2008 12:11 PM
**To:**      Batts, Alicia
**Cc:**      Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

OK, we will call you at your office number.

The org charts are obviously an important first step to identify the custodians to be searched. There are clearly certain individuals whose names appear on these charts who have files that we would like to include on the search list.  These include:

Strauss Zelnick, Chairman
Ben Feder, CEO
Lainie Goldstein, Chief Financial Officer
Gary Dale, Executive Vice President of Sales
Cindi Buckwalter, Executive Vice President of Investor Relations
Christopher Hartmann, President, 2K Games
Eric Whiteford, VP Marketing, 2K Sports

However, we are hoping that today, as is customary in a second request investigation, you can walk us through the various org charts that you provided yesterday so that we can develop an understanding of how Take Two is organized, and hear from you where else you believe responsive documents are kept and whose files in addition to the individuals above you propose to search to obtain those documents.  We will then react to your proposal as quickly as possible, keeping in mind that time is of the essence.

We look forward to speaking with you later today.

--Reid


-----Original Message-----
**From:** Batts, Alicia [mailto:abatts@proskauer.com]
**Sent:** Thursday, April 24, 2008 12:02 PM
**To:** Horwitz, Reid
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

That works fine.  Alicia


**From:** Horwitz, Reid [mailto:rhorwitz@ftc.gov]
**Sent:** Thursday, April 24, 2008 11:56 AM
**To:** Batts, Alicia
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** RE: FTC Custodians

Alicia, are you available today at 3PM?


-----Original Message-----
**From:** Batts, Alicia [mailto:abatts@proskauer.com]

**Sent:** Wednesday, April 23, 2008 6:08 PM
**To:** Horwitz, Reid
**Cc:** Elmore, E. Eric; Tapp, Jacqueline
**Subject:** FTC Custodians


Reid,

We are moving along with our process. I trust you received the detailed organization charts this afternoon. I have spent much of today finalizing our vendor selection. We should be able to begin data collection late Friday if not Monday morning if I give my vendor a list of custodians by close of business tomorrow. Please let me know what times you are able to discuss your desired custodians tomorrow and if you are not available tomorrow when you will be to resolve this issue so that we can move forward.

Best,

Alicia

Alicia J. Batts | PROSKAUER ROSE LLP
Member of the Firm
1001 Pennsylvania Avenue, NW | Suite 400 South | Washington, DC 20004-2533
v: 202.416.6812 | F: 202.416.6899
abatts@proskauer.com | www.proskauer.com

**************************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

**************************************************************
This message and its attachments are sent from a law firm
and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.

====================================================================
**************************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

```
*********************************************************
This message and its attachments are sent from a law firm
and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.

===========================================================================
```

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 24

| | |
|---|---|
| **From:** | Ingrassia, John [jingrassia@proskauer.com] |
| **Sent:** | Wednesday, April 30, 2008 3:08 PM |
| **To:** | Elmore, E. Eric |
| **Cc:** | Batts, Alicia |
| **Subject:** | RE: Back-up Tapes |

Eric, our proposal would be the same as our earlier understanding detailed below.  Please let me know if I can answer any questions.  Thanks, John

---

**From:** Elmore, E. Eric [mailto:EELMORE@ftc.gov]
**Sent:** Wednesday, April 30, 2008 1:28 PM
**To:** Ingrassia, John
**Subject:** RE: Back-up Tapes

John,
I believe there's a misunderstanding.  I did not make any such agreement on back-up tapes. I agreed to listen to any proposal put forward by Take-Two. To be clear, please forward to me Take-Two's proposal and we will consider it consistent with our need to get relevant documents and information in a timely manner.
Regards,
Eric Elmore

-----Original Message-----
**From:** Ingrassia, John [mailto:jingrassia@proskauer.com]
**Sent:** Wednesday, April 30, 2008 1:23 PM
**To:** Elmore, E. Eric
**Cc:** Batts, Alicia
**Subject:** Back-up Tapes

Eric,

This is to confirm your agreement yesterday with Alicia Batts to defer Take-Two's production of backup disks and tapes and archive disks and tapes ("backups") subject to the company agreeing to not destroy or rewrite any of the currently existing backups or any of the backups created during the course of the investigation, and also agreeing to restore and search those backups within a reasonable time period followed by a request by Commission staff to do so.  It is also agreed that any such request by Commission staff will not affect the Company's ability to certify its substantial compliance with the Second Request and CID.  Please let me know if this confirmation does not accurately reflect your understanding of the agreement.

Regards,
John Ingrassia

John R. Ingrassia | **PROSKAUER ROSE LLP**
1001 Pennsylvania Avenue, NW, Suite 400 S. | Washington, D.C. 20004-2533
☎ 202.416.6869 | 🖷 202.416.6899 | mobile 240.832.0557
✉ mailto:jingrassia@proskauer.com | www.proskauer.com

**********************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

**********************************************************
This message and its attachments are sent from a law firm
 and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.


===============================================================================

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 24

| | |
|---|---|
| **From:** | Ingrassia, John [jingrassia@proskauer.com] |
| **Sent:** | Wednesday, April 30, 2008 3:08 PM |
| **To:** | Elmore, E. Eric |
| **Cc:** | Batts, Alicia |
| **Subject:** | RE: Back-up Tapes |

Eric, our proposal would be the same as our earlier understanding detailed below.  Please let me know if I can answer any questions.  Thanks, John

---

**From:** Elmore, E. Eric [mailto:EELMORE@ftc.gov]
**Sent:** Wednesday, April 30, 2008 1:28 PM
**To:** Ingrassia, John
**Subject:** RE: Back-up Tapes

John,
I believe there's a misunderstanding.  I did not make any such agreement on back-up tapes. I agreed to listen to any proposal put forward by Take-Two. To be clear, please forward to me Take-Two's proposal and we will consider it consistent with our need to get relevant documents and information in a timely manner.
Regards,
Eric Elmore

-----Original Message-----
**From:** Ingrassia, John [mailto:jingrassia@proskauer.com]
**Sent:** Wednesday, April 30, 2008 1:23 PM
**To:** Elmore, E. Eric
**Cc:** Batts, Alicia
**Subject:** Back-up Tapes

Eric,

This is to confirm your agreement yesterday with Alicia Batts to defer Take-Two's production of backup disks and tapes and archive disks and tapes ("backups") subject to the company agreeing to not destroy or rewrite any of the currently existing backups or any of the backups created during the course of the investigation, and also agreeing to restore and search those backups within a reasonable time period followed by a request by Commission staff to do so.  It is also agreed that any such request by Commission staff will not affect the Company's ability to certify its substantial compliance with the Second Request and CID.  Please let me know if this confirmation does not accurately reflect your understanding of the agreement.

Regards,
John Ingrassia

John R. Ingrassia | **PROSKAUER ROSE LLP**
1001 Pennsylvania Avenue, NW, Suite 400 S. | Washington, D.C. 20004-2533
☎ 202.416.6869 | 📠 202.416.6899 | mobile 240.832.0557
✉ mailto:jingrassia@proskauer.com | www.proskauer.com

************************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

************************************************************
This message and its attachments are sent from a law firm
 and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.


===============================================================================

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 25

# AXINN,
# VELTROP &
# HARKRIDER LLP

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

114 WEST 47TH STREET
NEW YORK, NEW YORK 10036
———
TEL: (212) 728-2200
FAX: (212) 728-2201
www.avhlaw.com

90 STATE HOUSE SQUARE
HARTFORD, CONN 06103-3702
TEL: (860) 275-8100
FAX: (860) 275-8101
———
1330 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
TEL: (202) 912-4700
FAX: (202) 912-4701

PRIVILEGED AND CONFIDENTIAL

May 7, 2008

VIA HAND DELIVERY

Reid B. Horowitz, Esq.
Mergers II Division
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, D.C. 20001

     Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

Attached please find a series of hardcopy documents produced by Take-Two Interactive Software, Inc. ("Take-Two"). These documents, Bates stamped **T2--0000001 through T2--0000187**, are being provided to you in response to the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

This submission contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Sincerely,

*Michael L. Keeley /AWS*

Michael L. Keeley

Attachments

cc:    Stephen M. Axinn, Esq.
       Alicia J. Batts, Esq.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 26



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division

E. Eric Elmore
Attorney

Direct Dial (202) 326-3109
Facsimile (202) 326-2071

May 8, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

> Re: Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two
> Interactive Software, Inc. in connection with Electronics Arts Inc. Proposed
> Acquisition of Take-Two Interactive Software, Inc.
> File No. 081-0138

Dear Mr. Axinn:

Yesterday, in a meeting with staff that you requested on behalf of Take-Two Interactive
Software, Inc. ("Take-Two" or "the company"), we discussed your request to extend the
compliance deadline for both the Subpoena *Duces Tecum* and the Civil Investigative Demand
issued on April 21, 2008, to Take-Two. Because any modifications to the Subpoena *Duces
Tecum* and the Civil Investigative Demand must be memorialized in writing by the Federal
Trade Commission, this letter responds to that request. We agree to extend the deadline one
week from May 9, 2008 to May 16, 2008, for both the Subpoena *Duces Tecum* and the Civil
Investigative Demand.[1]

In addition, staff is prepared to extend Take-Two's compliance deadline further if the
company demonstrates its good faith by starting this week and significantly expanding next
week the production of documents and information that we discussed at yesterday's meeting.

Specifically, on behalf of Take-Two, you agreed to provide the following documents and
information, which fall into nine categories:

---

[1] Please take note that this extension relates to Take-Two's response to the Subpoena and
CID only. It does not modify the time period during which Take-Two may file a petition to
modify or set aside the Subpoena and CID, which, pursuant to 15 U.S.C. § 57b-1(f)(1), must be
filed within twenty days of service of the CID and/or Subpoena, or before the return date if it is
less than twenty days.

Stephen Axinn, Esq.                                                          Page 2
May 8, 2008

1.  A full response to Specification 21 of the Civil Investigative Demand issued to Take-
    Two beginning with the immediate production of a description of the company's
    electronic databases that contain certain information detailed in the Specification,
    examples of all regularly prepared and ad hoc reports generated using information
    contained in the databases, and the answers to subparts (a) - (g);

2.  Documents that describe Take-Two's pricing strategy during the 2004 to 2005 time
    period when it introduced certain sports titles at a recommended price point of
    $19.99, an analysis of the effects of that strategy, and any decisions relating to
    whether the company would continue or alter that strategy;

3.  Marketing and competition documents, including past, present and future product
    development plans, consumer research documents, and documents describing
    Metacritic ratings for the company's basketball, boxing, football, hockey, and tennis
    titles;

4.  Retailer account files containing information on promotional activities, pricing plans
    and strategies, and actual price discounts granted for GameStop, Best Buy, and
    Circuit City;

5.  Documents that discuss sports titles in the current development pipeline;

6.  Consumer research studies for Take-Two's 2K Sports brand and any other company's
    sports brand;

7.  Copies of the company's sports league licenses;

8.  NPD studies prepared for Take-Two analyzing 2K Sports and any sports title; and

9.  All other business and strategic plans for the company's basketball, boxing, football,
    hockey, and tennis titles.

Stephen Axinn, Esq.                                                    Page 3
May 8, 2008

We are prepared to work with you on the production of documents and information responsive to the Subpoena *Duces Tecum* and Civil Investigative Demand consistent with our need to conduct a thorough investigation of this matter.

Sincerely,

Ernest Eric Elmore

E. Eric Elmore
Staff Attorney, Mergers II Division

Catharine M. Moscatelli
Assistant Director, Mergers II Division

cc: Michael L. Keeley, Esq.
    Alicia J. Batts, Esq.

3

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 27

# INTENTIONALLY LEFT BLANK

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 28

**AXINN,**
**VELTROP &**
**HARKRIDER LLP**

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

114 WEST 47TH STREET
NEW YORK, NEW YORK 10036

TEL: (212) 728-2200
FAX: (212) 728-2201
www.avhlaw.com

90 STATE HOUSE SQUARE
HARTFORD, CONN 06103-3702
TEL: (860) 275-8100
FAX: (860) 275-8101

1330 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
TEL: (202) 912-4700
FAX: (202) 912-4701

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 9, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC  20001

  Re: Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

  As promised, attached please find copies of Take-Two Interactive Software, Inc.'s ("Take-Two") licensing agreements with (a) the Major League Baseball ("MLB") Players Association, Major League Alumni Marketing, Inc. (a wholly-owned subsidiary of the Major League Baseball Players Alumni Association) and Major League Baseball Properties, Inc.; (b) the National Hockey League Players' Association, and NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises B.V. and NHL Interactive Cyberenterprises, LLC; (c) NBA Properties, Inc. ("NBAP"); and (d) The Collegiate Licensing Company.

  One of the enclosed NBAP-agreements contained privileged handwritten notes in the margin, which were added after the agreement was executed.  As you will see, we redacted those privileged marginalia.

  We intend to produce one more MLB-related licensing agreement and an amendment to that agreement.  However, disclosure of that agreement requires Take-Two to provide advance notice to the other party.  We expect to be able to produce such agreements soon.

  The enclosed documents bear document control numbers **T2 -- 0000188 through T2 -- 0000596** and are being provided to you in response to the Request for Additional Information

Reid B. Horwitz, Esq.
May 9, 2008
Page 2

and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

This submission contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Sincerely,

Michael L. Keeley

Attachments

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 29

AXINN │ VELTROP │ HARKRIDER │ LLP

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 13, 2008


VIA FEDERAL EXPRESS

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

     Re:   Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

    As promised, enclosed please find copies of analyses and plans relating to Take-Two Interactive Software, Inc.'s ("Take-Two") hockey and basketball games, and relating to Take-Two's 2004-2005 decision to price some of its sports games at $19.99.

    The documents on the enclosed CD-Rom bear document control numbers **T2 – 0000597** through **T2 – 0001317**, and are being provided to you in response to the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

    This submission contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

              Sincerely,

              Michael L. Keeley /(DJB)

              Michael L. Keeley

Enclosures

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 30

AXINN | VELTROP | HARKRIDER | LLP

MICHAEL L. KEELEY
(212) 728-2231
mlk@avhlaw.com

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 13, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

You have requested that we provide a description of Take-Two Interactive Software, Inc.'s ("Take-Two") sports games pipeline. For that information, please refer to the presentation titled "2K FY 2008 PIRP Presentation, February 21, 2008," that we produced to you on May 7, 2008. The document control numbers corresponding to that presentation are T2 – 0000086 - 141. The third slide of that presentation—bearing document control number T2 – 0000088— provides an up-to-date description of Take-Two's current sports game pipeline. For your convenience, we have enclosed another copy of the referenced presentation.

This submission contains highly confidential business information; because it is being provided in response to a Second Request, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Sincerely,

Michael L. Keeley / (DJB)

Michael L. Keeley

Enclosures

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 31



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division

Reid B. Horwitz
Attorney

Direct Dial (202) 326-2037
Facsimile (202) 326-2071

May 15, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

Re:    Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two Interactive
Software, Inc. in connection with Electronics Arts Inc. Proposed Acquisition of Take-Two
Interactive Software, Inc., File No. 081-0138

Dear Mr. Axinn:

Pursuant to our phone call today, you proposed to narrow further the scope of the documents you previously agreed to provide to the following types of documents from the files of David Ismailer, COO and Senior VP Pub Ops; Sarah Anderson, SVP Marketing; and Bob Blau, SVP Sales:

1.    Marketing and competition documents, including past and present product development
plans, consumer research documents, and documents describing Metacritic ratings for the
company's basketball and hockey titles;

2.    Business and strategic plans for the company's basketball and hockey titles.

Moreover, you stated after conferring with the General Counsel of Take-Two that neither the CEO nor anyone else within Take-Two has, as of today, had any discussions with EA regarding EA's latest cash tender offer.

Although we have not extended the CID and Subpoena compliance deadline, we have agreed to forego filing a judicial enforcement action for the next seven days for purposes of evaluating the sufficiency of your compliance to date. We look forward to receiving documents and information pertaining to the above categories on a rolling basis over the next seven to ten days in a format consistent with instructions X of Y of the Subpoena *Duces Tecum* issued to Take-Two on April 21, 2008. If for any reason this letter does not accurately reflect our agreement and the representations that you made on behalf of Take-Two, please notify me immediately in writing.

Sincerely,

Reid B. Horwitz

cc: Michael L. Keeley, Esq.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 32

AXINN │ VELTROP │ HARKRIDER │ LLP

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 19, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

     Re:   Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

     Enclosed please find copies of Take-Two Interactive Software, Inc.'s ("Take-Two") licensing agreement with MLB Advanced Media L.P. and an amendment to that agreement. These are the MLB-related licensing agreement and associated amendment I mentioned in my May 9th letter, which required Take-Two to provide MLB Advanced Media L.P. advance notice of disclosure.

     The enclosed documents bear document control numbers **T2 -- 0001318** through **T2 -- 0001340** and are being provided to you in response to the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

     This submission contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

     Take-Two requests that the enclosed documents, and any information derived from them, not be publicly disclosed and be held in the strictest confidence, to the fullest extent permitted under the laws, rules and regulations to which the FTC is subject. Furthermore, Take-Two requests that such confidentiality be maintained by any person or other governmental body

Reid B. Horwitz, Esq.
May 19, 2008
Page 2

provided with access to such documents or information.  These requests also apply with regard to
the licensing agreements that we produced to you with my May 9th letter.

Sincerely,

Michael L. Keeley

Michael L. Keeley

Enclosures

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 33

AXINN | VELTROP | HARKRIDER | LLP

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

MICHAEL L. KEELEY
(212) 728-2231
mlk@avhlaw.com

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 20, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC  20001

      Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

      You have requested that we provide NPD sales data for sports games.  In response to that request, enclosed please find copies of excel spreadsheets from Take-Two Interactive Software, Inc.'s ("Take-Two") files containing NPD sales data for the years 2001 through 2007.  Some spreadsheets contain sport-specific NPD data (e.g., NPD data for basketball and for hockey). Others cover all sports titles.

      Note that most of the enclosed spreadsheets also contain analyses derived from NPD data (e.g., summary tabs) and, in many instances, some non-NPD data as well (e.g., average sales price (ASP) information).  Generally, the NPD data in the enclosed spreadsheets is limited to the title of a game, the game's publisher, the platform that the game is intended for, the genre that the game belongs in, the date that the game was released, and the unit and dollar sales numbers for the particular game.

      The enclosed materials bear document control numbers **T2 -- 0001341** through **T2 – 0001366** and are being provided to you in response to the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

Reid B. Horwitz, Esq.
May 20, 2008
Page 2


This submission contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Take-Two requests that the enclosed documents, and any information derived from them, not be publicly disclosed and be held in the strictest confidence, to the fullest extent permitted under the laws, rules and regulations to which the FTC is subject. Furthermore, Take-Two requests that such confidentiality be maintained by any person or other governmental body provided with access to such documents or information.

Sincerely,

Michael L. Keeley / (PSB)

Michael L. Keeley

Enclosures

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 34

AXINN | VELTROP | HARKRIDER | LLP

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 22, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

      Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

      In response to your May 15, 2008 letter to Stephen Axinn, we have produced the first set of marketing and competition documents and business and strategic plans relating to Take-Two Interactive Software, Inc.'s ("Take-Two") basketball and hockey titles. The production contains documents from the files of Robert Blau, Sarah Anderson and David Ismailer. As agreed, we have made these documents available to the FTC through a document review platform maintained by Take-Two's document vendor, Kroll Ontrack ("Kroll Database"). The documents were available to you and your team on the Kroll Database as of 1:00 P.M. EDT today. We will continue to produce more documents to the Kroll Database over the next couple of days.

      The documents currently available on the Kroll Database are all in TIFF format. PowerPoint, Excel and Access documents will become available in native format on the Kroll Database starting Saturday May 24th.

      Note that today's production includes the documents that were produced to you in portable document format on May 13, 2008.

      The documents we produced today bear document control numbers **T2 – 0001367** through **T2 – 0118472** and are being provided to you in response to the Request for Additional

Reid B. Horwitz, Esq.
May 22, 2008
Page 2

Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

This document production contains highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Take-Two requests that the produced documents, and any information derived from them, not be publicly disclosed and be held in the strictest confidence, to the fullest extent permitted under the laws, rules and regulations to which the FTC is subject. Furthermore, Take-Two requests that such confidentiality be maintained by any person or other governmental body provided with access to such documents or information.

Sincerely,

Michael L. Keeley /(DSB)

Michael L. Keeley

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 35

AXINN │ VELTROP │ HARKRIDER │ LLP

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

May 27, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

  Re: Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

  We have produced a second set of marketing and competition documents and business and strategic plans relating to Take-Two Interactive Software, Inc.'s ("Take-Two") basketball and hockey titles in response to your May 15th letter.  In addition, we have produced documents from Take-Two's retailer account files for GameStop, Circuit City and Best Buy, which you had requested prior to your May 15th letter.  The documents in these productions are from the files of Sarah Anderson, Robert Blau, David Ismailer, Nicole Nicoletti and Evan Drew Smith, and were made available to you and your team on the Kroll Database as of Sunday, May 25, 2008, 11:00 A.M. EDT.

  All documents we have produced to the Kroll Database to date are available to you in TIFF format.  Any PowerPoint, Excel and Access documents we have produced to the Kroll Database are also available in native format.  Note that one page of an Excel document on the Kroll Database is not properly viewable in TIFF format.  The corresponding document control numbers for this Excel document are **T2 – 0155517** through **T2 – 0158001**.  The page that is not viewable in TIFF format bears document control number **T2 – 0157757**.  Take-Two's vendor, Kroll Ontrack, will resolve that problem as soon as possible.  In the meantime, you should be able to view the entire Excel document in native format without any problems.

Reid B. Horwitz, Esq.
May 27, 2008
Page 2

The documents in Sunday's productions bear document control numbers **T2 – 0118473** through **T2 – 0288879** and are being provided to you in response to the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

The document productions contain highly confidential business information; because it is being provided in response to a Second Request and Subpoena, it is afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

Take-Two requests that the produced documents, and any information derived from them, not be publicly disclosed and be held in the strictest confidence, to the fullest extent permitted under the laws, rules and regulations to which the FTC is subject. Furthermore, Take-Two requests that such confidentiality be maintained by any person or other governmental body provided with access to such documents or information.

Sincerely,

Michael L. Keeley

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 36

AXINN | VELTROP | HARKRIDER | LLP

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

MICHAEL L. KEELEY
(212) 728-2231
MLK@AVHLAW.COM

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

June 4, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II Division
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

This letter is to notify you that we have produced 1,719 additional documents relating to Take-Two Interactive Software, Inc.'s ("Take-Two") basketball,  football and hockey titles. These documents are being submitted to the FTC in response to your letter of May 15th, 2008 and the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena Duces Tecum ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.

The documents comprising today's production, marked T2 -- 0340592 through T2 -- 0363039, are from the files of Sarah Anderson and Robert Blau and were made available to you and your team on the Kroll Database at approximately 11:00 A.M. EDT this morning.  As with Take-Two's four previous ASP productions, all documents produced to the Kroll Database are available in TIFF format: PowerPoint, Excel and Access documents are also available in native format.

This document production contains highly confidential business information.  As it is being provided to the Commission in response to a Second Request and Subpoena, Take-Two respectfully requests they be afforded the confidentiality protections of Section 7A(h) of the HSR Act and Sections 21(c)-(d) of the FTC Act.  Furthermore, Take-Two requests that such

Reid B. Horwitz, Esq.
June 4, 2008
Page 2

confidentiality be maintained by any person or other governmental body provided with access to
any such documents or information.

Sincerely,

Michael L. Keeley

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 37



UNITED STATES OF AMERICA

FEDERAL TRADE COMMISSION

WASHINGTON, D.C. 20580

Bureau of Competition
Mergers II Division
601 New Jersey Avenue, N.W.
Washington, D.C. 20580

Reid B. Horwitz
Attorney

Direct Dial
202.326.2037

June 4, 2008

Take-Two Interactive Software, Inc.
c/o Stephen Axinn, Esquire
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036

   Re: Subpoena *Duces Tecum* and Civil Investigative Demand Issued to Take-Two
     Interactive Software, Inc. in Connection with Electronic Arts Inc. Proposed
     Acquisition of Take-Two Interactive Software, Inc., File No. 081-0138

Dear Mr. Axinn:

  As you know, your client, Take-Two Interactive, has been out of compliance with the
above-referenced Subpoena and CID since May 16, 2008. Moreover, as recently as June 2, you
have represented that your client does not intend to ever come into compliance with the
Subpoena and CID. Commission staff repeatedly has attempted to work with Take-Two and its
various counsel to attempt to reach a compromise concerning this process that would benefit
Take-Two by narrowing the scope of the process and benefit the Commission by helping to
assure the prompt submission of the most critical responsive information. But, on both
occasions where Commission staff and counsel for Take-Two reached such agreements, within
one week counsel for Take-Two informed staff that Take-Two was reneging on the agreement.

  Instead, after these false starts, Take-Two has reviewed the files of only three of its
employees and these reviews were very limited in scope. On June 2, you indicated that, at most,
Take-Two would be willing to conduct a similarly limited review of the files of three additional
current or former employees. As has been repeatedly indicated to you, this attempt at unilateral
line drawing by Take-Two regarding the scope of the Commission's investigation does not
comprise satisfactory compliance with the Subpoena and CID.

  As a result of the impasse created by Take-Two, the Commission sees little alternative to
seeking judicial enforcement of its compulsory process. After much consideration, we will file

an action unless, by 9 a.m. tomorrow morning, Take-Two, in writing, agrees to the following terms:

- To search the files of the nine employees that we discussed on May 28 and again on June 2 (many of whom have files that we had requested as far back as April);[1]

- To search the files of each custodian for responsive documents consistent with the parameters that you agreed to on May 7;[2]

- To produce all such responsive, non-privileged documents by June 18, 2008;

- To produce all of the current employees whose files are reviewed for investigational hearings;[3] and

- To search the files and to produce all responsive, non-privileged documents for any additional current or former employees of Take-Two designated by the Commission, as you also agreed to do on May 7.

Unless we receive an affirmative response from you, we will presume that Take-Two rejects this final effort at compromise by the Commission and the Commission will seek immediate judicial relief.

Very truly yours,


Reid B. Horwitz

---

1 These custodians are: Ben Feder, Christoph Hartmann, Greg Thomas, Gary Dale, David Gershik, Erik Whiteford, Jason Argent, Evan Drew Smith, and Christopher Snyder.
2 A copy of the May 8, 2008, letter memorializing the May 7 agreement is attached for your convenience.
3 Our understanding is that all of the individuals whose files would be reviewed are currently employees of Take-Two other than Eric Whiteford.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 38

AXINN | VELTROP | HARKRIDER | LLP

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

STEPHEN M. AXINN
(212) 728-2222
SMA@AVHLAW.COM

CONFIDENTIAL SUBMISSION UNDER HSR ACT

June 5, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Bureau of Competition
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20580

    Re:    Subpoena and CID Issued to Take-Two Interactive Software, Inc.

Dear Reid:

I am responding to your letter of June 4, 2008, in which you asserted that the FTC would seek judicial enforcement of the Subpoena and CID issued to Take-Two Interactive Software, Inc. ("Take-Two") in connection with the unsolicited and hostile cash tender offer made by Electronic Arts Inc. ("EA") for the shares of Take-Two. Given the cooperation that my client has extended to the Staff's investigation, I find your threat of litigation to be misplaced. Moreover, several assertions in your letter are incorrect.

Take-Two's cooperation with the Staff has been timely and extensive, not to mention extremely costly.

### Documents Produced

To date, including a production made via the Kroll ASP yesterday morning, we have produced 13,042 documents representing 362,292 pages in response to your May 15 letter and other requests. To produce these documents, Take-Two's attorneys have reviewed 122,409 documents representing 1,179,743 pages. Take-Two's attorneys have spent in excess of 3,500 hours reviewing these documents.

These documents come from the files of Take-Two's Senior Vice President of Sales (Robert Blau), the Senior Vice President of Marketing of 2K Games (Sarah Anderson), and 2K Games' Chief Operating Officer (David Ismailer). These three senior managers clearly have

Reid B. Horwitz, Esq.
June 5, 2008
Page 2

responsibilities for areas that would be of the most import to the Staff's investigation: sales, marketing and pricing. You agreed to these custodians in your May 15 letter, and we made productions from these custodians' files starting on May 22.

We also offered yesterday to produce additional files from three of the six new custodians you requested on May 28: Gary Dale, David Gershik and Erik Whiteford, individuals with sales and marketing responsibilities. (Doing so likely would provide the Staff with thousands of additional responsive documents.) However, we asked you to omit from the search documents held by Take-Two's CEO, Ben Feder, and the presidents of two divisions of Take-Two, Greg Thomas and Christoph Hartmann, because of the disruption such a search would have on these individuals' performance for Take-Two. We explained that David Ismailer, whose files have been and are still being produced, and whom we have offered for an investigational hearing, would be knowledgeable about the game development issues in which you are interested. In addition, Take-Two made several voluntary submissions to the Staff in response to the access letter of March 14.

I also note that you now, for the first time, are demanding the production of files from three additional custodians: Jason Argent, Evan Drew Smith and Christopher Snyder. Previously you had asked only for information on the identity and responsibilities of these individuals (which we provided to you last week).

### Testimony

You requested, on a May 28 conference call, that we make available for investigational hearings Robert Blau, David Ismailer and Sarah Anderson. We have agreed to provide all three of these employees for investigational hearings or phone interviews, depending on the Staff's preference. You also suggested on the May 28 call that you might seek investigational hearings of some of the six additional custodians you named on May 28. Your June 4 letter demands that Take-Two make available for investigational hearings the five of these six individuals who remain Take-Two employees (Feder, Dale, Gershik, Hartmann and Thomas), as well as the three individuals whose files you requested for the first time yesterday (Argent, Smith and Snyder). This would bring the total to eleven investigational hearings.

### Data

At the very first meeting in which our firm was involved, on May 7, you requested as your most urgent need a description of Take-Two's databases, presumably for use by the Bureau of Economics for its analysis. We provided a detailed letter on May 9 that described Take-Two's databases in detail and offered to make available to the FTC Take-Two personnel to explain the databases to the FTC so that the FTC could make tailored requests for data. Four weeks later, the FTC has yet to make any such request.

### Burden

The volume and scope of documents you request exceeds that which a company that had already agreed to a transaction would be asked to produce. We have explained several times that

Reid B. Horwitz, Esq.
June 5, 2008
Page 3

the burden the Staff is attempting to place on Take-Two is unreasonable given the nature of this transaction (hostile and by no means likely to occur under its current terms). To date, Take-Two has incurred legal bills of nearly $2 million in responding to the FTC's requests. The additional requests contained in your June 4 letter certainly will cost Take-Two several million dollars more, even without considering the open-ended demand contained in your final bullet point.

The Subpoena also is remarkable in that it seeks documents as far back as January 1, 2004, instead of for the FTC's usual 2-year period.

*    *    *    *

Contrary to your assertion, Take-Two has not "reneged" on any commitments to the Staff. As you know, as soon as we realized that the scope of the documentary requests in your May 8 letter, as applied to the voluminous nature of Take-Two's files, would delay any sort of meaningful production for many weeks, we contacted Staff and obtained a modification of the terms of your May 8 letter. I note, however, that Take-Two quickly complied with items 1, 4, 5, 7 and 8 of your May 8 letter; these were the items that Take-Two was able to comply with without searching through hundreds of thousands of pages of documents. We provided a subset of high-level documents responsive to items 2, 3 and 9 as well.

In seeking a modification of the document-intensive items in the May 8 letter (items 2, 3, 6 and 9), we explained that because Take-Two has maintained a litigation hold for a significant time, it would take Take-Two many weeks and millions of dollars in expenses to produce the responsive documents to Staff. Because Staff indicated an urgent need for Take-Two's information, we and Staff agreed to a modified request, as outlined in your May 15 letter. We promptly moved to comply with the terms of that modified agreement. We have not "reneged" on that or any other agreement with Staff and strongly disagree with any implication that we have.

We remain willing to discuss these issues with you in hopes of reaching an amicable agreement on modifications to the subpoena without the need for lengthy and costly litigation.

Sincerely,

Stephen M. Axinn

Stephen M. Axinn

cc:    Morris A. Bloom, Esq.

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 39

AXINN │ VELTROP │ HARKRIDER │ LLP

MICHAEL L. KEELEY
(212) 728-2231
mlk@avhlaw.com

AXINN, VELTROP & HARKRIDER LLP
114 WEST 47TH STREET  NEW YORK, NY 10036
TEL: 212.728.2200  FAX: 212.728.2201

1330 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
TEL: 202.912.4700  FAX: 202.912.4701

90 STATE HOUSE SQUARE  HARTFORD, CT 06103-3702
TEL: 860.275.8100  FAX: 860.275.8101

www.avhlaw.com

CONFIDENTIAL SUBMISSION
UNDER HSR ACT

June 16, 2008

VIA E-MAIL

Reid B. Horwitz, Esq.
Mergers II
Federal Trade Commission
601 New Jersey Avenue, NW
Washington, DC 20001

    Re:    Electronic Arts, Inc./Take-Two Interactive Software, Inc.

Dear Reid:

    This letter is to inform you of productions we submitted on behalf of Take-Two Interactive Software, Inc. ("Take-Two") on May 30, June 11 and June 12, 2008.

    On June 11 and 12, we produced 2,784 additional documents relating to Take-Two's basketball, football and hockey titles in response to your May 15 letter and the Request for Additional Information and Documentary Materials ("Second Request") and the Subpoena *Duces Tecum* ("Subpoena") issued to Take-Two on April 16, 2008 and April 21, 2008, respectively.  The documents in the June 11 and 12 productions all came from the files of David Ismailer and were marked with document control numbers **T2 – 0363040** through **T2 – 0480534**.

    On May 30, we produced 625 documents relating to Take-Two's basketball, football and hockey titles in response to your May 15 letter and the Second Request and Subpoena.  I mention that production in this letter because I have not sent you a separate transmittal letter for that production.  The documents in the May 30 production all came from the files of Robert Blau and were marked with document control numbers **T2 – 0288880** through **T2 – 0340591**.

    As before, these productions were made available to you and your team on the Kroll Database.

Reid B. Horwitz, Esq.
June 16, 2008
Page 2

　　　　The referenced productions all contain highly confidential business information; because they were provided in response to a Second Request and Subpoena, they are afforded the confidentiality protections of Section 7A(h) of the HSR Act and Section 21(c)-(d) of the FTC Act.

　　　　Take-Two requests that the produced documents, and any information derived from them, not be publicly disclosed and be held in the strictest confidence, to the fullest extent permitted under the laws, rules and regulations to which the FTC is subject.  Furthermore, Take-Two requests that such confidentiality be maintained by any person or other governmental body provided with access to such documents or information.

　　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　　Michael L. Keeley

F.T.C. v. Take-Two Interactive Software, Inc.
No. 08-mc-00360 (HHK)

# Opposition Exhibit 23

## REDACTED FOR ATTORNEY-CLIENT PRIVILEGE









----- Original Message -----
From: Batts, Alicia
To: 'Horwitz, Reid' <rhorwitz@ftc.gov>; Perrell, Jacqueline
Cc: Elmore, E. Eric <EELMORE@ftc.gov>; Tapp, Jacqueline <JTAPP@ftc.gov>; Ingrassia, John;
Zabriskie, Linda
Sent: Mon Apr 28 11:27:33 2008
Subject: RE: Take Two - Custodians

Are you available for a call after 3 to discuss the custodian list so that we can begining
collecting data?

---

From: Horwitz, Reid [mailto:rhorwitz@ftc.gov]
Sent: Friday, April 25, 2008 6:00 PM
To: Perrell, Jacqueline; Batts, Alicia
Cc: Elmore, E. Eric; Tapp, Jacqueline
Subject: RE: Take Two - Custodians


Thank you for sending over your suggestions of individuals whose files you believe are
likely to help us get up the learning curve as quickly as possible.  The goal here is to
find a group knowledgeable enough to have such information, and small enough to search
quickly and be available for investigational hearings.  To that end, would it make sense
to prioritize the production of the files of David Gershik, VP Sales 2K NA, over that of
Nicoletti, who Karl suggested was more in charge of "traffic?"  Would it also make sense
to include in the priority production the files of Christoph Hartmann, President of 2K
Games, Sarah Anderson, Senior VP Marketing, and the files of Eric Whiteford, former VP
Marketing for 2K Sports?  Why don't we talk about this Monday, and also talk next week
about the company's plans to comply with the CID, etc. beyond this priority production.
Have a good weekend.


-----Original Message-----
From: Perrell, Jacqueline [mailto:jperrell@proskauer.com]
Sent: Friday, April 25, 2008 4:01 PM
To: Horwitz, Reid
Cc: Elmore, E. Eric; Batts, Alicia; Tapp, Jacqueline
Subject: Take Two - Custodians

1

Good afternoon Reid:

The following is an initial list of custodians that we propose to search:

David Ismailer - COO and Senior Vice President - Publishing Operations - 2K Games Karl Slatoff - Executive Vice President Lainie Goldstein - CFO Nicole Nicoletti - Vice President - Sales Administration (North America)

Gary Dale - Executive Vice President - Sales Bob Blau - Sales (North America) Maeve Cronin - Vice President - Planning and Forecasting Doug Jones - President - Jack of all Games - Ohio Cindi Buckwalter, Executive Vice President of Investor Relations

But for Cindi Buckwalter, we have met with each of these individuals to gain an understanding of Take Two's business and how Take Two is organized, and believe that these are the appropriate people to search initially.

Please let us know if you are amenable to this initial list.

Best regards,
Jackie Perrell


Jacqueline W. Perrell | PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW | Suite 400 South | Washington, DC 20004-2533
V: 202.416.5821 | F: 202.416.6899
jperrell@proskauer.com | www.proskauer.com <http://www.proskauer.com/index.html>

*********************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

*********************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

=========================================================================
=====

*********************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

*********************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

=========================================================================